### THE UNITED STATES DISTRICT COURT FOR
### THE SOUTHERN DISTRICT OF FLORIDA

UNISOURCE DISCOVERY, INC.

      Plaintiff,

      v.

UNISOURCE DISCOVERY, LLC                **Case No. 1:20-cv-23276-DPG**
a California Limited Liability Company
and STEVEN A. CERASALE, Individually

      Defendants,

_____/

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S
### MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, UNISOURCE DISCOVERY, INC a *Florida* Corporation ("UNISOURCE" or

"Plaintiff"), by and through its undersigned counsel, hereby files this Emergency Motion for

Preliminary Injunction pursuant to Fed. R. Civ. P. 65 enjoining Defendants, UNISOURCE

DISCOVERY, LLC (hereinafter "UNI-CA" or "Defendant"), a *California* Limited Liability

Company, and STEVEN A. CERASALE, (hereinafter "CERASALE")[1] unlawful use and trading

on Plaintiff's well-known "UNISOURCE trademarks.

On its face, this is a very easy case — the parties' business names and marks are identical.

The services are related. The evidence shows that actual confusion has developed which

Unisource has been harmed, and preliminary injunctive relief undoubtedly is in the public's best

interest.

The Defendants' unlawful activities have caused and will continue to cause irreparable

injury to Plaintiff because Defendants have (1) deprived Plaintiff of their right to determine the

---

[1] Other than the fact that the entities are completely separate, different ownership, but share similar names, the plaintiff is a Florida Corporation whereas the defendant is a California limited liability company.

1

manner in which Plaintiff' trademarks are presented to the public; (2) defrauded the public into thinking Defendants' goods and services are the same; and (3) deceived the public as to Plaintiff' association with Defendants through, amongst other false misrepresentations, using same/similar website/email address[es] and has/continues to create confusion so to advance an effort to convert Unisource clients (*as discussed more fully, below*).

## FACTUAL BACKGROUND

1.     For 15-years, UNISOURCE continues to be a notably recognized digital document retrieval records company that conducts business throughout Florida and the Continental United States.  It is headquartered in Miami Florida. Amongst other and direct and indirect functions, UNISOURCE works with the legal community and businesses for litigation case management and support (a simple example, UNISOURCE offers digital records retrieval and process serving for nationally recognized insurance companies, law firms and the like.)

2.     UNISOURCE continuously infuses the latest technology to create paramount support. In doing so, UNISOURCE has earned a rather sizable client base and dedicated customers. This accolade has not come at a small expense. UNISOURCE has earned every client through significant investment capital, dedication, unparalleled support, and personalized care.

3.     CERASALE is the owner and Managing Director of UNI-CA -- a California company. UNISOURCE has no relation to UNI-CA; that is, with the exception of CERASALE. However, UNI-CA and UNISOURCE is otherwise in the same or similar business while each cover different territories.

4.     CERASALE has been a Shareholder and Board of Director of UNISOURCE since 2006 (14 Years).

5.     CERASALE, through UNI-CA, has advanced an intentional effort to expand UNI-CA coverage area to the State of Florida through using his position as a Shareholder and

Board of Director of UNISOURCE and exposure to UNISOURCE clients.

6.     Specifically, CERASALE and UNI-CA has communicated with UNISOURCE Florida Clients, among those CSK, and duped this client into trusting that CERASALE was UNISOURCE, to the extent that CERASALE and UNI-CA created an email account named "Florida Records" under **recordsfl@unisourcediscovery.com** to obtain work from CSK and other Florida UNISOURCE clients, knowing full well that this is a UNISOURCE client for over 10 years.

7.     Additionally, CERASALE through UNI-CA has directly contacted additional UNISOURCE clients in Louisiana, Georgia and Florida.

8.     CERASALE's initiation of a large-scale exodus from UNISOURCE through taking several clients under false pretenses by communicating untrue statements and allegations to clients that confuses the two different companies. Further, UNISOURCE sent CERASALE and UNI-CA a cease and desist. CERASALE and UNI-CA have ignored the cease and desist letters. See Exhibit "A"

9.     UNISOURCE extensive marketing gives it an advantage in the fiercely competitive market in Florida. UNISOURCE engages in print, digital and pointed marketing campaigns throughout Florida including, but not limited to other mediums.

10.     Desiring to ride on the coattails of UNISOURCE's success and marketing dollars, CERASALE sought a board position with UNISOURCE which allowed him the opportunity to build relationships in a short period of time with UNISOURCE's clients and methodically plan his likely abrupt exit and scheme to loot clients that he did NOT generate and that he did NOT contribute the funds necessary to originate those clients.

11.     As a result, Plaintiff advanced an action in this Court. [DE 1]

CERASALE Contractual Obligations to UNISOURCE

3

12.     The parties executed a Close Corporation Shareholder Agreement ("Shareholders Agreement") on June 28, 2010. See Exhibit B

13.     Pursuant to Shareholder Agreement ¶1.2(e),

"Without limiting the generality of the provisions of this Agreement set forth below relating to fiduciary duties, the Directors of the Company are **prohibited from engaging in any business or employment activities competitive to the business of the Company**. The parties hereto acknowledge and agree that the business of the Company includes expansion plans nationwide in the business of records retrieval, eDiscovery, and legal discovery case and records management. The parties agree that presently existing businesses operated by the Directors are complementary to the business of the Company, and it is anticipated that working relationships, cross referrals, another collaborative activities may be conducted between the Company and such other businesses."

(emphasis added)

14.     Pursuant to Shareholder Agreement ¶ 1.4, the parties agreed to separate territory when agreeing "The Subpoena Company. The parties acknowledge and agree that the Company shall have the exclusive rights to utilize the Florida Platform of "the Subpoena Company" to establish a presence in the region."

15.     Pursuant to Shareholder Agreement ¶1.10, the parties Fiduciary Duties agreed outlined and agreed upon, *to wit,*

"The Existing Shareholders acknowledge that officers, directors, managing agents, and other executive or high-level employees (collectively referred to herein as an "Employee" or "Employees") maintain a relationship with the Company in which high degrees of confidence and trust are reposed in the Employee. (Controlling shareholders also have certain fiduciary duties to the other shareholders of a company.) *An Employee's fiduciary duties to the Company include the following*:

(a)     **The Duty of Undivided Loyalty.** In addition to the straightforward meaning of those terms, the employee may not benefit himself, a competitor, or any other person, to the detriment of the Company, in anything which the employee does within the scope or during the term of his employment or on company time. All of employee's efforts and activities conducted while being compensated by the Company, or within the scope and course of the employment relationship, must be ***The Duty to Avoid Conflicts of Interest. The employee may not place himself in a position where he has obligations to any third party, or interests of his own, which are in any way in conflict with or competitive to the interests of his Company. If any such conflicting obligations or interests arise, the employee must remove himself from the situation or relationship which gives rise to such a conflict of interest.***

4

(b)   **The Duty of Full Disclosure**. The employee is ***obligated to disclose to the Company all information which comes into the possession of the employee which is relevant to the business or affairs of the Company*** including, without limitation, all information relating to the activities of the employee within the course and scope of his employment.

*(c)*   **The Duty to Avoid Self-Dealing**. The employee may not engage in any transaction, directly or through the use of third parties, middlemen, or otherwise, with the Company, without full disclosure to and consent from the Company as to all of the material terms and details of the transaction. The employee is not permitted to make "secret profits" of any kind. ***Secret profits include any profit or other type of benefit obtained by the employee which results from the employment relationship, or from any of the activities of the employee conducted in the course and scope of the employment relationship, which have not been fully disclosed to, and consented to by, the Company in all material respects and detail.***

(d)   **The Duty of Fair Dealing**. Transactions between the employee and the Company which are arranged, brought about, or conducted by the Employee, must be fair and reasonable as to the Company even if they are fully disclosed.

(e   **The Duty to make available to the Company all "Corporate, Business, or Partnership Opportunities"**. ***All business or commercial opportunities which fall within the type of business conducted by the Company, or which are within the type of business planned for future activities by the Company, or which are within the general scope of the types of business activities into which the Company might reasonably be expected to expand its business, are considered to fall within the "Corporate Opportunity Doctrine" (also referred to as the "Partnership Opportunity Doctrine" or the "Business Opportunity Doctrine" depending upon the form of the business entity involved).*** All business opportunities which fit that description, and which become available to or known by the employee during the term of his employment must be disclosed to and made available to the Company. ***The employee may not take advantage of any such business opportunities for his own account unless and until the Company has knowingly elected not to avail itself of each such opportunity after full disclosure of all material elements and details of the opportunity. (The employee still may be unable to avail himself of such a business opportunity if doing so would violate any of the employee's other fiduciary duties.)***

***In addition to and supplementing the foregoing fiduciary duties, there are also state and federal statutory and regulatory provisions, including, without limitation, Florida statute 607.0901,*** imposing duties and limitations with respect to transactions and activities of Company insiders and their affiliates.

To the extent they serve as officers, directors, managing agents, or other employees of the Company, the Existing Shareholders agree to abide by all such fiduciary obligations to the Company and its shareholders."

(emphasis added)

16.   In contemplation of a potential dispute, pursuant Shareholder Agreement ¶12, the

parties contractually agreed,

"Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. ***In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.*** The word "including" shall mean including without limitation and is used in an illustrative sense rather than a limiting sense. Terms used with initial capital letters will have the meanings specified, applicable to singular and plural forms, for all purposes of this Agreement. Reference to any gender will be deemed to include all genders and the neutral four."

(emphasis added)

17.     Under Shareholder Agreement ¶6 "Further Acts The parties to this Agreement shall promptly take such further acts and execute such other documents as shall be necessary to carry out the spirit and letter of this Agreement. Without limiting the generality of the foregoing, in the event any court, county recorder, secretary of state of any state, any federal agency, or any other governmental agency may require any additional or different documents or actions in order to effect the purposes contemplated by this Agreement, the parties to this Agreement shall execute the necessary documents and take the necessary steps to comply with those requirements.

18.     Notwithstanding that the Shareholders Agreement incorporates Florida Statute 607.0901, and indeed outlines significant obligations and duties including fiduciary duty, CERASALE through UNI-CA has continued to intentionally interfere with the business relations of UNISOURCE through attempting to convert clients and therefore compete and interfere with UNISOURCE business in Florida.

**THE DEFENDANTS INFRINGEMENT**

19.     UNISOURCE is the owner of the following United States Federal Trademark:



6

*Registration No. 3,634,516 and Serial No. 77594059, which registered on June 9, 2009 in International Class 045 and is used in connection with legal research.*

20.     The Plaintiff's registration is incontestable. A self-authenticated copy of the U.S. Trademark Registration is attached hereto as (Exhibit C).

21.     The Mark has been used in interstate commerce to identify and distinguish Unisource's high-quality legal support services and has been renewed under Section 8 (6-YR) and Section 8 (10-YR) on April 5, 2019. (Exhibit D)

22.     For the past (eleven) 11 years UNISOURCE allowed UNI-CA the Right to Use of Trademark to market and use the Registered Trademark in connection with the business relationship, at no cost to UNI-CA for such privilege.   During this time, both companies shared website, emails, marketing materials.

23.     On February 21, 2020, UNISOURCE notified UNI-CA and CERASALE that the Right to Use of Trademark had been revoked and provided proper notice via Email and U.S. Certified Mail to both parties.  The notice provided UNI-CA with the option to stop all further use of the Trademark, and requested that if UNI-CA wanted to continue to use the Trademark, it would be required to enter into a Licensing Agreement with UNISOURCE.  Failure to act would result in a Cease and Desist Letter. (Exhibit E)

24.     The Mark that Uni-CA is and has been wrongfully using that is virtually identical to Unisource's Mark can be easily seen in (Exhibit F)

25.     On May 12, 2020, UNISOURCE Counsel sent a Cease and Desist letter to UNI-CA and CERASALE via Email and U.S. Certified Mail of their continued Infringement of Trademark Rights of UNISOURCE. (Exhibit G)

26.     The Name and Mark has never been assigned or licensed to the Defendants

7

27. The Name and Mark is a symbol of UNISOURCE's quality, reputation and good will and has never been abandoned.

28. Defendants, a California company which have been using the name Unisource with full knowledge of Unisource's rights and growing actual confusion and reputation, have engaged the same business in State of Florida seeking Unisource's clients.

29. Most alarmingly, Defendants have now forayed beyond mere marketing and have systematically and continuously attempted to procure Unisource's existing clients because, amongst other reasons, CERASALE's position as a board member of Unisource (Florida) -- thus ensuring that Unisource's existing clients will confuse the two companies and confuse Unisource's mark with Uni-CA.

30. Defendants' fast-growing use of UNISOURCE likeness is causing [and will continue] to cause actual confusion among the public and irreparable injury to Plaintiff, thus justifying issuance of preliminary injunction.

31. Absent immediate injunctive relief, Plaintiff will continue to incur irreparable harm such that money damages will not adequately compensate Plaintiff. Accordingly, Plaintiff requests that the Court grant this motion pursuant to Fed. R. Civ. P. 65 and order immediate injunctive relief prohibiting Defendants' unlawful activities and the misuse of Plaintiff's trademarks, reputation and goodwill, pending trial and final judgment in this matter.

## **LEGAL STANDARD**

32. Plaintiff have filed claims pursuant to 15 U.S.C. sections 1114(1)(a), 1125(a), and 1125(d), and Florida's common law. Title 15 U.S.C. section 1116(a) provides the Court "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c),

or (d) of section 1125 of this title." 15 U.S.C. § 1116.

33.     Injunctive relief is also available under section 1116(a) for a violation of section 1114(1)(a). See id. § 1116(d)(1)(A).

34.     In order to obtain a temporary restraining order, a party must demonstrate "(1) [there is] a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non- movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (citation omitted); *see also Levi Strauss & Co. v. Sunrise Int'l. Trading Inc.*, 51 F. 3d 982, 985 (11th Cir. 1995) (applying the test to a preliminary injunction in a Lanham Act case).

35.     Additionally, a court may only issue a temporary restraining order without notice to the adverse party or its attorney if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party or can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required. FED. R. CIV. P. 65(b)(1).

36.     Ex parte temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameida Cnty, etc.*, 415 U.S. 423, 439 (1974) (footnote call number omitted). With respect to scope, generally, "persons who are not actual parties to the action or in privity with any of them may not be brought within the effect of a[n injunctive] decree merely by naming them in the order." Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 2956 (2d ed. 1995) (footnote call number

omitted).

37.     However, "a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 180 (1973) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)); see also FED. R. CIV. P. 65(d)(2).

38.     Specifically relevant to this case, 15 U.S.C. section 1114(2)(D) implicitly provides the Court with authority to request or order "[a] domain name registrar, domain name registry, or other domain name registration authority . . . [to] deposit[] with a court, in which an action has been filed regarding the disposition of the domain name, documents sufficient for the court to establish the court's control and authority regarding the disposition of the registration and use of the domain name." 15 U.S.C. § 1114(2)(D)(i).

## ANALYSIS

A.     Probability of Success on the Merits

1.     Counterfeiting and Infringement – 15 U.S.C. section 1114

39.     Section 32 of The Lanham Act, 15 U.S.C. section 1114, provides liability for trademark infringement if, without the consent of the registrant, a defendant uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive."

40.     To prevail on a trademark infringement claim, a plaintiff must demonstrate "(1) that it had prior rights to the mark at issue and (2) that the defendant had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1193 (11th Cir. 2001) (footnote call number and citation omitted).

41.     To evaluate likelihood of consumer confusion in a Lanham Act trademark claim,

the Eleventh Circuit has developed a seven-factor balancing test. See *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989). The seven factors are: "(1) type [or strength] of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion." *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1313 (11th Cir. 2001) (citation omitted); *see also Dieter*, 880 F.2d at 326.

42.     No single factor is dispositive. See *Lipscher*, 266 F.3d at 1313.

43.     When the Court considers these seven factors in light of the submissions provided by Plaintiff and it will conclude the balance of factors indicates there is a likelihood that consumers would confuse Defendants' websites/email addresses and with the Plaintiff.

44.     In particular, the submissions provided by Plaintiff supports the strength of Plaintiff's Marks, show that the goods and services sold by Defendants are nearly identical to Plaintiff' respective genuine products, indicate that both Plaintiff and Defendants target the same clients on the Internet, suggest that Defendants intended to benefit from the use of Plaintiff' brand reputation, and show that the client would actually confuse them for Plaintiff' real products.

45.     Accordingly, Plaintiff have shown a probability of success on the merits of their trademark counterfeiting and infringement claim under section 1114

2.      <u>False Designation of Origin – 15 U.S.C. section 1125(a)</u>

46.     The test for liability for false designation of origin under 15 U.S.C. section 1125(a) is the same as for a trademark counterfeiting and infringement claim — i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992).

47.     As just discussed in relation to Plaintiff's trademark counterfeiting and infringement claims, Defendants' services and products will be confused by consumers for

11

Plaintiff' genuine products. Therefore, Plaintiff have shown a likelihood of success on Plaintiff's claim of false designation of origin

48.     The Anticybersquatting Consumer Protection Act ("ACPA") protects the owner of a distinctive or famous trademark from another's bad faith intent to profit from the trademark owner's mark by registering or using a domain name which is identical or confusingly similar to, or dilutive of, the trademark owner's mark without regard to the goods or services of the parties. See 15 U.S.C. § 1125(d).

49.     To prevail under the ACPA, a plaintiff must prove: "(1) its mark is distinctive or famous and entitled to protection; (2) the defendant's domain name is identical or confusingly similar to the plaintiff's mark; and (3) the defendant registered or used the domain name with a bad faith intent to profit." *Bavaro Palace, S.A. v. Vacation Tours, Inc.*, 203 F. App'x 252, 256 (11th Cir. 2006) (citing *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)).

50.     As to the first element, the Unisource's Marks and all of Uni-CA Mark(s) are inherently distinctive because they are arbitrary as applied to the products and services which they identify — *i.e.,* they "do[] not suggest or describe the goods or services offered thereunder." *Victoria's Cyber Secret Ltd. P'ship v. V Secret Catalogue, Inc.*, 161 F. Supp. 2d 1339, 1349 (S.D. Fla. 2001) (citing *Frehling Enters., Inc. v. Int'l Select Grp., Inc.,* 192 F.3d 1330, 1335–36 (11th Cir. 1999)).

51.     Moreover, Unisource are indisputably known because it enjoys widespread recognition by the local business community.

52.     Regarding the second element — use of confusingly similar domain names — Plaintiff have supplied the domain/email names allegedly used by Defendants to confuse likeness of Plaintiff' products and services.

53.     The Court may seize control of the remaining Subject Domain Names which do

not themselves contain any of Plaintiff' Marks because the websites associated with those domain names allegedly promote and offer for sale goods which infringe Plaintiff's in violation of sections 1114 and 1125(a). *See Chanel, Inc. v. 2012 chanelbagsoutletstore.com et al,* 1:12-cv-22075-CMA (S.D. Fla. June 13, 2012) [ECF No. 6]. Case 1:13-cv-21230-CMA

54.    Sufficient evidence in their submissions to support the conclusion that these domain/email names are confusingly similar to Unisource Mark.

55.    With regard to the third element — whether Defendants registered the domain/email names with the bad faith intent to profit — when the Court considers the nine factors laid out in 15 U.S.C. section 1125(d)(1)(B)(i)(I)–(IX) it will conclude the submissions provided by Plaintiff adequately demonstrate Defendants registered the Subject Domain Names in bad faith to attract customers.

56.    Consequently, Plaintiff have shown a likelihood of success on the merits of their section 1125(d) claim Unfair Competition Under Florida's Common Law.

57.    Whether a defendant's use of a plaintiff's trademark creates a likelihood of confusion between the plaintiff's and the defendant's products is also the determining factor in the analysis of unfair competition under the common law of Florida. *See Rolex Watch U.S.A., Inc. v. Forrester,* No. 83–8381–Civ-Paine, 1986 WL 15668, at *3 (S.D. Fla. Dec. 9, 1986) ("The appropriate test for determining whether there is a likelihood of confusion, and thus trademark infringement, false designation of origin, and unfair competition under the common law of Florida, is set forth in *John H. Harland, Inc. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir. 1983).").

58.    As discussed in relation to Plaintiff's trademark counterfeiting and infringement claims, Plaintiff has established there is a likelihood of confusion regarding Defendants' use of Plaintiff's Marks on their counterfeit and infringing products and services.

59.     Accordingly, Plaintiff have also shown a likelihood of success on the merits of their common law unfair competition claim.

B.      Irreparable Injury

60.     The Eleventh Circuit has acknowledged that "once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim," 5 there is a "presumption of irreparable harm." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008) (citations omitted).

61.     However, the strength of this presumption has been called into question by the Supreme Court's decision in *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388 (2006). *See N. Am. Med. Corp.*, 522 F.3d at 1227-28 (discussing eBay).

62.     After eBay, a court may grant preliminary injunctive relief "without the benefit of a presumption of irreparable injury," or may "decide that the particular circumstances of the instant case bear substantial parallels to previous cases such that a presumption of irreparable injury is an appropriate exercise of its discretion in light of the historical traditions." *Id.* at 1228.

63.     As already discussed, based on Plaintiff's submissions to this point, there is a substantial likelihood that consumers will incorrectly believe Defendants' websites and products are approved or sponsored by Plaintiff.  Furthermore, the Defendants' have already created special emails to specifically target Plaintiffs clients in Florida, creating confusion and misrepresentations.

64.     Although the Court may be permitted to presume irreparable harm from the likely consumer confusion in this case, it is not necessary to rely on a presumption. The operation of Defendants' websites/emails displaying Plaintiff' similar Marks and the sale of Defendants' inferior services to consumers is likely to cause irreparable damage to Plaintiff's respective reputations if they continue because Plaintiff will not have the ability to control the quality of

14

what appears to be their services in the marketplace.

65.    This damage to Plaintiff' respective reputations and goodwill could not be easily quantified nor could it be undone through an award of money damages. *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008).

66.    As discussed in the legal standard section *supra,* injunctive relief is available on each of Plaintiff' four claims, not only the trademark infringement claim. *See* 15 U.S.C. § 1116(a).

C.    The Balance of Hardships

67.    Believing that the Honorable Court will be satisfied after reviewing Plaintiff's submissions that the risk to the reputations and goodwill associated with Plaintiff's Marks should Defendants' infringing activities continue outweighs any hardship to Defendants caused by enjoining those activities -- it does not appear that Defendants will suffer any legitimate hardship if a temporary restraining order is issued because they have no legal right to use Plaintiff' Marks on their website/email or to sell counterfeit versions of Plaintiff' Services through customers believing the two companies are the same.

D.    Public Interest

68.    The public has an interest in not being misled as to the origin, source, or sponsorship of trademarked products. *See Nailtiques Cosmetic Corp. v. Salon Sciences, Corp.*, No. 96-2709- CIV-NESBITT, 1997 WL 244746 at *5 (S.D. Fla. Jan 10, 1997) ("The interests of the public in not being victimized and misled are important considerations in determining the propriety of granting injunctive relief." (citing *Scarves By Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167 (2d Cir. 1976))).

69.    Here, Plaintiff has demonstrated that Defendants' websites/email and products/services mislead consumers into believing they are approved or sponsored by Plaintiff

15

and make it more difficult for a consumer to be sure he or she is purchasing a Plaintiff's genuine product.

## CONCLUSION

70.     Based on Plaintiff's Complaint, Application for an injunction, and evidentiary submissions, this Court has ample basis to conclude that the four-part test for injunctive relief has been satisfied.

71.     Moreover, because an immediate inaction would allow Defendants to funnel traffic to their current websites/emails and allow Defendants to continue selling counterfeit products/services, a temporary restraining order should issue.

72.     Accordingly, Plaintiff' Motion for a preliminary injunction should be granted, and ordered that Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with Defendants having notice of this Court's Order to temporarily restrained:

a.     From advertising, promoting, offering to sell, selling, distributing, or transferring any products/services bearing the Unisource Marks, or any confusingly similar trademarks, other than those actually manufactured or distributed by Plaintiff;

b.     From secreting, concealing, destroying, selling off, transferring, or otherwise disposing of: (i) any products/services, not distributed by Plaintiff, bearing the Unisource Marks; and

c.     Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with any Defendant having notice of this Order shall immediately discontinue the use of Unisource, or any confusingly similar trademarks.

d.     Pursuant to the executed Shareholder Agreement ¶1.2(d), Order Defendants to  …

16

*"disclose to the Company all information which comes into the possession of the employee which is relevant to the business or affairs of the Company including, without limitation, all information relating to the activities of the employee within the course and scope of his employment"* no later than <u>Ten (10) days from entering this Order</u> (**"The Duty of Full Disclosure**. The employee is obligated to disclose to the Company all information which comes into the possession of the employee which is relevant to the business or affairs of the Company including, without limitation, all information relating to the activities of the employee within the course and scope of his employment.")

### CERTIFICATE OF SERVICE

I hereby certify that this notice was served via the Florida Court E-Filing Portal on upon: Juan C. Zorilla, Esq., <u>jzorilla@fowler-white.com</u> Fowler, White, Burnett, P.A., counsel for Unisource Discovery, LLC and Steven A. Cerasale on this day 28th of <u>October</u>, 2020.

**DIEGO DAVID VALDES, P.A.**
2350 Coral Way, Suite 403B
Miami, FL 33145
Tel: 305-910-6602
Fax: 305-513-5924

By: /s/ *Diego David Valdes*
Diego David Valdes, Esq.
Florida State Bar No.: 251010
Email:  ddvlaw@gmail.com
          ddv@ddvlawgroup.com
Attorney for Plaintiff: Unisource Discovery, Inc.

Case No. 1:20-cv-23276-DPG

Unisource Discovery, Inc. v Unisource Discovery, LLC and Steven A. Cerasale

# Exhibit A



Miami, February 21, 2020                              VIA Email & Certified Mail

Unisource Discovery, LLC
c/o Mr. Steven A. Cerasale
625 The City Drive, Suite 303
Orange, CA 92868

Mr. Steven A. Cerasale
2881 Forrester Drive
Los Angeles, CA 90064

RE:  Right to Use of Trademark

Mr. Cerasale,

Please be advised that effective immediately, Unisource Discovery, LLC no longer has the Right to Use, Market or Transact business under the USPTO Registered Trademark of Unisource Discovery:

To this end, we are offering Unisource Discovery, LLC the option of a Licensing Agreement for the Right to Use and Transact under the Registered Trademark.

This offer is good for a period of 14 days from the receipt of this notice.  If on the 15th day we have not received word in writing, we will proceed with a Cease & Desist Letter to cure all operations and infringements under said Trademark.

Sincerely Yours,
/S/ Noel Mijares
Noel Mijares
CEO, President


cc. USPTO-udld.f


555 NE 15th Street – 9th Floor – Miami – Florida 33132
T.866.580.0002 F.866.580.9070

Case No. 1:20-cv-23276-DPG

Unisource Discovery, Inc. v Unisource Discovery, LLC and Steven A. Cerasale

# Exhibit B

# CLOSE CORPORATION SHAREHOLDER AGREEMENT

This Close Corporation Shareholder Agreement (this "Agreement") is entered into as of June 28, 2010, by and between Alfred W. Lutter, III ("Lutter"), Noel Mijares ("Mijares"), Lisa D. Cote ("Cote"), Steven Cerasale ("Cerasale"), and Unisource Discovery, Inc., a Florida corporation ("Company").

## RECITALS

A.      Concurrently herewith the parties to this Agreement are entering into that certain Stock Purchase and License Agreement of even date herewith (the "Stock Purchase and License Agreement").

B.      Mijares, Cote, and Cerasale (collectively, "Existing Shareholders") are the existing shareholders of Company.  Effective at and following the Closing (as defined in Section 4 below), the Existing Shareholders and Lutter shall collectively be referred to as the "Shareholders" and individually as a "Shareholder".

C.      Company operations have heretofore been conducted pursuant to, in part, that certain Operating Agreement dated effective as of June 15, 2006, by and among the Existing Shareholders (the "Operating Agreement") is made part of the Unisource Discovery, Inc. Corporate By-Laws.

D.      The parties now wish to restate, amend, and incorporate into this Agreement provisions regarding certain ongoing rights and obligations of the parties previously set forth in the Operating Agreement, and to provide for certain additional shareholder protections for the benefit of each of the Shareholders.

Accordingly, the parties to this Agreement hereby agree as follows:

## AGREEMENT

1.      Corporate Governance in General.

1.1     Operating Agreement.  The Operating Agreement is terminated effective as of the Closing and shall be of no further force or effect following the Closing.  The provisions of the Operating Agreement are superseded by the provisions of this Agreement.

1.2     Board of Directors.

(a)     The Board of Directors shall consist of a total of three board seats, unless such arrangement is changed in the corporate bylaws by a majority vote and written consent of the shareholders voting on the basis of shares held by each of them.

(b)    Notwithstanding any provision to the contrary set forth in the Articles or Bylaws of the Company, the Board of Directors of the Company shall consist of Cerasale, Mijares, and Cote (the "Directors"). The Directors shall remain in such positions from year-to-year until such time as they may be removed by resignation, death, disability, or written consent of the Shareholders. Annual shareholder meetings for the purpose of electing directors shall not be required and are hereby waived. Each Director shall devote only such time and effort as such Director deems appropriate for the furtherance of the Company's business.

(c)    Without limiting the generality of the provisions of this Agreement set forth below relating to fiduciary duties, the Directors of the Company are prohibited from engaging in any business or employment activities competitive to the business of the Company. The parties hereto acknowledge and agree that the business of the Company includes expansion plans nationwide in the business of records retrieval, eDiscovery, and legal discovery case and records management. The parties agree that presently existing businesses operated by the Directors are complementary to the business of the Company, and it is anticipated that working relationships, cross referrals, another collaborative activities may be conducted between the Company and such other businesses.

1.3    Trademark. UNISOURCE DISCOVERY DIGITAL DOCUMENT RETRIEVAL is a registered US trademark of the Company. Without limiting the foregoing, the parties agree that the Company shall be entitled to use the trademark "Unisource Discovery", as part of its corporate name, Unisource Discovery, Inc., or as a fictitious business name, or otherwise.

1.4    The Subpoena Company. The parties acknowledge and agree that the Company shall have the exclusive rights to utilize the Florida Platform of "the Subpoena Company" to establish a presence in the region.

1.5    Company Bylaws. Effective at or before the Closing, the Existing Shareholders shall, by unanimous written consent, adopt bylaws in the form attached hereto as Exhibit "A".

1.6    Corporate Minute Book. At or before the Closing, the Company shall create or update a corporate minute book, to be maintained in the custody of the president or secretary of the Company, or such other custodian as may be authorized by the Board of Directors of the Company, containing copies of the Articles of Incorporation, the amendment thereto provided for herein below, the corporate bylaws adopted as provided herein, a stock ledger recording the issuance and transfer of the Common Stock, all minutes and forms of actions by written consent of the shareholders and directors, including such items as are contemplated as set forth in this Agreement, a copy of the current annual statement as filed with the Florida Department of State together with such prior annual filings as may be available, a copy of the statement of registered agent

accepting appointment as such, and such other corporate organizational documents and filings as are customarily maintained in such minute books.

1.7    Annual Meeting, Election of Directors, Election of Officers. At or before the Closing, the Existing Shareholders shall, by unanimous written consent, conduct the annual meeting of shareholders of the Company and elect directors for the following year and shall, immediately thereafter, use their best efforts to cause the directors so elected to conduct the annual organizational meeting of directors for the purpose of electing the officers of the Company for the following year.

1.8    Amendment of Articles. At or before the Closing, the Existing Shareholders shall, by unanimous written consent, authorize and adopt an amendment to the Articles of Incorporation of the Company, and the Company shall cause to be filed with the Florida Department of State the amendment so adopted and further providing that, "Stockholder agreements imposing reasonable restrictions on transfer of stock are authorized and permitted."

1.9    Compliance with Laws and Governing Instruments. The Existing Shareholders who may, from time to time, serve as officers, directors, or managing agents of the Company shall use their best efforts to observe and comply with, and to cause the Company to observe and comply with, the articles and bylaws all the Company together with all federal, state and local statutes, regulations, ordinances and administrative rules and orders applicable to the conduct of the business of the Company and its corporate existence and organization. Without limiting the foregoing, (i) at or before the Closing the Existing Shareholders shall confirm that the annual statement required to be filed with the Florida Department of State is current or, if not current, shall immediately file and bring current such annual statement; (ii) the Company shall prepare and deliver to its Shareholders, as required by Florida law Section___, annual financial statements that include balance sheet, income statement and statement of cash flow for each fiscal year.

1.10    Fiduciary Duties. The Existing Shareholders acknowledge that officers, directors, managing agents, and other executive or high-level employees (collectively referred to herein as an "Employee" or "Employees") maintain a relationship with the Company in which high degrees of confidence and trust are reposed in the Employee. (Controlling shareholders also have certain fiduciary duties to the other shareholders of a company.) An Employee's fiduciary duties to the Company include the following:

   (a)    The Duty of Undivided Loyalty. In addition to the straightforward meaning of those terms, the employee may not benefit himself, a competitor, or any other person, to the detriment of the Company, in anything which the employee does within the scope or during the term of his employment or on company time. All of employee's efforts and activities conducted while being compensated by the Company, or within the scope and course of the employment relationship, must be undertaken solely in the interests of the Company.

(b)   The Duty to Avoid Conflicts of Interest. The employee may not place himself in a position where he has obligations to any third party, or interests of his own, which are in any way in conflict with or competitive to the interests of his Company. If any such conflicting obligations or interests arise, the employee must remove himself from the situation or relationship which gives rise to such a conflict of interest.

(c)   The Duty of Full Disclosure. The employee is obligated to disclose to the Company all information which comes into the possession of the employee which is relevant to the business or affairs of the Company including, without limitation, all information relating to the activities of the employee within the course and scope of his employment.

(d)   The Duty to Avoid Self Dealing. The employee may not engage in any transaction, directly or through the use of third parties, middlemen, or otherwise, with the Company, without full disclosure to and consent from the Company as to all of the material terms and details of the transaction. The employee is not permitted to make "secret profits" of any kind. Secret profits include any profit or other type of benefit obtained by the employee which results from the employment relationship, or from any of the activities of the employee conducted in the course and scope of the employment relationship, which have not been fully disclosed to, and consented to by, the Company in all material respects and detail.

(e)   The Duty of Fair Dealing. Transactions between the employee and the Company which are arranged, brought about, or conducted by the Employee, must be fair and reasonable as to the Company even if they are fully disclosed.

(f)   The Duty to make available to the Company all "Corporate, Business, or Partnership Opportunities". All business or commercial opportunities which fall within the type of business conducted by the Company, or which are within the type of business planned for future activities by the Company, or which are within the general scope of the types of business activities into which the Company might reasonably be expected to expand its business, are considered to fall within the "Corporate Opportunity Doctrine" (also referred to as the "Partnership Opportunity Doctrine" or the "Business Opportunity Doctrine" depending upon the form of the business entity involved). All business opportunities which fit that description and which become available to or known by the employee during the term of his employment must be disclosed to and made available to the Company. The employee may not take advantage of any such business opportunities for his own account unless and until the Company has knowingly elected not to avail itself of each such opportunity after full disclosure of all material elements and details of the opportunity. (The employee still may be unable to avail himself of such a

business opportunity if doing so would violate any of the employee's other fiduciary duties.)

In addition to and supplementing the foregoing fiduciary duties, there are also state and federal statutory and regulatory provisions, including, without limitation, Florida statute 607.0901, imposing duties and limitations with respect to transactions and activities of Company insiders and their affiliates.

To the extent they serve as officers, directors, managing agents, or other employees of the Company, the Existing Shareholders agree to abide by all such fiduciary obligations to the Company and its shareholders.

1.11    General Corporate Management. Except as otherwise expressly provided in this Agreement, the business and affairs of the Company shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors. Notwithstanding the foregoing, neither the Company nor any officer or Director of the Company may engage, permit, waive, or suffer any breach of fiduciary duty to the Company or its shareholders other than with the express written consent of all of the Shareholders].

1.12    Taxes; Dividends of Distributable Cash. To the extent reasonably possible to do so given the financial capabilities of the Company, the Board of Directors of the Company shall declare and the Company shall distribute dividends at least quarterly to the Shareholders in an annualized amount not less than 50% of the net income projected to be reported on the shareholder K-1s for the then current taxable year for federal income taxes. The Company shall timely provide the Shareholders with federal and state K-1s, including K-1s compliant with the requirements of the state of residence of the Shareholders, with copies of the full federal and any state tax returns filed by the Company.

1.13    Access to Records. The Shareholders shall have access at all reasonable times to all Company financial information, including through access to accounting software utilized by Company, together with the corporate minute book, and other corporate records generally.

1.14    Indemnity. The Company shall indemnify any Director and may indemnify any officer or other person who was or is a party to, or threatened to be made a party to, any pending or completed action, suit, or proceeding by reason of the fact that he or she or it is or was an officer, director, employee, or agent, or is or was serving at the request or for the benefit of the Company, to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

2.      Tag-Along Right.

2.1     In the event that any of the Existing Shareholders (the "Offering Party") shall determine to sell shares of Common Stock to any person or entity (individually a "Third Party" and collectively, "Third Parties") in any one transaction or any series of related

transactions, directly or indirectly, such sale or other disposition shall not be permitted unless the Offering Party shall offer (or cause the Third Party to offer) to the other Shareholders the right to elect to include, at the sole option of such other Shareholders, such number of shares of Common Stock owned by the other Shareholders making such election as shall be determined in accordance with subsection 2.2 below in the sale or other disposition to the Third Party. The Offering Party shall give written notice to the other Shareholders describing the transactions (the "Tag-Along Notice"). At any time within sixty (60) days after the giving of the Tag-Along Notice, any one or more of the other Shareholders may make an election to include any number of shares of Common Stock owned or controlled by such other Shareholders in such a sale or other disposition (the "Inclusion Election") by giving written notice thereof to the Offering Party proposed proposing to sell such Common Stock and delivering to the Offering Party a stock certificate or certificates representing such shares (the "Tag-Along Shares"), together with a limited power of attorney authorizing the Offering Party to sell or otherwise dispose of such Tag-Along Shares pursuant to the terms of such Third Party's offer.

2.2     The other Shareholders who make such Inclusion Election (the "Included Shareholders") shall have the right to sell, pursuant to the Third Party's offer, that percentage of the shares of Common Stock of each the Included Shareholders which shall be equal to the ratio (expressed as a percentage) of the shares of Common Stock to be sold by the Offering Party as compared to the aggregate number of shares of Common Stock then owned by the Offering Party; provided, however, that if the Third Party's offer is for a maximum number of shares of Common Stock, and such number is less than the number that would be sold by application of the foregoing, then the right to sell Common Stock pursuant to the Third Party's offer shall be allocated on a pro rata basis between the Offering Party and the Included Shareholders in proportion to the number of shares of Common Stock owned by the Offering Party and the Included Shareholders.

2.3     The purchase from the Included Shareholders pursuant to this Section 2 shall be on the same terms and conditions, including the price per share and the date of sale or other disposition, as are received by the Offering Party and stated in the Tag-Along Notice.

2.4     Promptly (but in no event later than five business days) after the consummation of the sale or other disposition of shares of Common Stock of the Offering Party and the Included Shareholders to the Third Party pursuant to the Third Party's offer, the Offering Party shall (i) notify the Included Shareholders of the completion thereof, (ii) cause to be remitted to the Included Shareholders the total sales price attributable to the shares of Common Stock which the Included Shareholders sold or otherwise disposed of pursuant thereto, and (iii) furnish such other evidence of the completion and time of completion of such share or other disposition and the terms thereof as may be reasonably requested by the Included Shareholders.

2.5     If, within sixty (60) days after the Tag-Along Notice is given, no other Shareholders have accepted the offer to make an Inclusion Election, the other Shareholders will be deemed to have waived any and all of their rights to participate in the sale or other disposition of shares of Common Stock pursuant to this Section 2.

Promptly upon the earlier of expiration of such sixty (60) day period, written waiver by all of the other Shareholders of any Tag-Along rights under this Section 2, or receipt of an Inclusion Election from any of the other Shareholders, Offering Party shall give the right of first refusal "Notice" as defined in Section 3.1 (a) below.

2.6     If, at the end of the time period specified hereinbelow for completion of any such sale, Offering Party shall not have completed the sale of shares of Common Stock and the Included Shareholders in accordance with the terms of the Third Party's offer, Offering Party shall return to the Included Shareholders all certificates representing shares of Common Stock which the Included Shareholders shall have delivered for sale pursuant to Section 2.1 above, and each of the restrictions on sale contained in this Agreement with respect to Common Stock owned by Offering Party shall again be in effect.

2.7     The rights provided in this Section 2 shall not be applicable to any merger or other reorganization involving the Company in which the shares of Common Stock owned by any Shareholder are in substantial part exchanged for or converted into securities of another corporation or cash or both.

3.     Right of First Refusal.

3.1     **Definitions**. For purposes of this Section 3, Right of First Refusal, in addition to terms defined elsewhere herein, the following terms shall have the definitions ascribed to them below:

(a)     **Notice**. "Notice" shall mean the notice to be provided by an Offering Party of the intended issuance, sale, transfer, assignment or other disposition of any Offered Shares. The Notice shall contain all of the conditions of the Offering Party's intended disposition of the Offered Shares, and shall constitute the Offering Party's offer to sell the Offered Shares to the Remaining Shareholders on the terms specified herein. If the Offering Party has received a bona fide offer from a third party to purchase the Offered Shares, such Notice shall contain all material terms and conditions of such offer, including the name of the proposed purchaser, the purchase price and terms of payment for the Offered Shares, or if such Offering Party intends a gift or other transfer of the Offered Shares other than sale, the terms and conditions thereof.

(b)     **Offered Shares**. "Offered Shares" shall mean any shares of Common Stock (or any other shares or equity interest, or right or option to acquire shares or equity interest in or to the Company) proposed to be issued, sold, transferred, or otherwise disposed of by the Offering Party. If any other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, the Offered Shares shall be deemed to include the Common Stock of the Included Shareholders to be included in the sale or other disposition of shares as determined pursuant to Section 2 above.

(c)    **Offering Party**. "Offering Party" shall mean the Company or the Shareholder who desires to sell, transfer, assign or dispose of any Offered Shares, together with the legal heirs, successors and assigns of such Shareholder or the Company. If any other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, the Included Shareholders shall be deemed to be included within the meaning of Offering Party for purposes of this Section 3.

(d)    **Remaining Shareholders**. "Remaining Shareholders" shall mean the Shareholders other than the Offering Party. If any other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, the Included Shareholders shall not be included within the term Remaining Shareholders for purposes of this Section 3. If no other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, all other Shareholders shall be deemed to be included among the Remaining Shareholders for purposes of this Section 3.

3.2    **Grant**. The Company and each Shareholder hereby grants to each of the other Shareholders, and each Shareholder hereby grants to the Company, a right of first refusal to purchase the Offered Shares on the terms specified herein, subject to the condition that in the event the Company and the Remaining Shareholders, as applicable, do not elect to purchase all of the Offered Shares, the Offering Party shall not be required to sell any of the Offered Shares to the Company or the Remaining Shareholders. The Offering Party agrees to sell the Offered Shares to the Company and the Remaining Shareholders in accordance with the terms of this Section 3. In accordance with such right of first refusal, the Offering Party shall, prior to the intended sale, transfer, assignment or other disposition of the Offered Shares, give Notice thereof to the Remaining Shareholders.

3.3    **Exercise Period; Unsubscribed Shares**. The Remaining Shareholders and the Company, as applicable, shall have the right, for a period of ninety (90) days from the date of the Notice (such date being determined in accordance with Section 7 below) to collectively purchase all but not less than all of the Offered Shares for the price and on the terms set forth in the Notice, or on terms no less favorable that those set forth in the Notice.

3.4    **Manner of Exercise**. If any of the Remaining Shareholders or the Company wish to exercise their rights of first refusal, they shall so notify each of the Offering Party, the Company, and the Remaining Shareholders, in writing, within a period of sixty (60) days from the date of the Notice. The Remaining Shareholders and the Company, where applicable, may each elect to purchase any number or all of the Offered Shares and shall specify the number which they elect to so acquire in their written notice. If the number of shares which the Company and the Remaining Shareholders elect in the aggregate to purchase exceeds the total number of Offered Shares, the Company shall purchase or acquire all of the number of the Offered Shares specified by it in its notice given pursuant to this Section 3.4, and any Offered Shares remaining thereafter shall be purchased or acquired by the Remaining Shareholders in such portions of the remainder of the Offered

Shares not purchased or acquired by the Company proportionate to the number of Offered Shares specified in their respective notices given pursuant to this Section 3.4. If the number of shares which the Company and the Remaining Shareholders elect in the aggregate to purchase exceeds the total number of Offered Shares, the Company and the Remaining Shareholders may increase the number of the Offered Shares which they elect to purchase by giving written notice to each of the Offering Party, the Company, and the Remaining Shareholders not later than ninety (90) days from the date of the original Notice. Upon receipt of notices of exercise sufficient to acquire all of the Offered Shares, the Company and the Remaining Shareholders shall be bound to purchase, and the Offering Party shall be bound to sell, the Offered Shares. The closing of such transaction shall take place at the principal executive offices of the Company on that date five (5) business days following the expiration date of the right of first refusal. If notices of exercise sufficient to acquire all of the Offered Shares have not been delivered within ninety (90) days from the date of the original Notice pursuant to the foregoing provisions, then all of the Offered Shares may be sold or otherwise transferred by the Offering Party only to the person or persons specified in the Notice, within a period of ninety (90) days after the expiration of the right of first refusal provided herein. Such sale or other disposition shall be made to such persons only upon the terms and conditions contained in the Notice.

3.5     **Appraisal**. In the event the terms offered by the third party purchaser involve the transfer or assignment to the Offering Party of consideration other than cash, the Remaining Shareholders shall be entitled to exercise their rights of first refusal by tendering, in lieu of such consideration, cash in the amount of the fair market value thereof. The fair market value shall be determined by an independent appraiser selected by the Remaining Shareholders and who is reasonably acceptable to the Offering Party. The cost of the appraisal performed pursuant to this Section 3.5 shall be borne in equal amounts by the Offering Party on the one hand and the Remaining Shareholders on the other hand. In the event the fair market value of the property is determined in the above manner, the period specified in Section 3.3 above during which the Remaining Shareholders may elect to exercise their rights to purchase the Offered Shares shall be extended until that date ninety (90) days from the date on which the parties are notified of such appraised fair market value.

3.6     Notwithstanding the foregoing, any Shareholder shall have the right to transfer by gift all or any portion of his interest in his Common Stock to his spouse, children or grandchildren, or to a trust established by such Shareholder for the benefit of himself, his spouse, children or grandchildren, without such transfer being subject to the provisions of this Section 3; provided that the recipient of such gift shall agree in writing prior to the completion of the transfer to be bound by the terms and conditions of this Agreement including, without limitation, this right of first refusal.

4.     Closing. The "Closing" hereunder, at which time those documents to be delivered at the Closing, as specified elsewhere herein and in the Stock Purchase and License Agreement, shall be delivered, and at or by which time those acts or events to be effected at or before the Closing, as specified herein, shall take place by electronic exchange of documents at such time as may be agreed upon by the parties hereto but, in any event, not later than 2:00 PM Pacific Standard

Time, on June 28, 2010. The Closing hereunder and under the Stock Purchase and License Agreement shall occur simultaneously.

5.    Representations and Warranties of the Parties. Each of the representations and warranties set forth in the Stock Purchase and License Agreement are hereby incorporated herein by this reference and each of the parties hereto, and Company's agent or agents executing this Agreement on behalf of Company, hereby jointly and severally, reiterate and reconfirm such warranties and representations.

6.    Further Acts. The parties to this Agreement shall promptly take such further acts and execute such other documents as shall be necessary to carry out the spirit and letter of this Agreement. Without limiting the generality of the foregoing, in the event any court, county recorder, secretary of state of any state, any federal agency, or any other governmental agency may require any additional or different documents or actions in order to effect the purposes contemplated by this Agreement, the parties to this Agreement shall execute the necessary documents and take the necessary steps to comply with those requirements.

7.    Notices. Unless otherwise provided herein, any notice, offer, exercise of rights or other communication required or permitted to be given hereunder shall be in writing and shall be given by registered or certified mail, confirmed facsimile or telecopy (with a hard copy deposited in overnight mail), or overnight delivery service such as Federal Express if a receipt is obtained showing delivery, at such party's address set forth next below or such other address as such party may hereafter specify by notice to the other parties hereto, or by actual personal delivery. Any notice or other communication shall be deemed to have been given as of the date so personally delivered or transmitted by confirmed telecopy or like transmission, on the date of delivery shown on the receipt when sent by overnight delivery service, or on the date shown on the return receipt for delivery or, if refused, the date of first attempted delivery, when given by registered or certified mail. Any party may change its address for notice by notice to the other party given in accordance with this Section. Address and fax numbers for such notice are as follows:

If to Lutter, to:

> Mr. Alfred W. Lutter, III
> Lutter Consulting
> 2934 Quarry Mountain Road
> Park City, UT 84098
> Facsimile:  435-655-9292
> Confirming no:  (949) 500-2007

With a copy to:

> Ed Sybesma, Esq.
> Rutan & Tucker, LLP
> 611 Anton Boulevard
> Suite 1400
> Costa Mesa, CA 92626
> Facsimile:            (714) 546-9035

| | |
|---|---|
| Confirming no: | (714) 641-3427 |

If to Company, to:

| | |
|---|---|
| Name: | Noel Mijares |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 5810 Biscayne Blvd |
| City, State, ZIP: | Miami, FL  33137 |
| Facsimile: | 866-580-9070 |
| Confirming no: | 305-757-5739 |

With a copy to:

| | |
|---|---|
| Name: | Lisa Cote |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 5810 Biscayne Blvd |
| City, State, ZIP: | Miami, FL  33137 |
| Facsimile: | 866-580-9070 |
| Confirming no: | 305-757-5739 |

And a copy to:

| | |
|---|---|
| Name: | Steven Cerasale |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 2881 Forrester Avenue |
| City, State, ZIP: | Los Angeles, CA 90064 |
| Facsimile: | 310-837-5588 |
| Confirming no: | 310-837-2889 |

8.     Entire Agreement. This Agreement together with the exhibits hereto and the Stock Purchase and License Agreement effective concurrently herewith constitute the entirety of the agreements between the parties hereto concerning the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties, and there are no warranties, representations or agreements, express or implied, among the parties except as set forth herein. No amendment, supplement, modification, waiver, or termination of this Agreement, or any provision hereof, shall be binding unless executed in writing by the party against whom any of the foregoing is sought to be enforced. No waiver of any provision of this Agreement shall constitute a waiver of any other provision (whether similar or not), nor shall any waiver constitute a continuing waiver unless otherwise expressly provided hereunder or in writing signed by the party against whom any such waiver is sought to be enforced.

9.    Counterparts. This Agreement may be executed in counterparts, and each executed counterpart shall be deemed to be a duplicate original of this Agreement. This Agreement may be delivered by facsimile or other electronic communication. Facsimile or electronic images of signatures shall be treated as original signatures for all applicable purposes.

10.    Headings. The captions and headings contained in this Agreement are for convenience only and shall not affect the construction or interpretation of any provisions of this Agreement.

11.    Attorneys' Fees. If any party breaches any obligation under this Agreement, or any dispute arises out of or with respect to this Agreement, the non-breaching party (or the prevailing party in the event of any litigation or alternate dispute resolution procedure) shall be entitled to its reasonable expenses, attorneys' fees, experts' fees, and costs, incurred as a result of any such breach, dispute, or litigation, including, without limitation, in any action taken, with or without litigation, to enforce, work out, or renegotiate the terms of this Agreement, or to remedy or compensate for such breach.

12.    Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The word "including" shall mean including without limitation and is used in an illustrative sense rather than a limiting sense. Terms used with initial capital letters will have the meanings specified, applicable to singular and plural forms, for all purposes of this Agreement. Reference to any gender will be deemed to include all genders and the neutral form.

13.    No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any person other than the parties hereto and their permitted successors and assigns, and only in accordance with the express terms of this Agreement.

14.    Reformation and Severability of Provisions. If any provision of this Agreement is declared invalid, in whole or in part, by a court of competent jurisdiction, such provision may be modified or limited in its effect to the extent necessary to cause it to be enforceable. If any provision cannot be so modified or limited, then such provision shall be severed and the remainder of this Agreement shall remain in full force and effect.

15:    Applicable Law. The obligations, rights , duties, powers and remedies under this agreement shall be governed and construed by the laws of the State of Florida. If any legal action is necessary to enforce the terms and conditions of this agreement, the parties agree that the Circuit Court of Miami Dade County Florida, or, if applicable, federal district court sitting in Miami Dade county, shall be the sole venue and jurisdiction for the bringing of such action.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Dated: June 28, 2010

_____
Alfred W. Lutter, III

Dated: June 28, 2010

_____
Noel Mijares

Dated: June 28, 2010

_____
Lisa D. Cote

Dated: June 28, 2010

_____
Steven Cerasale

Dated: June 28, 2010

Unisource Discovery, Inc., a Florida corporation

By: _____
Noel Mijares, CEO, President

By: _____

_____, Secretary

Case No. 1:20-cv-23276-DPG

Unisource Discovery, Inc. v Unisource Discovery, LLC and Steven A. Cerasale

# Exhibit C



United States Patent and Trademark Office

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

# Trademarks > Trademark Electronic Search System (TESS)

TESS was last updated on Wed Oct 28 04:07:23 EDT 2020

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout   Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

TSDR   ASSIGN Status   TTAB Status   ( Use the "Back" button of the Internet Browser to return to TESS)

UNISOURCE
DISCOVERY
DIGITAL DOCUMENT RETRIEVAL

| | |
|---|---|
| **Word Mark** | **UNISOURCE DISCOVERY** DIGITAL DOCUMENT RETRIEVAL |
| **Goods and Services** | IC 045. US 100 101. G & S: Legal research. FIRST USE: 20010301. FIRST USE IN COMMERCE: 20010301 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 26.11.21 - Rectangles that are completely or partially shaded |
| **Trademark Search Facility Classification Code** | SHAPES-GEOMETRIC Geometric figures and solids including squares, rectangles, quadrilaterals and polygons<br>SHAPES-MISC Miscellaneous shaped designs |
| **Serial Number** | 77594059 |
| **Filing Date** | October 16, 2008 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | March 24, 2009 |
| **Registration Number** | 3634516 |
| **Registration Date** | June 9, 2009 |
| **Owner** | (REGISTRANT) Unisource Discovery CORPORATION FLORIDA 555 NE 15th Street, 9th Floor 934-A Miami FLORIDA 33132 |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "DISCOVERY DIGITAL DOCUMENT RETRIEVAL" APART FROM THE MARK AS SHOWN |
| **Description of Mark** | Color is not claimed as a feature of the mark. The mark consists of the stylized word "Unisource" reversed out on a shaded rectangle, with the stylized word "Discovery" below it and the stylized wording "Digital Document Retrieval" below that. |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 8 (6-YR). SECTION 8(10-YR) 20190405. |

| **Renewal** | 1ST RENEWAL 20190405 |
| **Live/Dead Indicator** | LIVE |

TESS HOME  NEW USER  STRUCTURED  FREE FORM  BROWSE DICT  SEARCH OG  TOP  HELP

| HOME | SITE INDEX| SEARCH | *e*BUSINESS | HELP | PRIVACY POLICY

tmsearch.uspto.gov/bin/showfield?f=doc&state=4807:pgiyyt.2.1

Case No. 1:20-cv-23276-DPG

Unisource Discovery, Inc. v Unisource Discovery, LLC and Steven A. Cerasale

# Exhibit D

For assistance with TSDR, email **teas@uspto.gov** and include your serial number, the document you are looking for, and a screenshot of any error messages you have received.

| STATUS | DOCUMENTS | MAINTENANCE | | Back to Search | Print |

**Generated on:** This page was generated by TSDR on 2020-10-28 12:20:55 EDT

**Mark:** UNISOURCE DISCOVERY DIGITAL DOCUMENT RETRIEVAL

UNISOURCE
DISCOVERY
DIGITAL DOCUMENT RETRIEVAL

**US Serial Number:** 77594059

**US Registration Number:** 3634516

**Filed as TEAS Plus:** Yes

**Register:** Principal

**Mark Type:** Service Mark

**Application Filing Date:** Oct. 16, 2008

**Registration Date:** Jun. 09, 2009

**Currently TEAS Plus:** Yes

**TM5 Common Status Descriptor:**



LIVE/REGISTRATION/Issued and Active

The trademark application has been registered with the Offic

**Status:** The registration has been renewed.

**Status Date:** Apr. 05, 2019

**Publication Date:** Mar. 24, 2009

Mark Information

Goods and Services

Basis Information (Case Level)

Current Owner(s) Information

Attorney/Correspondence Information

Prosecution History

TM Staff and Location Information

Assignment Abstract Of Title Information - Click to Load

Proceedings - Click to Load

For assistance with TSDR, email **teas@uspto.gov** and include your serial number, the document you are looking for, and a screenshot of any error messages you have received.

| STATUS | DOCUMENTS | MAINTENANCE | | Back to Search | Print |

**Declaration:** §9 Renewal Granted
§8 (10 year) - Accepted

## §8 Declaration and §9 Application for Renewal Due Dates:

Earliest date §§8 & 9 can be filed: Jun. 09, 2028

Latest date §§8 & 9 can be filed without paying additional fee: Jun. 11, 2029

Latest date §§8 & 9 can be filed by paying an additional fee: Dec. 10, 2029

Privacy - Terms

Case No. 1:20-cv-23276-DPG

Unisource Discovery, Inc. v Unisource Discovery, LLC and Steven A. Cerasale

# Exhibit E



# UNISOURCE
## DISCOVERY®
### DIGITAL DOCUMENT RETRIEVAL

Miami, February 21, 2020                              VIA Email & Certified Mail

Unisource Discovery, LLC
c/o Mr. Steven A. Cerasale
625 The City Drive, Suite 303
Orange, CA 92868

Mr. Steven A. Cerasale
2881 Forrester Drive
Los Angeles, CA 90064

RE:  Right to Use of Trademark

Mr. Cerasale,

Please be advised that effective immediately, Unisource Discovery, LLC no longer has the Right to Use, Market or Transact business under the USPTO Registered Trademark of Unisource Discovery:

To this end, we are offering Unisource Discovery, LLC the option of a Licensing Agreement for the Right to Use and Transact under the Registered Trademark.

This offer is good for a period of 14 days from the receipt of this notice.  If on the 15th day we have not received word in writing, we will proceed with a Cease & Desist Letter to cure all operations and infringements under said Trademark.

Sincerely Yours,
/S/ Noel Mijares
Noel Mijares
CEO, President

cc. USPTO-udld.f

555 NE 15th Street – 9th Floor – Miami – Florida 33132
T.866.580.0002 F.866.580.9070

Case No. 1:20-cv-23276-DPG

Unisource Discovery, Inc. v Unisource Discovery, LLC and Steven A. Cerasale

# Exhibit F



Case No. 1:20-cv-23276-DPG

Unisource Discovery, Inc. v Unisource Discovery, LLC and Steven A. Cerasale

# Exhibit G



May 12, 2020

VIA EMAIL and CERTIFIED MAIL

Mr. Steven A. Cerasale
Unisource Discovery, LLC
625 The City Drive, Suite 303
Orange, CA 92868

Re: Cease & Desist / Infringement of Trademark Rights of Unisource Discovery, Inc.

Dear Mr. Cerasale,

This law firm represents Unisource Discovery, Inc., in connection with its intellectual property rights. Your use of [Unisource Discovery name and Logo} is a violation of Unisource Discovery, Inc. common law trademark rights, common law service mark rights, trade name rights, and this letter constitutes Unisource Discovery, Inc. demand that you Cease and Desist any and all use of these trademark/domain/brand/names. You should immediately forward this letter to your attorney.

On February 21, 2020 Unisource Discovery, Inc. provided notice in writing (see attached Exhibit A) to Unisource Discovery, LLC that the Right to Use of Trademark had been terminated, providing 14 days to respond to enter into a Licensing Agreement for the Right to Use and Transact under the Registered Trademark name and logo of Unisource Discovery.

As you are aware, Unisource Discovery, Inc. is registered as a Florida corporation and has continually used "Unisource Discovery" and the trade "Unisource Discovery" (the "Marks") throughout the United States as its brand name since that time.  Since its incorporation, Unisource Discovery, Inc. has continually used the Marks in advertising campaigns and in the community, including through its websites at www.unisourcediscovery.com and www.unisourcediscovery.net.

In addition, Unisource Discovery, Inc. has been actively involved in the community in its efforts to further promote its brand on a state and national presence.  As a result of these efforts, Unisource Discovery customers, and the general public, have come to recognize [Unisource Discovery, Inc.] as an established and successful Records Retrieval and Service of Process provider.

Under Florida law, common law trademark infringement occurs when a party utilizes a trade or service mark that creates a likelihood of consumer confusion.  As you are undoubtedly aware, use of this trademark and trade name is prohibited.

Unisource Discovery, Inc. has several options under Florida law to enforce its legal rights in the Marks. If Unisource Discovery, Inc. were to file a lawsuit against you, it would be entitled to seek: (1) preliminary and permanent injunctions; (2) actual monetary damages; (3) disgorging of any profits you have realized

through your use of the Marks; (4) reimbursement of attorney's fees required to prosecute a lawsuit against you; and (5) monetary damages for damage to Unisource Discovery, Inc. goodwill in the market.

Please be advised that Unisource Discovery, Inc. will undertake all appropriate steps to protect its Trademark and its associated goodwill. You can avoid legal action by immediately ceasing and desisting from any and all further infringing activity, by entering into an immediate Licensing Agreement. You must cease and desist all promotion and/or marketing.

You are hereby put on notice that Unisource Discovery, Inc. will be enforcing its Rights under Florida Law and will be monitoring your use of these names for this purpose. Additionally, you must execute a copy of this letter and send it to this firm within seven (7) days of the receipt of this letter. I recommend you consult with an attorney before taking any action.

**GOVERN YOURSELF ACCORDINGLY.**

Sincerely,

/S/ Diego Valdes
Diego Valdes, Esq.
Diego David Valdes, P.A.
2350 Coral Way, Suite 403B
Miami, FL 33145
T. 305-910-6602


CC: Client

AGREEMENT

I, Steven A. Cerasale, personally and on behalf of Unisource Discovery, LLC, agree to immediately cease and desist from any and all further use of the Unisource Discovery, Inc. Trademark. In the event this agreement is breached by me or Unisource Discovery, LLC then Unisource Discovery, Inc. shall be entitled to costs, attorney's fees, and collection costs related to any claims and/or action brought to enforce this agreement and shall be free to pursue all rights it had as of the date of this letter as if this letter had never been signed. I certify that I have the authority to enter into this agreement on behalf of Unisource Discovery, LLC.

By: Steven A. Cerasale

_____

Both individually and on behalf of Unisource Discovery, LLC. / Dated: _____

For an Oath of Affirmation: STATE OF _____ COUNTY OF _____

Sworn to (or Affirmed) and subscribed before me this _____ day of _____, 2020, by (name of person making statement).

(Notary Seal)

_____
Name and Signature of Notary Public

Personally known_____ OR produced Identification _____ (Type of ID) Produced.

Cease & Desist Pre-Suit Letter Page | 1