**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 20-23276-CIV-GAYLES/OTAZO-REYES

UNISOURCE DISCOVERY, INC.,

                Plaintiff,

    v.

UNISOURCE DISCOVERY, LLC
and STEVEN A. CERASALE,
and EQUICOPY, INC.

                Defendants.

_____

## PLAINTIFF, UNISOURCE DISCOVERY INC. EX PARTE AMEDED MOTION FOR PRELIMINARY INJUNCTION

        Plaintiff,  Unisource Discovery Inc. a Florida Corporation ("UNISOURCE" or "Plaintiff"),

by and through its undersigned counsel, hereby files this Ex Parte Amended Motion for Preliminary

Injunction pursuant to Fed. R. Civ. P. 65 enjoining Defendants, Unisource Discovery LLC

(hereinafter "UNI-CA" or "Defendant"), a California Limited Liability Company, Equicopy, Inc. a

California corporation ("Equicopy") and Steven Cerasale, (hereinafter "CERASALE")[1] for

unlawful use and trading on Plaintiff's well-known registered "Unisource" Trademark.

        The evidence shows that actual confusion has developed over time which Unisource has

been harmed, and preliminary injunctive relief undoubtedly is in the public's best interest.

        The Defendants' unlawful activities have caused and will continue to cause irreparable

injury to Plaintiff because Defendants have (1) deprived Plaintiff of their right to determine the

manner in which Plaintiff' trademarks are presented to the public; (2) defrauded the public into

_____

[1] Factually, all Defendants entities are owned and controlled by Defendant Steven Cerasale.

thinking Defendants' goods and services are the same; and (3) deceived the public as to Plaintiff' association with Defendants through, amongst other false misrepresentations, using same/similar website/email address[es] and has/continues to create confusion so to advance an effort to convert Unisource clients (*as discussed more fully, below*); (4) used Equicopy to further the foregoing acting of trademark infringement and poaching/converting Plaintiff's existing clients that causing further market confusion surrounding the Unisource name.

## **Factual Background**

a.      ***Defendants Unisource LLC and Steven Cerasale***

1.      For 15-years, UNISOURCE continues to be a notably recognized digital document retrieval records retrieval company that conducts business throughout Florida and the Continental United States.  It is headquartered in Miami Florida. Amongst other and direct and indirect functions, UNISOURCE works with the legal community and businesses for litigation case management and support (a simple example, UNISOURCE offers records retrieval and process serving for nationally recognized insurance companies, law firms, government agencies and the like.)

2.      UNISOURCE continuously infuses the latest technology to create paramount support. In doing so, UNISOURCE has earned a rather sizable client base and dedicated customers. This accolade has not come at a small expense. UNISOURCE has earned every client through significant investment capital, dedication, unparalleled support, extensive marketing, branding, and personalized care.

3.      CERASALE is the owner and Managing Director of UNI-CA -- a California company. UNISOURCE has no relation to UNI-CA; that is, with the exception of CERASALE. However, UNI-CA and UNISOURCE is otherwise in the same or similar business while each cover different territories.

4.      CERASALE has been a Shareholder of UNISOURCE since 2006 (15 Years) and a Board of Director from 2006 to 2018 (12 Years).

5.      CERASALE is a signatory to the Close Corporation Shareholder Agreement which he acknowledged and executed on June 28, 2010. *See* Pl. Am. Comp. Exh A

6.      Under the Close Corporation Shareholder Agreement, Section 1.3 TRADEMARK, it clearly states that Plaintiff is the owner of the Trademark; ***UNISOURCE DISCOVERY DIGITAL DOCUMENT RETRIEVAL is a registered US trademark of the Company.***

7.      CERASALE, through UNI-CA, has advanced an intentional effort to expand UNI-CA coverage area to the State of Florida through using his position as a Shareholder and Board of Director of UNISOURCE and exposure to UNISOURCE client directory, to use his majority-owned companies to target and poach UNISOURCE clients, in the process making them believe they are working with UNISOURCE, when they are not.

8.      Specifically, CERASALE has communicated with UNISOURCE Florida Clients, among those CSK, and duped this client into trusting that CERASALE was UNISOURCE, to the extent that CERASALE created an email account named "Florida Records" under recordsfl@unisourcediscovery.com to specifically target UNISOURCE Florida clients, and obtain work from CSK and other Florida UNISOURCE clients, knowing full well that this is a UNISOURCE client for over 10 years, and in direct violation of the UNISOURCE Close Corporation Shareholder Agreement, that Cerasale is a party and signatory since June 28, 2010.

9.      Additionally, CERASALE through UNI-CA has directly contacted additional UNISOURCE clients in Louisiana, Georgia and Florida.

10.     CERASALE's initiation of a large-scale exodus from UNISOURCE through taking several clients under false pretenses by communicating untrue statements and allegations to clients that confuses the two different companies. Further, UNISOURCE sent CERASALE and UNI-CA

a cease and desist, on three (3) separate occasions. CERASALE and UNI-CA have ignored the cease-and-desist letters. *See* Pl. Am. Comp. Exh A

11.     UNISOURCE extensive marketing gives it an advantage in the fiercely competitive market in Florida. UNISOURCE engages in print, digital and pointed marketing campaigns throughout Florida including, but not limited to other mediums. (Exhibit A)

12.     Desiring to ride on the coattails of UNISOURCE's success and marketing dollars, CERASALE sought a board position with UNISOURCE which allowed him the opportunity to build relationships in a short period of time with UNISOURCE's clients and methodically plan his likely abrupt exit and scheme to loot clients that he did NOT generate and that he did NOT contribute the funds necessary to originate those clients.

13.     As a result, Plaintiff advanced an action in this Court.

b.     ***Equicopy and Steven Cerasale***

14.     Equicopy was incorporated in year 2016 in the State of California and Defendant Steven Cerasale is the founder, registrar, and has a controlling interest in the company.

15.      Defendant Steven Cerasale clearly has the ongoing ambition and intent to maintain the fraudulent appearance of a separate business entity whereas Equicopy is not separate from Defendant Steven Cerasale's other businesses --- specifically UNI-CA.

16.     In fact, UNI-CA and Equicopy are in the same business, selling same or similar products, same or similar type of clients, share same employees, share same software, and in the same geographical coverage area in the United States --- including this District.

17.     As architect of this fraudulent design, defendant Steven Cerasale clearly and intentionally created Equicopy to be a pawn in his scheme against UNISOURCE.

18.     Defendant Steven Cerasale's intentional acts of creating competitive entities against Plaintiff is *contractually prohibited* since he agreed to refrain from forming/creating any business

that competes with Plaintiff and/or be in any position to compete with Plaintiff, as stipulated in the

Close Corporation Shareholder Agreement. *See* Pl. Am. Comp. Exh A

19.     Defendant Steven Cerasale breached the following contractual provisions of the

Close Corporation Shareholder Agreement (this "Agreement") entered into as of June 28, 2010, to

*wit:*

> A.      <u>Fiduciary Duties</u>:    Pursuant to provision 1.10(a-f)
> "Fiduciary Duties" – Defendant Steven Cerasale breached theses
> enumerated contractual fiduciary duty obligation to Plaintiff;
>
> B.      <u>General Corporate Management</u>:    Pursuant to provision
> 1.11, Defendant Steven Cerasale breach " …. any officer or Director
> of the Company may engage, permit, waive, or suffer any breach of
> fiduciary duty to the Company or its shareholders other than with the
> express written consent of all of the Shareholders.
>
> C.      <u>Further Acts</u>:    Pursuant to provision 6,   Defendant Steven
> Cerasale violated/breach because he did not inter alia "….  promptly
> take such further acts and execute such other documents as shall be
> necessary to carry out the spirit and letter of this Agreement.
>
> D. <u>General Corporate Management</u>:    Pursuant to provision 1.11,
> Defendant Steven Cerasale breached this contractual provision when
> "…. Notwithstanding the foregoing, neither the Company nor any
> officer or Director of the Company may engage, permit, waive, or
> suffer any breach of fiduciary duty to the Company or its shareholders
> other than with the express written consent of all of the Shareholders."

20.     At no time did defendant Steven Cerasale confer with UNISOURCE that he would

be creating other businesses – here, Equicopy -- that would be a competitor with Plaintiff.

21.     Moreover, defendant Steven Cerasale never disclosed to Plaintiff that Equicopy would be integrated into Plaintiff Unisource Records Retrieval Software Programs – that is, Equicopy is a foreign company defendant Steven Cerasale unilaterally imbedded into Plaintiff's business operational software platform, without notice, thereby damaging UNISOURCE online application and invading its protected client information and protected client privacy.

22.     On or about March 2016, defendant Steven Cerasale also unilaterally changed the Unisource Florida Records Retrieval Software when he altered Plaintiff's ability to provide the same level of services to its clients and resulted in a material loss of business.

23.     These breakdowns were also a direct result of defendant Steven Cerasale imbedding Equicopy directly into the software since it downgraded Unisource Florida's ability to operate at full capacity. For example, all of Florida's legal template forms were removed by defendant Steven Cerasale from the system, and to date Plaintiff can only use three (3) out of (32) legal template forms, and this has caused great damage and loss of business to Plaintiff.

24.     The direct consequence of defendant Steven Cerasale's unilateral acts of installing/imbedding Equicopy into Plaintiff's operational software has been critical because the monthly revenue averages have been steadily falling month-to-month, year-to-year, by sixty-five percent (65%).  This revenue dive is substantially or wholly connected to Plaintiff's clients being prevented from processing online orders, properly using legal templates, check order status, obtain affidavits, obtain updates on orders, and more, due to the impact caused by defendants.

25.     As a consequence of defendant Steven Cerasale actions and inactions, all these functions ceased working and clients canceled their order(s) and services.

26.     As another direct consequence of the foregoing, Plaintiff's software is functioning at sixty-percent (60%) none-useability that is preventing Plaintiff from growing its business base

because it cannot maintain the same volume of orders/subpoena with this marked reduction.

c.    ***Cerasale Contractual Obligations to Plaintiff Unisource***

27.    The parties executed a Close Corporation Shareholder Agreement ("Shareholders Agreement") on June 28, 2010. *See* Pl. Am. Comp. Exh A

28.    Pursuant to Shareholder Agreement ¶1.2(e),

"Without limiting the generality of the provisions of this Agreement set forth below relating to fiduciary duties, the Directors of the Company are ***prohibited from engaging in any business or employment activities competitive to the business of the Company***. The parties hereto acknowledge and agree that the business of the Company includes expansion plans nationwide in the business of records retrieval, eDiscovery, and legal discovery case and records management. The parties agree that presently existing businesses operated by the Directors are complementary to the business of the Company, and it is anticipated that working relationships, cross referrals, another collaborative activities may be conducted between the Company and such other businesses."

(emphasis added)

29.    Pursuant to Shareholder Agreement ¶ 1.4, the parties agreed to separate territory when agreeing "The Subpoena Company. The parties acknowledge and agree that the Company shall have the exclusive rights to utilize the Florida Platform of "the Subpoena Company" to establish a presence in the region."

30.    Pursuant to Shareholder Agreement ¶1.10, the parties Fiduciary Duties agreed outlined and agreed upon, *to wit*,

"The Existing Shareholders acknowledge that officers, directors, managing agents, and other executive or high-level employees (collectively referred to herein as an "Employee" or "Employees") maintain a relationship with the Company in which high degrees of confidence and trust are reposed in the Employee. (Controlling shareholders also have certain fiduciary duties to the other shareholders of a company.) ***An Employee's fiduciary duties to the Company include the following***:

(a)    **The Duty of Undivided Loyalty.** In addition to the straightforward meaning of those terms, the employee may not benefit himself, a competitor, or any other person, to the detriment of the Company, in anything which the employee does within the scope or during the term of his employment or on company time. All of employee's efforts and activities conducted while being compensated by the Company, or within the scope and course of the employment relationship, must be ***The Duty to Avoid Conflicts of Interest. The employee may not place himself in a position where he has obligations to any third***

7

*party, or interests of his own, which are in any way in conflict with or competitive to the interests of his Company. If any such conflicting obligations or interests arise, the employee must remove himself from the situation or relationship which gives rise to such a conflict of interest.*

(b)     **The Duty of Full Disclosure**. The employee is ***obligated to disclose to the Company all information which comes into the possession of the employee which is relevant to the business or affairs of the Company*** including, without limitation, all information relating to the activities of the employee within the course and scope of his employment.

*(c)*     **The Duty to Avoid Self-Dealing**. The employee may not engage in any transaction, directly or through the use of third parties, middlemen, or otherwise, with the Company, without full disclosure to and consent from the Company as to all of the material terms and details of the transaction. The employee is not permitted to make "secret profits" of any kind. ***Secret profits include any profit or other type of benefit obtained by the employee which results from the employment relationship, or from any of the activities of the employee conducted in the course and scope of the employment relationship, which have not been fully disclosed to, and consented to by, the Company in all material respects and detail.***

(d)     **The Duty of Fair Dealing**. Transactions between the employee and the Company which are arranged, brought about, or conducted by the Employee, must be fair and reasonable as to the Company even if they are fully disclosed.

(e     **The Duty to make available to the Company all "Corporate, Business, or Partnership Opportunities"**. ***All business or commercial opportunities which fall within the type of business conducted by the Company, or which are within the type of business planned for future activities by the Company, or which are within the general scope of the types of business activities into which the Company might reasonably be expected to expand its business, are considered to fall within the "Corporate Opportunity Doctrine" (also referred to as the "Partnership Opportunity Doctrine" or the "Business Opportunity Doctrine" depending upon the form of the business entity involved).*** All business opportunities which fit that description, and which become available to or known by the employee during the term of his employment must be disclosed to and made available to the Company. ***The employee may not take advantage of any such business opportunities for his own account unless and until the Company has knowingly elected not to avail itself of each such opportunity after full disclosure of all material elements and details of the opportunity. (The employee still may be unable to avail himself of such a business opportunity if doing so would violate any of the employee's other fiduciary duties.)***

*In addition to and supplementing the foregoing fiduciary duties, there are also state and federal statutory and regulatory provisions, including, without limitation, Florida statute 607.0901,* imposing duties and limitations with respect to transactions and activities of Company insiders and their affiliates.

To the extent they serve as officers, directors, managing agents, or other employees of the Company, the Existing Shareholders agree to abide by all such fiduciary obligations to the Company and its shareholders."

(emphasis added)

31.     In contemplation of a potential dispute, pursuant Shareholder Agreement ¶12, the

parties contractually agreed,

> "Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. *In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.* The word "including" shall mean including without limitation and is used in an illustrative sense rather than a limiting sense. Terms used with initial capital letters will have the meanings specified, applicable to singular and plural forms, for all purposes of this Agreement. Reference to any gender will be deemed to include all genders and the neutral four."

(emphasis added)

32.     Under Shareholder Agreement ¶6 "Further Acts The parties to this Agreement shall

promptly take such further acts and execute such other documents as shall be necessary to carry out

the spirit and letter of this Agreement. Without limiting the generality of the foregoing, in the event

any court, county recorder, secretary of state of any state, any federal agency, or any other

governmental agency may require any additional or different documents or actions in order to effect

the purposes contemplated by this Agreement, the parties to this Agreement shall execute the

necessary documents and take the necessary steps to comply with those requirements.

33.     Notwithstanding that the Shareholders Agreement incorporates Florida Statute

607.0901, and indeed outlines significant obligations and duties including fiduciary duty,

CERASALE through UNI-CA has continued to intentionally interfere with the business relations

of UNISOURCE through attempting to convert clients and therefore compete and interfere with

UNISOURCE  business in Florida.

d.      *The Defendants Infringement*

34.     UNISOURCE is the owner of the following United States Federal Trademark:



Registration No. 3,634,516 and Serial No. 77594059, which registered on June 9, 2009 in International Class 045 and is used in connection with legal research.

35.     The Plaintiff's registration is incontestable. A self-authenticated copy of the U.S. Trademark Registration is attached hereto as (Exhibit B)

36.     The Mark has been used in interstate commerce to identify and distinguish Unisource's high-quality legal support services and has been renewed under Section 8 (6-YR) and Section 8 (10-YR) on April 5, 2019. (Exhibit C)

37.     For the past (eleven) 11 years UNISOURCE allowed UNI-CA the Right to Use of Trademark to market and use the Registered Trademark in connection with the business relationship, at no cost to UNI-CA for such privilege.   During this time, both companies co-owned and shared website, emails, and used marketing materials with the Trademark.

38.     On February 21, 2020, UNISOURCE notified UNI-CA and CERASALE that the Right to Use of Trademark had been revoked and provided proper notice via Email and U.S. Certified Mail to both parties.  The notice provided UNI-CA with the option to stop all further use of the Trademark and requested that if UNI-CA wanted to continue to use the Trademark, it would be required to enter into a Licensing Agreement with UNISOURCE.  Failure to act would result in a Cease-and-Desist Letter. *See* Pl. Am. Comp. Exh A

39.     On May 12, 2020, UNISOURCE Counsel sent a Cease-and-Desist letter to UNI-CA and CERASALE via Email and U.S. Certified Mail of their continued Infringement of Trademark Rights of UNISOURCE. *See* Pl. Am. Comp. Exh A

40.     The Name and Mark has never been assigned or licensed to the Defendants.

41.     The Name and Mark is a symbol of UNISOURCE's quality, reputation and good will and has never been abandoned.

42.     Defendants, a California company which have been using the name Unisource with full knowledge of Unisource's rights and growing actual confusion and reputation, have engaged the same business in State of Florida seeking Unisource's clients.

43.     Most alarmingly, Defendants have now forayed beyond mere marketing and have systematically and continuously attempted to procure Unisource's existing clients because, amongst other reasons, CERASALE's position as a shareholder and board member of Unisource (Florida) -- thus ensuring that Unisource's existing clients will confuse the two companies and confuse Unisource's mark with Uni-CA.

44.     Defendants' fast-growing use of UNISOURCE likeness is causing [and will continue] to cause actual confusion among the public and irreparable injury to Plaintiff, thus justifying issuance of preliminary injunction.

45.     Absent immediate injunctive relief, Plaintiff will continue to incur irreparable harm such that money damages will not adequately compensate Plaintiff. Accordingly, Plaintiff requests that the Court grant this motion pursuant to Fed. R. Civ. P. 65 and order immediate injunctive relief prohibiting Defendants' unlawful activities and the misuse of Plaintiff's trademarks, reputation and goodwill, pending trial and final judgment in this matter.

## **LEGAL STANDARD**

46.     Plaintiff have filed claims pursuant to 15 U.S.C. sections 1114(1)(a), 1125(a), and 1125(d), and Florida's common law. Title 15 U.S.C. section 1116(a) provides the Court "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section

1125 of this title." 15 U.S.C. § 1116.

47.     Injunctive relief is also available under section 1116(a) for a violation of section 1114(1)(a). See id. § 1116(d)(1)(A).

48.     In order to obtain a temporary restraining order, a party must demonstrate "(1) [there is] a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non- movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (citation omitted); *see also Levi Strauss & Co. v. Sunrise Int'l. Trading Inc*., 51 F. 3d 982, 985 (11th Cir. 1995) (applying the test to a preliminary injunction in a Lanham Act case).

49.     Additionally, a court may only issue a temporary restraining order without notice to the adverse party or its attorney if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party or can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required. FED. R. CIV. P. 65(b)(1).

50.     Ex parte temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameida Cnty, etc.,* 415 U.S. 423, 439 (1974) (footnote call number omitted). With respect to scope, generally, "persons who are not actual parties to the action or in privity with any of them may not be brought within the effect of a[n injunctive] decree merely by naming them in the order." Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 2956 (2d ed. 1995) (footnote call number omitted).

51.     However, "a decree of injunction not only binds the parties defendant but also those

identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 180 (1973) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)); see also FED. R. CIV. P. 65(d)(2).

52.     Specifically relevant to this case, 15 U.S.C. section 1114(2)(D) implicitly provides the Court with authority to request or order "[a] domain name registrar, domain name registry, or other domain name registration authority . . . [to] deposit[] with a court, in which an action has been filed regarding the disposition of the domain name, documents sufficient for the court to establish the court's control and authority regarding the disposition of the registration and use of the domain name." 15 U.S.C. § 1114(2)(D)(i).

## **ANALYSIS**

A.     Probability of Success on the Merits

1.     Counterfeiting and Infringement – 15 U.S.C. section 1114

53.     Section 32 of The Lanham Act, 15 U.S.C. section 1114, provides liability for trademark infringement if, without the consent of the registrant, a defendant uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive."

54.     To prevail on a trademark infringement claim, a plaintiff must demonstrate "(1) that it had prior rights to the mark at issue and (2) that the defendant had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1193 (11th Cir. 2001) (footnote call number and citation omitted).

55.     To evaluate likelihood of consumer confusion in a Lanham Act trademark claim, the Eleventh Circuit has developed a seven-factor balancing test. See *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989). The seven factors are: "(1) type [or strength] of mark;

(2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion." *Lipscher v. LRP Publ'ns, Inc.,* 266 F.3d 1305, 1313 (11th Cir. 2001) (citation omitted); *see also Dieter*, 880 F.2d at 326.

56.     No single factor is dispositive. See *Lipscher,* 266 F.3d at 1313.

57.     When the Court considers these seven factors in light of the submissions provided by Plaintiff, and it will conclude the balance of factors indicates there is a likelihood that consumers would confuse Defendants' websites/email addresses and with the Plaintiff.

58.     In particular, the submissions provided by Plaintiff supports the strength of Plaintiff's Marks, show that the goods and services sold by Defendants are nearly identical to Plaintiff' respective genuine products, indicate that both Plaintiff and Defendants target the same clients on the Internet, suggest that Defendants intended to benefit from the use of Plaintiff' brand reputation, and show that the client would actually confuse them for Plaintiff' real products.

59.     Accordingly, Plaintiff have shown a probability of success on the merits of their trademark counterfeiting and infringement claim under section 1114.

2.     Underline False Designation of Origin – 15 U.S.C. section 1125(a)

60.     The test for liability for false designation of origin under 15 U.S.C. section 1125(a) is the same as for a trademark counterfeiting and infringement claim — i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue. *See Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 780 (1992).

61.     As just discussed in relation to Plaintiff's trademark counterfeiting and infringement claims, Defendants' services and products will be confused by consumers for Plaintiff' genuine products. Therefore, Plaintiff have shown a likelihood of success on Plaintiff's claim of false designation of origin.

62.     The Anticybersquatting Consumer Protection Act ("ACPA") protects the owner of a distinctive or famous trademark from another's bad faith intent to profit from the trademark owner's mark by registering or using a domain name which is identical or confusingly similar to, or dilutive of, the trademark owner's mark without regard to the goods or services of the parties. See 15 U.S.C. § 1125(d).

63.     To prevail under the ACPA, a plaintiff must prove: "(1) its mark is distinctive or famous and entitled to protection; (2) the defendant's domain name is identical or confusingly similar to the plaintiff's mark; and (3) the defendant registered or used the domain name with a bad faith intent to profit." *Bavaro Palace, S.A. v. Vacation Tours, Inc*., 203 F. App'x 252, 256 (11th Cir. 2006) (citing *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)).

64.     As to the first element, the Unisource's Marks and all of Uni-CA Mark(s) are inherently distinctive because they are arbitrary as applied to the products and services which they identify — *i.e.,* they "do not suggest or describe the goods or services offered thereunder." *Victoria's Cyber Secret Ltd. P'ship v. V Secret Catalogue, Inc*., 161 F. Supp. 2d 1339, 1349 (S.D. Fla. 2001) (citing *Frehling Enters., Inc. v. Int'l Select Grp., Inc.,* 192 F.3d 1330, 1335–36 (11th Cir. 1999)).

65.     Moreover, Unisource with the assistance of Equicopy are indisputably known because it enjoys widespread recognition by the local business community.

66.     Regarding the second element — use of confusingly similar domain names — Plaintiff have supplied the domain/email names allegedly used by Defendants to confuse likeness of Plaintiff' products and services.

67.     The Court may seize control of the remaining Subject Domain Names which do not themselves contain any of Plaintiff' Marks because the websites associated with those domain names allegedly promote and offer for sale goods which infringe Plaintiff's in violation of sections

1114 and 1125(a). *See Chanel, Inc. v. 2012 chanelbagsoutletstore.com et al,* 1:12-cv-22075-CMA

(S.D. Fla. June 13, 2012) [ECF No. 6]. Case 1:13-cv-21230-CMA

68.     Sufficient evidence in their submissions to support the conclusion that these

domain/email names are confusingly similar to Unisource Mark.

69.     With regard to the third element — whether Defendants registered the domain/email

names with the bad faith intent to profit — when the Court considers the nine factors laid out in 15

U.S.C. section 1125(d)(1)(B)(i)(I)–(IX) it will conclude the submissions provided by Plaintiff

adequately demonstrate Defendants registered the Subject Domain Names in bad faith to attract

customers.

70.     Consequently, Plaintiff have shown a likelihood of success on the merits of their

section 1125(d) claim Unfair Competition Under Florida's Common Law.

71.     Whether a defendant's use of a plaintiff's trademark creates a likelihood of

confusion between the plaintiff's and the defendant's products is also the determining factor in the

analysis of unfair competition under the common law of Florida. *See Rolex Watch U.S.A., Inc. v.*

*Forrester*, No. 83–8381–Civ-Paine, 1986 WL 15668, at *3 (S.D. Fla. Dec. 9, 1986) ("The

appropriate test for determining whether there is a likelihood of confusion, and thus trademark

infringement, false designation of origin, and unfair competition under the common law of Florida,

is set forth in *John H. Harland, Inc. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir. 1983).").

72.     As discussed in relation to Plaintiff's trademark counterfeiting and infringement

claims, Plaintiff has established there is a likelihood of confusion regarding Defendants' use of

Plaintiff's Marks on their counterfeit and infringing products and services.

73.     Accordingly, Plaintiff have also shown a likelihood of success on the merits of their

common law unfair competition claim.

B.      Irreparable Injury

74.     The Eleventh Circuit has acknowledged that "once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim," there is a "presumption of irreparable harm." *N. Am. Med. Corp. v. Axiom Worldwide, Inc*., 522 F.3d 1211, 1227 (11th Cir. 2008) (citations omitted).

75.     However, the strength of this presumption has been called into question by the Supreme Court's decision in *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388 (2006). *See N. Am. Med. Corp.,* 522 F.3d at 1227-28 (discussing eBay).

76.     After eBay, a court may grant preliminary injunctive relief "without the benefit of a presumption of irreparable injury," or may "decide that the particular circumstances of the instant case bear substantial parallels to previous cases such that a presumption of irreparable injury is an appropriate exercise of its discretion in light of the historical traditions." *Id*. at 1228.

77.     As already discussed, based on Plaintiff's submissions to this point, there is a substantial likelihood that consumers will incorrectly believe Defendants' websites and products are approved or sponsored by Plaintiff.

78.     Although the Court may be permitted to presume irreparable harm from the likely consumer confusion in this case, it is not necessary to rely on a presumption. The operation of Defendants' websites/emails displaying Plaintiff' similar Marks and the sale of Defendants' inferior services to consumers is likely to cause irreparable damage to Plaintiff's respective reputations if they continue because Plaintiff will not have the ability to control the quality of what appears to be their services in the marketplace.

79.     This damage to Plaintiff' respective reputations and goodwill could not be easily quantified, nor could it be undone through an award of money damages. *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008).

80.     As discussed in the legal standard section *supra,* injunctive relief is available on

each of Plaintiff' four claims, not only the trademark infringement claim. *See* 15 U.S.C. § 1116(a).

C.      The Balance of Hardships

81.     Believing that the Honorable Court will be satisfied after reviewing Plaintiff's submissions that the risk to the reputations and goodwill associated with Plaintiff's Marks should Defendants' infringing activities continue outweighs any hardship to Defendants caused by enjoining those activities -- it does not appear that Defendants will suffer any legitimate hardship if a temporary restraining order is issued because they have no legal right to use Plaintiff' Marks on their website/email or to sell counterfeit versions of Plaintiff' Services through customers believing the two companies are the same.

D.      Public Interest

82.     The public has an interest in not being misled as to the origin, source, or sponsorship of trademarked products. *See Nailtiques Cosmetic Corp. v. Salon Sciences, Corp*., No. 96-2709-CIV-NESBITT, 1997 WL 244746 at *5 (S.D. Fla. Jan 10, 1997) ("The interests of the public in not being victimized and misled are important considerations in determining the propriety of granting injunctive relief." (citing *Scarves By Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167 (2d Cir. 1976))).

83.     Here, Plaintiff has demonstrated that Defendants' websites/email and products/services mislead consumers into believing they are approved or sponsored by Plaintiff and make it more difficult for a consumer to be sure he or she is purchasing a Plaintiff's genuine product.

**CONCLUSION**

84.     Based on Plaintiff's Complaint, application for an injunction, and evidentiary submissions, this Court has ample basis to conclude that the four-part test for injunctive relief has been satisfied.

85.     An injunction against UNI-CA is necessary for its ongoing acts of converting and poaching Plaintiff's clients and assisting with its trademark infringement because Defendant Steven Casserole has marshalled all of these entities – Uni-CA and Equicopy – as an organized scheme to damage Plaintiff.

86.     Moreover, because an immediate inaction would allow Defendants to funnel traffic to their current websites/emails and allow Defendants to continue selling counterfeit products/services coupled with poaching clients, a temporary restraining order should issue.

87.     Accordingly, Plaintiff' Motion for a preliminary injunction should be granted, and ordered that Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with Defendants having notice of this Court's Order to temporarily restrained:

a.     From advertising, promoting, offering to sell, selling, distributing, or transferring any products/services bearing the Unisource Marks, or any confusingly similar trademarks, other than those actually manufactured or distributed by Plaintiff;

b.     From secreting, concealing, destroying, selling off, transferring, or otherwise disposing of: (i) any products/services, not distributed by Plaintiff, bearing the Unisource Marks;

c.     Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with any Defendant having notice of this Order shall immediately discontinue the use of Unisource, or any confusingly similar trademarks;

d.     Pursuant to the executed Shareholder Agreement ("Shareholders Agreement") ¶1.2(d), Order Defendants to  … "*disclose to the Company all information which comes into the possession of the employee which is relevant to the business or affairs of the*

*Company including, without limitation, all information relating to the activities of the employee within the course and scope of his employment.*" ("**The Duty of Full Disclosure**. The employee is obligated to disclose to the Company all information which comes into the possession of the employee which is relevant to the business or affairs of the Company including, without limitation, all information relating to the activities of the employee within the course and scope of his employment."); and

e.       Cease, all acts of converting and poaching Plaintiff's existing clients

**WHEREFORE**, the Plaintiff respectfully pray this Court:

A.       Rule on Plaintiff's Motion for Preliminary Injunction;

B.       Enter an Order ex parte;

C.       Enter an Order prohibiting Defendants from further use of Plaintiff's trademark;

D.       Enter an Order prohibiting Defendants from poaching and contacting any and all of Unisource Florida's Clients;

E.       Enter an Order directing Defendants will provide a current matrix of all their clients to determine further similar poaching and contact occurrences; and

F.       Any other relief this Court determines is fair and just.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this notice was served via the Florida Court E-Filing Portal on upon: Juan

C. Zorilla, Esq., jzorilla@fowler-white.com Fowler, White, Burnett, P.A., counsel for Unisource

Discovery, LLC and Steven A. Cerasale on this day 12th of July, 2021.

<div style="margin-left:50%">

**Diego David Valdes, P.A.**
2350 Coral Way, Suite 403B
Miami, FL 33145
Tel: 305-910-6602
Fax: 305-513-5924

By: /s/ *Diego David Valdes*
Diego David Valdes, Esq.
Florida State Bar No.: 251010
Email:  ddvlaw@gmail.com
Attorney for Plaintiff: Unisource Discovery,
Inc.

</div>

.