# CLOSE CORPORATION SHAREHOLDER AGREEMENT

This Close Corporation Shareholder Agreement (this "Agreement") is entered into as of June 28, 2010, by and between Alfred W. Lutter, III ("Lutter"), Noel Mijares ("Mijares"), Lisa D. Cote ("Cote"), Steven Cerasale ("Cerasale"), and Unisource Discovery, Inc., a Florida corporation ("Company").

## RECITALS

A.  Concurrently herewith the parties to this Agreement are entering into that certain Stock Purchase and License Agreement of even date herewith (the "Stock Purchase and License Agreement").

B.  Mijares, Cote, and Cerasale (collectively, "Existing Shareholders") are the existing shareholders of Company. Effective at and following the Closing (as defined in Section 4 below), the Existing Shareholders and Lutter shall collectively be referred to as the "Shareholders" and individually as a "Shareholder".

C.  Company operations have heretofore been conducted pursuant to, in part, that certain Operating Agreement dated effective as of June 15, 2006, by and among the Existing Shareholders (the "Operating Agreement") is made part of the Unisource Discovery, Inc. Corporate By-Laws.

D.  The parties now wish to restate, amend, and incorporate into this Agreement provisions regarding certain ongoing rights and obligations of the parties previously set forth in the Operating Agreement, and to provide for certain additional shareholder protections for the benefit of each of the Shareholders.

Accordingly, the parties to this Agreement hereby agree as follows:

## AGREEMENT

1.  Corporate Governance in General.

    1.1  Operating Agreement. The Operating Agreement is terminated effective as of the Closing and shall be of no further force or effect following the Closing. The provisions of the Operating Agreement are superseded by the provisions of this Agreement.

    1.2  Board of Directors.

       (a)  The Board of Directors shall consist of a total of three board seats, unless such arrangement is changed in the corporate bylaws by a majority vote and written consent of the shareholders voting on the basis of shares held by each of them.

(b) Notwithstanding any provision to the contrary set forth in the Articles or Bylaws of the Company, the Board of Directors of the Company shall consist of Cerasale, Mijares, and Cote (the "Directors"). The Directors shall remain in such positions from year-to-year until such time as they may be removed by resignation, death, disability, or written consent of the Shareholders. Annual shareholder meetings for the purpose of electing directors shall not be required and are hereby waived. Each Director shall devote only such time and effort as such Director deems appropriate for the furtherance of the Company's business.

(c) Without limiting the generality of the provisions of this Agreement set forth below relating to fiduciary duties, the Directors of the Company are prohibited from engaging in any business or employment activities competitive to the business of the Company. The parties hereto acknowledge and agree that the business of the Company includes expansion plans nationwide in the business of records retrieval, eDiscovery, and legal discovery case and records management. The parties agree that presently existing businesses operated by the Directors are complementary to the business of the Company, and it is anticipated that working relationships, cross referrals, another collaborative activities may be conducted between the Company and such other businesses.

1.3   Trademark. UNISOURCE DISCOVERY DIGITAL DOCUMENT RETRIEVAL is a registered US trademark of the Company. Without limiting the foregoing, the parties agree that the Company shall be entitled to use the trademark "Unisource Discovery", as part of its corporate name, Unisource Discovery, Inc., or as a fictitious business name, or otherwise.

1.4   The Subpoena Company. The parties acknowledge and agree that the Company shall have the exclusive rights to utilize the Florida Platform of "the Subpoena Company" to establish a presence in the region.

1.5   Company Bylaws. Effective at or before the Closing, the Existing Shareholders shall, by unanimous written consent, adopt bylaws in the form attached hereto as Exhibit "A".

1.6   Corporate Minute Book. At or before the Closing, the Company shall create or update a corporate minute book, to be maintained in the custody of the president or secretary of the Company, or such other custodian as may be authorized by the Board of Directors of the Company, containing copies of the Articles of Incorporation, the amendment thereto provided for herein below, the corporate bylaws adopted as provided herein, a stock ledger recording the issuance and transfer of the Common Stock, all minutes and forms of actions by written consent of the shareholders and directors, including such items as are contemplated as set forth in this Agreement, a copy of the current annual statement as filed with the Florida Department of State together with such prior annual filings as may be available, a copy of the statement of registered agent

accepting appointment as such, and such other corporate organizational documents and filings as are customarily maintained in such minute books.

1.7   Annual Meeting, Election of Directors, Election of Officers. At or before the Closing, the Existing Shareholders shall, by unanimous written consent, conduct the annual meeting of shareholders of the Company and elect directors for the following year and shall, immediately thereafter, use their best efforts to cause the directors so elected to conduct the annual organizational meeting of directors for the purpose of electing the officers of the Company for the following year.

1.8   Amendment of Articles. At or before the Closing, the Existing Shareholders shall, by unanimous written consent, authorize and adopt an amendment to the Articles of Incorporation of the Company, and the Company shall cause to be filed with the Florida Department of State the amendment so adopted and further providing that, "Stockholder agreements imposing reasonable restrictions on transfer of stock are authorized and permitted."

1.9   Compliance with Laws and Governing Instruments. The Existing Shareholders who may, from time to time, serve as officers, directors, or managing agents of the Company shall use their best efforts to observe and comply with, and to cause the Company to observe and comply with, the articles and bylaws all the Company together with all federal, state and local statutes, regulations, ordinances and administrative rules and orders applicable to the conduct of the business of the Company and its corporate existence and organization. Without limiting the foregoing, (i) at or before the Closing the Existing Shareholders shall confirm that the annual statement required to be filed with the Florida Department of State is current or, if not current, shall immediately file and bring current such annual statement; (ii) the Company shall prepare and deliver to its Shareholders, as required by Florida law Section___, annual financial statements that include balance sheet, income statement and statement of cash flow for each fiscal year.

1.10   Fiduciary Duties. The Existing Shareholders acknowledge that officers, directors, managing agents, and other executive or high-level employees (collectively referred to herein as an "Employee" or "Employees") maintain a relationship with the Company in which high degrees of confidence and trust are reposed in the Employee. (Controlling shareholders also have certain fiduciary duties to the other shareholders of a company.) An Employee's fiduciary duties to the Company include the following:

   (a)   The Duty of Undivided Loyalty. In addition to the straightforward meaning of those terms, the employee may not benefit himself, a competitor, or any other person, to the detriment of the Company, in anything which the employee does within the scope or during the term of his employment or on company time. All of employee's efforts and activities conducted while being compensated by the Company, or within the scope and course of the employment relationship, must be undertaken solely in the interests of the Company.

(b) The Duty to Avoid Conflicts of Interest. The employee may not place himself in a position where he has obligations to any third party, or interests of his own, which are in any way in conflict with or competitive to the interests of his Company. If any such conflicting obligations or interests arise, the employee must remove himself from the situation or relationship which gives rise to such a conflict of interest.

(c) The Duty of Full Disclosure. The employee is obligated to disclose to the Company all information which comes into the possession of the employee which is relevant to the business or affairs of the Company including, without limitation, all information relating to the activities of the employee within the course and scope of his employment.

(d) The Duty to Avoid Self Dealing. The employee may not engage in any transaction, directly or through the use of third parties, middlemen, or otherwise, with the Company, without full disclosure to and consent from the Company as to all of the material terms and details of the transaction. The employee is not permitted to make "secret profits" of any kind. Secret profits include any profit or other type of benefit obtained by the employee which results from the employment relationship, or from any of the activities of the employee conducted in the course and scope of the employment relationship, which have not been fully disclosed to, and consented to by, the Company in all material respects and detail.

(e) The Duty of Fair Dealing. Transactions between the employee and the Company which are arranged, brought about, or conducted by the Employee, must be fair and reasonable as to the Company even if they are fully disclosed.

(f) The Duty to make available to the Company all "Corporate, Business, or Partnership Opportunities". All business or commercial opportunities which fall within the type of business conducted by the Company, or which are within the type of business planned for future activities by the Company, or which are within the general scope of the types of business activities into which the Company might reasonably be expected to expand its business, are considered to fall within the "Corporate Opportunity Doctrine" (also referred to as the "Partnership Opportunity Doctrine" or the "Business Opportunity Doctrine" depending upon the form of the business entity involved). All business opportunities which fit that description and which become available to or known by the employee during the term of his employment must be disclosed to and made available to the Company. The employee may not take advantage of any such business opportunities for his own account unless and until the Company has knowingly elected not to avail itself of each such opportunity after full disclosure of all material elements and details of the opportunity. (The employee still may be unable to avail himself of such a

>business opportunity if doing so would violate any of the employee's other fiduciary duties.)

In addition to and supplementing the foregoing fiduciary duties, there are also state and federal statutory and regulatory provisions, including, without limitation, Florida statute 607.0901, imposing duties and limitations with respect to transactions and activities of Company insiders and their affiliates.

To the extent they serve as officers, directors, managing agents, or other employees of the Company, the Existing Shareholders agree to abide by all such fiduciary obligations to the Company and its shareholders.

1.11   General Corporate Management. Except as otherwise expressly provided in this Agreement, the business and affairs of the Company shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors. Notwithstanding the foregoing, neither the Company nor any officer or Director of the Company may engage, permit, waive, or suffer any breach of fiduciary duty to the Company or its shareholders other than with the express written consent of all of the Shareholders].

1.12   Taxes; Dividends of Distributable Cash. To the extent reasonably possible to do so given the financial capabilities of the Company, the Board of Directors of the Company shall declare and the Company shall distribute dividends at least quarterly to the Shareholders in an annualized amount not less than 50% of the net income projected to be reported on the shareholder K-1s for the then current taxable year for federal income taxes. The Company shall timely provide the Shareholders with federal and state K-1s, including K-1s compliant with the requirements of the state of residence of the Shareholders, with copies of the full federal and any state tax returns filed by the Company.

1.13   Access to Records. The Shareholders shall have access at all reasonable times to all Company financial information, including through access to accounting software utilized by Company, together with the corporate minute book, and other corporate records generally.

1.14   Indemnity. The Company shall indemnify any Director and may indemnify any officer or other person who was or is a party to, or threatened to be made a party to, any pending or completed action, suit, or proceeding by reason of the fact that he or she or it is or was an officer, director, employee, or agent, or is or was serving at the request or for the benefit of the Company, to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

2.   Tag-Along Right.

2.1   In the event that any of the Existing Shareholders (the "Offering Party") shall determine to sell shares of Common Stock to any person or entity (individually a "Third Party" and collectively, "Third Parties") in any one transaction or any series of related

transactions, directly or indirectly, such sale or other disposition shall not be permitted unless the Offering Party shall offer (or cause the Third Party to offer) to the other Shareholders the right to elect to include, at the sole option of such other Shareholders, such number of shares of Common Stock owned by the other Shareholders making such election as shall be determined in accordance with subsection 2.2 below in the sale or other disposition to the Third Party. The Offering Party shall give written notice to the other Shareholders describing the transactions (the "Tag-Along Notice"). At any time within sixty (60) days after the giving of the Tag-Along Notice, any one or more of the other Shareholders may make an election to include any number of shares of Common Stock owned or controlled by such other Shareholders in such a sale or other disposition (the "Inclusion Election") by giving written notice thereof to the Offering Party proposed proposing to sell such Common Stock and delivering to the Offering Party a stock certificate or certificates representing such shares (the "Tag-Along Shares"), together with a limited power of attorney authorizing the Offering Party to sell or otherwise dispose of such Tag-Along Shares pursuant to the terms of such Third Party's offer.

2.2     The other Shareholders who make such Inclusion Election (the "Included Shareholders") shall have the right to sell, pursuant to the Third Party's offer, that percentage of the shares of Common Stock of each the Included Shareholders which shall be equal to the ratio (expressed as a percentage) of the shares of Common Stock to be sold by the Offering Party as compared to the aggregate number of shares of Common Stock then owned by the Offering Party; provided, however, that if the Third Party's offer is for a maximum number of shares of Common Stock, and such number is less than the number that would be sold by application of the foregoing, then the right to sell Common Stock pursuant to the Third Party's offer shall be allocated on a pro rata basis between the Offering Party and the Included Shareholders in proportion to the number of shares of Common Stock owned by the Offering Party and the Included Shareholders.

2.3     The purchase from the Included Shareholders pursuant to this Section 2 shall be on the same terms and conditions, including the price per share and the date of sale or other disposition, as are received by the Offering Party and stated in the Tag-Along Notice.

2.4     Promptly (but in no event later than five business days) after the consummation of the sale or other disposition of shares of Common Stock of the Offering Party and the Included Shareholders to the Third Party pursuant to the Third Party's offer, the Offering Party shall (i) notify the Included Shareholders of the completion thereof, (ii) cause to be remitted to the Included Shareholders the total sales price attributable to the shares of Common Stock which the Included Shareholders sold or otherwise disposed of pursuant thereto, and (iii) furnish such other evidence of the completion and time of completion of such share or other disposition and the terms thereof as may be reasonably requested by the Included Shareholders.

2.5     If, within sixty (60) days after the Tag-Along Notice is given, no other Shareholders have accepted the offer to make an Inclusion Election, the other Shareholders will be deemed to have waived any and all of their rights to participate in the sale or other disposition of shares of Common Stock pursuant to this Section 2.

Promptly upon the earlier of expiration of such sixty (60) day period, written waiver by all of the other Shareholders of any Tag-Along rights under this Section 2, or receipt of an Inclusion Election from any of the other Shareholders, Offering Party shall give the right of first refusal "Notice" as defined in Section 3.1 (a) below.

2.6   If, at the end of the time period specified hereinbelow for completion of any such sale, Offering Party shall not have completed the sale of shares of Common Stock and the Included Shareholders in accordance with the terms of the Third Party's offer, Offering Party shall return to the Included Shareholders all certificates representing shares of Common Stock which the Included Shareholders shall have delivered for sale pursuant to Section 2.1 above, and each of the restrictions on sale contained in this Agreement with respect to Common Stock owned by Offering Party shall again be in effect.

2.7   The rights provided in this Section 2 shall not be applicable to any merger or other reorganization involving the Company in which the shares of Common Stock owned by any Shareholder are in substantial part exchanged for or converted into securities of another corporation or cash or both.

3.   Right of First Refusal.

3.1   **Definitions**. For purposes of this Section 3, Right of First Refusal, in addition to terms defined elsewhere herein, the following terms shall have the definitions ascribed to them below:

(a)   **Notice**. "Notice" shall mean the notice to be provided by an Offering Party of the intended issuance, sale, transfer, assignment or other disposition of any Offered Shares. The Notice shall contain all of the conditions of the Offering Party's intended disposition of the Offered Shares, and shall constitute the Offering Party's offer to sell the Offered Shares to the Remaining Shareholders on the terms specified herein. If the Offering Party has received a bona fide offer from a third party to purchase the Offered Shares, such Notice shall contain all material terms and conditions of such offer, including the name of the proposed purchaser, the purchase price and terms of payment for the Offered Shares, or if such Offering Party intends a gift or other transfer of the Offered Shares other than sale, the terms and conditions thereof.

(b)   **Offered Shares**. "Offered Shares" shall mean any shares of Common Stock (or any other shares or equity interest, or right or option to acquire shares or equity interest in or to the Company) proposed to be issued, sold, transferred, or otherwise disposed of by the Offering Party. If any other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, the Offered Shares shall be deemed to include the Common Stock of the Included Shareholders to be included in the sale or other disposition of shares as determined pursuant to Section 2 above.

(c) **Offering Party**. "Offering Party" shall mean the Company or the Shareholder who desires to sell, transfer, assign or dispose of any Offered Shares, together with the legal heirs, successors and assigns of such Shareholder or the Company. If any other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, the Included Shareholders shall be deemed to be included within the meaning of Offering Party for purposes of this Section 3.

(d) **Remaining Shareholders**. "Remaining Shareholders" shall mean the Shareholders other than the Offering Party. If any other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, the Included Shareholders shall not be included within the term Remaining Shareholders for purposes of this Section 3. If no other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, all other Shareholders shall be deemed to be included among the Remaining Shareholders for purposes of this Section 3.

3.2 **Grant**. The Company and each Shareholder hereby grants to each of the other Shareholders, and each Shareholder hereby grants to the Company, a right of first refusal to purchase the Offered Shares on the terms specified herein, subject to the condition that in the event the Company and the Remaining Shareholders, as applicable, do not elect to purchase all of the Offered Shares, the Offering Party shall not be required to sell any of the Offered Shares to the Company or the Remaining Shareholders. The Offering Party agrees to sell the Offered Shares to the Company and the Remaining Shareholders in accordance with the terms of this Section 3. In accordance with such right of first refusal, the Offering Party shall, prior to the intended sale, transfer, assignment or other disposition of the Offered Shares, give Notice thereof to the Remaining Shareholders.

3.3 **Exercise Period; Unsubscribed Shares**. The Remaining Shareholders and the Company, as applicable, shall have the right, for a period of ninety (90) days from the date of the Notice (such date being determined in accordance with Section 7 below) to collectively purchase all but not less than all of the Offered Shares for the price and on the terms set forth in the Notice, or on terms no less favorable that those set forth in the Notice.

3.4 **Manner of Exercise**. If any of the Remaining Shareholders or the Company wish to exercise their rights of first refusal, they shall so notify each of the Offering Party, the Company, and the Remaining Shareholders, in writing, within a period of sixty (60) days from the date of the Notice. The Remaining Shareholders and the Company, where applicable, may each elect to purchase any number or all of the Offered Shares and shall specify the number which they elect to so acquire in their written notice. If the number of shares which the Company and the Remaining Shareholders elect in the aggregate to purchase exceeds the total number of Offered Shares, the Company shall purchase or acquire all of the number of the Offered Shares specified by it in its notice given pursuant to this Section 3.4, and any Offered Shares remaining thereafter shall be purchased or acquired by the Remaining Shareholders in such portions of the remainder of the Offered

Shares not purchased or acquired by the Company proportionate to the number of Offered Shares specified in their respective notices given pursuant to this Section 3.4. If the number of shares which the Company and the Remaining Shareholders elect in the aggregate to purchase exceeds the total number of Offered Shares, the Company and the Remaining Shareholders may increase the number of the Offered Shares which they elect to purchase by giving written notice to each of the Offering Party, the Company, and the Remaining Shareholders not later than ninety (90) days from the date of the original Notice. Upon receipt of notices of exercise sufficient to acquire all of the Offered Shares, the Company and the Remaining Shareholders shall be bound to purchase, and the Offering Party shall be bound to sell, the Offered Shares. The closing of such transaction shall take place at the principal executive offices of the Company on that date five (5) business days following the expiration date of the right of first refusal. If notices of exercise sufficient to acquire all of the Offered Shares have not been delivered within ninety (90) days from the date of the original Notice pursuant to the foregoing provisions, then all of the Offered Shares may be sold or otherwise transferred by the Offering Party only to the person or persons specified in the Notice, within a period of ninety (90) days after the expiration of the right of first refusal provided herein. Such sale or other disposition shall be made to such persons only upon the terms and conditions contained in the Notice.

3.5   **Appraisal**. In the event the terms offered by the third party purchaser involve the transfer or assignment to the Offering Party of consideration other than cash, the Remaining Shareholders shall be entitled to exercise their rights of first refusal by tendering, in lieu of such consideration, cash in the amount of the fair market value thereof. The fair market value shall be determined by an independent appraiser selected by the Remaining Shareholders and who is reasonably acceptable to the Offering Party. The cost of the appraisal performed pursuant to this Section 3.5 shall be borne in equal amounts by the Offering Party on the one hand and the Remaining Shareholders on the other hand. In the event the fair market value of the property is determined in the above manner, the period specified in Section 3.3 above during which the Remaining Shareholders may elect to exercise their rights to purchase the Offered Shares shall be extended until that date ninety (90) days from the date on which the parties are notified of such appraised fair market value.

3.6   Notwithstanding the foregoing, any Shareholder shall have the right to transfer by gift all or any portion of his interest in his Common Stock to his spouse, children or grandchildren, or to a trust established by such Shareholder for the benefit of himself, his spouse, children or grandchildren, without such transfer being subject to the provisions of this Section 3; provided that the recipient of such gift shall agree in writing prior to the completion of the transfer to be bound by the terms and conditions of this Agreement including, without limitation, this right of first refusal.

4.   **Closing**. The "Closing" hereunder, at which time those documents to be delivered at the Closing, as specified elsewhere herein and in the Stock Purchase and License Agreement, shall be delivered, and at or by which time those acts or events to be effected at or before the Closing, as specified herein, shall take place by electronic exchange of documents at such time as may be agreed upon by the parties hereto but, in any event, not later than 2:00 PM Pacific Standard

Time, on June 28, 2010. The Closing hereunder and under the Stock Purchase and License Agreement shall occur simultaneously.

5.  Representations and Warranties of the Parties. Each of the representations and warranties set forth in the Stock Purchase and License Agreement are hereby incorporated herein by this reference and each of the parties hereto, and Company's agent or agents executing this Agreement on behalf of Company, hereby jointly and severally, reiterate and reconfirm such warranties and representations.

6.  Further Acts. The parties to this Agreement shall promptly take such further acts and execute such other documents as shall be necessary to carry out the spirit and letter of this Agreement. Without limiting the generality of the foregoing, in the event any court, county recorder, secretary of state of any state, any federal agency, or any other governmental agency may require any additional or different documents or actions in order to effect the purposes contemplated by this Agreement, the parties to this Agreement shall execute the necessary documents and take the necessary steps to comply with those requirements.

7.  Notices. Unless otherwise provided herein, any notice, offer, exercise of rights or other communication required or permitted to be given hereunder shall be in writing and shall be given by registered or certified mail, confirmed facsimile or telecopy (with a hard copy deposited in overnight mail), or overnight delivery service such as Federal Express if a receipt is obtained showing delivery, at such party's address set forth next below or such other address as such party may hereafter specify by notice to the other parties hereto, or by actual personal delivery. Any notice or other communication shall be deemed to have been given as of the date so personally delivered or transmitted by confirmed telecopy or like transmission, on the date of delivery shown on the receipt when sent by overnight delivery service, or on the date shown on the return receipt for delivery or, if refused, the date of first attempted delivery, when given by registered or certified mail. Any party may change its address for notice by notice to the other party given in accordance with this Section. Address and fax numbers for such notice are as follows:

If to Lutter, to:

Mr. Alfred W. Lutter, III
Lutter Consulting

With a copy to:

Ed Sybesma, Esq.



If to Company, to:

| | |
|---|---|
| Name: | Noel Mijares |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 5810 Biscayne Blvd |
| City, State, ZIP: | Miami, FL  33137 |

With a copy to:

| | |
|---|---|
| Name: | Lisa Cote |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 5810 Biscayne Blvd |
| City, State, ZIP: | Miami, FL  33137 |

And a copy to:

| | |
|---|---|
| Name: | Steven Cerasale |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 2881 Forrester Avenue |
| City, State, ZIP: | Los Angeles, CA 90064 |

8.     Entire Agreement. This Agreement together with the exhibits hereto and the Stock Purchase and License Agreement effective concurrently herewith constitute the entirety of the agreements between the parties hereto concerning the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties, and there are no warranties, representations or agreements, express or implied, among the parties except as set forth herein. No amendment, supplement, modification, waiver, or termination of this Agreement, or any provision hereof, shall be binding unless executed in writing by the party against whom any of the foregoing is sought to be enforced. No waiver of any provision of this Agreement shall constitute a waiver of any other provision (whether similar or not), nor shall any waiver constitute a continuing waiver unless otherwise expressly provided hereunder or in writing signed by the party against whom any such waiver is sought to be enforced.

9. <u>Counterparts</u>. This Agreement may be executed in counterparts, and each executed counterpart shall be deemed to be a duplicate original of this Agreement. This Agreement may be delivered by facsimile or other electronic communication. Facsimile or electronic images of signatures shall be treated as original signatures for all applicable purposes.

10. <u>Headings</u>. The captions and headings contained in this Agreement are for convenience only and shall not affect the construction or interpretation of any provisions of this Agreement.

11. <u>Attorneys' Fees</u>. If any party breaches any obligation under this Agreement, or any dispute arises out of or with respect to this Agreement, the non-breaching party (or the prevailing party in the event of any litigation or alternate dispute resolution procedure) shall be entitled to its reasonable expenses, attorneys' fees, experts' fees, and costs, incurred as a result of any such breach, dispute, or litigation, including, without limitation, in any action taken, with or without litigation, to enforce, work out, or renegotiate the terms of this Agreement, or to remedy or compensate for such breach.

12. <u>Construction</u>. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The word "including" shall mean including without limitation and is used in an illustrative sense rather than a limiting sense. Terms used with initial capital letters will have the meanings specified, applicable to singular and plural forms, for all purposes of this Agreement. Reference to any gender will be deemed to include all genders and the neutral form.

13. <u>No Third Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any person other than the parties hereto and their permitted successors and assigns, and only in accordance with the express terms of this Agreement.

14. <u>Reformation and Severability of Provisions</u>. If any provision of this Agreement is declared invalid, in whole or in part, by a court of competent jurisdiction, such provision may be modified or limited in its effect to the extent necessary to cause it to be enforceable. If any provision cannot be so modified or limited, then such provision shall be severed and the remainder of this Agreement shall remain in full force and effect.

15: <u>Applicable Law</u>. The obligations, rights , duties, powers and remedies under this agreement shall be governed and construed by the laws of the State of Florida. If any legal action is necessary to enforce the terms and conditions of this agreement, the parties agree that the Circuit Court of Miami Dade County Florida, or, if applicable, federal district court sitting in Miami Dade county, shall be the sole venue and jurisdiction for the bringing of such action.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Dated: June 28, 2010    _____
                        Alfred W. Lutter, III

Dated: June 28, 2010    _____
                        Noel Mijares

Dated: June 28, 2010    _____
                        Lisa D. Cote

Dated: June 28, 2010    _____
                        Steven Cerasale

Dated: June 28, 2010    Unisource Discovery, Inc., a Florida corporation

                        By: _____
                            Noel Mijares, CEO, President

                        By: _____

                        _____, Secretary

# Exhibit "A"

# BYLAWS OF

# UNISOURCE DISCOVERY, INC., A FLORIDA CORPORATION

By Laws not attached or reviewed.