Exhibit "H"

# Unisource Discovery, Inc.

# Closed Corporation Shareholder Agreement

# CLOSE CORPORATION SHAREHOLDER AGREEMENT

This Close Corporation Shareholder Agreement (this "Agreement") is entered into as of June 28, 2010, by and between Alfred W. Lutter, III ("Lutter"), Noel Mijares ("Mijares"), Lisa D. Cote ("Cote"), Steven Cerasale ("Cerasale"), and Unisource Discovery, Inc., a Florida corporation ("Company").

## RECITALS

A.     Concurrently herewith the parties to this Agreement are entering into that certain Stock Purchase and License Agreement of even date herewith (the "Stock Purchase and License Agreement").

B.     Mijares, Cote, and Cerasale (collectively, "Existing Shareholders") are the existing shareholders of Company. Effective at and following the Closing (as defined in Section 4 below), the Existing Shareholders and Lutter shall collectively be referred to as the "Shareholders" and individually as a "Shareholder".

C.     Company operations have heretofore been conducted pursuant to, in part, that certain Operating Agreement dated effective as of June 15, 2006, by and among the Existing Shareholders (the "Operating Agreement") is made part of the Unisource Discovery, Inc. Corporate By-Laws.

D.     The parties now wish to restate, amend, and incorporate into this Agreement provisions regarding certain ongoing rights and obligations of the parties previously set forth in the Operating Agreement, and to provide for certain additional shareholder protections for the benefit of each of the Shareholders.

Accordingly, the parties to this Agreement hereby agree as follows:

## AGREEMENT

1.     Corporate Governance in General.

1.1     Operating Agreement. The Operating Agreement is terminated effective as of the Closing and shall be of no further force or effect following the Closing. The provisions of the Operating Agreement are superseded by the provisions of this Agreement.

1.2     Board of Directors.

(a)     The Board of Directors shall consist of a total of three board seats, unless such arrangement is changed in the corporate bylaws by a majority vote and written consent of the shareholders voting on the basis of shares held by each of them.

(b) Notwithstanding any provision to the contrary set forth in the Articles or Bylaws of the Company, the Board of Directors of the Company shall consist of Cerasale, Mijares, and Cote (the "Directors"). The Directors shall remain in such positions from year-to-year until such time as they may be removed by resignation, death, disability, or written consent of the Shareholders. Annual shareholder meetings for the purpose of electing directors shall not be required and are hereby waived. Each Director shall devote only such time and effort as such Director deems appropriate for the furtherance of the Company's business.

(c) Without limiting the generality of the provisions of this Agreement set forth below relating to fiduciary duties, the Directors of the Company are prohibited from engaging in any business or employment activities competitive to the business of the Company. The parties hereto acknowledge and agree that the business of the Company includes expansion plans nationwide in the business of records retrieval, eDiscovery, and legal discovery case and records management. The parties agree that presently existing businesses operated by the Directors are complementary to the business of the Company, and it is anticipated that working relationships, cross referrals, another collaborative activities may be conducted between the Company and such other businesses.

1.3  Trademark. UNISOURCE DISCOVERY DIGITAL DOCUMENT RETRIEVAL is a registered US trademark of the Company. Without limiting the foregoing, the parties agree that the Company shall be entitled to use the trademark "Unisource Discovery", as part of its corporate name, Unisource Discovery, Inc., or as a fictitious business name, or otherwise.

1.4  The Subpoena Company. The parties acknowledge and agree that the Company shall have the exclusive rights to utilize the Florida Platform of "the Subpoena Company" to establish a presence in the region.

1.5  Company Bylaws. Effective at or before the Closing, the Existing Shareholders shall, by unanimous written consent, adopt bylaws in the form attached hereto as Exhibit "A".

1.6  Corporate Minute Book. At or before the Closing, the Company shall create or update a corporate minute book, to be maintained in the custody of the president or secretary of the Company, or such other custodian as may be authorized by the Board of Directors of the Company, containing copies of the Articles of Incorporation, the amendment thereto provided for herein below, the corporate bylaws adopted as provided herein, a stock ledger recording the issuance and transfer of the Common Stock, all minutes and forms of actions by written consent of the shareholders and directors, including such items as are contemplated as set forth in this Agreement, a copy of the current annual statement as filed with the Florida Department of State together with such prior annual filings as may be available, a copy of the statement of registered agent

accepting appointment as such, and such other corporate organizational documents and filings as are customarily maintained in such minute books.

1.7     Annual Meeting, Election of Directors, Election of Officers.  At or before the Closing, the Existing Shareholders shall, by unanimous written consent, conduct the annual meeting of shareholders of the Company and elect directors for the following year and shall, immediately thereafter, use their best efforts to cause the directors so elected to conduct the annual organizational meeting of directors for the purpose of electing the officers of the Company for the following year.

1.8     Amendment of Articles.  At or before the Closing, the Existing Shareholders shall, by unanimous written consent, authorize and adopt an amendment to the Articles of Incorporation of the Company, and the Company shall cause to be filed with the Florida Department of State the amendment so adopted and further providing that, "Stockholder agreements imposing reasonable restrictions on transfer of stock are authorized and permitted."

1.9     Compliance with Laws and Governing Instruments.  The Existing Shareholders who may, from time to time, serve as officers, directors, or managing agents of the Company shall use their best efforts to observe and comply with, and to cause the Company to observe and comply with, the articles and bylaws all the Company together with all federal, state and local statutes, regulations, ordinances and administrative rules and orders applicable to the conduct of the business of the Company and its corporate existence and organization.  Without limiting the foregoing, (i) at or before the Closing the Existing Shareholders shall confirm that the annual statement required to be filed with the Florida Department of State is current or, if not current, shall immediately file and bring current such annual statement; (ii) the Company shall prepare and deliver to its Shareholders, as required by Florida law Section___, annual financial statements that include balance sheet, income statement and statement of cash flow for each fiscal year.

1.10    Fiduciary Duties.  The Existing Shareholders acknowledge that officers, directors, managing agents, and other executive or high-level employees (collectively referred to herein as an "Employee" or "Employees") maintain a relationship with the Company in which high degrees of confidence and trust are reposed in the Employee.  (Controlling shareholders also have certain fiduciary duties to the other shareholders of a company.) An Employee's fiduciary duties to the Company include the following:

   (a)     The Duty of Undivided Loyalty.  In addition to the straightforward meaning of those terms, the employee may not benefit himself, a competitor, or any other person, to the detriment of the Company, in anything which the employee does within the scope or during the term of his employment or on company time.  All of employee's efforts and activities conducted while being compensated by the Company, or within the scope and course of the employment relationship, must be undertaken solely in the interests of the Company.

(b)     The Duty to Avoid Conflicts of Interest.  The employee may not place himself in a position where he has obligations to any third party, or interests of his own, which are in any way in conflict with or competitive to the interests of his Company.  If any such conflicting obligations or interests arise, the employee must remove himself from the situation or relationship which gives rise to such a conflict of interest.

(c)     The Duty of Full Disclosure.  The employee is obligated to disclose to the Company all information which comes into the possession of the employee which is relevant to the business or affairs of the Company including, without limitation, all information relating to the activities of the employee within the course and scope of his employment.

(d)     The Duty to Avoid Self Dealing.  The employee may not engage in any transaction, directly or through the use of third parties, middlemen, or otherwise, with the Company, without full disclosure to and consent from the Company as to all of the material terms and details of the transaction. The employee is not permitted to make "secret profits" of any kind. Secret profits include any profit or other type of benefit obtained by the employee which results from the employment relationship, or from any of the activities of the employee conducted in the course and scope of the employment relationship, which have not been fully disclosed to, and consented to by, the Company in all material respects and detail.

(e)     The Duty of Fair Dealing.  Transactions between the employee and the Company which are arranged, brought about, or conducted by the Employee, must be fair and reasonable as to the Company even if they are fully disclosed.

(f)     The Duty to make available to the Company all "Corporate, Business, or Partnership Opportunities".  All business or commercial opportunities which fall within the type of business conducted by the Company, or which are within the type of business planned for future activities by the Company, or which are within the general scope of the types of business activities into which the Company might reasonably be expected to expand its business, are considered to fall within the "Corporate Opportunity Doctrine" (also referred to as the "Partnership Opportunity Doctrine" or the "Business Opportunity Doctrine" depending upon the form of the business entity involved).  All business opportunities which fit that description and which become available to or known by the employee during the term of his employment must be disclosed to and made available to the Company.  The employee may not take advantage of any such business opportunities for his own account unless and until the Company has knowingly elected not to avail itself of each such opportunity after full disclosure of all material elements and details of the opportunity. (The employee still may be unable to avail himself of such a

business opportunity if doing so would violate any of the employee's other fiduciary duties.)

In addition to and supplementing the foregoing fiduciary duties, there are also state and federal statutory and regulatory provisions, including, without limitation, Florida statute 607.0901, imposing duties and limitations with respect to transactions and activities of Company insiders and their affiliates.

To the extent they serve as officers, directors, managing agents, or other employees of the Company, the Existing Shareholders agree to abide by all such fiduciary obligations to the Company and its shareholders.

1.11    General Corporate Management.  Except as otherwise expressly provided in this Agreement, the business and affairs of the Company shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors. Notwithstanding the foregoing, neither the Company nor any officer or Director of the Company may engage, permit, waive, or suffer any breach of fiduciary duty to the Company or its shareholders other than with the express written consent of all of the Shareholders].

1.12    Taxes; Dividends of Distributable Cash.  To the extent reasonably possible to do so given the financial capabilities of the Company, the Board of Directors of the Company shall declare and the Company shall distribute dividends at least quarterly to the Shareholders in an annualized amount not less than 50% of the net income projected to be reported on the shareholder K-1s for the then current taxable year for federal income taxes.  The Company shall timely provide the Shareholders with federal and state K-1s, including K-1s compliant with the requirements of the state of residence of the Shareholders, with copies of the full federal and any state tax returns filed by the Company.

1.13    Access to Records.  The Shareholders shall have access at all reasonable times to all Company financial information, including through access to accounting software utilized by Company, together with the corporate minute book, and other corporate records generally.

1.14    Indemnity.  The Company shall indemnify any Director and may indemnify any officer or other person who was or is a party to, or threatened to be made a party to, any pending or completed action, suit, or proceeding by reason of the fact that he or she or it is or was an officer, director, employee, or agent, or is or was serving at the request or for the benefit of the Company, to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

2.    Tag-Along Right.

2.1    In the event that any of the Existing Shareholders (the "Offering Party") shall determine to sell shares of Common Stock to any person or entity (individually a "Third Party" and collectively, "Third Parties") in any one transaction or any series of related

transactions, directly or indirectly, such sale or other disposition shall not be permitted unless the Offering Party shall offer (or cause the Third Party to offer) to the other Shareholders the right to elect to include, at the sole option of such other Shareholders, such number of shares of Common Stock owned by the other Shareholders making such election as shall be determined in accordance with subsection 2.2 below in the sale or other disposition to the Third Party.  The Offering Party shall give written notice to the other Shareholders describing the transactions (the "Tag-Along Notice").  At any time within sixty (60) days after the giving of the Tag-Along Notice, any one or more of the other Shareholders may make an election to include any number of shares of Common Stock owned or controlled by such other Shareholders in such a sale or other disposition (the "Inclusion Election") by giving written notice thereof to the Offering Party proposed proposing to sell such Common Stock and delivering to the Offering Party a stock certificate or certificates representing such shares (the "Tag-Along Shares"), together with a limited power of attorney authorizing the Offering Party to sell or otherwise dispose of such Tag-Along Shares pursuant to the terms of such Third Party's offer.

2.2    The other Shareholders who make such Inclusion Election (the "Included Shareholders") shall have the right to sell, pursuant to the Third Party's offer, that percentage of the shares of Common Stock of each the Included Shareholders which shall be equal to the ratio (expressed as a percentage) of the shares of Common Stock to be sold by the Offering Party as compared to the aggregate number of shares of Common Stock then owned by the Offering Party; provided, however, that if the Third Party's offer is for a maximum number of shares of Common Stock, and such number is less than the number that would be sold by application of the foregoing, then the right to sell Common Stock pursuant to the Third Party's offer shall be allocated on a pro rata basis between the Offering Party and the Included Shareholders in proportion to the number of shares of Common Stock owned by the Offering Party and the Included Shareholders.

2.3    The purchase from the Included Shareholders pursuant to this Section 2 shall be on the same terms and conditions, including the price per share and the date of sale or other disposition, as are received by the Offering Party and stated in the Tag-Along Notice.

2.4    Promptly (but in no event later than five business days) after the consummation of the sale or other disposition of shares of Common Stock of the Offering Party and the Included Shareholders to the Third Party pursuant to the Third Party's offer, the Offering Party shall (i) notify the Included Shareholders of the completion thereof, (ii) cause to be remitted to the Included Shareholders the total sales price attributable to the shares of Common Stock which the Included Shareholders sold or otherwise disposed of pursuant thereto, and (iii) furnish such other evidence of the completion and time of completion of such share or other disposition and the terms thereof as may be reasonably requested by the Included Shareholders.

2.5    If, within sixty (60) days after the Tag-Along Notice is given, no other Shareholders have accepted the offer to make an Inclusion Election, the other Shareholders will be deemed to have waived any and all of their rights to participate in the sale or other disposition of shares of Common Stock pursuant to this Section 2.

Promptly upon the earlier of expiration of such sixty (60) day period, written waiver by all of the other Shareholders of any Tag-Along rights under this Section 2, or receipt of an Inclusion Election from any of the other Shareholders, Offering Party shall give the right of first refusal "Notice" as defined in Section 3.1 (a) below.

2.6    If, at the end of the time period specified hereinbelow for completion of any such sale, Offering Party shall not have completed the sale of shares of Common Stock and the Included Shareholders in accordance with the terms of the Third Party's offer, Offering Party shall return to the Included Shareholders all certificates representing shares of Common Stock which the Included Shareholders shall have delivered for sale pursuant to Section 2.1 above, and each of the restrictions on sale contained in this Agreement with respect to Common Stock owned by Offering Party shall again be in effect.

2.7    The rights provided in this Section 2 shall not be applicable to any merger or other reorganization involving the Company in which the shares of Common Stock owned by any Shareholder are in substantial part exchanged for or converted into securities of another corporation or cash or both.

3.    Right of First Refusal.

3.1    **Definitions**. For purposes of this Section 3, Right of First Refusal, in addition to terms defined elsewhere herein, the following terms shall have the definitions ascribed to them below:

(a)    **Notice**. "Notice" shall mean the notice to be provided by an Offering Party of the intended issuance, sale, transfer, assignment or other disposition of any Offered Shares. The Notice shall contain all of the conditions of the Offering Party's intended disposition of the Offered Shares, and shall constitute the Offering Party's offer to sell the Offered Shares to the Remaining Shareholders on the terms specified herein. If the Offering Party has received a bona fide offer from a third party to purchase the Offered Shares, such Notice shall contain all material terms and conditions of such offer, including the name of the proposed purchaser, the purchase price and terms of payment for the Offered Shares, or if such Offering Party intends a gift or other transfer of the Offered Shares other than sale, the terms and conditions thereof.

(b)    **Offered Shares**. "Offered Shares" shall mean any shares of Common Stock (or any other shares or equity interest, or right or option to acquire shares or equity interest in or to the Company) proposed to be issued, sold, transferred, or otherwise disposed of by the Offering Party. If any other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, the Offered Shares shall be deemed to include the Common Stock of the Included Shareholders to be included in the sale or other disposition of shares as determined pursuant to Section 2 above.

(c)     **Offering Party**.  "Offering Party" shall mean the Company or the Shareholder who desires to sell, transfer, assign or dispose of any Offered Shares, together with the legal heirs, successors and assigns of such Shareholder or the Company.  If any other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, the Included Shareholders shall be deemed to be included within the meaning of Offering Party for purposes of this Section 3.

(d)     **Remaining Shareholders**.  "Remaining Shareholders" shall mean the Shareholders other than the Offering Party.  If any other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, the Included Shareholders shall not be included within the term Remaining Shareholders for purposes of this Section 3.  If no other Shareholder delivers an Inclusion Election to the Offering Party pursuant to Section 2.1 above, all other Shareholders shall be deemed to be included among the Remaining Shareholders for purposes of this Section 3.

3.2     **Grant**.  The Company and each Shareholder hereby grants to each of the other Shareholders, and each Shareholder hereby grants to the Company, a right of first refusal to purchase the Offered Shares on the terms specified herein, subject to the condition that in the event the Company and the Remaining Shareholders, as applicable, do not elect to purchase all of the Offered Shares, the Offering Party shall not be required to sell any of the Offered Shares to the Company or the Remaining Shareholders.  The Offering Party agrees to sell the Offered Shares to the Company and the Remaining Shareholders in accordance with the terms of this Section 3.  In accordance with such right of first refusal, the Offering Party shall, prior to the intended sale, transfer, assignment or other disposition of the Offered Shares, give Notice thereof to the Remaining Shareholders.

3.3     **Exercise Period; Unsubscribed Shares**.  The Remaining Shareholders and the Company, as applicable, shall have the right, for a period of ninety (90) days from the date of the Notice (such date being determined in accordance with Section 7 below) to collectively purchase all but not less than all of the Offered Shares for the price and on the terms set forth in the Notice, or on terms no less favorable that those set forth in the Notice.

3.4     **Manner of Exercise**.  If any of the Remaining Shareholders or the Company wish to exercise their rights of first refusal, they shall so notify each of the Offering Party, the Company, and the Remaining Shareholders, in writing, within a period of sixty (60) days from the date of the Notice.  The Remaining Shareholders and the Company, where applicable, may each elect to purchase any number or all of the Offered Shares and shall specify the number which they elect to so acquire in their written notice.  If the number of shares which the Company and the Remaining Shareholders elect in the aggregate to purchase exceeds the total number of Offered Shares, the Company shall purchase or acquire all of the number of the Offered Shares specified by it in its notice given pursuant to this Section 3.4, and any Offered Shares remaining thereafter shall be purchased or acquired by the Remaining Shareholders in such portions of the remainder of the Offered

Shares not purchased or acquired by the Company proportionate to the number of Offered Shares specified in their respective notices given pursuant to this Section 3.4. If the number of shares which the Company and the Remaining Shareholders elect in the aggregate to purchase exceeds the total number of Offered Shares, the Company and the Remaining Shareholders may increase the number of the Offered Shares which they elect to purchase by giving written notice to each of the Offering Party, the Company, and the Remaining Shareholders not later than ninety (90) days from the date of the original Notice. Upon receipt of notices of exercise sufficient to acquire all of the Offered Shares, the Company and the Remaining Shareholders shall be bound to purchase, and the Offering Party shall be bound to sell, the Offered Shares. The closing of such transaction shall take place at the principal executive offices of the Company on that date five (5) business days following the expiration date of the right of first refusal. If notices of exercise sufficient to acquire all of the Offered Shares have not been delivered within ninety (90) days from the date of the original Notice pursuant to the foregoing provisions, then all of the Offered Shares may be sold or otherwise transferred by the Offering Party only to the person or persons specified in the Notice, within a period of ninety (90) days after the expiration of the right of first refusal provided herein. Such sale or other disposition shall be made to such persons only upon the terms and conditions contained in the Notice.

3.5     **Appraisal**. In the event the terms offered by the third party purchaser involve the transfer or assignment to the Offering Party of consideration other than cash, the Remaining Shareholders shall be entitled to exercise their rights of first refusal by tendering, in lieu of such consideration, cash in the amount of the fair market value thereof. The fair market value shall be determined by an independent appraiser selected by the Remaining Shareholders and who is reasonably acceptable to the Offering Party. The cost of the appraisal performed pursuant to this Section 3.5 shall be borne in equal amounts by the Offering Party on the one hand and the Remaining Shareholders on the other hand. In the event the fair market value of the property is determined in the above manner, the period specified in Section 3.3 above during which the Remaining Shareholders may elect to exercise their rights to purchase the Offered Shares shall be extended until that date ninety (90) days from the date on which the parties are notified of such appraised fair market value.

3.6     Notwithstanding the foregoing, any Shareholder shall have the right to transfer by gift all or any portion of his interest in his Common Stock to his spouse, children or grandchildren, or to a trust established by such Shareholder for the benefit of himself, his spouse, children or grandchildren, without such transfer being subject to the provisions of this Section 3; provided that the recipient of such gift shall agree in writing prior to the completion of the transfer to be bound by the terms and conditions of this Agreement including, without limitation, this right of first refusal.

4.     Closing. The "Closing" hereunder, at which time those documents to be delivered at the Closing, as specified elsewhere herein and in the Stock Purchase and License Agreement, shall be delivered, and at or by which time those acts or events to be effected at or before the Closing, as specified herein, shall take place by electronic exchange of documents at such time as may be agreed upon by the parties hereto but, in any event, not later than 2:00 PM Pacific Standard

Time, on June 28, 2010. The Closing hereunder and under the Stock Purchase and License Agreement shall occur simultaneously.

5.      Representations and Warranties of the Parties. Each of the representations and warranties set forth in the Stock Purchase and License Agreement are hereby incorporated herein by this reference and each of the parties hereto, and Company's agent or agents executing this Agreement on behalf of Company, hereby jointly and severally, reiterate and reconfirm such warranties and representations.

6.      Further Acts. The parties to this Agreement shall promptly take such further acts and execute such other documents as shall be necessary to carry out the spirit and letter of this Agreement. Without limiting the generality of the foregoing, in the event any court, county recorder, secretary of state of any state, any federal agency, or any other governmental agency may require any additional or different documents or actions in order to effect the purposes contemplated by this Agreement, the parties to this Agreement shall execute the necessary documents and take the necessary steps to comply with those requirements.

7.      Notices. Unless otherwise provided herein, any notice, offer, exercise of rights or other communication required or permitted to be given hereunder shall be in writing and shall be given by registered or certified mail, confirmed facsimile or telecopy (with a hard copy deposited in overnight mail), or overnight delivery service such as Federal Express if a receipt is obtained showing delivery, at such party's address set forth next below or such other address as such party may hereafter specify by notice to the other parties hereto, or by actual personal delivery. Any notice or other communication shall be deemed to have been given as of the date so personally delivered or transmitted by confirmed telecopy or like transmission, on the date of delivery shown on the receipt when sent by overnight delivery service, or on the date shown on the return receipt for delivery or, if refused, the date of first attempted delivery, when given by registered or certified mail. Any party may change its address for notice by notice to the other party given in accordance with this Section. Address and fax numbers for such notice are as follows:

If to Lutter, to:

> Mr. Alfred W. Lutter, III
> Lutter Consulting
> 2934 Quarry Mountain Road
> Park City, UT 84098
> Facsimile: 435-655-9292
> Confirming no: (949) 500-2007

With a copy to:

> Ed Sybesma, Esq.
> Rutan & Tucker, LLP
> 611 Anton Boulevard
> Suite 1400
> Costa Mesa, CA 92626
> Facsimile:          (714) 546-9035

Confirming no:     (714) 641-3427

If to Company, to:

| | |
|---|---|
| Name: | Noel Mijares |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 5810 Biscayne Blvd |
| City, State, ZIP: | Miami, FL 33137 |
| Facsimile: | 866-580-9070 |
| Confirming no: | 305-757-5739 |

With a copy to:

| | |
|---|---|
| Name: | Lisa Cote |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 5810 Biscayne Blvd |
| City, State, ZIP: | Miami, FL 33137 |
| Facsimile: | 866-580-9070 |
| Confirming no: | 305-757-5739 |

And a copy to:

| | |
|---|---|
| Name: | Steven Cerasale |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 2881 Forrester Avenue |
| City, State, ZIP: | Los Angeles, CA 90064 |
| Facsimile: | 310-837-5588 |
| Confirming no: | 310-837-2889 |

8.    Entire Agreement. This Agreement together with the exhibits hereto and the Stock Purchase and License Agreement effective concurrently herewith constitute the entirety of the agreements between the parties hereto concerning the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties, and there are no warranties, representations or agreements, express or implied, among the parties except as set forth herein. No amendment, supplement, modification, waiver, or termination of this Agreement, or any provision hereof, shall be binding unless executed in writing by the party against whom any of the foregoing is sought to be enforced. No waiver of any provision of this Agreement shall constitute a waiver of any other provision (whether similar or not), nor shall any waiver constitute a continuing waiver unless otherwise expressly provided hereunder or in writing signed by the party against whom any such waiver is sought to be enforced.

9.      Counterparts. This Agreement may be executed in counterparts, and each executed counterpart shall be deemed to be a duplicate original of this Agreement.  This Agreement may be delivered by facsimile or other electronic communication.  Facsimile or electronic images of signatures shall be treated as original signatures for all applicable purposes.

10.     Headings. The captions and headings contained in this Agreement are for convenience only and shall not affect the construction or interpretation of any provisions of this Agreement.

11.     Attorneys' Fees. If any party breaches any obligation under this Agreement, or any dispute arises out of or with respect to this Agreement, the non-breaching party (or the prevailing party in the event of any litigation or alternate dispute resolution procedure) shall be entitled to its reasonable expenses, attorneys' fees, experts' fees, and costs, incurred as a result of any such breach, dispute, or litigation, including, without limitation, in any action taken, with or without litigation, to enforce, work out, or renegotiate the terms of this Agreement, or to remedy or compensate for such breach.

12.     Construction. The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  The word "including" shall mean including without limitation and is used in an illustrative sense rather than a limiting sense.  Terms used with initial capital letters will have the meanings specified, applicable to singular and plural forms, for all purposes of this Agreement.  Reference to any gender will be deemed to include all genders and the neutral form.

13.     No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any person other than the parties hereto and their permitted successors and assigns, and only in accordance with the express terms of this Agreement.

14.     Reformation and Severability of Provisions. If any provision of this Agreement is declared invalid, in whole or in part, by a court of competent jurisdiction, such provision may be modified or limited in its effect to the extent necessary to cause it to be enforceable. If any provision cannot be so modified or limited, then such provision shall be severed and the remainder of this Agreement shall remain in full force and effect.

15:     Applicable Law. The obligations, rights , duties, powers and remedies under this agreement shall be governed and construed by the laws of the State of Florida. If any legal action is necessary to enforce the terms and conditions of this agreement, the parties agree that the Circuit Court of Miami Dade County Florida, or, if applicable, federal district court sitting in Miami Dade county, shall be the sole venue and jurisdiction for the bringing of such action.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

Dated: June 28, 2010

Alfred W. Lutter, III

Dated: June 28, 2010

Noel Mijares

Dated: June 28, 2010

Lisa D. Cote

Dated: June 28, 2010

Steven Cerasale

Dated: June 28, 2010

Unisource Discovery, Inc., a Florida corporation

By: _____
Noel Mijares, CEO, President

By: _____

_____, Secretary

Unisource Discovery, Inc.

Stock Purchase and License Agreement

# STOCK PURCHASE AND LICENSE AGREEMENT

This Stock Purchase and License Agreement (this "Agreement") is entered into as of June 28, 2010 by and between Alfred W. Lutter, III ("Lutter"), Noel Mijares ("Mijares"), Lisa D. Cote ("Cote"), Steven Cerasale ("Cerasale"), and Unisource Discovery, Inc., a Florida corporation ("Company").

## RECITALS

A.      Lutter is the sole author and sole owner of certain Legal Discovery Case and Records Management Software (the "Software") which was developed in part with pre-existing software components written and owned by Lutter and was licensed to Unisource Discovery, LLC, a California limited liability company pursuant to arrangements between Lutter, Cerasale, and Unisource Discovery, LLC, an active California Limited Liability Company.

B.      Mijares, Cote, and Cerasale (collectively, "Existing Shareholders") are the existing shareholders of Company.  Effective at and following the Closing (as defined in Section 4 below), the Existing Shareholders and Lutter shall collectively be referred to as the "Shareholders" and individually as a "Shareholder".

C.      Company has been utilizing the Software without written license from Lutter but with his permission.

D.      Company operations under Unisource Discovery, Inc. (Company) have heretofore been conducted pursuant to, in part, that certain Operating Agreement dated effective as of June 15, 2006, by and among the Existing Shareholders (the "Operating Agreement").  Cerasale originally acquired his stock in the Company in consideration in part for the undertaking to provide rights to the use of the Software.

E.      The parties now wish to provide for licensing of the Software to the Company, to provide for compensation in the form of the transfer of stock in the Company to Lutter in exchange for the Company's license to the Software, and to provide for certain shareholder protections in connection with the ownership of the stock in the Company by Lutter and Existing Shareholders.

Accordingly, the parties to this Agreement hereby agree as follows:

## AGREEMENT

1.      <u>Software License to Company</u>.

1.1      License.  Effective as of the Closing, Lutter (also sometimes referred to hereinbelow as "Licensor") grants to Company (also sometimes referred to within this Section 1 as "Licensee") exclusive "License" and full rights (the "Company License") to use the Software on the terms and conditions, and subject to the limitations, set forth

hereinbelow and, solely for that purpose, to use any accompanying manuals, descriptions, instructions, or other literature ("Documentation") provided by Lutter in connection with the Software. Should licensor cease to perform any necessary maintenance on any licensed product, Licensor will provide Licensee with Source Code for Licensee's use only. It is agreed and understood that all new developments, additions and modifications to the software are made-part of this Software License to Company Agreement.

1.2     Scope of and Limitations on License.  Company shall use the Software and Documentation only solely for Company's own business.  Company shall not:

(a)     Sell, assign, license, sublicense, lease, lend, transfer, hypothecate, encumber, pledge, publish, disclose, display, or otherwise make available, to any person or entity whatsoever (including, without limitation, any parent, subsidiary, or affiliated entity), any of the Software, Documentation, or other Intellectual Properties (as defined in Section 1.5 below), or any portion thereof, it being further agreed that such License is personal to Company, and to the business and intended uses of Company, and any attempted or purported transfer of the License or any portion thereof would constitute an impermissible, void, and invalid expansion of the scope of such License;

(b)     use the Software in the operation of a service bureau, or in the operation of a Web-hosted Application Service Provider ("ASP") business or otherwise distribute the use or benefits of the Software over the Internet or other network accessible by any third party;

(c)     copy any of the Software, Documentation, or other Intellectual Properties; except that, solely to provide an emergency backup of the Software, Company may make archival copies of the Software; provided that any such copy must be stored in a safe and secure location and must include all of Lutter's copyright notices, proprietary legends, and other notices, and all such copies shall be the exclusive property of Lutter and shall be accounted for by Company upon the request of Lutter;

(d)     disassemble, decompile, or reverse engineer the Software, or any portion thereof, or otherwise attempt to determine or identify any of the content of the programming code contained therein; or

(e)     alter, enhance, or otherwise modify any of the source or object code contained within any of the Software, or any portion thereof, or create any derivative works there from, but Company may configure the Software in accordance with configuration options provided as part of the Software and may customize or utilize APIs and create templates or schemas without modifying any of the source or object code contained within the Software.

-2-

1.3     Notwithstanding the provisions of Section 1.2 above, Company shall have full rights of assignment of the entirety of, and not less than all of, Company's License rights to the acquiring party in connection with any merger, takeover, or similar reorganization, or the sale of all or substantially all of the assets of the Company provided that the assignee in any such transaction accepts in writing, delivered to Licensor, all of Company's obligations under this License.  In such event, the Company shall have full authority to book the transaction and the sale and disposition of the License on the Company books in such manner as the Company and its accountants may deem necessary or appropriate.

1.4     Limited Warranty & Limitations.]

Lutter warrants that all modifications and deliverables with respect to the Software will not infringe any other software owner's intellectual property rights, perform substantially in accordance with the applicable purchase order requirements or specifications for a period of ninety (90) days from the date of delivery of each deliverable.  Lutter's and its suppliers entire liability and Company's exclusive remedy shall be, at Lutter's option, either the return of the price paid for the License to, or the reasonable and best efforts repair or replacement of, any Software deliverable that does not meet this limited warranty and which is returned to Lutter. This warranty is void if failure of the Software or hardware has resulted from accident, abuse or misuse, or modifications or uses which are not authorized by Lutter.

EXCEPT AS EXPRESSLY PROVIDED IN THE PRECEDING PARAGRAPH, THE SOFTWARE AND ALL DELIVERABLES WITH RESPECT THERETO ARE PROVIDED "AS IS".  ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ARE EXCLUDED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE, OF NONINFRINGEMENT, OR ANY OTHER WARRANTY WITH RESPECT TO THE QUALITY, ACCURACY, OR FREEDOM FROM ERROR OF THE OPERATION, USE, AND FUNCTION OF THE SOFTWARE AND DELIVERABLES.  Implied warranties, if any, which are not disclaim-able are limited to ninety (90) days.

LICENSOR SHALL NOT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR ANY DAMAGES CAUSED BY LICENSEE'S FAILURE TO PERFORM LICENSEE'S RESPONSIBILITIES TO ANY THIRD PARTIES, EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING FROM ANY CAUSE WHATSOEVER, INCLUDING FOR NEGLIGENCE OR OTHER TORT LIABILITY.

LICENSOR'S LIABILITY FOR DAMAGES TO LICENSEE FOR ANY CAUSE WHATSOEVER, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE, SHALL BE LIMITED TO THE TOTAL FEES PAID TO LICENSOR FOR THE RESPECTIVE SOFTWARE DELIVERABLES.

1.5     Preservation and Protection of Intellectual Property Rights. The Software, Documentation, and all component parts thereof, including, without limitation, algorithms, programming and programming code, whether in source code, object code, or otherwise, all systems and procedures, all modifications, corrections, and enhancements (made by any person whatsoever, whether permitted or unpermitted), all descriptions and expressions of any of the foregoing, and all material objects which contain, embody, represent, explain, implement, or depict any of the foregoing, together with all copyrights, patents, patent rights, trade secrets, confidential information and ideas, and all other proprietary rights in and to any and all of the foregoing (the "Intellectual Properties") shall be and remain the exclusive property of Lutter or its suppliers. Company agrees to protect the Intellectual Properties in a manner consistent with the maintenance of Lutter's rights therein and to notify Lutter promptly upon discovery of any unauthorized possession, use, or knowledge of any part or form of the Software, Documentation, or Intellectual Properties by anyone not authorized to have such possession, use, or knowledge.

1.6     Export Control. The parties hereto are each subject to regulation by laws and agencies of the United States Government which prohibit export or diversion of certain products and technology to certain countries, including, without limitation, the U.S. Export Administration Act of 1979, as amended, any successor legislation, and the Export Administration Regulations issued by the U.S. Department of Commerce. Each party warrants that it will comply with the U.S. export regulations and laws governing exports in effect from time to time.

2.     Stock Transfer in Consideration for Company Software License.

2.1     Purchase and Sale of Shares. At the Closing hereunder, Company shall sell, transfer and assign to Lutter, and Lutter shall acquire from Company, as full consideration for the Company License and for the additional consideration and upon the additional terms and conditions specified herein, one hundred (100) shares (the "Transfer Shares") of Common Stock (as defined at Section 5.1 below) of the Company.

2.2     Share Certificates. At the Closing, Company shall cause to be delivered to Lutter a certificate or certificates representing all of Transfer Shares, all of which shares are duly and validly issued, fully paid and nonassessable, which certificates shall be issued and recorded on the books of the Company in the name of Lutter.

3.     Close Corporation Shareholder Agreement. Concurrently herewith the parties to this Agreement shall enter into that certain Close Corporation Shareholder Agreement of even date herewith (the "Close Corporation Shareholder Agreement") in the form attached hereto as Exhibit "A".

4.     Closing. The "Closing" hereunder, at which time those documents to be delivered at the Closing, as specified elsewhere herein and in the Close Corporation Shareholder Agreement, shall be delivered, and at or by which time those acts or events to be effected at or before the Closing, as specified herein, shall take place by electronic exchange of documents at such time as may be agreed upon by the parties hereto but, in any event, not later than 2:00 PM Eastern

-4-

Daylight Savings Time Standard Time, on or before June 28, 2010.  The Closing hereunder and under the Close Corporation Shareholder Agreement shall occur simultaneously.

5.      Representations and Warranties of Company Parties.  Existing Shareholders and the Company (collectively "Company Parties"), and Company's agent or agents executing this Agreement on behalf of Company, jointly and severally, represent and warrant to Lutter that, as of the date of signing of this agreement:

5.1     Common Stock.  The Company currently has a total of 1000 shares of authorized common stock (the "Common Stock"), without par value, all of which Common Stock has been issued and is currently outstanding as follows:

| | |
|---|---|
| 1. Steven A. Cerasale | 400 Shares |
| 2. Lisa D. Cote | 250 Shares |
| 3. Noel Mijares | 250 Shares |
| 4. Company | 100 Shares (reacquired from Cerasale) |

Immediately following the Closing hereunder, the Company's Common Stock issued and outstanding shall be held as follows:

| | |
|---|---|
| 1. Steven A. Cerasale | 400 Shares |
| 2. Lisa D. Cote | 250 Shares |
| 3. Noel Mijares | 250 Shares |
| 4. Alfred W. Lutter, III | 100 Shares |

5.2     Authorized Stock.  The Common Stock is the only class of Company stock authorized.

5.3     Board of Directors.  The Board of Directors shall continue to consist of a total of three board seats, unless such arrangement is changed in the corporate bylaws by a majority vote and written consent of the shareholders each voting the number of shares that he or she owns.

5.4     Warrants, Options, Other Equity Interests.  There are no options, warrants, or other equity interests in or to the Company, and no outstanding agreements or commitments of any kind to sell, issue, or transfer any of the Common Stock or other equity or ownership interests in or to the Company.

5.5     Title to the Company Shares.  At the Closing, Lutter shall acquire good and marketable title to all of the Transfer Shares, free and clear of any liens, claims, encumbrances, options, proxies, restrictive rights and restrictive legends.

5.6     Certain Transactions with Principals. None of the Existing Shareholders, and none of their family members, relatives, or affiliates, is indebted to the Company, nor is the Company indebted to any of such persons.  Except as expressly provided herein, there currently exist no employment agreements (other than at will employment agreements which are not in writing) with any of the Existing Shareholders or any other employee of the Company, no shareholder agreements of any type (other than the Operating Agreement been terminated hereby), no promissory notes made by the Company or any other agreements between the Company and any of the Existing Shareholders,

5.7     Voting Trusts or Agreements.  Except as expressly provided herein, there exist no voting trust, voting agreements, or other agreements, restrictions, or obligations affecting the voting rights of the Shareholders.

5.8     Consents.  The Company and Cerasale have obtained all consents, authorizations, approvals, orders, registrations and qualification from, and have made all filings with, any third party, including, without limitation, any public, governmental, administrative or regulatory authority, agency or body required in connection with the original issuance of the Common Stock, including the Transfer Shares, to the Existing Shareholders, and in connection with the execution, delivery or performance of this Agreement by the Company and Cerasale, or the consummation of the sale and transfer of the Transfer Shares.

5.9     Due Authority.  Company Parties are each duly authorized to enter into this Agreement and to perform the terms and obligations herein contained, in accordance with the terms and provisions of this Agreement.  The consummation of the transactions hereunder will not result in a breach or violation of, or a default under, any material agreement by which Company Parties, or any of them, are bound or any statute, rule, regulation, order or other law to which Company Parties, or any of them, are subject, nor require the obtaining of any consent, approval, permit or license from, or filing with, any government authority or other person by Company Parties in connection with the execution and delivery by Company Parties of this Agreement and the performance by Company Parties of the transactions contemplated hereby, except for such breaches, violations or defaults which would not, or such consents, approvals, permits, licenses or filings which, if not obtained or made, would not, in the aggregate, be material.  This Agreement constitutes the legal, valid and binding obligation of Company Parties, and each of them, enforceable against Company Parties in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting the rights and remedies of creditors generally and to general principles of equity (regardless of whether in equity or at law).

5.10    Licenses, Permits, and Filings.  Company has all licenses, permits, franchises, registrations, certificates, consents and other authorizations (collectively, "Licenses") of, and has made all filings ("Filings") with, any government or non-government authority which in each case is necessary to the conduct of the business of Company as it is currently conducted and as it is proposed to be conducted, except for such failures to have such Licenses or to make such Filings which individually or in the aggregate are not material.  All Licenses are in full force and effect and all Filings are complete and up to

-6-

date. No claim, action, suit, litigation or other proceeding (each an "Action") is pending or, to the knowledge of Company Parties threatened, by or before any court, arbitrator, panel or other government or non-government authority seeking the revocation, modification or limitation of any License.

5.11    Corporate Organization.  Company is duly incorporated and validly existing as a corporation under the laws of the State of Florida and Company is in good standing therein and has the power and authority to enter into and perform this Agreement.  The execution of this Agreement by Company Parties has been duly authorized by all required corporate actions.

5.12    Tax Returns.  Tax returns previously provided to Lutter for calendar years 2006, 2007, 2008, and 2009 are true and correct copies of all of the Company's federal and state tax returns, including any amendments thereto, as actually filed by the Company.

6.      Representations and Warranties of Lutter.  Lutter represents and warrants to Company Parties:

6.1    Lutter is the sole owner of the worldwide software licensed under this agreement and the duly authorized to enter into this Agreement and to perform the terms and obligations herein contained, in accordance with the terms and provisions of this Agreement.  The consummation of the transactions hereunder will not result in a breach or violation of, or a default under, any material agreement by which Lutter is bound or any statute, rule, regulation, order or other law to which Lutter is subject, nor require the obtaining of any consent, approval, permit or license from, or filing with, any government authority or other person by Lutter in connection with the execution and delivery by Lutter of this Agreement and the performance by Lutter of the transactions contemplated hereby, except for such breaches, violations or defaults which would not, or such consents, approvals, permits, licenses or filings which, if not obtained or made, would not, in the aggregate, be material.  This Agreement constitutes the legal, valid and binding obligation of Lutter, enforceable against Lutter in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting the rights and remedies of creditors generally and to general principles of equity (regardless of whether in equity or at law).

7.      Legal Representation.  Each party acknowledges the receipt of the advice of independent legal counsel prior to the execution of this Agreement; that the legal nature and effect of this Agreement has been fully explained to it by counsel; and that each party fully understands the terms and provisions of this Agreement and its nature and effect. Each party further represents that it is relying solely on the advice of its own counsel in executing this Agreement and has not relied on the representation of any other party, except as expressly set forth herein, or of the counsel for any other party. Each party further represents that this Agreement, and the terms hereof, were arrived at after bargaining and negotiation among the parties, and each provision hereof shall be construed as having been drafted by each and all of the parties hereto.

8.     <u>Further Acts</u>.  The parties to this Agreement shall promptly take such further acts and execute such other documents as shall be necessary to carry out the spirit and letter of this Agreement.  Without limiting the generality of the foregoing, in the event any court, county recorder, secretary of state of any state, any federal agency, or any other governmental agency may require any additional or different documents or actions in order to effect the purposes contemplated by this Agreement, the parties to this Agreement shall execute the necessary documents and take the necessary steps to comply with those requirements.

9.     <u>Notices</u>.  Unless otherwise provided herein, any notice, offer, exercise of rights or other communication required or permitted to be given hereunder shall be in writing and shall be given by registered or certified mail, confirmed facsimile or telecopy (with a hard copy deposited in overnight mail), or overnight delivery service such as Federal Express if a receipt is obtained showing delivery, at such party's address set forth next below or such other address as such party may hereafter specify by notice to the other parties hereto, or by actual personal delivery.  Any notice or other communication shall be deemed to have been given as of the date so personally delivered or transmitted by confirmed telecopy or like transmission, on the date of delivery shown on the receipt when sent by overnight delivery service, or on the date shown on the return receipt for delivery or, if refused, the date of first attempted delivery, when given by registered or certified mail.  Any party may change its address for notice by notice to the other party given in accordance with this Section.  Address and fax numbers for such notices are as follows:

If to Lutter, to:

Mr. Alfred W. Lutter, III
Lutter Consulting
2934 Quarry Mountain Road
Park City, UT 84098
Facsimile:  435-655-9292
Confirming no:  (949) 500-2007

With a copy to:

Ed Sybesma, Esq.
Rutan & Tucker, LLP
611 Anton Boulevard
Suite 1400
Costa Mesa, CA 92626
Facsimile:          (714) 546-9035
Confirming no:     (714) 641-3427

If to Company, to:

| | |
|---|---|
| Name: | Noel Mijares |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 5810 Biscayne Blvd |
| City, State, ZIP: | Miami, FL  33137 |
| Facsimile: | 866-580-9070 |
| Confirming no: | 305-757-5739 |

With a copy to:

| | |
|---|---|
| Name: | Lisa Cote |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 5810 Biscayne Blvd |
| City, State, ZIP: | Miami, FL  33137 |
| Facsimile: | 866-580-9070 |
| Confirming no: | 305-757-5739 |

And a copy to:

| | |
|---|---|
| Name: | Steven Cerasale |
| Title: | Director |
| Company: | Unisource Discovery |
| Address: | 2881 Forrester Avenue |
| City, State, ZIP: | Los Angeles, CA 90064 |
| Facsimile: | 310-837-5588 |
| Confirming no: | 310-837-2889 |

10.    Entire Agreement. This Agreement together with the exhibits hereto and the Stock Purchase and License Agreement effective concurrently herewith constitute the entirety of the agreements between the parties hereto concerning the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties, and there are no warranties, representations or agreements, express or implied, among the parties except as set forth herein. No amendment, supplement, modification, waiver, or termination of this Agreement, or any provision hereof, shall be binding unless executed in writing by the party against whom any of the foregoing is sought to be enforced. No waiver of any provision of this Agreement shall constitute a waiver of any other provision (whether similar or not), nor shall any waiver constitute a continuing waiver unless otherwise expressly provided hereunder or in writing signed by the party against whom any such waiver is sought to be enforced.

11.    Counterparts. This Agreement may be executed in counterparts, and each executed counterpart shall be deemed to be a duplicate original of this Agreement. This Agreement may

-9-

be delivered by facsimile or other electronic communication. Facsimile or electronic images of signatures shall be treated as original signatures for all applicable purposes.

12. Headings. The captions and headings contained in this Agreement are for convenience only and shall not affect the construction or interpretation of any provisions of this Agreement.

13. Attorneys' Fees. If any party breaches any obligation under this Agreement, or any dispute arises out of or with respect to this Agreement, the non-breaching party (or the prevailing party in the event of any litigation or alternate dispute resolution procedure) shall be entitled to its reasonable expenses, attorneys' fees, experts' fees, and costs, incurred as a result of any such breach, dispute, or litigation, including, without limitation, in any action taken, with or without litigation, to enforce, work out, or renegotiate the terms of this Agreement, or to remedy or compensate for such breach.

14. Applicable Law. The obligations, rights, duties, powers and remedies under this Agreement and of the parties hereto shall be governed and construed by the laws of the State of Florida. If any legal action is necessary to enforce the terms and conditions of this Agreement, the parties hereby agree that the Circuit Court of Florida, County of Miami Dade, or, if applicable, federal District Court sitting in the County of Miami Dade, shall be the sole venue and jurisdiction for the bringing of such action.

15. Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. The word "including" shall mean including without limitation and is used in an illustrative sense rather than a limiting sense. Terms used with initial capital letters will have the meanings specified, applicable to singular and plural forms, for all purposes of this Agreement. Reference to any gender will be deemed to include all genders and the neutral form.

16. No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any person other than the parties hereto and their permitted successors and assigns, and only in accordance with the express terms of this Agreement.

17. Reformation and Severability of Provisions. If any provision of this Agreement is declared invalid, in whole or in part, by a court of competent jurisdiction, such provision may be modified or limited in its effect to the extent necessary to cause it to be enforceable. If any provision cannot be so modified or limited, then such provision shall be severed and the remainder of this Agreement shall remain in full force and effect.

18. Florida Law. The obligations, rights, duties, powers and remedies under this Agreement and of the parties hereto shall be governed and construed by the laws of the State of Florida.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

-10-

Dated:  June 28, 2010 _____
Alfred W. Lutter, III

Dated:  June 28, 2010 _____
Noel Mijares

Dated:  June 28, 2010 _____
Lisa D. Cote

Dated:  June 28, 2010 _____
Steven Cerasale

Dated:  June 28, 2010 Unisource Discovery, Inc., a Florida corporation

By: _____
Noel Mijares, CEO, President

By: _____

_____, Secretary

# Exhibit "A"

## Close Corporation Shareholder Agreement