**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:20-cv-23276-CIV-DPG**

UNISOURCE DISCOVERY, INC.,

    Plaintiff,

    v.

UNISOURCE DISCOVERY, LLC
and STEVEN A. CERASALE,

    Defendants.

_____

**<u>PLAINTIFF'S MEMORANDUM OPINION SETTING OUT FINDINGS OF FACT
AND CONCLUSIONS OF LAW</u>**

In this trademark infringement action, Plaintiff ("Plaintiff Unisource" or Plaintiff) moves for Plaintiff's Count I (Trademark Infringement), Count II (False Designation or Origin and Unfair Competition), Count V (Trademark Counterfeiting) and Count III/VII (Common-law Trademark Infringement), and Count VII (Misleading Advertising Under Florida Law -- Fla. Stat. Ann. § 817.41), to prevent Defendants referred to herein as "Defendants" or otherwise designated) from using the mark "UNISOURCE DISCOVERY" as a name, mark, or source identifier for its legal services.[1]

Based on the pleadings, the numerous briefs and submissions,[3] the arguments and evidence presented, and the applicable law, the Court enters the findings of fact and conclusions of law set forth below. Based on the findings and conclusions, the Court enters a final judgment in Plaintiff's favor on all counts.

_____

[1] Pursuant to Fed. R. Civ. P. 52(a) and the December 06, 2021, Order [DE 221], the Plaintiff is providing the Court with its findings of fact and conclusions of law.  Please note that any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed.

## BACKGROUND

On July 1, 2006, Unisource Discovery, Inc. was incorporated as a legal records retrieval company catering to the legal community.

As majority shareholder, Defendant Steven Cerasale's acquired 50% of the company in shares and became a board of director. Noel Mijares and Lisa Cote each accepted 25% ownership interest in shares and also took board positions.

In year 2006, the Noel Mijares, Lisa Cote, and Steven Cerasale entered into a year 2006 Shareholder Operating Agreement for Plaintiff Unisource. [DE 03] In the Operating Agreement, under Section 4.10 "LICENSE AND NAME USE" Plaintiff Unisource was provided a license to use the name and logo.  At that time, a Unisource trademark did not exist, *to wit,*

> "4.10 LICENSE AND NAME USE: It is understood by the Board of Directors that the name UNISOURCE DISCOVERY, INC. is a Florida Registered Corporation, clear and clean of any titles, and it's not subject to nor under any form of a Licensing Agreement to transact in business. It is understood by the Board of Directors that the Use of Name was chosen as a means to move forward, but in no way a constitution to that particular Use of Name, since the Board of Directors agree that certain Directors have other entities that utilize similar names deriving from the words such as "Unisource" and "Discovery" and this Agreement shall govern and restrict any unlawful misuse of any part of the Company name. The Board of Directors further agrees that in the case that Steven Cerasale is no longer a Director, Officer or Agent of the Company, at that time the Board of Directors shall modify the current name of the Company "UNISOURCE DISCOVERY" to be different in name only."

On October 16, 2008, the Board of Directors of Unisource Discovery, Inc. (Defendant Steven Cerasale was a board member at that time) filed its application for registration of Trademark with all required documents to the USPTO. [DE 01] The board of directors, including Defendant Steven Cerasale, had actual knowledge of the trademark application process at all relevant times. On June 9, 2009, the USPTO approved the "Trademark Unisource Discovery Digital Records Retrieval" as principal service mark of the Company, Unisource Discovery, Inc., with US Serial Number 77594059 and US Registration Number 3634516.

2

After Plaintiff Unisource registered the trademark with the USPTO, Defendant Steven Cerasale did not object to the trademark application and filing at all relevant times.  Likewise, Defendant Steven Cerasale did not informally object to Plaintiff at all relevant times.

Rather, on June 28, 2010, the Shareholders of Unisource Discovery, Inc. entered into a Close Corporation Shareholder Agreement ("Shareholders Agreement") [DE 01]. The purposes of the 2010 Shareholder Agreement, *inter alia*, was to substitute and make unenforceable the year 2006 Operating Agreement [DE 01] pursuant to the integration clause in Section 8.  The intent of the parties is clear pursuant to Section 1, when stipulating that the parties jointly participated the drafting the Shareholder Agreement.

Under Section 1.3 titled Trademark of the Close Corporation Shareholder Agreement the Defendants transferred ownership of the name and logo to Plaintiff,

> 1.3 Trademark. UNISOURCE DISCOVERY DIGITAL DOCUMENT RETRIEVAL is a registered US trademark of the Company. Without limiting the foregoing, the parties agree that the Company shall be entitled to use the trademark "Unisource Discovery", as part of its corporate name, Unisource Discovery, Inc., or as a fictitious business name, or otherwise."

Before the complaint was filed, the Plaintiff began experiencing a number of customers disclosing they were contacted by Defendant Unisource agents and were confused between the two businesses. The customers not only were confused about the products Plaintiff sold, but the customers were led to believe by Defendant's agents that Plaintiff Unisource and Defendant Unisource was the same company.

 In light of the confusion, it became clear that Defendants were competing with Plaintiff Unisource and leveraging the same name in its advertising and trade channels as a device to intentionally confuse to Plaintiff's customers into re-directing their business and relationship to Defendants. As a result, on February 21, 2020, the Board of Directors of Unisource Discovery, Inc. served a notice upon Defendants revoking the license and directing them to cease using the trademark. The Defendants ignored this notice and at all relevant times intentionally continued to

use Plaintiff's trademark. Then on May 12, 2020, the Board of Directors of Unisource Discovery, Inc. served a second revocation notice to Defendants (titled: Cease & Desist). The Defendants intentionally ignored Plaintiff's second notice. The third notice was served on May 26, 2020,  and likewise the Defendants ignored this third notice.

On August 6, 2020, the Plaintiff filed its complaint [DE 01]. On September 22, 2020, the Defendants filed their answer and imposed their counterclaim for cancelation of trademark [DE 13].

Defendants counterclaim asserts -- with no documentary or circumstantial evidence – that over 11-years ago the Plaintiff committed fraud upon the USPTO by not disclosing Defendants had a legal right in the trademark.

Then, in ¶ 37 of Defendants' cancelation of trademark counterclaim [DE 13], the Defendants largely rely upon the following averment,

> "However, Unisource Florida acknowledged that the Mark nonetheless continued to belong to Unisource California by providing that "the parties agree that [Unisource Florida] shall be entitled to use the trademark 'Unisource Discovery,' as part of its corporate name ... or as a fictitious name, or otherwise." *Id*.

It appears that Defendants, in the above quote, are relying upon the same paragraph in the 2006 Operating Agreement.  Defendants also take the position, under ¶ 25 of their amended answer, affirmative defenses and counterclaim that "Unisource California was not a party to Unisource Florida's Operating Agreement."

Contrarily, the Plaintiff relies upon section 1.3 of the 2010 Close Corporation Shareholder Agreement. The Court notes that while the Defendants cite certain provisions of the 2010 Close Corporation Shareholder Agreement, they ignore provision 1.3., Trademark.

In reviewing the 2010 Close Corporation Shareholder Agreement the Court also looks through the lens of the following provisions: First, the integration clause in provision 8 states the agreement "… constitute[s] the entirety of the agreements between the parties hereto concerning

the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties …".  And Second, under provision 8 of the 2010 Close Corporation Shareholder Agreement, "The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement."

The Court finds these provisions material to its review.

In threading all of Defendants arguments together, they have taken the position that when Plaintiff registered the mark with the USPTO over 11 years ago it subjectively and intentionally did not notify the USPTO of their legal rights in the trademark, and that Defendant Unisource was not a party to any agreement and therefore has no liability.

The facts disclose that Defendants did not object to Plaintiff's registration at all relevant times after the mark was registered. Given that Defendant Steven Cerasale was a board member of Plaintiff Unisource, and remains a majority shareholder, the Court will accept he had actual knowledge of the registration at all relevant times.  And again, with full knowledge of the trademark registration Defendant Steven Cerasale still elected to enter into the 2010 Close Corporation Shareholder Agreement with provision 1.3., Trademark.

During discovery, the only evidence Defendants are using to support its cancelation claim is the Deposition of Noel Mijares, the CEO of Plaintiff Unisource.  Defendants offer no further evidence in support of their counter-claim.

A.    **Trademark Infringement - The Lanham Act**

To prevail on a claim for trademark infringement, a plaintiff must show that: "(1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive." *Burger King*

*Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983).

The analysis for trademark infringement under the Lanham Act also applies to claims for common law trademark infringement. *Chanel*, *Inc. v. Italian Activewear of Fla.*, *Inc.*, 931 F.2d 1472, 1475 n.3 (11th Cir. 1991) (holding).

It is axiomatic that, to prove the first prong, the Plaintiff must show "that it had trademark rights in the mark or name at issue," *Lone Star Steakhouse & Saloon*, *Inc. v. Longhorn Steaks*, *Inc.*, 106 F.3d 355, 358 (11th Cir. 1997)—simply, that it owned the mark at issue.

Thus, to satisfy the first prong, Plaintiff must prove four separate factors:

(1) it had "rights in the Trademark" (simply, that it owns the Trademark);

(2) that its granting Defendant Unisource California use the Trademark;

(3) that it terminated Defendant Unisource use; and

(4) that Plaintiff continued to use the Trademark in commerce.

*See Burger King Corp.*, 710 F.2d at 1492; *Lone Star Steakhouse*, 106 F.3d at 358.

This Court will address each of these requirements in turn.

 i.  **First Prong: Use of the Trademark in Commerce Without Plaintiff's Consent**

  a.  **Ownership of the Trademark**

Plaintiff maintains that it owns the Unisource name and logo and relies upon the year 2010 Close Corporation Shareholder Agreement [DE 1] in evidence and Defendants conduct. *See Sream*, *Inc. v. Grateful J's*, *Inc.*, 2017 WL 6409004, at 3 (S.D. Fla. Oct. 13, 2017) ("[A]ssignment of a trademark under the Lanham Act requires (1) sale or transfer of all rights in the mark; and (2) assignment as well of the business's goodwill connected with the mark's use."). The Court notes that Defendants never registered the name and logo with the USPTO and therefore Defendants cannot claim ownership of any trademark itself.

Defendants raises a defensive argument, now (over a decade later) challenging the validity of the 2008 registration with the USPTO. The Defendants claim that Plaintiff committed

6

fraud in registering the Trademark with the USPTO. Defendants contend Plaintiff made a material misrepresentation by not disclosing Defendant allegedly had a legal right to the USPTO in registering it.  This "legal right", according to Defendants' counterclaim, is that at all relevant times Plaintiff never owned the name and logo to register as a trademark without disclosing Defendants use of the name and logo since 2001. Thus, at the very least, Defendants insists Plaintiff obtained "ownership" of the "name" and "logo" through fraud in 2008 that merits trademark cancellation.

This Court rejects this unsupported theory by Defendants. At best, this is a contrived allegation. *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (Similarly a "… nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment.").

There is no circumstantial or direct evidence in the record that shows -- under Rule 9 and with clear and convincing evidence -- that Plaintiff intended to commit fraud on the USPTO.  The Court will address Plaintiff's intent below.

If anything, the parties were governed by the 2010 Close Corporation Shareholder Agreement [DE 01].  Pursuant to section 1.3 [Trademark] the Defendants transferred ownership of the name and logo with full knowledge it was already registered as a trademark. While the Defendants never objected to the USPTO, the Defendants also approved Plaintiff's registration when entering into the 2010 Close Corporation Shareholder Agreement with provision 1.3., Trademark.

Therefore, for the first prong -- ownership of the Trademark -- the Court finds there is sufficient facts to establish that Plaintiff took ownership of the Trademark in 2008 and upon execution of the year 2010 Close Corporation Shareholder Agreement [DE 1]. This factor weighs in favor of Plaintiff.

b.      **The Grant of Use as an Implied License**

7

The parties do not dispute that, following the 2008 registration of the logo as Plaintiff's Trademark and after the execution of the year 2010 Close Corporation Shareholder Agreement, Defendant Unisource continued operating its business under the name bearing the Trademark pursuant to ¶ 1.3,

> "Trademark. Plaintiff Unisource DISCOVERY DIGITAL DOCUMENT RETRIEVAL is a registered US trademark of the Company. Without limiting the foregoing, the parties agree that the Company shall be entitled to use the trademark "Unisource Discovery", as part of its corporate name, Unisource Discovery, Inc., or as a fictitious business name, or otherwise.

The only way to interpret this is a license by Plaintiff to Defendant Unisource. "Acquiescence to one's use of a trademark is analogous to an implied license to use the mark." *Coach House Rest., Inc. v. Coach & Six Rests. Inc.*, 934 F.2d 1551, 1563 (11th Cir. 1991).

The law does not require any express contract, promise, or even certain words to find an implied license. The very nature of an implied license is creation-by-conduct—that the owner "permits the use of a copyrighted work in a particular manner." *Karlson v. Red Door Homes, LLC*, 611 F. App'x 566, 569 (11th Cir. 2015) (quotation omitted). In other words, "[t]he grant of a nonexclusive license does not require a writing under the Copyright Act, and it may occur orally or may be implied from the copyright owner's conduct." *Id.*

Plaintiff permitted Defendant Unisource to operate under the name of the Trademark after the execution of the 2010 Close Corporation Shareholder Agreement [DE 1] under an implied license.

Here, an evaluation of the 2010 Close Corporation Shareholder Agreement, the record and facts establish there are  sufficient support to establish an implied license.

c.      **Termination of the Implied License**

It is well established that an implied license is terminable at will. *Menendez v. Holt*, 128 U.S. 514, 524 (1888). Of course, the successful termination of an implied license, however, presupposes ownership over the trademark. That is to say, the licensor purporting to terminate the

licensee's allowed use of the trademark must own the mark at the time of termination.

Terminating the implied license for Defendant Unisource use of the Trademark, the Plaintiff served its first cease and desist letter upon Defendants on February 21, 2020 [DE 1] and the second cease and desist letter on May 12, 2020 [DE 1]. Defendant, however, argues through its counterclaim [DE 166] that Plaintiff committed fraud when registering the logo as a Trademark with the USPTO in year 2008 and, therefore, has no legal justification to terminate the implied license.

The record supports, and the Court finds, that Defendants' position lacks evidentiary support. Cancelation of trademark under a fraud theory required Defendant's counterclaim [DE 166] to be pled pursuant to Rule 9 (particularity) and Defendants must prove Plaintiff's alleged fraud with "clear and convincing evidence" that "bears a heavy burden of proof." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) ("[T]he very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence.")

There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (T.T.A.B.1981)

Here, the record supports Plaintiff has provided this Court sufficient evidence of a termination of the license provided to Defendants.

### d.   Continuing Use of the Trademark

The final factor of the first prong --- that Defendant Unisource continues to use the Trademark in commerce after Plaintiff attempted to terminate the implied license --- is undisputed.

Defendants do not dispute that it continues to use the Trademark today.

### ii.   Second Prong: Likelihood of Confusion

For the second prong, "[c]ourts in the Eleventh Circuit consider seven factors when

determining whether or not a likelihood of consumer confusion exists:

>   (1) type of mark;
>
>   (2) similarity of mark;
>
>   (3) similarity of the products the marks represent;
>
>   (4) similarity of the parties' trade channels and customers;
>
>   (5) similarity of advertising media;
>
>   (6) the defendant's intent; and
>
>   (7) actual confusion."

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat. Univ., Inc.*, 91 F. Supp. 3d 1265, 1274 (S.D. Fla. 2015); *see also ATP Sci. Proprietary, Ltd. v. Bacarella*, 2020 WL 3868701, at 4-6 (S.D. Fla. July 9, 2020).

"Of these factors, the type of mark and evidence of actual confusion are considered the most important." *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1274.

Moreover, these factors "are just that—factors." *ATP Sci. Proprietary, Ltd.*, 2020 WL 3868701, at 6; *see also You Fit, Inc. v. Pleasanton Fitness, LLC*, 2013 WL 521784, at 2 (M.D. Fla. Feb. 11, 2013) ("When balancing the factors, the issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists.").

### 1.    **The Type of Trademark**

The Eleventh Circuit instructs the district courts first to classify the type of mark to determine "whether it is strong or weak." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) (establishing four categories of marks: generic, descriptive, suggestive, and arbitrary). Of the four categories, arbitrary marks, those that bear no relationship to the product, "are the strongest."[2] *Id.*

---

[2] "The stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives." *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).  There are four types of marks (listed in order of weakest to strongest): generic, descriptive, suggestive, and arbitrary. *Id.* The

Here, the Court has reviewed the Trademark and finds it is an arbitrary mark, entitled to the strongest protection under the case law.

In the Court's evaluation, the "Unisource Discovery" trademark is clearly a portmanteau of "discovery" in litigation. As for the word "Unisource", it connects the word "Uni" that means "one", and "source" that means "where something can be obtained" -- creating the original name "Unisource"

"Also important in gauging the strength of a mark is the degree to which third parties make use of the mark." *Frehling Enters*., 192 F.3d at 1336. "There is no hard-and-fast rule about the number of other users which diminish a mark's strength. Courts have found that a mark has been weakened by third-party use based on a relatively small number of third-party users." *Fla. Int'l Univ. Bd. of Trs*., 91 F. Supp. 3d at 1276 (internal citation omitted).

Here, the parties did not present any evidence showing an indication that anyone other than Defendants are a third-party user of the Trademark. With only one third-party user in alleged violation of the trademark, the Court finds that Plaintiff's position is strong.

However, another factor that weakens Defendants position is their unlawful use of the Trademark is in the same field. *See Fla. Int'l Univ. Bd. of Trs*., 91 F. Supp. 3d at 1276 ("Third-party use is also considered more potent when the users are operating in the same field as the plaintiff."). It is not disputed that the parties offer very similar legal services in the same field.

Nevertheless, when the Court balances all of this, and, in so doing, the Court designates the Trademark as being entitled to the strongest protection. The Trademark is arbitrary. It is an amalgamation of three words.

---

types of marks are "based on the relationship between the name and the service or good it describes:" generic marks bear a name that is entirely connected to the service or good it describes ("liquor store" as applied to a store that sells liquor), *id.* , and arbitrary marks that bear "a word in common usage applied to a service unrelated to its meaning" ("Sun Bank" as applied to banking services). *Freedom Sav. & Loan Ass'n v. Way* , 757 F.2d 1176, 1182 n.5 (11th Cir. 1985). "Descriptive marks describe a characteristic or quality of an article or service" ("vision center" as applied to a store that sells glasses) and "suggestive marks suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive" ("penguin" is suggestive of refrigerators). *Frehling Enters*, 192 F.3d at 1335

Therefore, this prong heavily weighs in favor of Plaintiff.

    2.      **The Similarity of the Trademark**

For the second factor, the Court is to "compare[] the marks and consider[] the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling Enters*., 192 F.3d at 1337.

This prong does not demand a rigorous analysis.

The appearance of  both marks are strikingly similar – in fact, Plaintiff and Defendant Unisource California appear to use the exact same styled Trademark. The fact that both words in Defendants' mark appear in Plaintiff's mark ("Unisource" and "Discovery"), which is a noteworthy fact in and of itself.  Far more troubling, however, is the way in which Defendants deploy their mark in the marketplace. Consider Defendants' logo, for example, which is prominently featured in most (if not all) of the promotional material in evidence. As is true of the Plaintiff's logo. Defendants' logo uses block letters, emphasizes the words "Unisource Discovery" and utilizes the same spacing and font scheme.  Indeed, these features are ubiquitous throughout Defendants' marketing materials.

Likewise, the Defendants do not identify a single difference in the two logos, and therefore, there are no distinctions that are sufficient to alter the "overall impression" that the logos elicit.

But even if the Court assumed that prospective customers would recognize that the two designations are distinct in their appearance, confusion may still result if customers are likely to assume that the similarities in the designations indicate a connection between the two users.  And here, the meaning of the parties' marks makes potential customers likely to assume such an affiliation between Defendants, on the one hand, and Plaintiff on the other. *Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc*., 2016 WL 4010164, at *11 (11th Cir. July 26, 2016)[3]

---

[3]   There, the court specifically noted that two of the words at issue, "national" and "international," are "near

Thus, this factor weighs in favor of Plaintiff. *Eli Research*, *LLC v. Must Have Info Inc.*, 2015 WL 5934611, at 5 (M.D. Fla. Oct. 6, 2015) ("Defendants use the exact same mark as AAH—the CPC mark. As such, the similarities of the mark indicate to the Court that the use of the CPC mark is likely to cause confusion.").

### 3.    The Similarity of the Products the Trademark Represents

For the third factor, "the Court must examine whether the parties' services are the kind that the public attributes to a single source." *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1277. "The greater the similarity between the products and services, the greater the likelihood of confusion." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir. 1983). This inquiry "does not turn on whether the services can be distinguished by consumers, but on whether the services are so related in the minds of consumers that they get the sense that a single producer is likely to "offer both services." *Id.*

Plaintiff Unisource Florida uses the Trademark for the sale of legal goods and litigation/attorney support services in Florida. Similarly, Defendant Unisource California uses the Trademark on their website, internet advertising, and therefore advertises its same goods/services in the same channels that caters to the same types of customers throughout the United States and including Florida.

Here, this factor also favors Plaintiff's position. The complete lack of dichotomy between Plaintiff's business of selling litigation support services and goods and Defendant Unisource business of selling litigation support service and goods is sufficient to find it will create the likelihood of confusion.

As such, the Court finds that the third factor of confusion weighs heavily in favor of finding a likelihood of confusion.

### 4.    The Similarity of the Parties' Trade Channels and Customers

---

antonym[s]." The court placed significant weight on this factor -- affirming that it was reasonable for the district court to "attribute more weight to the meanings than to the appearance and sound of the marks".

"Likelihood of confusion is more probable if the products are sold through the same channels to the same purchasers." *Deltona Transformer Corp. v. Wal-Mart Stores, Inc.*, 115 F. Supp. 2d 1361, 1369 (M.D. Fla. 2000).

It follows that "[d]issimilarities between the retail outlets for the parties' services reduce the possibility of confusion." *Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1184 (11th Cir. 1985); *see also Fehling*, 192 F.3d at 1339. "This factor takes into consideration where, how and to whom the services are sold. The Court also must consider the level of sophistication and investment required of the parties' customers, which can influence the likelihood of confusion based on a mark." *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1279 (internal citation omitted).

"While 'the parties' outlets and customer bases need not be identical, some degree of overlap should be present' to weigh in favor of a likelihood of confusion." *Id.* (quoting *Frehling*, 192 F.3d at 1339).

The Court finds that the third and fourth factors are closely related. Comparable products and services obviously attract similar customers and use similar trade channels.

In *Florida International University Board of Trustees*, the court determined this factor favored the defendant Florida National University ("FNU"), despite the plaintiff FIU and defendant FNU both being post-secondary educational institutions and both serving the same customers that are students. *Id.* at 1279. Vetting several affidavits and exhibits presented by FNU, the court found the "differences between the schools' respective student populations." *Id.* ("[A]bout 70 percent of FNU's students are seeking either associate's degrees or attending ESL programs that are not offered by FIU.

In other words, FNU's predominant customers are in the market for educational services that FIU simply doesn't provide. This was enough to determine the two schools did not serve the same customer base. *Id.* This contrast shows the distinction between case similar to *Fla. Int'l Univ. Bd. of Trs.* and the instant case.

14

Here, unlike *Fla. Int'l Univ. Bd. of Trs.*, Plaintiff presented enough for the Court to make a meaningful determination as to their customer base. Defendant implicitly concedes that it uses the same channels of advertising similar to those employed by Plaintiffs. This is a virtual guarantee that the two entities cater to the same clientele and work through the same channels.

Given this fact, the Court must find that this factor of confusion weighs in favor of finding a likelihood of confusion.

### 5.     The Similarity of Advertising Media

For the fifth factor, the Court must consider the advertising media used by each party. *Deltona Transformer Corp.*, 115 F. Supp. 2d at 1369. Clearly, "[i]f a plaintiff and defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *Id.* "A court may properly consider the overall advertising campaigns." *Id.*

In its Complaint [DE 1], Plaintiff alleges, "Through UNI-CA's Internet presence, and with the Internet's concomitant ability to reach instantly millions of online consumers throughout the United States, including Florida, Defendants' have consciously and deliberately attempted to create a false impression of identification to diminish the distinctiveness of the Defendants trademark[4]. For over a decade the Plaintiffs has expended substantial time and money developing, advertising, and promoting the name and Mark." *See* Pl. Comp. ¶ 17

Because the Defendants do not deny that they advertise on the Internet and cater to the same customer base, like the previous factor and this Court's review, the record supports a likelihood of confusion.

### 6.     The Defendants' Intent

"In determining whether consumer confusion is likely, the Court must also examine the defendant's intent, to determine whether the defendant 'had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper

---

[4] The Court notes Plaintiff's scrivener's error -- "Defendants" Trademark" is in error and Plaintiff meant "Plaintiff's" Trademark.

15

intent.'" *Fla Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1281 (quoting *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 648 (11th Cir. 2007)).

"[L]ikelihood of confusion can be found as a matter of law if Plaintiff shows that Defendants intended to derive benefit from Plaintiff's trademark." *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1354 (S.D. Fla. 2002). While objective factors are most important in assessing the likelihood of confusion between two marks, courts also examine the defendant's subjective intent." *Canes Bar & Grill of S. Fla., Inc. v. Sandbar Bay, LLC*, 343 F. Supp. 3d 1236, 1244 (S.D. Fla. 2018).

Subjective intent, no matter the cause of action or type of proceeding before a court, almost never can be proved by direct evidence. *See Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 1981 WL 40564, at 6 (N.D. Ga. May 15, 1981) ("Since improper motive is rarely, if ever, admitted . . . the court can only infer bad intent from the facts and circumstances in evidence.").

Plaintiff argues that Defendant's intent to derive benefit from the Trademark could not be clearer:

First, the Defendants do not deny that they are currently using the Trademark despite being served two cease and desist letters by Plaintiff. Clearly, Defendants continued use after being served twice shows intent in itself.

Second, and equally compelling, Defendants' counterclaim [DE 166] against Plaintiff for cancelation of trademark is an admission that that Defendants intend to deprive Plaintiff of its Trademark.

Here, the Court finds sufficient evidence for this factor and, therefore, has sufficiently proved likelihood of confusion.

7.    **Evidence of Actual Confusion**

As for the seventh and final factor, "evidence of actual confusion . . . is the best evidence of the likelihood of confusion . . . ." *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1282. There is

16

no litmus test; that is, the applicable cases instruct of no magical amount of evidence of customer confusion a party must show. *Caliber Auto. Liquidators*, *Inc. v. Premier Chrysler*, *Jeep*, *Dodge*, *LLC*, 605 F.3d 931, 937 (11th Cir. 2010).

In fact, "the quantum of evidence needed to show actual confusion is relatively small." *Id*. And, the burden on the defending party is much greater than that on the moving party.

As the Fifth Circuit has nicely stated, "[R]eason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *World Carpets*, *Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971).

Before and during the instant litigation there has been sixteen (16) instances of actual customer confusion logged by Plaintiff.  Several of these instances of customer confusion were made known prior to the instant litigation and, amongst other reasons, triggered the filing of Plaintiff's complaint [DE 1].  *Amstar Corp. v. Domino's Pizza*, *Inc.*, 615 F.2d 252, 263 (5th Cir. 1980) (holding that *three instances* of customer confusion was not sufficient) (emphasis added).

As for the seventh and final factor, Plaintiff has sufficiently showed actual confusion.

ii.     **<u>Defendant's Counterclaim of Cancellation of Trademark</u>**

Because the Plaintiff's registered mark that is presumed to be valid, then the Court will address Defendants' cancellation of trademark counterclaim [DE 13]. 15 U.S.C. §§ 1064(3), 1119.  Defendants' counterclaim that alleges Plaintiff's registration is invalid because Plaintiff committed fraud on the USPTO through the oath that accompanies a service mark application, which requires the applicant's representative to attest to the following: The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the

17

applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. § 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

Defendants are claiming that Plaintiff, as applicant, committed fraud when "knowingly makes false, material representations of fact in connection with an application for a registered mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir.2008); *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Jerusalem*, 694 F.3d 1200 (11th Cir. 2012); *In re Bose Corp.*, 580 F.3d 1240, 1243, 1245 (Fed.Cir.2009)

Here, as alleged by Defendants, Plaintiff did not inform the USPTO over 11 years ago of Defendants' legal rights and intended to deceive the USPTO in the application; however, there is no document filed by Defendants with the Court that specifically outlines what "exact" legal rights have been violated. It appears that Defendants are claiming they retained complete ownership of the name and logo and their interest was not extinguish when ownership was transferred pursuant to the year 2010 Close Corporation Shareholder Agreement in evidence [DE 01].

Fraud further requires an intention failure to disclose the mark. *In re Bose Corp.*, 580 F.3d 1240, 1243, 1245 (Fed.Cir.2009); *see also Angel Flight*, 522 F.3d at 1210–11 (affirming cancellation on the basis of the applicant's purposeful failure to disclose a superior user of the mark).

For the Defendants to seek cancellation on the basis of fraud they must prove their claim by clear and convincing evidence. *Angel Flight*, 522 F.3d at 1209; *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Jerusalem*, 702 F.3d 1279 (11th Cir. 2012).

As a consequence, the Court acknowledges that Defendant carries a heavy burden, and "any doubt must be resolved against the charging party." *Bose*, 580 F.3d at 1243.   In the trademark application, the declarant-focused text of the application oath requires the signatory's good-faith, subjective belief in the truth of its contents. *See, e.g., Bose*, 580 F.3d at 1245 ("Subjective intent to deceive ... is an indispensable element in the [fraud] analysis."); *Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir.2001); Sovereign Military Hospitaller Order of Saint John of ... 702 F.3d 1279 (11th Cir. 2012); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1227 (10th Cir.2000) ("[W]e focus on the 'declarant's subjective, "honestly held, good faith" belief.' " (quoting *San Juan Prods., Inc. v. San Juan Pools, Inc*., 849 F.2d 468, 472 (10th Cir.1988))); *see also McCarthy on Trademarks* § 31:76 ("The oath is phrased in terms of a subjective belief such that it is difficult, if not impossible, to prove objective falsity and fraud so long as the affiant or declarant has an honestly held, good faith belief.").

This requirement is implicit in our holding in *Angel Flight*, where we upheld a district court's cancellation of a mark because the declarant purposefully failed to disclose the right of others to use the mark at issue "even though he was aware organizations throughout the country were using the [mark] and had a right to do so." 522 F.3d at 1210 (emphasis added).

Unlike the situation in *Angel Flight*, Plaintiff had no subjective awareness that Defendants unregistered name and logo was a mark that needed to be disclosed to the USPO.   There are several factors the Court considers.  First, the Unisource name and logo was never a trademark at any time prior to Plaintiff's ownership of the name and logo. Second, according to the 2010 Close Corporation Shareholder Agreement – as already discussed and cited above – the Defendants did

transfer ownership of the name and logo and therefore divested themselves as this legal right under [provision 1.3. Trademark]. Third, although Defendant Steven Cerasale is a majority shareholder and held a position on the board of directors, with actual knowledge of the trademark registration he never filed an objection. And Fourth, Defendant Steven Cerasale had actual knowledge of the trademark registration and still entered into the 2010 Close Corporation Shareholder Agreement with provision 1.3., Trademark.

These facts shows that Plaintiff could not have intended to deceive the USPTO in attesting to an oath that it believed was entirely accurate.

As such, the Court finds in Plaintiff's favor because Defendants' cancellation of trademark counterclaim does not prevent the infringement claims.

iv.      **Conclusion**

The Court set out its conclusions of law throughout its above discussion of the case, but it repeats them here for the sake of clarity:

(1)      The Court has determined that Defendants were provided an implied license that was revoked by Plaintiff.  Upon revocation, Defendant Unisource's implied license terminated.

(2)      There is a substantial likelihood of success on the merits of Plaintiff's trademark infringement claim under the Lanham Act: Plaintiff's mark, "UNISOURCE DISCOVERY" is eligible for protection.

(3)      There is a likelihood of confusion between the marks (both individually and collectively).

B.      **Claim for Trademark Counterfeiting (15 U.S.C. § 1114)**

Federal law prohibits counterfeiting of a registered mark. 15 U.S.C. § 1114. The aim of a counterfeiter is typically to create a duplicate of a renowned product, and to market the duplicate to a confused public as the genuine article. *Fila U.S.A., Inc. v. Kim,* 884 F. Supp. 491, 494 (S.D. Fla. 1995).

Plaintiff claims that it is a "counterfeit" mark, and as applicable here, is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

The test for whether marks are substantially indistinguishable is more rigorous than the test for likelihood of confusion. *Id.*; *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 471-72 (S.D.N.Y. 2011) The Court's examination of the parties' marks establishes that a reasonable trier of fact could find them "substantially indistinguishable."

Because the Defendants admit that they use the "exact" same mark with the same name, font, style and logo, thus evaluation is unusually easy -- and by all definitions this would constitute "substantially indistinguishable." *See GMA Accessories, Inc.,* 765 F. Supp. 2d at 471-72 (granting summary judgment on counterfeiting claim where marks contained different words); *Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp., Inc.,* 486 F. Supp. 2d 286, 290-91 (S.D.N.Y. 2007) (differences in spelling and font variations of marks not "trivial").

The Court has determined that Defendants' Trademark is more than confusingly similar – it appears exactly the same as Plaintiff's Trademark.

Given that the marks are exceptionally similar, as fact-finder the Court determines that the marks are "substantially indistinguishable."

As such, this Court finds in factor of  Plaintiff's claim for Trademark Counterfeiting under 15 U.S.C. § 1114.

C.     **Claims For Deceptive Trade Practice Under Florida Law (Fla. Stat. Ann. § 501.204) and Misleading Advertising Under Florida Law (Fla. Stat. Ann. § 817.41)**

The Plaintiff advances two claims under Florida's Deceptive and Unfair Trade Practices Act.

The First, Florida's Deceptive and Unfair Trade Practices Act Fla. Stat. §§ 501.207-501.2075 ("FDUTPA").  Here, the Plaintiff must show: "(1) a deceptive act or unfair practice, (2)

21

causation, and (3) actual damages or aggrievement." *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1326 (M.D. Fla. 2007).

Engaging in trademark infringement is an unfair and deceptive trade practice for purposes of FDUTPA. *Sun Protection Factory, Inc. v. Tender Corp.*, No. 6:04–cv–723–Orl–19KRS, 2005 WL 2484710, at 13 (M.D. Fla. Oct. 7, 2005).

As to Plaintiff's second argument under its FDUTPA claim, Plaintiff additionally argues that Defendants unauthorized use of its trademark is a violation of section 817.41.  In relevant part, section 817.41 makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement." Fla. Stat. § 817.41(1).

As Eleventh Circuit stated in *Smith v. William Wrigley Jr. Co*., 663 F.Supp.2d 1336, 1339 (S.D. Fla. 2009):

> "To state a claim for equitable relief under FDUTPA, Plaintiff must allege, at a minimum, that it has been aggrieved. *See Macias v. HBC of Florida, Inc.*, 694 So. 2d 88, 90 (Fla. 3rd DCA 1997) ("in order for the consumer to be entitled to any relief under FDUTPA, the consumer must not only plead and prove that the conduct complained of was unfair and deceptive but the consumer must also plead and prove that he or she was aggrieved by the unfair and deceptive act"). A claim for damages under FDUTPA requires the Plaintiff to allege the following three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *City First Mortgage Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006), review denied, 962 So. 2d 335 (Fla. 2007))."

Plaintiff's statutory claim of misleading advertising must comply with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Plaintiff's claim is considered one for fraudulent inducement. *Smith v. Mellon Bank,* 957 F.2d 856, 858 (11th Cir. 1992).

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b).

22

The particularity requirement of Rule 9(b) serves an important purpose in fraud actions by "alerting defendants to the precise misconduct with which they are charged and protecting spurious charges of immoral and fraudulent behavior." *Ziemba v. Cascade Int'l, Inc*., 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation marks omitted). The application of Rule 9(b), however, must not abrogate the concept of notice pleading under the federal rules. *Id*.; *Friedlander v. Nims*, 755 F.2d 810, 813 n.2 (11th Cir. 1985)

More specifically, the Eleventh Circuit stated in *Ziemba* that:

 "Rule 9(b) is satisfied if the complaint sets forth:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and

(2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and

(3) the content of such statements and the manner in which they misled the plaintiff, and

(4) what the defendants obtained as a consequence of the fraud."

256 F.3d at 1202 (quotations and citations omitted); *U. S. ex rel. Clausen v. Laboratory Corp. of America, Inc*., 290 F.3d 1301, 1310 (11th Cir. 2002).

The Court has reviewed Plaintiff's allegations in light of Rule 9 heightened pleading requirement.  The Court notes that Plaintiff did plead allegations of date, time, and place that satisfies the requirement of Rule 9(b) that the circumstances of the fraud be alleged with particularity, but alternative means are also available to satisfy the rule. *Durham v. Business Management Associates*, 847 F.2d 1505, 1512 (11th Cir. 1988).

Plaintiff asserts that the particular details related to when, why, and how, the Defendants converted Plaintiff's trademark and falsely advertised was plead with the required particularity.

 This Court agrees.

The Complaint alleges that the conversion of the Plaintiff's Trademark  began over 10 years before the Complaint [DE 01] was filed, and likewise, months before Plaintiff filed its

Complaint [DE 01] the Plaintiff served Defendants with two cease and desist letters that went ignored.  These critical paragraphs sufficiently alert the Defendant to the precise misconduct with which it is charged in this case.

The Court also finds Defendants activity is the type that is proscribed by section 817.41—misleading advertising—and precisely the type of unfair and deceptive trade practice that is prohibited by FDUTPA.  *Third Party Verification, Inc. v. Signaturelink, Inc.,* 492 F.Supp.2d 1314, 1323, 1327-28 (M.D. Fla. 2007) (determining that allegations regarding a misleading advertisement stated a claim under both the private' right of action in § 817.41 and FDUTPA); *Izadi v. Machado (Gus) Ford, Inc.,* 550 So.2d 1135, 1140-41 (Fla. 3d DCA 1989)

The Court finds the Defendants are "'direct participant' in the improper dealings." *N. Am. Clearing, Inc. v. Brokerage Computer Sys., Inc.*, 666 F. Supp. 2d 1299, 1311 (M.D. Fla. 2009) (quoting *KC Leisure, Inc. v. Habe*r, 972 So. 2d 1069, 1074 (Fla. 5th DCA 2008). Here, Plaintiff alleged that Defendant Steven Cerasale personally directed, controlled, and participated in the unfair activity.

Because the well-pleaded facts in the complaint are sufficient to establish each element of the FDUTPA claim, and section 817.41. the Court finds in Plaintiff's favor.

D.      **Claims for <u>Florida Common Law Unfair Competition --</u>**
        **<u>Count IV and Count VIII</u>**

Plaintiff also makes a claim for unfair competition under Florida law.

A party may prevail on a Florida common law unfair competition claim by proving that (1) the plaintiff is the prior user of the trade name or service mark, (2) the trade name or service mark is arbitrary or suggestive or has acquired secondary meaning, (3) the defendant is using a confusingly similar trade name or service mark to indicate or identify similar services rendered (or similar goods marketed) by it in competition with plaintiff in the same trade area in which plaintiff has already established its trade name or service mark, and (4) as a result of the

24

defendant's action or threatened action, consumer confusion as to the source or sponsorship of the defendant's goods or services is likely. *Am. United L fe Ins. Co. v. Am. United Ins. Co*. , 72 1 F. Supp. 480, 486 (S.D. Fla. l 990).

Specifically, Plaintiff has alleged that because the Defendants have continuously and intentionally used Plaintiff's trademark it has resulted in consumer confusion. Plaintiff has therefore pleaded that Defendants infringing conduct is directly related to the same trade area in which Plaintiff has already established its trade name and trademark rights. Plaintiff has further alleged the customer confusion resulting from Defendants' acts.

The Court has noted that is finds Plaintiff stated a claim for statutory trademark infringement. In sum, Plaintiff has successfully stated a claim for unfair competition under Florida law.

E. **Claim for Federal False Designation Of Origin and False Advertising (15 U.S.C. § 1125(a))**

Here, the Plaintiffs allege that Defendants registered domain names incorporating the Unisource trademark to operate websites marketing and selling services. Furthermore, Plaintiff contends that Defendants designed trademark on Defendants' websites resembles the authentic Plaintiff Unisource sites, Finally, Plaintiffs plead detailed facts indicating that Defendants' conduct caused instances of actual customer confusion

To state a claim for false designation of origin under The Lanham Act, the Plaintiff must plead that Defendants: (1) used a designation; (2) in commerce; (3) in connection with goods or services; (4) where the designation was likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of defendant with another person, or as to the origin, sponsorship, or approval of defendant's goods, services, or commercial activities by another person"; and (5) plaintiff suffered damaged as a result. *McCarthy on Trademarks and Unfair Competition* 27: 13.

The Defendants have not offered any counter evidence other than denials. The Plaintiffs therefore have pled stated a false designation of origin claim under The Lanham Act.

F.     **<u>Relief Requested</u>**

i.     <u>Individual Liability</u>

Under the Copyright Act, an individual who can control the acts of a corporation may be held jointly and severally liable with the corporate entity for copyright infringements, even in the absence of the individual's actual knowledge of the infringements. *Southern Bell Telephone and Telegraph Co. v. Associated Telephone Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985) (affirming liability of individuals who had a financial interest in the infringing activity and the right to supervise the infringing activities and holding that "[l]iability falls on all of them even if they were ignorant of the infringement"); *Broad. Music, Inc. v. Evie's Tavern Ellenton, Inc*., No. 8:11L-CV-2056-T-17, 2013 WL 5487066, at 6 (M.D. Fla. Sept. 30, 2013), aff'd, 772 F.3d 1254 (11th Cir. 2014) ("[I]t is well established that a corporate officer will be liable as a joint tortfeasor with the corporation in a copyright infringement case where the officer was the dominant influence in the corporation, and determined the policies which resulted in the infringement.").

Here, Plaintiff has alleged that Defendant Steven Cerasale is owner of Defendant Unisource, and active force behind directing and controlling its actions. As such, the Plaintiff has alleged facts sufficient to support the liability of both of the Defendants.

ii.     <u>Monetary damages/Statutory Damages</u>

The Plaintiff may seek statutory damages under both the Copyright and the Lanham Act. 15 U.S.C. § 1117(c); 17 U.S.C. § 504. Although Plaintiff is permitted to recover actual damages from the Defendants for their infringement, the Plaintiff may assert that the full extent of these actual damages cannot readily be ascertained, and therefore, Plaintiff requests that statutory damages be awarded instead. *See PetMed Express, Inc. v. MedPets.Com, Inc.,* 336 F. Supp. 2d 1213, 1220 (S.D. Fla. 2004)

26

Under the Lanham Act, a plaintiff may elect to recover, instead of actual damages, statutory damages for the use of a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services in the amount of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed." 15 U.S.C. § 1117(c).

Alternatively, if the court finds that the use of the mark was willful, an award of statutory damages in the amount of "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed." 15 U.S.C. § 1117(c).

The Copyright Act also permits a plaintiff to elect either actual or statutory damages. 17 U.S.C. § 504.

Statutory damages must be calculated according to the number of separately copyrightable works infringed, not on the number of infringements. *Disney Enters., Inc. v. Law*, No. 6:07–cv–1153–Orl–18GJK, 2008 WL 203393, at 4 (M.D. Fla. Jan.23, 2008).

Courts have discretion to award between $750 and $30,000 in statutory damages for all infringements of each work under 17 U.S.C. § 504(c).

When the copyright owner sustains the burden of proving that an infringement was committed willfully, the court may increase the award of statutory damages up to $150,000.  The Court may infer willfulness from continued infringing behavior after being given notice. *See PetMed Express, In*c., 336 F. Supp. 2d at 1220

The Court notes that Plaintiff has the option to request that the Court determine its statutory damages without an evidentiary hearing.

## CERTIFICATE OF SERVICE

I hereby certify that this notice was served via the PACER E-Filing Portal on upon: Juan C. Zorilla, Esq., jzorilla@fowler-white.com Fowler, White, Burnett, P.A., counsel for Unisource Discovery, LLC and Steven A. Cerasale on this day 31st of December, 2021.

**Diego David Valdes, P.A.**
2350 Coral Way, Suite 403B
Miami, FL 33145
Tel: 305-910-6602
Fax: 305-513-5924

By: */s/ Diego David Valdes*
Diego David Valdes, Esq.
Florida State Bar No.: 251010
Email:  ddvlaw@gmail.com
        legal@ddvlawgroup.com
Attorney for Plaintiff: Unisource Discovery, Inc.

28