UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
                         MIAMI DIVISION
                  CASE NO. 20-CV-23276-DPG


UNISOURCE DISCOVERY, INC., et al.,      Miami, Florida

     Plaintiffs,                        December 5, 2022

          vs.                           Pages 1 to 219

UNISOURCE DISCOVERY, LLC, et al.,       9:30 a.m. to 5:00 p.m.

     Defendants.                        Volume 1
_____


                            JURY TRIAL
              BEFORE THE HONORABLE DARRIN P. GAYLES
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFF:        JESUS SANCHELIMA, ESQ.
                          LIANY VELAZQUEZ, ESQ.
                          DIEGO VALDES, ESQ.
                          SANCHELIMA & ASSOCIATES
                          235 SW LeJeune Road
                          Miami, Florida 33134


FOR THE DEFENDANT:        VICTOR M. VELARDE, ESQ.
                          JUAN ZORRILLA, ESQ.
                          FOWLER WHITE BURNETT, P.A.
                          1395 Brickell Avenue
                          Miami, Florida 33131


STENOGRAPHICALLY REPORTED BY:

                          PATRICIA DIAZ, FCRR, RPR, FPR
                          Official Court Reporter
                          United States District Court
                          400 North Miami Avenue
                          11th Floor
                          Miami, Florida 33128
                          (305) 523-5178

I N D E X

VOIR DIRE BY THE COURT                                    PAGE  17

PROSPECTIVE JURORS SWORN                                  PAGE  18

VOIR DIRE BY THE PLAINTIFF                                PAGE  55

VOIR DIRE BY THE DEFENSE                                  PAGE  60

JURY SELECTION                                            PAGE  63

JURY SWORN                                                PAGE  72

PRELIMINARY INSTRUCTIONS TO THE JURY                      PAGE  72

PLAINTIFF OPENING STATEMENT BY MR. SANCHELIMA             PAGE  85

DEFENSE OPENING STATEMENT BY MR. VELARDE                  PAGE  94

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| STEVEN CERASALE<br>BY MR. SANCHELIMA | 103 | | |

| PLAINTIFFS' EXHIBITS | FOR ID | ADMITTED |
|---|---|---|
| Plaintiffs' Exhibit 2 | 115 | 116 |
| Plaintiffs' Exhibit 3 | 117 | 119 |
| Plaintiffs' Exhibit 4 | 119 | 120 |
| Plaintiffs' Exhibit 5 | 121 | 124 |
| Plaintiffs' Exhibit 6 | | 152 |
| Plaintiffs' Exhibit 7 | | 153 |
| Plaintiffs' Exhibit 8 | | 156 |
| Plaintiffs' Exhibit 9 | | 159 |
| Plaintiffs' Exhibit 10 | | 164 |
| Plaintiffs' Exhibit 11 | | 164 |
| Plaintiffs' Exhibit 12 | | 168 |
| Plaintiffs' Exhibit 13 | | 172 |
| Plaintiffs' Exhibit 14 | | 178 |

(Call to the Order of the Court.)

THE COURT:  All right.  Please be seated.

COURTROOM DEPUTY:  Calling case 20-CV-23276, Unisource Discovery, Inc., versus Unisource Discovery, LLC.

Counsel, please state your appearances, starting with the plaintiff.

MR. SANCHELIMA:  Good morning, Your Honor.  Jesus Sanchelima representing the plaintiff, Unisource Discovery, Inc., a Florida corporation.

With me at the table I have Liany Estevez, our associate at Sanchelima & Associates, PA.

Next to her is Mr. Noel Mijares, president of the plaintiff, and in the far left is Attorney Diego Valdes, who is our co-counsel.

THE COURT:  Okay.  Good morning.

For the defense?

MR. VELARDE:  Good morning, Your Honor.  Victor Velarde from Fowler, White, Burnett on behalf of the defendants.

With me is Juan Zorrilla, my partner at Fowler, White, Burnett, and to his right is Mr. Cerasale, the defendant.

THE COURT:  Okay.  I know we got the questionnaires up here a little late, so you may you need a few moments to go through them, but I wanted to know if there are any preliminary issues in addition we needed to take up.

One thing for me, I want to make sure I am pronouncing

all the names correctly.

For the defendant, it's Cerasale.  How do you pronounce his name?

MR. CERASALE:  A lot of different ways.

THE COURT:  The correct pronunciation.

MR. CERASALE:  That's good, Cerasale.

THE COURT:  Okay.  And for plaintiffs, Mijares?

MR. MIJARES:  That's correct, Your Honor.

THE COURT:  And is it Lisa Cote or Cote?

MR. MIJARES:  Cote.

THE COURT:  I'm sorry, the joint pretrial stipulation says Lisa Corte, Corte with an R, but the pleadings say Cote without the R.  Which one is it?

MR. MIJARES:  Without the R.

THE COURT:  As far as -- we received the joint motion to bring electronic equipment in the courtroom this morning.

Did you all have any problems bringing the equipment in?

MR. SANCHELIMA:  No, Your Honor.

MR. VELARDE:  No, Your Honor.

THE COURT:  With all the time off for the holidays, I don't recall.  I do allow the attorneys to ask questions during the voir dire, although I typically do the bulk of them.

Did we discuss the amount of time at the calendar call?

MR. SANCHELIMA:  Not that I remember, Your Honor.

THE COURT:  All right.  How much time are you requesting, keeping in mind I normally allow 15 to 20 minutes?

MR. SANCHELIMA:  Fifteen to 20 minutes.

THE COURT:  Okay.  Are you fine with 20 minutes?

MR. ZORRILLA:  Yes, Your Honor.

THE COURT:  All right.  I will give each side 20 minutes.

Openings, is 20 minutes all right for that?

MR. SANCHELIMA:  Yes, Your Honor.  Will I be able to reserve or can I split?

THE COURT:  Not for openings, but you will be able to do that for the closing.

MR. SANCHELIMA:  Just 20 minutes.

THE COURT:  Just 20 minutes.

That's fine for the defense as well?

MR. VELARDE:  Yes, Your Honor.

THE COURT:  For a civil trial we have to end it with at least six jurors, but typically, especially on a very short trial, we usually have about eight, eight to nine.  I usually leave it up to the parties.

Have both parties discussed how many jurors you want?

MR. SANCHELIMA:  Not yet, Your Honor.  But I have no objection to eight.

THE COURT:  All right.

MR. VELARDE:  No objection to eight either.

MR. ZORRILLA:  Eight is fine.

THE COURT:  Okay.  It's eight jurors, and I just want to remind everyone that the eight will sit.  There are no alternates on a civil case.

If we select eight, all eight will deliberate, according to the Federal Rules.

All right.  How much more time do you need to go over the -- well, I guess before we get to that, any other preliminary issues we need to take up before we get to jury selection?

MR. SANCHELIMA:  Well, I don't know if this is the time to discuss it, but plaintiff made a suggestion that maybe bifurcating the case and having an adjudication as to the counterclaim with respect to the fraud in procuring the registration.  I don't know if the Court has considered that because the burden of proof is different and the rest of the counts involve preponderance of the evidence, but for that particular count it requires a clear and convincing evidence that Mr. Mijares in this case had a good faith effort and good faith belief that when he filed the application -- and it's such a narrow issue that maybe it could be decided within that framework and then move on to the rest of the case.

I don't think that the delay would be significant, and I believe that the fact that we would be able to have a less confusing issue brought to the jury more than outweighs the

delay that could be, that would be introduced.

The other thing, Your Honor, is we have a pending --

THE COURT:  Well, let's talk about that issue first.  I know we talked about it a bit at the calendar call.

Has your position changed?

MR. VELARDE:  No, Your Honor, I believe that there is no need.  In fact, I think it would be prejudicial to bifurcate this case for a couple of reasons.

First, the underlying facts of the counterclaim substantially overlap the facts of our affirmative defenses to the complaint.

Second, the issues -- the case would actually be prolonged by bifurcating it.  It wouldn't lead to a shorter trial.  It would lead to a much longer trial because the jury would have to hear the facts twice, and I believe the Plaintiffs' position is regardless of the outcome of the counterclaim, the Plaintiffs' position is that they still have a claim, regardless whether the jury finds both for or against the defendants, and, therefore, we would still have essentially a full trial after the counterclaim is decided.

Finally, Your Honor, this was brought on at the last minute, a week ago, less than a week ago during calendar call.  I mean, we have been preparing for this case, and it would be prejudicial to now bifurcate the case and change the presentation to the jury at this late minute.

For those reasons, Your Honor, we don't believe it's beneficial and we think it's actually prejudicial and would actually confuse the jury more.

MR. SANCHELIMA:  A short reply, Your Honor?

THE COURT:  Sure.

MR. SANCHELIMA:  Basically, the facts that would be relevant would be those up to 2008, the date when the application or registration was filed.

Everything else is irrelevant to the purpose of determining the state of mind of the plaintiff at the time that this registration application was filed, and I really don't see that it would inconvenience the defendant that much if we could concentrate on that, but the risk of confusing the two burdens of proof more than outweigh the little delay that we have.

We don't have to state the facts twice, and the jury instructions may not have to be given twice.  It could be general instructions and then just concentrate on the counterclaim, the instructions that we deal with the counterclaim.

THE COURT:  I mean, is the counterclaim, though, issue, is it fully dispositive, meaning the case ends depending on that verdict?

MR. SANCHELIMA:  No, Your Honor, but the complication of the case varies.  It's pivotal because the registration, if survives, it provides a prima facie of validity and ownership

of the mark, and that would greatly accelerate the disposition of the case.

THE COURT:  Okay.  I am going to deny the request to bifurcate the trial.  One, the issues related to the claims and the counterclaims substantially overlap the factual evidence as to both.

I mean, I get the point that you are making that there are different standards of proof and that it might be somewhat confusing, but I don't think even the bifurcation cures that.

If I tell them -- if I give them the standard as to one and then have them come back and further deliberate, there is always the possibility of some confusion, and I think it's just incumbent upon us to explain that different claims have different standards in this instance and as far as just regular judicial economy, I don't -- this is a short trial.  It's not like we are going to be saving -- the issue, first of all, isn't fully dispositive, and we wouldn't be saving a lot of time to a two or three-day trial, in any event.

It's two to three days or is it three to four days?

MR. SANCHELIMA:  Two to three.

THE COURT:  All right.  The second issue you wanted to bring up?

MR. SANCHELIMA:  Yes, Your Honor.  We filed a motion in limine with respect to some exhibits that were filed relating to the state litigation, and we believe that they are

completely irrelevant to the issues of infringement of a trademark and counterfeiting in this case.

So, we believe that they would just confuse the issues here, especially if defendants want to introduce and want, as one of the exhibits, the complaint from the state court.

THE COURT:  So the specific items you want to exclude are what, Exhibits 15, 16 and 18?

MR. SANCHELIMA:  Yes, Your Honor, those dealing with -- 15 is a request for documents, pursuant to Florida Statute 607. We really don't see what relevance that has in this case, and the most difficult one for me to understand why it's here is the complaint, Exhibit 16.

Now, if the theory is an affirmative defense of retaliation of some sort by the, by the plaintiff because of the state case, now they brought the federal case, that's kind of speculative, and it really shouldn't bear on the jury to know or to get confused with another litigation.

Your Honor, and their estoppel equitable defenses may weigh this fact, the fact that there was a lawsuit in state court.  If Your Honor deems to be relevant for equitable relief, well, that's fine but the jury would just be confused with another complaint, totally different, not even mentioned infringement, counterfeiting, unfair competition or any of those causes of actions that we have here.

THE COURT:  And what about the e-mail?

MR. SANCHELIMA:  Which one is that, Your Honor?

THE COURT:  It's Docket Entry 18.

MR. SANCHELIMA:  18.

THE COURT:  I believe you are trying to exclude that as well.

MR. SANCHELIMA:  Oh, yes, Your Honor, 18, that too, motion to dismiss state court complaint documents.

If anything, a motion to dismiss deals with legal issues.  I don't know why we need a fact-finder to analyze historic events three or four years ago related to a corporate fight that the parties had.

THE COURT:  All right.  Why are you -- well, first of all, are you seeking to admit these items, and if so, why?

MR. VELARDE:  Your Honor, we will agree not to admit the actual documents, but we definitely want to ask about the existence of the state court lawsuit.

The reason, Your Honor, is because it goes directly to the credibility.

THE COURT:  Can you speak closer to the microphone?

MR. VELARDE:  Yes, Your Honor, my apologies.  The issue, Your Honor, is it goes directly to the plaintiff for filing this lawsuit.  There are several cases.  It's almost axiomatic that a Plaintiffs' motivation for filing a lawsuit is relevant because it informs their credibility for the allegations and that's the purpose here.  The facts are -- or

at least the facts that we are going to try to establish is that a lawsuit was filed in state court.  The plaintiff in this case tried to dismiss that lawsuit.  When that dismissal was denied and he realized he had to litigate in state court, he filed this case in federal court.

So the idea, Your Honor, is the motivation to file this case was actually a retaliation for having to litigate an issue in state court.

I, again, will not introduce -- I will agree not to introduce the actual complaint.  I will agree not to introduce the underlying demand, but I should be allowed to ask about the existence of that lawsuit and --

THE COURT:  I'm sorry to interrupt, finish your thought.

MR. VELARDE:  I should be allowed to ask about the existence of that lawsuit for the purpose of impeachment and credibility and, Your Honor, I have several cases that I could cite, but I will just rely on Chavez versus Arancedo, which is a Southern District of Florida case from 2018, and it says -- I'm going to quote it -- "We agree with defendants that for impeachment purposes defendants may inquire about Plaintiffs' motivation in filing this lawsuit, the basis of her claim, and the formulation of damages, the circumstances surrounding her decision to file this lawsuit.

"These inquiries are allowed because they are proper

areas of impeachment that go to the validity of a Plaintiffs' allegations."

So, for the same reasons, in this case I should be allowed to ask about the impeachment of the underlying lawsuit, and where it was when this lawsuit was filed, the fact that a motion to dismiss was denied.

On top of that, Your Honor, the plaintiff has identified, as Plaintiffs' Exhibit 12, an e-mail, and that e-mail is titled tortious interference. That's one of the Plaintiffs' exhibits, and it talks about tortious interference with business relationships. That was a claim that was filed in state court, and that claim was ultimately dismissed under a final judgment in favor of my client. So it would be extremely prejudicial if the plaintiff brings a document that says -- accuses my client of tortious interference, and I am not allowed to confirm or ask the plaintiff, didn't that claim get dismissed, wasn't that subject to a final judgment against you.

For those reasons, Your Honor, I should be allowed to ask these questions.

THE COURT: All right. So basically, these are -- you are not planning on introducing the documents but you -- I guess the substance of the documents or the fact that they exist. You want to use that -- well, have that as potential impeachment in case the plaintiff testifies.

MR. VELARDE: That's correct, Your Honor.

THE COURT:  All right.  What's the relevance to this e-mail, Docket Entry -- I'm sorry, Plaintiffs' Exhibit, Defense Exhibit 18?

MR. VELARDE:  So that e-mail, Your Honor, after the hearing on the motion to dismiss, the Court denied the motion to dismiss in the state court case, and I don't plan on introducing that e-mail either, Your Honor, unless I need to for impeachment purposes.

Mr. Diego Valdes was present at that hearing and unfortunately because Mr. Diego Valdes was co-counsel, I sent the e-mail to lead counsel, we never submitted a proposed order denying that motion to dismiss.  So the Court never entered an order denying the motion to dismiss, so I put in that e-mail, Your Honor, as a confirmation, which is the only confirmation I have other than the fact that looking at a docket that a hearing was scheduled and heard, confirmation that the motion to dismiss was actually denied in court.

Again, Your Honor, I don't plan to introduce it.  I just plan to ask questions about the status of the case at the time this lawsuit was filed.

THE COURT:  Anything else, Counsel, regarding those issues?

MR. SANCHELIMA:  Well, first, I haven't read or at least I don't remember the case that counsel is citing but there is no claim for damages from defendants.  That's number

one -- that would require the jury to evaluate that purported retaliation.

Number two, interference with a business relationship is not an exclusive state -- the state courts don't have exclusive jurisdiction with that.

We have alleged unfair competition, and that's broad enough to cover also interference with a business relationship. And I don't see the relationship that counsel attempts to make.

Having said that, we are not objecting to the use of those documents for impeachment purposes, nor would we object if there is a mention of the state litigation.

What we are against is introducing documents that are completely foreign to this litigation and there is a tendency that they will confuse the jury.

THE COURT:  With regard to the motion in limine, based on defense counsel's statement that they are not seeking to introduce the documents, I think it renders the motion moot.

The subject of those areas may be addressed during cross-examination for purposes of impeachment but, you know, of course, that's subject to the regular rules of evidence.  I mean, the e-mail in particular, not making any comments regarding hearsay or anything like that, at this point I think I need to wait to understand the context of it.

So I'm going to deny the motion in limine, but to the extent during trial defense counsel is going to address any of

those issues, you can still make contemporaneous objections and I will take it up as I hear it.

All right.  Anything else we need to take up before we begin from the plaintiff?

MR. ZORRILLA:  Your Honor, in terms of protocol, Mr. Cerasale informed me that every once in a while he has to go to the restroom.  He is under a medication.

THE COURT:  He can just go.  He can just go.

MR. ZORRILLA:  He doesn't need permission?

THE COURT:  Well, I am giving him permission now.  When he needs to go, he can just go.

Did you have anything else, Counsel?

MR. SANCHELIMA:  No, Your Honor, just playing with this button and how it works.

THE COURT:  All right.  Anything else from the defense before we begin?

MR. VELARDE:  Nothing from the defense, Your Honor.

THE COURT:  All right.  We do need a few moments to bring the jury up.

Do you need more time to go over the questionnaires because I know we got those a little bit late?

MR. SANCHELIMA:  Yes, if we can have five more minutes, we are halfway here.

THE COURT:  All right.  Is that enough time for the defense?

MR. ZORRILLA:  Yes, Your Honor.

THE COURT:  So, in the meantime, we will take about ten minutes.  In the meantime, we will start getting the jurors up.

MR. SANCHELIMA:  Thank you, Your Honor.

MR. VELARDE:  Thank you, Your Honor.

(Brief recess.)

COURTROOM DEPUTY:  All rise.  Court is back in session.

THE COURT:  All right.  We have all the jurors now.

Are you ready, for the plaintiff?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  For the defense?

MR. VELARDE:  Yes, Your Honor.

THE COURT:  All right.  We will bring them in bail.

COURTROOM DEPUTY:  All rise for the jury, please.

(The prospective jurors entered the courtroom at 10:09 a.m.)

THE COURT:  Please have a seat as you come in.

Please watch your step as you go up the incline.  You may have a seat when you get to your seat.

VOIR DIRE BY THE COURT

THE COURT:  All right.  Everyone please be seated.

Good morning, ladies and gentlemen.  My name is Darrin Gayles.  I am a United States District Judge for the Southern District of Florida.  The Southern District of Florida is a judicial district that covers -- well, it spans from Fort Pierce all the way down to Key West.

I have the pleasure of presiding over the case Unisource Discovery, Incorporated, versus Unisource Discovery, LLC, and Steven A. Cerasale.  The first thing I am going to have you do is while you remain seated is to please raise your right hands and Mr. Ahmad will administer the oath.

(The prospective jurors were duly sworn at 10:11 a.m.)

COURTROOM DEPUTY:  Thank you.

THE COURT:  All right.  You may lower your hands.

Now that you have been sworn, I want to give you an idea of what we are here to do.

Now, this is a civil trial.  A civil trial is different from a criminal case where a defendant is charged by the government with committing a crime.  The subject of a civil trial is a disagreement between people or companies where the claims of one or more of these parties has been brought to court to be resolved.  It is called a trial of a lawsuit.

Now, in this case I have asked the parties to provide a short summary of the case, and I will read that summary to you now.  This case involves the mark or brand, Unisource Discovery Digital Document Retrieval.

The plaintiff is Unisource Discovery, Incorporated, who we will refer to as Unisource Florida on one side.  And the defendant Unisource Discovery, LLC, who we will refer to as Unisource California and Defendant Cerasale on the other side.

Both sides are using the identical mark or brand for

the same services.

In May of 2001 Unisource California was created by Mr. Cerasale. In June of 2006, Unisource Florida was created by Mr. Cerasale, who owned 50 percent of the corporation, and Noel Mijares with 25 percent and Lisa Cote, also with 25 percent, and Ms. Cote is Mr. Mijares' wife.

It is Unisource Florida's position that it owns the Unisource mark, including the registration with the United States Patent and Trademark Office since 2009 and that Unisource Florida's granted a license to Unisource California to use the mark or brand, which it later revoked in February of 2020.

It is the defendant's position that Unisource California owns the Unisource mark since May of 2001 and that Unisource California granted a license to Unisource Florida to use the mark or brand.

The plaintiff has brought claims of counterfeiting and infringement of the federally-registered Unisource mark or brand, false designation of origin, common law, unfair competition and common law mark infringement.

The defendants have raised affirmative defenses and also brought a counterclaim stating that Unisource Florida's mark registration should be cancelled because Unisource Florida's allegedly committed fraud when it filed its registration application in 2008.

Now, that is a summary of the claims by both sides and, of course, the parties will elaborate on that, on those issues in both their opening statements and in their presentation of the evidence as well as the closing arguments.

Now, with that said, just the subject matter of the claims here, does that affect anyone's ability to sit as a fair and impartial juror in this case?

Okay.  For the record, I see no hands.

Well, I guess this would be a good time to have the parties introduce themselves and their clients to you.

We will start at the table to my right.

If you will please introduce yourselves, as well as your client.

MR. SANCHELIMA:  Good morning, Your Honor, Jesus Sanchelima representing the plaintiff, and with me is Liany Estevez, our associate, and my co-counsel Diego Valdes.

THE COURT:  Okay.  And Mr. Mijares, did you introduce him as well?

MR. SANCHELIMA:  Yes, did I mention -- oh, I'm sorry, I didn't mention the most important person at our table.  Our client, Mr. Noel Mijares, president of Unisource Discovery Florida.

THE COURT:  And to my left, counsel for the opposing side, if you would like to introduce yourself, your co-counsel and your client.

MR. VELARDE:  Thank you, Your Honor.

Ladies and gentlemen, my name is Victor Velarde.  To my right is my colleague, Juan Zorrilla, and we represent Mr. Steven Cerasale, who is seated in the far right over here.

Mr. Cerasale is the owner of Unisource California and also 40 percent owner of Unisource Florida.

THE COURT:  All right.  Ladies and gentlemen, do any of you know the attorney or the parties for either side?

Okay.  We will get the microphone to you.  Just a moment, if you will start by telling us your name and your juror number.

PROSPECTIVE JUROR:  My name is Veronica Tarajano.  I am juror 16.  I just wanted to point out for full disclosure, I'm a paralegal.  I work for Herrera Law Firm, and the names just happen to sound familiar.

THE COURT:  All right.  The names of?

PROSPECTIVE JUROR:  Of the attorneys.

THE COURT:  Okay.  On both sides?

PROSPECTIVE JUROR:  They both have seemed familiar with me as if I have dealt with them in the past.  I've been with my firm for 20 years.  I didn't know if that was something I need to disclose.

THE COURT:  Yes.  But do you recall in --

PROSPECTIVE JUROR:  No, I don't recall a specific case or anything.

THE COURT:  Do you recall the attorneys specifically?

PROSPECTIVE JUROR:  No, just the names sound familiar.

THE COURT:  Is there anything about the fact that those names sound familiar that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR:  No, it would not.

THE COURT:  Since I have you standing here, you work, again, for which firm?

PROSPECTIVE JUROR:  Herrera Law Firm.

THE COURT:  What do you do as a paralegal there?

PROSPECTIVE JUROR:  He is a sole practitioner.  I used to work for the father.  Now I work for the son.  We were formerly Jose Herrera P.A., and then a couple of years ago we became Herrera Law Firm, but I have been his paralegal and his assistant for the last 19 years.

THE COURT:  And your general duties as a paralegal?

PROSPECTIVE JUROR:  Anything, drafting motions, to doing research for him.

THE COURT:  What kind of cases does he normally handle?

PROSPECTIVE JUROR:  He's done everything.  We've done family, criminal, civil litigation.

THE COURT:  Do you regularly attend court proceedings?

PROSPECTIVE JUROR:  No, only a few times when he has gone to trial.

THE COURT:  Okay.  And the types of trials you have sat

in on are civil, criminal, family or what?

PROSPECTIVE JUROR:  I have sat in on two family.

THE COURT:  Okay.  Have you ever worked on -- well, your work as a paralegal, has it only been with that firm?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Have you done any work at any copyright or trademark cases?

PROSPECTIVE JUROR:  I don't -- not necessarily.  We did several years ago for -- it was a criminal case involving cigar cases, infringement, I think, of trademarks but I don't -- but it dealt more with the criminal aspect, not with civil.

THE COURT:  Okay.  Thank you very much.

Anyone else with any familiarity with the parties?

All right.  For the record I see no hands.

Now, I keep saying for the record because Ms. Diaz, who is seated right in front of me, she is keeping an accurate record of everything that we all say during the trial and, of course, I can see that there are no hands but for the record, I need to note that for Ms. Diaz.

That's also the reason why before any of you speak I will have you state your name and juror number so that Ms. Diaz can identify who is speaking, again, so we can keep an accurate record.

You have all already met my courtroom deputy, Mr. Rehan Ahmad, who has a number of responsibilities, primarily just to

make sure that the mechanics of the trial go smoothly.

He will swear in witnesses.  He will be the primary person that you all speak to as far as when and where you should report, particularly those of you that are ultimately selected as jurors in this case.  If you need any documentation for your jobs or for school, he will provide that as well.

We are also joined by our court security officers.  You will probably see mostly Officer Acosta closest to you in the jury box because he is regularly assigned here, but you will see the court security officers rotate in and out.  They will do it quietly.  You probably won't even notice when that happens.

If any issues come up outside my presence, please address them with either the Court security officers or with Mr. Ahmad, and they will, in turn, address the issue with me, but bear in mind that they can't answer any specific questions about any of the evidence or any of the issues with this case.

They can just answer questions regarding when and where you should report, or if you have any issues or concerns, they will relate that to me.

Of course, we have already -- the parties have already introduced themselves to you.  Last but not least is me, of course, the judge.

My central role in the case is to make sure that the rules of evidence and procedure are followed.  I will rule on

issues during the trial, and for those of you selected, I will talk to you a bit more about that in a moment.  But the main thing for me, of course, is to remain neutral, as I am required to do, and that I just naturally do, so that each side has a fair trial.

Now, for a federal case, this is a relatively short case.  I have discussed it with the parties in advance.  We expect this case to last no more than three days, so this case -- we will select a jury today.  We should be able to do that this morning.  We will take a break for lunch, and then we will have the opening statements and the presentation of the evidence.

We will work each day until approximately 5:00 p.m.  We will start tomorrow and Wednesday -- well, tomorrow we will start about 9:30.  Wednesday we have some other matters, so we will probably start around 10:00 or 10:30 and work until 5:00.  Even if we have to work until Thursday, I mean, the case will last no longer than Thursday.

We think the case will conclude by Wednesday, but it should conclude by Thursday, at the latest.

Now, with that schedule in mind, does that pose a hardship to anyone starting here in the jury box?

Okay.  Bring the microphone over here.

Please remember to state your name and juror number.

PROSPECTIVE JUROR:  Eugene Smith, III, juror number 8.

THE COURT:  What's your conflict?

PROSPECTIVE JUROR:  I have surgery tomorrow on my mouth.  I have a dentist appointment, which when the information was sent out about a jury, it went over my head some type of way.  I forgot.  I put it on the questionnaire.

THE COURT:  Okay.

PROSPECTIVE JUROR:  About my surgery, so what happened was we were actually scheduled for later this month, but they had an opening and I was able to be fit.  I got to go tomorrow morning at 9:00.

THE COURT:  Okay.  Is this like a significant -- you don't have to give me the details, but is it something significant?

PROSPECTIVE JUROR:  Yes, I have a tooth that has been bothering me, and I'm finally able to get it pulled.

THE COURT:  All right.  Thank you, sir.

That's tomorrow morning?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.  There was another hand.

PROSPECTIVE JUROR:  Your Honor, Sana Bolooki.  My juror number is nine.  I have an intern evaluation on Wednesday at 12:00, and I also have a training evaluation on Wednesday again.

THE COURT:  All right.  You said an intern evaluation?

PROSPECTIVE JUROR:  Yes.

THE COURT:  What is that exactly?

PROSPECTIVE JUROR:  I am a master level student at FIU. I am currently in professional counseling program, and I work as an intern counselor, so I do have an intern evaluation and also a training evaluation.

THE COURT:  And those are both on Wednesday?

PROSPECTIVE JUROR:  Correct.

THE COURT:  At what time on Wednesday?

PROSPECTIVE JUROR:  At 12:00 p.m.

THE COURT:  And --

PROSPECTIVE JUROR:  One of them is 12:00 p.m. and the other one starts at 6:00 p.m.

THE COURT:  All right.  At what university?

PROSPECTIVE JUROR:  Florida International University.

THE COURT:  What are you studying?  You're getting a masters in what?

PROSPECTIVE JUROR:  In professional counseling.

THE COURT:  These evaluations, are these things that can be moved?

PROSPECTIVE JUROR:  I am not sure -- well, I don't know.  I need to discuss this.

THE COURT:  Okay.  I will say, normally big employers as well as universities, they are pretty accommodating.

Now, do you have any exams left for this semester?

PROSPECTIVE JUROR:  I have a training exam on Wednesday

that needs to be done at 6:00 p.m.

THE COURT:  Okay.  Just because I don't understand exactly what that entails, is this something that you have to study for or is this something just based on the experience from your training that you are just able to --

PROSPECTIVE JUROR:  Well, the intern evaluation is by experience, and the training evaluation is by study.  It has a manual and book.

THE COURT:  Okay.  So, you will have to tell me, if this is something that can be moved, would that cause some kind of problem for you or no?

PROSPECTIVE JUROR:  Well, my guess is if the evaluation is not done within the final week, it should be a no pass for the semester.

THE COURT:  What I am going to ask, if you don't mind is, when we take a break, and we will take a break, is that you reach out to your professor and ask whether or not it's something that can be moved, specifically tell them because of jury duty, and then you will tell us the answer to that.

Thank you.  If you will pass the mic.

PROSPECTIVE JUROR:  My name is Janice Barefoot.  I am juror number 11.  I have a ten-year old daughter.  I do have a husband.  He is in his seventies, and he is managing today.  I don't have any family in South Florida that can help, and I brought a letter.

I do have a housekeeper/nanny who, you know, routinely does the driving to school, makes dinner, you know, keeps things working.  She is having surgery today.  I have the note from her surgeon attached.

If it was one or two days, like Thursday, for instance, my daughter has a doctor's appointment at the dermatologist.  I could probably manage to, you know, like I say, if it was today and tomorrow, you know, we can make do for a couple of days but if it stretches into Thursday, I just got too much going on.  I have no help.

THE COURT:  Okay.  You can pass the letter, please, to Officer Acosta.

Okay.  Anyone else with a scheduling issue?

If you can, pass the microphone down.  Thank you.

PROSPECTIVE JUROR:  Good morning.  My name is Amada Lopez.  I am juror number 13.

I take care of my grandson, who is five years old, and he is autistic.  I take care of him on Wednesdays, Thursdays and Fridays, and on those days the therapist comes to my home to provide therapy for him.  And I have nobody else who could be home.  She comes around 10 o'clock, and she leaves -- she comes at 10:00 a.m. and she leaves around 3:00 p.m.

THE COURT:  And that is, I'm sorry, Wednesday and Thursday?

PROSPECTIVE JUROR:  Wednesday, Thursday, Friday.  Both

parents work, so I -- today he is with his mother, but Wednesday, Thursday, and Friday I am supposed to stay home with him even overnight so his mom can work and his dad can work.

THE COURT:  Thank you.

Anyone else with a scheduling issue?

Yes, ma'am.

PROSPECTIVE JUROR:  Yes, hi.  My name is Ana Maria Souffront.  I am juror number six.  I just want to be fair with my client at work.  I work for a crew scheduler for an airline, and we are short one person in the office.  We work ten hours. I work from 5:00 in the afternoon until 3 o'clock in the morning.

Today is my day off, and I am off tomorrow too, but I work then five days straight starting Thursday.  And I just want to make sure that I let you know, I don't know -- I love these things.  This is my fourth time being a juror, so I like this, but I feel like I am going to be unfair with my colleagues at work because three people would have to work 24 hours.  If I am not there, somebody has to cover me.

THE COURT:  For which airline do you work?

PROSPECTIVE JUROR:  The name of the airlines is SkyLease.  It's a cargo company.

THE COURT:  I'm sorry, what is the name?

PROSPECTIVE JUROR:  SkyLease.

THE COURT:  SkyLease?

PROSPECTIVE JUROR:  Yes, just one word, SkyLease Cargo.

THE COURT:  You said earlier, it's crew scheduling that you do?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Just so I understand what you are saying earlier, it's not that you can't serve but there is a burden that it would put on your coworkers?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Have you talked to your employer about you having this issue?

PROSPECTIVE JUROR:  I talked to my HR when I received the papers.

The truth is, I served last year in a criminal court, and I thought I was excuse this.  I was told two different things, criminal, civil so I have to be here.  Therefore, that's what I said I have to go if they -- you know, when I called last night, I text her, I have to go but probably I am going to be dismissed, which wasn't the case.  So I have to let them know.

But I feel the obligation to be fair with them too, just to let you know, if there is a possibility that I don't have to, okay.  If I have to, then, you know, I did my part.

THE COURT:  All right.  Well, thank you for letting us know.

There is also a hand here.  Good morning.

PROSPECTIVE JUROR:  Good morning.  I am a physician and I have other people covering for me but, of course, I have the obligation to be here and it's -- we are very tight, especially with the snowbirds in the hospital that are coming from New York and all the cold places.  This is the worst time for coverage, and they are covering for me.  And being here, sitting here, I know is my obligation but I feel bad for them to cover for me until Thursday.

I work in the Bruce W. Carter, VA, seeing veterans, and we have a lot of patients right now.  I know if I can be excused, that would be great because I feel really bad for them to cover for me all these days.  It's a lot of work every day that I am there, and I just feel bad for them to cover for me all these days.

THE COURT:  Okay.  And you are a --

PROSPECTIVE JUROR:  I am a psychiatrist.

THE COURT:  You are?  You didn't state your name.

You are Mercedes Rodriguez-Suarez?

PROSPECTIVE JUROR:  Yes, juror one.

THE COURT:  What happens when one of you goes on vacation?  How does that coverage take place?

PROSPECTIVE JUROR:  We basically do it in advance. This was not made in advance.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Yes.  So we accommodate like three

months before when we go on vacation, and we do it in advance, there is a floater, but this was not in advance.

THE COURT:  All right.  Thank you.

Anyone else with a scheduling issue in the jury box?

How about in the back?

Okay.

PROSPECTIVE JUROR:  Hello, good morning.  My name is Pedro Batista.  I work as a behavior technician.

I have two cases right now at the setting of school.  I have to be there for them every day from Monday to Friday because they display very different maladaptive behaviors, head banging behaviors, aggressiveness towards other students and even the teachers.  So the agency and the school need me to be there to prevent those behaviors to occur.

THE COURT:  Let's back up.  Do you work for the school board?

PROSPECTIVE JUROR:  No, I work for an agency, RBT, behavior technician.

THE COURT:  And they have a contract with the schools?

PROSPECTIVE JUROR:  Not with the schools, but with the families, so we provide services to the family of the kids with autism.

THE COURT:  Okay.  So you work specifically directly with the families?

PROSPECTIVE JUROR:  Yes, directly with the kid.  I give

therapy to the kid.  I go to school from 8:00 until they pick him up, 2:00, 3:00, depending on the time they pick him up. Like I said, sometimes the students don't go by the rules in school like sitting down, no talking and those maladaptive behaviors occur like head banging, aggressiveness, and -- I mean, there is only one teacher there for 20 or 25 students and they can't be on top of the student that I give therapy to.

THE COURT:  So you shadow the students while they are in school?

PROSPECTIVE JUROR:  Only that student, yeah, my client.

THE COURT:  And you are assigned to one student?

PROSPECTIVE JUROR:  One student, yes.

THE COURT:  What happens when you have time off?

PROSPECTIVE JUROR:  I don't really have time off.  From Monday to Friday I have to be there.  Because the thing is, sometimes when this happens the student is taken out of the classroom and they have to call the mom because they cannot handle these things.  That's why I'm there.

THE COURT:  I am not diminishing the importance of what you do, but everyone either has sick time off or they have vacation.  What happens when that happens?  Who goes with the student then?

PROSPECTIVE JUROR:  No one.  I haven't had that problem because I started like three months ago, so I haven't taken time off there.

THE COURT:  So what happens in your company when that happens?

PROSPECTIVE JUROR:  I'm not sure.  The thing is that client only has me as a service.  The only other person is the analyst, which is the one who provides supervision to me, but they don't go to the school.  They are not directly with the student.

The thing is, I wouldn't have an issue if it was just for today or tomorrow, but if it extends three days, then that's three days that I am not going to be at school with him, with the client.

THE COURT:  All right.  Thank you, sir.

Anyone else with a scheduling issue?

Okay.  I told you earlier, this is a relatively short trial.  There are a few witnesses that may be called to testify.  I am going to read those names to you now and again ask you whether or not any of you know any of them.

The first person is Noel Mijares, who we have already introduced you to this morning.  The second person is Steven Cerasale, who we have also introduced to you this morning. Jill Nolden, N-O-L-D-E-N, Kristen Morcos, M-O-R-C-O-S, and Alfred Lutter, L-U-T-T-E-R.

Do any of you know any of those individuals?

All right.  For the record, I see no hands.

We all know just from our life experiences that we

might not recognize a name, but we might recognize the person when we see him or her.

For those of you that are selected to sit on the jury, if you recognize any person that is called to testify, please raise your hand and let me know immediately.

Now, the last thing I want to do before we begin selecting the jury is to explain how the selection process works.  This is the part of the case where the parties and their lawyers have an opportunity to get to know a little bit about you in order to help them come to their own conclusions about your ability to be fair and impartial.

First I am going to ask some general questions of you based on your written questionnaires.  Then one lawyer for each side will have an opportunity to ask more specific questions. After they have asked all their questions, I will meet with their attorneys and the parties and they will tell me their choices for jurors.

Each side can ask that I exclude a person from serving on a jury if they can give me a reason to believe that he or she might be unable to be fair and impartial.  That is what we call a challenge for cause.

In addition, the lawyers also have a certain number of what we call peremptory challenges by which the parties may exclude a person from serving on the jury without giving a specific reason for doing so.

By this process of elimination, the remaining persons are selected as the jury. It may take more than one conference by the parties, their lawyers, and me before the final selections are made.

Now, the questions that are going to be asked during this process are not intended to embarrass you or to unnecessarily pry into your personal affairs, but it is important that you understand why we have to ask these questions.

If a question is asked that you prefer not to answer in front of the whole courtroom, please let me know and we will take your answer outside the presence of the other jurors. And if you have a question for either me or the attorneys, please let us know.

Remember there are no right or wrong answers to the questions that will be asked of you. The only thing that I ask is that you answer the questions as frankly and as honestly and as completely as you can. You have taken an oath to answer all questions truthfully and completely, and you must do so.

Remaining silent when you have information you should disclose is a violation of that oath as well. If the jury violates this oath, it not only may result in having to try the case all over again but it can result in civil and criminal penalties against a juror personally.

Again, it is very important that you be as honest and

complete with your answers as you possibly can. If you don't understand the question, please raise your hand and ask for an explanation or clarification.

In sum, this is a process to assist the parties and their attorneys to select a fair and impartial jury. All the questions that you will be asked are for this purpose. If for any reason you do not think that you can be a fair and impartial juror, you must tell us, and I will only leave you with the last caveat. You know, if this case isn't the best one for you and you don't think you can be fair to both sides, you let us know. We will send you back to the jury pool and they will select you, perhaps, for another jury trial.

There are some kinds of cases for which people feel that they -- well, for which people are generally fair, they think they can be fair, but there might be a certain kind of case where you think, oh, well, on this kind of case, based on a past experience, I don't think this is the one for me, and that's fine. We've got other trials going on in this courthouse and perhaps you can sit on one of those.

Now, I do have questions for many of you, if not all of you. Some of you I have already spoken to, including Dr. Rodriguez-Suarez, so I don't have any additional questions for you.

Juror number two, Monica Bustillo.

Good morning.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  Where do you work as a treasurer?

PROSPECTIVE JUROR:  I work at a school.

THE COURT:  Is it a public or private school?

PROSPECTIVE JUROR:  It's a charter school, a public charter school.

THE COURT:  What does a treasurer do at a school?

PROSPECTIVE JUROR:  I collect all the money.  I run all the books, accounts payable, receivables.

THE COURT:  Are you a full-time employee?

PROSPECTIVE JUROR:  Full-time.

THE COURT:  Any reason why you cannot be fair to both sides in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Juror number three, is it Soraya?

PROSPECTIVE JUROR:  Jiha.

THE COURT:  Jiha.

Good morning.  Where do you work as a CPA?

PROSPECTIVE JUROR:  I am self-employed.

THE COURT:  Sitting as a juror, would that pose any kind of financial hardship for you if you are selected?

PROSPECTIVE JUROR:  Well, it's only for two or three days.  I'm hoping it's just a couple of days.

THE COURT:  I expect it to conclude within three days,

so is that something you think you can do?

PROSPECTIVE JUROR:  I will do it.

THE COURT:  Okay.  Is there any reason why you cannot be fair to both sides?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

Juror number four, Mohammed Soutto.

PROSPECTIVE JUROR:  Soutto, yes.

THE COURT:  You are a cancer researcher?

PROSPECTIVE JUROR:  I am a scientist.

THE COURT:  You are a --

PROSPECTIVE JUROR:  Scientist.

THE COURT:  Where do you work as a scientist?

PROSPECTIVE JUROR:  I am in cancer -- I am at University of Miami.

THE COURT:  Okay.  Of course, we have talked about the schedule.  Does that pose any kind of problem for you?

PROSPECTIVE JUROR:  No, I don't think so.

THE COURT:  Is there any reason why you cannot be fair to both sides in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, sir.

Juror number five, Steven O'Neill.

PROSPECTIVE JUROR:  Yes.

THE COURT:  Good morning.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  Where do you work as a construction project manager?

PROSPECTIVE JUROR:  It's a company called MAC Construction, M-A-C.

THE COURT:  I mean, I know what the title implies, but what specifically do you do?

PROSPECTIVE JUROR:  We do mostly government work with a lot of renovations with the school board renovating schools, Miami-Dade College.

THE COURT:  You are a full-time employee?

PROSPECTIVE JUROR:  Yes.

THE COURT:  I am assuming this is a pretty big company?

PROSPECTIVE JUROR:  It's a medium size.

THE COURT:  Any issue with being paid if you are selected?

PROSPECTIVE JUROR:  No.

THE COURT:  Is there any reason why you could not be fair to both sides in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, sir.

Juror number six, Ms. Souffront, we have already spoken.

I did have one question.  You previously served on a civil jury.  Is that correct?

PROSPECTIVE JUROR:  Before, yes, twice.

THE COURT:  Was that state court or federal court?  Do you recall?

PROSPECTIVE JUROR:  I think it was state because it was a lawsuit, and the second one -- yeah, both of them were, but I think it was something -- one was a lawyer against insurance and the other one is a business against the city.

THE COURT:  Okay.

PROSPECTIVE JUROR:  So I understand it was like four years ago.

THE COURT:  Was it at the Dade County Courthouse down the street?

PROSPECTIVE JUROR:  Yeah, in the old building.

THE COURT:  Yes.

PROSPECTIVE JUROR:  Yeah, there.

THE COURT:  Okay.  Anything about that experience that would affect your ability to serve in this case?

PROSPECTIVE JUROR:  No.  I have to say that I studied law in my country.  I am a doctor in law in my country.  That was 30 years ago, a little bit more than that.  I don't deal with anything around law, but that's why I said I like this.

THE COURT:  In what country did you study?

PROSPECTIVE JUROR:  Dominican Republic.

THE COURT:  Okay.  So you are a lawyer by training, although you don't practice?

PROSPECTIVE JUROR:  Yes, I have my title, but when I work there, I was working for like internal revenue.

THE COURT:  Okay.

I know we discussed your concerns about your fellow co-workers, but is there any reason why you could not be fair to both sides in this case if you are selected?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, ma'am.

Juror number seven, Heather Mejia-Montes.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Are you currently employed?

PROSPECTIVE JUROR:  No.

THE COURT:  Were you ever previously employed?

PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Your answer to question 13, is this an issue of concern for you generally or just when you are speaking?

PROSPECTIVE JUROR:  I think it's general.

THE COURT:  Okay.  Your answer is pretty clear, but is this something you think you would be able to do in this short trial or no?

PROSPECTIVE JUROR:  I think I could do it.  I could overcome it, maybe.

THE COURT:  I will say, if you need any breaks during a trial, all you have to do is let us know and we can take a

break.

Okay.  Any reason why you could not be fair to both sides?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, ma'am.

Juror number eight, Mr. Smith.

Mr. Smith, you've got the dental surgery tomorrow.  I am assuming that's going to take most of the day tomorrow.  Is that correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Then I don't have any additional questions for you.  Thank you.

Juror number nine, we have also -- Ms. Bolooki.

PROSPECTIVE JUROR:  Yes.

THE COURT:  We have also spoken.

Now, apart from your issue with the scheduling, you indicate that you worked at a law firm.  Were you working in a law firm?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Are you currently working at a law firm?

PROSPECTIVE JUROR:  Yes, currently working as a legal assistant.

THE COURT:  Which law firm?

PROSPECTIVE JUROR:  It's Corridor & Jose, P.A.

THE COURT:  Corridor & Jose?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  What kind of work does the firm do?

PROSPECTIVE JUROR:  It's very broad.  We do have many civil cases.  We have family, criminal, anything.

THE COURT:  Okay.  Do you know whether or not they have worked on any trademark cases?

PROSPECTIVE JUROR:  Nothing comes to my head right now.

THE COURT:  Specifically, what kind of work do you do for the firm?

PROSPECTIVE JUROR:  I am a legal assistant.  I usually work on drafting discovery, motions, scheduling, kind of like a paralegal.

THE COURT:  Sometimes firms handle one side or the other, either Plaintiffs' work or defense work?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Your firm does primarily Plaintiffs' work?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Obviously, in this case there is a plaintiff, and there is a defendant, but you also learned that there is a counterclaim, so it's not as simple because one side is filing a complaint against the other and the other side is filing a counterclaim against the other side.  So they are both, in a sense, plaintiffs and they are both, in a sense, defendants.

So with that in mind -- you indicate that you might be

biased towards the plaintiff, but in this case they are both plaintiffs.  I mean --

PROSPECTIVE JUROR:  Well, yeah, I don't know.  We got to give it a try, but I just put -- I tried to answer the question as fairly as possible.

THE COURT:  Right.  And we want people to be forthcoming, and if you think there are any concerns, we want people to tell us.

Just given generally what I told you the case is about, do you think you would have any issues with being fair to either side?

PROSPECTIVE JUROR:  It's just the mindset of, you know, how representing a plaintiff is a problem, has to be there to set a staff for work to bring justice, so I just had this idea.  But you're right that this is a counterclaim as well so I got to give it a try.

THE COURT:  All right.  Thank you.  The attorneys may talk a little more about that going forward.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Mr. Brian Shedrack.

PROSPECTIVE JUROR:  Good morning, Your Honor.

THE COURT:  Good morning.

Juror number ten.

What do you do right now for a living?

PROSPECTIVE JUROR:  Currently I am a full-time

specialty banker over at the Seminole Hard Rock Hotel and Casino over in Hollywood, Florida, the Hard Rock Hotel.

THE COURT:  Are you a full-time employee there?

PROSPECTIVE JUROR:  Correct.

THE COURT:  You also mentioned a university student. Was that what you did before within the past five years, or are you also a student now?

PROSPECTIVE JUROR:  Correct.

I was a university student from 2016 all the way up to 2020 at Florida International.

THE COURT:  What did you study?

PROSPECTIVE JUROR:  Initially I studied accounting, and then I switched when I went to FIU in 2008, general finance.

THE COURT:  Any issues with serving if you are selected?

PROSPECTIVE JUROR:  No, Your Honor.

THE COURT:  Can you be fair to both sides in this case?

PROSPECTIVE JUROR:  I believe so.

THE COURT:  Okay.  Thank you.

Juror number 11, Ms. Barefoot.

We have had a chance to speak about your --specifically about the child care issue.  I don't have any additional questions for you now.  Thank you.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Actually, Ms. Barefoot, you did in response

to question 14, note a reason why you may not be able to be fair to each side, but that seems to relate to a criminal case. This isn't a criminal case.

PROSPECTIVE JUROR:  Correct.

THE COURT:  That doesn't negate, of course, what you told us about the other issue, but I just want to find out whether or not this is still an issue?

PROSPECTIVE JUROR:  Yeah, I mean, a civil case is different.

THE COURT:  All right.  Thank you, ma'am.

Juror number 12, Martha -- pronounce your last name for me.

PROSPECTIVE JUROR:  Jaureguizar.

THE COURT:  Good morning.  You are a principal, an elementary school principal?

PROSPECTIVE JUROR:  Yes.

THE COURT:  For the three-day trial, is there any problem with you serving in this case?

PROSPECTIVE JUROR:  If we get breaks or we are allowed to just stand, that would help me a lot because I do have a problem with my sciatic nerve.

THE COURT:  You are free to stand whenever you like and, in fact, you are free to stand there or if you want to come and sit on the end, we can put a chair there.

PROSPECTIVE JUROR:  I appreciate it.

THE COURT:  Any reason why you cannot be fair to both sides in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Whenever you are ready to move, just let Officer Acosta know.

PROSPECTIVE JUROR:  I will go right now.

THE COURT:  All right.  Feel free to move over here. Juror number 13, Amada Lopez.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  Good morning again.  You told us about the scheduling issue with your grandson.  I was curious.  You indicate that both you and your spouse are retired.  Retired from doing what kind of work?

PROSPECTIVE JUROR:  I was a registered nurse.

THE COURT:  Okay.  And your spouse?

PROSPECTIVE JUROR:  He used to work on construction.

THE COURT:  All right.  Thank you very much.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Juror number 14, Germany Dixon.  Where are you associate dean of public affairs?

PROSPECTIVE JUROR:  Palm Beach State College.

THE COURT:  Any issue with missing three days of work if you are selected?

PROSPECTIVE JUROR:  I am going to hold on as well as I can.  We are in the last couple of weeks of the semester, so

administration for me and being over all of the departments makes a lot of difference, but I'll -- as long as we have breaks, which I think we do, we will try to check e-mails and communicate properly.

THE COURT:  We will have breaks, and just in general, usually -- especially once a trial gets going we will take a break after about an hour and a half of testimony so our court reporter has a break and also to so the jurors can get coffee and use the restroom, etcetera.  We will have an hour lunch break each day, so we will break it up so you have an opportunity to check in whenever you need to.

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  In the civil trial where you served as a juror, was that in state court or federal court; do you recall?

PROSPECTIVE JUROR:  It was in state.  It was with Dade County.  It was an insurance case between, I think, Progressive and somebody else.

THE COURT:  All right.  Is there any reason why you cannot be fair to each side in this case?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Thank you, sir.

Juror number 15, Stricker.  Is it Dilhomme?

PROSPECTIVE JUROR:  Correct.

THE COURT:  Yes, ma'am.

PROSPECTIVE JUROR:  I texted my work -- all right.

This is Dr. Rodriguez-Suarez, juror number one?

Yes.  I texted them, and they say that if you -- if the trial ends on Thursday morning I can go to work on Thursday afternoon they are okay.

THE COURT:  All right.  Thank you for letting me know.

All right.  Mr. Dilhomme, you work as a flight attendant?

PROSPECTIVE JUROR:  Correct.

THE COURT:  For which airline?

PROSPECTIVE JUROR:  American.

THE COURT:  You are a full-time employee?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Any issue with serving on the trial?

PROSPECTIVE JUROR:  No.

THE COURT:  Any issue with being fair to both sides in this case?

PROSPECTIVE JUROR:  Not at all.

THE COURT:  All right.  Thank you, sir.

Juror number 16, Ms. Tarajano.

PROSPECTIVE JUROR:  Yes.

THE COURT:  We spoke earlier.

You were a -- you were a witness in your mother's case. Is that right?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And you were deposed?

PROSPECTIVE JUROR:  I was deposed.

THE COURT:  Let's see was that case --

PROSPECTIVE JUROR:  The case settled.  It didn't go to court.

THE COURT:  Okay.

Any reason why you cannot be fair to each side in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you, ma'am.

Juror number 17, Arianne Plasencia.

PROSPECTIVE JUROR:  It's Arianne Plasencia, Your Honor.

THE COURT:  Good morning.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  What kind of law do you practice?

PROSPECTIVE JUROR:  I do tax and estate planning.

THE COURT:  Do you work for yourself or with a firm?

PROSPECTIVE JUROR:  I work with McDermott, Will and Emery.

THE COURT:  Any scheduling issue?

PROSPECTIVE JUROR:  It's my busiest time of the year, but I understand it's my civic duty here and I'll shuffle things around as necessary.

THE COURT:  Have you been a litigator?

PROSPECTIVE JUROR:  I have not, other than probate work, not in federal court.

THE COURT: I don't recall seeing your hands. Do you know any of the lawyers in this case?

PROSPECTIVE JUROR: I do not, not to my knowledge.

THE COURT: Okay. Let me see, you were a plaintiff in a lawsuit that settled and so was your spouse.

Anything about those cases that would affect your ability to be fair in this case?

PROSPECTIVE JUROR: No, Your Honor.

THE COURT: Is there any reason why you could not be fair and impartial?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR: Thank you.

THE COURT: Juror number 18, is it Bisleixis Oropesa?

PROSPECTIVE JUROR: Yes, good morning.

THE COURT: Am I close?

PROSPECTIVE JUROR: Yes.

THE COURT: You are a school principal?

PROSPECTIVE JUROR: Yes, I am.

THE COURT: What school?

PROSPECTIVE JUROR: Aventura Waterways K-8 Center.

THE COURT: Okay. Again, I guess for every educator, I know this is a tough time of year, but could you serve for these three days?

PROSPECTIVE JUROR: Yes.

THE COURT:  Your spouse is an attorney.  What type of law?

PROSPECTIVE JUROR:  Family law.

THE COURT:  All right.  Is there any reason why you could not be fair to both sides in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you.

Juror number 19, Maria Schneider.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  Good morning.

You specifically worked during retail as a district manager.  Is that correct?

PROSPECTIVE JUROR:  Correct.

THE COURT:  Any issue with serving on this trial if you are selected?

PROSPECTIVE JUROR:  No.

THE COURT:  Is there any reason why you cannot be fair to both sides?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Thank you very much.

Then last but not least, Mr. Batista Rubio, who we spoke to earlier.

Other than your work schedule, is there any reason why you could not be fair to both sides?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  All right.  Thank you.

Before I let the lawyers start with their questioning, does anyone need a restroom break?

All right.  Seeing no hands.

The attorneys have an opportunity to ask you questions. The same rules apply.  If you want to provide any answers in private, I am happy to do that, or if you have any questions feel free to ask those questions.

By procedure -- well, counsel for plaintiff, although there is a counterclaim, goes first.

Are you ready to proceed, Counsel?

MS. SANCHELIMA:  Yes, Your Honor.

THE COURT:  All right.

MR. SANCHELIMA:  Your Honor, may I leave the area of the table so that I am facing the prospective jurors?

THE COURT:  Yes.  If you need the lapel mic, we will give that to you, but there is also a microphone at the podium if you prefer to use that as well.

If you want to use that one, unless you want to hold it up, you can put it on your lapel, whatever you prefer.

VOIR DIRE BY THE PLAINTIFF

MR. SANCHELIMA:  Good morning.  My name is Jesus Sanchelima.

I am a trademark attorney, and I am here -- I have the privilege of representing Unisource Florida.  I am going to try

to be quick.  We appreciate your time here today, so I will probably just ask questions generally, collectively and maybe then a couple of questions to each of the persons that I may have additional questions for.

Do any of you own your own business?  Could you please raise your hand?  Ms. Jiha?

PROSPECTIVE JUROR:  Yes.

MR. SANCHELIMA:  What is the name of your business?

PROSPECTIVE JUROR:  Soraya W. Jiha, CPA, PA.

MR. SANCHELIMA:  How long have you owned the business?

PROSPECTIVE JUROR:  Twenty-two years.

MR. SANCHELIMA:  Did you register that business?

PROSPECTIVE JUROR:  Yes.

MR. SANCHELIMA:  With whom?

PROSPECTIVE JUROR:  The State of Florida, Division of Corporations.

MR. SANCHELIMA:  With the Secretary of State?

PROSPECTIVE JUROR:  That is correct.

MR. SANCHELIMA:  And you received the certificate?

PROSPECTIVE JUROR:  Yes.

MR. SANCHELIMA:  Showing that you can use the name, maybe?

PROSPECTIVE JUROR:  Well, we have to check to make sure the name is not used before you can select it, yes.

MR. SANCHELIMA:  I see.

Have you registered a service mark for that name?

PROSPECTIVE JUROR:  No.

MR. SANCHELIMA:  What kind of services do you render?

PROSPECTIVE JUROR:  I provide accounting and tax services to businesses and individuals.

MR. SANCHELIMA:  I see.  Has anyone else -- does anyone else own their own business or have owned their own business?

Mr. Batista?

PROSPECTIVE JUROR:  Yes.

MR. SANCHELIMA:  Can you tell me what business?

PROSPECTIVE JUROR:  My business is a therapy business.  It's new.  I am only doing it three months.  I am a self-contractor for the agency I work for.  My business is to provide therapy to kids with autism.

MR. SANCHELIMA:  I see.  What is the name of your business?

PROSPECTIVE JUROR:  PBBA Therapy.

MR. SANCHELIMA:  Did you register that, sir?

PROSPECTIVE JUROR:  Yes, sir.

MR. SANCHELIMA:  Anybody else?

And Ms. Schneider, I think you mentioned you are a retail district manager?

PROSPECTIVE JUROR:  I was.

MR. SANCHELIMA:  Oh, you were.  Could you tell us part of your -- as part of your duties there, what exactly did you

do?

THE WITNESS:  I used to lead managers, and I used to run eight stores.  I used to work in the West Palm Beach area. It was off-price business.

MR. SANCHELIMA:  And as retail manager, did you have to deal with brands?

PROSPECTIVE JUROR:  No, not necessarily.

MR. SANCHELIMA:  Or with products?

PROSPECTIVE JUROR:  Products, yes.

MR. SANCHELIMA:  Did they have a name, brand?

PROSPECTIVE JUROR:  Of course, yes.

MR. SANCHELIMA:  Did you need to deal with trademark and brands?

PROSPECTIVE JUROR:  No, we don't.  We receive the merchandise, and we feature it in the store.

MR. SANCHELIMA:  Mr. Smith, I believe you mentioned in your questionnaire that you do not believe the judicial system?

PROSPECTIVE JUROR:  Yes, that's for criminal.

MR. SANCHELIMA:  Why is that?

PROSPECTIVE JUROR:  I had a brother, and we was not -- I was 9; he was 14.  He was wrongfully convicted, and we was kids.

Now I am 40; he is 45, and he been out maybe like eight years now.  And I just feel as though he was let down.

MR. SANCHELIMA:  May I just have 30 seconds to consult

with my associates, please?

THE COURT:  Sure.

MR. SANCHELIMA:  One more question, Dr. Rodriguez-Suarez, I believe you answered here that said that you have your own opinions, "my own opinions" was one of your answers, your own opinions.

"I'm a psychiatrist and I have my own opinions," what did you mean by that?  You mean your own medical opinions?

PROSPECTIVE JUROR:  Yeah.

MR. SANCHELIMA:  But not an opinion as to maybe you would favor one side or the other one?

PROSPECTIVE JUROR:  No.

MR. SANCHELIMA:  From what you are going to hear here today?

PROSPECTIVE JUROR:  No, I am neutral, but I have my own.

MR. SANCHELIMA:  You mean your professional opinion?

PROSPECTIVE JUROR:  Right, my professional opinion.

MR. SANCHELIMA:  Within your field?

PROSPECTIVE JUROR:  Right.

MR. SANCHELIMA:  All right.  I don't want to take any more time.  Thank you very much.

THE COURT:  All right.  For the defense.

VOIR DIRE FOR THE DEFENSE

MR. VELARDE:  Good morning, ladies and gentlemen.

As I mentioned earlier, my name is Victor Velarde, and with my colleague, Juan Zorrilla. We represent Steven Cerasale, the gentleman sitting over here, and his company, Unisource California.

The Plaintiffs' counsel actually took most of my questions, so I will be brief.

My first question for the group is, has anyone ever had a business partner?

No business partners.

Other than -- I believe it was Ms. Jiha, correct, you have your own company.

Other than Ms. Jiha, has anyone else built a company or helped build a company? Yes.

PROSPECTIVE JUROR: As part of my work for clients I regularly form companies.

MR. VELARDE: As an attorney. Right?

PROSPECTIVE JUROR: As an attorney, yes.

MR. VELARDE: That's in trust and estates.

PROSPECTIVE JUROR: I do tax and trust and estates, yes.

THE COURT: Also, for the record, that's Ms. Plasencia.

MR. VELARDE: Has anyone --

PROSPECTIVE JUROR: I work -- before this job that I have I worked 24 years for -- oh, sorry, I worked 24 years for a person. He is an entrepreneur, and I was his assistant. And

we opened like three or four companies here in Miami.

I did the registration and everything around, certificates and sales and everything, so I'm a little bit familiar with looking for a name and do the process with the state of Florida.

MR. VELARDE:  Perfect.

Those three or four companies, what kind of companies were they?

PROSPECTIVE JUROR:  One was a freight forwarder, and the other one was an import/export, and the other one was a service company for water dispensers.

MR. VELARDE:  Okay.  You said that as part of that process you filed forms with the Secretary of State?

PROSPECTIVE JUROR:  Correct.  Yeah.

MR. VELARDE:  Understood.  Thank you very much.  That was Ms. Souffront.

Final questions.  Has anyone had anything stolen from them, ever?

Yeah.  Mr. O'Neill.

PROSPECTIVE JUROR:  I had minor things, some binoculars stolen from my apartment in Collins at a party.

MR. VELARDE:  How did you that make you feel?

PROSPECTIVE JUROR:  I was kind of upset.  I mean, it was a party with friends, and they steal from me so --

MR. VELARDE:  I saw a good number of hands.  We don't

have to get into it, but I thank you very much for time.

THE COURT:  I do want to note, for the record, that was Mr. O'Neill that spoke most recently and Ms. Souffront spoke right before him.

All right.  Ladies and gentlemen, the next task for us is to select a jury.

Why don't we take about 15 minutes?  Please don't discuss anything about the case.  Of course, that should be easy because you don't know much about the case, but we will call you in shortly.

The restrooms are on the opposite side of this building in case you need to use it.

COURT SECURITY OFFICER:  All rise for the jury.

You may step out.  Just watch your step going down.

(The prospective jurors exited the courtroom at 11:17 a.m.)

THE COURT:  All right.  Please be seated.  Take a few moments and go over your notes before we go through the selection process.  I will alternate between the plaintiff and the defense, and there are no back strikes unless both sides have agreed to a juror then that person will be sat.

If you want some more privacy, you are welcome to use the rooms out back.

MR. SANCHELIMA:  Thank you, Your Honor.

MR. ZORRILLA:  Thank you, Your Honor.

THE COURT:  Sure.

(Brief recess.)

THE COURT:  Also, if any of you have need to use the restroom -- well, we will allow the attorneys to use the jury restroom right through this door, but for the parties you will have to go to a floor either up or down, just not on this floor.

MR. SANCHELIMA:  Thank you, Your Honor.

(Brief recess.)

JURY SELECTION

THE COURT:  All right.  Are you ready to proceed?

MR. VELARDE:  Yes.

THE COURT:  We will start with the plaintiff and alternate.  Before we start with that exercise, why don't we take any agreed challenges for cause.  If they are not agreed, we will just handle them in the normal course.

Are there any for cause you both agree to?  I'm sorry.

MR. SANCHELIMA:  Number eight.

MR. ZORRILLA:  Eugene Smith.

THE COURT:  Any objection?

MR. ZORRILLA:  We both agree.

THE COURT:  All right.  We will strike Mr. Smith for cause.

Juror number eight --

MR. SANCHELIMA:  Number seven, Your Honor.

THE COURT:  Heather Mejia-Montes?

MR. SANCHELIMA:  Yes, Your Honor.

MR. ZORRILLA:  Yes, Your Honor.

THE COURT:  I didn't note anything with her.  What was the issue with her?

MR. ZORRILLA:  I think she said she suffers from panic attacks.

THE COURT:  All right.  I am fine striking her if both sides agree, but she said she could serve.

All right.  If both sides are in agreement, I will strike Ms. Mejia-Montes.

MR. SANCHELIMA:  We both agree to 13 also, Your Honor.

THE COURT:  All right.  Ms. Lopez.  Is that correct?

MR. SANCHELIMA:  Yes, Your Honor.

MR. ZORRILLA:  Yes, Your Honor.

THE COURT:  All right.  I will strike her for cause.

MR. SANCHELIMA:  I think that's all we can agree to.

THE COURT:  Okay.

All right.  We will go one by one.

Juror number one, Mercedes Rodriguez-Suarez.  Plaintiff, do you accept?

MR. SANCHELIMA:  Yes, sir.

THE COURT:  Defense?

MR. ZORRILLA:  We do, Your Honor.

THE COURT:  All right.  She will be our first juror.

That takes us to Monica Bustillo, juror number two.

Defense, do you object?

MR. SANCHELIMA:  Yes, Your Honor.

MR. ZORRILLA:  We do as well.

THE COURT:  I am going to alternate, plaintiff and defense.

Defense, do you accept Ms. Bustillo?

MR. ZORRILLA:  Yes, Your Honor.

THE COURT:  Plaintiff?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  All right.  Ms. Bustillo will be our second juror.

Juror number three, Soraya Jiha, plaintiff, do you accept?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  Defense?

MR. ZORRILLA:  We do.

THE COURT:  All right.  She will be our third juror.

That takes us to juror number four, Mohammed Soutto.

Defense, do you accept?

MR. ZORRILLA:  We do.

THE COURT:  You do?

MR. ZORRILLA:  Yes.

THE COURT:  Plaintiff?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  All right.  He will be our fourth juror.

Juror number five, Steven O'Neill, plaintiff do you accept?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  Defense?

MR. ZORRILLA:  Yes, we do as well.

THE COURT:  All right.  He will be our fifth juror.

Juror number 6, Ana Maria Souffront.

Defense, do you accept?

MR. ZORRILLA:  Yes, Your Honor.

THE COURT:  Plaintiff.  Sorry.

MR. ZORRILLA:  I think we crossed over.

THE COURT:  We will start with defense again.

Ms. Souffront, do you accept?

MR. ZORRILLA:  We do.

THE COURT:  Plaintiff?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  She will be our fifth juror.  That takes us to juror number nine, Sana Bolooki.  Plaintiff, do you accept?

MR. SANCHELIMA:  No, Your Honor.

THE COURT:  You are using a peremptory?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  That is Plaintiffs' first peremptory.

That takes us to juror number ten, Bryant Shedrack.

Defense, do you accept?

MR. ZORRILLA:  We do, Your Honor.

THE COURT:  Plaintiff?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  All right.  Mr. Shedrack will be our seventh juror.

That takes us to Janice Barefoot.  Plaintiff, do you accept?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  Now, she said she had the surgery -- she said she has the child care issues and that her caregiver is having surgery and that she didn't want to cover -- oh, and she sent somebody the letter, which I should give to the parties.  It's from her husband -- well, it's signed by her husband.

It says, "Please be advised that my wife, Janice Lynn Barefoot, and I have a ten-year old daughter, Claire Biyazakee (phonetic).  While I continue to work full time for Western International Securities as a stock broker, Janice is the primary caregiver for Claire.

"While we do have some help with driving to school and housework, our longtime housekeeper/nanny is undergoing emergency surgery on Monday, December 5th, 2022.  See attached letter.

"We anticipate that Ana will be off for two to three weeks.  As such, the daily commute to school at Miami Country Day in Miami Shores is about one hour each way.  This driving will adversely affect my ability to trade stocks and

earn a living if Janice is not available.

"Janice is very civic-minded and involved in a number of voluntary activities, be it for women veterans or the Florida Foster Care System.  Additionally, she serves on two committees at MCDS and gives back innumerable hours to the Miami community."

And then there is a certificate of live birth regarding their daughter as well as a certificate of marriage and a letter regarding the caregiver's doctor (sic) having surgery.

MR. SANCHELIMA:  To me it's persuasive for cause.

THE COURT:  Is there an objection -- first, are you moving to strike her for cause?

MR. SANCHELIMA:  Yes.

THE COURT:  All right.  Is there an objection from the defense?

MR. ZORRILLA:  No, Your Honor.

THE COURT:  All right.  I will strike Ms. Barefoot, juror number 11, for cause.

That takes us down to Martha Jaureguizar.

Plaintiff, do you accept her?

MR. ZORRILLA:  Yes, we do.

THE COURT:  Plaintiff?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  She would be our eighth juror.

Now, we said eight earlier.  I'm just wondering,

Dr. Rodriguez-Suarez, who is the first one, she said she can only work until Thursday.  She can work until Thursday at noon she said.

Should we take another juror just in case?

MR. ZORRILLA:  An alternate?

THE COURT:  Well, they all sit.  In federal civil there are no alternates.

MR. ZORRILLA:  I suggest Mr. Germany Dixon.

THE COURT:  Well, I guess the issue just right now is should we go to nine, and then we will go in the normal order.  I mean, it's up to you.

You want to go to nine?

MR. VELARDE:  I think it's a good idea, Your Honor.

THE COURT:  What about for the plaintiff?

MR. SANCHELIMA:  Yes, we agree.

THE COURT:  All right.  So the next person up is Germany Dixon, juror number 14.  Does the plaintiff accept Mr. Dixon?

MR. SANCHELIMA:  You have one more to go?

THE COURT:  One more.

You still have two peremptories and the plaintiff has three.

MR. SANCHELIMA:  No, we'll use a peremptory.

THE COURT:  All right.  That is the Plaintiffs' second peremptory.

That takes us to juror number 15, Stricker Dilhomme. Defense, do you accept?

MR. ZORRILLA:  We exercise a peremptory.

THE COURT:  All right.  That is the defense's first peremptory.  That takes us to Veronica Tarajano, juror number 16.

Plaintiff, do you accept?

MR. SANCHELIMA:  We use our third peremptory, Your Honor.

THE COURT:  That takes us to Arianne Plasencia, juror number 17.  Defense, do you accept?

MR. ZORRILLA:  We exercise our second peremptory.

THE COURT:  Okay.  That is the defense's second peremptory.

That takes us Bisleixis Oropesa, juror number 18.

Plaintiff, do you accept?

MR. SANCHELIMA:  Well, I used all our peremptories.

THE COURT:  Well, there is also a matter of cause if you have an issue.

MR. SANCHELIMA:  Accept, Your Honor.

THE COURT:  All right. Defense?

MR. ZORRILLA:  Accept.

THE COURT:  All right.  That is a panel of nine.

Mercedes Rodriguez-Suarez, juror number 1; juror number 2, Monica Bustillo; juror number 3, Soraya Jiha; juror number

4, Mohammed Soutto; juror number 5, Steven O'Neill; juror number 6, Ana Maria Souffront; juror number 10, Brian Shedrack; juror number 12, Martha Jaureguizar; and juror number 18, Bisleixis Oropesa.

Plaintiff, do you tender the panel?

MR. SANCHELIMA:  I'm sorry, Your Honor.

THE COURT:  Do you tender the panel?

MR. SANCHELIMA:  Yes, sir.

THE COURT:  Defense?

MR. ZORRILLA:  We do.

THE COURT:  We will call them in and swear them in.  I will give them the preliminary instructions, and then we will take an hour for lunch.

All right.  Let's bring them in.

(The prospective jurors entered the courtroom at 11:45 a.m.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  All right.  If you can return to your original seats, please.

All right.  Just watch your step up the incline.  Just watch your step.  Everyone, please be seated.

Ladies and gentlemen, thank you very much for your patience.  We have selected a jury.  When I call your name, I am going to ask that you please stand.

Juror number 1, Mercedes Rodriguez-Suarez; juror number 2, Monica Bustillo; juror number 3, Soraya Jiha; juror number

4, Mohammed Soutto; juror number 5, Steven O'Neill; juror number 6, Ana Maria Souffront; juror number 10, Bryant Shedrack; juror number 12, Martha Jaureguizar; and juror number 18, Bisleixis Oropesa.

I need the nine of you to please raise your right hands and be sworn.

(The jury was duly sworn at 11:46 a.m.)

COURTROOM DEPUTY:  Thank you.

THE COURT:  You may be seated.

Those of you that were selected, you are going to remain with us a few more moments.

Those of you that were not selected will report back to the fifth floor jury room.

For those of you -- Ms. Oropesa, you will make your way up to the jury box, please.

Thank you very much.

Those of you that were selected, you can sit anywhere you like.  Feel free to sit anywhere you like in the jury box. You don't have to sit in the same seats.

You can sit or stand, ma'am, whenever you like.

PRELIMINARY JURY INSTRUCTIONS

THE COURT:  All right.  Everyone, please be seated.

All right.  So, ladies and gentlemen, I am going to read to you some preliminary instructions, and then we will take our lunch break.  You don't have to write any of this

down, just listen closely, please.

All right.  Members of the jury, now that you have been sworn, I need to explain some basic principles about a civil trial and your duty as jurors.

These are preliminary instructions.  I will give you more detailed instructions at the end of the trial.

It is your duty to listen to the evidence, decide what happened and apply the law to the facts.  It is my job to provide you with the law you must apply and you must follow the law even if you disagree with it.

You must decide the case on only the evidence in the courtroom.  Evidence comes in many forms.  It can be testimony about what someone saw, heard or smelled.  It can be an exhibit or a photograph.  It can be someone's opinion.

Some evidence may prove a fact indirectly.  Let's say a witness saw wet grass outside and people walking into courthouse carrying wet umbrellas.  This may be indirect evidence that it rained even though the witness did not personally see it rain.  Indirect evidence like this is also called circumstantial evidence, simply a chain of circumstances that is likely to prove a fact.

As far as the law is concerned, it makes no difference whether evidence is direct or indirect.  You may have to choose to believe or disbelieve either kind.  Your job is to give each piece of evidence whatever weight you think it deserves.

During the trial, you will hear certain things that are not evidence and you must not consider them.  First, the lawyers' statements and arguments are not evidence.  In their opening statements and closing arguments, the lawyers will discuss the case.  Their remarks may help you follow each side's arguments and presentation of evidence, but the remarks themselves are not evidence and should not play a role in your deliberations.

Second, the lawyers' questions and objections are not evidence.  Only the witness's answers are evidence.

Do not decide that something is true just because a lawyer's question suggests that it is.  For example, a lawyer may ask a witness, "You saw Mr. Jones hit his sister, didn't you?"

That question is not evidence of what the witness saw or what Mr. Jones did unless the witness agrees with it.  There are rules of evidence that control what the Court can receive into evidence.  When a lawyer asks a witness a question or presents an exhibit, the opposing lawyer may object if he thinks the rules of evidence does not permit it.

If I overrule the objection, then the witness may answer the question or the Court may receive the exhibit.  If I sustain the objection, then the witness cannot answer the question and the Court cannot receive the exhibit.

When I sustain an objection to a question, you must

ignore the question and not guess what the answer might have been.  Sometimes I may disallow evidence.  This is called striking evidence and order you to disregard or ignore it.  That means you must not consider that evidence when you are deciding the case.

I may allow some evidence for only a limited purpose.  When I instruct you that I have admitted an item of evidence for a limited purpose, you must consider it for only that purpose and no other.

To reach a verdict, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, part of it, or none of it.

When considering a witness's testimony, you may take into account the following:  The witness's opportunity and ability to see, hear or know the things the witness is testifying about; the witness's memory; the witness's manner while testifying; any interest the witness has in the outcome of the case; any bias or prejudice the witness may have; any other evidence that contradicts the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence and any other factors affecting believability.

At the end of the trial, I will give you additional guidelines for determining a witness's credibility.  This is a civil case.  To help you follow the evidence, the parties have,

again, agreed to a summary, which I have already read to you about the case.

Now, the plaintiff, Unisource Discovery, Inc., has the burden of proving its case by what the law calls a preponderance of the evidence.  That means the plaintiff must prove that in light of all the evidence what it claims is more likely true than not.  So if you could put the evidence favoring the plaintiff and the evidence favoring the defendant on opposite sides of balancing scales, the plaintiff needs to make the scales tip to its side.

If the plaintiff fails to meet this burden, you must find in favor of the defendant or the defendants.

To decide whether any fact has been proved by a preponderance of the evidence, you may, unless I instruct you otherwise, consider the testimony of all witnesses, regardless of who called them and all exhibits that the Court allowed regardless of who produced them.  After considering all the evidence, if you decide a claim or fact is more likely true than not, then the claim or fact has been proved by a preponderance of the evidence.

On certain issues called affirmative defenses, the defendants, Unisource Discovery, LLC, and Steven Cerasale, have the burden of proving elements of a defense by a preponderance of the evidence.  I will instruct you later on the affirmative defenses.

After considering all the evidence, you must decide that the defendant's -- whether the defendants have successfully proven that the required facts are more likely true than not, that the affirmative defenses have been proven.

The defendants, again, Unisource Discovery, LLC, and Mr. Cerasale, have also brought claims for relief against the plaintiff, Unisource Discovery, Incorporated, called counterclaims.

On these claims the defendants have the same burden of proof that the plaintiff has for its claims.  Although, again, I will give you further instructions that will govern you regarding the claims and the level of proof required for each of those claims.

While serving on the jury, you may not talk with anyone about anything related to the case.  You may tell people that you are a juror and give them information about when you must be in court, but you must not discuss anything about the case itself with anyone.  You should not even talk about the case with each other unless you begin your deliberations.

You want to make sure you have heard everything, all the evidence, the lawyers' closing arguments and my instructions on the law before you begin deliberating.

You should keep an open mind until the end of the trial.  Premature discussions may lead to a premature decision.

In this age of technology, I want to emphasize that in

addition to not talking face to face with anyone about the case, you must not communicate with anyone about the case by any other means. This includes e-mails, text messages, and the Internet, including social networking websites such as Facebook, Instagram or Twitter.

You also should not Google or search online or offline for any information about this case, the parties, or the law. Do not read or listen to the news about this case, although I do not expect there to be any news.

Please do not visit any places related to the case or research any fact, issue, or law related to this case. The law forbids the jurors to talk with anyone else about the case and forbids anyone else to talk to the jurors about it. It is very important that you understand why these rules exist and why they are so important.

You must base your decision only on the testimony and other evidence presented in the courtroom. It is not fair to the parties if you base your decision in any way on information you acquire outside the courtroom. For example, the law often uses words and phrases in special ways, so it is important that any definitions you hear come only from me and not from any other source.

Only you jurors can decide a verdict in this case. The law sees only you as fair and only you have promised to be fair. No one else is so qualified.

If you wish, you may take notes to help you remember what the witnesses said. If you do take notes, please don't share them with anyone until you go to the jury room to decide the case. Don't let note taking distract you from carefully listening to and observing the witnesses.

When you leave the courtroom, you should leave your notes hidden from view in the jury room. Whether or not you take notes, you should rely on your own memory of the testimony. Your notes are there only to help your memory. They are not entitled to any greater weight than your memory or impression about the testimony.

Now, let's walk through the trial.

First, each side may make an opening statement, but they don't have to. Remember, an opening statement is not evidence and it is not supposed to be argumentative. It is just an outline of what that party intends to prove.

Afterwards, the plaintiff, Unisource Discovery, Incorporated, will present its witnesses and ask them questions. After the plaintiff questions the witness, the defendants may ask the witness questions. This is called cross-examining the witness.

Then the defendants, Unisource Discovery, LLC, and Mr. Cerasale will present their witnesses and the plaintiff may cross-examine them.

You should base your decision on all the evidence

regardless of which party presented it.  After all the evidence is in, the parties' lawyers will present their closing arguments to summarize and interpret the evidence for you, and then I will give you instructions on the law.

Then you will go to the jury room to deliberate.

So that concludes the preliminary instructions.  It's 12:01 now.  We will take you into -- Mr. Ahmad will take you into the jury room, so you will see where you will report going forward.

So, again, after our lunch break don't report to the fifth floor.  Report to the jury room here.

There are also restrooms here in the jury room.

When you are on this floor, please use those restrooms because going forward the restrooms outside on the floor will be used by the witnesses and the lawyers.

Also, during the lunch break and any other break you may run into one of the lawyers or one of the litigants.  If they don't say good afternoon to you or hello or exchange the kind of pleasantries you would expect a good, kind person to exchange with you, do not hold that against them.  The parties are instructed not to talk to you because we don't want the appearance of any impropriety.  So, you may be on the same elevator, but if they just ignore you, that's fine.

Also, when you are in the building, please wear your name badges, not your name badges, your juror badges because

there are other trials going on, and we don't want other lawyers in other cases saying something to you that you probably should not hear.

With that being said, why don't we return back here at 1:15. We will proceed with the opening statements from the parties, and then the presentation of the evidence. And as I told you before, we will work today until 5:00 p.m.

With that said, they will show you where you are going to report, and we will see you back here at 1:15.

COURT SECURITY OFFICER: All rise for the jury.

(The jury exited the courtroom at 12:05 p.m.)

THE COURT: All right. Please be seated. I don't know if you all can necessarily hear it, but I typically won't speak when the jury goes out until I hear the door closed.

Yes, sir.

MR. SANCHELIMA: Your Honor, I need to bring to the Court's attention that I didn't hear an instruction on the burden of the counterclaim, which we addressed this morning is clear and convincing, and the way it is now, the jury does not know that for the plaintiff to be, to succeed in its claim for fraud on the patent and trademark office and cancel the registration the burden is higher than merely preponderance of the evidence.

The plaintiff requests the Court to so instruct the jury on the next opportunity.

THE COURT:  Any objection to me clarifying that when we come back?

MR. VELARDE:  No, Your Honor, no objection.

THE COURT:  All right.  Anything else we need to take up before we break for the plaintiff?

MR. SANCHELIMA:  No, Your Honor.

THE COURT:  For the defense?

MR. ZORRILLA:  As far as courtroom, your protocol objections, how do you normally handle them?

For example, sidebar conferences when you feel they're necessary.

THE COURT:  Well, most objections can just be handled by stating the objection and the legal basis, hearsay, relevance, or whatever it is, and I can rule on it that way.

If it's something for which I think I need a sidebar, then I will do it, but you should not expect very many sidebars unless it's absolutely necessary.

MR. ZORRILLA:  Okay.

THE COURT:  There shouldn't be any speaking objections. You just give the regular basic legal objection.  I will make a ruling.

MR. ZORRILLA:  I assume, unless you need an explanation, you need to get more into it then you will have a sidebar.

THE COURT:  If I am not sure, I will tell you to come

sidebar.

MR. ZORRILLA:  All right.  Thank you.

THE COURT:  As far as the equipment, if any of you are going to need it, just make sure you are familiar with it.

The ELMO, if you are showing any exhibits by the computer, just make sure they are connected and you test it out before we begin.

All right.  I will see you back here at 1:15.

COURT SECURITY OFFICER:  All rise.

THE COURT:  All right.  We are in recess.

(Lunch recess.)

THE COURT:  All right.  Please be seated.

Are we ready to begin?

MR. SANCHELIMA:  Yes, sir.

MR. VELARDE:  Yes, Your Honor.

THE COURT:  All right.  Let's bring them in.

COURT SECURITY OFFICER:  All rise for the jury.

(The jury entered the courtroom at 1:17 p.m.)

THE COURT:  Please sit wherever you like.  Please sit wherever you like.

All right.  Everyone, please be seated.

Welcome back, ladies and gentlemen.

A couple of things.  The note pads that you have, my suggestion is that you write -- once you flip it over, the hard cover, you write your name on the first page and then start

taking notes on the second page.  That way when you are in the jury room you can distinguish which book belongs to whom without looking at one another's notes.

The second thing I just wanted to clarify, in the instructions that I gave you earlier, I talked to you about the Plaintiffs' claim and the burden of proof being a preponderance of the evidence, and I talked to you about affirmative defenses and the defense counterclaim and I said that I would follow up with you in the closing instructions with more information about the burden of proof, but I do want to tell you preliminarily now so you understand it.

The burden of proof for the defendant's counterclaim is higher than preponderance of the evidence.  It's clear and convincing evidence.  So, I will give you further instructions at the end of the case about that standard and what it means, not just that standard but both standards, preponderance of the evidence and clear and convincing evidence, so that you understand what they mean.  But I just want to make sure you understand at the outset that there are different burden of proofs depending on the claim or counterclaim.

All right.  With that said, we are ready for opening statements.  Again, what the attorneys say during opening statements is not evidence, so you shouldn't consider it as such, but listen closely to the attorneys' statements because through the statements the attorneys will explain to you what

they believe the evidence will show during trial.

By procedure, the plaintiff goes first, followed by the defense.

All right.  Counsel, are you ready to proceed?

MR. SANCHELIMA:  Yes, Your Honor.  Thank you very much.

May I approach the jury?

THE COURT:  Sure.

OPENING STATEMENT BY THE PLAINTIFF

MR. SANCHELIMA:  Thank you, Your Honor.

Good afternoon.  As you know, we represent the plaintiff, Unisource California, in this controversy, and basically both sides engage in the same business, the same services, legal support for lawyers, typically personal injury lawyers and the like that require information, to retrieve information from hospitals because of an accident or what have you.  This is the business they engage in, and their customers have been always the same.

They have this controversy today that it could be summarized basically as a business marriage that went sour.

Like any other marriage, with this problem and separate and the way that you separate could be in an orderly fashion or it could be radical -- it could give rise to damages and injury to the reputation.

As jurors, you are judges of facts, facts that we will try to submit in this case, even though it's a long history.  I

am going to provide you with a clue that will make your job easier, and I will provide you that clue before I sit down, I promise you, but for now I will tell you what the evidence we believe, the plaintiff believes, Unisource Florida believes we have.

The plaintiffs Mr. Cerasale and his company, Unisource California, started business in California 2001, using a trade name, the name of a corporation or actually an LLC, a limited liability company, which is basically very similar to the corporation, but that's the way that they call them.  And the mark is Unisource Discovery Digital Document Retrieval, and it has a logo design.  In fact, I'd like to show you what that mark looks like.

Excuse me, Counsel, I'm going to have to place it here, if you don't mind, but this is what I am going to show.  You are familiar with this.

This is the mark.  It has what we call a logo or a design associated with what we refer to as the word mark. Basically, this is a registration but this is the mark and the services are for legal research, which is legal support, legal obtaining information and so forth to make lawyer's life easier.

In the old days, they used to serve a subpoena. Lawyers had to contact somebody in California, a print shop, and tell them, go here, go to this hospital, whatever, and make

photocopies and mail them to us.

Well, faxes came afterwards, then e-mail, E-discovery, everything is electronic now and they scan and so forth, but that's basically the business that they're engaged in.

Mr. Cerasale developed, adopted this mark back in 2001, and in 2005, because the evidence will show that Mr. Mijares's wife was working in a company where Mr. Cerasale was working, they kind of started talking, and as a matter of fact, my husband is in the same business as you are related to me or they were working in the same company, but in 2005 they meet and they start talking about the possibility of a new business venture, something like one plus one equals three, by joining forces they'll be able to expand nationwide rather than just merely California.  And Mr. Mijares, who at the time had a company in Florida called The Subpoena Company, he was doing substantially the same thing but in a more limited basis.

So they form this corporation, Unisource Floridae, and Defendant Cerasale receives 50 percent of the shares, Mr. Mijares receives 25 percent of the shares, and his wife, Lisa Cote, receives 25 percent of the shares, basically, 50 percent for each side.

Then they enter into an agreement in 2006, at the time that they form this corporation with an effective date of July 1, 2006, and basically, the plaintiff, Unisource Florida, will show that the contributions that each of the shareholder

side provided was Defendant Cerasale was required to contribute the software, computerized equipment and the transfer of the brand, including the name of the corporation, which at that time in 2006 was adopted and it was incorporated as Unisource Discovery, Inc., a Florida corporation.

Mr. Mijares and his wife, Ms. Cote, they were required to provide the platform for this new venture to be launched here from Florida.  That included office space.  That included personnel and some clientele.  That's how the business started. There were some initial capital contributions but basically those were the main assets that both sides wanted to contribute and this is what we intend to show.

All three shareholders at the time were directors, members of the board of directors of Unisource Florida. Mr. Mijares was in charge of the day-to-day operations.  He was the president of Unisource Florida, and today he is still the president of Unisource Florida.

As a business group, the new venture group and the market territory group, as it was envisioned by the parties, they were cooperating with each other.  In fact, they co-owned and shared the same website and the domain name account.  So the e-mails with the .com was unisourcediscovery.com.  That was shared by the parties.  Potential clients would call; they would cooperate; they would share the clients.

Until 2008, Mr. Mijares, on behalf of Unisource

Florida, decided to file an application for registration, the application for registration for the brand Unisource Discovery Digital Document Retrieval and the logo design -- the little square in reverse that you see there -- for the benefit of the corporation of which he was the president.  In fact, he had the duty, we submit, that it was an asset of the corporation that he needed to protect against possibility of third parties coming in and registering the mark and then he would be out and then he would not be able to use the mark that he was investing effort, time, labor, and so forth.

If you don't register the mark, well, there were consequences.

The mark application was filed.  In 2009 it was published by the United States Patent and Trademark Office in Washington and published in the Official Gazette, and in 2009 eventually it was registered with the United States Patent and Trademark Office.  So the Government gave, provided, gave the plaintiff Unisource Florida, a registration for his mark.  This was back in 2009.

In the interim, there were some problems that developed with respect to that software that Defendant Cerasale had contributed.  All of a sudden plaintiff, Unisource Florida, receives a letter from a lawyer.  Somebody claims superior rights to that software.

MR. VELARDE:  Your Honor, if I may apologize, I don't

want to interrupt the opening, but Mr. Sanchelima is getting into the issues on the motion in limine which are going to be removed or barred from this case.  So I apologize for cutting into Mr. Sanchelima's --

THE COURT:  All right.  Overruled.

Ladies and gentlemen, again, what the attorneys say is not evidence.

Please proceed.

MR. SANCHELIMA:  Basically, a claim for that software was received by Unisource Florida, and Mr. Mijares -- the evidence will show that Mr. Mijares contacted Defendant Cerasale to discuss the matter, and the result was that Defendant Cerasale to pacify this claimant, copyright claimant for the software, had to give up 10 percent of the 50 percent shares that he had.

Then, moving forward, due to these uncertainties, the shareholders, including the new shareholder, now we have four shareholders, decided to enter into an agreement to clarify everything that went on with that cooperation, and in 2010 they did enter into an agreement.  The agreement provided, recognized the new shareholder with the 10 percent, and it also provided, among other things, that the 2006 agreement is now null and void, no longer.

But more important, you will see that the agreement will show a paragraph where it acknowledges that Unisource

Florida is the owner of this registration, and that agreement is signed by Mr. Mijares, Ms. Cote, the new shareholder with the 10 percent and the defendant, Cerasale. All four of them signed that agreement acknowledging the ownership of the registration by Unisource Florida.

Unisource Florida -- after five years the Patent and Trademark Office requires us to file a declaration of use, of continuous use to avoid cancellation of the mark.

Plaintiff, Unisource Florida, filed that declaration of use.

Year ten, requires a renewal. In 2019, Unisource Florida filed a declaration of use and a request for the renewal of the registration, which is now good until 2029.

Now, Defendant Cerasale visited, initially, Unisource Florida with relatively -- with relatives frequency three, four times a year, the evidence will show you when you hear the testimony, until about 2015. At that time the visits stopped.

The almost daily or weekly communications of business matters between Mr. Mijares and Defendant Cerasale stopped. So, the parties were no longer in cooperations and there were some problems, typical in a marriage, I guess, in a business marriage too, misuse of credit cards, business, that sort of thing.

But in 2019, Unisource California, who had control over the website and the domain account suddenly disconnected

Unisource Florida; suddenly cold disconnect.  No more calls from clients, no more -- the ability to generate business had been curtailed tremendously.

This left Unisource Florida in a precarious position incurring damages with a large drop in sales.  You will hear testimony from Mr. Mijares on that and damage to his goodwill.

Not being able to resolve the controversy, several cease and desist letters were sent to Defendant Cerasale and his company.  All three cease and desist letters were ignored and there was no other alternative for Unisource Florida but to bring this lawsuit.

Now, this lawsuit has, as Your Honor mentioned, several causes of action, service mark infringement, counterfeiting, common law service mark infringement, false association, violation of federal statutes, and common law unfair competition as the overall conduct being unfair practice.

Now, Unisource Florida requested disgorgement of defendant's profits, in other words, to give up his profits. That's one of the things that we are here for, requesting that, for which we will be asking you to determine, to find what is the amount of sales realized by defendants from February of 2020 when the license that Unisource Florida had extended based on its ownership of the mark to defendants was received by them.

In February of 2020, two years ago, to the present

time, the damages that Unisource Florida incurred we are asking for that, also, in terms of the drop of the sales of Unisource Florida. So, two things, the sales, the profits, the sales that they realized and also the damages that Unisource Florida suffered.

In addition to that, there are damages for the loss of goodwill, not being able to service the customers sometimes.

And lastly, we request that punitive damages be awarded also in an amount adequate based on a number of factors that Your Honor will be instructing you as to the law, not me, that will be adequate to deter future willful acts of unfair competition by defendants or others, to send that signal to the world.

Like I promised you, I will provide you with a clue to resolve the facts in this case. Basically, it's the evidence that you will not find. Look for any evidence, testimony, document, tending to show the defendant protested the registration of the mark registration by Unisource Florida since 2008 when the application was filed and laid opened to the public. You will not find anything.

The first protest came last year or 12 years after the registration of the mark with the U.S. Patent and Trademark Office. Defendants, in a desperate effort to confuse this litigation, counterclaimed with a petition to cancel the 12-year old federal registration.

It is simply not believable that Defendant Cerasale, the owner of multi-million dollar companies did not know that Unisource Florida claimed ownership of the mark for 12 years, especially since Defendant Cerasale, who was also part of the board of directors of Unisource Florida, signed the 2010 agreement.  His signature is there, you will see it acknowledging that Unisource Florida owned the registration.

Again, look for any evidence of a protest from defendants, and you will find none.

That is a pretty big clue here.

Thank you very much.

THE COURT:  All right.  On behalf of the defense.

OPENING STATEMENT BY THE DEFENSE

MR. VELARDE:  Thank you, Your Honor.

Mr. Sanchelima, I am going to move this right here.

Good afternoon, ladies and gentlemen, again, my name is Victor Velarde, and together with Mr. Juan Zorrilla, we represent the defendants, Steven Cerasale or Unisource California or Unisource Discovery, LLC, which I will refer to as Unisource California.

I am going to limit myself to what the evidence is going to show in my opening.

This case is about a name and a logo that Mr. Cerasale created and has been using in his business for more than 21 years.  The plaintiff, Unisource Florida, has been using

that same name and logo with the permission of my client, Mr. Cerasale, for less than 16 years, but is claiming to have a greater right to use that name and logo than my client is and is trying to take it away.

I am going to show you that logo.  That's the logo that Steven Cerasale and Unisource California created back in May of 2001.

You will be asked to consider evidence, and that evidence will include testimony, documents submitted by both sides, and after you have seen all of that evidence you will make a decision using your good judgment and common sense.

That evidence will show three important facts.

First, that evidence is going to show that Steven Cerasale and Unisource California own, and have always owned, that name and logo for more than 21 years.

The evidence will also show, the second important fact, that in October 2008 Mr. Noel Mijares from Unisource Florida lied to the United States Patent and Trademark Office in order to secure a registration of that trademark.

The evidence will also show that he lied to Mr. Cerasale about what that trademark does.  He told him that it would protect him, that it would protect him in California.

Finally, the evidence is also going to show that for 21 years, or rather for -- let me do the math here, for 14 years from 2006 when Unisource Florida was first created,

all the way to February 2020, Unisource Florida, not once, attempted to control or say how Steven Cerasale or Unisource California used that name and logo, not once.

So now the facts in this case span a period of 20 years, more than 20 years, but I am going to guide you through the evidence through three time periods.  The first time period is going to be what happened before Unisource Florida existed, from May 2001 to June 2006, when it was just Unisource California.  That's the first time period.

The second time period I am going to guide you through is what happened in 2008 when Unisource Florida lied to the United States Patent and Trademark Office in order to get registration of that trademark.

And the third time period we are going to discuss is what happened in February 2020 when, for the first time ever, Unisource Florida claimed to have the right to tell Unisource California to not use that name and logo.

So the first time period, May 2001 to June 2006, the evidence will show that in May 2001 Mr. Steven Cerasale created that name and logo and used it in his business, Unisource California.

Unisource California is in the process of what's called digital document retrieval.  What that means is that they obtain, they gather, and organize documents for their customers.  Their customers are usually law firms or insurance

companies, and for five years, from May 2001 through June 2006 Mr. Cerasale built that business from nothing.

The evidence will show that he created that brand and he grew that brand throughout California and through other states. Those states include Kentucky, Oregon, Arizona and other states, as the evidence will show.

He grew his brand into a multi-state brand over a period of five years, and that business was his. He controlled it. Through hard work and dedication he created a successful business, and then in 2005 he met Mr. Noel Mijares. And Mr. Mijares was in the business, a completely separate business of subpoena processing, but he wanted to get into the document retrieval business.

So, they spoke, Mr. Cerasale and Mr. Noel Mijares, and they agreed to open a Florida company, Unisource Florida, and the evidence will show that from the very beginning before they opened it, the purpose, the reason that the parties intended for this Florida company was so that Unisource California can expand into Florida.

Unisource Florida was supposed to be a branch, a division of Unisource California. That was the purpose that the evidence would reflect that. So, at the very beginning, Mr. Cerasale agreed to own 50 percent of Unisource Florida, Mr. Noel Mijares 25 percent, and Ms. Lisa Cote another 25 percent.

To this day, Mr. Cerasale still owns 40 percent of the company, of Unisource Florida.  So he is, by himself, the biggest shareholder of Unisource Florida to this day.

You will hear from Mr. Steven Cerasale that he never sold his brand that he has been building for five years, he never sold it to Unisource Florida.  That was not the intent.

Now, in June 2006, when they agreed to open Unisource Florida, they did put that in writing.  They reached an agreement in writing.  That agreement was called the operating agreement for Unisource Florida.

You will see, the evidence will show that that agreement very clearly has a provision called license and name use.  It's not called purchase.  It's not called assignment.  It's called license and name use, and that provision clearly says -- let me see if I can quote it.

"If Cerasale is no longer a director, officer, or agent of the company, that's Unisource Florida, at that time the board of directors of the company shall modify the current name of the company, Unisource Discovery, to be different in name only."

So, Mr. Cerasale will explain that means if he leaves the company, Unisource Florida, the name goes with it.

He didn't sell it.  He gave permission to use it.

Mr. Mijares is going to have a different version.  He disagrees with that.  He is going to tell you in his testimony

that Mr. Mijares -- that Mr. Cerasale gave up his business. After five years of building a brand over California and other states, building a successful business that was his, he gave them all up in exchange for 50 percent of a new company that doesn't have a single customer, doesn't have a history of business, hasn't had a single sale, gives it all up for 50 percent of that.

That's why you come in.  Your good judgment and common sense will determine whether you believe that.

The second time period that we are going to look at is 2008, October 2008, when Mr. Mijares, through Unisource Florida, lied to the United States Patent and Trademark Office in order to get a registration, which you saw the certificate, a registration of that trademark.

The evidence will show in his application he gave three specific lies.  The first lie is that he told the United States Patent and Trademark Office that he owned the name and logo, knowing full well that name and logo was owned by Mr. Cerasale in California.

The second lie is that he told the United States Patent and Trademark Office that no one else has the right to use the name and logo, nobody else other than Unisource Florida, knowing full well that Unisource California and Mr. Cerasale alone had the right to use that name and logo.

The third lie that he told the U.S. Patent and

Trademark Office is that Unisource Florida supposedly used the same name and logo as early as March of 2001, years before Unisource Florida existed, years before Mr. Cerasale met Mr. Mijares and, in fact, even months before the logo existed.

And the evidence will also show, that Mr. Mijares lied to Mr. Cerasale, told him that this registration would protect him, that it would protect him in California.

Finally, we are going to look at what happened in February of 2020. Now, to be clear, we do not dispute that Unisource Florida registered the trademark. It did. But like I mentioned, it did so by lying.

But in February 2020 Unisource Florida, for the first time ever, told Unisource California, "You're not allowed to use that logo."

After 20 years, the evidence will show that Mr. Cerasale used that name and logo however he wished because it was his, without any interference or say-so from Mr. Mijares, without any say-so or interference or say-so from Unisource Florida.

And now for the first time, after 20 years building a business, he says, "Hey, that doesn't belong to you; stop using it.

The evidence will reveal facts that after the end of the case will inform your judgment, one of those facts is that Mr. Cerasale, as a 40 percent owner of Unisource Florida, asked

for documents, as is his right, asked for documents from Unisource Florida saying I don't think you guys are doing a good job.  It seems like you are losing money.  Let's see what's going on.  After all, he is a 40 percent owner.  I want to see those documents, where is the money going.

The evidence will show that Mr. Mijares and Unisource Florida refused to produce the documents, and then because they refused to turn in the documents, Mr. Cerasale was required to go to court and compel Unisource Florida to produce those documents, as is his right.

Then, the evidence will show that Mr. Mijares and Unisource Florida tried to get that case thrown out of court. When the Court didn't throw it out, when the Court said you have to answer to this, you have to get this document, we get this lawsuit.  We get a letter saying, "Stop using my logo."

The evidence will also show that for the years leading up to February 2020, Unisource Florida was losing money every year.  It was not a successful business, 2015, 2016, 2017, 2018 -- 2019 it had its worst year.

In all those years, it didn't make a dime of profit, and when 2019, when it had its worst year, two months later we get that letter, "Stop using my name and logo."

So to recap, although this case expands a period of 20 years, we are going to look at those three time periods, 2001 to 2006, before Unisource Florida existed; 2008, when Unisource

Florida lied to the U.S. Patent and Trademark Office; and 2020, February of 2020, when Unisource Florida for the first time said stop using it.

You will be asked to consider all of that evidence, decide who you believe and determine why my client received that February 2020 letter.  And at the end you will see that Mr. Cerasale, at Unisource California, owned that logo, the logo that he built, that he created and that built a successful business for more than 20 years, that it belongs to him, and not to Unisource Florida.

Thank you.

THE COURT:  All right.  Would you like to call your first witness?

MR. SANCHELIMA:  The plaintiff calls Defendant Cerasale as his first witness.

THE COURT:  All right.  Mr. Cerasale, if you will come forward, please.

THE WITNESS:  Give me a minute.

THE COURT:  Sure.

All right.  Sir, I just need you to please raise your right hand and be sworn.

(The witness, Steven Cerasale, was duly sworn.)

THE COURT:  Pull the microphone up close to you.

THE WITNESS:  Okay.

DIRECT EXAMINATION

BY MR. SANCHELIMA:

Q. Good afternoon, Mr. Cerasale.

As you know, I represent Unisource Florida, and you are 40 percent shareholder there.

I understand that you have an issue with your knees, so if at any time you feel uncomfortable, please let us know and I am sure the Court will accommodate you and maybe stretch and whatever you need.

A. Thank you.

Q. Could you please state for the record your full name and address?

A. Steven Cerasale, 2881 Forrester Drive, Los Angeles, California.

Q. Could you please describe for us your educational background?

A. Educational background?

Q. Background, yes.

A. I graduated from UCLA with a BA and then took some classes toward getting a law degree, but I never did any further than that. I did about a year and then I gave up.

Q. Lucky.

A. I decided I rather drive a Volkswagon van.

Q. What did you do after school, after going to college?

A. A series of sales jobs with bigger companies, bigger, bigger companies. Then in 1989 I started my own company with a

different partner.

THE COURT: I'm sorry, can you pull the microphone a little closer to you?

Thank you.

BY MR. SANCHELIMA:

Q. What kind of business was that?

A. It was computer output microfiche. It was the same -- a similar kind of thing. It's a paper printing, although we printed these films, and then people stored them.

Q. Pretty much before the digital age?

A. That was not so much. It kind of came up on people quickly.

Q. Microfiche. What was the name of the company that you formed then?

A. My company or their company?

Q. Your company, the one you worked for?

A. It was called Anacon.

Q. Then after that, what did you do?

A. After Anacon, I started a company that started something similar to what Anacon does, and very quickly after that I started a company in kind of the same business we are still in.

Q. What's the name of that company?

A. The one I worked for?

Q. Yes.

A. Jeez, I don't even remember anymore, sorry. We started --

pretty quickly we started Unisource.

Q.   Unisource Discovery, LLC?

A.   Right.

Q.   That's a limited liability company in California?

A.   Right.

Q.   The defendant in this case and you are the owner of that company.  Correct?

A.   Right.

Q.   Prior to that, to forming Unisource California -- we will refer to it as Unisource California to facilitate, avoid confusion.  We have a lot of that already, but Unisource California.  Before that you worked for a company called Datamed.  Correct?

A.   Actually -- another partner and I made, started Datamed.

Q.   Datamed, how long did you work there?

A.   Twelve years.

Q.   And it was substantially the same kind of business that Unisource California has?

A.   Right.

Q.   Why did you leave Datamed?

A.   Because I didn't -- my partner didn't want to work any longer and I did.  He had more of a stake in the company than I did and more shares, so I thought I should probably do better on my own.

Q.   I see.  Do you know a person by the name of Lisa Cote?

A.   Yes.

Q.   Who is she?

A.   She is Noel's wife.

Q.   Right.  And when did you meet her?

A.   Sometime during the Datamed thing, probably in 19 -- I don't remember, right after -- I can't say.  Early -- late '80s, '90s, like that.

Q.   Did she work for Datamed also?

A.   She did.

Q.   By that time you already knew of her and you had met her.  Correct?

A.   Right.

Q.   So at the time that you are working with Datamed, did you meet a person by the name of Alfred Lutter?

A.   Yes.

Q.   He was a programmer.  Right?

A.   Uh-huh.

Q.   He developed software?

A.   Right.

Q.   And he developed software for Datamed, your ex-employer or your ex-venture.  Right?

A.   Yes.

Q.   And was the program that was developed then also used subsequently at Unisource California?

A.   No, it was completely rewritten as far as I know.  It did

the same thing.  Yeah, it made paper.

Q.  It was the same documentation, information retrieval, digitalization of documents in hospitals so that lawyers can come to court and argue?

A.  Right.

Q.  Okay.  And when did you form Unisource California?

A.  April 2001.

Q.  When did you meet Mr. Mijares?

A.  Sometime after that, three or four years after that.  I don't remember exactly when.

Q.  All right.  Would it be fair to say around 2005?

A.  Yes, that's probably it.  I really can't say for sure, but somewhere in that range.

Q.  Who introduced you to Mr. Mijares?  How did you come to meet him?

A.  Lisa Cote.

Q.  Lisa Cote?

A.  Yeah.

Q.  Lisa Cote mentioned to you and what did she say, hey, my husband is in the same line of business and I'd like you to meet him, something like --

A.  He was in --

THE COURT:  Gentlemen, only one at a time.  Let him finish his question, and then you get a chance to answer.

THE WITNESS:  I'm sorry.  I couldn't hear what you

said.

BY MR. SANCHELIMA:

Q.   Was Mr. Mijares substantially in the same line of business as you were?

A.   I don't think so.  I think he was doing something similar, but he had just started, as far as I know.  I really don't know more than that about his business.

Q.   Do you remember what the name of his business was?

A.   Yes, The Subpoena -- The Subpoena Company.

Q.   The Subpoena Company.  So it's reasonable to assume that he was in the business of serving subpoenas.  Right?

A.   Yeah, you could.

Q.   And that in serving subpoenas sometimes you request documents.  Correct?

A.   Yes.

Q.   And basically -- yes, I need a vocalization of your answers so it's picked up by the court reporter.

A.   Okay.

Q.   And that's also what Unisource California does is collect information, based on subpoenas sometimes if the client is an attorney or maybe just hospital records as authorizations to retrieve information from hospitals.  You don't need a subpoena for that.  Basically, that would be the difference, that your company had a computerized system, software that allowed you to do more than what, more than what Mr. Mijares was doing with

his subpoena company.  Correct?

A.  Yes.

Q.  Okay.  So in 2005, what was discussed with Mr. Mijares?

A.  I'm sorry, I can't hear you when you talk away like that.
It's me.  It's my ears.  I am not sure if I have a cold or
something.

Q.  Okay.  I will try to be close to the witness.  Maybe that
way I can communicate better.

What did you discuss with Mr. Mijares the first time that
you met him?

A.  I don't recall.  I mean, eventually we talked about forming
Unisource Florida.

Q.  That was a common interest that you had.  Right?

A.  Right.

Q.  You had never met him before, and Ms. Cote told you, oh,
you guys should talk.  You have some parallels here.  Right?

A.  Right.

Q.  Maybe you can join forces and do something good, a joint
venture, something, one plus one equals three type of thing?

A.  Yes.

Q.  Some synergism, you got this, you got that, so let's get
together.  Correct?

A.  Right.

Q.  And come up with something.

And did something come out of that meeting?

A.   Did you say did something come out of that?

Q.   Yeah.  Anything happen after that?

A.   Well, we formed Unisource Florida.

Q.   Right.  So, did you come to Florida?

A.   Yes.

Q.   In 2006?

A.   Sometime.  I don't remember exact dates, but I came down here periodically.

Q.   Well, I represent to you that your corporation, Florida corporation, Unisource Florida, was formed in 2006.

When it was formed, when it was incorporated, did you come to Florida at that time?

A.   I don't recall.  I mean, I must have done it sometime around there.

Q.   And you remember forming this corporation where you subscribed to 50 percent of the shares.  Correct?

A.   Uh-huh.

THE COURT:  I'm sorry, you have to answer yes or no, sir.

Mr. Cerasale, you have to answer yes or no.  You said uh-huh.

THE WITNESS:  Oh, I'm sorry, bad habit.

Yes, I did.

BY MR. SANCHELIMA:

Q.   And you entered into an agreement, the so-called operating

agreement that counsel just referred to.  Correct?

A.  Right.

Q.  And that was in June of 2006, I represent to you, because we don't have the document in front of us.  We will soon see it.

A.  Yes.

Q.  And what was your understanding as to what you would have to contribute for receiving that 50 percent of the shares of Unisource Florida?

A.  Just -- software, everything that we had that would help, that would facilitate running a business like that.

Q.  So the software was one of the things that was required for you to contribute to the new business venture.  Correct?

A.  Yes.

Q.  Did you own that software at that time?

A.  I have always been a licensee of it.

Q.  But then did you have the right to contribute that software?

A.  Yes.

Q.  And what else did you have to contribute?

A.  What else did I have to what?

Q.  Contribute?

A.  Oh, contribute.

Q.  Contribute in exchange for the 50 percent shares that you obtained?

A.   Our knowledge about the business.  It's not just software.
It's the mechanism of how we went about it.

Q.   You're not a programmer, are you?

A.   No.

Q.   Did you have to contribute any capital?

A.   Yes, and some equipment too.

Q.   Equipment like servers?

A.   Right.

Q.   Scanners?

A.   Probably.  I'm sure it must have been some of that.

Q.   Whatever the agreement says in 2006 you did contribute.  Is that fair?

A.   Yeah.

Q.   And as part of that contribution, did you contribute the name of the new corporation, Unisource Discovery, Inc.?

A.   Yeah, I guess I told him he could use it.

Q.   Okay.  So you did not object to the use of the trade name Unisource Discovery, Inc., did you?

A.   Yes.

Q.   And the brand represented by Unisource, the Unisource Discovery Digital Document Retrieval, let me see if I can show it to you.

     This brand here, did you contribute that too?

A.   Yes.

Q.   And as a result of that, you continued using the same

website, unisourcediscovery.com.  Correct?

A.   Yes.

Q.   And the account for the different e-mails is also tied to that discovery, I mean unisourcediscovery.com.  Correct?

A.   I don't understand the question.

Q.   The e-mail accounts, everything is tied?

THE COURT:  Hold on, gentlemen.  One at a time, please. Let him finish his question, and then you can provide your answer.

All right.  Would you ask the question again, please?

BY MR. SANCHELIMA:

Q.   The e-mails associated with unisourcediscovery.com, were they advertised in the website?

A.   I don't know, probably -- I really don't know.

Q.   What is your current e-mail right now.

A.   My personal e-mail account?

Q.   No, your business e-mail, the one that you use for your business?

A.   Steven@unisourcediscovery.com.

Q.   And what is the website address?

A.   Unisourcediscovery.

Q.   .com?

A.   Yeah, .com.

Q.   And the plaintiff, Unisource Florida, has the same unisourcediscovery.net.  Correct?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    After the agreement was signed and the corporation started doing business and so forth, was the website co-owned with Unisource Florida?

A.    No.

Q.    Was the website co-shared, was it shared with Unisource Florida?

A.    Yes.

Q.    But your position is that you didn't sell part of that website.  Correct?

A.    That's correct.

Q.    And in that website you advertised both?

A.    Yes.

Q.    Your company's telephone number in California and also your -- your company in Florida.  Correct?

A.    Yes.

Q.    And there were two different numbers, one for the east coast and one for the west coast.  Correct?

A.    Uh-huh.

        THE COURT:  I'm sorry, you have to answer yes or no.

        THE WITNESS:  I'm sorry, yes.

        MR. SANCHELIMA:  Just as a preliminary matter, we have two sets of exhibit lists, one for plaintiff and one for

defendant.  Should we use letters as we introduce the exhibits?

THE COURT:  You can use the same number, just refer to it as Plaintiffs' Exhibit or Defendant's Exhibit.

MR. SANCHELIMA:  Thank you, Your Honor.

How do I do to see the whole document?

THE COURT:  You can zoom out.  There is a button there.

BY MR. SANCHELIMA:

Q.   Mr. Cerasale, do you see what has been identified as Plaintiffs' Exhibit 2?

Do you see it?

(Plaintiffs' Exhibit 2 was marked for identification.)

A.   I see something.  It doesn't say Exhibit 2, so I'd have to --

BY MR. SANCHELIMA:

Q.   No, it says Plaintiffs' Exhibit 2, but are you seeing that document that's dated June 2nd, 2006?

A.   Right.

Q.   That's page one.  Do you remember receiving that document?

A.   I'm sure I did.

I don't remember it, but I am sure I did.

Q.   Well, take some time to read it, please.

A.   I recognize the material on the document, so I must have seen it.

Q.   Okay.  I am going to show you, just to be thorough, the rest of the document as page two.  Can I show you page three?

A.   Okay.

Q.   And then this is page three?

A.   Okay.

Q.   All right.  You testified that you have seen this document before.  Is that -- was that your testimony?

A.   Yes.

MR. SANCHELIMA:  All right.  Do you have any objections to introduction of Exhibit 2 Plaintiffs' Exhibit 2 on the record?

MR. VELARDE:  No.

THE COURT:  All right.  Without objection, Plaintiffs' Exhibit 2 will be admitted.

(Plaintiffs' Exhibit 2 was admitted in evidence.)

THE COURT:  I'm sorry, do you want to publish now?

MR. SANCHELIMA:  Yes.

BY MR. SANCHELIMA:

Q.   This document basically captures the subject matter that you discussed prior to the corporation of the plaintiff, Unisource Florida.  Correct?

A.   You have to say that again.  I couldn't understand you.

Q.   This document basically deals with the subject matter that you discussed with Mr. Mijares prior to the corporation of Unisource Florida.  Correct?

A.   Yes.

Q.   I am going to show you now Plaintiffs' Exhibit 3, which is

a similar document, dated June 14 of the same year, 2006, and I will ask you if you recognize this document after I show you the rest of the pages.  Could you tell me when you are ready for the next page?

(Plaintiffs' Exhibit 3 was marked for identification.)

A.   Okay.  I read it.

BY MR. SANCHELIMA:

Q.   Okay.  This document refers to that 2006 operating agreement that your attorney referred to in his opening statement.  Correct?

A.   Right.

Q.   And this is the first page of that agreement.

Do you see that?

A.   Yes, I can see it.

MR. SANCHELIMA:  Your Honor, instead of using the ELMO, I'd like to go the old way of handing the document to the witness.  Would that be possible?

THE COURT:  Whatever you prefer.

BY MR. SANCHELIMA:

Q.   I think it would be simpler if I hand you a hard copy of it and it's simpler than going page by page?

A.   This is not a very good copy.

Q.   Yes, this is the old way.

You saw the first page dated June 14th, 2006, and it has an attachment which refers to the operating agreement.

Do you see that?

A.   Yeah, I see that.  It says operating agreement.

Q.   Okay.  And this is the operating agreement that your, or at least a draft of the operating agreement that your attorney was referring to, except that it's not signed.  It was just an attachment to this letter that you received.  Correct?

A.   If you say so.  I don't see it here.

MR. SANCHELIMA:  Do you have any problem accepting this Exhibit 3, Plaintiffs' Exhibit 3 into the record?

MR. VELARDE:  No, no objection.

THE COURT:  All right.  Without objection --

MR. VELARDE:  I just wanted to do a point of clarification that this is not the operating agreement referred to in the opening.  This is a draft that has not been signed and it's incomplete.

MR. SANCHELIMA:  I believe I so characterized the document as an unsigned draft, Your Honor, yes.

THE COURT:  All right.  Without objection Plaintiffs' Exhibit 3 will be admitted.

(Plaintiffs' Exhibit 3 was admitted in evidence.)

BY MR. SANCHELIMA:

Q.   I will show you now what has been identified as Plaintiffs' Exhibit 4.  I ask you to review this document and tell us if you have seen this document before.  I represent to you that's the electronic version of the Articles of Incorporation of

Unisource Discovery, Inc., the plaintiff in this action.

(Plaintiffs' Exhibit 4 was marked for identification.)

A.   The thing you just handed me just has a bunch of names and a document list on it.  It doesn't have data on it.  Did you mean for that to have information on it?

BY MR. SANCHELIMA:

Q.   The first page?

A.   Any of them.

Q.   Of the Articles of Incorporation.

A.   It's not just the Articles of Incorporation.  It's just these articles, right?

Q.   Well, it is a title --

THE COURT:   Hold on.  You guys are talking at the same time.  We can't distinguish who is talking.

BY MR. SANCHELIMA:

Q.   The first page says Articles of Incorporation, Electronic Articles of Incorporation for Unisource Discovery, Inc.

Do you recognize that document?

A.   No.

Q.   Okay.  Now, if you go to page two, Article 7 says, "initial officers and directors of the corporation is or are," and then it has three names.  Do you see that?

A.   Right.

Q.   And your name is there.  Correct?

A.   Yes.

Q.   Do you have any reason to disagree that you were an officer and director of Unisource Florida when it was incorporated?

A.   No, I was.

Q.   You were?

A.   Yes.

MR. SANCHELIMA:   Do you have any objection to this document being introduced into the record?

MR. VELARDE:   No objection.

MR. SANCHELIMA:   Your Honor, so moved.

THE COURT:   All right.   Plaintiffs' Exhibit 4 will be admitted.

(Plaintiffs' Exhibit 4 was admitted in evidence.)

BY MR. SANCHELIMA:

Q.   Now I will hand you Plaintiffs' Exhibit 5.   I will give you a copy of this exhibit which is, which is a copy of the operating agreement of 2006 that your attorney referred to in his opening statement and signed this -- this particular document signed.

After you review it, can you please tell us if you find your signature in that document which should appear.

Do you see your signature there?

(Plaintiffs' Exhibit 5 was marked for identification.)

A.   I am getting there.

BY MR. SANCHELIMA:

Q.   Oh, sorry.

A.   Okay.  I'm there.

Q.   Is that your signature on page 11?

A.   Yep, that's my signature.

Q.   And if we look at the first page, the parties to this agreement include you, Steven Cerasale, as an individual and resident of the state of Florida.

Correct?

A.   Yes.

Q.   And other parties were Noel Mijares and Lisa Cote.

Correct?

A.   Right.

Q.   And collectively you were all referred to as the board of directors for this corporation.  Correct?

A.   Yes.

Q.   Now, on Article 1, it says, "The name of the company shall be Unisource Discovery, Inc."  Correct?

A.   Yes.

Q.   You didn't protest that, did you?

A.   I didn't what?

Q.   Protest that, the fact that the name of the corporation was going to be named Unisource Discovery, Inc.?

A.   No, I did not protest that.

Q.   At that time the corporation name could be any other name. It didn't have to be Unisource Discovery, Inc.; it could have been anything else.  Correct?

A.  Sure.

Q.  And isn't it true that at that time the name was not worth any good, it didn't have any goodwill because in Florida it was not known?

A.  No, I don't think that's true.

Q.  Was the California company, Unisource California, doing business in Florida in 2006?

A.  No.

Q.  So then how could it have any value, any goodwill if it didn't have any use, if it didn't have any sales?

Nobody knew Unisource at that time in 2006.  Correct?

A.  That's not the question you asked first.  The question you asked first is did it have any value.  Yes, it has value. Maybe not in Florida, but it certainly has value in all over the country.

Q.  I'm sorry, I thought I restricted the question to Florida.

When this company was formed, this name was chosen, but any other name could have been chosen because whatever name was chosen it was starting at zero.  Correct?

A.  Yes.

Q.  This company was born in 2006.  It didn't have any sales or anything at that time, so it could have been The Subpoena Company as a trade name or it could have been the name that was actually chosen?

THE COURT:  Counsel, at times, I think you are going

into complex questions.  If you keep the questions as simple as possible because it's supposing more than one question in your overall question.

MR. SANCHELIMA:  Thank you, Your Honor.  I will do my best.

BY MR. SANCHELIMA:

Q.   Let's move forward.  The name of the company was chosen to be Unisource Discovery, Inc.  Then if we go to the second page, 1.4, the purpose of the company, as described there, as providing records retrieval and related services.  Correct?

A.   Yes.

Q.   And that's what it did?

A.   Uh-huh.

THE COURT:  I'm sorry?

THE WITNESS:  Yes.

THE COURT:  Also, Counsel, this isn't in evidence.  You are reading from the document.

Are you offering this into evidence?

MR. SANCHELIMA:  Yes, Your Honor.

Do you have any objection to this document being introduced into evidence?

You have a copy of this, and we discussed this several times.

MR. VELARDE:  Plaintiffs' 5?

MR. SANCHELIMA:  Yes.

MR. VELARDE:  No objection.

THE COURT:  All right.  Without objection, Plaintiffs' Exhibit 5 will be admitted.

(Plaintiffs' Exhibit 5 was admitted in evidence.)

BY MR. SANCHELIMA:

Q.  Thank you, Your Honor.

Then on paragraph 2.1, it says, "The director shall make such initial capital investments to the company as needed."

Do you see that?

A.  Yes.

Q.  And you did make capital investments in this company. Right?

A.  Yes.

Q.  Now, when we go to page three, it basically recites the same structure for the shareholders' holdings of the common shares, 50 percent, 25 percent, 25 percent.  And then on 3.2 -- do you follow me?

A.  3.2, is that where you are?

Q.  No, 3.1, that was the distribution of the shares.  You agree that's what was the initial distribution of the shares for that corporation.  Right?

A.  Yeah, I think so.  Let me look.

So, 3.1.  I got it.

What do you need?

Q.  You received 500 shares Class A common stock.  Correct?

A.   Uh-huh.

THE COURT:  Sir, again, you have to answer yes or no.

THE WITNESS:  I'm sorry, yes, I did.

BY MR. SANCHELIMA:

Q.   On page four, it says that the total numbers of shares were a thousand?

A.   Yes.

Q.   And there were no more.  Correct?

A.   Yes.

Q.   Now, on 4.1, the document reads, "Each director shall have full, complete and exclusive authority, power and discretion to manage and control the business, property, and affairs of the company."  What did that mean to you?

A.   It sounds like anybody could do anything.

Q.   Correct.  Who was the person in charge of the day-to-day operations of Unisource Florida at that time?

A.   Noel.

Q.   Noel Mijares sitting here today?

A.   Right.

THE COURT:  I'm sorry to keep interrupting.

Can you pull the microphone closer to you, sir?

THE WITNESS:  Yeah.

THE COURT:  It's a big courtroom.  We all need to be able to hear you.

BY MR. SANCHELIMA:

Q.   Prior to the corporation, Unisource Florida, Mr. Noel Mijares had his company, The Subpoena Company, as you mentioned before.  Correct?

A.   Yes.

Q.   And on paragraph 4.2, it says, "The board of directors acknowledges that Unisource Discovery, Inc. shall have the exclusive rights to utilize the Florida platform of The Subpoena Company to establish a presence in the region."

What did that mean to you?

A.   It meant to me that they had field agents, that's all they really had, field agents, people that went out and delivered subpoenas and they were going to deliver the subpoenas.

Q.   So they were going to service Unisource Florida.  Correct?

A.   Correct.

Q.   Exclusively, it was this company that was going to service Unisource Florida.  Correct?

A.   No.

Q.   So what it says here is incorrect?

A.   What it says here is that they are going to -- it says they are going to have to utilize the platform -- I have to read this now.

Q.   Take your time.  We are on 4.2.

A.   Yeah, I mean, this is The Subpoena Company is going to be able to use The Subpoena Company to establish a presence in Florida.  I really don't know what that means.

Q.   You don't know what that means.  Okay.  But do you see the words exclusive rights?

A.   Exclusive what, though?

Q.   Rights.

A.   What is exclusive?

Q.   Well, take a look at 4.2, please.

A.   The way I read it, the board of directors further acknowledges that without --

Q.   Well, before that.  I haven't gotten there.

A.   Well, that's 4.2.

Q.   Yes, but the first sentence.  I will read it for you.

A.   Okay.

Q.   "The board of directors acknowledges that Unisource Discovery, Inc. shall have the exclusive rights to utilize the Florida platform of The Subpoena Company to establish a presence in the region."

A.   Okay.

Q.   What did that mean to you?

A.   It means to me that they're going to use all of their software, and they're going to use our processes and then The Subpoena Company is going to serve subpoenas for the new company.  That's what that means.

Q.   Exclusively.  Correct?

A.   Exclusively to serve the subpoenas, yes.

Q.   Correct.  And then it says, the second sentence says, "The

board of directors further acknowledges that without the established Florida platform assistance, support, contributions, systems, employees, tools, facilities, relationships and direct management of daily operations from The Subpoena Company, this agreement is null and void and of no force and effect."

Do you see that?

A.   Yes, I got it.

Q.   What did that mean to you?

A.   It means that the people who are running The Subpoena Company now are going to be direct -- they are going to be the people who are running the new company.

Q.   So you agree with me that the contribution of Mr. Mijares and his wife, Cote, was substantial and important.  Correct?

A.   Well, it was as important as the things they were getting from us.

Q.   Right.  In this case the name of the corporation.  Right?

A.   Right.

Q.   You would think even though at that time it was of very limited value because they had not been used, and the software. Correct?

A.   And the -- the software is not just the stuff to scan the records.  It was the whole procedural thing that we do.

Q.   Right, the work flow --

A.   Right.

Q.   -- of how to process a subpoena, how to retrieve information, how to process it, how to store it, all of that?

A.   Right.

Q.   That's what you brought in to the deal?

A.   Right.

Q.   Those were the toys that you brought?  Mr. Mijares brought his toys and you brought your toys, pretty much.  Correct?

A.   Yes.

Q.   The last sentences in that paragraph says, "For these reasons The Subpoena Company shall be the managing authority under article 4.1 until such time as Unisource Discovery, Inc., is self-sufficient and operating exclusively and independent from any other resources."

     What did you understand that to mean?

A.   It means that eventually Unisource Florida would be separated from The Subpoena Company and do their own thing, but I don't think that's ever happened.  But that's what was the idea.

Q.   But that was the idea at that time in 2006?

A.   Right.

Q.   And The Subpoena Company did its part, didn't it?

A.   As far as I know, yes.

Q.   Now, that sentence refers to paragraph 4.1, which we read before, and it gave the directors full power to control the business, property, and affairs of the company.  Correct?

A.   Yeah.

Q.   And it was the duty of the president of the company to preserve the assets of Unisource Florida.  Correct?

A.   Yes.

Q.   Including its rights to the name.  Correct?

A.   Yes.

Q.   Isn't that what Mr. Mijares did when he filed an application for registration of the mark on October 16 of 2008?

A.   I don't know.  I don't know that that.  We had the mark for ten years and it was never a problem.

THE COURT:  Hold on.  Let him finish his answer first.

THE WITNESS:  Excuse me.

THE COURT:  Continue your answer, sir.

THE WITNESS:  I'm sorry, I won't do that.

MR. SANCHELIMA:  No, it was my mistake this time.

THE WITNESS:  Okay.  This time.

THE COURT:  I am not sure if you understood me.

The attorney interrupted you, and I told him to let you finish your answer.

Were you finished with your answer?

THE WITNESS:  Yeah, I think so.

My ears are a little bad, I'm sorry.

THE COURT:  Okay.  All right.  Please continue.

MR. SANCHELIMA:  Would it be possible for me to ask madam court reporter to read that last question again, please,

Your Honor.

(The question referred to was read back as above recorded.)

A.   Okay.  You want me to answer that again.

Okay.  He did it to his exclusive benefit, not to the benefit of the company in general, my business in general.

BY MR. SANCHELIMA:

Q.   Registration is not in his name.  The registration is in the name of a corporation of Florida of which you owned at that time 50 percent?

A.   Uh-huh.

Q.   You only owned 25 percent.  How could that be to his benefit?

A.   Because we are having this conversation now.  We are having this conversation now because he felt like that meant that he owned the name of the company.

He didn't own the name of the company.  He never owned the name of the company.  I let him use it.

Q.   All right.  So let's -- I'm sorry.

THE COURT:  Hold on.  One at a time.

THE COURT REPORTER:  Can you repeat the answer because I could not hear it?

THE WITNESS:  He told the PTO he owned.  He said, "I own this.  This is mine."

BY MR. SANCHELIMA:

Q.   I'm sorry, I didn't understand that.

A.   I said he did it to his own benefit because he wanted to be the owner of the mark, and he is not the owner of the mark.

Q.   He tried to protect the mark and registered, not in his personal name, but in the name of the corporation that you owned 50 percent of, and pursuant to this agreement he had a duty as managing director to preserve the assets of the corporation?

A.   Okay.  It was an asset of the California corporation long before it was his asset, and he decided to make it his asset.

Q.   Unisource Florida's assets?

A.   Yes, if you want to call them -- if you want to make that differentiation, yes.  But that's BS.

THE COURT:  All right.  Counsel, we are at about an hour and a half.  Is this a good time to take a break?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  Ladies and gentlemen, we will take 15 minutes.

Please don't discuss anything about the case.  You don't have to stay in the jury room.  You can move about.  We will resume here at 3 o'clock.

COURT SECURITY OFFICER:  All rise.

(The jury exited the courtroom at 2:45 p.m.)

THE COURT:  All right.  Anything we need to take up before we break?

All right.

MR. SANCHELIMA: Your Honor, may I address an issue that it was part of a motion to strike and the magistrate denied it and then the motion for reconsideration was also denied, but we still feel that we need to preserve, have an exception to that ruling, and that has to do with the document of licensee estoppel. The document of licensee estoppel prevents a licensee from challenging the validity of the license.

We have had this discussion several times and so forth. We still think that, and respectfully submit it will be reversible error as a matter of law, if we use the control of the quality or nature of the service mark as an affirmative defense or whatever.

So I just want to make sure that the record has been preserved, and if we have to make a proffer then maybe at the time that Your Honor chooses we can address that.

THE COURT: All right. Well, your objection is noted. Any need to revisit that issue?

MR. VELARDE: No, Your Honor, it's been fully briefed via motions. It's been fully briefed via motion for rehearing. There is nothing new to say or that I need to say. It's been fully briefed.

THE COURT: I will just note that you have a standing objection to that issue.

MR. SANCHELIMA: Thank you, Your Honor.

THE COURT:  All right.  We will see you back at 3 o'clock.

We will just -- you can try your cases however you wish, but I do think about the jury and what may work better for them.  After you have admitted the document, it might be helpful to have the document on the ELMO or if you've got it on the laptop so the jury can follow along when you are reading it.

When you are standing there reading it, I mean, they are listening and this is for both sides, it might be better to let them follow along with you on the ELMO.

MR. SANCHELIMA:  You are absolutely correct.  It's just that in the ELMO you have to be paying attention to the document, page by page and it's easier to scroll it.

THE COURT:  Well, maybe if one of your co-counsel wants to do that, that's fine.

All right.  We will see you back at 3 o'clock.

MR. SANCHELIMA:  Thank you, Your Honor.

(Brief recess.)

COURTROOM DEPUTY:  All rise.  The Court is now back in session.

THE COURT:  All right.  Are we ready to resume?

If you can make your way back up and we will bring the jury.

(The jury entered the courtroom at 3:03 p.m.)

UNIDENTIFIED JUROR:  Can I go get my sweater?

THE COURT:  While we are waiting, I don't know if you are hot, cold.  I don't control the temperature.  I am wearing a robe and I am cold, I assume you are as well.  Mr. Ahmad called.  We are still waiting for an adjustment.

All right.  Are we ready?

Is this Exhibit 5?

MR. SANCHELIMA:  Yes, Your Honor, still Exhibit 5.  We were on page 5 of Exhibit 5.  Now we learned how to operate.

BY MR. SANCHELIMA:

Q.  Mr. Cerasale, you have a hard copy and you also have the monitor, I believe.

I direct your attention to paragraph 4.9, and it reads, "First Right of Refusal, the board of directors has entered into a binding agreement for the purposes stated in Article 1.4 of this agreement, with a clear understanding that each director has an invested interest in other ventures."

Do you know what that meant, like other ventures?

A.  Other what?

Q.  Other ventures?

A.  Yeah, orders, selling.  Those are new clients.

Q.  Other, "other ventures".

A.  It's in the first right of refusal?

Q.  Yes, 4.9.  "Other ventures in and out of the state of Florida."

A.   "Other ventures," okay.  Yeah.  It means going other places and selling stuff.

Q.   Right, and that would include Unisource California.  Right?  That's what it was referring to, other ventures in and outside the state of Florida?

A.   In my opinion understanding that, I wasn't supposed to call anyone in Florida, and he wasn't supposed to call anyone in California.  I don't know that it says that here, but it certainly could.  It could have been an understanding we had between the two of us, but that was always what was talked about.

Q.   Okay.  But the question is, really, the question that I have asked is, in connection with this sentence that says the board of directors has entered into a binding agreement for the purposes stated in Article 1.4 of this agreement, with a clear understanding that each director -- and the directors were you and Mr. Mijares, and Lisa Cote -- has an invested interest in other ventures, in and out of the state of Florida, in other words, other companies maybe?

     Is that your understanding?

A.   Not necessarily, no.  If you went down one more sentence after that, you see where it says the use of names, it says the board of directors agree.

Q.   That's 4.10 --

     THE COURT:  Let him finish his answer.

Continue with your response, sir.

THE WITNESS:  Oh, I can talk?

THE COURT:  Yes.

THE WITNESS:  It says right here that the board of directors agrees that certain folks have the right to use the name and all of that within -- it says it's not a subject, the subject is in a licensing form, form of licensing, rather, and it means moving forward anybody could use that if they're -- if they have some sort of, I don't know what you call it, right to use it, right of refusal.

Oh, therefore -- anyway, that's what I think it means. I think it means "we," that everybody -- you know, you can't have -- I don't understand how you have a right of first refusal when there is only two people involved.  That's like -- right of first refusal is typically when there are five or ten people trying for some piece of business.

I don't understand what that is supposed to mean.

BY MR. SANCHELIMA:

Q.   Basically, are you saying that you don't understand what "other ventures in and out of the state of Florida" means in that paragraph 4.9?

A.   It says that people have ventures -- have interest in other parts in and out of the state of Florida, therefore, the directors should provide the other with the first right of refusal for any future business transaction relating to this

agreement with reference to other locations but not limited to.

So, anywhere you go, that's what that says, anywhere you go you're supposed to tell somebody, you are supposed to go, oh, I'm going there and then what are they supposed to say after that, you can or you can't or we got a hot lead down there.

I mean, I think that's what this is supposed to mean.  That was never practiced but that was, that's what I read that to be.

MR. SANCHELIMA:  I don't want to interrupt you but, Your Honor, I move to strike the response because it's not responsive to the question.  I have asked three times already what was the meaning of other ventures in and out of state of Florida.

THE COURT:  Well, the request is denied but you can deal with that in your questioning if you think it was unresponsive.

BY MR. SANCHELIMA:

Q.  Were you represented by an attorney when you signed this document?

A.  No.

Q.  All right.  The next sentence says, "Therefore, each director shall provide the other with the first right of refusal for any future business transaction related to this agreement with reference to other locations as listed but not limited to," and then it has state of Arizona, state of Texas

and state of Illinois.

Would it be fair to say that at that time your company in California had not done business in the state of Florida, state of Texas, and state of Illinois?

A.   You just said Arizona a minute ago.  Did you leave it off the second time?

The first time you read Arizona.  We had a business in Arizona, which is why I am bringing it up.

Q.   Before you signed this agreement, you already, your company, California, Unisource California had business in Arizona already.  Correct?

A.   That's right.

Q.   Did you disclose that to Mr. Mijares when you signed this agreement?

A.   I don't know.  I think -- I don't know why I wouldn't have but I can't remember.  He knew it.  He knew what we were doing.

Q.   Then what was the purpose of including the state of Arizona in paragraph 4.9, the first right of refusal, if you had already done business in Arizona?

A.   Well, there is a lot of answers to that, but the most salient would be the fact that you can't have right of first refusal if there are only two people.  Either you got it or I got it.  It's like a ball gets hit in the air.

The second is that even if -- if I had an agreement with somebody in Arizona and it was like we are doing like $2,000 a

month or $3,000 a month, and Noel came to me and said, oh, I got this great lead here and I can just close this stuff down right away and I can have like $20,000 worth of business, well then I'd give it to him.

I mean, that -- if you two want to be partners and play fair, that's what you'd do.  That's what I'd do.

Q.   Did you play fairly with Mr. Mijares?

A.   Yes, he knew we had very little business in Arizona.  If he had gone come forward and said I've got all this business, then he could have had it.

Q.   All right.  Let's move on to the next paragraph then.  It's titled license and name use.  Do you see that?

A.   I got it.

Q.   The first sentence says, "It is understood by the board of directors that the name Unisource Discovery, Inc. is a Florida registered corporation, clear and clean of any titles, and it's not subject to nor under any other form of a licensing agreement to transact business."

Do you see that?

A.   Yes.

Q.   What do you understand that to mean?

A.   It means Noel registered this name in Florida and that it was understood that as chosen as a means to moving forward but in no way a constitution that particular use of names -- in no way a constitution to that -- I don't know exactly what

that's -- obviously, that's a typo.  That's not a proper use of the word constitution but --

Q.  Are you through, sir?

A.  I am just reading the rest of it.

Q.  Okay.  I am not asking you to read the paragraph.  I am asking you to read the first sentence of the paragraph, which I read to you and exclusively, specifically, that first sentence.

It says, "It is understood by the board of directors that the name, Unisource Discovery, Inc. is a Florida registered corporation, clear and clean of any titles and is not subject to nor of any form of licensing agreement to transact in business."

The question is, what did that mean to you when you signed the agreement?

A.  It meant that Noel could use the name in Florida and wherever else he wanted to.

Q.  And it was not subject to any license agreement, including any license agreement from Unisource California either. Correct?

A.  That's right.

Q.  It was completely detached from Unisource California at that point.  Correct?

A.  Right.

Q.  Now, the second sentence says, "It is understood by the board of directors that the use of name was chosen as a means

to move forward but in no way a constitution to that particular use of name, since the board of directors agreed that certain directors have other entities that utilize similar names deriving from the works such as Unisource and discovery and this agreement shall govern and restrict any unlawful misuse of any part of the company name."

Do you interpret that, sir, to mean that it recognized the fact that you were already using Unisource Discovery in California and allowed you to continue using the name there?

A.   No, more importantly, it allowed him to continue to use the name.

Q.   What is your interpretation of that sentence?

A.   Well, what you just said, but it went both ways.

Q.   That you could continue using Unisource in California. Correct?

A.   He could too in whatever territory he was in.

Q.   Well, the only other Unisource Discovery company that was using the name was Unisource Florida because The Subpoena Company is far removed from the use of the word "Unisource" and "Discovery."  So, it could only referred to your company in California.  You were allowed to continue using the word "Unisource" and "Discovery" in California, as result of this clause.  Correct?

THE COURT:  I'm sorry, Counsel.  That was a compound question, and I had trouble following.  If you can, ask it in a

simpler way.  Maybe break those questions.

BY MR. SANCHELIMA:

Q.  Okay.  Let's see if we can unpack this second sentence because I think it's important.

It is understood by the board of directors that the use of name was chosen as a means to move forward.  In other words, hey, let's take a name and move forward.

Is that what that means?

A.  Yes, that's what happened.

Q.  And the name that was selected was Unisource Discovery, Inc.  Like you said before, it had no value at that time because it was just a startup.  Correct?

MR. VELARDE:  Objection.  It mischaracterizes the testimony.  That was not what Mr. Cerasale testified to.

THE COURT:  Overruled, but Mr. Cerasale can clarify his understanding.

THE WITNESS:  Okay.  Going forward you mean?

THE COURT:  Listen to the question and we will wait for your answer.

THE WITNESS:  Okay.  Give me the question again, please.

MR. SANCHELIMA:  Madam court reporter, please.

THE COURT REPORTER:  There was a word there that I'm not sure what you said.

THE COURT:  If the record isn't clear, the specific

words you used, maybe if you can repeat that question.

BY MR. SANCHELIMA:

Q.   We already went through the first part of the second sentence.  Now let's go to the second part of the second sentence.

It says, "Since the board of directors agree that certain directors have other entities that utilize similar names deriving from the words such as "Unisource" and "Discovery," that refers to Unisource California.  Correct?

A.   Or anybody else.

Q.   Nobody else was using Unisource Discovery except Florida and California?

A.   It gives them license to do that, does it not?

Q.   I don't know.  I am asking you what --

A.   That's how I read it.

Q.   Well, did you know if there were other companies using Unisource Discovery other than California and Florida?

A.   Not that they couldn't start -- this doesn't prevent them from starting another company tomorrow.

Q.   The question is not what would prevent somebody from doing something.  At that time, 2006, there were no other companies using Unisource Discovery except in California with the LLC and Florida with the Inc.  Correct?

A.   As far as I know.

Q.   "Since the board of directors agreed that certain directors

have other entities that utilize similar names derived from the words 'Unisource' and 'Discovery,' and this agreement shall govern and restrict any unlawful misuse of any part of the company name."

So, other than these two corporations nobody else would use "Unisource" and "Discovery," is that what you understand this clause to mean?

A.   Yeah, but it doesn't say by who.

Q.   That's your response?

A.   It says it's restricted, but it doesn't say to what or to whom.

Q.   Understood.

A.   That's all I would remember.

Q.   Now, after this agreement was signed in 2006 and the corporation formed, what happened?

Did you come to Florida to launch the business?

A.   Did I help them, yeah.

Q.   Help who?

A.   Noel and everybody who was in Florida.

Q.   And if you look at the last part of Exhibit 5, there is an addendum.  There is a Schedule A that, of course, is what we already discussed, the share distribution, but there is an addendum at the end.  Do you see that?

A.   It's directors' addresses and stock references?

Oh, here we go, this contributions addendum?

Q.   Yes.

A.   I have it here.

Q.   It starts by saying, "The following addendum shall be part of and overrides any prior agreements, whether verbally or in writing, entered by the board of directors to the operating agreement."

In other words, we are going to clean everything before today and we are going to just go by what this contribution addendum is.  Whatever promises were made as to who is going to do what and all of that is erased.  Correct?

A.   I guess.  I'm not really sure why this was put in here but, yeah, let's just say it does.

Q.   Well, it's -- this is part of the record in this case now. It was admitted in the record.  Your attorney stipulated that it is legitimate, genuine, and this was what you signed. Correct?

A.   Yeah, it is.

Q.   And it says here, "It is understood and agreed that Steven Cerasale, being a California resident, shall have the right to choose, organize, prepare and approve his visitations to the company in Florida according to his discretion only."

Did that occur?

A.   What was that last thing you said, I'm sorry?  Did that occur?

Q.   According to his discretion only?

A.   Did you say did that occur?

Q.   Yes, did that occur?

A.   Yes, it did.

Q.   You came whenever you wanted to.  Right?

A.   Right.

Q.   And you visited the offices of Unisource Florida at any time that you wanted to.  Right?

A.   Yes.

Q.   And you didn't have to announce yourself.  Correct?

A.   I can't imagine why I would come without doing that.

Q.   Were any documents hidden from you?  Is it your position that some documents were hidden from you?

A.   No.

Q.   When did you first learn that the mark had been registered?

A.   I can't say.  I don't remember.

Q.   Did you ever discuss the mark registration with Mr. Mijares in one of your visits to the Florida corporation?

A.   No.

Q.   It was not important to you to discuss who owned the mark?

A.   I thought we were all pulling with the same set of oars but later I found out that we weren't.  Initially that's what I thought.

Q.   When did you first learn that the mark had been registered?

A.   As I said a minute ago, I don't remember.

     What is the date on the mark, on the PTO document?

Q. Well, it was filed in 2008, and it was registered in 2009.

A. Well that's the date then. That's when I found out, I guess, or at some point thereafter. I didn't find out until after it happened, so sometime after 2009.

Q. After 2008?

A. You said it was 2008 at the top.

Q. It's 2009 at the top.

A. Either one, I don't care.

Q. Either 2008 or 2009?

A. I am sure it's like --

THE COURT: Hold on. Gentlemen, only one at a time, please. Finish your answer and then we will move on to the next question.

Have you finished your response?

THE WITNESS: It was okay with me. The fact that it was either 2008 or 2009, just a couple of months apart, I didn't think too much of that. Maybe I should but I didn't.

BY MR. SANCHELIMA:

Q. Okay. So, 2009 and it was 2021, a year after this lawsuit was started that your attorneys filed the counterclaim purportedly, allegedly because Mr. Mijares committed fraud 13 years ago.

Why didn't you protest or indicate some dissatisfaction with the fact that Unisource Florida had registered the mark in his name, the name of the corporation which you own today

40 percent?

A.   As I said the last time you asked this question, I didn't -- I trusted Noel.  It was a mistake, but I did and I just figured we were all pulling with the same oars and in the same direction, but that wasn't the case.  As that became more evident to me, then I did other things.

Q.   But you are a savvy businessman.  You own several companies, multi-million dollar companies.  You must have been doing very well for many years, and you mean to tell me that you allowed this to happen, the flagship mark of your corporation in California, you wouldn't check the records or ask questions?  You were part of the board of directors?

A.   No.  For the third time, I trusted Noel to do the right thing.  And I totally agree that it was a mistake but that's the answer to my question.  It's not going to change.

Q.   All right.  So, number two, Steven Cerasale -- the same contribution then.  "Steven Cerasale shall provide the company under his initial capital investment the required equipment needed for performing the services of records retrieval, including but not limited to billing services, servers, printers, scanners and software applications."

Did that happen?

A.   Yes.

Q.   And software that you contributed at the time -- your contribution of the software was challenged years later.

Correct?

A.   Yes.

Q.   By the programmer, Mr. Lutter, Alfred Lutter, the same?

MR. VELARDE:  Your Honor, objection.  As I mentioned before, the order in limine Your Honor already ruled that any testimony or documents relating to the dispute that Mr. Sanchelima is alluding to should be stricken.

THE COURT:  All right.  Overruled.  Please proceed.

BY MR. SANCHELIMA:

Q.   Thank you, Your Honor.

The same programmer that you had been dealing with your olden days, in 1999, with Datamed, Mr. Alfred Lutter, came back a few years later and claimed an ownership right over that software and that your use of the software in your Florida Unisource corporation was illegal.  Correct?

A.   Yes.  We will say yes.

Q.   Okay.  And as a result of that, you had to give up a fifth of your shares, ten percent of your shares.  Correct?

A.   Yeah, that's right.

Q.   And Alfred Lutter ended up getting those shares so that we could settle or that Florida, and your company, and yourself, who were all charged with illegal use of the software, could settle the case.  Correct?

A.   Yeah, I think that's overcomplicating it, but, yes.

Q.   He ended up with ten percent of your shares, basically?

A.   He did.

Q.   And that was because he had brought this claim that it was illegal for Unisource Florida to use the software?

A.   That's not true.

Q.   Okay.  So then why would you -- why did you -- tell the jury why did you give up ten percent of your shares?

A.   Because it was not -- it was illegal for us to use it.  His contention was that since we were only licensees of the software, which we were as was Florida, that we could only offer it to them through him as a separate license.

Q.   Correct.  But when you went to Oregon to open a branch in Oregon, you didn't have any problems with Mr. Alfred Lutter, did you?

A.   No.

Q.   But when you came to Florida, you did have that problem with Alfred Lutter.  Correct?

A.   Uh-huh.

Q.   So there is a difference between expanding a branch in Oregon and a totally different corporation in Florida.

Correct?

A.   Okay.

Q.   That's what got Alfred Lutter upset.  Correct?

A.   Yes.

MR. SANCHELIMA:  We are going to move quickly to Exhibit 6, Your Honor.  I believe it was stipulated that the

mark is registered in the name of Unisource Discovery, Inc., the Florida corporation and I move to admit into the record the registration.

MR. VELARDE:  No objection.

THE COURT:  All right.  This is marked as Plaintiffs' Exhibit 6?

MR. SANCHELIMA:  It's six, Your Honor.

THE COURT:  All right.  That exhibit will be admitted.

(Plaintiffs' Exhibit 6 was admitted in evidence.)

THE COURT:  Counsel, do you want to publish that?

MS. SANCHELIMA:  Yes, Your Honor.

THE COURT:  Until I know, the jury doesn't see it.

MR. SANCHELIMA:  When I say publish, the jury doesn't see it?

THE COURT:  Unless I agree to publish it, the jury doesn't see it.

Now I have shown it to them.

MR. SANCHELIMA:  I am not going to ask any questions at this particular time about this document.  I am going to move to the next exhibit.

THE COURT:  Okay.

MR. SANCHELIMA:  I guess the -- for expedience purposes, I will ask my co-counsel, I mean, opposite counsel if he has any objection to Exhibit 7.

MR. VELARDE:  No objection.

THE COURT:  All right.  Without objection Plaintiffs' Exhibit 7 be admitted.

MR. SANCHELIMA:  Will that exhibit be published, Your Honor?

THE COURT:  Sure.

(Plaintiffs' Exhibit 7 was admitted in evidence.)

BY MR. SANCHELIMA:

Q.  Mr. Cerasale, I call your attention to Plaintiffs' Exhibit 7, and it includes several excerpts I represent to you were advertisement, promotional materials, snapshots from different web pages and whatnot.  So, specifically, what has been Bates stamped as P, as in Peter, or as in Plaintiff, 000477.  Do you see that first snapshot?

A.  Yes, I do.

Q.  Do you recognize that?

A.  No, I have never seen that before.

Q.  You have never seen that before.  Okay.  So then you have not seen P-478 either.  Correct?

A.  Correct.

Q.  And we can say the same thing about P-00479?

A.  Yes.

Q.  All the way to P-41.  So now we are in P-00482.  Have you seen that advertisement before?

A.  No, I have never seen any of this ever as material.

Q.  Let me ask you, does Unisource California advertise?

A.   Yeah, the same way we do, the same sort of thing he has been doing.

Q.   So does California advertise?

A.   Yes.

MR. SANCHELIMA:  Thirty seconds, Your Honor, please.

BY MR. SANCHELIMA:

Q.   Your attorney referred to a state litigation.  Correct?

A.   Say it again.

Q.   Your attorney referred to an ongoing state litigation that you have against Unisource Florida?

A.   I'm sorry.  Ongoing what?

Q.   Litigation, case, a lawsuit?

A.   Yes, that's what we are doing right now.  Right?

Q.   No, there is another one in state court.  Correct?

A.   Yes, that's correct.  So there are two of them.

Q.   Do you remember giving your deposition in one of those two cases on June 21st, 2022, not long ago?

A.   Okay.  Which question?

Q.   Well, the question is, do you remember giving your deposition in that case?

A.   Off the top of my head if you show it to me maybe I can recognize it.

MR. SANCHELIMA:  If I may approach, Your Honor, to give him a copy of the deposition notice, the deposition's first page.

THE COURT:  Okay.

BY MR. SANCHELIMA:

Q.  Do you remember giving your deposition on that day?

A.  I don't.  I'm sorry, I don't remember that.

Do you have a copy of the deposition?

Q.  Yes.

A.  This is like one page.

Q.  Okay.  I will give you a copy of page 39.  You don't remember giving a deposition on that date?

A.  No, I'm sorry, I don't.

Q.  Okay.  Well, I represent to you that you gave a deposition and you swore to tell the truth and nothing but the truth during that deposition.

Now, I bring your attention to line 14 of page 39, and the question that the attorney posed to you was, "Do you advertise your services?"

A.  Uh-huh.

Q.  And your response was no?

A.  Well, that's -- it depends on what you are talking about advertising.  I mean, we let people know where we are.  We don't take out full pages in magazines or anything like that, but we try to let people know where we are other ways.

Q.  Well, you are a savvy businessman.  What do you understand by advertisement?

A.  Anything where you are letting your clients know what you

do and why you do it better than the best guy.

Q.   So according to this deposition answer, you didn't let your clients what you were doing or anything like that and the only person, the only entity that was doing the advertising appears to be Unisource Florida.  Correct?

A.   Yes.

Q.   Thank you.

Now, moving to Exhibit 8, I believe that we have stipulated as to the genuineness that you don't have any --

THE COURT:  I'm sorry, I can't hear either one of you. You are offering Exhibit 8?

MR. SANCHELIMA:  Into evidence, Your Honor, without objection.

MR. VELARDE:  No objection.

THE COURT:  All right.  Plaintiffs' Exhibit 8 will be admitted.

(Plaintiffs' Exhibit 8 was admitted in evidence.)

BY MR. SANCHELIMA:

Q.   Mr. Cerasale, I call your attention to Exhibit 8, which I believe the first page is being displayed to you, and I will give you a copy.

A.   This one right here?

Q.   I will give you a copy that is easier for you.

I am going to ask you to review that document and tell us if you recognize it?

A.   I can't read the whole thing quickly here.   Is there something in particular you want me to read?

Q.   Well, I will tell you the question that I want to ask you is, isn't this a document that you signed agreeing to turn in the ten percent of your stocks?

A.   In 2006.

Q.   This is 2010.

A.   Oh, okay.  Okay.  I read it.  Clearly, I signed this.

Q.   On July page seven, you signed the document?

A.   Yes, 14 years ago, 13 years ago.

Q.   And as a result of this document, Mr. Alfred Lutter, III, obtained the ten percent interest in Unisource Florida. Correct?

A.   Correct.

Q.   And then on page one we can see the consideration for obtaining the ten percent insurance was a software license agreement to the company.  Right?

A.   Yes.

Q.   So that now Unisource Florida finally could use the software that you had promised to contribute back in 2006. Correct?

A.   Incorrect.

Q.   Could Unisource Florida continue to use the software had you not given up ten percent of the stocks?

A.   Yes, it happened way before that.

Q.  It could have continued.  Then why Mr. Lutter received the ten percent?  You just testified that it was to settle his claim?

A.  It was not -- it was because he said that we could license -- we couldn't license that stuff, the software to Florida, without paying him.  So we said, okay, we'll pay you.

That's what -- that's as simple as it can get.  We paid him -- we paid him for licensing the software in Florida, and it had nothing to do whether he was getting -- all the time that we are talking about from the beginning to the end until -- it was 2010, I am not very -- well, I am not sure.  Anyway, all along he was being, his software needs were being met.  He was getting his software updated.

The only -- I stopped -- he refused to pay me to update software.  You know, that's always been -- the software guys charge to update stuff.  They don't say, oh, okay, here is the package, you can plug this into your computer and use it for next ten years.  That's not how it goes, especially when you're making changes.

I was paying, and Alfred refused to pay -- I mean, Noel refused to pay him.  At some point I said I wasn't going to pay anymore for his changes because they were materially different than ours.  He needed different things.

Q.  Sorry.

A.  Oh, that's okay.

Q.   Did you finish?

A.   I'm done.

Q.   Okay.  That's not what I asked, but I will ask you another question.  Had you not given up that ten percent of the shares would Alfred Lutter sue Unisource Florida, Unisource California and yourself?

A.   Yes.

          MR. SANCHELIMA:  Did I move to admit Exhibit 8, Your Honor?

          THE COURT:  I thought I admitted it a moment ago.

          MR. SANCHELIMA:  Okay.  This is Plaintiffs' Exhibit 9 that I believe there are no objections to introduction of Exhibit 9.

          MR. VELARDE:  No objection to Exhibit 9.

          THE COURT:  All right.  Without objection Plaintiffs' Exhibit 9 will be admitted.

          (Plaintiffs' Exhibit 9 was admitted in evidence.)

BY MR. SANCHELIMA:

Q.   Again, I am going to give you a hard copy that's simpler for you.  I ask you to review this document entitled, Close Corporation Shareholder Agreement dated June 28th, 2010.

     Do you recognize this document, Mr. Cerasale?

A.   Yes.

Q.   Is that your signature on page 15?

A.   Yes, it is.

Q.   Could you tell us why you signed this agreement?

A.   Page 15?

Q.   The page with your signature, it says page 15 on the top.

A.   That's a scanner page, so I wouldn't use that as the number of the page.  That's from a scanner.  You know, the Bates stamp numbers is what I am looking at.  Anyway, yeah, that's it.

Q.   This is the one I am looking at.

A.   Yes, I looked at it like that.

Q.   That's your signature?

A.   Yeah.

Q.   Why did the parties, Alfred Lutter, Noel Mijares, Lisa Cote and Steven Cerasale enter into this agreement?

A.   Alfred wanted to do a separate agreement for the licensing of the software in Florida.

Q.   So now instead of three shareholders now we have four. Correct?

A.   Yes.

          THE COURT:  I'm sorry, Counsel, is your microphone on?

          We can't hear you if your back is turned.  The lapel mic is fine, but you need to turn it closer.

          Yes, I hear you.

          MR. SANCHELIMA:  Are we ready?

          THE COURT:  Yes.

BY MR. SANCHELIMA:

Q.   Do you know why this agreement was signed?

A.   Yes.

Q.   Why?

A.   Because Alfred wanted to be compensated for the software separately, and he wanted to have a separate license for the Florida work that he had done, so we did.

Q.   And also because we -- the shareholders here wanted to get rid of the 2006 agreement, wasn't it?  That was the purpose of this agreement?

A.   I don't think so.

Q.   All right.  What does paragraph 1.1 say?

A.   It says, "This agreement terminates the other one, doesn't it?"

Q.   Correct.  The operating agreement, in other words, the 2006 agreement is terminated effective as of the closing and shall be of no further force or effect following the closing.  And in the whereas, the operating agreement is defined, correct, as the one from June 15th, 2006.  So with this agreement -- do you agree with me?

A.   I haven't read it all the way through but the new one would have to supplant the same -- would have to have the same stuff on it as the other one, I would think, to be of any value but maybe not.  Maybe it's fine the way it is.

Q.   Well, it says -- it defines the 2006 agreement.  It says that it's going to be null and void.

A.   Well, that makes sense, wouldn't it?  Would you make one

null and void and make another one?

Q.   So we start a new one, a new life, reset buttons?

A.   You couldn't have two operating agreements at the same time, right.

Q.   Yes, but the 2006 was terminated, wasn't it, according to this language?

A.   That's what it says.

Q.   Then if we go to the next page, in paragraph 1.3, this paragraph is entitled trademark.  Do you see that?

A.   Right.

Q.   Could you read what it says after the word trademark.

A.   "Unisource Discovery Digital Document Retrieval is a registered U.S. trademark of the company.  Without limiting the foregoing, the parties agree that the company shall be entitled to use the trademark Unisource Discovery as part of its corporate name, Unisource Discovery, Inc., or fictitional business or otherwise."

Q.   Correct.  So the first sentence here is an acknowledgment that the registration is a trademark of the company, and by the company, of course, we are referring to Unisource Discovery, Inc., a Florida corporation, and your signature is in this agreement?

A.   Yes, it's my signature.

Q.   So you knew that this registration existed at least as early as 2010.  Correct?

A.   This what?

Q.   This registration, this registration here?

A.   Yeah, the registration, yeah.

Q.   This one?

A.   No, I didn't know that.  I wasn't paying enough attention. I already did the mea culpa here.  I wasn't paying attention to things like that.  I was doing other things and not paying attention to registering things, and that's my fault.

Q.   I guess it's your fault also that Mr. Mijares spent 12 years developing the goodwill of Unisource Florida, investing in all this advertisement, where you didn't invest any money on advertisement to develop the business and so forth that you indirectly enjoyed from dividends that you received from Unisource Florida over the years.  Correct?

A.   I have no idea what you said, I'm sorry.  Could you repeat it?

           MR. SANCHELIMA:  Never mind.  I withdraw the question.

           MR. SANCHELIMA:  Exhibit 10, Your Honor.

           Do you have any objection to Exhibit 10, Counsel?

           This is part of the file history of the prosecution of the registration application in this case.

           MR. VELARDE:  No objection to Exhibit 10.

           MR. SANCHELIMA:  Move to admit, Your Honor.

           THE COURT:  All right.  Plaintiffs' Exhibit 10 will be admitted.

(Plaintiffs' Exhibit 10 was admitted in evidence.)

MR. SANCHELIMA:  I am not asking any questions of the witness.  I just wanted to make it part of the record.

All right.  Exhibit 11, I believe you don't have an objection to Exhibit 11 either.  Right?

MR. VELARDE:  No objection to Exhibit 11.

THE COURT:  All right.  Without objection Plaintiffs' Exhibit 11 will be admitted.

(Plaintiffs' Exhibit 11 was admitted in evidence.)

BY MR. SANCHELIMA:

Q.   Mr. Cerasale, I am handing you what has been identified as Plaintiffs' Exhibit 11, and I ask you if you have seen this document before.

A.   I read it.

Q.   Have you seen that document before today?

A.   Yes, I have.

Q.   And the address, 625 The City Drive, Suite 303, Orange, California, 92868, that's the address of Unisource California?

A.   That's correct.  That's where I got this document.

Q.   Correct?

A.   Yes, correct.

Q.   What did you do when you received this letter via -- well, first of all, let me withdraw that.

Did you receive this letter via e-mail and certified mail?

A.   I don't know.  What does it say?  It doesn't say either

way.  I don't remember -- oh, it says via e-mail and certified mail in the upper right corner.  It must be right.

Q.  Do you have any reason to doubt that you received a copy of this letter via e-mail?

A.  I don't remember.  I certainly have a copy at some point. I can't tell you how I got it.

Q.  All right.  That's fair enough for purposes of what we need here.  What did you do after receiving this letter?

A.  I started legal action against Noel for trying to tell us we can't use our own logo.

Q.  Is there -- where is that?  Is there a document showing that?

A.  I called a lawyer I did -- I don't remember what I did.  We took care of it.  I don't have -- I don't have chapter and versus on that, but, you know, we reacted to it as anybody would.

Q.  How did you react, by calling your lawyer and telling him you received this letter?  Is that what the testimony is?

A.  Yes.

Q.  What did your lawyer do?

A.  I don't recall.  I mean, I guess he -- I guess he sent Noel a letter, and I don't remember anything more about it other than, obviously, something had to be done so we did something.

Q.  Well, it looks like this is a cease and desist letter for you using the mark.  Correct?

A.   It's a what?

Q.   A cease and desist letter?

A.   Yeah.

Q.   It's asking you to stop using the mark.  Correct?

A.   That's what it says, yes.

Q.   And did you receive similar letters after this one?

A.   No.

Q.   There were no other letters after this one?

A.   No.

Q.   Okay.  So other than communicating with your lawyer, you didn't do anything else?

A.   Well, like I said, I think that was the prudent thing to do.

Q.   Did you continue using the mark --

A.   Absolutely.

Q.   -- Unisource Discovery, after receiving this letter?

A.   Absolutely.

Q.   You intended to continue using the mark.  Right?

A.   Right.

Q.   Even though it was identical to the registered mark. Correct?

A.   Because it was -- this is my company.  This is my livelihood.  I have had this logo for 22 years, and there is no way Noel can, other than fraudulently come to me and say you can't use that anymore.

Q.   Why is that?  Why do you think it was fraudulent?

A.   Because it was mine.

Q.   Because it was yours?

A.   It always was mine, and I started this company with nothing, with nobody, like one employee, and I have had somebody give me a logo and I still have it.  It's still mine as far as I am concerned, which is why we are here today.

Q.   Correct.  So maybe like your attorney said during opening statement, it was a bad deal you made with Mijares in assigning your mark and the trade name and everything else, but we are 12 years later and now you want to pull the rug from under him?

          MR. VELARDE:  Objection.

          THE WITNESS:  Tell me what rug.

          THE COURT:  Hold on sir.

          THE WITNESS:  I'm sorry.

          THE COURT:  Sustained as argumentative.  Please rephrase your question.

          MR. SANCHELIMA:  Exhibit 12, Your Honor, any objections?

          MR. VELARDE:  No objections to Exhibit 12.

          MR. SANCHELIMA:  No objections.

          Move to admit, Your Honor.

          THE COURT:  All right.  Without objection, Plaintiffs' Exhibit 12 will be admitted.

          (Plaintiffs' Exhibit 12 admitted in evidence.)

BY MR. SANCHELIMA:

Q.   Mr. Cerasale, I hand you what has been marked as Exhibit 12, and I ask you if you recognize this document that I represent to you is an e-mail from Noel Mijares to your e-mail that you previously mentioned.

Do you see that?

A.   Yes, I see it.

Q.   Did you receive this e-mail from Mr. Mijares?

A.   Yes, I am sure I did.

Q.   So this letter says, again, cease and desist immediately from contacting and purging Unisource Discovery.  Do you see that line there?

A.   I see what this letter says, yes.

Q.   What did you do after receiving this letter?

A.   I continued to try to run my business and to address this issue with Noel, which is why we are here today.

Q.   So basically because you thought that the mark was still yours, you ignored that letter.  Is that true?

A.   No.  I just told you what I did.  I didn't ignore it.  I took action.

Q.   What action did you take?

A.   I told my lawyer to get cracking on it.

Q.   Okay.  But you continued using the mark in commerce.  You continued to advertise the mark?

A.   Absolutely, I continued to use it until someone other than

Noel tells me because I don't really think he has that authority.

Q.   Okay.   And in your web page did you ever use the trademark notice?

A.   Trademark what?

Q.   Notice?

A.   I don't know what that is.

Q.   Okay.   Have you seen an R in a circle?

A.   Right.

Q.   Do you know what that is, an R in a circle?

A.   Yes.

Q.   Registered mark.   Right?

A.   Right.

Q.   Have you used that in your web page?

A.   Honestly, I don't know.   I don't think so, but we might have.

Q.   Because your company, Unisource California, has never registered a mark.   Correct?

A.   Right.

Q.   And the only --

A.   That's not correct.   We were registered with the state of California, which is not the same as PTO, but there is a mechanism for doing that as well.

Q.   Well, the record is devoid of any registration of marks.   I represent to you that maybe what you are referring to is the

corporation registration with the Secretary of State of California, maybe.

A.   I'm sorry?

Q.   We have no records -- do you have any records showing that the mark was registered?

A.   About a mark, no; the company, yes.

Q.   Correct.  So, this R in the circle that you see in the letter from Mr. Mijares, that is a notice that a mark was registered.  At that point -- did you know that?

A.   I know what, that that's what that means?

Q.   Yes.

A.   I recognize the mark.  I recognize that particular symbol, yes.

Q.   Okay.  And did you inquire at that time, May 26th, of 2020, whether the mark was still registered in the name of Unisource Florida?

A.   No.

Q.   Okay.  And your counterclaim for the cancellation of the registration was not filed until 2021.  Why did it take that long to protest the registration?

A.   I can't answer that.

Q.   What did you find from May of 2026 -- I mean, May 26th, 2020 to 2021 when the counterclaim for the cancellation of the mark was filed that you think constituted a fraud that was perpetrated on the copy -- on the trademark office back in

2008.  What did you uncover?

A.   The fact that on the paperwork that Noel filed with PTO he said that he started doing business in March of 2001, which is a lie.

Q.   Well, it all depends.

A.   No, either way it's a lie.  Depends on what --

Q.   Not if your company is --

THE COURT:  Again, gentlemen, one at a time, please.

BY MR. SANCHELIMA:

Q.   Do you know -- well, you studied law, but you didn't specialize in intellectual property.  Correct?

A.   What, my company?

Q.   Yes.

A.   No, we did records.

Q.   Do you know what a predecessor in interest is?

A.   No, I don't know what that means.

Q.   Did you resign as a director of Unisource Florida?

A.   Yes.

Q.   When was that?

A.   You are probably looking at it there, aren't you?

Q.   Yes.

A.   Then you tell me because I don't know.

MS. SANCHELIMA:  Okay.  Exhibit 13.

MR. VELARDE:  No objection to that.

MR. SANCHELIMA:  No objection, Your Honor.  I move to

introduce in the record Plaintiffs' Exhibit 13.

THE COURT:  Without objection, Plaintiffs' Exhibit 13 will be admitted.

(Plaintiffs' Exhibit 13 was admitted in evidence.)

BY MR. SANCHELIMA:

Q.   Do you recognize that document?

A.   Yes, I do.

Q.   That's your signature.  Correct?

A.   Yes, that's my signature.

Q.   All right.  So, May 15 of 2018, your relationship with Mr. Mijares was not the best.  Correct?

A.   Correct.

Q.   And you decided to resign?

A.   I decided to what?

Q.   Resign.

A.   Yes.

Q.   No longer a director?

A.   Right.

Q.   Now, had that occurred prior to 2010 when the 2006 operating agreement was effective, you would have picked up your toys and go home, including the trade name.  Correct?

A.   Right.

Q.   But now is it your position that you should ask Unisource Florida to discontinue the use of Unisource Florida because you resigned?

A.   I don't understand the question.  Could you repeat it?

Q.   Okay.  Under the operating agreement of 2006, there was a clause there that to move forward they were going to use Unisource Discovery, Inc.  Correct?

A.   Right.

Q.   Now, in 2018 you resign?

A.   Right.

Q.   Had you resigned before 2010, before the agreement was terminated and became null and void, you could have said, hey, Noel, I am picking my toys, going home, stop using Unisource Discovery, Inc.  Correct?

A.   Right.

Q.   But in 2018, so many years later, is it your position that you can still do that?

A.   Yes.

Q.   Even in the state of Florida?

A.   I don't know the state of Florida laws exactly, but, yeah, I think so.

I don't think I have to -- I don't have to stay in partnership with someone who is that dishonest.  I think I can get out of it.

Q.   Well, it's not a matter of partnership.  It's a matter of whether or not --

A.   No, it's a matter of partnership.

Q.   Sorry, go ahead.

A.   It's a matter of partnership.  I said I didn't want to be in partnership with him, anymore and I sent him a letter to that effect.

The other thing you want to look at, I wrote second notice out here because I had asked him at least two other times to acknowledge the fact that I didn't want to be a director anymore.  He didn't get back to me.  You asked me about the time, why it did it take me so long, that might have done something to do with it.

Q.   But you cannot enforce any provisions from the 2006 agreement to take the mark back?

A.   Right.

THE COURT:  All right.  While we are gathering our thoughts, we have to take our final break.

Why don't we take ten minutes?

Again, don't discuss anything about the case.

We will conclude at 5 o'clock today.

(The jury exited the courtroom at 4:18 p.m.)

THE COURT:  All right.  Ten minutes, please.

MR. SANCHELIMA:  Your Honor, your admonition to not discuss the case applies to the witness too?

THE COURT:  You are invoking the rule?

MR. VELARDE:  Yes, Your Honor.

THE COURT:  Well, the rule is invoked.

And while we are at it, I misunderstood the objection

before regarding the motion in limine, and I thought you were referring to the earlier one, but you were referring to the earlier order issued by Judge Otazo-Reyes.

MR. VELARDE:  Yes, Your Honor.  My apologies, it was Judge Otazo-Reyes.

THE COURT:  Okay.

MR. VELARDE:  Yes, it had to do with the dispute between Mr. Alfred Lutter and Unisource Discovery of Florida, and Judge Otazo-Reyes had granted that motion in limine that that evidence should not come in.

However, the only reason, Your Honor, is because it would have created the need to bring more evidence to kind of explain that away, and it would have just been a waste of time and potentially confusing the jury.  But since that evidence came in, Your Honor, we will respond with evidence.

THE COURT:  Okay.

MR. SANCHELIMA:  Your Honor, I believe that counsel is referring to Docket Entry 184, which is an order from Magistrate Otazo-Reyes, and the way I understand that order to read is that the specific letter, the paragraph on the first page, of April 15, 2010, would be excluded, but not necessarily that the topic is taboo or that there cannot be any testimony about it.  At least that's the way I read it last time.

THE COURT:  She said -- well, the motion, according to this, was the exclusion -- it says, "Defendants first argued

that the Court should exclude evidence remaining to nonparty Alfred Lutter's April 15th, 2010, demand letter and its referenced underlying dispute."

Although, there is a reference to the letter itself, I mean, you asked basically about the substance of it, which arguably does violate her order.

The whole point was her finding that it was marginally relevant.  I can't disagree with her that it's marginally relevant, but -- I don't find it to be unduly prejudicial so you mentioned it, the jury can put whatever weight to it they think it deserves and we will proceed.

I don't need to hear any more argument about it.  It's already happened.

MR. SANCHELIMA:  I didn't argue that particular motion.

THE COURT:  Counsel, we all need a break.

MR. SANCHELIMA:  Okay.

THE COURT:  The bell has already rung.

MR. SANCHELIMA:  Thank you, Your Honor.

THE COURT:  I will say though, in the Court's prior rulings it doesn't matter who were the attorneys.  The rulings are what they are.

All right.  We will be in recess for ten minutes.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURTROOM DEPUTY:  All rise.  Court is back in session.

THE COURT:  All right.  Are we ready to proceed?

Let's bring them in.

(The jury entered the courtroom at 4:33 p.m.)

THE COURT:  All right.  Please be seated.

Let's proceed.

MR. SANCHELIMA:  Yes, Your Honor.

Counsel, do you have any objections to Exhibit 14?

MR. VELARDE:  That's the one that was changed this morning?

MS. ESTEVEZ:  Yes.

MR. VELARDE:  I was just pointing out that I can't make out the date at the bottom of this document, but other than that we have no objection.

THE COURT:  Well, what is the date?

All right.  Counsel, if you -- just so you know, your microphone is on.  If it's a private conversation, you can turn it off.

Is there still a stipulation?

MR. VELARDE:  I believe the stipulation is that the date wasn't legible, with that stipulation.  Otherwise, we would object that the date is not legible.

THE COURT:  Are you agreeing to the admission of the exhibit, yes or no?

MR. VELARDE:  I believe that Mr. Sanchelima is agreeing it's illegible.

THE COURT:  Well, listen to my question.

Are you agreeing to the admission of this document, yes or no?

MR. VELARDE:  I apologize, Your Honor, yes.

THE COURT:  Okay.  Exhibit 14 will be admitted.

MR. SANCHELIMA:  Thank you, Your Honor.

(Plaintiffs' Exhibit 14 add mid in evidence.)

BY MR. SANCHELIMA:

Q.  Mr. Cerasale, I call your attention to Exhibit 14 that you have in front of you.

Do you see that document?

A.  Yes.

Q.  Do you recognize it?  Do you know what it is?

A.  No, not offhand.

Q.  Isn't that --

A.  It looks like a part of a website --

THE COURT REPORTER:  I'm sorry, you need to speak closer to the mic.  I need to capture your exact words.

THE WITNESS:  It's a redesign -- images from the redesign of the website that we did a while ago.

BY MR. SANCHELIMA:

Q.  All right.  So, if you look at the top, it says www.unisourcediscovery.com.

Do you see that at the top in the URL field?

A.  Yeah, I guess it's real faint, of course, but it looks like

that's what it says.

Q.   That's your website.  Correct?

A.   Right.

Q.   If you go to the bottom, where it says employee login, do you see that?

A.   Yes.

Q.   That's how your employees log into the web page?

A.   Some of them do.  Some of them have direct access.

Q.   Then it says, "privacy policy."  Do you see that?

A.   Yes.

Q.   Then after that it says, "2020," followed by "Unisource Discovery and logo."  Do you see that?

A.   Let me look at it over here.  Okay.

Q.   Then after that it says, "registration."

Do you see that?

A.   Yes, I can see it.  I can make it out.

Q.   Why would you use registered trademarks in your web page when your company does not have a registered mark?

A.   I can't explain that.

Q.   Do you agree with me that that's a false statement?

A.   No, I would have to look into it more like why it's there, what happened, but I can't -- it seems like there is something wrong, but I can't tell you what it is.

I can't agree with you on anything until I could research that a little more carefully.

Q.   You can't agree with me because you don't like the word false?

A.   Because I don't like what?

Q.   You don't like the word false?

A.   False.

Q.   False, yes, that's a false statement, isn't it?

A.   Maybe.  I mean, I can't answer that question.

Q.   Okay.

A.   Could you --

Q.   Okay.  Let me ask you then -- I believe you testified before that your company had not registered a mark before.  Are you changing your testimony now?

A.   We have -- we registered with the state of California. That's all we ever did until you came along.

Q.   Well, that's a corporate name.  That's not a trademark, is it?

A.   Right.

Q.   What it says here is registered trademark?

A.   It doesn't sound right.  I agree with you on the face of it, but I can't make that statement.

Q.   But you are not ready to agree with me it's a false statement?

A.   Yes, that's correct.

Q.   Do you believe this was a true statement?

A.   Pardon me?

Q.   Do you believe that that's a true statement that your company has registered trademarks?

A.   I don't think so, but maybe, I don't know.  I just -- you know, somebody might have done something.  I don't know, but it seems like it needs to be addressed.  That's all I can say.

Q.   But as it stands now in front of you, it is fair to say it's a false statement.  Correct?

A.   I think it bears looking into.

Q.   Fair enough.

Of course, the date on the right-hand side corner, which counsel was bringing to my attention and I couldn't read it, I don't know if we can magnify it so we can see what it says.  It looks to me, September 30th, 2021, but I will defer to another witness to ask some questions about that.

Thank you.

Let's see.  Let's talk about money now.

What are the annual sales of Unisource California in 2021?

A.   I don't have the final numbers for that.  It's probably around, I don't know -- I don't really know.  It's somewhere, 10 million maybe, but I really don't -- I don't have those documents with me.  I have them somewhere but not with me.

Q.   But it would not be less than 5 million.  Correct?

A.   No.

Q.   And your best estimate is 10 million, but it could be more.  Right?

A.   It could be more, could be less.  I'm not positive.

Q.   How many employees did you have in 2021?

A.   I don't know.  I know right now we have more than that.  We have -- we have like 120 or 130 or something.

Q.   In 2021 you had more or less?

A.   Less.

Q.   And in 2020?

A.   I don't know, I can't do this.  If you want me to look at the numbers, I can look at the numbers, but I can't just speculate on what these numbers are.  I gave you a ballpark number, which is all it is.

Q.   For 2021.  Well, do you have a ballpark number as to what your sales were in 2020?

A.   No, I don't.

Q.   Could it be also $10 million?

A.   Probably not, probably less than that.

Q.   But not less than 5 million.  Correct?

A.   You asked me that, and I said, yes.  I said, no, but it was definitely in that range.

Q.   That was for 2021?

A.   Yeah.

Q.   So, 2021, what was the -- what is your best estimate as to the sales in 2019?

         MR. VELARDE:  Objection, 2019.

         THE COURT:  Hold on.  There's an objection.

What's the objection?

MR. VELARDE:  The parties stipulated in the joint pretrial stipulation that plaintiff, Unisource Florida, is not seeking any damages before 2020, so information regarding --

THE COURT:  So the objection is relevance?

MR. VELARDE:  Relevance, Your Honor, yes.

THE COURT:  All right.  Sustained.

MR. SANCHELIMA:  Your Honor -- all right.

BY MR. SANCHELIMA:

Q.   What were your expenses in 2021?

A.   I don't know, less than we -- less than the revenue, I hope.

Q.   Because you have a profitable business, correct, in California?

A.   Sometimes.  Sometimes it's not.

Q.   And in 2020, was there a profit?

A.   I don't know.

Q.   But the expenses were less than the sales.  Correct?

A.   Probably, or we'd be in trouble so -- I really.  I don't see a point in speculating about all of this.  If you want to ask that information, we can give it to you, but I can't just tell you off the top of my head how much revenue, how much expenses we have on an annual basis.  I wish I was that good.

Q.   Well, your attorney didn't want to provide that information.  That's why I am asking you now.

MR. VELARDE:  Objection.

THE WITNESS:  When did you ask him for it?

THE COURT:  Sustained.  Please rephrase your question.

MR. SANCHELIMA:  I withdraw it, Your Honor.

BY MR. SANCHELIMA:

Q.   Did Unisource California request a PP loan in 2021?

A.   What is that?

Q.   A PP loan.  Do you know what the PP loan is?

A.   It's three Ps.

Q.   Three Ps?

A.   Okay.  I know what three Ps are, not two Ps.

Q.   Well, three Ps?

A.   That's what it is.

Q.   You requested a loan on behalf of your corporation. Correct?

A.   Yes.

Q.   And in 2021, it was over half a million dollars.  Correct?

A.   I don't remember again but something in that range.

Q.   And in 2020 you asked for another triple P loan. Correct?

A.   We got two.  I don't remember what year.

Q.   You got two.

The one for 2020 was over $600,000.  Correct?

A.   I am not sure, probably.

MR. SANCHELIMA:  Thirty seconds, Your Honor.

BY MR. SANCHELIMA:

Q.  For the sake of accuracy, I am showing you a form with triple P loan data, and I call your attention to the first entry there that says $582,600 loan --

A.  Right.

Q.  -- to a limited liability company.  Do you see that?

A.  Yep, I do.

Q.  The address is 625 --

THE COURT:  I'm sorry, Counsel.  You can't read from a document that's not in evidence.

If you want to refresh his recollection, you can but --

BY MR. SANCHELIMA:

Q.  Okay.  That amount, that was the loan that you requested?

A.  Yes.

Q.  Was that loan forgiven?

A.  Yes.

Q.  And that's income to your corporation.  Correct?

A.  Actually, it's not.  You need to look a little bit before you make those comments.  It's not income.

Q.  I am just asking.  It's not?

A.  It's not.

Q.  So how do you account for it?

A.  You don't have to account for it.  You probably should talk to your accountant.  This was a one-time freebie from the U.S. Government for PPP loans and you are not -- you don't have

to pay tax on it.

Q.   You don't pay taxes on it but it goes through your books.
Right?

A.   Right.

Q.   It's an income for your cooperation.  Correct?

A.   Is what?

Q.   Income for your corporation, for?

A.   I don't know how we classify it, but it's not income.  It's
not income in the U.S. Government.  It's not taxable.  It was a
free gift from the Government.

Q.   A gift is income.  Correct?

A.   It's money.  I don't know -- I don't know if accountants
classify that as income.  There is a lot of different words
there.

Q.   It's not an expense.  Correct?

A.   It's not an expense.  It's a gift.

Q.   Correct.

     And then below it says 648 --

        THE COURT:  Counsel, again, I am not going to allow you
to read from a document not in evidence.

BY MR. SANCHELIMA:

Q.   And you mentioned that there was another loan, this time
from 2020.  Correct?

A.   Right.

Q.   And would it be fair to say that the amount was $648,800?

A.   I'm sure that's close.

You got it on a piece of paper there so you have more information than I have.

Q.   Well, you have it in front of you too, if that helps you make your recollection more accurate.

A.   It's here.  It's right here.

Q.   So you agree that was a second loan.  Right?

A.   Yeah.  Yeah.

Q.   And, again, a gift?

A.   Yeah, they are gifts.  Everybody got them.

MR. SANCHELIMA:  Thirty seconds, Your Honor.

THE COURT:  Okay.

MR. SANCHELIMA:  Your witness.

THE COURT:  Well, ladies and gentlemen, it's close to 5:00, so we will resume with the examination by defense counsel tomorrow.  We will start back at 9:30 a.m.

Please don't discuss anything about the case and, again, you are going to report directly to the jury room when you arrive tomorrow morning.

All right.  Have a good evening.  See you in the morning.

Make sure you take your note pads with you.

Sir, just wait until the jury leaves, please.

THE WITNESS:  I'm sorry.

(The jury exited the courtroom at 4:54 p.m.)

THE WITNESS:  Can I throw this in the trash?

THE COURT:  They will retrieve the documents.

You can just leave them there.

Anything else on behalf of the plaintiff for today?

MR. SANCHELIMA:  Nothing, Your Honor.

THE COURT:  For the defense?

MR. VELARDE:  Nothing, Your Honor.

MR. ZORRILLA:  Other than, Your Honor, I want to bring something to the Court's attention relating to the evidence.

THE COURT:  Okay.

MR. ZORRILLA:  There was an objection that was made about a motion in limine which the Court --

THE COURT REPORTER:  Can you pull the microphone closer to you, please.

MR. ZORRILLA:  We were going to let that go, the issue of evidence coming in on the letter that Mr. Lutter had written, that whole issue that Magistrate Otazo-Reyes had already ruled.

Mr. Velarde and I discussed letting that go and not asking for some kind of a curative instruction but now we got into a second question where Mr. Sanchelima asked a question that I think was very unfair, which says your attorney never asked, never provided that information to us.

I am talking about revenues and expenses.

I know that Your Honor sustained the objection, but

it's still in the jury's mind that the attorney did not give the information.  The fact is, Your Honor, that that information was never requested.  There has never -- that information has never been requested by the plaintiff, and I think it's misleading to the jury.

It's already heard two things that may impinge upon counsel's credibility.  The first, that there was a motion in limine which was overruled but, in fact, it turned out to be an inaccurate objection.  And the second one is that counsel never provided information in a case relating to income and expenses, and I think at this point, at least on that issue, we might get some kind of curative instruction by the Court.

THE COURT:  All right.  Well, did you ever ask for that discovery?

MR. SANCHELIMA:  Your Honor, we joined the litigation after discovery cutoff, but my understanding is that this information should have been provided with the initial disclosures, at the very least.

There were some requests for production that were not very artfully crafted, and they are relying on those limitations in the request for production for not producing this critical sales documents.  So that leaves us with, you know, basically our position is that they should have produced that with initial disclosure without any kind of request for production.

Again, we were not involved in the request for production, the discovery. We joined the litigation after discovery cutoff.

MR. VELARDE: Can I respond to that very briefly, Your Honor?

THE COURT: It's not necessary. If, in fact, the documents weren't specifically requested or it wasn't subject to any request for production, if, in fact, the plaintiff believed that it should have been produced, it's a little careless, I think, to make the suggestion that you made to the jury. I -- from your question, I understood that to mean that you made a request and it wasn't complied with.

I sustained the objection. I don't think there is a need for me to address with a curative, but Counsel, again, today I let you get away with a violation of the motion and the Court's order on the motion in limine because I misunderstood which order they were talking about because that was a Judge Otazo-Reyes order and not something I ruled on.

Now you've suggested something that is not accurate, so, I mean, be very careful with the representations that you make. Okay.

All right.

MR. SANCHELIMA: Yes, Your Honor.

THE COURT: All right. Anything else?

MR. SANCHELIMA: No, Your Honor.

THE COURT:  All right.  We will be in recess until 9:30 tomorrow.

COURT SECURITY OFFICER:  All rise.

(Proceedings were adjourned at 5:00 p.m., to be continued in Volume 2.)

C E R T I F I C A T E


          I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.




June 26, 2023              /s/Patricia Diaz_____
DATE                       PATRICIA DIAZ, FCRR, RPR, FPR
                           Official Court Reporter
                           United States District Court
                           400 North Miami Avenue, 11th Floor
                           Miami, Florida 33128
                           (305) 523-5178

## $

**$10** [1] - 182:15
**$2,000** [1] - 139:25
**$20,000** [1] - 140:3
**$3,000** [1] - 140:1
**$582,600** [1] - 185:4
**$600,000** [1] - 184:23
**$648,800** [1] - 186:25

## '

**'80s** [1] - 106:7
**'90s** [1] - 106:7
**'Discovery** [1] - 145:2
**'Unisource'** [1] - 145:2

## /

**/s/Patricia** [1] - 192:9

## 0

**000477** [1] - 153:13

## 1

**1** [6] - 1:6, 1:8, 70:24, 71:24, 87:24, 121:15
**1.1** [1] - 161:10
**1.3** [1] - 162:8
**1.4** [3] - 123:9, 135:15, 136:15
**10** [14] - 2:21, 29:21, 71:2, 72:2, 90:14, 90:21, 91:3, 163:18, 163:19, 163:22, 163:24, 164:1, 181:20, 181:24
**103** [1] - 2:14
**10:00** [2] - 25:16, 29:22
**10:09** [1] - 17:15
**10:11** [1] - 18:6
**10:30** [1] - 25:16
**11** [11] - 2:21, 28:22, 47:20, 68:18, 121:2, 164:4, 164:5, 164:6, 164:8, 164:9, 164:12
**115** [1] - 2:17
**116** [1] - 2:17
**117** [1] - 2:17
**119** [2] - 2:17, 2:18
**11:17** [1] - 62:15
**11:45** [1] - 71:15
**11:46** [1] - 72:7
**11th** [2] - 1:24, 192:11

**12** [14] - 2:22, 13:8, 48:11, 71:3, 72:3, 93:21, 94:3, 163:10, 167:11, 167:18, 167:20, 167:24, 167:25, 168:3
**12-year** [1] - 93:25
**120** [2] - 2:18, 182:4
**121** [1] - 2:18
**124** [1] - 2:18
**12:00** [3] - 26:22, 27:9, 27:11
**12:01** [1] - 80:7
**12:05** [1] - 81:11
**13** [11] - 2:22, 29:16, 43:15, 49:8, 64:11, 148:22, 157:10, 171:23, 172:1, 172:2, 172:4
**130** [1] - 182:4
**1395** [1] - 1:19
**14** [13] - 2:23, 48:1, 49:19, 58:21, 69:17, 95:25, 117:1, 155:14, 157:10, 177:7, 178:5, 178:7, 178:9
**14th** [1] - 117:24
**15** [12] - 5:2, 10:7, 10:9, 50:22, 62:7, 70:1, 132:17, 159:24, 160:2, 160:3, 172:10, 175:21
**152** [1] - 2:19
**153** [1] - 2:19
**156** [1] - 2:20
**159** [1] - 2:20
**15th** [2] - 161:17, 176:2
**16** [7] - 10:7, 10:12, 21:13, 51:19, 70:6, 95:2, 130:8
**164** [2] - 2:21, 2:21
**168** [1] - 2:22
**17** [3] - 2:3, 52:10, 70:11
**172** [1] - 2:22
**178** [1] - 2:23
**18** [10] - 2:4, 10:7, 11:2, 11:3, 11:6, 14:3, 53:14, 70:15, 71:3, 72:4
**184** [1] - 175:18
**19** [3] - 22:15, 54:8, 106:5
**1989** [1] - 103:25
**1999** [1] - 150:12
**1:15** [3] - 81:5, 81:9, 83:8
**1:17** [1] - 83:18

## 2

**2** [12] - 2:17, 70:25, 71:25, 115:9, 115:11, 115:12, 115:15, 116:8, 116:12, 116:13, 191:5
**2.1** [1] - 124:7
**20** [15] - 5:2, 5:3, 5:4, 5:6, 5:8, 5:13, 5:14, 21:21, 34:6, 96:5, 100:15, 100:20, 101:23, 102:9
**20-CV-23276** [1] - 3:3
**20-CV-23276-DPG** [1] - 1:2
**2001** [13] - 19:2, 19:14, 86:7, 87:5, 95:7, 96:8, 96:18, 96:19, 97:1, 100:2, 101:24, 107:7, 171:3
**2005** [5] - 87:6, 87:10, 97:10, 107:11, 109:3
**2006** [36] - 19:3, 87:22, 87:24, 88:4, 90:22, 95:25, 96:8, 96:18, 97:1, 98:7, 101:25, 110:6, 110:10, 111:3, 112:11, 115:16, 117:1, 117:8, 117:24, 120:16, 122:7, 122:11, 122:21, 129:19, 144:21, 145:14, 157:6, 157:20, 161:7, 161:13, 161:17, 161:23, 162:5, 172:19, 173:2, 174:10
**2008** [17] - 8:7, 19:25, 47:13, 88:25, 93:19, 95:17, 96:11, 99:11, 101:25, 130:8, 148:1, 148:5, 148:6, 148:9, 148:16, 171:1
**2009** [10] - 19:9, 89:13, 89:15, 89:19, 148:1, 148:4, 148:7, 148:9, 148:16, 148:19
**2010** [10] - 90:19, 94:5, 157:7, 158:11, 159:21, 162:25, 172:19, 173:8, 175:21, 176:2
**2015** [2] - 91:17, 101:18
**2016** [2] - 47:9, 101:18

**2017** [1] - 101:18
**2018** [5] - 12:19, 101:19, 172:10, 173:6, 173:13
**2019** [6] - 91:11, 91:24, 101:19, 101:21, 182:23, 182:24
**2020** [22] - 19:12, 47:10, 92:22, 92:25, 96:1, 96:15, 100:9, 100:12, 101:17, 102:1, 102:2, 102:6, 170:14, 170:23, 179:11, 182:7, 182:13, 183:4, 183:16, 184:19, 184:23, 186:23
**2021** [13] - 148:19, 170:19, 170:23, 181:13, 181:17, 182:2, 182:5, 182:12, 182:20, 182:22, 183:10, 184:6, 184:17
**2022** [3] - 1:5, 67:20, 154:17
**2023** [1] - 192:9
**2026** [1] - 170:22
**2029** [1] - 91:13
**21** [3] - 94:25, 95:15, 95:24
**21st** [1] - 154:17
**22** [1] - 166:23
**235** [1] - 1:15
**24** [3] - 30:19, 60:24
**25** [10] - 19:5, 19:6, 34:6, 87:19, 87:20, 97:24, 124:16, 131:11
**26** [1] - 192:9
**26th** [2] - 170:14, 170:22
**2881** [1] - 103:12
**28th** [1] - 159:21
**2:00** [1] - 34:2
**2:45** [1] - 132:22
**2nd** [1] - 115:16

## 3

**3** [13] - 2:17, 30:11, 70:25, 71:25, 116:25, 117:5, 118:9, 118:19, 118:20, 132:20, 134:2, 134:17
**3.1** [2] - 124:19, 124:23
**3.2** [2] - 124:16, 124:18
**30** [2] - 42:20, 58:25
**303** [1] - 164:17

**305** [2] - 1:25, 192:12
**30th** [1] - 181:13
**33128** [2] - 1:24, 192:11
**33131** [1] - 1:19
**33134** [1] - 1:16
**39** [2] - 155:8, 155:14
**3:00** [2] - 29:22, 34:2
**3:03** [1] - 134:25

## 4

**4** [7] - 2:18, 71:1, 72:1, 118:23, 119:2, 120:10, 120:12
**4.1** [3] - 125:10, 129:11, 129:23
**4.10** [1] - 136:24
**4.2** [4] - 126:5, 126:22, 127:6, 127:10
**4.9** [4] - 135:13, 135:24, 137:21, 139:18
**40** [7] - 21:6, 58:23, 98:1, 100:25, 101:4, 103:4, 149:1
**400** [2] - 1:23, 192:11
**45** [1] - 58:23
**4:18** [1] - 174:18
**4:33** [1] - 177:3
**4:54** [1] - 187:25

## 5

**5** [17] - 1:5, 2:18, 71:1, 72:1, 120:14, 120:22, 123:24, 124:3, 124:4, 135:7, 135:8, 135:9, 145:20, 174:17, 181:22, 182:17
**50** [13] - 19:4, 87:18, 87:21, 90:14, 97:23, 99:4, 99:7, 110:16, 111:8, 111:24, 124:16, 131:9, 132:5
**500** [1] - 124:25
**523-5178** [2] - 1:25, 192:12
**55** [1] - 2:5
**5:00** [7] - 1:7, 25:13, 25:16, 30:11, 81:7, 187:15, 191:4
**5th** [1] - 67:20

## 6

**6** [7] - 2:19, 66:7, 71:2, 72:2, 151:25, 152:6, 152:9

**60** [1] - 2:6
**607** [1] - 10:9
**625** [2] - 164:17, 185:8
**63** [1] - 2:7
**648** [1] - 186:18
**6:00** [2] - 27:12, 28:1

## 7

**7** [6] - 2:19, 119:20, 152:24, 153:2, 153:6, 153:9
**72** [2] - 2:8, 2:9

## 8

**8** [8] - 2:20, 25:25, 156:8, 156:11, 156:15, 156:17, 156:19, 159:8
**85** [1] - 2:10
**8:00** [1] - 34:1

## 9

**9** [7] - 2:20, 58:21, 159:11, 159:13, 159:14, 159:16, 159:17
**92868** [1] - 164:18
**94** [1] - 2:11
**9:00** [1] - 26:10
**9:30** [4] - 1:7, 25:15, 187:16, 191:1

## A

**a.m** [8] - 1:7, 17:15, 18:6, 29:22, 62:15, 71:15, 72:7, 187:16
**ability** [8] - 20:6, 22:4, 36:11, 42:17, 53:7, 67:25, 75:16, 92:2
**able** [15] - 5:9, 5:11, 6:24, 25:9, 26:9, 26:15, 28:5, 43:20, 48:1, 87:13, 89:9, 92:7, 93:7, 125:24, 126:24
**above-entitled** [1] - 192:5
**absolutely** [5] - 82:17, 134:12, 166:15, 166:17, 168:25
**accelerate** [1] - 9:1
**accept** [17] - 64:20, 65:6, 65:13, 65:19,

66:2, 66:8, 66:13, 66:18, 66:24, 67:6, 68:20, 69:17, 70:2, 70:7, 70:11, 70:16, 70:20
**Accept** [1] - 70:22
**accepting** [1] - 118:8
**access** [1] - 179:8
**accident** [1] - 85:15
**accommodate** [2] - 32:25, 103:7
**accommodating** [1] - 27:23
**according** [6] - 6:6, 146:21, 146:25, 156:2, 162:5, 175:24
**account** [7] - 75:15, 88:21, 91:25, 113:3, 113:16, 185:22, 185:23
**accountant** [1] - 185:24
**accountants** [1] - 186:12
**accounting** [2] - 47:12, 57:4
**accounts** [2] - 39:9, 113:6
**accuracy** [1] - 185:2
**accurate** [5] - 23:16, 23:22, 187:5, 190:19, 192:4
**accuses** [1] - 13:15
**acknowledge** [1] - 174:6
**acknowledges** [5] - 90:25, 126:6, 127:8, 127:13, 128:1
**acknowledging** [2] - 91:4, 94:7
**acknowledgment** [1] - 162:18
**Acosta** [3] - 24:8, 29:12, 49:5
**acquire** [1] - 78:19
**action** [5] - 92:13, 119:1, 165:9, 168:20, 168:21
**actions** [1] - 10:24
**activities** [1] - 68:3
**acts** [1] - 93:11
**actual** [2] - 11:15, 12:10
**add** [1] - 178:7
**addendum** [5] - 145:21, 145:23, 145:25, 146:3, 146:9
**addition** [4] - 3:24, 36:22, 78:1, 93:6
**additional** [5] -

38:22, 44:12, 47:23, 56:4, 75:23
**additionally** [1] - 68:4
**address** [12] - 15:25, 24:14, 24:15, 103:11, 113:20, 133:1, 133:16, 164:17, 164:18, 168:15, 185:8, 190:14
**addressed** [3] - 15:18, 81:18, 181:5
**addresses** [1] - 145:24
**adequate** [2] - 93:9, 93:11
**adjourned** [1] - 191:4
**adjudication** [1] - 6:13
**adjustment** [1] - 135:5
**administer** [1] - 18:5
**administration** [1] - 50:1
**admission** [2] - 177:22, 178:2
**admit** [6] - 11:13, 11:14, 152:2, 159:8, 163:23, 167:22
**ADMITTED** [1] - 2:16
**admitted** [29] - 75:7, 116:12, 116:13, 118:19, 118:20, 120:11, 120:12, 124:3, 124:4, 134:5, 146:14, 152:8, 152:9, 153:2, 153:6, 156:16, 156:17, 159:10, 159:16, 159:17, 163:25, 164:1, 164:8, 164:9, 167:24, 167:25, 172:3, 172:4, 178:5
**admonition** [1] - 174:20
**adopted** [2] - 87:5, 88:4
**advance** [5] - 25:7, 32:22, 32:23, 33:1, 33:2
**adversely** [1] - 67:25
**advertise** [4] - 153:25, 154:3, 155:15, 168:24
**advertised** [2] - 113:13, 114:14
**advertisement** [5] - 153:10, 153:23, 155:24, 163:11,

163:12
**advertising** [2] - 155:20, 156:4
**advised** [1] - 67:13
**affairs** [4] - 37:7, 49:20, 125:12, 129:25
**affect** [5] - 20:6, 22:4, 42:17, 53:6, 67:25
**affecting** [1] - 75:22
**afternoon** [6] - 30:11, 51:4, 80:18, 85:10, 94:16, 103:2
**afterwards** [2] - 79:17, 87:2
**age** [2] - 77:25, 104:10
**agency** [3] - 33:13, 33:17, 57:13
**agent** [1] - 98:16
**agents** [2] - 126:10, 126:11
**aggressiveness** [2] - 33:12, 34:5
**ago** [17] - 7:22, 11:10, 22:13, 23:9, 34:24, 42:10, 42:20, 92:25, 139:5, 147:24, 148:22, 154:17, 157:10, 159:10, 178:20
**agree** [24] - 11:14, 12:9, 12:10, 12:20, 63:16, 63:20, 64:8, 64:11, 64:16, 69:15, 124:20, 128:13, 136:23, 144:6, 149:14, 152:15, 161:18, 162:14, 179:20, 179:24, 180:1, 180:19, 180:21, 187:7
**agreed** [10] - 62:20, 63:14, 76:1, 97:15, 97:23, 98:7, 142:2, 144:25, 146:18
**agreeing** [4] - 157:4, 177:22, 177:24, 178:2
**agreement** [65] - 64:9, 87:22, 90:18, 90:20, 90:22, 90:24, 91:1, 91:4, 94:6, 98:9, 98:10, 98:12, 110:25, 111:1, 112:11, 114:4, 117:9, 117:12, 117:25, 118:2, 118:3, 118:4, 118:13, 120:16, 121:5, 128:5, 132:5, 135:15, 135:16, 136:14,

136:15, 138:1, 138:24, 139:9, 139:14, 139:24, 140:18, 141:11, 141:14, 141:17, 141:18, 142:5, 145:2, 145:14, 146:6, 157:17, 160:1, 160:12, 160:13, 160:25, 161:7, 161:8, 161:11, 161:13, 161:14, 161:16, 161:17, 161:23, 162:22, 172:20, 173:2, 173:8, 174:11
**Agreement** [1] - 159:21
**agreements** [2] - 146:4, 162:3
**agrees** [2] - 74:16, 137:5
**ahead** [1] - 173:25
**Ahmad** [5] - 18:5, 23:25, 24:15, 80:7, 135:4
**air** [1] - 139:23
**airline** [3] - 30:9, 30:20, 51:9
**airlines** [1] - 30:21
**al** [2] - 1:4, 1:7
**Alfred** [16] - 35:22, 106:14, 150:3, 150:12, 150:20, 151:12, 151:16, 151:22, 157:11, 158:20, 159:5, 160:11, 160:13, 161:3, 175:8, 176:2
**allegations** [2] - 11:25, 13:2
**alleged** [1] - 15:6
**allegedly** [2] - 19:24, 148:21
**allow** [5] - 4:22, 5:2, 63:3, 75:6, 186:19
**allowed** [14] - 12:11, 12:15, 12:25, 13:4, 13:16, 13:18, 48:19, 76:16, 100:13, 108:24, 142:9, 142:10, 142:21, 149:10
**alluding** [1] - 150:7
**almost** [2] - 11:22, 91:18
**alone** [1] - 99:24
**alternate** [4] - 62:18, 63:13, 65:4, 69:5
**alternates** [2] - 6:4, 69:7

**alternative** [1] - 92:10

**Amada** [2] - 29:15, 49:8

**American** [1] - 51:10

**amount** [5] - 4:24, 92:21, 93:9, 185:13, 186:25

**Ana** [5] - 30:7, 66:7, 67:22, 71:2, 72:2

**Anacon** [3] - 104:17, 104:19, 104:20

**analyst** [1] - 35:5

**analyze** [1] - 11:9

**Angeles** [1] - 103:12

**announce** [1] - 147:9

**annual** [2] - 181:17, 183:23

**another's** [1] - 84:3

**answer** [33] - 24:16, 24:18, 28:19, 37:10, 37:12, 37:17, 37:18, 43:15, 43:19, 46:4, 74:22, 74:23, 75:1, 101:14, 107:24, 110:18, 110:20, 113:9, 114:22, 125:2, 130:11, 130:13, 130:19, 130:20, 131:3, 131:20, 136:25, 143:19, 148:12, 149:15, 156:2, 170:21, 180:7

**answered** [1] - 59:4

**answers** [7] - 37:15, 38:1, 55:6, 59:6, 74:10, 108:16, 139:20

**anticipate** [1] - 67:22

**anyway** [3] - 137:11, 158:11, 160:6

**apart** [2] - 44:16, 148:16

**apartment** [1] - 61:21

**apologies** [2] - 11:20, 175:4

**apologize** [3] - 89:25, 90:3, 178:4

**appear** [1] - 120:20

**appearance** [1] - 80:22

**APPEARANCES** [1] - 1:12

**appearances** [1] - 3:5

**application** [11] - 6:20, 8:8, 8:11, 19:25, 89:1, 89:2, 89:13, 93:19, 99:15, 130:8, 163:21

**applications** [1] - 149:21

**applies** [1] - 174:21

**apply** [3] - 55:6, 73:8, 73:9

**appointment** [2] - 26:3, 29:6

**appreciate** [2] - 48:25, 56:1

**approach** [2] - 85:6, 154:23

**approve** [1] - 146:20

**April** [3] - 107:7, 175:21, 176:2

**Arancedo** [1] - 12:18

**area** [2] - 55:14, 58:3

**areas** [2] - 13:1, 15:18

**arguably** [1] - 176:6

**argue** [2] - 107:4, 176:14

**argued** [1] - 175:25

**argument** [1] - 176:12

**argumentative** [2] - 79:15, 167:16

**arguments** [6] - 20:4, 74:3, 74:4, 74:6, 77:21, 80:3

**Arianne** [3] - 52:10, 52:11, 70:10

**Arizona** [10] - 97:5, 138:25, 139:5, 139:7, 139:8, 139:11, 139:17, 139:19, 139:25, 140:8

**arrive** [1] - 187:19

**artfully** [1] - 189:20

**article** [1] - 129:11

**Article** [4] - 119:20, 121:15, 135:15, 136:15

**Articles** [5] - 118:25, 119:9, 119:10, 119:16, 119:17

**articles** [1] - 119:11

**aspect** [1] - 23:11

**asset** [4] - 89:6, 132:8, 132:9

**assets** [4] - 88:11, 130:3, 132:6, 132:10

**assigned** [2] - 24:9, 34:11

**assigning** [1] - 167:9

**assignment** [1] - 98:13

**assist** [1] - 38:4

**assistance** [1] - 128:2

**assistant** [4] - 22:15,

44:22, 45:10, 60:25

**associate** [3] - 3:11, 20:16, 49:20

**associated** [2] - 86:18, 113:12

**ASSOCIATES** [1] - 1:15

**associates** [1] - 59:1

**Associates** [1] - 3:11

**association** [1] - 92:14

**assume** [3] - 82:22, 108:10, 135:4

**assuming** [2] - 41:13, 44:8

**attached** [2] - 29:4, 67:20

**attachment** [2] - 117:25, 118:6

**attacks** [1] - 64:6

**attempted** [1] - 96:2

**attempts** [1] - 15:8

**attend** [1] - 22:22

**attendant** [1] - 51:7

**attention** [13] - 81:17, 134:13, 135:13, 153:8, 155:14, 156:19, 163:5, 163:6, 163:8, 178:9, 181:11, 185:3, 188:9

**attorney** [19] - 21:8, 54:1, 55:24, 60:16, 60:17, 108:21, 117:9, 118:4, 120:16, 130:18, 138:18, 146:14, 154:7, 154:9, 155:15, 167:8, 183:24, 188:22, 189:1

**Attorney** [1] - 3:13

**attorneys** [14] - 4:22, 21:17, 22:1, 36:16, 37:13, 38:5, 46:17, 55:5, 63:3, 84:22, 84:25, 90:6, 148:20, 176:20

**attorneys'** [1] - 84:24

**authority** [3] - 125:11, 129:10, 169:2

**authorizations** [1] - 108:21

**autism** [2] - 33:22, 57:14

**autistic** [1] - 29:18

**available** [1] - 68:1

**Aventura** [1] - 53:21

**Avenue** [3] - 1:19, 1:23, 192:11

**avoid** [2] - 91:8, 105:10

**awarded** [1] - 93:8

**axiomatic** [1] - 11:23

---

**B**

---

**BA** [1] - 103:18

**background** [3] - 103:15, 103:16, 103:17

**bad** [6] - 32:7, 32:11, 32:13, 110:22, 130:22, 167:9

**badges** [3] - 80:25

**bail** [1] - 17:13

**balancing** [1] - 76:9

**ball** [1] - 139:23

**ballpark** [2] - 182:10, 182:12

**banging** [2] - 33:12, 34:5

**banker** [1] - 47:1

**Barefoot** [6] - 28:21, 47:20, 47:25, 67:5, 67:14, 68:17

**barred** [1] - 90:3

**base** [3] - 78:16, 78:18, 79:25

**based** [7] - 15:15, 28:4, 36:13, 38:16, 92:23, 93:9, 108:20

**basic** [2] - 73:3, 82:20

**basis** [4] - 12:22, 82:13, 87:16, 183:23

**Bates** [2] - 153:12, 160:5

**Batista** [3] - 33:8, 54:21, 57:8

**Beach** [2] - 49:21, 58:3

**bear** [2] - 10:16, 24:16

**bears** [1] - 181:8

**became** [3] - 22:14, 149:5, 173:9

**BEFORE** [1] - 1:10

**begin** [7] - 16:4, 16:16, 36:6, 77:19, 77:22, 83:7, 83:13

**beginning** [3] - 97:16, 97:22, 158:10

**behalf** [5] - 3:18, 88:25, 94:12, 184:14, 188:4

**behavior** [2] - 33:8, 33:18

**behaviors** [4] - 33:11, 33:12, 33:14, 34:5

**belief** [1] - 6:20

**believability** [1] - 75:22

**believable** [1] - 94:1

**believes** [2] - 86:4

**bell** [1] - 176:17

**belong** [1] - 100:21

**belongs** [2] - 84:2, 102:9

**below** [1] - 186:18

**beneficial** [1] - 8:2

**benefit** [5] - 89:4, 131:4, 131:5, 131:12, 132:1

**best** [6] - 38:9, 123:5, 156:1, 172:11, 181:24, 182:22

**better** [5] - 105:23, 109:8, 134:4, 134:10, 156:1

**between** [7] - 18:14, 50:16, 62:18, 91:19, 136:10, 151:18, 175:8

**bias** [1] - 75:19

**biased** [1] - 46:1

**bifurcate** [3] - 7:7, 7:24, 9:4

**bifurcating** [2] - 6:13, 7:13

**bifurcation** [1] - 9:9

**big** [4] - 27:22, 41:13, 94:10, 125:23

**bigger** [3] - 103:24, 103:25

**biggest** [1] - 98:3

**billing** [1] - 149:20

**binding** [2] - 135:15, 136:14

**binoculars** [1] - 61:20

**birth** [1] - 68:7

**Bisleixis** [4] - 53:14, 70:15, 71:4, 72:4

**bit** [7] - 7:4, 16:21, 25:2, 36:9, 42:20, 61:3, 185:18

**Biyazakee** [1] - 67:14

**board** [23] - 33:16, 41:9, 88:14, 94:5, 98:18, 121:12, 126:5, 127:7, 127:13, 128:1, 135:14, 136:14, 136:23, 137:4, 140:14, 141:8, 141:25, 142:2, 143:5, 144:6, 144:25, 146:5, 149:12

**Bolooki** [3] - 26:20, 44:13, 66:18

**book** [2] - 28:8, 84:2

**books** [2] - 39:9,

186:2

**born** [1] - 122:21
**bothering** [1] - 26:15
**bottom** [2] - 177:12, 179:4
**box** [5] - 24:9, 25:22, 33:4, 72:15, 72:18
**branch** [3] - 97:20, 151:11, 151:18
**brand** [16] - 18:19, 18:25, 19:11, 19:16, 19:19, 58:10, 88:3, 89:2, 97:3, 97:4, 97:7, 98:5, 99:2, 112:20, 112:23
**brands** [2] - 58:6, 58:13
**break** [19] - 25:10, 28:16, 44:1, 50:7, 50:8, 50:10, 55:3, 72:25, 80:10, 80:16, 82:5, 132:14, 132:24, 143:1, 174:14, 176:15
**breaks** [4] - 43:24, 48:19, 50:3, 50:5
**Brian** [2] - 46:20, 71:2
**Brickell** [1] - 1:19
**brief** [4] - 17:6, 60:6, 63:8, 134:19
**Brief** [1] - 63:1
**briefed** [3] - 133:19, 133:20, 133:22
**briefly** [1] - 190:4
**bring** [15] - 4:16, 9:22, 16:19, 17:13, 25:23, 46:14, 71:14, 81:16, 83:16, 92:11, 134:23, 155:14, 175:12, 177:2, 188:8
**bringing** [3] - 4:17, 139:8, 181:11
**brings** [1] - 13:14
**broad** [2] - 15:6, 45:3
**broker** [1] - 67:16
**brother** [1] - 58:20
**brought** [13] - 6:25, 7:21, 10:15, 18:15, 19:17, 19:22, 28:25, 77:6, 129:4, 129:6, 129:7, 151:2
**Bruce** [1] - 32:9
**Bryant** [2] - 66:23, 72:2
**BS** [1] - 132:12
**build** [1] - 60:13
**building** [7] - 42:13, 62:11, 80:24, 98:5, 99:2, 99:3, 100:20
**built** [4] - 60:12,

97:2, 102:8
**bulk** [1] - 4:23
**bunch** [1] - 119:3
**burden** [12] - 6:16, 31:6, 76:4, 76:11, 76:23, 77:9, 81:18, 81:22, 84:6, 84:10, 84:12, 84:19
**burdens** [1] - 8:13
**BURNETT** [1] - 1:18
**Burnett** [2] - 3:18, 3:20
**busiest** [1] - 52:20
**business** [81] - 13:11, 15:3, 15:7, 42:7, 56:5, 56:8, 56:10, 56:12, 57:7, 57:10, 57:11, 57:13, 57:16, 58:4, 60:8, 60:9, 85:12, 85:16, 85:19, 86:7, 87:4, 87:9, 87:11, 88:9, 88:18, 91:18, 91:21, 91:22, 92:2, 94:24, 96:20, 97:2, 97:8, 97:10, 97:11, 97:13, 99:1, 99:3, 99:6, 100:21, 101:18, 102:9, 104:6, 104:21, 105:17, 107:20, 108:3, 108:7, 108:8, 108:11, 111:11, 111:13, 112:1, 113:17, 113:18, 114:5, 122:7, 125:12, 129:25, 131:5, 137:16, 137:25, 138:23, 139:3, 139:7, 139:10, 139:19, 140:3, 140:8, 140:9, 140:18, 141:12, 145:16, 162:17, 163:12, 168:15, 171:3, 183:13
**businesses** [1] - 57:5
**businessman** [2] - 149:7, 155:23
**Bustillo** [6] - 38:24, 64:25, 65:6, 65:10, 70:25, 71:25
**button** [2] - 16:14, 115:6
**buttons** [1] - 162:2
**BY** [56] - 1:21, 2:3, 2:5, 2:6, 2:10, 2:11, 2:14, 17:19, 55:21, 85:8, 94:13, 103:1, 104:5, 108:2, 110:24, 113:11, 115:7,

115:14, 116:16, 117:7, 117:19, 118:21, 119:6, 119:15, 120:13, 120:24, 123:6, 124:5, 125:4, 125:25, 131:6, 131:24, 135:10, 137:18, 138:17, 143:2, 144:2, 148:18, 150:9, 153:7, 154:6, 155:2, 156:18, 159:18, 160:24, 164:10, 168:1, 171:9, 172:5, 178:8, 178:21, 183:9, 184:5, 185:1, 185:12, 186:21

## C

**calendar** [3] - 4:24, 7:4, 7:22
**California** [74] - 18:24, 19:2, 19:10, 19:14, 19:15, 21:5, 60:4, 85:11, 86:7, 86:24, 87:14, 91:24, 94:19, 94:20, 95:6, 95:14, 95:22, 96:3, 96:9, 96:17, 96:21, 96:22, 97:4, 97:18, 97:21, 99:2, 99:19, 99:23, 100:7, 100:13, 102:7, 103:13, 105:4, 105:9, 105:10, 105:12, 105:18, 106:24, 107:6, 108:19, 114:16, 122:6, 132:8, 136:3, 136:8, 139:3, 139:10, 141:18, 141:21, 142:9, 142:14, 142:21, 142:22, 144:9, 144:12, 144:17, 144:22, 146:19, 149:11, 153:25, 154:3, 159:5, 164:18, 169:17, 169:22, 170:2, 180:13, 181:17, 183:14, 184:6
**cancel** [2] - 81:21, 93:24
**cancellation** [3] - 91:8, 170:18, 170:23
**cancelled** [1] - 19:23
**cancer** [2] - 40:9, 40:14
**cannot** [12] - 34:17, 39:12, 40:3, 40:19, 49:1, 50:19, 52:6, 54:17, 74:23, 74:24,

174:10, 175:22
**capital** [5] - 88:10, 112:5, 124:8, 124:11, 149:18
**capture** [1] - 178:18
**captures** [1] - 116:17
**cards** [1] - 91:22
**care** [6] - 29:17, 29:18, 47:22, 67:9, 148:8, 165:14
**Care** [1] - 68:4
**careful** [1] - 190:20
**carefully** [2] - 79:4, 179:25
**caregiver** [2] - 67:9, 67:17
**caregiver's** [1] - 68:9
**careless** [1] - 190:10
**cargo** [1] - 30:22
**Cargo** [1] - 31:1
**carrying** [1] - 73:17
**Carter** [1] - 32:9
**CASE** [1] - 1:2
**case** [117] - 3:3, 6:4, 6:13, 6:19, 6:22, 7:8, 7:12, 7:23, 7:24, 8:21, 8:24, 9:2, 10:2, 10:10, 10:15, 12:3, 12:5, 12:7, 12:19, 13:3, 13:24, 14:6, 14:19, 14:24, 18:1, 18:12, 18:17, 18:18, 18:19, 20:7, 21:24, 23:9, 24:5, 24:17, 24:24, 25:6, 25:7, 25:8, 25:9, 25:17, 25:19, 31:18, 36:8, 37:23, 38:9, 38:16, 39:13, 40:20, 41:19, 42:17, 43:6, 45:18, 46:1, 46:9, 47:17, 48:2, 48:3, 48:8, 48:18, 49:2, 50:16, 50:19, 51:16, 51:22, 52:2, 52:3, 52:7, 53:2, 53:7, 54:5, 62:8, 62:9, 62:12, 69:4, 73:11, 74:5, 75:5, 75:19, 75:25, 76:2, 76:4, 77:15, 77:17, 77:18, 78:2, 78:7, 78:8, 78:10, 78:11, 78:12, 78:23, 79:4, 84:15, 85:25, 90:3, 93:15, 94:23, 96:4, 100:24, 101:12, 101:23, 105:6, 128:17, 132:18, 146:13, 149:5, 150:23, 154:12, 154:20, 163:21,

174:16, 174:21, 187:17, 189:10
**cases** [13] - 11:22, 12:17, 22:19, 23:7, 23:10, 33:9, 38:13, 45:4, 45:6, 53:6, 81:2, 134:3, 154:17
**Casino** [1] - 47:2
**causes** [2] - 10:24, 92:13
**caveat** [1] - 38:9
**cease** [5] - 92:8, 92:9, 165:24, 166:2, 168:10
**Center** [1] - 53:21
**central** [1] - 24:24
**Cerasale** [74] - 3:20, 4:2, 4:6, 16:6, 18:3, 18:24, 19:3, 19:4, 21:4, 21:5, 35:20, 60:3, 76:22, 77:6, 79:23, 86:6, 87:5, 87:7, 87:18, 88:1, 89:21, 90:12, 90:13, 91:3, 91:14, 91:19, 92:8, 94:1, 94:4, 94:18, 94:23, 95:2, 95:6, 95:14, 95:21, 96:2, 96:19, 97:2, 97:14, 97:23, 98:1, 98:4, 98:16, 98:21, 99:1, 99:18, 99:23, 100:3, 100:6, 100:16, 100:25, 101:8, 102:7, 102:14, 102:16, 102:22, 103:2, 103:12, 110:20, 115:8, 121:5, 135:11, 143:14, 143:15, 146:19, 149:16, 149:17, 153:8, 156:19, 159:22, 160:12, 164:11, 168:2, 178:9
**CERASALE** [3] - 2:14, 4:4, 4:6
**certain** [8] - 36:22, 38:15, 74:1, 76:21, 137:5, 142:2, 144:6, 144:25
**certainly** [3] - 122:14, 136:9, 165:5
**certificate** [4] - 56:19, 68:7, 68:8, 99:13
**certificates** [1] - 61:3
**certified** [2] - 164:24, 165:1
**certify** [1] - 192:3
**chain** [1] - 73:20

chair [1] - 48:24
challenge [1] - 36:21
challenged [1] - 149:25
challenges [2] - 36:23, 63:14
challenging [1] - 133:7
chance [2] - 47:21, 107:24
change [2] - 7:24, 149:15
changed [2] - 7:5, 177:8
changes [2] - 158:19, 158:22
changing [1] - 180:12
chapter [1] - 165:14
characterized [1] - 118:16
charge [3] - 88:15, 125:15, 158:16
charged [2] - 18:12, 150:22
charter [2] - 39:5, 39:6
Chavez [1] - 12:18
check [4] - 50:3, 50:11, 56:23, 149:11
child [2] - 47:22, 67:9
choices [1] - 36:17
choose [2] - 73:23, 146:20
chooses [1] - 133:16
chosen [8] - 122:17, 122:18, 122:19, 122:24, 123:7, 140:23, 141:25, 143:6
cigar [1] - 23:9
circle [3] - 169:8, 169:10, 170:7
circumstances [2] - 12:23, 73:20
circumstantial [1] - 73:20
cite [1] - 12:18
citing [1] - 14:24
city [1] - 42:7
City [1] - 164:17
civic [2] - 52:21, 68:2
civic-minded [1] - 68:2
civil [17] - 5:17, 6:4, 18:11, 18:13, 22:21, 23:1, 23:11, 31:15, 37:23, 41:25, 45:4, 48:8, 50:13, 69:6, 73:3, 75:25

claim [14] - 7:18, 12:22, 13:11, 13:12, 13:16, 14:25, 76:18, 76:19, 81:20, 84:6, 84:20, 90:9, 151:2, 158:3
claimant [2] - 90:13
claimed [3] - 94:3, 96:16, 150:13
claiming [1] - 95:2
claims [13] - 9:4, 9:13, 18:15, 19:17, 20:1, 20:6, 76:6, 77:6, 77:9, 77:10, 77:12, 77:13, 89:23
Claire [2] - 67:14, 67:17
clarification [2] - 38:3, 118:13
clarify [3] - 84:4, 90:18, 143:15
clarifying [1] - 82:1
Class [1] - 124:25
classes [1] - 103:18
classify [2] - 186:8, 186:13
classroom [1] - 34:17
clause [3] - 142:23, 145:7, 173:3
clean [3] - 140:16, 141:10, 146:7
clear [11] - 6:18, 43:19, 81:19, 84:13, 84:17, 100:9, 135:16, 136:15, 140:16, 141:10, 143:25
clearly [3] - 98:12, 98:14, 157:8
client [13] - 13:13, 13:15, 20:13, 20:21, 20:25, 30:9, 34:10, 35:4, 35:11, 95:1, 95:3, 102:5, 108:20
clientele [1] - 88:9
clients [8] - 20:10, 60:14, 88:23, 88:24, 92:2, 135:21, 155:25, 156:3
Close [1] - 159:20
close [6] - 53:16, 102:23, 109:7, 140:2, 187:1, 187:14
closed [1] - 81:14
closely [2] - 73:1, 84:24
closer [6] - 11:19, 104:3, 125:21, 160:20, 178:18, 188:13

closest [1] - 24:8
closing [8] - 5:12, 20:4, 74:4, 77:21, 80:2, 84:9, 161:14, 161:15
clue [4] - 86:1, 86:2, 93:14, 94:10
co [10] - 3:14, 14:10, 20:16, 20:24, 43:5, 88:20, 114:5, 114:8, 134:15, 152:23
co-counsel [6] - 3:14, 14:10, 20:16, 20:24, 134:15, 152:23
co-owned [2] - 88:20, 114:5
co-shared [1] - 114:8
co-workers [1] - 43:5
coast [2] - 114:20
coffee [1] - 50:8
cold [5] - 32:5, 92:1, 109:5, 135:3, 135:4
colleague [2] - 21:3, 60:2
colleagues [1] - 30:18
collect [2] - 39:8, 108:19
collectively [2] - 56:2, 121:12
college [1] - 103:23
College [2] - 41:10, 49:21
Collins [1] - 61:21
com [3] - 88:22, 113:22, 113:23
coming [3] - 32:4, 89:8, 188:16
comments [2] - 15:21, 185:19
commerce [1] - 168:23
committed [2] - 19:24, 148:21
committees [1] - 68:5
committing [1] - 18:13
common [9] - 19:19, 19:20, 92:14, 92:15, 95:11, 99:8, 109:13, 124:15, 124:25
communicate [3] - 50:4, 78:2, 109:8
communicating [1] - 166:10
communications [1] - 91:18
community [1] - 68:6
commute [1] - 67:23

companies [14] - 18:14, 60:15, 61:1, 61:7, 94:2, 97:1, 103:24, 103:25, 136:19, 144:16, 144:21, 149:8
company [82] - 30:22, 35:1, 41:4, 41:13, 60:3, 60:11, 60:12, 60:13, 61:11, 86:6, 86:9, 87:7, 87:10, 87:15, 92:9, 97:15, 97:18, 98:2, 98:17, 98:18, 98:19, 98:22, 99:4, 103:25, 104:13, 104:15, 104:16, 104:19, 104:21, 104:22, 105:4, 105:7, 105:12, 105:22, 108:24, 109:1, 114:17, 121:15, 122:6, 122:17, 122:21, 123:7, 123:9, 124:8, 124:11, 125:13, 126:2, 126:15, 127:22, 128:12, 129:25, 130:2, 131:5, 131:15, 131:16, 131:17, 139:2, 139:10, 142:6, 142:17, 142:20, 144:19, 145:4, 146:21, 149:17, 150:21, 157:17, 162:13, 162:14, 162:19, 162:20, 166:22, 167:4, 169:17, 170:6, 171:7, 171:12, 179:18, 180:11, 181:2, 185:6
Company [16] - 87:15, 108:9, 108:10, 122:23, 126:2, 126:8, 126:23, 126:24, 127:15, 127:21, 128:5, 128:11, 129:10, 129:16, 129:21, 142:19
company's [1] - 114:16
compel [1] - 101:9
compensated [1] - 161:3
competition [5] - 10:23, 15:6, 19:20, 92:16, 93:12
complaint [7] - 7:11, 10:5, 10:12, 10:22, 11:7, 12:10, 45:21

complete [2] - 38:1, 125:11
completely [7] - 10:1, 15:13, 37:18, 37:19, 97:11, 106:25, 141:21
complex [1] - 123:1
complication [1] - 8:23
complied [1] - 190:12
compound [1] - 142:24
computer [3] - 83:6, 104:7, 158:17
computerized [2] - 88:2, 108:24
concentrate [2] - 8:13, 8:17
concern [1] - 43:16
concerned [2] - 73:22, 167:7
concerns [3] - 24:19, 43:4, 46:7
conclude [4] - 25:19, 25:20, 39:25, 174:17
concludes [1] - 80:6
conclusions [1] - 36:10
conduct [1] - 92:16
conference [1] - 37:2
conferences [1] - 82:10
confirm [1] - 13:16
confirmation [3] - 14:14, 14:16
conflict [1] - 26:1
confuse [4] - 8:3, 10:3, 15:14, 93:23
confused [2] - 10:17, 10:21
confusing [4] - 6:25, 8:13, 9:9, 175:14
confusion [2] - 9:12, 105:11
connected [1] - 83:6
connection [1] - 136:13
consequences [1] - 89:12
consider [7] - 74:2, 75:4, 75:8, 76:15, 84:23, 95:8, 102:4
consideration [1] - 157:15
considered [1] - 6:15
considering [3] - 75:14, 76:17, 77:1
constituted [1] - 170:24

**constitution** [4] - 140:24, 140:25, 141:2, 142:1

**Construction** [1] - 41:5

**construction** [2] - 41:2, 49:16

**consult** [1] - 58:25

**contact** [1] - 86:24

**contacted** [1] - 90:11

**contacting** [1] - 168:11

**contemporaneous** [1] - 16:1

**contention** [1] - 151:8

**context** [1] - 15:23

**continue** [11] - 67:15, 130:13, 130:23, 137:1, 142:9, 142:10, 142:14, 142:21, 157:23, 166:14, 166:18

**continued** [7] - 112:25, 158:1, 168:15, 168:23, 168:24, 168:25, 191:4

**continuous** [1] - 91:8

**contract** [1] - 33:19

**contractor** [1] - 57:13

**contradicts** [1] - 75:20

**contribute** [14] - 88:1, 88:11, 111:8, 111:13, 111:17, 111:20, 111:22, 111:23, 111:24, 112:5, 112:11, 112:14, 112:23, 157:20

**contributed** [2] - 89:22, 149:24

**contribution** [5] - 112:14, 128:13, 146:8, 149:17, 149:25

**contributions** [4] - 87:25, 88:10, 128:3, 145:25

**control** [7] - 74:17, 91:24, 96:2, 125:12, 129:24, 133:11, 135:3

**controlled** [1] - 97:8

**controversy** [3] - 85:11, 85:18, 92:7

**conversation** [3] - 131:13, 131:14, 177:16

**convicted** [1] - 58:21

**convincing** [4] - 6:18, 81:19, 84:14, 84:17

**cooperate** [1] - 88:24

**cooperating** [1] - 88:20

**cooperation** [2] - 90:19, 186:5

**cooperations** [1] - 91:20

**copy** [15] - 117:20, 117:22, 120:15, 123:22, 135:11, 154:24, 155:5, 155:8, 156:21, 156:23, 159:19, 165:3, 165:5, 170:25

**copyright** [2] - 23:6, 90:13

**corner** [2] - 165:2, 181:10

**corporate** [3] - 11:10, 162:16, 180:15

**corporation** [42] - 3:9, 19:4, 86:8, 86:10, 87:17, 87:23, 88:3, 88:5, 89:5, 89:6, 110:9, 110:10, 110:15, 112:15, 114:4, 116:18, 116:22, 119:21, 121:13, 121:20, 121:23, 124:21, 126:1, 128:17, 131:8, 132:4, 132:7, 132:8, 140:16, 141:10, 145:15, 147:17, 148:25, 149:11, 150:15, 151:19, 152:2, 162:21, 170:1, 184:14, 185:17, 186:7

**Corporation** [1] - 159:21

**Corporations** [1] - 56:16

**corporations** [1] - 145:5

**Correct** [2] - 50:23, 118:6

**correct** [128] - 4:5, 4:8, 13:25, 27:7, 41:25, 44:9, 47:4, 47:8, 48:4, 51:8, 54:12, 54:13, 56:18, 60:10, 61:14, 64:12, 105:7, 105:13, 106:11, 108:14, 109:1, 109:22, 110:16, 111:1, 111:13, 113:1, 113:4,

113:25, 114:12, 114:13, 114:17, 114:20, 116:19, 116:23, 117:10, 119:24, 121:7, 121:10, 121:13, 121:16, 121:25, 122:11, 122:19, 123:10, 124:25, 125:8, 125:15, 126:3, 126:13, 126:14, 126:16, 127:23, 127:25, 128:14, 128:21, 129:7, 129:25, 130:3, 130:5, 134:12, 139:11, 141:19, 141:22, 142:15, 142:23, 143:12, 144:9, 144:23, 146:10, 146:16, 147:9, 150:1, 150:15, 150:18, 150:23, 151:11, 151:16, 151:20, 151:22, 153:18, 153:19, 154:7, 154:14, 154:15, 156:5, 157:13, 157:14, 157:21, 160:16, 161:13, 161:16, 162:18, 162:25, 163:14, 164:19, 164:20, 164:21, 165:25, 166:4, 166:21, 167:8, 169:18, 169:21, 170:7, 171:11, 172:8, 172:11, 172:12, 172:21, 173:4, 173:11, 179:2, 180:23, 181:7, 181:22, 182:17, 183:13, 183:18, 184:15, 184:17, 184:20, 184:23, 185:17, 186:5, 186:11, 186:15, 186:17, 186:23

**correctly** [1] - 4:1

**Corridor** [1] - 44:24

**corridor** [1] - 44:25

**Corte** [2] - 4:12

**Cote** [19] - 4:9, 4:10, 4:12, 19:5, 19:6, 87:20, 88:6, 91:2, 97:24, 105:25, 107:16, 107:17, 107:19, 109:15, 121:9, 128:14, 136:17, 160:11

**Counsel** [10] - 14:21, 16:12, 55:11, 86:14, 123:16, 142:24, 160:18, 163:19, 185:9, 190:14

**counsel** [28] - 3:5, 3:14, 14:10, 14:11, 14:24, 15:8, 15:25, 20:16, 20:23, 20:24, 55:9, 60:5, 85:4, 111:1, 122:25, 132:13, 134:15, 152:10, 152:23, 175:17, 176:15, 177:7, 177:15, 181:11, 186:19, 187:15, 189:9

**counsel's** [2] - 15:16, 189:7

**counseling** [2] - 27:3, 27:17

**counselor** [1] - 27:4

**count** [1] - 6:18

**counterclaim** [19] - 6:14, 7:9, 7:17, 7:20, 8:18, 8:19, 8:20, 19:22, 45:20, 45:22, 46:15, 55:10, 81:18, 84:8, 84:12, 84:20, 148:20, 170:18, 170:23

**counterclaimed** [1] - 93:24

**counterclaims** [2] - 9:5, 77:8

**counterfeiting** [4] - 10:2, 10:23, 19:17, 92:13

**Country** [1] - 67:24

**country** [4] - 42:19, 42:22, 122:15

**counts** [1] - 6:17

**County** [2] - 42:11, 50:16

**couple** [8] - 7:8, 22:13, 29:8, 39:24, 49:25, 56:3, 83:23, 148:16

**course** [16] - 15:20, 20:2, 23:18, 24:21, 24:23, 25:3, 32:2, 40:16, 48:5, 58:11, 62:8, 63:15, 145:21, 162:20, 178:25, 181:10

**court** [33] - 10:5, 10:20, 11:7, 11:16, 12:2, 12:4, 12:5, 12:8, 13:12, 14:6, 14:17, 17:7, 18:16, 22:22,

24:7, 24:10, 31:13, 42:2, 50:7, 50:14, 52:4, 52:25, 77:17, 101:9, 101:12, 107:4, 108:17, 130:25, 143:22, 154:14, 176:25

**Court** [21] - 1:22, 1:23, 3:1, 6:15, 14:5, 14:12, 24:14, 74:17, 74:22, 74:24, 76:16, 81:24, 101:13, 103:7, 134:20, 176:1, 188:12, 189:12, 192:10, 192:10

**COURT** [410] - 1:1, 2:3, 3:2, 3:15, 3:21, 4:5, 4:7, 4:9, 4:11, 4:15, 4:21, 5:1, 5:4, 5:6, 5:11, 5:14, 5:17, 5:24, 6:2, 7:3, 8:5, 8:20, 9:3, 9:21, 10:6, 10:25, 11:2, 11:4, 11:12, 11:19, 12:13, 13:20, 14:1, 14:21, 15:15, 16:8, 16:10, 16:15, 16:18, 16:24, 17:2, 17:8, 17:11, 17:13, 17:16, 17:19, 17:20, 18:8, 20:17, 20:23, 21:7, 21:16, 21:18, 21:23, 22:1, 22:3, 22:7, 22:10, 22:16, 22:19, 22:22, 22:25, 23:3, 23:6, 23:12, 26:1, 26:6, 26:11, 26:16, 26:19, 26:24, 27:1, 27:6, 27:8, 27:10, 27:13, 27:15, 27:18, 27:22, 28:2, 28:9, 28:15, 29:11, 29:23, 30:4, 30:20, 30:23, 30:25, 31:2, 31:5, 31:9, 31:23, 32:15, 32:17, 32:20, 32:24, 33:3, 33:15, 33:19, 33:23, 34:8, 34:11, 34:13, 34:19, 35:1, 35:12, 39:2, 39:4, 39:7, 39:10, 39:12, 39:15, 39:18, 39:21, 39:25, 40:3, 40:6, 40:9, 40:11, 40:13, 40:16, 40:19, 40:22, 40:25, 41:2, 41:6, 41:11, 41:13, 41:15, 41:18, 41:21, 42:2, 42:8, 42:11, 42:14, 42:16, 42:22, 42:24, 43:3, 43:8, 43:11, 43:13,

43:15, 43:19, 43:24, 44:5, 44:11, 44:15, 44:20, 44:23, 44:25, 45:2, 45:5, 45:8, 45:13, 45:16, 45:18, 46:6, 46:17, 46:20, 46:22, 47:3, 47:5, 47:11, 47:14, 47:17, 47:19, 47:25, 48:5, 48:10, 48:14, 48:17, 48:22, 49:1, 49:4, 49:7, 49:10, 49:15, 49:17, 49:19, 49:22, 50:5, 50:13, 50:18, 50:21, 50:24, 51:5, 51:9, 51:11, 51:13, 51:15, 51:18, 51:21, 51:25, 52:2, 52:5, 52:9, 52:12, 52:14, 52:16, 52:19, 52:23, 53:1, 53:4, 53:9, 53:12, 53:14, 53:16, 53:18, 53:20, 53:22, 54:1, 54:4, 54:7, 54:10, 54:14, 54:17, 54:20, 55:1, 55:13, 55:16, 59:2, 59:23, 60:21, 62:2, 62:13, 62:16, 62:25, 63:2, 63:10, 63:12, 63:19, 63:21, 63:25, 64:3, 64:7, 64:12, 64:15, 64:17, 64:22, 64:24, 65:4, 65:8, 65:10, 65:15, 65:17, 65:21, 65:23, 65:25, 66:4, 66:6, 66:10, 66:12, 66:15, 66:17, 66:20, 66:22, 67:1, 67:3, 67:8, 68:11, 68:14, 68:17, 68:22, 68:24, 69:6, 69:9, 69:14, 69:16, 69:20, 69:24, 70:4, 70:10, 70:13, 70:18, 70:21, 70:23, 71:7, 71:9, 71:11, 71:16, 71:17, 72:9, 72:22, 81:10, 81:12, 82:1, 82:4, 82:7, 82:12, 82:19, 82:25, 83:3, 83:9, 83:10, 83:12, 83:16, 83:17, 83:19, 85:7, 90:5, 94:12, 102:12, 102:16, 102:19, 102:23, 104:2, 107:23, 110:18, 113:7, 114:22, 115:2, 115:6, 116:11, 116:14, 117:18, 118:11, 118:18,

119:13, 120:10, 122:25, 123:14, 123:16, 124:2, 125:2, 125:20, 125:23, 130:11, 130:13, 130:17, 130:23, 131:19, 131:20, 132:13, 132:16, 132:21, 132:23, 133:17, 133:23, 134:1, 134:15, 134:22, 135:2, 136:25, 137:3, 138:14, 142:24, 143:15, 143:18, 143:23, 143:25, 148:11, 150:8, 152:5, 152:8, 152:10, 152:12, 152:15, 152:21, 153:1, 153:5, 155:1, 156:10, 156:15, 159:10, 159:15, 160:18, 160:23, 163:24, 164:7, 167:14, 167:16, 167:23, 171:8, 172:2, 174:13, 174:19, 174:22, 174:24, 175:6, 175:16, 175:24, 176:15, 176:17, 176:19, 176:23, 177:1, 177:4, 177:14, 177:22, 178:1, 178:5, 178:17, 182:25, 183:5, 183:7, 184:3, 185:9, 186:19, 187:12, 187:14, 188:2, 188:6, 188:10, 188:13, 189:13, 190:6, 190:24, 191:1, 191:3
   **Court's** [4] - 81:17, 176:19, 188:9, 190:16
   **courthouse** [2] - 38:19, 73:17
   **Courthouse** [1] - 42:11
   **courtroom** [19] - 4:16, 17:15, 23:24, 37:11, 62:15, 71:15, 73:12, 78:17, 78:19, 79:6, 81:11, 82:8, 83:18, 125:23, 132:22, 134:25, 174:18, 177:3, 187:25
   **COURTROOM** [7] - 3:3, 17:7, 17:14, 18:7, 72:8, 134:20, 176:25
   **courts** [1] - 15:4

   **cover** [7] - 15:7, 30:19, 32:8, 32:12, 32:13, 67:10, 83:25
   **coverage** [2] - 32:6, 32:21
   **covering** [2] - 32:2, 32:6
   **covers** [1] - 17:24
   **coworkers** [1] - 31:7
   **CPA** [2] - 39:19, 56:9
   **cracking** [1] - 168:22
   **crafted** [1] - 189:20
   **created** [10] - 19:2, 19:3, 94:24, 95:6, 95:25, 96:19, 97:3, 97:9, 102:8, 175:12
   **credibility** [5] - 11:18, 11:24, 12:17, 75:24, 189:7
   **credit** [1] - 91:22
   **crew** [2] - 30:9, 31:2
   **crime** [1] - 18:13
   **criminal** [12] - 18:12, 22:21, 23:1, 23:9, 23:11, 31:13, 31:15, 37:23, 45:4, 48:2, 48:3, 58:18
   **critical** [1] - 189:22
   **cross** [3] - 15:19, 79:21, 79:24
   **CROSS** [1] - 2:13
   **cross-examination** [1] - 15:19
   **cross-examine** [1] - 79:24
   **cross-examining** [1] - 79:21
   **crossed** [1] - 66:11
   **culpa** [1] - 163:6
   **curative** [3] - 188:20, 189:12, 190:14
   **cures** [1] - 9:9
   **curious** [1] - 49:11
   **current** [2] - 98:18, 113:15
   **curtailed** [1] - 92:3
   **customer** [1] - 99:5
   **customers** [4] - 85:16, 93:7, 96:25
   **cutoff** [2] - 189:16, 190:3
   **cutting** [1] - 90:3

### D

   **dad** [1] - 30:3
   **Dade** [3] - 41:10, 42:11, 50:15
   **daily** [3] - 67:23, 91:18, 128:4

   **damage** [1] - 92:6
   **damages** [9] - 12:23, 14:25, 85:22, 92:5, 93:1, 93:4, 93:6, 93:8, 183:4
   **Darrin** [1] - 17:21
   **DARRIN** [1] - 1:10
   **data** [2] - 119:4, 185:3
   **Datamed** [9] - 105:13, 105:14, 105:15, 105:20, 106:5, 106:8, 106:13, 106:20, 150:12
   **date** [10] - 8:7, 87:23, 147:25, 148:2, 155:9, 177:12, 177:14, 177:20, 177:21, 181:10
   **DATE** [1] - 192:9
   **dated** [4] - 115:16, 117:1, 117:24, 159:21
   **dates** [1] - 110:7
   **daughter** [4] - 28:22, 29:6, 67:14, 68:8
   **day-to-day** [2] - 88:15, 125:15
   **days** [18] - 9:19, 25:8, 29:5, 29:8, 29:19, 30:14, 32:12, 32:14, 35:9, 35:10, 39:24, 39:25, 49:22, 53:24, 86:23, 150:12
   **deal** [7] - 8:18, 42:20, 58:6, 58:12, 129:4, 138:15, 167:9
   **dealing** [2] - 10:8, 150:11
   **deals** [2] - 11:8, 116:21
   **dealt** [2] - 21:20, 23:11
   **dean** [1] - 49:20
   **December** [2] - 1:5, 67:20
   **decide** [10] - 73:7, 73:11, 74:11, 75:10, 76:13, 76:18, 77:1, 78:23, 79:3, 102:5
   **decided** [8] - 6:21, 7:20, 89:1, 90:18, 103:22, 132:9, 172:13, 172:14
   **deciding** [1] - 75:5
   **decision** [6] - 12:24, 77:24, 78:16, 78:18, 79:25, 95:11
   **declaration** [3] - 91:7, 91:9, 91:12
   **dedication** [1] - 97:9

   **deems** [1] - 10:20
   **DEFENDANT** [1] - 1:17
   **Defendant** [12] - 18:24, 87:18, 88:1, 89:21, 90:11, 90:13, 91:14, 91:19, 92:8, 94:1, 94:4, 102:14
   **defendant** [12] - 3:20, 4:2, 8:12, 18:12, 18:23, 45:19, 76:8, 76:12, 91:3, 93:17, 105:6, 115:1
   **Defendant's** [1] - 115:3
   **defendant's** [4] - 19:13, 77:2, 84:12, 92:18
   **defendants** [22] - 1:8, 3:18, 7:19, 10:4, 12:20, 12:21, 14:25, 19:21, 45:24, 76:12, 76:22, 77:2, 77:5, 77:9, 79:20, 79:22, 92:21, 92:23, 93:12, 93:23, 94:9, 94:18
   **Defendants** [1] - 175:25
   **defense** [35] - 3:16, 5:15, 10:13, 15:16, 15:25, 16:15, 16:17, 16:25, 17:11, 45:14, 59:23, 62:19, 64:22, 65:1, 65:5, 65:6, 65:15, 65:19, 66:4, 66:8, 66:12, 66:24, 68:15, 70:2, 70:11, 70:21, 71:9, 76:23, 82:7, 84:8, 85:3, 94:12, 133:13, 187:15, 188:6
   **Defense** [1] - 14:2
   **DEFENSE** [4] - 2:6, 2:11, 59:24, 94:13
   **defense's** [2] - 70:4, 70:13
   **defenses** [7] - 7:10, 10:18, 19:21, 76:21, 76:25, 77:4, 84:7
   **defer** [1] - 181:13
   **defined** [1] - 161:16
   **defines** [1] - 161:23
   **definitely** [2] - 11:15, 182:19
   **definitions** [1] - 78:21
   **degree** [1] - 103:19
   **delay** [3] - 6:23, 7:1, 8:14
   **deliberate** [3] - 6:5,

9:11, 80:5

**deliberating** [1] - 77:22

**deliberations** [2] - 74:8, 77:19

**deliver** [1] - 126:12

**delivered** [1] - 126:11

**demand** [2] - 12:11, 176:2

**denied** [7] - 12:4, 13:6, 14:5, 14:17, 133:3, 133:4, 138:14

**dental** [1] - 44:7

**dentist** [1] - 26:3

**deny** [2] - 9:3, 15:24

**denying** [2] - 14:12, 14:13

**departments** [1] - 50:1

**deposed** [2] - 51:25, 52:1

**deposition** [9] - 154:16, 154:20, 154:24, 155:3, 155:5, 155:9, 155:11, 155:13, 156:2

**deposition's** [1] - 154:24

**deputy** [1] - 23:24

**DEPUTY** [7] - 3:3, 17:7, 17:14, 18:7, 72:8, 134:20, 176:25

**derived** [1] - 145:1

**deriving** [2] - 142:4, 144:8

**dermatologist** [1] - 29:6

**describe** [1] - 103:14

**described** [1] - 123:9

**deserves** [2] - 73:25, 176:11

**design** [3] - 86:12, 86:18, 89:3

**designation** [1] - 19:19

**desist** [5] - 92:8, 92:9, 165:24, 166:2, 168:10

**desperate** [1] - 93:23

**detached** [1] - 141:21

**detailed** [1] - 73:6

**details** [1] - 26:12

**deter** [1] - 93:11

**determine** [3] - 92:20, 99:9, 102:5

**determining** [2] - 8:10, 75:24

**develop** [1] - 163:12

**developed** [5] - 87:5, 89:20, 106:18, 106:20, 106:23

**developing** [1] - 163:10

**devoid** [1] - 169:24

**Diaz** [4] - 23:15, 23:19, 23:21, 192:9

**DIAZ** [2] - 1:22, 192:9

**Diego** [4] - 3:13, 14:9, 14:10, 20:16

**DIEGO** [1] - 1:14

**difference** [4] - 50:2, 73:22, 108:23, 151:18

**different** [21] - 4:4, 6:16, 9:8, 9:13, 9:14, 10:22, 18:11, 31:14, 33:11, 48:9, 84:19, 98:19, 98:24, 104:1, 113:3, 114:19, 151:19, 153:11, 158:22, 158:23, 186:13

**differentiation** [1] - 132:12

**difficult** [1] - 10:11

**digital** [2] - 96:23, 104:10

**Digital** [5] - 18:20, 86:11, 89:3, 112:21, 162:12

**digitalization** [1] - 107:3

**Dilhomme** [3] - 50:22, 51:6, 70:1

**dime** [1] - 101:20

**diminishing** [1] - 34:19

**dinner** [1] - 29:2

**DIRE** [6] - 2:3, 2:5, 2:6, 17:19, 55:21, 59:24

**dire** [1] - 4:23

**direct** [5] - 73:23, 128:4, 128:11, 135:13, 179:8

**DIRECT** [2] - 2:13, 102:25

**direction** [1] - 149:5

**directly** [6] - 11:17, 11:21, 33:23, 33:25, 35:6, 187:18

**director** [11] - 98:16, 120:2, 124:7, 125:10, 132:6, 135:17, 136:16, 138:22, 171:17, 172:17, 174:6

**directors** [29] - 88:13, 88:14, 94:5,

98:18, 119:21, 121:13, 126:5, 127:7, 127:13, 128:1, 129:24, 135:14, 136:14, 136:16, 136:23, 137:5, 137:24, 140:15, 141:8, 141:25, 142:2, 142:3, 143:5, 144:6, 144:7, 144:25, 146:5, 149:12

**directors'** [1] - 145:24

**disagree** [3] - 73:10, 120:1, 176:8

**disagreement** [1] - 18:14

**disagrees** [1] - 98:25

**disallow** [1] - 75:2

**disbelieve** [1] - 73:24

**disclose** [3] - 21:22, 37:21, 139:13

**disclosure** [2] - 21:13, 189:24

**disclosures** [1] - 189:18

**disconnect** [1] - 92:1

**disconnected** [1] - 91:25

**discontinue** [1] - 172:24

**discovery** [8] - 45:11, 87:2, 113:4, 142:4, 189:14, 189:16, 190:2, 190:3

**DISCOVERY** [2] - 1:4, 1:7

**Discovery** [56] - 3:4, 3:8, 18:2, 18:19, 18:21, 18:23, 20:21, 76:3, 76:22, 77:5, 77:7, 79:17, 79:22, 86:11, 88:5, 89:2, 94:19, 98:19, 105:2, 112:15, 112:18, 112:21, 119:1, 119:17, 121:16, 121:21, 121:24, 123:8, 126:6, 127:14, 129:11, 140:15, 141:9, 142:8, 142:17, 142:20, 142:22, 143:10, 144:8, 144:11, 144:17, 144:22, 145:6, 152:1, 162:12, 162:15, 162:16, 162:20, 166:16, 168:11, 173:4, 173:11, 175:8,

179:12

**discretion** [3] - 125:11, 146:21, 146:25

**discuss** [15] - 4:24, 6:12, 27:21, 62:8, 74:5, 77:17, 90:12, 96:14, 109:9, 132:18, 147:16, 147:19, 174:16, 174:21, 187:17

**discussed** [9] - 5:21, 25:7, 43:4, 109:3, 116:18, 116:22, 123:22, 145:22, 188:19

**discussion** [1] - 133:9

**discussions** [1] - 77:24

**disgorgement** [1] - 92:17

**dishonest** [1] - 173:20

**dismiss** [9] - 11:7, 11:8, 12:3, 13:6, 14:5, 14:6, 14:12, 14:13, 14:17

**dismissal** [1] - 12:3

**dismissed** [3] - 13:12, 13:17, 31:18

**dispensers** [1] - 61:11

**display** [1] - 33:11

**displayed** [1] - 156:20

**disposition** [1] - 9:1

**dispositive** [2] - 8:21, 9:17

**dispute** [4] - 100:9, 150:6, 175:7, 176:3

**disregard** [1] - 75:3

**dissatisfaction** [1] - 148:23

**distinguish** [2] - 84:2, 119:14

**distract** [1] - 79:4

**distribution** [3] - 124:19, 124:20, 145:22

**District** [6] - 1:23, 12:19, 17:22, 17:23, 192:10

**district** [3] - 17:24, 54:11, 57:22

**DISTRICT** [3] - 1:1, 1:1, 1:11

**dividends** [1] - 163:13

**division** [1] - 97:21

**DIVISION** [1] - 1:2

**Division** [1] - 56:15

**Dixon** [4] - 49:19, 69:8, 69:17, 69:18

**Docket** [3] - 11:2, 14:2, 175:18

**docket** [1] - 14:15

**doctor** [2] - 42:19, 68:9

**doctor's** [1] - 29:6

**Document** [5] - 18:20, 86:11, 89:3, 112:21, 162:12

**document** [54] - 13:14, 93:17, 96:23, 97:12, 101:14, 111:4, 115:5, 115:16, 115:18, 115:22, 115:25, 116:4, 116:17, 116:21, 117:1, 117:2, 117:8, 117:16, 118:17, 118:23, 118:24, 119:4, 119:18, 120:7, 120:18, 120:20, 123:17, 123:20, 125:10, 133:5, 133:6, 134:5, 134:6, 134:14, 138:19, 147:25, 152:19, 156:24, 157:4, 157:9, 157:11, 159:20, 159:22, 164:13, 164:15, 164:19, 165:11, 168:3, 172:6, 177:12, 178:2, 178:11, 185:10, 186:20

**documentation** [2] - 24:5, 107:2

**documents** [25] - 10:9, 11:7, 11:15, 13:21, 13:22, 15:10, 15:12, 15:17, 95:9, 96:24, 101:1, 101:5, 101:7, 101:8, 101:10, 107:3, 108:14, 147:11, 147:12, 150:6, 181:21, 188:2, 189:22, 190:7

**dollar** [2] - 94:2, 149:8

**dollars** [1] - 184:17

**domain** [2] - 88:21, 91:25

**Dominican** [1] - 42:23

**done** [13] - 22:20, 23:6, 28:1, 28:13, 110:13, 139:3, 139:19, 159:2, 161:5,

165:23, 174:8, 181:4
**door** [2] - 63:4, 81:14
**doubt** [1] - 165:3
**down** [14] - 17:25, 29:14, 34:4, 42:11, 58:24, 62:14, 63:5, 68:19, 73:1, 86:2, 110:7, 136:21, 138:5, 140:2
**Dr** [4] - 38:22, 51:1, 59:4, 69:1
**draft** [3] - 118:4, 118:14, 118:17
**drafting** [2] - 22:17, 45:11
**Drive** [2] - 103:12, 164:17
**drive** [1] - 103:22
**driving** [3] - 29:2, 67:18, 67:25
**drop** [2] - 92:5, 93:2
**due** [1] - 90:16
**duly** [3] - 18:6, 72:7, 102:22
**during** [16] - 4:22, 7:22, 15:18, 15:25, 23:17, 25:1, 37:5, 43:24, 54:11, 74:1, 80:16, 84:22, 85:1, 106:5, 155:13, 167:8
**duties** [2] - 22:16, 57:25
**duty** [7] - 28:19, 52:21, 73:4, 73:7, 89:6, 130:2, 132:6

**E**

**E-discovery** [1] - 87:2
**e-mail** [20] - 10:25, 13:8, 13:9, 14:2, 14:4, 14:7, 14:11, 14:13, 15:21, 87:2, 113:6, 113:15, 113:16, 113:17, 164:24, 165:1, 165:4, 168:4, 168:8
**e-mails** [5] - 50:3, 78:3, 88:22, 113:3, 113:12
**early** [3] - 100:2, 106:6, 162:25
**earn** [1] - 68:1
**ears** [2] - 109:5, 130:22
**easier** [4] - 86:2, 86:22, 134:14, 156:23
**east** [1] - 114:19
**easy** [1] - 62:9

**economy** [1] - 9:15
**educational** [2] - 103:14, 103:16
**educator** [1] - 53:22
**effect** [3] - 128:6, 161:15, 174:3
**effective** [3] - 87:23, 161:14, 172:20
**effort** [3] - 6:19, 89:10, 93:23
**eight** [15] - 5:19, 5:23, 5:25, 6:1, 6:2, 6:3, 6:5, 44:6, 58:3, 58:23, 63:17, 63:23, 68:25
**eighth** [1] - 68:24
**either** [20] - 5:25, 14:7, 21:8, 24:14, 34:20, 37:13, 45:14, 46:11, 63:5, 73:24, 139:22, 141:18, 148:8, 148:9, 148:16, 153:18, 156:10, 164:5, 164:25, 171:6
**elaborate** [1] - 20:2
**electronic** [3] - 4:16, 87:3, 118:25
**Electronic** [1] - 119:16
**elementary** [1] - 48:15
**elements** [1] - 76:23
**elevator** [1] - 80:23
**elimination** [1] - 37:1
**ELMO** [5] - 83:5, 117:15, 134:6, 134:11, 134:13
**embarrass** [1] - 37:6
**emergency** [1] - 67:20
**Emery** [1] - 52:18
**emphasize** [1] - 77:25
**employed** [3] - 39:20, 43:11, 43:13
**employee** [6] - 39:10, 41:11, 47:3, 51:11, 167:5, 179:4
**employees** [3] - 128:3, 179:7, 182:2
**employer** [2] - 31:9, 106:20
**employers** [1] - 27:22
**end** [10] - 5:17, 48:24, 73:6, 75:23, 77:23, 84:15, 100:23, 102:6, 145:23, 158:10
**ended** [2] - 150:20, 150:25

**ends** [2] - 8:21, 51:3
**enforce** [1] - 174:10
**engage** [2] - 85:12, 85:16
**engaged** [1] - 87:4
**enjoyed** [1] - 163:13
**entails** [1] - 28:3
**enter** [4] - 87:22, 90:18, 90:20, 160:12
**entered** [10] - 14:12, 17:15, 71:15, 83:18, 110:25, 134:25, 135:14, 136:14, 146:5, 177:3
**entities** [3] - 142:3, 144:7, 145:1
**entitled** [5] - 79:10, 159:20, 162:9, 162:14, 192:5
**entity** [1] - 156:4
**entrepreneur** [1] - 60:25
**entry** [1] - 185:4
**Entry** [3] - 11:2, 14:2, 175:18
**envisioned** [1] - 88:19
**equals** [2] - 87:12, 109:19
**equipment** [7] - 4:16, 4:17, 83:3, 88:2, 112:6, 112:7, 149:18
**equitable** [2] - 10:18, 10:20
**erased** [1] - 146:10
**error** [1] - 133:11
**especially** [6] - 5:18, 10:4, 32:3, 50:6, 94:4, 158:18
**ESQ** [5] - 1:13, 1:14, 1:14, 1:17, 1:18
**essentially** [1] - 7:19
**establish** [4] - 12:1, 126:8, 126:24, 127:15
**established** [1] - 128:2
**estate** [1] - 52:15
**estates** [2] - 60:18, 60:19
**ESTEVEZ** [1] - 177:10
**Estevez** [2] - 3:10, 20:16
**estimate** [2] - 181:24, 182:22
**estoppel** [3] - 10:18, 133:6
**et** [2] - 1:4, 1:7
**etcetera** [1] - 50:9
**Eugene** [2] - 25:25,

63:18
**evaluate** [1] - 15:1
**evaluation** [8] - 26:21, 26:22, 26:24, 27:4, 27:5, 28:6, 28:7, 28:12
**evaluations** [1] - 27:18
**evening** [1] - 187:20
**event** [1] - 9:18
**events** [1] - 11:10
**eventually** [3] - 89:16, 109:11, 129:15
**evidence** [117] - 6:17, 6:18, 9:5, 15:20, 20:4, 24:17, 24:25, 25:12, 73:7, 73:11, 73:12, 73:15, 73:18, 73:19, 73:20, 73:23, 73:25, 74:2, 74:3, 74:6, 74:7, 74:10, 74:15, 74:17, 74:18, 74:20, 75:2, 75:3, 75:4, 75:6, 75:7, 75:20, 75:22, 75:25, 76:5, 76:6, 76:7, 76:8, 76:14, 76:18, 76:20, 76:24, 77:1, 77:21, 78:17, 79:15, 79:25, 80:1, 80:3, 81:6, 81:23, 84:7, 84:13, 84:14, 84:17, 84:23, 85:1, 86:3, 87:6, 90:7, 90:11, 91:16, 93:15, 93:16, 94:8, 94:21, 95:8, 95:9, 95:10, 95:12, 95:13, 95:16, 95:20, 95:23, 96:6, 96:19, 97:3, 97:6, 97:16, 97:22, 98:11, 99:15, 100:5, 100:15, 100:23, 101:6, 101:11, 101:16, 102:4, 116:13, 118:20, 120:12, 123:16, 123:18, 123:21, 124:4, 152:9, 153:6, 156:12, 156:17, 159:17, 164:1, 164:9, 167:25, 172:4, 175:10, 175:12, 175:14, 175:15, 176:1, 178:7, 185:10, 186:20, 188:9, 188:16
**evident** [1] - 149:6
**ex** [2] - 106:20, 106:21
**ex-employer** [1] - 106:20

**ex-venture** [1] - 106:21
**exact** [2] - 110:7, 178:18
**exactly** [6] - 27:1, 28:3, 57:25, 107:10, 140:25, 173:17
**exam** [1] - 27:25
**EXAMINATION** [1] - 102:25
**examination** [2] - 15:19, 187:15
**examine** [1] - 79:24
**examining** [1] - 79:21
**example** [3] - 74:12, 78:19, 82:10
**exams** [1] - 27:24
**except** [3] - 118:5, 144:11, 144:22
**exception** [1] - 133:5
**excerpts** [1] - 153:9
**exchange** [4] - 80:18, 80:20, 99:4, 111:24
**exclude** [5] - 10:6, 11:4, 36:18, 36:24, 176:1
**excluded** [1] - 175:21
**exclusion** [1] - 175:25
**exclusive** [9] - 15:4, 15:5, 125:11, 126:7, 127:2, 127:3, 127:5, 127:14, 131:4
**exclusively** [5] - 126:15, 127:23, 127:24, 129:12, 141:7
**excuse** [3] - 31:14, 86:14, 130:12
**excused** [1] - 32:11
**exercise** [3] - 63:13, 70:3, 70:12
**exhibit** [10] - 73:13, 74:19, 74:22, 74:24, 114:25, 120:15, 152:8, 152:20, 153:3, 177:23
**Exhibit** [87] - 2:17, 2:17, 2:18, 2:18, 2:19, 2:19, 2:20, 2:20, 2:21, 2:21, 2:22, 2:22, 2:23, 10:12, 13:8, 14:2, 14:3, 115:3, 115:9, 115:11, 115:12, 115:15, 116:8, 116:12, 116:13, 116:25, 117:5, 118:9, 118:19, 118:20,

118:23, 119:2, 120:10, 120:12, 120:14, 120:22, 124:3, 124:4, 135:7, 135:8, 135:9, 145:20, 151:25, 152:6, 152:9, 152:24, 153:2, 153:6, 153:9, 156:8, 156:11, 156:15, 156:17, 156:19, 159:8, 159:11, 159:13, 159:14, 159:16, 159:17, 163:18, 163:19, 163:22, 163:24, 164:1, 164:4, 164:5, 164:6, 164:8, 164:9, 164:12, 167:18, 167:20, 167:24, 167:25, 168:3, 171:23, 172:1, 172:2, 172:4, 177:7, 178:5, 178:7, 178:9

**Exhibits** [1] - 10:7
**exhibits** [6] - 9:24, 10:5, 13:10, 76:16, 83:5, 115:1
**EXHIBITS** [1] - 2:16
**exist** [2] - 13:23, 78:14
**existed** [5] - 96:8, 100:3, 100:4, 101:25, 162:24
**existence** [3] - 11:16, 12:12, 12:16
**exited** [5] - 62:15, 81:11, 132:22, 174:18, 187:25
**expand** [2] - 87:13, 97:19
**expanding** [1] - 151:18
**expands** [1] - 101:23
**expect** [5] - 25:8, 39:25, 78:9, 80:19, 82:16
**expedience** [1] - 152:22
**expense** [2] - 186:15, 186:16
**expenses** [5] - 183:10, 183:18, 183:23, 188:24, 189:10
**experience** [4] - 28:4, 28:7, 38:17, 42:16
**experiences** [1] - 35:25
**explain** [7] - 9:13, 36:7, 73:3, 84:25,

98:21, 175:13, 179:19
**explanation** [2] - 38:3, 82:23
**extended** [1] - 92:22
**extends** [1] - 35:9
**extent** [1] - 15:25
**extremely** [1] - 13:13

**F**

**face** [3] - 78:1, 180:19
**Facebook** [1] - 78:5
**facie** [1] - 8:25
**facilitate** [2] - 105:10, 111:11
**facilities** [1] - 128:3
**facing** [1] - 55:15
**fact** [33] - 6:24, 7:7, 10:19, 11:9, 13:5, 13:22, 14:15, 22:3, 48:23, 73:15, 73:21, 76:13, 76:18, 76:19, 78:11, 86:12, 87:8, 88:20, 89:5, 95:16, 100:4, 121:20, 139:21, 142:8, 148:15, 148:24, 171:2, 174:6, 189:2, 189:8, 190:6, 190:8
**fact-finder** [1] - 11:9
**factors** [2] - 75:22, 93:9
**facts** [16] - 7:9, 7:10, 7:15, 8:6, 8:15, 11:25, 12:1, 73:8, 77:3, 85:24, 93:15, 95:12, 96:4, 100:23, 100:24
**factual** [1] - 9:5
**fails** [1] - 76:11
**faint** [1] - 178:25
**fair** [41] - 20:6, 22:4, 25:5, 30:8, 31:20, 36:11, 36:20, 38:5, 38:7, 38:10, 38:14, 38:15, 39:12, 40:4, 40:19, 41:19, 43:5, 44:2, 46:10, 47:17, 48:2, 49:1, 50:19, 51:15, 52:6, 53:7, 53:10, 54:5, 54:17, 54:24, 78:17, 78:24, 78:25, 107:11, 112:12, 139:2, 140:6, 165:7, 181:6, 181:9, 186:25
**fairly** [2] - 46:5, 140:7
**faith** [2] - 6:19, 6:20
**false** [10] - 19:19,

92:14, 179:20, 180:2, 180:4, 180:5, 180:6, 180:21, 181:7
**familiar** [7] - 21:15, 21:19, 22:2, 22:4, 61:4, 83:4, 86:16
**familiarity** [1] - 23:13
**families** [2] - 33:21, 33:24
**family** [7] - 22:21, 23:1, 23:2, 28:24, 33:21, 45:4, 54:3
**far** [14] - 3:13, 4:15, 9:14, 21:4, 24:3, 73:22, 82:8, 83:3, 106:25, 108:6, 129:22, 142:19, 144:24, 167:7
**fashion** [1] - 85:21
**father** [1] - 22:12
**fault** [2] - 163:8, 163:9
**favor** [3] - 13:13, 59:11, 76:12
**favoring** [2] - 76:8
**faxes** [1] - 87:2
**FCRR** [2] - 1:22, 192:9
**feature** [1] - 58:15
**February** [10] - 19:11, 92:21, 92:25, 96:1, 96:15, 100:9, 100:12, 101:17, 102:2, 102:6
**Federal** [1] - 6:6
**federal** [9] - 10:15, 12:5, 25:6, 42:2, 50:14, 52:25, 69:6, 92:15, 93:25
**federally** [1] - 19:18
**federally-registered** [1] - 19:18
**fellow** [1] - 43:4
**felt** [1] - 131:14
**few** [7] - 3:22, 16:18, 22:23, 35:15, 62:16, 72:11, 150:13
**fictitional** [1] - 162:16
**field** [4] - 59:19, 126:10, 126:11, 178:24
**fifteen** [1] - 5:3
**fifth** [5] - 66:6, 66:17, 72:13, 80:11, 150:17
**fight** [1] - 11:11
**figured** [1] - 149:4
**file** [5] - 12:6, 12:24, 89:1, 91:7, 163:20
**filed** [22] - 6:20, 8:8,

8:11, 9:23, 9:24, 12:2, 12:5, 13:5, 13:11, 14:20, 19:24, 61:13, 89:13, 91:9, 91:12, 93:19, 130:7, 148:1, 148:20, 170:19, 170:24, 171:2
**filing** [5] - 11:22, 11:23, 12:22, 45:21, 45:22
**films** [1] - 104:9
**final** [7] - 13:13, 13:17, 28:13, 37:3, 61:17, 174:14, 181:18
**finally** [5] - 7:21, 26:15, 95:23, 100:8, 157:19
**finance** [1] - 47:13
**financial** [1] - 39:22
**finder** [1] - 11:9
**fine** [10] - 5:4, 5:15, 6:1, 10:21, 38:18, 64:7, 80:23, 134:16, 160:20, 161:22
**finish** [8] - 12:13, 107:24, 113:8, 130:11, 130:19, 136:25, 148:12, 159:1
**finished** [2] - 130:20, 148:14
**Firm** [3] - 21:14, 22:9, 22:14
**firm** [11] - 21:21, 22:8, 23:4, 44:17, 44:18, 44:20, 44:23, 45:2, 45:9, 45:16, 52:16
**firms** [2] - 45:13, 96:25
**First** [1] - 135:14
**first** [65] - 7:3, 7:9, 9:16, 11:12, 14:23, 18:3, 35:18, 36:12, 55:10, 60:7, 64:24, 66:22, 68:11, 69:1, 70:4, 74:2, 79:13, 83:25, 85:2, 93:21, 95:13, 95:25, 96:6, 96:9, 96:15, 96:18, 99:16, 100:12, 100:20, 102:2, 102:13, 102:15, 109:9, 117:12, 117:24, 119:7, 119:16, 121:4, 122:12, 122:13, 127:11, 130:11, 135:23, 137:13, 137:15, 137:24, 138:22, 139:7,

139:18, 139:21, 140:14, 141:6, 141:7, 144:3, 147:14, 147:23, 153:13, 154:24, 156:20, 162:18, 164:23, 175:20, 175:25, 185:3, 189:7
**fit** [1] - 26:9
**FIU** [2] - 27:2, 47:13
**five** [12] - 16:22, 29:17, 30:14, 40:23, 47:6, 66:1, 91:6, 97:1, 97:8, 98:5, 99:2, 137:15
**flagship** [1] - 149:10
**flight** [1] - 51:6
**flip** [1] - 83:24
**floater** [1] - 33:2
**floor** [6] - 63:5, 63:6, 72:13, 80:11, 80:13, 80:14
**Floor** [2] - 1:24, 192:11
**FLORIDA** [1] - 1:1
**Florida** [171] - 1:4, 1:16, 1:19, 1:24, 3:9, 10:9, 12:19, 17:23, 18:22, 19:3, 19:15, 20:22, 21:6, 27:14, 28:24, 47:2, 47:10, 55:25, 56:15, 61:5, 68:4, 86:4, 87:15, 87:24, 88:5, 88:8, 88:14, 88:16, 88:17, 89:1, 89:18, 89:22, 90:10, 91:1, 91:5, 91:6, 91:9, 91:12, 91:15, 92:1, 92:4, 92:10, 92:17, 92:22, 93:1, 93:3, 93:4, 93:18, 94:3, 94:5, 94:7, 94:25, 95:17, 95:25, 96:1, 96:8, 96:11, 96:16, 97:15, 97:18, 97:19, 97:20, 97:23, 98:2, 98:3, 98:6, 98:8, 98:10, 98:17, 98:22, 99:12, 99:22, 100:1, 100:3, 100:10, 100:12, 100:19, 100:25, 101:2, 101:7, 101:9, 101:12, 101:17, 101:25, 102:1, 102:2, 102:10, 103:3, 109:12, 110:3, 110:4, 110:9, 110:10, 110:12, 111:9, 113:24, 114:6, 114:9,

114:17, 116:19, 116:23, 120:2, 121:6, 122:3, 122:7, 122:14, 122:16, 125:16, 126:1, 126:7, 126:13, 126:16, 126:25, 127:15, 128:2, 129:15, 130:3, 131:8, 135:25, 136:5, 136:7, 136:18, 137:20, 137:23, 138:13, 139:3, 140:15, 140:22, 141:9, 141:15, 142:18, 144:11, 144:17, 144:23, 145:16, 145:19, 146:21, 147:6, 147:17, 148:24, 150:14, 150:21, 151:3, 151:9, 151:15, 151:19, 152:2, 154:10, 156:5, 157:12, 157:19, 157:23, 158:5, 158:8, 159:5, 160:14, 161:5, 162:21, 163:10, 163:14, 170:16, 171:17, 172:24, 173:16, 173:17, 175:8, 183:3, 192:11

**Florida's** [5] - 19:7, 19:10, 19:22, 19:24, 132:10

**Floridae** [1] - 87:17

**flow** [1] - 128:24

**folks** [1] - 137:5

**follow** [7] - 73:9, 74:5, 75:25, 84:8, 124:17, 134:7, 134:11

**followed** [3] - 24:25, 85:2, 179:11

**following** [4] - 75:15, 142:25, 146:3, 161:15

**FOR** [4] - 1:13, 1:17, 2:16, 59:24

**forbids** [2] - 78:12, 78:13

**force** [2] - 128:6, 161:15

**forces** [2] - 87:13, 109:18

**foregoing** [2] - 162:14, 192:3

**foreign** [1] - 15:13

**forgiven** [1] - 185:15

**forgot** [1] - 26:5

**form** [9] - 60:15, 87:17, 87:23, 107:6, 137:7, 140:17, 141:11, 185:2

**formed** [6] - 104:14, 110:3, 110:10, 110:11, 122:17, 145:15

**formerly** [1] - 22:13

**forming** [3] - 105:9, 109:11, 110:15

**forms** [2] - 61:13, 73:12

**formulation** [1] - 12:23

**Forrester** [1] - 103:12

**Fort** [1] - 17:24

**forth** [6] - 86:21, 87:3, 89:10, 114:5, 133:9, 163:12

**forthcoming** [1] - 46:7

**forward** [14] - 46:18, 80:9, 80:14, 90:16, 102:17, 123:7, 137:8, 140:9, 140:23, 142:1, 143:6, 143:7, 143:17, 173:3

**forwarder** [1] - 61:9

**Foster** [1] - 68:4

**four** [13] - 9:19, 11:10, 40:7, 42:9, 61:1, 61:7, 65:18, 90:17, 91:3, 91:15, 107:9, 125:5, 160:15

**fourth** [2] - 30:16, 65:25

**Fowler** [2] - 3:18, 3:19

**FOWLER** [1] - 1:18

**FPR** [2] - 1:22, 192:9

**framework** [1] - 6:22

**frankly** [1] - 37:17

**fraud** [5] - 6:14, 19:24, 81:21, 148:21, 170:24

**fraudulent** [1] - 167:1

**fraudulently** [1] - 166:24

**free** [6] - 48:22, 48:23, 49:7, 55:8, 72:18, 186:10

**freebie** [1] - 185:24

**freight** [1] - 61:9

**frequency** [1] - 91:15

**Friday** [4] - 29:25, 30:2, 33:10, 34:15

**Fridays** [1] - 29:19

**friends** [1] - 61:24

**front** [6] - 23:16, 37:11, 111:4, 178:10, 181:6, 187:4

**full** [15] - 7:20, 21:13, 39:10, 39:11, 41:11, 46:25, 47:3, 51:11, 67:15, 99:18, 99:23, 103:10, 125:11, 129:24, 155:21

**full-time** [6] - 39:10, 39:11, 41:11, 46:25, 47:3, 51:11

**fully** [5] - 8:21, 9:17, 133:19, 133:20, 133:22

**future** [3] - 93:11, 137:25, 138:23

## G

**gather** [1] - 96:24

**gathering** [1] - 174:13

**GAYLES** [1] - 1:10

**Gayles** [1] - 17:22

**Gazette** [1] - 89:15

**general** [8] - 8:17, 22:16, 36:12, 43:18, 47:13, 50:5, 131:5

**generally** [4] - 38:14, 43:16, 46:9, 56:2

**generate** [1] - 92:2

**gentleman** [1] - 60:3

**gentlemen** [16] - 17:21, 21:2, 21:7, 59:25, 62:5, 71:21, 72:23, 83:22, 90:6, 94:16, 107:23, 113:7, 132:16, 148:11, 171:8, 187:14

**genuine** [1] - 146:15

**genuineness** [1] - 156:9

**Germany** [3] - 49:19, 69:8, 69:17

**gift** [4] - 186:10, 186:11, 186:16, 187:9

**gifts** [1] - 187:10

**given** [4] - 8:16, 46:9, 157:24, 159:4

**goodwill** [5] - 92:6, 93:7, 122:3, 122:9, 163:10

**Google** [1] - 78:6

**govern** [3] - 77:11, 142:5, 145:3

**government** [2] - 18:13, 41:8

**Government** [4] - 89:17, 185:25, 186:9, 186:10

**graduated** [1] - 103:18

**grandson** [2] - 29:17, 49:11

**granted** [3] - 19:10, 19:15, 175:9

**grass** [1] - 73:16

**great** [2] - 32:11, 140:2

**greater** [2] - 79:10, 95:3

**greatly** [1] - 9:1

**grew** [2] - 97:4, 97:7

**group** [4] - 60:7, 88:18, 88:19

**guess** [16] - 6:8, 13:22, 20:9, 28:12, 53:22, 69:9, 75:1, 91:21, 112:16, 146:11, 148:3, 152:22, 163:9, 165:21, 178:25

**guide** [2] - 96:5, 96:10

**guidelines** [1] - 75:24

**guy** [1] - 156:1

**guys** [4] - 101:2, 109:16, 119:13, 158:15

## H

**habit** [1] - 110:22

**half** [3] - 50:7, 132:14, 184:17

**halfway** [1] - 16:23

**hand** [10] - 26:19, 31:25, 36:5, 38:2, 56:6, 102:21, 117:20, 120:14, 168:2, 181:10

**handed** [1] - 119:3

**handing** [2] - 117:16, 164:11

**handle** [5] - 22:19, 34:18, 45:13, 63:15, 82:9

**handled** [1] - 82:12

**hands** [10] - 18:5, 18:8, 20:8, 23:14, 23:18, 35:24, 53:1, 55:4, 61:25, 72:5

**happy** [1] - 55:7

**Hard** [2] - 47:1, 47:2

**hard** [5] - 83:24, 97:9, 117:20, 135:11, 159:19

**hardship** [2] - 25:22, 39:22

**head** [6] - 26:4, 33:11, 34:5, 45:7, 154:21, 183:22

**hear** [21] - 7:15, 16:2, 59:13, 74:1, 75:16, 78:21, 81:3, 81:13, 81:14, 81:17, 91:16, 92:5, 98:4, 107:25, 109:4, 125:24, 131:21, 156:10, 160:19, 160:21, 176:12

**heard** [4] - 14:16, 73:13, 77:20, 189:6

**hearing** [3] - 14:5, 14:9, 14:16

**hearsay** [2] - 15:22, 82:13

**Heather** [2] - 43:9, 63:25

**hello** [2] - 33:7, 80:18

**help** [12] - 28:24, 29:10, 36:10, 48:20, 67:18, 74:5, 75:25, 79:1, 79:9, 111:10, 145:17, 145:18

**helped** [1] - 60:13

**helpful** [1] - 134:6

**helps** [1] - 187:4

**hereby** [1] - 192:3

**Herrera** [4] - 21:14, 22:9, 22:13, 22:14

**hi** [1] - 30:7

**hidden** [3] - 79:7, 147:11, 147:12

**higher** [2] - 81:22, 84:13

**himself** [1] - 98:2

**historic** [1] - 11:10

**history** [3] - 85:25, 99:5, 163:20

**hit** [2] - 74:13, 139:23

**hold** [9] - 49:24, 55:19, 80:20, 113:7, 119:13, 130:11, 148:11, 167:14, 182:25

**Hold** [1] - 131:19

**holdings** [1] - 124:15

**holidays** [1] - 4:21

**Hollywood** [1] - 47:2

**home** [5] - 29:19, 29:21, 30:2, 172:21, 173:10

**honest** [1] - 37:25

**honestly** [2] - 37:17, 169:15

**Honor** [147] - 3:7, 3:17, 4:8, 4:19, 4:20, 4:25, 5:5, 5:9, 5:16, 5:22, 7:2, 7:6, 7:21,

8:1, 8:4, 8:23, 9:23, 10:8, 10:18, 10:20, 11:1, 11:6, 11:14, 11:17, 11:20, 11:21, 12:6, 12:17, 13:7, 13:18, 13:25, 14:4, 14:7, 14:14, 14:18, 16:5, 16:13, 16:17, 17:1, 17:4, 17:5, 17:10, 17:12, 20:14, 21:1, 26:20, 46:21, 47:16, 52:11, 53:8, 55:12, 55:14, 62:23, 62:24, 63:7, 63:24, 64:1, 64:2, 64:11, 64:13, 64:14, 64:23, 65:2, 65:7, 65:9, 65:14, 65:24, 66:3, 66:9, 66:16, 66:19, 66:21, 66:25, 67:2, 67:7, 68:16, 68:23, 69:13, 70:9, 70:20, 71:6, 81:16, 82:3, 82:6, 83:15, 85:5, 85:9, 89:25, 92:12, 93:10, 94:14, 115:4, 117:15, 118:17, 120:9, 123:4, 123:19, 124:6, 131:1, 132:15, 133:1, 133:16, 133:19, 133:25, 134:18, 135:8, 138:10, 150:4, 150:5, 150:10, 151:25, 152:7, 152:11, 153:4, 154:5, 154:23, 156:12, 159:9, 163:18, 163:23, 167:18, 167:22, 171:25, 174:20, 174:23, 175:4, 175:11, 175:15, 175:17, 176:18, 177:6, 178:4, 178:6, 183:6, 183:8, 184:4, 184:25, 187:11, 188:5, 188:7, 188:8, 188:25, 189:2, 189:15, 190:5, 190:23, 190:25

HONORABLE [1] - 1:10

hope [1] - 183:12

hoping [1] - 39:24

hospital [3] - 32:4, 86:25, 108:21

hospitals [3] - 85:15, 107:3, 108:22

hot [2] - 135:3, 138:5

Hotel [2] - 47:1, 47:2

hour [5] - 50:7, 50:9, 67:24, 71:13, 132:14

hours [3] - 30:10, 30:19, 68:5

housekeeper/ nanny [2] - 29:1, 67:19

housework [1] - 67:19

HR [1] - 31:11

husband [5] - 28:23, 67:12, 87:9, 107:20

**I**

ID [1] - 2:16

idea [7] - 12:6, 18:10, 46:14, 69:13, 129:18, 129:19, 163:15

identical [2] - 18:25, 166:20

identification [4] - 115:11, 117:5, 119:2, 120:22

identified [4] - 13:8, 115:8, 118:22, 164:11

identify [1] - 23:22

ignore [4] - 75:1, 75:3, 80:23, 168:19

ignored [2] - 92:9, 168:18

III [2] - 25:25, 157:11

illegal [4] - 150:15, 150:22, 151:3, 151:7

illegible [1] - 177:25

Illinois [2] - 139:1, 139:4

images [1] - 178:19

imagine [1] - 147:10

immediately [2] - 36:5, 168:10

impartial [7] - 20:7, 22:5, 36:11, 36:20, 38:5, 38:8, 53:10

impeachment [8] - 12:16, 12:21, 13:1, 13:4, 13:24, 14:8, 15:10, 15:19

impinge [1] - 189:6

implies [1] - 41:6

import/export [1] - 61:10

importance [1] - 34:19

important [13] - 20:20, 37:8, 37:25, 78:14, 78:15, 78:20, 90:24, 95:12, 95:16, 128:14, 128:15, 143:4, 147:19

importantly [1] -

142:10

impression [1] - 79:11

impropriety [1] - 80:22

inaccurate [1] - 189:9

Inc [24] - 3:4, 3:9, 76:3, 88:5, 112:15, 112:18, 119:1, 119:17, 121:16, 121:21, 121:24, 123:8, 126:6, 127:14, 129:11, 140:15, 141:9, 143:11, 144:23, 152:1, 162:16, 162:21, 173:4, 173:11

INC [1] - 1:4

incline [2] - 17:17, 71:19

include [4] - 95:9, 97:5, 121:5, 136:3

included [2] - 88:8

includes [2] - 78:3, 153:9

including [10] - 19:8, 38:21, 78:4, 88:3, 90:17, 130:5, 139:17, 141:17, 149:20, 172:21

income [9] - 185:17, 185:19, 186:5, 186:7, 186:8, 186:9, 186:11, 186:13, 189:10

incomplete [1] - 118:15

inconvenience [1] - 8:12

incorporated [3] - 88:4, 110:11, 120:2

Incorporated [4] - 18:2, 18:21, 77:7, 79:18

Incorporation [5] - 118:25, 119:9, 119:10, 119:16, 119:17

incorrect [2] - 126:18, 157:22

incumbent [1] - 9:13

incurred [1] - 93:1

incurring [1] - 92:5

independent [1] - 129:12

indicate [4] - 44:17, 45:25, 49:12, 148:23

indirect [3] - 73:17, 73:19, 73:23

indirectly [2] - 73:15,

163:13

individual [1] - 121:5

individuals [2] - 35:23, 57:5

inform [1] - 100:24

information [24] - 26:4, 37:20, 77:16, 78:7, 78:18, 84:9, 85:14, 85:15, 86:21, 107:2, 108:20, 108:22, 119:5, 129:2, 183:4, 183:21, 183:25, 187:3, 188:23, 189:2, 189:3, 189:4, 189:10, 189:17

informed [1] - 16:6

informs [1] - 11:24

infringement [7] - 10:1, 10:23, 19:18, 19:20, 23:10, 92:13, 92:14

initial [7] - 88:10, 119:20, 124:8, 124:20, 149:18, 189:17, 189:24

injury [2] - 85:13, 85:22

innumerable [1] - 68:5

inquire [2] - 12:21, 170:14

inquiries [1] - 12:25

Instagram [1] - 78:5

instance [2] - 9:14, 29:5

instead [2] - 117:15, 160:15

instruct [4] - 75:7, 76:14, 76:24, 81:24

instructed [1] - 80:21

instructing [1] - 93:10

instruction [3] - 81:17, 188:20, 189:12

INSTRUCTIONS [2] - 2:9, 72:21

instructions [14] - 8:16, 8:17, 8:18, 71:12, 72:24, 73:5, 73:6, 77:11, 77:22, 80:4, 80:6, 84:5, 84:9, 84:14

insurance [4] - 42:6, 50:16, 96:25, 157:16

intellectual [1] - 171:11

intend [1] - 88:12

intended [3] - 37:6, 97:17, 166:18

intends [1] - 79:16

intent [1] - 98:6

interest [7] - 75:18, 109:13, 135:17, 136:17, 137:22, 157:12, 171:15

interference [7] - 13:9, 13:10, 13:15, 15:3, 15:7, 100:17, 100:18

interim [1] - 89:20

intern [5] - 26:21, 26:24, 27:4, 28:6

internal [1] - 43:2

International [3] - 27:14, 47:10, 67:16

Internet [1] - 78:4

interpret [2] - 80:3, 142:7

interpretation [1] - 142:12

interrupt [3] - 12:13, 90:1, 138:9

interrupted [1] - 130:18

interrupting [1] - 125:20

introduce [12] - 10:4, 12:9, 12:10, 14:18, 15:17, 20:10, 20:12, 20:17, 20:24, 115:1, 172:1

introduced [7] - 7:1, 24:22, 35:19, 35:20, 107:14, 120:7, 123:21

introducing [3] - 13:21, 14:7, 15:12

introduction [2] - 116:8, 159:12

invest [1] - 163:11

invested [2] - 135:17, 136:17

investing [2] - 89:9, 163:11

investment [1] - 149:18

investments [2] - 124:8, 124:11

invoked [1] - 174:24

invoking [1] - 174:22

involve [1] - 6:17

involved [3] - 68:2, 137:14, 190:1

involves [1] - 18:19

involving [1] - 23:9

irrelevant [2] - 8:9, 10:1

issue [39] - 6:21, 6:25, 7:3, 8:20, 9:16, 9:21, 11:21, 12:7,

24:15, 29:13, 30:5, 31:10, 33:4, 35:8, 35:13, 41:15, 43:16, 44:16, 47:22, 48:6, 48:7, 49:11, 49:22, 51:13, 51:15, 52:19, 54:14, 64:4, 69:9, 70:19, 78:11, 103:5, 133:1, 133:18, 133:24, 168:16, 188:15, 188:17, 189:11

**issued** [1] - 175:3
**issues** [19] - 3:24, 6:9, 7:12, 9:4, 10:1, 10:3, 11:9, 14:22, 16:1, 20:2, 24:13, 24:17, 24:19, 25:1, 46:10, 47:14, 67:9, 76:21, 90:2
**item** [1] - 75:7
**items** [2] - 10:6, 11:13
**itself** [2] - 77:18, 176:4

## J

**Janice** [6] - 28:21, 67:5, 67:13, 67:16, 68:1, 68:2
**Jaureguizar** [4] - 48:13, 68:19, 71:3, 72:3
**jeez** [1] - 104:25
**JESUS** [1] - 1:13
**Jesus** [3] - 3:7, 20:14, 55:22
**Jiha** [9] - 39:17, 39:18, 56:6, 56:9, 60:10, 60:12, 65:12, 70:25, 71:25
**Jill** [1] - 35:21
**job** [5] - 60:23, 73:8, 73:24, 86:1, 101:3
**jobs** [2] - 24:6, 103:24
**join** [1] - 109:18
**joined** [3] - 24:7, 189:15, 190:2
**joining** [1] - 87:12
**joint** [4] - 4:11, 4:15, 109:18, 183:2
**Jones** [2] - 74:13, 74:16
**Jose** [3] - 22:13, 44:24, 44:25
**Juan** [4] - 3:19, 21:3, 60:2, 94:17
**JUAN** [1] - 1:18

**judge** [1] - 24:23
**Judge** [5] - 17:22, 175:3, 175:5, 175:9, 190:17
**JUDGE** [1] - 1:11
**judges** [1] - 85:24
**judgment** [5] - 13:13, 13:17, 95:11, 99:8, 100:24
**judicial** [3] - 9:15, 17:24, 58:17
**July** [2] - 87:24, 157:9
**June** [13] - 19:3, 96:8, 96:18, 97:1, 98:7, 111:3, 115:16, 117:1, 117:24, 154:17, 159:21, 161:17, 192:9
**jurisdiction** [1] - 15:5
**JUROR** [203] - 21:12, 21:17, 21:19, 21:24, 22:2, 22:6, 22:9, 22:11, 22:17, 22:20, 22:23, 23:2, 23:5, 23:8, 25:25, 26:2, 26:7, 26:14, 26:18, 26:20, 26:25, 27:2, 27:7, 27:9, 27:11, 27:14, 27:17, 27:20, 27:25, 28:6, 28:12, 28:21, 29:15, 29:25, 30:7, 30:21, 30:24, 31:1, 31:4, 31:8, 31:11, 32:1, 32:16, 32:19, 32:22, 32:25, 33:7, 33:17, 33:20, 33:25, 34:10, 34:12, 34:14, 34:23, 35:3, 39:1, 39:3, 39:5, 39:8, 39:11, 39:14, 39:17, 39:20, 39:23, 40:2, 40:5, 40:8, 40:10, 40:12, 40:14, 40:18, 40:21, 40:24, 41:1, 41:4, 41:8, 41:12, 41:14, 41:17, 41:20, 42:1, 42:4, 42:9, 42:13, 42:15, 42:18, 42:23, 43:1, 43:7, 43:10, 43:12, 43:14, 43:18, 43:22, 44:4, 44:10, 44:14, 44:19, 44:21, 44:24, 45:1, 45:3, 45:7, 45:10, 45:15, 45:17, 46:3, 46:12, 46:19, 46:21, 46:25, 47:4, 47:8, 47:12, 47:16, 47:18,

47:24, 48:4, 48:8, 48:13, 48:16, 48:19, 48:25, 49:3, 49:6, 49:9, 49:14, 49:16, 49:18, 49:21, 49:24, 50:12, 50:15, 50:20, 50:23, 50:25, 51:8, 51:10, 51:12, 51:14, 51:17, 51:20, 51:24, 52:1, 52:3, 52:8, 52:11, 52:13, 52:15, 52:17, 52:20, 52:24, 53:3, 53:8, 53:11, 53:13, 53:15, 53:17, 53:19, 53:21, 53:25, 54:3, 54:6, 54:9, 54:13, 54:16, 54:19, 54:25, 56:7, 56:9, 56:11, 56:13, 56:15, 56:18, 56:20, 56:23, 57:2, 57:4, 57:9, 57:11, 57:17, 57:19, 57:23, 58:7, 58:9, 58:11, 58:14, 58:18, 58:20, 59:9, 59:12, 59:15, 59:18, 59:20, 60:14, 60:17, 60:19, 60:23, 61:9, 61:14, 61:20, 61:23, 135:1
**juror** [80] - 20:7, 21:11, 21:13, 23:21, 25:24, 25:25, 26:20, 28:22, 29:16, 30:8, 30:16, 32:19, 37:24, 38:8, 38:24, 39:15, 39:21, 40:7, 40:23, 41:22, 43:9, 44:6, 44:13, 46:23, 47:20, 48:11, 49:8, 49:19, 50:14, 50:22, 51:1, 51:19, 52:10, 53:14, 54:8, 62:20, 63:23, 64:19, 64:24, 64:25, 65:11, 65:12, 65:17, 65:18, 65:25, 66:1, 66:6, 66:7, 66:17, 66:18, 66:23, 67:4, 68:18, 68:24, 69:4, 69:17, 70:1, 70:5, 70:10, 70:15, 70:24, 70:25, 71:1, 71:2, 71:3, 71:24, 71:25, 72:1, 72:2, 72:3, 77:16, 80:25
**JURORS** [1] - 2:4
**jurors** [19] - 5:18, 5:21, 6:2, 17:3, 17:8, 17:15, 18:6, 24:5, 36:17, 37:12, 50:8, 55:15, 62:15, 71:15, 73:4, 78:12, 78:13,

78:23, 85:24
**JURY** [6] - 1:10, 2:7, 2:8, 2:9, 63:9, 72:21
**jury** [73] - 6:9, 6:25, 7:14, 7:18, 7:25, 8:3, 8:15, 10:16, 10:21, 15:1, 15:14, 16:19, 17:14, 24:9, 25:9, 25:22, 26:4, 28:19, 33:4, 36:3, 36:7, 36:19, 36:24, 37:2, 37:21, 38:5, 38:11, 38:12, 41:25, 62:6, 62:13, 63:3, 71:22, 72:7, 72:13, 72:15, 72:18, 73:2, 77:14, 79:3, 79:7, 80:5, 80:8, 80:11, 80:12, 81:10, 81:11, 81:14, 81:19, 81:25, 83:17, 83:18, 84:2, 85:6, 132:19, 132:22, 134:4, 134:7, 134:24, 134:25, 151:6, 152:12, 152:13, 152:15, 174:18, 175:14, 176:10, 177:3, 187:18, 187:23, 187:25, 189:5, 190:11
**jury's** [1] - 189:1
**justice** [1] - 46:14

## K

**K-8** [1] - 53:21
**keep** [5] - 23:15, 23:22, 77:23, 123:1, 125:20
**keeping** [2] - 5:2, 23:16
**keeps** [1] - 29:2
**Kentucky** [1] - 97:5
**Key** [1] - 17:25
**kid** [2] - 33:25, 34:1
**kids** [3] - 33:21, 57:14, 58:22
**kind** [28] - 10:15, 22:19, 28:10, 38:15, 38:16, 39:22, 40:17, 45:2, 45:8, 45:11, 49:13, 52:14, 57:3, 61:7, 61:23, 73:24, 80:19, 87:8, 104:6, 104:8, 104:11, 104:21, 105:17, 175:12, 188:20, 189:12, 189:24
**kinds** [1] - 38:13
**knees** [1] - 103:5
**knowing** [2] - 99:18,

99:23
**knowledge** [2] - 53:3, 112:1
**known** [1] - 122:4
**Kristen** [1] - 35:21

## L

**L-U-T-T-E-R** [1] - 35:22
**labor** [1] - 89:10
**ladies** [12] - 17:21, 21:2, 21:7, 59:25, 62:5, 71:21, 72:23, 83:22, 90:6, 94:16, 132:16, 187:14
**laid** [1] - 93:19
**language** [1] - 162:6
**lapel** [3] - 55:16, 55:20, 160:19
**laptop** [1] - 134:7
**large** [1] - 92:5
**last** [19] - 7:21, 22:15, 24:22, 25:8, 25:18, 31:13, 31:17, 36:6, 38:9, 48:11, 49:25, 54:21, 93:21, 129:9, 130:25, 145:20, 146:23, 149:2, 175:23
**lastly** [1] - 93:8
**late** [4] - 3:22, 7:25, 16:21, 106:6
**latest** [1] - 25:20
**launch** [1] - 145:16
**launched** [1] - 88:7
**Law** [3] - 21:14, 22:9, 22:14
**law** [31] - 19:19, 19:20, 42:19, 42:21, 44:17, 44:18, 44:20, 44:23, 52:14, 54:2, 54:3, 73:8, 73:9, 73:10, 73:22, 76:4, 77:22, 78:7, 78:11, 78:19, 78:24, 80:4, 92:14, 92:15, 93:10, 96:25, 103:19, 133:11, 171:10
**laws** [1] - 173:17
**lawsuit** [21] - 10:19, 11:16, 11:22, 11:23, 12:2, 12:3, 12:12, 12:16, 12:22, 12:24, 13:4, 13:5, 14:20, 18:16, 42:5, 53:5, 92:11, 92:12, 101:15, 148:19, 154:12
**lawyer** [12] - 36:13, 42:6, 42:24, 74:12,

74:18, 74:19, 89:23, 165:13, 165:17, 165:20, 166:10, 168:22

**lawyer's** [2] - 74:12, 86:21

**lawyers** [14] - 36:9, 36:22, 37:3, 53:2, 55:2, 74:4, 80:2, 80:15, 80:17, 81:2, 85:13, 85:14, 86:24, 107:3

**lawyers'** [3] - 74:3, 74:9, 77:21

**lead** [7] - 7:13, 7:14, 14:11, 58:2, 77:24, 138:5, 140:2

**leading** [1] - 101:16

**learn** [2] - 147:14, 147:23

**learned** [2] - 45:19, 135:9

**least** [11] - 5:18, 12:1, 14:24, 24:22, 54:21, 118:4, 162:24, 174:5, 175:23, 189:11, 189:18

**leave** [8] - 5:20, 38:8, 55:14, 79:6, 105:20, 139:5, 188:3

**leaves** [5] - 29:21, 29:22, 98:21, 187:23, 189:22

**left** [4] - 3:13, 20:23, 27:24, 92:4

**legal** [10] - 11:8, 44:21, 45:10, 82:13, 82:20, 85:13, 86:20, 165:9

**legible** [2] - 177:20, 177:21

**legitimate** [1] - 146:15

**LeJeune** [1] - 1:15

**less** [12] - 6:24, 7:22, 95:2, 181:22, 182:1, 182:5, 182:6, 182:16, 182:17, 183:11, 183:18

**letter** [29] - 28:25, 29:11, 67:11, 67:21, 68:9, 89:23, 101:15, 101:22, 102:6, 118:6, 164:22, 164:24, 165:4, 165:8, 165:18, 165:22, 165:24, 166:2, 166:16, 168:10, 168:13, 168:14, 168:18, 170:8, 174:2, 175:20,

176:2, 176:4, 188:16

**letters** [5] - 92:8, 92:9, 115:1, 166:6, 166:8

**letting** [4] - 31:23, 51:5, 155:25, 188:19

**level** [2] - 27:2, 77:12

**liability** [3] - 86:9, 105:4, 185:6

**Liany** [2] - 3:10, 20:15

**LIANY** [1] - 1:14

**license** [15] - 19:10, 19:15, 92:22, 98:12, 98:14, 133:8, 140:12, 141:17, 141:18, 144:13, 151:10, 157:16, 158:4, 158:5, 161:4

**licensee** [4] - 111:16, 133:6, 133:7

**licensees** [1] - 151:8

**licensing** [6] - 137:7, 140:17, 141:11, 158:8, 160:13

**lie** [5] - 99:16, 99:20, 99:25, 171:4, 171:6

**lied** [6] - 95:18, 95:20, 96:11, 99:12, 100:5, 102:1

**lies** [1] - 99:16

**life** [3] - 35:25, 86:21, 162:2

**light** [2] - 75:21, 76:6

**likely** [4] - 73:21, 76:7, 76:18, 77:3

**limine** [10] - 9:24, 15:15, 15:24, 90:2, 150:5, 175:1, 175:9, 188:12, 189:8, 190:16

**limit** [1] - 94:21

**limitations** [1] - 189:21

**limited** [10] - 75:6, 75:8, 86:8, 87:16, 105:4, 128:20, 138:1, 138:25, 149:20, 185:6

**limiting** [1] - 162:13

**line** [4] - 107:20, 108:3, 155:14, 168:12

**Lisa** [12] - 4:9, 4:12, 19:5, 87:20, 97:24, 105:25, 107:16, 107:17, 107:19, 121:9, 136:17, 160:11

**list** [1] - 119:4

**listed** [1] - 138:24

**listen** [6] - 73:1, 73:7, 78:8, 84:24, 143:18, 178:1

**listening** [2] - 79:5, 134:10

**lists** [1] - 114:25

**litigants** [1] - 80:17

**litigate** [2] - 12:4, 12:7

**litigation** [11] - 9:25, 10:17, 15:11, 15:13, 22:21, 93:24, 154:7, 154:9, 154:12, 189:15, 190:2

**litigator** [1] - 52:23

**live** [1] - 68:7

**livelihood** [1] - 166:23

**living** [2] - 46:24, 68:1

**LLC** [11] - 1:7, 3:4, 18:3, 18:23, 76:22, 77:5, 79:22, 86:8, 94:19, 105:2, 144:22

**loan** [11] - 184:6, 184:8, 184:14, 184:19, 185:3, 185:4, 185:13, 185:15, 186:22, 187:7

**loans** [1] - 185:25

**locations** [2] - 138:1, 138:24

**log** [1] - 179:7

**login** [1] - 179:4

**logo** [28] - 86:12, 86:17, 89:3, 94:23, 95:1, 95:3, 95:5, 95:15, 96:3, 96:17, 96:20, 99:17, 99:18, 99:22, 99:24, 100:2, 100:4, 100:14, 100:16, 101:15, 101:22, 102:7, 102:8, 165:10, 166:23, 167:6, 179:12

**longtime** [1] - 67:19

**look** [16] - 93:16, 94:8, 99:10, 100:8, 101:24, 121:4, 124:22, 127:6, 145:20, 174:4, 178:22, 179:13, 179:21, 182:8, 182:9, 185:18

**looked** [1] - 160:8

**looking** [7] - 14:15, 61:4, 84:3, 160:6, 160:7, 171:20, 181:8

**looks** [5] - 86:13, 165:24, 178:16, 178:25, 181:13

**Lopez** [3] - 29:16, 49:8, 64:12

**Los** [1] - 103:12

**losing** [2] - 101:3, 101:17

**loss** [1] - 93:6

**love** [1] - 30:15

**lower** [1] - 18:8

**lucky** [1] - 103:21

**lunch** [7] - 25:10, 50:9, 71:13, 72:25, 80:10, 80:16, 83:11

**Lutter** [15] - 35:22, 106:14, 150:3, 150:12, 150:20, 151:12, 151:16, 151:22, 157:11, 158:1, 159:5, 160:11, 175:8, 188:16

**Lutter's** [1] - 176:2

**lying** [1] - 100:11

**Lynn** [1] - 67:13

## M

**M-A-C** [1] - 41:5

**ma'am** [7] - 30:6, 43:8, 44:5, 48:10, 50:24, 52:9, 72:20

**MAC** [1] - 41:4

**madam** [2] - 130:25, 143:22

**magazines** [1] - 155:21

**Magistrate** [2] - 175:19, 188:17

**magistrate** [1] - 133:2

**magnify** [1] - 181:12

**mail** [23] - 10:25, 13:8, 13:9, 14:2, 14:4, 14:7, 14:11, 14:13, 15:21, 87:1, 87:2, 113:6, 113:15, 113:16, 113:17, 164:24, 165:1, 165:2, 165:4, 168:4, 168:8

**mails** [5] - 50:3, 78:3, 88:22, 113:3, 113:12

**main** [2] - 25:2, 88:11

**maladaptive** [2] - 33:11, 34:4

**manage** [2] - 29:7, 125:12

**management** [1] - 128:4

**manager** [4] - 41:3, 54:12, 57:22, 58:5

**managers** [1] - 58:2

**managing** [3] - 28:23, 129:10, 132:6

**manner** [1] - 75:17

**manual** [1] - 28:8

**March** [2] - 100:2, 171:3

**marginally** [2] - 176:7, 176:8

**Maria** [5] - 30:7, 54:8, 66:7, 71:2, 72:2

**mark** [63] - 9:1, 18:19, 18:25, 19:8, 19:11, 19:14, 19:16, 19:18, 19:20, 19:23, 57:1, 86:11, 86:13, 86:17, 86:18, 86:19, 87:5, 89:8, 89:9, 89:11, 89:13, 89:18, 91:8, 92:13, 92:14, 92:23, 93:18, 93:22, 94:3, 130:8, 130:9, 132:2, 132:3, 133:12, 147:14, 147:16, 147:19, 147:23, 147:25, 148:24, 149:10, 152:1, 165:25, 166:4, 166:14, 166:18, 166:20, 167:10, 168:17, 168:23, 168:24, 169:12, 169:18, 170:5, 170:6, 170:8, 170:12, 170:15, 170:24, 174:11, 179:18, 180:11

**marked** [6] - 115:11, 117:5, 119:2, 120:22, 152:5, 168:2

**market** [1] - 88:19

**marks** [1] - 169:24

**marriage** [5] - 68:8, 85:19, 85:20, 91:21, 91:22

**Martha** [4] - 48:11, 68:19, 71:3, 72:3

**master** [1] - 27:2

**masters** [1] - 27:16

**material** [2] - 115:22, 153:24

**materially** [1] - 158:22

**materials** [1] - 153:10

**math** [1] - 95:24

**matter** [14] - 20:5, 70:18, 87:8, 90:12, 114:24, 116:17, 116:21, 133:11, 173:22, 173:24, 174:1, 176:20, 192:5

**matters** [2] - 25:15,

91:19

**McDermott** [1] - 52:17

**MCDS** [1] - 68:5

**mea** [1] - 163:6

**mean** [45] - 7:23, 8:20, 9:7, 15:21, 25:17, 34:6, 41:6, 46:2, 48:8, 59:8, 59:17, 61:23, 69:11, 84:18, 109:11, 110:13, 113:4, 119:5, 125:13, 126:9, 126:23, 127:18, 128:9, 129:14, 134:9, 137:17, 138:6, 140:5, 140:21, 141:13, 142:7, 143:17, 145:7, 149:9, 152:23, 155:20, 158:20, 165:21, 170:22, 176:5, 180:7, 190:11, 190:20

**meaning** [2] - 8:21, 138:12

**means** [24] - 75:4, 76:5, 78:3, 84:15, 96:23, 98:21, 126:25, 127:1, 127:19, 127:22, 128:10, 129:15, 136:1, 137:8, 137:11, 137:12, 137:20, 140:22, 140:23, 141:25, 143:6, 143:8, 170:10, 171:16

**meant** [4] - 126:10, 131:14, 135:18, 141:15

**meantime** [2] - 17:2, 17:3

**mechanics** [1] - 24:1

**mechanism** [2] - 112:2, 169:23

**medical** [1] - 59:8

**medication** [1] - 16:7

**medium** [1] - 41:14

**meet** [8] - 36:15, 76:11, 87:10, 106:4, 106:14, 107:8, 107:15, 107:21

**meeting** [1] - 109:25

**Mejia** [3] - 43:9, 63:25, 64:10

**Mejia-Montes** [3] - 43:9, 63:25, 64:10

**members** [2] - 73:2, 88:14

**memory** [4] - 75:17, 79:8, 79:9, 79:10

**mention** [3] - 15:11, 20:19, 20:20

**mentioned** [13] - 10:22, 47:5, 57:21, 58:16, 60:1, 92:12, 100:11, 107:19, 126:2, 150:4, 168:5, 176:10, 186:22

**Mercedes** [4] - 32:18, 64:19, 70:24, 71:24

**merchandise** [1] - 58:15

**merely** [2] - 81:22, 87:14

**messages** [1] - 78:3

**met** [7] - 23:24, 97:10, 100:3, 106:10, 109:10, 109:15, 158:12

**MIAMI** [1] - 1:2

**Miami** [13] - 1:4, 1:16, 1:19, 1:23, 1:24, 40:15, 41:10, 61:1, 67:23, 67:24, 68:6, 192:11, 192:11

**Miami-Dade** [1] - 41:10

**mic** [4] - 28:20, 55:16, 160:20, 178:18

**microfiche** [2] - 104:7, 104:13

**microphone** [11] - 11:19, 21:9, 25:23, 29:14, 55:17, 102:23, 104:2, 125:21, 160:18, 177:16, 188:13

**mid** [1] - 178:7

**might** [13] - 9:8, 36:1, 36:20, 38:15, 45:25, 75:1, 134:5, 134:10, 169:15, 174:8, 181:4, 189:11

**Mijares** [55] - 3:12, 4:7, 6:19, 19:5, 20:17, 20:21, 35:18, 87:14, 87:19, 88:6, 88:15, 88:25, 90:10, 90:11, 91:2, 91:19, 92:6, 95:17, 97:10, 97:11, 97:14, 97:24, 98:24, 99:1, 99:11, 100:4, 100:5, 100:18, 101:6, 101:11, 107:8, 107:14, 108:3, 108:25, 109:3, 109:9, 116:22, 121:9, 125:18, 126:2, 128:13, 129:6, 130:7,

136:17, 139:13, 140:7, 147:16, 148:21, 160:11, 163:9, 167:9, 168:4, 168:8, 170:8, 172:11

**MIJARES** [3] - 4:8, 4:10, 4:14

**Mijares'** [1] - 19:6

**Mijares's** [1] - 87:6

**million** [8] - 94:2, 149:8, 181:20, 181:22, 181:24, 182:15, 182:17, 184:17

**mind** [10] - 5:2, 8:10, 24:16, 25:21, 28:15, 45:25, 77:23, 86:15, 163:17, 189:1

**minded** [1] - 68:2

**mindset** [1] - 46:12

**mine** [4] - 131:23, 167:2, 167:4, 167:6

**minor** [1] - 61:20

**minute** [5] - 7:22, 7:25, 102:18, 139:5, 147:24

**minutes** [14] - 5:2, 5:3, 5:4, 5:7, 5:8, 5:13, 5:14, 16:22, 17:3, 62:7, 132:17, 174:15, 174:19, 176:22

**mischaracterizes** [1] - 143:13

**misleading** [1] - 189:5

**missing** [1] - 49:22

**mistake** [3] - 130:15, 149:3, 149:14

**misunderstood** [2] - 174:25, 190:16

**misuse** [3] - 91:22, 142:5, 145:3

**modify** [1] - 98:18

**Mohammed** [4] - 40:7, 65:18, 71:1, 72:1

**mom** [2] - 30:3, 34:17

**moment** [3] - 21:10, 25:2, 159:10

**moments** [4] - 3:22, 16:18, 62:17, 72:11

**Monday** [3] - 33:10, 34:15, 67:20

**money** [7] - 39:8, 101:3, 101:5, 101:17, 163:12, 181:16, 186:12

**Monica** [4] - 38:24,

64:25, 70:25, 71:25

**monitor** [1] - 135:12

**Montes** [3] - 43:9, 63:25, 64:10

**month** [3] - 26:8, 140:1

**months** [6] - 33:1, 34:24, 57:12, 100:4, 101:21, 148:16

**moot** [1] - 15:17

**Morcos** [1] - 35:21

**MORCOS** [1] - 35:21

**morning** [38] - 3:7, 3:15, 3:17, 4:16, 17:21, 20:14, 25:10, 26:10, 26:17, 29:15, 30:12, 31:25, 32:1, 33:7, 35:19, 35:20, 38:25, 39:1, 39:19, 40:25, 41:1, 46:21, 46:22, 48:14, 49:9, 49:10, 51:3, 52:12, 52:13, 53:15, 54:9, 54:10, 55:22, 59:25, 81:18, 177:9, 187:19, 187:21

**most** [7] - 10:11, 20:20, 44:8, 60:5, 62:3, 82:12, 139:20

**mostly** [2] - 24:8, 41:8

**mother** [1] - 30:1

**mother's** [1] - 51:22

**motion** [25] - 4:15, 9:23, 11:7, 11:8, 13:6, 14:5, 14:12, 14:13, 14:16, 15:15, 15:17, 15:24, 90:2, 133:2, 133:3, 133:20, 175:1, 175:9, 175:24, 176:14, 188:12, 189:7, 190:15, 190:16

**motions** [3] - 22:17, 45:11, 133:20

**motivation** [3] - 11:23, 12:6, 12:22

**mouth** [1] - 26:3

**move** [20] - 6:22, 49:4, 49:7, 94:15, 123:7, 132:19, 138:10, 140:11, 142:1, 143:6, 143:7, 148:12, 151:24, 152:2, 152:19, 159:8, 163:23, 167:22, 171:25, 173:3

**moved** [4] - 27:19, 28:10, 28:18, 120:9

**moving** [5] - 68:12, 90:16, 137:8, 140:23,

156:8

**MR** [299] - 2:10, 2:11, 2:14, 3:7, 3:17, 4:4, 4:6, 4:8, 4:10, 4:14, 4:19, 4:20, 4:25, 5:3, 5:5, 5:9, 5:13, 5:16, 5:22, 5:25, 6:1, 6:11, 7:6, 8:4, 8:6, 8:23, 9:20, 9:23, 10:8, 11:1, 11:3, 11:6, 11:14, 11:20, 12:15, 13:25, 14:4, 14:23, 16:5, 16:9, 16:13, 16:17, 16:22, 17:1, 17:4, 17:5, 17:10, 17:12, 20:14, 20:19, 21:1, 55:14, 55:22, 56:8, 56:10, 56:12, 56:14, 56:17, 56:19, 56:21, 56:25, 57:3, 57:6, 57:10, 57:15, 57:18, 57:20, 57:24, 58:5, 58:8, 58:10, 58:12, 58:16, 58:19, 58:25, 59:3, 59:10, 59:13, 59:17, 59:19, 59:21, 59:25, 60:16, 60:18, 60:22, 61:6, 61:12, 61:15, 61:22, 61:25, 62:23, 62:24, 63:7, 63:11, 63:17, 63:18, 63:20, 63:24, 64:1, 64:2, 64:5, 64:11, 64:13, 64:14, 64:16, 64:21, 64:23, 65:2, 65:3, 65:7, 65:9, 65:14, 65:16, 65:20, 65:22, 65:24, 66:3, 66:5, 66:9, 66:11, 66:14, 66:16, 66:19, 66:21, 66:25, 67:2, 67:7, 68:10, 68:13, 68:16, 68:21, 68:23, 69:5, 69:8, 69:13, 69:15, 69:19, 69:23, 70:3, 70:8, 70:12, 70:17, 70:20, 70:22, 71:6, 71:8, 71:10, 81:16, 82:3, 82:6, 82:8, 82:18, 82:22, 83:2, 83:14, 83:15, 85:5, 85:9, 89:25, 90:9, 94:14, 102:14, 103:1, 104:5, 108:2, 110:24, 113:11, 114:24, 115:4, 115:7, 115:14, 116:7, 116:10, 116:15, 116:16, 117:7, 117:15, 117:19, 118:8, 118:10,

118:12, 118:16, 118:21, 119:6, 119:15, 120:6, 120:8, 120:9, 120:13, 120:24, 123:4, 123:6, 123:19, 123:24, 123:25, 124:1, 124:5, 125:4, 125:25, 130:15, 130:24, 131:6, 131:24, 132:15, 133:1, 133:19, 133:25, 134:12, 134:18, 135:8, 135:10, 137:18, 138:9, 138:17, 143:2, 143:13, 143:22, 144:2, 148:18, 150:4, 150:9, 151:24, 152:4, 152:7, 152:13, 152:18, 152:22, 152:25, 153:3, 153:7, 154:5, 154:6, 154:23, 155:2, 156:12, 156:14, 156:18, 159:8, 159:11, 159:14, 159:18, 160:22, 160:24, 163:17, 163:18, 163:22, 163:23, 164:2, 164:6, 164:10, 167:12, 167:18, 167:20, 167:21, 168:1, 171:9, 171:24, 171:25, 172:5, 174:20, 174:23, 175:4, 175:7, 175:17, 176:14, 176:16, 176:18, 177:6, 177:8, 177:11, 177:19, 177:24, 178:4, 178:6, 178:8, 178:21, 182:24, 183:2, 183:6, 183:8, 183:9, 184:1, 184:4, 184:5, 184:25, 185:1, 185:12, 186:21, 187:11, 187:13, 188:5, 188:7, 188:8, 188:11, 188:15, 189:15, 190:4, 190:23, 190:25

**MS** [4] - 55:12, 152:11, 171:23, 177:10

**multi** [3] - 94:2, 97:7, 149:8

**multi-million** [2] - 94:2, 149:8

**multi-state** [1] - 97:7

**must** [21] - 37:19,

38:8, 73:9, 73:11, 74:2, 74:25, 75:4, 75:8, 76:5, 76:11, 77:1, 77:16, 77:17, 78:2, 78:16, 110:13, 112:10, 115:22, 149:8, 165:2

---

## N

**name** [106] - 4:3, 17:21, 21:2, 21:10, 21:12, 23:21, 25:24, 28:21, 29:15, 30:7, 30:21, 30:23, 32:17, 33:7, 36:1, 48:11, 55:22, 56:8, 56:21, 56:24, 57:1, 57:15, 58:10, 60:1, 61:4, 71:22, 80:25, 83:25, 86:8, 88:3, 88:21, 94:16, 94:23, 95:1, 95:3, 95:15, 96:3, 96:17, 96:20, 98:12, 98:14, 98:18, 98:19, 98:22, 99:17, 99:18, 99:22, 99:24, 100:2, 100:16, 101:22, 103:10, 104:13, 104:22, 105:25, 106:14, 108:8, 112:15, 112:17, 119:24, 121:15, 121:20, 121:23, 122:2, 122:17, 122:18, 122:23, 123:7, 128:17, 130:5, 131:7, 131:8, 131:15, 131:16, 131:17, 132:4, 137:6, 140:12, 140:15, 140:22, 141:9, 141:15, 141:25, 142:2, 142:6, 142:9, 142:11, 142:18, 143:6, 143:7, 143:10, 145:4, 148:25, 152:1, 162:16, 167:10, 170:15, 172:21, 180:15

**named** [1] - 121:21

**names** [13] - 4:1, 21:14, 21:16, 22:2, 22:4, 35:16, 119:3, 119:22, 136:22, 140:24, 142:3, 144:7, 145:1

**narrow** [1] - 6:21

**nationwide** [1] - 87:13

**naturally** [1] - 25:4

**nature** [1] - 133:12

**necessarily** [5] - 23:8, 58:7, 81:13, 136:21, 175:21

**necessary** [4] - 52:22, 82:11, 82:17, 190:6

**need** [50] - 3:22, 6:7, 6:9, 7:7, 11:9, 14:7, 15:23, 16:3, 16:9, 16:18, 16:20, 21:21, 23:19, 24:5, 27:21, 33:13, 43:24, 50:11, 55:3, 55:16, 58:12, 62:12, 63:2, 72:5, 73:3, 81:16, 82:4, 82:15, 82:22, 82:23, 83:4, 102:20, 103:8, 108:16, 108:22, 124:24, 125:23, 132:23, 133:4, 133:18, 133:21, 160:20, 165:7, 175:12, 176:12, 176:15, 178:17, 178:18, 185:18, 190:14

**needed** [5] - 3:24, 89:7, 124:8, 149:19, 158:23

**needs** [5] - 16:11, 28:1, 76:9, 158:12, 181:5

**negate** [1] - 48:5

**nerve** [1] - 48:21

**networking** [1] - 78:4

**neutral** [2] - 25:3, 59:15

**never** [20] - 14:11, 14:12, 98:4, 98:6, 103:19, 109:15, 130:10, 131:16, 138:7, 153:16, 153:17, 153:24, 163:17, 169:17, 188:22, 188:23, 189:3, 189:4, 189:9

**new** [17] - 57:12, 87:11, 88:7, 88:18, 90:17, 90:21, 91:2, 99:4, 111:13, 112:15, 127:21, 128:12, 133:21, 135:21, 161:19, 162:2

**New** [1] - 32:4

**news** [2] - 78:8, 78:9

**next** [11] - 3:12, 62:5, 69:16, 81:25, 117:4, 138:21, 140:11, 148:13, 152:20,

158:18, 162:8

**night** [1] - 31:17

**nine** [8] - 5:19, 26:21, 44:13, 66:18, 69:10, 69:12, 70:23, 72:5

**NO** [1] - 1:2

**nobody** [6] - 29:20, 99:22, 122:11, 144:11, 145:5, 167:5

**Noel** [28] - 3:12, 19:5, 20:21, 35:18, 95:17, 97:10, 97:14, 97:24, 121:9, 125:17, 125:18, 126:1, 140:1, 140:22, 141:15, 145:19, 149:3, 149:13, 158:20, 160:11, 165:9, 165:21, 166:24, 168:4, 168:16, 169:1, 171:2, 173:10

**Noel's** [1] - 106:3

**Nolden** [1] - 35:21

**NOLDEN** [1] - 35:21

**none** [2] - 75:12, 94:9

**nonparty** [1] - 176:1

**noon** [1] - 69:2

**normal** [2] - 63:15, 69:10

**normally** [4] - 5:2, 22:19, 27:22, 82:9

**North** [2] - 1:23, 192:11

**note** [9] - 23:19, 29:3, 48:1, 62:2, 64:3, 79:4, 83:23, 133:23, 187:22

**noted** [1] - 133:17

**notes** [8] - 62:17, 79:1, 79:2, 79:7, 79:8, 79:9, 84:1, 84:3

**nothing** [9] - 16:17, 45:7, 97:2, 133:21, 155:12, 158:9, 167:5, 188:5, 188:7

**notice** [6] - 24:11, 154:24, 169:4, 169:6, 170:8, 174:4

**null** [5] - 90:23, 128:5, 161:24, 162:1, 173:9

**number** [75] - 14:25, 15:3, 21:11, 23:21, 23:25, 25:24, 25:25, 26:21, 28:22, 29:16, 30:8, 36:22, 38:24, 39:15, 40:7, 40:23, 41:22, 43:9, 44:6,

44:13, 46:23, 47:20, 48:11, 49:8, 49:19, 50:22, 51:1, 51:19, 52:10, 53:14, 54:8, 61:25, 63:17, 63:23, 63:24, 64:19, 64:25, 65:12, 65:18, 66:1, 66:7, 66:18, 66:23, 68:2, 68:18, 69:17, 70:1, 70:5, 70:11, 70:15, 70:24, 70:25, 71:1, 71:2, 71:3, 71:24, 71:25, 72:1, 72:2, 72:3, 93:9, 114:16, 115:2, 149:16, 160:4, 182:11, 182:12

**numbers** [7] - 114:19, 125:5, 160:6, 181:18, 182:9, 182:10

**nurse** [1] - 49:14

---

## O

**o'clock** [6] - 29:21, 30:11, 132:20, 134:2, 134:17, 174:17

**O'Neill** [6] - 40:23, 61:19, 62:3, 66:1, 71:1, 72:1

**oars** [2] - 147:20, 149:4

**oath** [4] - 18:5, 37:18, 37:21, 37:22

**object** [5] - 15:10, 65:1, 74:19, 112:17, 177:21

**objecting** [1] - 15:9

**objection** [54] - 5:23, 5:25, 63:19, 68:11, 68:14, 74:21, 74:23, 74:25, 82:1, 82:3, 82:13, 82:20, 116:11, 118:10, 118:11, 118:18, 120:6, 120:8, 123:20, 124:1, 124:2, 133:17, 133:24, 143:13, 150:4, 152:4, 152:24, 152:25, 153:1, 156:13, 156:14, 159:14, 159:15, 163:19, 163:22, 164:5, 164:6, 164:7, 167:12, 167:23, 171:24, 171:25, 172:2, 174:25, 177:13, 182:24, 182:25, 183:1, 183:5, 184:1, 188:11, 188:25,

17

189:9, 190:13
**objections** [11] - 16:1, 74:9, 82:9, 82:12, 82:19, 116:7, 159:12, 167:19, 167:20, 167:21, 177:7
**obligation** [3] - 31:20, 32:3, 32:7
**observing** [1] - 79:5
**obtain** [1] - 96:24
**obtained** [2] - 111:25, 157:12
**obtaining** [2] - 86:21, 157:16
**obviously** [3] - 45:18, 141:1, 165:23
**occur** [6] - 33:14, 34:5, 146:22, 146:24, 147:1, 147:2
**occurred** [1] - 172:19
**October** [3] - 95:17, 99:11, 130:8
**OF** [1] - 1:1
**off-price** [1] - 58:4
**offer** [1] - 151:10
**offering** [2] - 123:18, 156:11
**offhand** [1] - 178:14
**office** [4] - 30:10, 81:21, 88:8, 170:25
**Office** [12] - 19:9, 89:14, 89:17, 91:7, 93:23, 95:18, 96:12, 99:12, 99:17, 99:21, 100:1, 102:1
**OFFICER** [8] - 62:13, 71:16, 81:10, 83:9, 83:17, 132:21, 176:23, 191:3
**Officer** [3] - 24:8, 29:12, 49:5
**officer** [2] - 98:16, 120:1
**officers** [4] - 24:7, 24:10, 24:14, 119:21
**offices** [1] - 147:6
**official** [1] - 1:22
**Official** [2] - 89:15, 192:10
**offline** [1] - 78:6
**often** [1] - 78:19
**old** [8] - 28:22, 29:17, 42:13, 67:14, 86:23, 93:25, 117:16, 117:23
**olden** [1] - 150:12
**once** [5] - 16:6, 50:6, 83:24, 96:1, 96:3
**One** [1] - 131:19

**one** [102] - 3:25, 4:13, 9:4, 9:10, 10:5, 10:11, 11:1, 13:9, 15:1, 18:15, 18:22, 27:11, 27:12, 29:5, 30:10, 31:1, 32:19, 32:20, 34:6, 34:11, 34:12, 34:23, 35:5, 36:13, 37:2, 38:10, 38:17, 38:19, 41:24, 42:5, 42:6, 42:7, 45:13, 45:20, 51:1, 55:19, 59:3, 59:5, 59:11, 61:9, 61:10, 64:18, 64:19, 67:24, 69:1, 69:19, 69:20, 78:25, 80:17, 84:3, 87:12, 92:19, 99:21, 100:24, 104:16, 104:23, 107:23, 109:19, 111:12, 113:7, 113:17, 114:19, 114:20, 114:25, 115:18, 123:2, 134:15, 136:21, 147:17, 148:8, 148:11, 154:14, 154:16, 155:7, 156:10, 156:22, 157:15, 160:7, 161:11, 161:17, 161:19, 161:21, 161:25, 162:1, 162:2, 163:4, 166:6, 166:8, 167:5, 171:8, 175:2, 177:8, 184:23, 185:24, 189:9
**one-time** [1] - 185:24
**ongoing** [2] - 154:9, 154:11
**online** [1] - 78:6
**open** [4] - 77:23, 97:15, 98:7, 151:11
**opened** [3] - 61:1, 93:19, 97:17
**OPENING** [4] - 2:10, 2:11, 85:8, 94:13
**opening** [15] - 20:3, 25:11, 26:9, 74:4, 79:13, 79:14, 81:5, 84:21, 84:22, 90:1, 94:22, 117:9, 118:14, 120:17, 167:8
**openings** [2] - 5:8, 5:11
**operate** [1] - 135:9
**operating** [16] - 98:9, 110:25, 117:8, 117:25, 118:2, 118:3, 118:4, 118:13,

120:16, 129:12, 146:5, 161:13, 161:16, 162:3, 172:20, 173:2
**operations** [3] - 88:15, 125:16, 128:4
**opinion** [5] - 59:10, 59:17, 59:18, 73:14, 136:6
**opinions** [5] - 59:5, 59:6, 59:7, 59:8
**opportunity** [6] - 36:9, 36:14, 50:11, 55:5, 75:15, 81:25
**opposing** [2] - 20:23, 74:19
**opposite** [3] - 62:11, 76:9, 152:23
**Orange** [1] - 164:17
**Order** [1] - 3:1
**order** [16] - 14:11, 14:13, 36:10, 69:10, 75:3, 95:18, 96:12, 99:13, 150:5, 175:3, 175:18, 175:19, 176:6, 190:16, 190:17, 190:18
**orderly** [1] - 85:21
**orders** [1] - 135:21
**Oregon** [4] - 97:5, 151:11, 151:12, 151:19
**organize** [2] - 96:24, 146:20
**origin** [1] - 19:19
**original** [1] - 71:18
**Oropesa** [5] - 53:14, 70:15, 71:4, 72:4, 72:14
**Otazo** [6] - 175:3, 175:5, 175:9, 175:19, 188:17, 190:18
**Otazo-Reyes** [6] - 175:3, 175:5, 175:9, 175:19, 188:17, 190:18
**otherwise** [3] - 76:15, 162:17, 177:20
**outcome** [2] - 7:16, 75:18
**outline** [1] - 79:16
**output** [1] - 104:7
**outset** [1] - 84:19
**outside** [6] - 24:13, 37:12, 73:16, 78:19, 80:14, 136:5
**outweigh** [1] - 8:14
**outweighs** [1] - 6:25
**overall** [2] - 92:16, 123:3

**overcome** [1] - 43:23
**overcomplicating** [1] - 150:24
**overlap** [2] - 7:10, 9:5
**overnight** [1] - 30:3
**overrides** [1] - 146:4
**overrule** [1] - 74:21
**overruled** [4] - 90:5, 143:15, 150:8, 189:8
**own** [26] - 36:10, 56:5, 57:7, 59:5, 59:6, 59:7, 59:8, 59:16, 60:11, 79:8, 95:14, 97:23, 103:25, 105:24, 111:15, 129:16, 131:16, 131:23, 132:1, 148:25, 149:7, 165:10
**owned** [17] - 19:4, 56:10, 57:7, 88:20, 94:7, 95:14, 99:17, 99:18, 102:7, 114:5, 131:8, 131:11, 131:15, 131:16, 131:22, 132:5, 147:19
**owner** [9] - 21:5, 21:6, 91:1, 94:2, 100:25, 101:4, 105:6, 132:2
**ownership** [5] - 8:25, 91:4, 92:23, 94:3, 150:13
**owns** [3] - 19:7, 19:14, 98:1

---

## P

**P-00479** [1] - 153:20
**P-00482** [1] - 153:22
**P-41** [1] - 153:22
**P-478** [1] - 153:18
**P.A** [3] - 1:18, 22:13, 44:24
**p.m** [16] - 1:7, 25:13, 27:9, 27:11, 27:12, 28:1, 29:22, 81:7, 81:11, 83:18, 132:22, 134:25, 174:18, 177:3, 187:25, 191:4
**PA** [2] - 3:11, 56:9
**pacify** [1] - 90:13
**package** [1] - 158:17
**pads** [2] - 83:23, 187:22
**PAGE** [9] - 2:3, 2:4, 2:5, 2:6, 2:7, 2:8, 2:9, 2:10, 2:11
**page** [41] - 83:25, 84:1, 115:18, 115:25,

116:2, 117:4, 117:12, 117:21, 117:24, 119:7, 119:16, 119:20, 121:2, 121:4, 123:8, 124:14, 125:5, 134:14, 135:9, 154:25, 155:7, 155:8, 155:14, 156:20, 157:9, 157:15, 159:24, 160:2, 160:3, 160:4, 160:5, 162:8, 169:3, 169:14, 175:21, 179:7, 179:17
**Pages** [1] - 1:6
**pages** [3] - 117:3, 153:11, 155:21
**paid** [3] - 41:15, 158:7, 158:8
**Palm** [2] - 49:21, 58:3
**panel** [3] - 70:23, 71:5, 71:7
**panic** [1] - 64:5
**paper** [3] - 104:8, 107:1, 187:2
**papers** [1] - 31:12
**paperwork** [1] - 171:2
**paragraph** [15] - 90:25, 124:7, 126:5, 129:9, 129:23, 135:13, 137:21, 139:18, 140:11, 141:5, 141:6, 161:10, 162:8, 162:9, 175:20
**paralegal** [6] - 21:14, 22:10, 22:14, 22:16, 23:4, 45:12
**parallels** [1] - 109:16
**pardon** [1] - 180:25
**parents** [1] - 30:1
**part** [24] - 31:22, 36:8, 57:24, 57:25, 60:14, 61:12, 75:12, 94:4, 112:14, 114:11, 129:21, 133:2, 142:6, 144:3, 144:4, 145:3, 145:20, 146:3, 146:13, 149:12, 162:15, 163:20, 164:3, 178:16
**particular** [9] - 6:18, 15:21, 120:17, 140:24, 142:1, 152:19, 157:2, 170:12, 176:14
**particularly** [1] - 24:4
**parties** [33] - 5:20, 5:21, 11:11, 18:15,

18:17, 20:2, 20:10, 21:8, 23:13, 24:21, 25:7, 36:8, 36:16, 36:23, 37:3, 38:4, 63:4, 67:11, 75:25, 78:7, 78:18, 80:20, 81:6, 88:19, 88:23, 89:7, 91:20, 97:17, 121:4, 121:9, 160:11, 162:14, 183:2

**parties'** [1] - 80:2

**partner** [5] - 3:19, 60:8, 104:1, 105:14, 105:21

**partners** [2] - 60:9, 140:5

**partnership** [5] - 173:20, 173:22, 173:24, 174:1, 174:2

**parts** [1] - 137:23

**party** [4] - 61:21, 61:24, 79:16, 80:1

**pass** [4] - 28:13, 28:20, 29:11, 29:14

**past** [3] - 21:20, 38:17, 47:6

**patent** [1] - 81:21

**Patent** [12] - 19:9, 89:14, 89:16, 91:6, 93:22, 95:18, 96:12, 99:12, 99:17, 99:20, 99:25, 102:1

**patience** [1] - 71:22

**patients** [1] - 32:10

**PATRICIA** [2] - 1:22, 192:9

**pay** [7] - 158:6, 158:14, 158:20, 158:21, 186:1, 186:2

**payable** [1] - 39:9

**paying** [6] - 134:13, 158:6, 158:20, 163:5, 163:6, 163:7

**PBBA** [1] - 57:17

**Pedro** [1] - 33:8

**penalties** [1] - 37:24

**pending** [1] - 7:2

**people** [20] - 18:14, 30:18, 32:2, 38:13, 38:14, 46:6, 46:8, 73:16, 77:15, 104:9, 104:11, 126:11, 128:10, 128:12, 137:14, 137:16, 137:22, 139:22, 155:20, 155:22

**percent** [40] - 19:4, 19:5, 19:6, 21:6, 87:18, 87:19, 87:20, 87:21, 90:14, 90:21,

91:3, 97:23, 97:24, 97:25, 98:1, 99:4, 99:7, 100:25, 101:4, 103:4, 110:16, 111:8, 111:24, 124:16, 131:9, 131:11, 132:5, 149:1, 150:18, 150:25, 151:6, 157:5, 157:12, 157:16, 157:24, 158:2, 159:4

**peremptories** [2] - 69:21, 70:17

**peremptory** [10] - 36:23, 66:20, 66:22, 69:23, 69:25, 70:3, 70:5, 70:8, 70:12, 70:14

**perfect** [1] - 61:6

**performing** [1] - 149:19

**perhaps** [2] - 38:12, 38:19

**period** [9] - 96:4, 96:7, 96:9, 96:10, 96:14, 96:18, 97:8, 99:10, 101:23

**periodically** [1] - 110:8

**periods** [2] - 96:6, 101:24

**permission** [4] - 16:9, 16:10, 95:1, 98:23

**permit** [1] - 74:20

**perpetrated** [1] - 170:25

**person** [18] - 20:20, 24:3, 30:10, 35:4, 35:18, 35:19, 36:1, 36:4, 36:18, 36:24, 60:25, 62:20, 69:16, 80:19, 105:25, 106:14, 125:15, 156:4

**personal** [4] - 37:7, 85:13, 113:16, 132:4

**personally** [2] - 37:24, 73:19

**personnel** [1] - 88:9

**persons** [2] - 37:1, 56:3

**persuasive** [1] - 68:10

**Peter** [1] - 153:12

**petition** [1] - 93:24

**phonetic)** [1] - 67:15

**photocopies** [1] - 87:1

**photograph** [1] - 73:14

**phrases** [1] - 78:20

**physician** [1] - 32:1

**pick** [2] - 34:1, 34:2

**picked** [2] - 108:17, 172:20

**picking** [1] - 173:10

**piece** [3] - 73:25, 137:16, 187:2

**Pierce** [1] - 17:25

**pivotal** [1] - 8:24

**place** [2] - 32:21, 86:14

**places** [3] - 32:5, 78:10, 136:1

**PLAINTIFF** [5] - 1:13, 2:5, 2:10, 55:21, 85:8

**Plaintiff** [2] - 70:16, 153:12

**plaintiff** [72] - 3:6, 3:8, 3:13, 6:12, 8:10, 10:14, 11:21, 12:2, 13:7, 13:14, 13:16, 13:24, 16:4, 17:9, 18:21, 19:17, 20:15, 45:19, 46:1, 46:13, 53:4, 55:9, 62:18, 63:12, 64:20, 65:4, 65:8, 65:12, 65:23, 66:1, 66:10, 66:15, 66:18, 67:1, 67:5, 68:20, 68:22, 69:14, 69:17, 69:21, 70:7, 71:5, 76:3, 76:5, 76:8, 76:9, 76:11, 77:7, 77:10, 79:17, 79:19, 79:23, 81:20, 81:24, 82:5, 85:2, 85:11, 86:4, 87:24, 89:18, 89:22, 91:9, 94:25, 102:14, 113:24, 114:25, 116:18, 119:1, 183:3, 188:4, 189:4, 190:8

**Plaintiffs** [1] - 1:5

**plaintiffs** [4] - 4:7, 45:23, 46:2, 86:6

**PLAINTIFFS'** [1] - 2:16

**Plaintiffs'** [69] - 2:17, 2:17, 2:18, 2:18, 2:19, 2:19, 2:20, 2:20, 2:21, 2:21, 2:22, 2:22, 2:23, 7:16, 7:17, 11:23, 12:21, 13:1, 13:8, 13:10, 14:2, 45:14, 45:16, 60:5, 66:22, 69:24, 84:6, 115:3, 115:9, 115:11, 115:15, 116:8, 116:11, 116:13,

116:25, 117:5, 118:9, 118:18, 118:20, 118:22, 119:2, 120:10, 120:12, 120:14, 120:22, 123:24, 124:2, 124:4, 152:5, 152:9, 153:1, 153:6, 153:8, 156:15, 156:17, 159:11, 159:15, 159:17, 163:24, 164:1, 164:7, 164:9, 164:12, 167:23, 167:25, 172:1, 172:2, 172:4, 178:7

**plan** [3] - 14:6, 14:18, 14:19

**planning** [2] - 13:21, 52:15

**Plasencia** [4] - 52:10, 52:11, 60:21, 70:10

**platform** [5] - 88:7, 126:7, 126:20, 127:15, 128:2

**play** [3] - 74:7, 140:5, 140:7

**playing** [1] - 16:13

**pleadings** [1] - 4:12

**pleasantries** [1] - 80:19

**pleasure** [1] - 18:1

**plug** [1] - 158:17

**plus** [2] - 87:12, 109:19

**podium** [1] - 55:17

**point** [12] - 9:7, 15:22, 21:13, 118:12, 141:22, 148:3, 158:21, 165:5, 170:9, 176:7, 183:20, 189:11

**pointing** [1] - 177:11

**policy** [1] - 179:9

**pool** [1] - 38:11

**pose** [3] - 25:21, 39:21, 40:17

**posed** [1] - 155:15

**position** [11] - 7:5, 7:16, 7:17, 19:7, 19:13, 92:4, 114:11, 147:11, 172:23, 173:13, 189:23

**positive** [1] - 182:1

**possibility** [4] - 9:12, 31:21, 87:11, 89:7

**possible** [4] - 46:5, 117:17, 123:2, 130:24

**possibly** [1] - 38:1

**potential** [2] - 13:23, 88:23

**potentially** [1] - 175:14

**power** [2] - 125:11, 129:24

**PP** [3] - 184:6, 184:8

**PPP** [1] - 185:25

**practice** [3] - 42:25, 52:14, 92:16

**practiced** [1] - 138:7

**practitioner** [1] - 22:11

**precarious** [1] - 92:4

**predecessor** [1] - 171:15

**prefer** [4] - 37:10, 55:18, 55:20, 117:18

**prejudice** [1] - 75:19

**prejudicial** [5] - 7:7, 7:24, 8:2, 13:14, 176:9

**preliminarily** [1] - 84:11

**preliminary** [7] - 3:23, 6:9, 71:12, 72:24, 73:5, 80:6, 114:24

**PRELIMINARY** [2] - 2:9, 72:21

**premature** [2] - 77:24

**prepare** [1] - 146:20

**preparing** [1] - 7:23

**preponderance** [9] - 6:17, 76:5, 76:14, 76:20, 76:23, 81:22, 84:6, 84:13, 84:16

**presence** [5] - 24:13, 37:12, 126:8, 126:24, 127:16

**present** [5] - 14:9, 79:18, 79:23, 80:2, 92:25

**presentation** [5] - 7:25, 20:3, 25:11, 74:6, 81:6

**presented** [2] - 78:17, 80:1

**presents** [1] - 74:19

**preserve** [3] - 130:3, 132:6, 133:4

**preserved** [1] - 133:15

**president** [6] - 3:12, 20:21, 88:16, 88:17, 89:5, 130:2

**presiding** [1] - 18:1

**pretrial** [2] - 4:11, 183:3

**pretty** [7] - 27:23, 41:13, 43:19, 94:10,

104:10, 105:1, 129:7

**prevent** [3] - 33:14, 144:18, 144:20
**prevents** [1] - 133:7
**previously** [3] - 41:24, 43:13, 168:5
**price** [1] - 58:4
**prima** [1] - 8:25
**primarily** [2] - 23:25, 45:16
**primary** [2] - 24:2, 67:17
**principal** [3] - 48:14, 48:15, 53:18
**principles** [1] - 73:3
**print** [1] - 86:24
**printed** [1] - 104:9
**printers** [1] - 149:21
**printing** [1] - 104:8
**privacy** [2] - 62:21, 179:9
**private** [3] - 39:4, 55:7, 177:16
**privilege** [1] - 55:25
**probate** [1] - 52:24
**problem** [10] - 28:11, 34:23, 40:17, 46:13, 48:18, 48:21, 85:20, 118:8, 130:10, 151:15
**problems** [4] - 4:17, 89:20, 91:21, 151:12
**procedural** [1] - 128:23
**procedure** [3] - 24:25, 55:9, 85:2
**proceed** [9] - 55:11, 63:10, 81:5, 85:4, 90:8, 150:8, 176:11, 177:1, 177:5
**proceedings** [3] - 22:22, 191:4, 192:4
**process** [10] - 36:7, 37:1, 37:6, 38:4, 61:4, 61:13, 62:18, 96:22, 129:1, 129:2
**processes** [1] - 127:20
**processing** [1] - 97:12
**procuring** [1] - 6:14
**produce** [2] - 101:7, 101:9
**produced** [3] - 76:17, 189:23, 190:9
**producing** [1] - 189:21
**production** [5] - 189:19, 189:21, 189:25, 190:2, 190:8
**products** [2] - 58:8,

58:9

**professional** [4] - 27:3, 27:17, 59:17, 59:18
**professor** [1] - 28:17
**proffer** [1] - 133:15
**profit** [2] - 101:20, 183:16
**profitable** [1] - 183:13
**profits** [3] - 92:18, 93:3
**program** [2] - 27:3, 106:23
**programmer** [4] - 106:16, 112:3, 150:3, 150:11
**Progressive** [1] - 50:16
**project** [1] - 41:2
**prolonged** [1] - 7:13
**promise** [1] - 86:3
**promised** [3] - 78:24, 93:14, 157:20
**promises** [1] - 146:9
**promotional** [1] - 153:10
**pronounce** [2] - 4:2, 48:11
**pronouncing** [1] - 3:25
**pronunciation** [1] - 4:5
**proof** [8] - 6:16, 8:14, 9:8, 77:10, 77:12, 84:6, 84:10, 84:12
**proofs** [1] - 84:20
**proper** [2] - 12:25, 141:1
**properly** [1] - 50:4
**property** [3] - 125:12, 129:25, 171:11
**proposed** [1] - 14:11
**prosecution** [1] - 163:20
**prospective** [5] - 17:15, 18:6, 55:15, 62:15, 71:15
**PROSPECTIVE** [203] - 2:4, 21:12, 21:17, 21:19, 21:24, 22:2, 22:6, 22:9, 22:11, 22:17, 22:20, 22:23, 23:2, 23:5, 23:8, 25:25, 26:2, 26:7, 26:14, 26:18, 26:20, 26:25, 27:2, 27:7, 27:9, 27:11, 27:14, 27:17, 27:20, 27:25,

28:6, 28:12, 28:21, 29:15, 29:25, 30:7, 30:21, 30:24, 31:1, 31:4, 31:8, 31:11, 32:1, 32:16, 32:19, 32:22, 32:25, 33:7, 33:17, 33:20, 33:25, 34:10, 34:12, 34:14, 34:23, 35:3, 39:1, 39:3, 39:5, 39:8, 39:11, 39:14, 39:17, 39:20, 39:23, 40:2, 40:5, 40:8, 40:10, 40:12, 40:14, 40:18, 40:21, 40:24, 41:1, 41:4, 41:8, 41:12, 41:14, 41:17, 41:20, 42:1, 42:4, 42:9, 42:13, 42:15, 42:18, 42:23, 43:1, 43:7, 43:10, 43:12, 43:14, 43:18, 43:22, 44:4, 44:10, 44:14, 44:19, 44:21, 44:24, 45:1, 45:3, 45:7, 45:10, 45:15, 45:17, 46:3, 46:12, 46:19, 46:21, 46:25, 47:4, 47:8, 47:12, 47:16, 47:18, 47:24, 48:4, 48:8, 48:13, 48:16, 48:19, 48:25, 49:3, 49:6, 49:9, 49:14, 49:16, 49:18, 49:21, 49:24, 50:12, 50:15, 50:20, 50:23, 50:25, 51:8, 51:10, 51:12, 51:14, 51:17, 51:20, 51:24, 52:1, 52:3, 52:8, 52:11, 52:13, 52:15, 52:17, 52:20, 52:24, 53:3, 53:8, 53:11, 53:13, 53:15, 53:17, 53:19, 53:21, 53:25, 54:3, 54:6, 54:9, 54:13, 54:16, 54:19, 54:25, 56:7, 56:9, 56:11, 56:13, 56:15, 56:18, 56:20, 56:23, 57:2, 57:4, 57:9, 57:11, 57:17, 57:19, 57:23, 58:7, 58:9, 58:11, 58:14, 58:18, 58:20, 59:9, 59:12, 59:15, 59:18, 59:20, 60:14, 60:17, 60:19, 60:23, 61:9, 61:14, 61:20, 61:23
**protect** [6] - 89:7, 95:22, 100:6, 100:7, 132:3

**protest** [7] - 93:21, 94:8, 121:18, 121:20, 121:22, 148:23, 170:20
**protested** [1] - 93:17
**protocol** [2] - 16:5, 82:8
**prove** [4] - 73:15, 73:21, 76:6, 79:16
**proved** [2] - 76:13, 76:19
**proven** [2] - 77:3, 77:4
**provide** [17] - 18:17, 24:6, 29:20, 33:21, 55:6, 57:4, 57:14, 73:9, 86:1, 86:2, 88:7, 93:14, 113:8, 137:24, 138:22, 149:17, 183:24
**provided** [7] - 88:1, 89:17, 90:20, 90:22, 188:23, 189:10, 189:17
**provides** [2] - 8:25, 35:5
**providing** [1] - 123:10
**proving** [2] - 76:4, 76:23
**provision** [2] - 98:12, 98:14
**provisions** [1] - 174:10
**prudent** [1] - 166:12
**pry** [1] - 37:7
**Ps** [5] - 184:9, 184:10, 184:11, 184:12
**psychiatrist** [2] - 32:16, 59:7
**PTO** [4] - 131:22, 147:25, 169:22, 171:2
**public** [4] - 39:4, 39:5, 49:20, 93:20
**publish** [4] - 116:14, 152:10, 152:13, 152:15
**published** [3] - 89:14, 89:15, 153:3
**pull** [5] - 102:23, 104:2, 125:21, 167:11, 188:13
**pulled** [1] - 26:15
**pulling** [2] - 147:20, 149:4
**punitive** [1] - 93:8
**purchase** [1] - 98:13
**purging** [1] - 168:11
**purported** [1] - 15:1

**purportedly** [1] - 148:21
**purpose** [12] - 8:9, 11:25, 12:16, 38:6, 75:6, 75:8, 75:9, 97:17, 97:21, 123:9, 139:17, 161:7
**purposes** [8] - 12:21, 14:8, 15:10, 15:19, 135:15, 136:15, 152:23, 165:7
**pursuant** [2] - 10:9, 132:5
**put** [10] - 14:13, 26:5, 31:7, 46:4, 48:24, 55:20, 76:7, 98:8, 146:11, 176:10

---

**Q**

**qualified** [1] - 78:25
**quality** [1] - 133:12
**questioning** [2] - 55:2, 138:15
**questionnaire** [2] - 26:5, 58:17
**questionnaires** [3] - 3:21, 16:20, 36:13
**questions** [37] - 4:22, 13:19, 14:19, 24:16, 24:18, 36:12, 36:14, 36:15, 37:5, 37:9, 37:16, 37:17, 37:19, 38:6, 38:20, 38:22, 44:12, 47:23, 55:5, 55:7, 55:8, 56:2, 56:3, 56:4, 60:6, 61:17, 74:9, 79:19, 79:20, 123:1, 143:1, 149:12, 152:18, 164:2, 181:14
**quick** [1] - 56:1
**quickly** [5] - 104:12, 104:20, 105:1, 151:24, 157:1
**quietly** [1] - 24:11
**quote** [2] - 12:20, 98:15

---

**R**

**radical** [1] - 85:22
**rain** [1] - 73:19
**rained** [1] - 73:18
**raise** [6] - 18:4, 36:5, 38:2, 56:6, 72:5, 102:20
**raised** [1] - 19:21
**range** [3] - 107:13, 182:19, 184:18

**rather** [4] - 87:13, 95:24, 103:22, 137:7
**RBT** [1] - 33:17
**reach** [2] - 28:17, 75:10
**reached** [1] - 98:8
**react** [1] - 165:17
**reacted** [1] - 165:15
**read** [31] - 14:23, 18:18, 35:16, 72:24, 76:1, 78:8, 115:21, 117:6, 126:20, 127:7, 127:11, 129:23, 130:25, 131:2, 138:7, 139:7, 141:5, 141:6, 141:7, 144:15, 157:1, 157:2, 157:8, 161:19, 162:11, 164:14, 175:20, 175:23, 181:11, 185:9, 186:20
**reading** [4] - 123:17, 134:7, 134:9, 141:4
**reads** [2] - 125:10, 135:13
**ready** [13] - 17:9, 49:4, 55:11, 63:10, 83:13, 84:21, 85:4, 117:3, 134:22, 135:6, 160:22, 177:1, 180:21
**real** [1] - 178:25
**realized** [3] - 12:4, 92:21, 93:4
**really** [16] - 8:11, 10:10, 10:16, 32:11, 34:14, 107:12, 108:6, 113:14, 126:11, 126:25, 136:12, 146:11, 169:1, 181:19, 181:20, 183:19
**reason** [23] - 11:17, 23:20, 36:19, 36:25, 38:7, 39:12, 40:3, 40:19, 41:18, 43:5, 44:2, 48:1, 49:1, 50:18, 52:6, 53:9, 54:4, 54:17, 54:23, 97:17, 120:1, 165:3, 175:11
**reasonable** [1] - 108:10
**reasonableness** [1] - 75:21
**reasons** [5] - 7:8, 8:1, 13:3, 13:18, 129:10
**recap** [1] - 101:23
**receivables** [1] - 39:9
**receive** [7] - 58:14,

74:17, 74:22, 74:24, 164:24, 166:6, 168:8
**received** [13] - 4:15, 31:11, 56:19, 90:10, 92:23, 102:5, 118:6, 124:25, 158:1, 163:13, 164:22, 165:3, 165:18
**receives** [4] - 87:18, 87:19, 87:20, 89:23
**receiving** [5] - 111:8, 115:18, 165:8, 166:16, 168:14
**recently** [1] - 62:3
**recess** [8] - 17:6, 63:1, 63:8, 83:10, 83:11, 134:19, 176:22, 191:1
**Recess** [1] - 176:24
**recites** [1] - 124:14
**recognize** [15] - 36:1, 36:4, 115:22, 117:2, 119:18, 153:15, 154:22, 156:25, 159:22, 168:3, 170:12, 172:6, 178:13
**recognized** [2] - 90:21, 142:7
**recollection** [2] - 185:11, 187:5
**reconsideration** [1] - 133:3
**record** [21] - 20:8, 23:14, 23:15, 23:17, 23:18, 23:23, 35:24, 60:21, 62:2, 103:10, 116:9, 118:9, 120:7, 133:14, 143:25, 146:13, 146:14, 152:2, 164:3, 169:24, 172:1
**recorded** [1] - 131:2
**records** [8] - 108:21, 123:10, 128:23, 149:11, 149:19, 170:4, 171:14
**redesign** [2] - 178:19, 178:20
**REDIRECT** [1] - 2:13
**refer** [6] - 18:22, 18:23, 86:18, 94:19, 105:10, 115:2
**reference** [3] - 138:1, 138:24, 176:4
**referenced** [1] - 176:3
**references** [1] - 145:24
**referred** [9] - 111:1,

117:9, 118:13, 120:16, 121:12, 131:2, 142:20, 154:7, 154:9
**referring** [7] - 118:5, 136:4, 162:20, 169:25, 175:2, 175:18
**refers** [4] - 117:8, 117:25, 129:23, 144:9
**reflect** [1] - 97:22
**refresh** [1] - 185:11
**Refusal** [1] - 135:14
**refusal** [8] - 135:23, 137:10, 137:14, 137:15, 137:25, 138:23, 139:18, 139:22
**refused** [5] - 101:7, 101:8, 158:14, 158:20, 158:21
**regard** [1] - 15:15
**regarding** [8] - 14:21, 15:22, 24:18, 68:7, 68:9, 77:12, 175:1, 183:4
**regardless** [5] - 7:16, 7:18, 76:15, 76:17, 80:1
**region** [2] - 126:8, 127:16
**register** [3] - 56:12, 57:18, 89:11
**registered** [28] - 19:18, 49:14, 57:1, 89:16, 100:10, 132:3, 140:16, 140:22, 141:9, 147:14, 147:23, 148:1, 148:24, 152:1, 162:13, 166:20, 169:12, 169:18, 169:21, 170:5, 170:9, 170:15, 179:17, 179:18, 180:11, 180:13, 180:18, 181:2
**registering** [2] - 89:8, 163:8
**registration** [42] - 6:15, 8:8, 8:11, 8:24, 19:8, 19:23, 19:25, 61:2, 81:22, 86:19, 89:1, 89:2, 89:18, 91:1, 91:5, 91:13, 93:18, 93:22, 93:25, 94:7, 95:19, 96:13, 99:13, 99:14, 100:6, 130:8, 131:7, 147:16, 152:3, 162:19, 162:24, 163:2, 163:3, 163:21, 169:24,

170:1, 170:19, 170:20, 179:14
**regular** [3] - 9:14, 15:20, 82:20
**regularly** [3] - 22:22, 24:9, 60:15
**Rehan** [1] - 23:24
**rehearing** [1] - 133:20
**relate** [2] - 24:20, 48:2
**related** [8] - 9:4, 11:10, 77:15, 78:10, 78:11, 87:9, 123:10, 138:23
**relating** [5] - 9:24, 137:25, 150:6, 188:9, 189:10
**relationship** [4] - 15:3, 15:7, 15:8, 172:10
**relationships** [2] - 13:11, 128:4
**relatively** [3] - 25:6, 35:14, 91:15
**relatives** [1] - 91:15
**relevance** [5] - 10:10, 14:1, 82:14, 183:5, 183:6
**relevant** [5] - 8:7, 10:20, 11:24, 176:8, 176:9
**relief** [2] - 10:21, 77:6
**rely** [2] - 12:18, 79:8
**relying** [1] - 189:20
**remain** [3] - 18:4, 25:3, 72:11
**remaining** [3] - 37:1, 37:20, 176:1
**remarks** [2] - 74:5, 74:6
**remember** [29] - 4:25, 14:24, 25:24, 37:15, 79:1, 79:14, 104:25, 106:6, 107:10, 108:8, 110:7, 110:15, 115:18, 115:20, 139:16, 145:13, 147:15, 147:24, 154:16, 154:19, 155:3, 155:4, 155:9, 165:1, 165:5, 165:13, 165:22, 184:18, 184:21
**remind** [1] - 6:3
**removed** [2] - 90:3, 142:19
**render** [1] - 57:3
**renders** [1] - 15:17

**renewal** [2] - 91:11, 91:13
**renovating** [1] - 41:9
**renovations** [1] - 41:9
**repeat** [4] - 131:20, 144:1, 163:15, 173:1
**rephrase** [2] - 167:17, 184:3
**reply** [1] - 8:4
**report** [8] - 24:4, 24:19, 72:12, 80:8, 80:10, 80:11, 81:9, 187:18
**REPORTED** [1] - 1:21
**reporter** [4] - 50:8, 108:17, 130:25, 143:22
**REPORTER** [4] - 131:20, 143:23, 178:17, 188:13
**Reporter** [2] - 1:22, 192:10
**represent** [12] - 21:3, 60:2, 85:10, 94:18, 103:3, 110:9, 111:3, 118:24, 153:9, 155:11, 168:4, 169:25
**representations** [1] - 190:20
**represented** [2] - 112:20, 138:18
**representing** [4] - 3:8, 20:15, 46:13, 55:25
**Republic** [1] - 42:23
**reputation** [1] - 85:23
**request** [12] - 9:3, 10:9, 91:12, 93:8, 108:13, 138:14, 184:6, 189:21, 189:24, 190:1, 190:8, 190:12
**requested** [6] - 92:17, 184:14, 185:13, 189:3, 189:4, 190:7
**requesting** [2] - 5:2, 92:19
**requests** [2] - 81:24, 189:19
**require** [2] - 15:1, 85:14
**required** [8] - 25:3, 77:3, 77:12, 88:1, 88:6, 101:8, 111:12, 149:18
**requires** [3] - 6:18,

91:7, 91:11

**research** [4] - 22:18, 78:11, 86:20, 179:24
**researcher** [1] - 40:9
**reserve** [1] - 5:10
**reset** [1] - 162:2
**resident** [2] - 121:6, 146:19
**resign** [4] - 171:17, 172:13, 172:15, 173:6
**resigned** [2] - 172:25, 173:8
**resolve** [2] - 92:7, 93:15
**resolved** [1] - 18:16
**resources** [1] - 129:13
**respect** [3] - 6:14, 9:24, 89:21
**respectfully** [1] - 133:10
**respond** [2] - 175:15, 190:4
**response** [6] - 47:25, 137:1, 138:10, 145:9, 148:14, 155:18
**responsibilities** [1] - 23:25
**responsive** [1] - 138:11
**rest** [5] - 6:16, 6:22, 115:25, 117:3, 141:4
**restrict** [2] - 142:5, 145:3
**restricted** [2] - 122:16, 145:10
**restroom** [5] - 16:7, 50:9, 55:3, 63:3, 63:4
**restrooms** [4] - 62:11, 80:12, 80:13, 80:14
**result** [7] - 37:22, 37:23, 90:12, 112:25, 142:22, 150:17, 157:11
**resume** [3] - 132:20, 134:22, 187:15
**retail** [3] - 54:11, 57:22, 58:5
**retaliation** [3] - 10:14, 12:7, 15:2
**retired** [2] - 49:12
**retrieval** [5] - 96:23, 97:13, 107:2, 123:10, 149:19
**Retrieval** [5] - 18:20, 86:11, 89:3, 112:21, 162:12
**retrieve** [4] - 85:14, 108:22, 129:1, 188:2

**return** [2] - 71:17, 81:4
**reveal** [1] - 100:23
**revenue** [3] - 43:2, 183:11, 183:22
**revenues** [1] - 188:24
**reverse** [1] - 89:4
**reversible** [1] - 133:11
**review** [4] - 118:23, 120:19, 156:24, 159:20
**revisit** [1] - 133:18
**revoked** [1] - 19:11
**rewritten** [1] - 106:25
**Reyes** [6] - 175:3, 175:5, 175:9, 175:19, 188:17, 190:18
**rid** [1] - 161:7
**right-hand** [1] - 181:10
**rights** [6] - 89:24, 126:7, 127:2, 127:4, 127:14, 130:5
**rise** [13] - 17:7, 17:14, 62:13, 71:16, 81:10, 83:9, 83:17, 85:22, 132:21, 134:20, 176:23, 176:25, 191:3
**risk** [1] - 8:13
**Road** [1] - 1:15
**robe** [1] - 135:4
**Rock** [2] - 47:1, 47:2
**Rodriguez** [8] - 32:18, 38:22, 51:1, 59:4, 64:19, 69:1, 70:24, 71:24
**Rodriguez-Suarez** [8] - 32:18, 38:22, 51:1, 59:4, 64:19, 69:1, 70:24, 71:24
**role** [2] - 24:24, 74:7
**room** [10] - 72:13, 79:3, 79:7, 80:5, 80:8, 80:11, 80:12, 84:2, 132:19, 187:18
**rooms** [1] - 62:22
**rotate** [1] - 24:10
**routinely** [1] - 29:1
**RPR** [2] - 1:22, 192:9
**Rubio** [1] - 54:21
**rug** [2] - 167:11, 167:13
**rule** [4] - 24:25, 82:14, 174:22, 174:24
**ruled** [3] - 150:5, 188:18, 190:18
**Rules** [1] - 6:6

**rules** [7] - 15:20, 24:25, 34:3, 55:6, 74:17, 74:20, 78:14
**ruling** [2] - 82:21, 133:5
**rulings** [2] - 176:20
**run** [4] - 39:8, 58:3, 80:17, 168:15
**rung** [1] - 176:17
**running** [3] - 111:11, 128:10, 128:12

## S

**sake** [1] - 185:2
**sale** [1] - 99:6
**sales** [14] - 61:3, 92:5, 92:21, 93:2, 93:3, 103:24, 122:10, 122:21, 181:17, 182:13, 182:23, 183:18, 189:22
**salient** [1] - 139:21
**Sana** [2] - 26:20, 66:18
**Sanchelima** [9] - 3:8, 3:11, 20:15, 55:23, 90:1, 94:15, 150:7, 177:24, 188:21
**SANCHELIMA** [200] - 1:13, 1:15, 2:10, 2:14, 3:7, 4:19, 4:25, 5:3, 5:9, 5:13, 5:22, 6:11, 8:4, 8:6, 8:23, 9:20, 9:23, 10:8, 11:1, 11:3, 11:6, 14:23, 16:13, 16:22, 17:4, 17:10, 20:14, 20:19, 55:12, 55:14, 55:22, 56:8, 56:10, 56:12, 56:14, 56:17, 56:19, 56:21, 56:25, 57:3, 57:6, 57:10, 57:15, 57:18, 57:20, 57:24, 58:5, 58:8, 58:10, 58:12, 58:16, 58:19, 58:25, 59:3, 59:10, 59:13, 59:17, 59:19, 59:21, 62:23, 63:7, 63:17, 63:24, 64:1, 64:11, 64:13, 64:16, 64:21, 65:2, 65:9, 65:14, 65:24, 66:3, 66:16, 66:19, 66:21, 67:2, 67:7, 68:10, 68:13, 68:23, 69:15, 69:19, 69:23, 70:8, 70:17, 70:20, 71:6, 71:8, 81:16, 82:6, 83:14, 85:5, 85:9, 90:9,

102:14, 103:1, 104:5, 108:2, 110:24, 113:11, 114:24, 115:4, 115:7, 115:14, 116:7, 116:15, 116:16, 117:7, 117:15, 117:19, 118:8, 118:16, 118:21, 119:6, 119:15, 120:6, 120:9, 120:13, 120:24, 123:4, 123:6, 123:19, 123:25, 124:5, 125:4, 125:25, 130:15, 130:24, 131:6, 131:24, 132:15, 133:1, 133:25, 134:12, 134:18, 135:8, 135:10, 137:18, 138:9, 138:17, 143:2, 143:22, 144:2, 148:18, 150:9, 151:24, 152:7, 152:11, 152:13, 152:18, 152:22, 153:3, 153:7, 154:5, 154:6, 154:23, 155:2, 156:12, 156:18, 159:8, 159:11, 159:18, 160:22, 160:24, 163:17, 163:18, 163:23, 164:2, 164:10, 167:18, 167:21, 168:1, 171:9, 171:23, 171:25, 172:5, 174:20, 175:17, 176:14, 176:16, 176:18, 177:6, 178:6, 178:8, 178:21, 183:8, 183:9, 184:4, 184:5, 184:25, 185:1, 185:12, 186:21, 187:11, 187:13, 188:5, 189:15, 190:23, 190:25
**Sanchelima's** [1] - 90:4
**sat** [3] - 22:25, 23:2, 62:20
**saving** [2] - 9:16, 9:17
**savvy** [2] - 149:7, 155:23
**saw** [7] - 61:25, 73:13, 73:16, 74:13, 74:15, 99:13, 117:24
**say-so** [3] - 100:17, 100:18

**scales** [2] - 76:9, 76:10
**scan** [2] - 87:3, 128:22
**scanner** [2] - 160:4, 160:5
**scanners** [2] - 112:9, 149:21
**Schedule** [1] - 145:21
**schedule** [3] - 25:21, 40:17, 54:23
**scheduled** [2] - 14:16, 26:8
**scheduler** [1] - 30:9
**scheduling** [9] - 29:13, 30:5, 31:2, 33:4, 35:13, 44:16, 45:11, 49:11, 52:19
**Schneider** [2] - 54:8, 57:21
**school** [22] - 24:6, 29:2, 33:9, 33:13, 33:15, 34:1, 34:4, 34:9, 35:6, 35:10, 39:3, 39:4, 39:5, 39:6, 39:7, 41:9, 48:15, 53:18, 53:20, 67:18, 67:23, 103:23
**schools** [3] - 33:19, 33:20, 41:9
**sciatic** [1] - 48:21
**scientist** [3] - 40:10, 40:12, 40:13
**scroll** [1] - 134:14
**search** [1] - 78:6
**seat** [3] - 17:16, 17:18
**seated** [13] - 3:2, 17:20, 18:4, 21:4, 23:16, 62:16, 71:20, 72:9, 72:22, 81:12, 83:12, 83:21, 177:4
**seats** [2] - 71:18, 72:19
**second** [28] - 7:12, 9:21, 35:19, 42:5, 65:10, 69:24, 70:12, 70:13, 74:9, 84:1, 84:4, 95:16, 96:10, 99:10, 99:20, 123:8, 127:25, 139:6, 139:24, 141:24, 143:3, 144:3, 144:4, 174:4, 187:7, 188:21, 189:9
**seconds** [4] - 58:25, 154:5, 184:25, 187:11
**Secretary** [3] - 56:17, 61:13, 170:1

**secure** [1] - 95:19
**Securities** [1] - 67:16
**SECURITY** [8] - 62:13, 71:16, 81:10, 83:9, 83:17, 132:21, 176:23, 191:3
**security** [3] - 24:7, 24:10, 24:14
**see** [76] - 8:11, 10:10, 15:8, 20:8, 23:14, 23:18, 24:8, 24:10, 35:24, 36:2, 52:2, 53:4, 56:25, 57:6, 57:15, 67:20, 73:19, 75:16, 80:8, 81:9, 83:8, 89:4, 90:24, 94:6, 98:11, 98:15, 101:3, 101:5, 102:6, 105:25, 111:4, 112:21, 115:5, 115:8, 115:10, 115:12, 117:13, 117:14, 118:1, 118:2, 118:7, 119:22, 120:21, 124:9, 127:1, 128:7, 134:1, 134:17, 136:22, 140:12, 140:19, 143:3, 145:23, 152:12, 152:14, 152:16, 153:13, 157:15, 162:9, 168:6, 168:7, 168:11, 168:13, 170:7, 178:11, 178:24, 179:5, 179:9, 179:12, 179:15, 179:16, 181:12, 181:16, 183:20, 185:6, 187:20
**seeing** [4] - 32:9, 53:1, 55:4, 115:15
**seeking** [3] - 11:13, 15:16, 183:4
**sees** [1] - 78:24
**select** [6] - 6:5, 25:9, 38:5, 38:12, 56:24, 62:6
**selected** [15] - 24:5, 25:1, 36:3, 37:2, 39:22, 41:16, 43:6, 47:15, 49:23, 54:15, 71:22, 72:10, 72:12, 72:17, 143:10
**selecting** [1] - 36:7
**SELECTION** [2] - 2:7, 63:9
**selection** [3] - 6:10, 36:7, 62:18
**selections** [1] - 37:4
**self** [3] - 39:20,

57:13, 129:12
**self-contractor** [1] - 57:13
**self-employed** [1] - 39:20
**self-sufficient** [1] - 129:12
**sell** [2] - 98:23, 114:11
**selling** [2] - 135:21, 136:2
**semester** [3] - 27:24, 28:14, 49:25
**Seminole** [1] - 47:1
**send** [2] - 38:11, 93:12
**sense** [5] - 45:23, 95:11, 99:9, 161:25
**sent** [6] - 14:10, 26:4, 67:11, 92:8, 165:21, 174:2
**sentence** [15] - 127:11, 127:25, 129:23, 136:13, 136:21, 138:21, 140:14, 141:6, 141:7, 141:24, 142:12, 143:3, 144:4, 144:5, 162:18
**sentences** [1] - 129:9
**separate** [6] - 85:20, 85:21, 97:11, 151:10, 160:13, 161:4
**separated** [1] - 129:16
**separately** [1] - 161:4
**September** [1] - 181:13
**series** [1] - 103:24
**serve** [7] - 31:6, 42:17, 53:23, 64:8, 86:23, 127:21, 127:24
**served** [3] - 31:13, 41:24, 50:13
**servers** [2] - 112:7, 149:20
**serves** [1] - 68:4
**service** [9] - 35:4, 57:1, 61:11, 92:13, 92:14, 93:7, 126:13, 126:15, 133:12
**services** [10] - 19:1, 33:21, 57:3, 57:5, 85:13, 86:20, 123:10, 149:19, 149:20, 155:16
**serving** [9] - 36:18, 36:24, 47:14, 48:18,

51:13, 54:14, 77:14, 108:11, 108:13
**session** [3] - 17:7, 134:21, 176:25
**set** [2] - 46:14, 147:20
**sets** [1] - 114:25
**setting** [1] - 33:9
**settle** [3] - 150:21, 150:23, 158:2
**settled** [2] - 52:3, 53:5
**seven** [3] - 43:9, 63:24, 157:9
**seventh** [1] - 67:4
**seventies** [1] - 28:23
**several** [9] - 11:22, 12:17, 23:9, 92:7, 92:12, 123:22, 133:9, 149:7, 153:9
**shadow** [1] - 34:8
**shall** [15] - 98:18, 121:15, 124:7, 125:10, 126:6, 127:14, 129:10, 138:22, 142:5, 145:2, 146:3, 146:19, 149:17, 161:14, 162:14
**share** [3] - 79:3, 88:24, 145:22
**shared** [4] - 88:21, 88:23, 114:8
**Shareholder** [1] - 159:21
**shareholder** [6] - 87:25, 90:17, 90:21, 91:2, 98:3, 103:4
**shareholders** [5] - 88:13, 90:17, 90:18, 160:15, 161:6
**shareholders'** [1] - 124:15
**shares** [19] - 87:18, 87:19, 87:20, 90:15, 105:23, 110:16, 111:8, 111:24, 124:16, 124:19, 124:20, 124:25, 125:5, 150:18, 150:20, 150:25, 151:6, 159:4
**Shedrack** [5] - 46:20, 66:23, 67:3, 71:2, 72:3
**shop** [1] - 86:24
**Shores** [1] - 67:24
**short** [8] - 5:18, 8:4, 9:15, 18:18, 25:6, 30:10, 35:14, 43:20

**shorter** [1] - 7:13
**shortly** [1] - 62:10
**show** [36] - 81:8, 85:1, 86:12, 86:15, 87:6, 87:25, 88:12, 90:11, 90:25, 91:16, 93:17, 94:22, 95:5, 95:12, 95:13, 95:16, 95:20, 95:23, 96:19, 97:3, 97:6, 97:16, 98:11, 99:15, 100:5, 100:15, 101:6, 101:11, 101:16, 112:21, 115:24, 115:25, 116:25, 117:2, 118:22, 154:21
**showing** [5] - 56:21, 83:5, 165:11, 170:4, 185:2
**shown** [1] - 152:17
**shuffle** [1] - 52:21
**sic** [1] - 68:9
**sick** [1] - 34:20
**side** [23] - 5:6, 18:22, 18:24, 20:24, 21:8, 25:4, 36:14, 36:18, 45:13, 45:20, 45:21, 45:22, 46:11, 48:2, 50:19, 52:6, 59:11, 62:11, 76:10, 79:13, 87:21, 88:1, 181:10
**side's** [1] - 74:6
**sidebar** [4] - 82:10, 82:15, 82:24, 83:1
**sidebars** [1] - 82:16
**sides** [24] - 18:25, 20:1, 21:18, 38:10, 39:13, 40:4, 40:20, 41:19, 43:6, 44:3, 47:17, 49:2, 51:15, 54:5, 54:18, 54:24, 62:19, 64:8, 64:9, 76:9, 85:12, 88:11, 95:10, 134:10
**signal** [1] - 93:12
**signature** [12] - 94:6, 120:20, 120:21, 121:2, 121:3, 159:24, 160:3, 160:9, 162:21, 162:23, 172:8, 172:9
**signed** [20] - 67:12, 91:2, 91:4, 94:5, 114:4, 118:5, 118:14, 120:17, 120:18, 138:18, 139:9, 139:13, 141:13, 145:14, 146:15, 157:4, 157:8, 157:9, 160:1, 160:25
**significant** [3] - 6:23,

26:11, 26:13
**silent** [1] - 37:20
**similar** [9] - 86:9, 104:8, 104:20, 108:5, 117:1, 142:3, 144:7, 145:1, 166:6
**simple** [3] - 45:20, 123:1, 158:7
**simpler** [4] - 117:20, 117:21, 143:1, 159:19
**simply** [2] - 73:20, 94:1
**single** [2] - 99:5, 99:6
**sister** [1] - 74:13
**sit** [13] - 6:3, 20:6, 36:3, 38:19, 48:24, 69:6, 72:17, 72:18, 72:19, 72:20, 83:19, 86:2
**sitting** [5] - 32:7, 34:4, 39:21, 60:3, 125:18
**six** [4] - 5:18, 30:8, 41:22, 152:7
**size** [1] - 41:14
**SkyLease** [4] - 30:22, 30:24, 30:25, 31:1
**smelled** [1] - 73:13
**Smith** [6] - 25:25, 44:6, 44:7, 58:16, 63:18, 63:21
**smoothly** [1] - 24:1
**snapshot** [1] - 153:13
**snapshots** [1] - 153:10
**snowbirds** [1] - 32:4
**so-called** [1] - 110:25
**social** [1] - 78:4
**software** [35] - 88:2, 89:21, 89:24, 90:9, 90:14, 106:18, 106:20, 108:24, 111:10, 111:12, 111:15, 111:18, 112:1, 127:20, 128:20, 128:22, 149:21, 149:24, 149:25, 150:14, 150:22, 151:3, 151:9, 157:16, 157:20, 157:23, 158:5, 158:8, 158:12, 158:13, 158:15, 160:14, 161:3
**sold** [2] - 98:5, 98:6
**sole** [1] - 22:11
**someone** [3] - 73:13,

168:25, 173:20

**sometime** [5] - 106:5, 107:9, 110:7, 110:13, 148:4

**sometimes** [9] - 34:3, 34:16, 45:13, 75:2, 93:7, 108:13, 108:20, 183:15

**somewhat** [1] - 9:8

**somewhere** [3] - 107:13, 181:19, 181:21

**son** [1] - 22:12

**soon** [1] - 111:4

**Soraya** [5] - 39:16, 56:9, 65:12, 70:25, 71:25

**sorry** [43] - 4:11, 12:13, 14:2, 20:19, 29:23, 30:23, 60:24, 63:16, 66:10, 71:6, 104:2, 104:25, 107:25, 109:4, 110:18, 110:22, 114:22, 114:23, 116:14, 120:25, 122:16, 123:14, 125:3, 125:20, 130:14, 130:22, 131:18, 131:25, 142:24, 146:23, 154:11, 155:4, 155:10, 156:10, 158:24, 160:18, 163:15, 167:15, 170:3, 173:25, 178:17, 185:9, 187:24

**sort** [4] - 10:14, 91:22, 137:9, 154:1

**Souffront** [8] - 30:8, 41:22, 61:16, 62:3, 66:7, 66:13, 71:2, 72:2

**sound** [4] - 21:15, 22:2, 22:4, 180:19

**sounds** [1] - 125:14

**sour** [1] - 85:19

**source** [1] - 78:22

**South** [1] - 28:24

**SOUTHERN** [1] - 1:1

**Southern** [3] - 12:19, 17:22, 17:23

**Soutto** [5] - 40:7, 40:8, 65:18, 71:1, 72:1

**space** [1] - 88:8

**span** [1] - 96:4

**spans** [1] - 17:24

**speaking** [3] - 23:22, 43:17, 82:19

**special** [1] - 78:20

**specialize** [1] - 171:11

**specialty** [1] - 47:1

**specific** [8] - 10:6, 21:24, 24:16, 36:14, 36:25, 99:16, 143:25, 175:20

**specifically** [10] - 22:1, 28:18, 33:23, 41:7, 45:8, 47:22, 54:11, 141:7, 153:11, 190:7

**speculate** [1] - 182:10

**speculating** [1] - 183:20

**speculative** [1] - 10:16

**spent** [1] - 163:9

**split** [1] - 5:10

**spoken** [3] - 38:21, 41:23, 44:15

**spouse** [4] - 49:12, 49:15, 53:5, 54:1

**square** [1] - 89:4

**staff** [1] - 46:14

**stake** [1] - 105:22

**stamp** [1] - 160:5

**stamped** [1] - 153:12

**stand** [5] - 48:20, 48:22, 48:23, 71:23, 72:20

**standard** [3] - 9:10, 84:15, 84:16

**standards** [3] - 9:8, 9:14, 84:16

**standing** [3] - 22:7, 133:23, 134:9

**stands** [1] - 181:6

**start** [15] - 17:3, 20:11, 21:10, 25:14, 25:15, 25:16, 55:2, 63:12, 63:13, 66:12, 83:25, 87:11, 144:18, 162:2, 187:16

**started** [17] - 34:24, 86:7, 87:8, 88:9, 103:25, 104:19, 104:21, 104:25, 105:1, 105:14, 108:6, 114:4, 148:20, 165:9, 167:4, 171:3

**starting** [5] - 3:5, 25:22, 30:14, 122:19, 144:19

**starts** [2] - 27:12, 146:3

**startup** [1] - 143:12

**State** [5] - 49:21,

56:15, 56:17, 61:13, 170:1

**state** [48] - 3:5, 8:10, 8:15, 9:25, 10:5, 10:15, 10:19, 11:7, 11:16, 12:2, 12:4, 12:8, 13:12, 14:6, 15:4, 15:11, 23:21, 25:24, 32:17, 42:2, 42:4, 50:14, 50:15, 61:5, 97:7, 103:10, 121:6, 135:24, 136:5, 136:18, 137:20, 137:23, 138:12, 138:25, 139:1, 139:3, 139:4, 139:17, 154:7, 154:9, 154:14, 169:21, 173:16, 173:17, 180:13

**STATEMENT** [4] - 2:10, 2:11, 85:8, 94:13

**statement** [13] - 15:16, 79:13, 79:14, 117:10, 120:17, 167:9, 179:20, 180:6, 180:20, 180:22, 180:24, 181:1, 181:7

**statements** [9] - 20:3, 25:11, 74:3, 74:4, 81:5, 84:22, 84:23, 84:24, 84:25

**States** [11] - 1:23, 17:22, 19:9, 89:14, 89:16, 95:18, 96:12, 99:12, 99:16, 99:20, 192:10

**STATES** [2] - 1:1, 1:11

**states** [4] - 97:5, 97:6, 99:3

**stating** [2] - 19:22, 82:13

**status** [1] - 14:19

**Statute** [1] - 10:9

**statutes** [1] - 92:15

**stay** [3] - 30:2, 132:19, 173:19

**steal** [1] - 61:24

**STENOGRAPHICALLY** [1] - 1:21

**step** [5] - 17:17, 62:14, 71:19, 71:20

**STEVEN** [1] - 2:14

**Steven** [22] - 18:3, 21:4, 35:19, 40:23, 60:2, 66:1, 71:1, 72:1, 76:22, 94:18, 95:6, 95:13, 96:2, 96:19, 98:4, 102:22, 103:12,

121:5, 146:18, 149:16, 149:17, 160:12

**Steven@ unisourcediscovery. com** [1] - 113:19

**still** [19] - 7:17, 7:19, 16:1, 48:7, 69:21, 88:16, 98:1, 104:21, 133:4, 133:10, 135:5, 135:8, 167:6, 168:17, 170:15, 173:14, 177:18, 189:1

**stipulated** [4] - 146:14, 151:25, 156:8, 183:2

**stipulation** [5] - 4:11, 177:18, 177:19, 177:20, 183:3

**stock** [3] - 67:16, 124:25, 145:24

**stocks** [3] - 67:25, 157:5, 157:24

**stolen** [2] - 61:17, 61:21

**Stop** [2] - 101:15, 101:22

**stop** [4] - 100:21, 102:3, 166:4, 173:10

**stopped** [3] - 91:17, 91:19, 158:14

**store** [2] - 58:15, 129:2

**stored** [1] - 104:9

**stores** [1] - 58:3

**straight** [1] - 30:14

**street** [1] - 42:12

**stretch** [1] - 103:7

**stretches** [1] - 29:9

**stricken** [1] - 150:7

**Stricker** [2] - 50:22, 70:1

**strike** [7] - 63:21, 64:10, 64:15, 68:12, 68:17, 133:2, 138:10

**strikes** [1] - 62:19

**striking** [2] - 64:7, 75:3

**structure** [1] - 124:15

**student** [11] - 27:2, 34:7, 34:10, 34:11, 34:12, 34:16, 34:22, 35:7, 47:5, 47:7, 47:9

**students** [4] - 33:12, 34:3, 34:6, 34:8

**studied** [3] - 42:18, 47:12, 171:10

**study** [4] - 28:4, 28:7, 42:22, 47:11

**studying** [1] - 27:15

**stuff** [6] - 128:22, 136:2, 140:2, 158:5, 158:16, 161:20

**Suarez** [8] - 32:18, 38:22, 51:1, 59:4, 64:19, 69:1, 70:24, 71:24

**subject** [13] - 13:17, 15:18, 15:20, 18:13, 20:5, 116:17, 116:21, 137:6, 137:7, 140:17, 141:10, 141:17, 190:7

**submit** [3] - 85:25, 89:6, 133:10

**submitted** [2] - 14:11, 95:9

**Subpoena** [17] - 87:15, 108:9, 108:10, 122:22, 126:2, 126:8, 126:23, 126:24, 127:15, 127:21, 128:5, 128:10, 129:10, 129:16, 129:21, 142:18

**subpoena** [5] - 86:23, 97:12, 108:22, 109:1, 129:1

**subpoenas** [7] - 108:11, 108:13, 108:20, 126:12, 127:21, 127:24

**subscribed** [1] - 110:16

**subsequently** [1] - 106:24

**substance** [2] - 13:22, 176:5

**substantial** [1] - 128:14

**substantially** [5] - 7:10, 9:5, 87:16, 105:17, 108:3

**succeed** [1] - 81:20

**successful** [4] - 97:9, 99:3, 101:18, 102:8

**successfully** [1] - 77:3

**sudden** [1] - 89:22

**suddenly** [2] - 91:25, 92:1

**sue** [1] - 159:5

**suffered** [1] - 93:5

**suffers** [1] - 64:5

**sufficient** [1] - 129:12

**suggest** [1] - 69:8

**suggested** [1] - 190:19

**suggestion** [3] - 6:12, 83:24, 190:10

**suggests** [1] - 74:12

**Suite** [1] - 164:17

**sum** [1] - 38:4

**summarize** [1] - 80:3

**summarized** [1] - 85:19

**summary** [4] - 18:18, 20:1, 76:1

**superior** [1] - 89:23

**supervision** [1] - 35:5

**supplant** [1] - 161:20

**support** [3] - 85:13, 86:20, 128:2

**supposed** [10] - 30:2, 79:15, 97:20, 136:6, 136:7, 137:17, 138:3, 138:4, 138:6

**supposedly** [1] - 100:1

**supposing** [1] - 123:2

**surgeon** [1] - 29:4

**surgery** [8] - 26:2, 26:7, 29:3, 44:7, 67:8, 67:10, 67:20, 68:9

**surrounding** [1] - 12:23

**survives** [1] - 8:25

**sustain** [2] - 74:23, 74:25

**sustained** [5] - 167:16, 183:7, 184:3, 188:25, 190:13

**SW** [1] - 1:15

**swear** [2] - 24:2, 71:11

**sweater** [1] - 135:1

**switched** [1] - 47:13

**swore** [1] - 155:12

**sworn** [7] - 18:6, 18:9, 72:6, 72:7, 73:3, 102:21, 102:22

**SWORN** [2] - 2:4, 2:8

**symbol** [1] - 170:12

**synergism** [1] - 109:21

**System** [1] - 68:4

**system** [2] - 58:17, 108:24

**systems** [1] - 128:3

---

### T

**table** [4] - 3:10, 20:11, 20:20, 55:15

**taboo** [1] - 175:22

**talks** [1] - 13:10

**Tarajano** [3] - 21:12, 51:19, 70:5

**task** [1] - 62:5

**tax** [4] - 52:15, 57:4, 60:19, 186:1

**taxable** [1] - 186:9

**taxes** [1] - 186:2

**teacher** [1] - 34:6

**teachers** [1] - 33:13

**technician** [2] - 33:8, 33:18

**technology** [1] - 77:25

**telephone** [1] - 114:16

**temperature** [1] - 135:3

**ten** [22] - 17:2, 28:22, 30:10, 46:23, 66:23, 67:14, 91:11, 130:10, 137:16, 150:18, 150:25, 151:6, 157:5, 157:12, 157:16, 157:24, 158:2, 158:18, 159:4, 174:15, 174:19, 176:22

**ten-year** [2] - 28:22, 67:14

**tendency** [1] - 15:13

**tender** [2] - 71:5, 71:7

**tending** [1] - 93:17

**terminated** [3] - 161:14, 162:5, 173:9

**terminates** [1] - 161:11

**terms** [2] - 16:5, 93:2

**territory** [2] - 88:19, 142:16

**test** [1] - 83:6

**testified** [4] - 116:4, 143:14, 158:2, 180:10

**testifies** [1] - 13:24

**testify** [2] - 35:16, 36:4

**testifying** [2] - 75:17, 75:18

**testimony** [22] - 50:7, 73:12, 75:11, 75:14, 75:20, 75:21, 76:15, 78:16, 79:9, 79:11, 91:17, 92:6, 93:16, 95:9, 98:25, 116:5, 143:14, 150:6, 165:18, 175:22, 180:12

**Texas** [2] - 138:25, 139:4

**text** [2] - 31:17, 78:3

**texted** [2] - 50:25, 51:2

**THE** [436] - 1:10, 1:13, 1:17, 2:3, 2:5, 2:6, 2:9, 3:2, 3:15, 3:21, 4:5, 4:7, 4:9, 4:11, 4:15, 4:21, 5:1, 5:4, 5:6, 5:11, 5:14, 5:17, 5:24, 6:2, 7:3, 8:5, 8:20, 9:3, 9:21, 10:6, 10:25, 11:2, 11:4, 11:12, 11:19, 12:13, 13:20, 14:1, 14:21, 15:15, 16:8, 16:10, 16:15, 16:18, 16:24, 17:2, 17:8, 17:11, 17:13, 17:16, 17:19, 17:20, 18:8, 20:17, 20:23, 21:7, 21:16, 21:18, 21:23, 22:1, 22:3, 22:7, 22:10, 22:16, 22:19, 22:22, 22:25, 23:3, 23:6, 23:12, 26:1, 26:6, 26:11, 26:16, 26:19, 26:24, 27:1, 27:6, 27:8, 27:10, 27:13, 27:15, 27:18, 27:22, 28:2, 28:9, 28:15, 29:11, 29:23, 30:4, 30:20, 30:23, 30:25, 31:2, 31:5, 31:9, 31:23, 32:15, 32:17, 32:20, 32:24, 33:3, 33:15, 33:19, 33:23, 34:8, 34:11, 34:13, 34:19, 35:1, 35:12, 39:2, 39:4, 39:7, 39:10, 39:12, 39:15, 39:18, 39:21, 39:25, 40:3, 40:6, 40:9, 40:11, 40:13, 40:16, 40:19, 40:22, 40:25, 41:2, 41:6, 41:11, 41:13, 41:15, 41:18, 41:21, 42:2, 42:8, 42:11, 42:14, 42:16, 42:22, 42:24, 43:3, 43:8, 43:11, 43:13, 43:15, 43:19, 43:24, 44:5, 44:11, 44:15, 44:20, 44:23, 44:25, 45:2, 45:5, 45:8, 45:13, 45:16, 45:18, 46:6, 46:17, 46:20, 46:22, 47:3, 47:5, 47:11, 47:14, 47:17, 47:19, 47:25, 48:5, 48:10, 48:14, 48:17, 48:22, 49:1, 49:4, 49:7, 49:10, 49:15, 49:17, 49:19, 49:22, 50:5, 50:13, 50:18, 50:21, 50:24, 51:5, 51:9, 51:11, 51:13, 51:15, 51:18, 51:21, 51:25, 52:2, 52:5, 52:9, 52:12, 52:14, 52:16, 52:19, 52:23, 53:1, 53:4, 53:9, 53:12, 53:14, 53:16, 53:18, 53:20, 53:22, 54:1, 54:4, 54:7, 54:10, 54:14, 54:17, 54:20, 55:1, 55:13, 55:16, 55:21, 58:2, 59:2, 59:23, 59:24, 60:21, 62:2, 62:16, 62:25, 63:2, 63:10, 63:12, 63:19, 63:21, 63:25, 64:3, 64:7, 64:12, 64:15, 64:17, 64:22, 64:24, 65:4, 65:8, 65:10, 65:15, 65:17, 65:21, 65:23, 65:25, 66:4, 66:6, 66:10, 66:12, 66:15, 66:17, 66:20, 66:22, 67:1, 67:3, 67:8, 68:11, 68:14, 68:17, 68:22, 68:24, 69:6, 69:9, 69:14, 69:16, 69:20, 69:24, 70:4, 70:10, 70:13, 70:18, 70:21, 70:23, 71:7, 71:9, 71:11, 71:17, 72:9, 72:22, 81:12, 82:1, 82:4, 82:7, 82:12, 82:19, 82:25, 83:3, 83:10, 83:12, 83:16, 83:19, 85:7, 85:8, 90:5, 94:12, 94:13, 102:12, 102:16, 102:18, 102:19, 102:23, 102:24, 104:2, 107:23, 107:25, 110:18, 110:22, 113:7, 114:22, 114:23, 115:2, 115:6, 116:11, 116:14, 117:18, 118:11, 118:18, 119:13, 120:10, 122:25, 123:14, 123:15, 123:16, 124:2, 125:2, 125:3, 125:20, 125:22, 125:23, 130:11, 130:12, 130:13, 130:14, 130:16, 130:17, 130:21, 130:23, 131:19, 131:20, 131:22, 132:13, 132:16, 132:23, 133:17, 133:23, 134:1, 134:15, 134:22, 135:2, 136:25, 137:2, 137:3, 137:4, 138:14, 142:24, 143:15, 143:17, 143:18, 143:20, 143:23, 143:25, 148:11, 148:15, 150:8, 152:5, 152:8, 152:10, 152:12, 152:15, 152:21, 153:1, 153:5, 155:1, 156:10, 156:15, 159:10, 159:15, 160:18, 160:23, 163:24, 164:7, 167:13, 167:14, 167:15, 167:16, 167:23, 171:8, 172:2, 174:13, 174:19, 174:22, 174:24, 175:6, 175:16, 175:24, 176:15, 176:17, 176:19, 177:1, 177:4, 177:14, 177:22, 178:1, 178:5, 178:17, 178:19, 182:25, 183:5, 183:7, 184:2, 184:3, 185:9, 186:19, 187:12, 187:14, 187:24, 188:1, 188:2, 188:6, 188:10, 188:13, 189:13, 190:6, 190:24, 191:1

**themselves** [3] - 20:10, 24:22, 74:7

**theory** [1] - 10:13

**therapist** [1] - 29:19

**Therapy** [1] - 57:17

**therapy** [5] - 29:20, 34:1, 34:7, 57:11, 57:14

**thereafter** [1] - 148:3

**Therefore** [1] - 138:21

**therefore** [4] - 7:19, 31:15, 137:11, 137:23

**thinks** [1] - 74:20

**third** [6] - 65:17, 70:8, 89:7, 96:14, 99:25, 149:13

**thirty** [3] - 154:5, 184:25, 187:11

**thorough** [1] - 115:24

25

**thoughts** [1] - 174:14

**thousand** [1] - 125:6

**three** [43] - 9:18, 9:19, 9:20, 11:10, 25:8, 30:18, 32:25, 34:24, 35:9, 35:10, 39:15, 39:24, 39:25, 48:17, 49:22, 53:24, 57:12, 61:1, 61:7, 65:12, 67:23, 69:22, 87:12, 88:13, 91:15, 92:9, 95:12, 96:6, 99:15, 101:24, 107:9, 109:19, 115:25, 116:2, 119:22, 124:14, 138:11, 160:15, 184:9, 184:10, 184:11, 184:12

**three-day** [2] - 9:18, 48:17

**throughout** [1] - 97:4

**throw** [2] - 101:13, 188:1

**thrown** [1] - 101:12

**Thursday** [14] - 25:17, 25:18, 25:20, 29:5, 29:9, 29:24, 29:25, 30:2, 30:14, 32:8, 51:3, 69:2

**Thursdays** [1] - 29:18

**tied** [2] - 113:3, 113:6

**tight** [1] - 32:3

**tip** [1] - 76:10

**title** [3] - 41:6, 43:1, 119:12

**titled** [2] - 13:9, 140:12

**titles** [2] - 140:16, 141:10

**TO** [1] - 2:9

**today** [21] - 25:9, 28:23, 29:3, 29:7, 30:1, 30:13, 35:9, 56:1, 59:14, 81:7, 85:18, 88:16, 125:18, 146:8, 148:25, 164:15, 167:7, 168:16, 174:17, 188:4, 190:15

**together** [2] - 94:17, 109:22

**tomorrow** [14] - 25:14, 26:2, 26:9, 26:17, 29:8, 30:13, 35:9, 44:7, 44:8, 144:19, 187:16,

187:19, 191:2

**took** [4] - 60:5, 103:18, 165:14, 168:20

**tools** [1] - 128:3

**tooth** [1] - 26:14

**top** [9] - 13:7, 34:7, 148:6, 148:7, 154:21, 160:3, 178:22, 178:24, 183:22

**topic** [1] - 175:22

**tortious** [3] - 13:9, 13:10, 13:15

**total** [1] - 125:5

**totally** [3] - 10:22, 149:14, 151:19

**tough** [1] - 53:23

**toward** [1] - 103:19

**towards** [2] - 33:12, 46:1

**toys** [5] - 129:6, 129:7, 172:21, 173:10

**trade** [6] - 67:25, 86:7, 112:17, 122:23, 167:10, 172:21

**trademark** [21] - 10:2, 23:7, 45:6, 55:24, 58:12, 81:21, 95:19, 95:21, 96:13, 99:14, 100:10, 162:9, 162:11, 162:13, 162:15, 162:19, 169:3, 169:5, 170:25, 180:15, 180:18

**Trademark** [12] - 19:9, 89:14, 89:17, 91:7, 93:22, 95:18, 96:12, 99:12, 99:17, 99:21, 100:1, 102:1

**trademarks** [3] - 23:10, 179:17, 181:2

**training** [6] - 26:22, 27:5, 27:25, 28:5, 28:7, 42:24

**transact** [2] - 140:18, 141:11

**transaction** [2] - 137:25, 138:23

**transcription** [1] - 192:4

**transfer** [1] - 88:2

**trash** [1] - 188:1

**treasurer** [2] - 39:2, 39:7

**tremendously** [1] - 92:3

**trial** [35] - 5:17, 5:19, 7:14, 7:20, 9:4, 9:15, 9:18, 15:25, 18:11, 18:14, 18:16, 22:24,

23:17, 24:1, 25:1, 25:5, 35:15, 38:12, 43:21, 43:25, 48:17, 50:6, 50:13, 51:3, 51:13, 54:14, 73:4, 73:6, 74:1, 75:23, 77:24, 79:12, 85:1

**TRIAL** [1] - 1:10

**trials** [3] - 22:25, 38:18, 81:1

**tried** [4] - 12:3, 46:4, 101:12, 132:3

**triple** [2] - 184:19, 185:3

**trouble** [2] - 142:25, 183:19

**true** [10] - 74:11, 76:7, 76:18, 77:4, 122:2, 122:5, 151:4, 168:18, 180:24, 181:1

**trust** [2] - 60:18, 60:19

**trusted** [2] - 149:3, 149:13

**truth** [3] - 31:13, 155:12

**truthfully** [1] - 37:19

**try** [11] - 12:1, 37:22, 46:4, 46:16, 50:3, 55:25, 85:25, 109:7, 134:3, 155:22, 168:15

**trying** [4] - 11:4, 95:4, 137:16, 165:9

**turn** [5] - 24:15, 101:8, 157:4, 160:20, 177:16

**turned** [2] - 160:19, 189:8

**twelve** [1] - 105:16

**twenty** [1] - 56:11

**twenty-two** [1] - 56:11

**twice** [4] - 7:15, 8:15, 8:16, 42:1

**Twitter** [1] - 78:5

**two** [37] - 8:13, 9:18, 9:19, 9:20, 15:3, 23:2, 29:5, 31:14, 33:9, 38:24, 39:23, 56:11, 64:25, 67:22, 68:4, 69:21, 92:25, 93:3, 101:21, 114:19, 114:25, 115:25, 119:20, 136:10, 137:14, 139:22, 140:5, 145:5, 149:16, 154:15, 154:16, 162:3, 174:5, 184:11, 184:21, 184:22, 189:6

**type** [3] - 26:5, 54:1,

109:19

**types** [1] - 22:25

**typical** [1] - 91:21

**typically** [5] - 4:23, 5:18, 81:13, 85:13, 137:15

**typo** [1] - 141:1

## U

**U.S** [6] - 93:22, 99:25, 102:1, 162:13, 185:25, 186:9

**UCLA** [1] - 103:18

**ultimately** [2] - 13:12, 24:4

**umbrellas** [1] - 73:17

**unable** [1] - 36:20

**uncertainties** [1] - 90:16

**uncomfortable** [1] - 103:6

**uncover** [1] - 171:1

**under** [7] - 13:12, 16:7, 129:11, 140:17, 149:18, 167:11, 173:2

**undergoing** [1] - 67:19

**underlying** [4] - 7:9, 12:11, 13:4, 176:3

**understood** [10] - 61:15, 130:17, 140:14, 140:23, 141:8, 141:24, 143:5, 145:12, 146:18, 190:11

**unduly** [1] - 176:9

**unfair** [8] - 10:23, 15:6, 19:19, 30:17, 92:15, 92:16, 93:11, 188:22

**unfortunately** [1] - 14:10

**UNIDENTIFIED** [1] - 135:1

**Unisource** [214] - 3:3, 3:4, 3:8, 18:2, 18:19, 18:21, 18:22, 18:23, 18:24, 19:2, 19:3, 19:7, 19:8, 19:10, 19:13, 19:14, 19:15, 19:18, 19:22, 19:23, 20:21, 21:5, 21:6, 55:25, 60:4, 76:3, 76:22, 77:5, 77:7, 79:17, 79:22, 85:11, 86:4, 86:6, 86:11, 87:17, 87:24, 88:4, 88:14, 88:16, 88:17, 88:25, 89:2,

89:18, 89:22, 90:10, 90:25, 91:5, 91:6, 91:9, 91:11, 91:14, 91:24, 92:1, 92:4, 92:10, 92:17, 92:22, 93:1, 93:2, 93:4, 93:18, 94:3, 94:5, 94:7, 94:18, 94:19, 94:20, 94:25, 95:6, 95:14, 95:17, 95:25, 96:1, 96:2, 96:7, 96:9, 96:11, 96:16, 96:20, 96:22, 97:15, 97:18, 97:20, 97:21, 97:23, 98:2, 98:3, 98:6, 98:7, 98:10, 98:17, 98:19, 98:22, 99:11, 99:22, 99:23, 100:1, 100:3, 100:10, 100:12, 100:13, 100:19, 100:25, 101:2, 101:6, 101:9, 101:12, 101:17, 101:25, 102:2, 102:7, 102:10, 103:3, 105:1, 105:2, 105:9, 105:10, 105:11, 105:18, 106:24, 107:6, 108:19, 109:12, 110:3, 110:10, 111:9, 112:15, 112:18, 112:20, 113:24, 114:6, 114:8, 116:19, 116:23, 119:1, 119:17, 120:2, 121:16, 121:21, 121:24, 122:6, 122:11, 123:8, 125:16, 126:1, 126:6, 126:13, 126:16, 127:13, 129:11, 129:15, 130:3, 132:10, 136:3, 139:10, 140:15, 141:9, 141:18, 141:21, 142:4, 142:8, 142:14, 142:17, 142:18, 142:19, 142:22, 143:10, 144:8, 144:9, 144:11, 144:17, 144:22, 145:6, 147:6, 148:24, 150:15, 151:3, 152:1, 153:25, 154:10, 156:5, 157:12, 157:19, 157:23, 159:5, 162:12, 162:15, 162:16, 162:20, 163:10, 163:14, 164:18, 166:16, 168:11,

169:17, 170:15, 171:17, 172:23, 172:24, 173:4, 173:10, 175:8, 179:11, 181:17, 183:3, 184:6

**UNISOURCE** [2] - 1:4, 1:7

**Unisourcediscovery** [1] - 113:21

**unisourcediscovery.com** [4] - 88:22, 113:1, 113:4, 113:12

**unisourcediscovery.net** [1] - 113:25

**UNITED** [2] - 1:1, 1:11

**United** [10] - 17:22, 19:8, 89:14, 89:16, 95:18, 96:12, 99:12, 99:16, 99:20, 192:10

**united** [1] - 1:23

**universities** [1] - 27:23

**university** [3] - 27:13, 47:5, 47:9

**University** [2] - 27:14, 40:15

**unlawful** [2] - 142:5, 145:3

**unless** [9] - 14:7, 55:19, 62:19, 74:16, 76:14, 77:19, 82:17, 82:22, 152:15

**unnecessarily** [1] - 37:7

**unpack** [1] - 143:3

**unresponsive** [1] - 138:16

**unsigned** [1] - 118:17

**up** [46] - 3:21, 3:24, 5:20, 6:9, 8:7, 9:22, 16:2, 16:3, 16:19, 17:3, 17:17, 24:13, 33:15, 34:2, 47:9, 50:10, 55:20, 63:5, 69:11, 69:16, 71:19, 72:15, 82:5, 84:8, 90:14, 92:18, 99:1, 99:4, 99:6, 101:17, 102:23, 103:20, 104:11, 108:17, 109:24, 132:23, 134:23, 139:8, 150:17, 150:20, 150:25, 151:6, 157:24, 159:4, 172:20

**update** [2] - 158:14, 158:16

**updated** [1] - 158:13
**upper** [1] - 165:2
**upset** [2] - 61:23, 151:22
**URL** [1] - 178:24
**uses** [1] - 78:20
**utilize** [6] - 126:7, 126:20, 127:14, 142:3, 144:7, 145:1

## V

**VA** [1] - 32:9
**vacation** [3] - 32:21, 33:1, 34:21
**Valdes** [4] - 3:13, 14:9, 14:10, 20:16
**VALDES** [1] - 1:14
**validity** [3] - 8:25, 13:1, 133:7
**value** [7] - 122:9, 122:13, 122:14, 128:20, 143:11, 161:21
**van** [1] - 103:22
**varies** [1] - 8:24
**Velarde** [5] - 3:17, 21:2, 60:1, 94:17, 188:19
**VELARDE** [63] - 1:17, 2:11, 3:17, 4:20, 5:16, 5:25, 7:6, 11:14, 11:20, 12:15, 13:25, 14:4, 16:17, 17:5, 17:12, 21:1, 59:25, 60:16, 60:18, 60:22, 61:6, 61:12, 61:15, 61:22, 61:25, 63:11, 69:13, 82:3, 83:15, 89:25, 94:14, 116:10, 118:10, 118:12, 120:8, 123:24, 124:1, 133:19, 143:13, 150:4, 152:4, 152:25, 156:14, 159:14, 163:22, 164:6, 167:12, 167:20, 171:24, 174:23, 175:4, 175:7, 177:8, 177:11, 177:19, 177:24, 178:4, 182:24, 183:2, 183:6, 184:1, 188:7, 190:4
**VELAZQUEZ** [1] - 1:14
**venture** [6] - 87:12, 88:7, 88:18, 106:21, 109:19, 111:13
**ventures** [10] - 135:17, 135:18,

135:20, 135:24, 136:1, 136:4, 136:18, 137:20, 137:22, 138:12
**ventures"** [1] - 135:22
**verbally** [1] - 146:4
**verdict** [3] - 8:22, 75:10, 78:23
**Veronica** [2] - 21:12, 70:5
**version** [2] - 98:24, 118:25
**versus** [4] - 3:4, 12:18, 18:2, 165:15
**veterans** [2] - 32:9, 68:3
**via** [6] - 133:20, 164:22, 164:24, 165:1, 165:4
**VICTOR** [1] - 1:17
**Victor** [4] - 3:17, 21:2, 60:1, 94:17
**view** [1] - 79:7
**violate** [1] - 176:6
**violates** [1] - 37:22
**violation** [3] - 37:21, 92:15, 190:15
**visit** [1] - 78:10
**visitations** [1] - 146:20
**visited** [2] - 91:14, 147:6
**visits** [2] - 91:17, 147:17
**vocalization** [1] - 108:16
**void** [5] - 90:23, 128:5, 161:24, 162:1, 173:9
**voir** [1] - 4:23
**VOIR** [6] - 2:3, 2:5, 2:6, 17:19, 55:21, 59:24
**Volkswagon** [1] - 103:22
**Volume** [2] - 1:8, 191:5
**voluntary** [1] - 68:3
**vs** [1] - 1:6

## W

**wait** [3] - 15:23, 143:18, 187:23
**waiting** [2] - 135:2, 135:5
**walk** [1] - 79:12
**walking** [1] - 73:16
**wants** [1] - 134:15

**Washington** [1] - 89:15
**waste** [1] - 175:13
**watch** [4] - 17:17, 62:14, 71:19, 71:20
**water** [1] - 61:11
**Waterways** [1] - 53:21
**ways** [4] - 4:4, 78:20, 142:13, 155:22
**wear** [1] - 80:24
**wearing** [1] - 135:3
**web** [5] - 153:11, 169:3, 169:14, 179:7, 179:17
**website** [12] - 88:21, 91:25, 113:1, 113:13, 113:20, 114:5, 114:8, 114:12, 114:14, 178:16, 178:20, 179:2
**websites** [1] - 78:4
**Wednesday** [11] - 25:14, 25:15, 25:19, 26:21, 26:22, 27:6, 27:8, 27:25, 29:23, 29:25, 30:2
**Wednesdays** [1] - 29:18
**week** [3] - 7:22, 28:13
**weekly** [1] - 91:18
**weeks** [2] - 49:25, 67:23
**weigh** [1] - 10:19
**weight** [3] - 73:25, 79:10, 176:10
**welcome** [2] - 62:21, 83:22
**west** [1] - 114:20
**West** [2] - 17:25, 58:3
**Western** [1] - 67:15
**wet** [2] - 73:16, 73:17
**whatnot** [1] - 153:11
**whereas** [1] - 161:16
**White** [2] - 3:18, 3:19
**WHITE** [1] - 1:18
**whole** [6] - 37:11, 115:5, 128:23, 157:1, 176:7, 188:17
**wife** [7] - 19:6, 67:13, 87:7, 87:19, 88:6, 106:3, 128:14
**willful** [1] - 93:11
**wish** [3] - 79:1, 134:4, 183:23
**wished** [1] - 100:16
**withdraw** [3] - 163:17, 164:23, 184:4
**WITNESS** [26] - 2:13,

58:2, 102:18, 102:24, 107:25, 110:22, 114:23, 123:15, 125:3, 125:22, 130:12, 130:14, 130:16, 130:21, 131:22, 137:2, 137:4, 143:17, 143:20, 148:15, 167:13, 167:15, 178:19, 184:2, 187:24, 188:1
**witness** [25] - 51:22, 73:16, 73:18, 74:13, 74:15, 74:16, 74:18, 74:21, 74:23, 75:12, 75:16, 75:18, 75:19, 79:19, 79:20, 79:21, 102:13, 102:15, 102:22, 109:7, 117:17, 164:3, 174:21, 181:14, 187:13
**witness's** [8] - 74:10, 75:14, 75:15, 75:17, 75:20, 75:21, 75:24
**witnesses** [8] - 24:2, 35:15, 76:15, 79:2, 79:5, 79:18, 79:23, 80:15
**women** [1] - 68:3
**wondering** [1] - 68:25
**word** [9] - 31:1, 86:18, 141:2, 142:19, 142:21, 143:23, 162:11, 180:1, 180:4
**words** [12] - 78:20, 92:18, 127:2, 136:19, 143:6, 144:1, 144:8, 145:2, 146:7, 161:13, 178:18, 186:13
**workers** [1] - 43:5
**works** [3] - 16:14, 36:8, 142:4
**world** [1] - 93:13
**worst** [3] - 32:5, 101:19, 101:21
**worth** [2] - 122:2, 140:3
**write** [3] - 72:25, 83:24, 83:25
**writing** [3] - 98:8, 98:9, 146:5
**written** [2] - 36:13, 188:17
**wrongfully** [1] - 58:21
**wrote** [1] - 174:4
**www. unisourcediscovery.**

**com** [1] - 178:23

## Y

**year** [15] - 28:22, 31:13, 52:20, 53:23, 67:14, 91:11, 91:16, 93:21, 101:18, 101:19, 101:21, 103:20, 117:1, 148:19, 184:21

**years** [51] - 11:10, 21:21, 22:13, 22:15, 23:9, 29:17, 42:10, 42:20, 47:6, 56:11, 58:24, 60:24, 91:6, 92:25, 93:21, 94:3, 94:25, 95:2, 95:15, 95:24, 95:25, 96:5, 97:1, 97:8, 98:5, 99:2, 100:2, 100:3, 100:15, 100:20, 101:16, 101:20, 101:24, 102:9, 105:16, 107:9, 130:10, 148:22, 149:9, 149:25, 150:13, 157:10, 158:18, 163:10, 163:14, 166:23, 167:11, 173:13

**York** [1] - 32:5

**yourself** [5] - 20:24, 52:16, 147:9, 150:21, 159:6

**yourselves** [1] - 20:12

## Z

**zero** [1] - 122:19

**zoom** [1] - 115:6

**ZORRILLA** [38] - 1:18, 5:5, 6:1, 16:5, 16:9, 17:1, 62:24, 63:18, 63:20, 64:2, 64:5, 64:14, 64:23, 65:3, 65:7, 65:16, 65:20, 65:22, 66:5, 66:9, 66:11, 66:14, 66:25, 68:16, 68:21, 69:5, 69:8, 70:3, 70:12, 70:22, 71:10, 82:8, 82:18, 82:22, 83:2, 188:8, 188:11, 188:15

**Zorrilla** [4] - 3:19, 21:3, 60:2, 94:17