UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 20-CV-23276-DPG

UNISOURCE DISCOVERY, INC., et al.          Miami, Florida

     Plaintiffs,                          December 6, 2022

       vs.                               Pages 1 to 213

UNISOURCE DISCOVERY, LLC, et al.,          9:30 a.m. to 5:00 p.m.

     Defendants.                          Volume 2
_____

JURY TRIAL
BEFORE THE HONORABLE DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:          JESUS SANCHELIMA, ESQ.
                            LIANY VELAZQUEZ, ESQ.
                            DIEGO VALDES, ESQ.
                            SANCHELIMA & ASSOCIATES
                            235 SW LeJeune Road
                            Miami, Florida 33134


FOR THE DEFENDANT:          VICTOR M. VELARDE, ESQ.
                            JUAN ZORRILLA, ESQ.
                            FOWLER WHITE BURNETT, P.A.
                            1395 Brickell Avenue
                            Miami, Florida 33131


STENOGRAPHICALLY REPORTED BY:

                            PATRICIA DIAZ, FCRR, RPR, FPR
                            Official Court Reporter
                            United States District Court
                            400 North Miami Avenue
                            11th Floor
                            Miami, Florida 33128
                            (305) 523-5178

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| STEVEN CERASALE | | | |
| BY MR. SANCHELIMA | | | 41 |
| BY MR. VELARDE | | 15 | |
| JILL NOLDEN | | | |
| BY MR. SANCHELIMA | 63 | | 98 |
| BY MR. VELARDE | | 92 | |
| NOEL MIJARES | | | |
| BY MR. SANCHELIMA | 115 | | |

JUROR QUESTIONS OF STEVEN CERASALE                    PAGE 47

JUROR QUESTIONS OF JILL NOLDEN                        PAGE 105


| PLAINTIFFS' EXHIBITS | FOR ID | ADMITTED |
|---|---|---|
| Plaintiffs' Exhibit 23 | 87 | 88 |
| Plaintiffs' Exhibit 28 | 88 | 90 |
| Plaintiffs' Exhibit 25 | 112 | 113 |
| Plaintiffs' Exhibit 1 | 116 | 118 |
| Plaintiffs' Exhibit 30 | 163 | 163 |
| Plaintiffs' Exhibit 19 & 20 | 167 | 168 |
| Plaintiffs' Exhibit 21 | 175 | |
| Plaintiffs' Exhibit 22 | | 181 |


| DEFENSE EXHIBIT | FOR ID | ADMITTED |
|---|---|---|
| Defense Exhibit 2 | | 15 |
| Defense Exhibit 27 | 17 | 63 |
| Defense Exhibit 8 | | 29 |

(Call to the Order of the Court.)

THE COURT:  All right.  Please be seated.

MR. SANCHELIMA:  Good morning, Your Honor.

THE COURT:  Good morning.

We are back for Unisource Discovery, Inc., versus Unisource Discovery, LLC, and Steven Cerasale, case number 20-CV-23276 Gayles.

If you will make your appearances, please, first starting with plaintiffs' counsel.

MR. SANCHELIMA:  Good morning, Your Honor.  Jesus Sanchelima for the plaintiff.

MR. VELARDE:  Good morning, Your Honor.  Victor Velarde for the defendants.

THE COURT:  Okay.  So, we are still waiting for a few jurors.  I don't know if it's the traffic or not, but I wanted to see if there was anything we needed to take up since we have a few moments.

MR. SANCHELIMA:  Yes, Your Honor.

Your Honor, in the 45 years I have been in practice, I have never been interrupted in an opening statement, so I feel that the matter is of such an importance that I had to go over Docket Entry 184 and the motion in limine and also the magistrate's order, Docket Entry 266, last night to see exactly what is it that my predecessor or what happened with, in this case, while my predecessor was representing the plaintiff.

It appears to me that the magistrate's order is restricted, since it was granted in part as to items one and two of the motion, Docket Entry 184, and granted -- I'm sorry, and denied without any qualifications for item number three that the reference in the magistrate order is only exclusively to that letter of June 15 of 2010 from Mr. Lutter's attorney regarding the threats of a lawsuit, or what have you, dealing with ownership.

However, I have difficulties understanding this order from the magistrate, especially with the language that it carries to encompass an exclusion to any reference to the software ownership rights because it's an integral part of this litigation.  It was the consideration for the litigated 2006 operating agreement.

Moreover, two weeks after the motion was filed and the deposition of Mr. Lutter, which we intend to introduce since Mr. Lutter lives outside our district, more than a hundred miles from our district, the defendants failed to object to his testimony there in the deposition, and it was not until six months later that the magistrate rules on that motion.

So, looking at the time sequence of events, I think it would be unfair, and it's highly critical in this case that the contribution of Defendant Cerasale not be taken into consideration and the ownership rights.

THE COURT:  Counsel, just so I am clear, what is it you

are asking me to do so I can put all of this in context?

MR. SANCHELIMA:  Yes, Your Honor.  We want to define the metes and bounds of the magistrate's order 266, Docket Entry 266 of January 24, 2022, to be exclusively for excluding the letter from Mr. Lutter's attorney dated June 15th, 2010, and not a gag order over everything else related to the software because it is important in this case.  It was a consideration in the 1986 agreement.

THE COURT:  Okay.  So you want to introduce the letter is what you are asking?

MR. SANCHELIMA:  No, Your Honor.  We are fine with not introducing the letter.  If that's the extent of the order, that's the law of the case.  We will live with that.  We have documented our objections, our exceptions, hopefully in the record.  We don't need to go over that again, but I make reference to issues regarding the ownership of the software in my opening statement.  To me that's an indicator that this is something big, something that maybe because we joined the litigation after discovery cutoff, I read almost 300 docket entries as much as I could and I understood it was only the letter that we could not use.  And we didn't include it in the exhibit list because that's the law of the case.

But to go beyond that and apply to what I refer to as a gag order but as a prohibition for the plaintiff to discuss the software and the ownership of the software and the licensing of

the software and so forth, it would be detrimental in this case because it's the consideration that the plaintiff, the plaintiffs' principal look at what was being contributed.

So, all I am saying is if the interpretation of the order is just to the letter that has not been introduced, I understand that and we will live with that.

If those are the metes and bounds of the order, we will live with that, but if we are going to be -- I need to plan the testimony that I am going to elicit from the witnesses and I need to know.

THE COURT:  Well, I need to know exactly what it is that you want to introduce.

MR. SANCHELIMA:  The testimony of Mr. Lutter, for example, that deals with this issue as to why he received his ten percent interest and that was because the software rights that Defendant Cerasale attempted to provide to the new venture were just not there.

He didn't have the right to do that.

THE COURT:  And are you talking about deposition testimony?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  All right.  No one has presented me with any deposition testimony to review.  Are there objections that need to be ruled on regarding that?

MR. VELARDE:  I haven't received any designations of a

deposition transcript.  I know that the entirety of the state court deposition of Mr. Alfred Lutter was identified as an exhibit to which I raise the objections, but I don't know what section of that deposition is intended to be introduced.  So unless I have that, Your Honor, I don't know what objections might be.

MR. SANCHELIMA:  Yes, Your Honor, basically it's pages 11 to 13, very limited.

THE COURT:  Well, you are going to have to show that to opposing counsel so he can consider whether or not he has any specific objections to it and so that I can rule on it.

We can't do that in the middle of the reading.

MR. SANCHELIMA:  I believe it's Exhibit 16, the deposition transcript, Exhibit 16 at Docket Entry 333.  But I'll be glad after --

THE COURT:  Again, if it's a limited portion, you need to identify it so that I can consider it.

MR. SANCHELIMA:  Pages 11 through 13, Your Honor, three pages -- page 11, line 19.

THE COURT:  All right.  Give me just a moment.

MR. SANCHELIMA:  I gave him a copy, Your Honor, and there were no objections.

THE COURT:  Counsel, I need a moment to read.

Okay.  Counsel, are you ready?

MR. VELARDE:  These questions are the same questions

that were asked yesterday to Mr. Steven Cerasale, who answered consistent with these questions.

THE COURT:  What are you talking about, the deposition testimony?

MR. VELARDE:  Yes, the deposition testimony, pages 11 through 13.

The issue with these, with delving into the software license and the 2010 agreement dealing with the software license is that it has nothing to do with this case.  That's what the magistrate found as well.  It's very, very irrelevant.

This is not a software case.  This is not about the licensing of a software trademark, so creating this side issue of the license of software in 2010 doesn't go to any single one of the issues for the jury to determine, and I am very concerned that the jury will confuse the issues here.

And on top of that, this will require additional evidence on our part to explain this away or explain the context of the software license, which will delay this case further for an issue that is not an issue in this case.

THE COURT:  All right.  So, in Judge Otazo-Reyes's order, she noted that there is no software issue in a case, and she found this whole issue of marginal relevance.  So why is this relevant here?

I am asking you, Counsel.

MR. SANCHELIMA:  Plaintiff?

THE COURT:  Yes.

MR. SANCHELIMA:  Yes, Your Honor.  It is relevant because that's the reason, that's the consideration for the parties to create this joint venture.  This is not a case for software infringement, copyright infringement, granted.  This is not a case because anybody stole a computer.  This is not a case for a lot of things, but these assets were contributed and they are relevant to be discussed.  They are part of the agreement in 2006.

Will the order be interpreted to exclude the 2006 agreement?  We might as well not try the case, Your Honor.

THE COURT:  But how the agreement was formulated, we know that there is an agreement.

Why is this software issue probative of any issue in this case?

MR. SANCHELIMA:  Your Honor, the best way for me to address this is to proffer the statement in the record and Your Honor will decide how is it relevant after Your Honor hears what was said by Mr. Lutter.  It is the reason why Mr. Lutter came thinking that what Defendant Cerasale had opened in Florida was merely a branch of his operation in California.

The fact that Mr. Lutter complained shows that the operation in Florida was a totally different company, a totally different venture with a projection for nationwide coverage, and this is the reason why Mr. Lutter brought up the matter of

the illegal licensing by Defendant Cerasale of his own software.

It is relevant in this case, highly relevant in this case.  At the very least, I ask the Court to allow for the benefit of the record for the plaintiff to proffer the portion, three pages of the deposition transcript of Mr. Lutter.

THE COURT:  All right.

MR. VELARDE:  I could respond very quickly, Your Honor, if I may, as to what relevance does Mr. Alfred Lutter's beliefs, thoughts, have to do -- beliefs and thoughts in 2010, what do Mr. Lutter's beliefs and thoughts in 2010 have to do with what was in the mind of Mr. Noel Mijares in 2006 and what was in the mind of Mr. Cerasale in 2006.

If the argument is that this will inform what the agreement in 2006 meant, then what does Alfred Lutter in 2010 have to do with that?

Absolutely nothing.  We might as well ask another person off the street because he was a stranger to the 2006 agreement.  It's completely irrelevant to the issues and it will confuse the jury.

THE COURT:  I am not going to permit that deposition testimony or any further reference to this letter.  Judge Otazo-Reyes ruled on this issue back in January.  It wasn't addressed.  You didn't ask for any further reconsideration by the Court prior to trial, the plaintiff didn't.

I mean, I agree with her.  I mean, it's of limited relevance in this case.

Counsel, let me finish.

MR. SANCHELIMA:  I'm sorry.

THE COURT:  So it wasn't brought up before the Court, and in any event, to get this information in, Mr. Lutter isn't here to testify, and you are suggesting a designation that wasn't provided to defense counsel and the Court prior to trial so that they could consider cross designations or that the Court can rule on any objections.  We can't do this now in the middle of trial, in any event.

You've already been able to address that issue to some degree with Mr. Cerasale in your direct examination but we are going to have to -- I'm going to make you leave it at that.

MR. VELARDE:  Your Honor, I do want to make one point of clarification.  I identified Mr. Alfred as a witness for my case as a rebuttal witness.

THE COURT:  Mr. Who?

MR. VELARDE:  Mr. Lutter, as a rebuttal witness, not through his deposition but him in person.

If I need him as a rebuttal witness, not for this issue, of course, but I did identify him as a witness.  I just wanted to make that clarification.

THE COURT:  All right.  So were you planning on calling Mr. Lutter as a live witness?

MR. VELARDE:  Not unless I need him.

THE COURT:  Plaintiffs' counsel?

MR. SANCHELIMA:  Yes, Your Honor, if he is here.  I haven't seen him.  I don't know him, but if he is here, yes, of course, but we thought that we were not going to be able to bring him to court because he lives in Utah, from what we understand.  But still, Your Honor, we need the metes and bounds as to what we can say.  We don't want to violate an order from the Court, what the law of the case is.

Is Your Honor's interpretation of the magistrate order to preclude any discussion as to ownership of the software?

Are those the metes and bounds of the motion in limine that was granted in part?

THE COURT:  Well, she didn't grant -- this issue that we are talking about she didn't grant that in part.  She granted it.  I just want to be clear about that.  She didn't grant it in part.

The specific issue here was the demand letter and its referenced underlying dispute.  Okay.  That's what she talked about here.

So, if you want to call Mr. Lutter to talk generally about the relationship, the business relationship that they had and how he knew the parties, things like that, that's fine, and there has been limited testimony through Mr. Cerasale about a dispute over the software, but the case isn't about the

software dispute.

To the extent there is any marginal relevance of how that may have influenced their business relationship and the subsequent agreement, okay, maybe that -- there might be some limited relevance in context, but any drawn out testimony about this dispute and how this demand letter came about, she has already ruled.  There was no further issue about this regarding the demand letter and the dispute, and I don't see any reason to make this a big part of the case.

If you want to call him generally, that's fine, but the case won't become a case about any software dispute.

I do note that she noted, the plaintiffs' argument before about the relevance of this was that it was being offered to show Mr. Cerasale's propensity to lie and character evidence that Mr. Cerasale has the ability not to be truthful to plaintiff.  She quoted that from the plaintiffs' response.

If that's what it's being offered for, it's not relevant.

MR. SANCHELIMA:  No, that's the point.  That's not the reason why it should be admitted.  I did not argue that motion. It was my predecessor, but it is the consideration, as part of the software ownership and rights, and one of rights of that software was what led Mr. Mijares to enter into this agreement. That's why this is critical.

Your Honor, I understand the letter is not in, and I

will not -- I just want to make sure that I will not attempt to elicit any answers that may directly deal with the ownership issue.

Are those the metes and bounds?

THE COURT:  All I can generally tell you -- I mean, I have to hear it in context.  You have the same order that I am looking at right now.

If you call Mr. Lutter as a witness, you ask him questions, if there is a contemporaneous objection, I'll rule. But I can't give you a detailed list of bounds other than what I've already given you.  I mean, I said you can ask him generally about the business relationship, how the contracts, how the governance came to be but, again, any focus on the dispute about the issue addressed in the motion in limine in the judge's order, in particular the Lutter letter as she describes it, the demand letter, that should not be a focus of any testimony.

All right.  We have all the jurors?

COURTROOM DEPUTY:  Yes, Judge.

THE COURT:  All right.  Mr. Cerasale, you can start making your way back to the bench and we will bring in the jury.

MR. SANCHELIMA:  Yes, sir.

THE COURT SECURITY OFFICER:  All rise for the jury, please.

(The jury entered the courtroom at 10:00 a.m.)

THE COURT:  Good morning.

PROSPECTIVE JUROR:  Good morning.

(Mr. Steven Cerasale retook the stand.)

THE COURT:  All right.  Everyone, please be seated.

All right.  I will just have you, sir, if you can move as close to the microphone as possible.

All right.  Would you like to proceed with your examination?

MR. VELARDE:  Thank you, Your Honor.

Good morning, ladies and gentlemen of the jury.

First, I would like to introduce an exhibit that I believe has not yet been introduced.

MR. SANCHELIMA:  No objection.

MR. VELARDE:  Your Honor, I'd like to introduce Exhibit 2.

THE COURT:  All right.  Without objection, Defense Exhibit 2 will be admitted.

(Defense Exhibit 2 was admitted in evidence.)

THE COURT:  Do you want to publish that?

MR. VELARDE:  Yes, Your Honor, thank you.

CROSS-EXAMINATION

BY MR. VELARDE:

Q.  Good morning, Mr. Cerasale.

A.  Good morning.

Q.   I am showing you what's been marked as Defense Exhibit 2.

Do you recognize that document?

A.   I do.

Q.   What is that document?

A.   It's the logo design that I had someone do in 2011 for Unisource Discovery.

Q.   For Unisource Discovery California?

A.   Yes.

Q.   What year was that that you had someone do this?

A.   2001, I meant -- sorry, 2001.

Q.   In 2001.

Did you use that mark -- did you use that in your business in 2001?

A.   Yes.

MR. SANCHELIMA:  Objection, Your Honor.  Leading.

THE COURT:  It's cross.  It's overruled.

BY MR. VELARDE:

Q.   I'm sorry, what was your answer?

A.   No, I said yes.

Q.   Did you use it in a website in 2001?

A.   Yes.

Q.   What website was that?

A.   What website, is that what you said?

Q.   Yes, what website?

A.   Our corporate website.

Q.   Is that the one you testified yesterday was unisourcediscovery.com?

A.   Yes.

Q.   Until this day do you still use this logo?

A.   Yes.

Q.   Do you still use this logo in your website unisourcediscovery.com?

A.   We still do, yes.

Q.   I am going to show you what's been marked as Defense Exhibit 27.

(Defense Exhibit 27 was marked for identification.)

MR. SANCHELIMA:  Plaintiffs' object to this exhibit, Your Honor, as the proper foundation has not been laid out for its accuracy.

MR. VELARDE:  I will lay a foundation.  I will show it to Mr. Cerasale and ask him questions.

Mr. Cerasale, have you seen this document before?

THE WITNESS:  Yes, I have.

BY MR. VELARDE:

Q.   Let me make sure you can see it clearly.  What does this document show?

A.   It's a list of all the orders our clients have placed with us in Unisource Discovery Florida -- California, from 2001 to 2012.

Q.   Just to clarify, this is a list of customers who have

placed orders for Unisource California?

A.   That's correct.

Q.   Was this summary created out of information contained in the system of your Unisource Discovery California business records?

A.   Yes.

Q.   Was that summary based on information put in your business records as a regular course of business?

A.   I'm sorry, I wasn't understanding it very well.  What was your question?

Q.   This summary of orders?

A.   That's the summary of the business we have done in California for the dates there.

MR. VELARDE:  Your Honor, I move this document into evidence.

THE COURT:  Is there an objection?

MR. SANCHELIMA:  May I voir dire the witness, Your Honor?

THE COURT:  Yes, sir.

MR. SANCHELIMA:  Thank you.

VOIR DIRE BY THE PLAINTIFF

MR. SANCHELIMA:  Good morning, Mr. Cerasale.

THE WITNESS:  Good morning.

MR. SANCHELIMA:  The document that's being displayed, did you create that document?

THE WITNESS:  No.

MR. SANCHELIMA:  Do you know who created that document?

THE WITNESS:  Someone who works for me, I assume.

MR. SANCHELIMA:  You don't know the name of the person that created that document?

THE WITNESS:  No, I don't.  I could find it out for you but, you know, a lot of people create documents in our system.

MR. SANCHELIMA:  What -- do you know what instructions that person received to create this document?

THE WITNESS:  To make a list of all of the orders we had and what states they were from.

MR. SANCHELIMA:  Who gave those instructions to that person?

THE WITNESS:  I don't know.

MR. SANCHELIMA:  Your Honor, this document is --

THE COURT:  Well, before I have argument, is there something else?

MR. SANCHELIMA:  No.

THE COURT:  I am going to sustain the objection.

MR. VELARDE:  Your Honor, if I may.

THE COURT:  Counsel, I don't want any argument.

MR. VELARDE:  I would like a sidebar if possible because I want to let the Court know --

(Sidebar conference.)

MR. VELARDE:  One, this document was prepared as a

summary in response to a summary prepared by counsel of his client's records.

I provided the underlying data, this broad data directly from my clients to Mr. Sanchelima more than a month ago. I prepared the summary under the rules allowing us to introduce summaries because otherwise I would be introducing a document that's more than 20,000 pages long.

THE COURT: You didn't explain this was a summary. I thought you were trying to use it as a business record. You didn't introduce it as a summary.

MR. VELARDE: Because of the fact there was no objection filed until today. I thought it was unopposed, just like I agreed not to oppose his summary.

MR. SANCHELIMA: Judge, we are not questioning the opportunity to review the document. We exchanged many documents, but we are entitled to know whether the document is accurate or not. This witness has no idea, no clue as to who created this document. It cannot be introduced through this witness. Maybe through another witness it could be introduced, not this witness.

MR. VELARDE: If I may, Your Honor, the accuracy --

THE COURT: Wait a minute, are you disputing the underlying information in the summary?

MR. SANCHELIMA: I need some kind of accuracy as to who created this document. This is a document that, obviously, was

not in the normal ordinary course of business because it was created --

THE COURT:  I agree with you.  It's not a business record.

MR. VELARDE:  It's a summary.

THE COURT:  Counsel.

MR. VELARDE:  My apologies.  I'm sorry.

THE COURT:  It's not a business record, which is why I didn't admit it before, but he is saying now that we are at sidebar, that it was a summary, that you have the underlying data regarding the summary.  Is that not true?

MR. SANCHELIMA:  Well, we received thousands or hundreds of documents with the underlying data after discovery cutoff.  We didn't have an opportunity then to verify these documents.  We would need at least somebody that gives us some sort of idea as to what instructions were given to this unknown person for this document.

THE COURT:  I don't think you need that for a summary. You need that for a business record.  I am actually going to come back to that.  I am going to look at the law regarding the summaries to make sure there is a proper predicate, but I just want to be clear, you received a copy of this before trial?

MR. SANCHELIMA:  Yes, we received that after discovery cutoff in the last maybe month or so.

THE COURT:  Is there any reason to dispute the accuracy

of this document?

MR. SANCHELIMA:  We have had several conversations as to different issues pertaining to billing customers, ordering customers, a number of issues related as to what are the relevant customers for the list.  Counsel may take the position that is, I believe, the ordering customers.  We take the position it should be the billing customers, and we don't know who -- what instructions were given to the person that developed this chart.

THE COURT:  All right.  We will come and address this at the break.

MR. VELARDE:  Thank you, Your Honor.

MR. SANCHELIMA:  Thank you, Your Honor.

(Sidebar conference concluded.)

BY MR. SANCHELIMA:

Q.  Mr. Cerasale, from 2001 to 2006, were you using that logo that I showed you in your business?

A.  Yes.

Q.  From 2001 to 2006, were you operating in California?

A.  Yes.

Q.  From 2001 to 2006, did you operate or serve customers outside of California?

A.  Yes, yes.

Q.  From 2001 to 2006, did you operate or serve customers in Kentucky?

A. I'm sorry, what was the last thing you said, the last word?

Q. Kentucky, the state of Kentucky?

A. Yes.

Q. How about Wisconsin?

A. Yes.

Q. Oregon?

A. It's on the list. I don't remember specifically, but if it's on the list we did it.

Q. So there were other states other than California where you operated?

A. Right.

Q. Using this logo. Correct?

A. Right.

Q. From 2001 to 2006. Right?

A. Yes.

Q. That's before you met Mr. Noel Mijares?

A. Yes.

Q. And that's before Unisource Florida was created. Correct?

A. Yes.

Q. So this logo has some value?

A. I think so, yeah.

Q. This logo was used in California, correct, for five years?

A. Right.

Q. This logo was used outside of California for five years?

A. Yes.

Q.   So this logo had some value when you brought it to Florida?

A.   Again, I think so, yeah.  Yes.

Q.   Yesterday you were presented with Plaintiffs' Exhibit 5 that was introduced into evidence.  I am putting it there for your view.  Do you see that document?

A.   Yes, I do.

Q.   That's the operating agreement for Unisource Discovery Florida.  Correct?

A.   Yes.

MR. VELARDE:  If I may publish that to the jury.

Thank you.

BY MR. VELARDE:

Q.   Did you ever sell the name and logo Unisource Discovery to Unisource Florida?

A.   No.

Q.   Did you ever sell the name and logo of Unisource Discovery to Mr. Noel Mijares?

A.   No.

Q.   I'm going to point you to Section 4.10 of the operating agreement, titled "License and Name Use".

If you could, read that last sentence.

A.   Okay.

Q.   So it says, "The board of directors further agrees that in the case that Steven Cerasale is no longer a director, officer, or agent of the company, at that time the board of directors

shall modify the current name of the company Unisource Discovery to be different in name only."

A.   Yes.

Q.   What does that mean?

A.   I don't have to elaborate on that.  It seems pretty self-evident, but if I leave them the name has to change.  The company name goes with me.

Q.   If I understood you, you said if you leave the name goes with you?

A.   Say that again.

Q.   You said if you leave the name goes with you.  Is that what you testified?

A.   That's what it looks like to me.

Q.   This operating agreement was signed in June 2006.  Correct?
     Let me show you the first page here.  The first line there is the date of the agreement?

A.   Uh-huh.

Q.   June 15th, 2006?

A.   That's what it says, yeah.

Q.   This operating agreement was effective in 2006 and in 2007?

A.   Yes.

Q.   How about 2008?

A.   Yes.

Q.   How about 2009?

A.   That year too.

Q.   You were asked yesterday about contributions, assets and transfers relating to this agreement, correct.  Do you remember that testimony?

A.   Yes.

Q.   Does this agreement anywhere say that you are selling the name Unisource Discovery?

A.   No, it doesn't.

Q.   Does this agreement anywhere say that Unisource Florida is buying or purchasing the name Unisource Discovery?

A.   No.

Q.   This agreement does have a list of contributions.  Correct?

A.   Right.

Q.   If we look at number three, paragraph three on the list of contributions on paragraph 13, we see contributions by Mr. Noel Mijares and Lisa D. Cote, and I'm going to read that to you. It says, "Shall provide the company, under their initial capital investment, the total use and full resources of The Subpoena Company, in the state of Florida, to facilitate all sales, operations, facility support, field agents and all other requirements necessary for the company to operate successfully and completely in accordance with this operating agreement."

     What was your understanding as to what Noel Mijares and Lisa Cote were providing as a contribution to Unisource Florida?

A.   Their sweat equity, I guess.  Their going in every day to

make the business happen, and office space, I suppose that was something that would be their contribution.  If they would go out and sell some stuff would be good so they had something to do.

Q.  So this list of contributions on page 13 is a list of all of the contributions provided to Unisource Florida by its directors.  Correct?

A.  Right.

Q.  Does this list anywhere say that you are providing ownership of the name Unisource Discovery?

A.  No.

Q.  Does this list, at any point, say that you are providing ownership of the logo that I showed you earlier?

A.  No, it doesn't.

Q.  So if you were not selling the name and logo to Unisource Florida, what was your understanding as to what you were providing to Unisource Florida in connection to the name and logo?

A.  Could you say that last part again, I'm sorry?

Q.  What was your understanding of what you were providing to Unisource Florida?

A.  Well, we gave them some equipment.  We gave them knowledge and expertise on how to run the business day to day and the software we were using.

Q.  Did you give them permission to use the software?  Did you

give them permission to use the logo as well?

A.   Yes.

MR. SANCHELIMA:   Objection to leading a friendly witness.

THE COURT:   Overruled.

BY MR. VELARDE:

Q.   What was your understanding as to what Mr. Noel Mijares's duties were in Unisource Florida?

A.   He was supposed to run a business.   He was supposed to, you know --

Q.   Did that include advertising for Florida?

A.   Yeah.   If that's what needed to be done, yeah.

Q.   Did that include acquiring new business for Florida?

A.   Acquiring what?

Q.   New business for Florida?

A.   Yes, absolutely.

Q.   Was that all within the scope of the license that you provided to Unisource Florida?

A.   Yes.

Q.   You were also asked questions yesterday about the trademark registration.

Do you remember that?

A.   Yes, I remember.

MR. SANCHELIMA:   No objection except for the markings, Your Honor.

THE COURT:  All right.  Do you have -- well, first of all, what exhibit is this?

MR. VELARDE:  This is Defense Exhibit 8.

THE COURT:  Do you have a clean copy that does not have markings?

MR. VELARDE:  I believe I do that I can introduce as evidence.

THE COURT:  Exhibit 8 will be admitted but if there are -- markings or counsel's notes, is that what we are talking about?

MR. SANCHELIMA:  No, highlighting, Your Honor.

THE COURT:  Okay.

MR. SANCHELIMA:  Different colors of highlighting.

THE COURT:  Okay.  Is this a clean copy you are showing?

MR. VELARDE:  I am not going to get to the highlighted portion.

THE COURT:  All right.  It will be admitted.

(Defense Exhibit 8 was admitted in evidence.)

BY MR. VELARDE:

Q.  Mr. Cerasale, I am showing you the registration for the trademark application.  Before this lawsuit, did you ever see this application?

A.  No, I did not.

Q.  Before this lawsuit, did Mr. Noel Mijares ever provide you

with a copy of this application?

A.   No.

Q.   Did Mr. Mijares ask you to distribute anything in connection with this application?

A.   I don't recall that he did.  I would say no.

Q.   Did Mr. Mijares ask you for help in filling out this application?

A.   I don't remember.  I don't think so.  I doubt it because I would have known about it then, so that kind of answers that question.

Q.   I am going to show you page two of Exhibit 8, specifically where it says, "first used anywhere."

Do you see that?

A.   I see that line, yes.

Q.   First used anywhere, and it says at least as early as March 1st, 2001.  Do you see that?

A.   Yes.

Q.   Is it true that Unisource Florida first used the name and logo on March 1st, 2001?

A.   No.

Q.   Did the name and logo exist on March 1st, 2001?

A.   No.

Q.   Did Unisource California exist in March 1st, 2001?

A.   Did what?

Q.   Did Unisource California exist in March 1st, 2001?

A.   No, it was April 16th.

Q.   So the answer is, no, it did not exist?

A.   It did not.

Q.   So March 1st, 2001, is before you ever created the name and logo?

A.   Correct.

Q.   You were also presented -- if you remember, you were presented with your deposition testimony in the state court case.  Do you remember that part of your testimony?

A.   No.

Q.   You were presented with this document that I am showing you.  It's a June 21st, 2022, deposition, Steven Cerasale.

     Do you remember that?

A.   I do, yes.

Q.   In connection with this document, you were asked about whether you advertised.

     Do you remember that?

A.   Yes.

Q.   Did you advertise your business in California?

A.   We did very little advertising, it was all within.

     THE COURT:  I'm sorry, I couldn't hear you.

     THE WITNESS:  I'm sorry, not is just out -- just in trade magazines and things like that, yes, we did.  Very little, though.  Mostly it's word of mouth.

BY MR. VELARDE:

Q.   That's for your Unisource Discovery California business?

A.   Yes.

Q.   Did you do any advertising in Florida?

A.   No.

Q.   In the state court case -- well, let's look at what you were asked in deposition that you were presented yesterday.

On line three, and I am going to -- if I can produce this to the jury --

THE COURT:   Is this in evidence?

MR. VELARDE:   It is not in evidence, but I believe it was used by Mr. Sanchelima yesterday as rebuttal.

MR. SANCHELIMA:   It was impeachment evidence, Your Honor.

THE COURT:   I don't think it was shown to the jury.

MR. VELARDE:   It wasn't.   No problem, I am perfectly fine just asking questions on it.

BY MR. VELARDE:

Q.   In this deposition transcript -- Mr. Cerasale, you have it there, you can see it -- you were asked about whether you have clients in Florida.   Correct?

A.   Right.

Q.   And then you were asked whether you had, again, clients in the State of Florida.   Correct?

A.   Yes.

Q.   Then you were asked do you personally have any employees in

Florida.  Correct?

A.   Yes.

Q.   And then you were asked, "do you advertise."  Correct?

A.   Yes.

Q.   So you were asked one, two, three questions all related to Florida.  Correct?

A.   Yes.

Q.   And then you were asked, "do you advertise?"

MR. SANCHELIMA:  Objection, Your Honor.  Outside the direct testimony.

THE COURT:  Overruled.

BY MR. VELARDE:

Q.   When you were asked if you advertised, did you understand they were asking you do you advertise in Florida?

A.   No, I still don't.

Q.   No, you don't advertise in Florida or no you don't understand that was the question?

A.   I don't advertise in Florida.

Q.   So it's true that you don't advertise in Florida but you do advertise in California.  Correct?

A.   To a limited degree, yes.

Q.   I am going to show you Plaintiffs' Exhibit 2 that is in evidence, if I may publish it to the jury.

THE COURT:  They see it.

BY MR. VELARDE:

Q.   Mr. Cerasale, you were presented with this exhibit yesterday during your testimony.

Do you remember that?

A.   I'm sorry, I didn't hear what you said.

Q.   You were presented this Plaintiffs' Exhibit 2 during your testimony yesterday?

A.   Yes.

Q.   And this is a June 2nd, 2006, memo from Mr. Noel Mijares to you.  Correct?

A.   Yes, uh-huh.

Q.   If you look at the bottom, I am going to read it to you.

"By creating a Florida corporation, Unisource Discovery California will enter the Florida market."  Did I read that correctly?

A.   Yes, that's what it says.

Q.   So as of June 2nd, 2006, Mr. Noel Mijares was telling you that the purpose was Unisource California will enter the Florida market.  Correct?

A.   Yes.

Q.   Was that your understanding as to the purpose of Unisource California?

A.   Yeah.  Yes, other than I was just general business, a creation.

Q.   So you agree with that statement that the purpose of Unisource Florida was for Unisource California to enter the

Florida market?

A.   Yes.

Q.   Then you were shown Plaintiffs' Exhibit 9, which I am going to show to you now.   It was also admitted without objection.

THE COURT:   What exhibit is this?

MR. VELARDE:   Plaintiffs' Exhibit 9.

BY MR. VELARDE:

Q.   Do you remember being shown this document during your testimony yesterday?

A.   This document?

Q.   Yes.

A.   No, I don't.

Q.   Do you recognize this document?

A.   Yes.

Q.   This is the Closed Corporation Shareholder Agreement of 2010.  Correct?

A.   Yes.

Q.   And this is the agreement that replaced that original 2006 operating agreement.  Correct?

A.   Right.

Q.   And you were shown paragraph 1.3 titled "Trademark." Correct?

A.   Yes.

Q.   You were read the first sentence that says Unisource Discovery Digital Document Retrieval is a registered U.S.

trademark of the company, the company being Unisource Florida.

Correct?

A.   Yes, that's true.

Q.   And the second sentence says, "Without limiting the foregoing, the parties agree that the company shall be entitled to use the trademark Unisource Discovery as part of its corporate name, Unisource Discovery, Inc., or as a fictitious business name or otherwise."

Why would this document give Unisource Florida permission to use a trademark and the name and the logo if you have Unisource Florida owned it?

MR. SANCHELIMA:   Objection, Your Honor. Mischaracterization of the language in the document.   The document speaks for itself.

THE COURT:   Overruled.   You may answer it.   You may answer the question, sir.

THE WITNESS:   Okay.   There is no reason I can think of.

BY MR. VELARDE:

Q.   At some point before this lawsuit you knew that Unisource Florida registered the trademark.   Correct?

A.   Correct.

Q.   That's because Noel Mijares told you that he registered the trademark.   Correct?

A.   Yes.

Q.   What did he tell you was the reason he was registering that

trademark?

A.   To protect us he said.

Q.   To protect you against who?

A.   I don't think we got that far in the conversation.  I assumed it would be other people who wanted to use the logo and trademark.

Q.   Did he ever say, Mr. Cerasale, I am registering the trademark so I can protect myself against you?

A.   No, he didn't say that.

Q.   Did he ever say, Mr. Cerasale, I am registering the trademark so I can take it away from you whenever I want?

A.   No, he didn't say that.

Q.   If he had said that, what would you have done?

A.   I would have said, no, you can't do that.

Q.   As we are sitting here today --

     MR. SANCHELIMA:  I'm sorry, Your Honor, counsel is mischaracterizing the evidence.

     THE COURT:  Counsel, you can deal with that on your redirect.

     MR. SANCHELIMA:  Thank you, Your Honor.

BY MR. VELARDE:

Q.   Finally, you were shown yesterday, and it's been admitted into evidence without objection, Plaintiffs' Exhibit 12.

     Do you remember being shown this document?

A.   A copy of this document.

Q.   This is an e-mail from Noel Mijares to you dated May 26, 2020, and it's titled, "Business Relations/Tortious Interference/Cease and Desist."  Correct?

A.   Right.

Q.   And in this e-mail, Mr. Noel Mijares is accusing you of tortiously interfering with their AIG National Preferred Vendor status with the law firms of Burglass & Tankersley and the law firm of Cole, Scott & Kissane.  Correct?

A.   Yep.  Yes, it says that.

Q.   He is accusing you of tortiously interfering with his customers.  Correct?

A.   Yes.

Q.   That was not just an e-mail accusation.  Correct?
     He went further than that, did he not?

A.   I don't really recall.  I mean, I got this letter.  I got this letter, and we started action to, you know, by hiring you guys and we started taking some action for that.  We didn't do anything before that.

Q.   Well, did he sue you for tortious interference?

A.   I'm sorry?

Q.   Did he file a claim against you in court for tortious interference?

A.   Not that I know of.  The accusations are simply in this letter.  That's all I ever saw.

Q.   Do you remember a lawsuit in state court between yourself

and Mr. Mijares?

A.  I hate to keep asking you to repeat yourself, but can you open your mouth a little more?

Q.  I apologize, do you remember the existence of a lawsuit in state court between you and Mr. Noel Mijares?

A.  Sure.

Q.  Do you remember an existence of a lawsuit in state court between you and Unisource Florida?

A.  I assume it's the name.

Q.  Do you remember whether Mr. Mijares and Unisource Florida filed a counterclaim in that lawsuit?

A.  I don't recall.

MR. VELARDE:  I would ask to allow the witness to refresh his recollection, Your Honor.

MR. SANCHELIMA:  Objection as to the relevance of the state proceedings, Your Honor.

THE COURT:  All right.  Overruled at this point.

MR. VELARDE:  I can do it from here or I can go up close.

THE COURT:  Only the witness can see the monitor.

MR. VELARDE:  Okay.  This is what I am showing him.

BY MR. VELARDE:

Q.  Mr. Cerasale, do you see this document that I am showing you there?

A.  Yes, I do.

Q.   Does that refresh your recollection as to whether a counterclaim was filed in state court?

A.   I don't recall seeing this document before, but I think you have this.  This went through you, did it not?

Q.   Yes, but did you see -- do you?

A.   Right.

Q.   Does this refresh your recollection as to whether a counterclaim was filed against you?

A.   Uh-huh.

THE COURT:  You have to answer yes or no, sir.

THE WITNESS:  I'm sorry, yes, I can see that.

BY MR. VELARDE:

Q.   As to the counterclaim regarding tortious interference, what was the ultimate outcome on that?

THE COURT:  Can I see the parties at sidebar for a moment?

(Sidebar conference.)

THE COURT:  Why are you getting into the results in another proceeding?

MR. VELARDE:  Because we have accusation that my client was tortiously interfering with customers.  That accusation was presented to the jury.  That accusation was not just an idle accusation.  It was the subject of litigation and after full litigation that claim was found to be nonviable.  And specifically, the tortious interference of business

relationship was found to be nonviable.  It did not state a cause of action, so I want to establish the fact that this accusation should not impinge on my client's credibility and the claim that he was stealing customers was actually litigated and thrown out.

THE COURT:  You have to speak up, Counsel.

MR. SANCHELIMA:  Sorry, tortious interference is unfair competition.  This case includes a count for unfair competition.

However, these other issues of interfering in a state court position and so forth is going to create a lot of confusion with the jury.  I don't see a point.

THE COURT:  I am not going to allow either one of you to get into findings in another proceeding so I am not going to allow you to ask that question.

MR. SANCHELIMA:  Thank you, Your Honor.

(Sidebar conference concluded.)

BY MR. VELARDE:

Q.  Mr. Cerasale, did you ever interfere with any customers of Unisource Florida?

A.  No.

MR. VELARDE:  No further questions, Your Honor.

THE COURT:  All right.  Redirect.

MR. SANCHELIMA:  Can I have 30 seconds, Your Honor?

THE COURT:  Sure.

REDIRECT EXAMINATION

BY MR. SANCHELIMA:

Q.   Mr. Cerasale, yesterday we discussed the value of Unisource Discovery, and your answer was that, from what I remember, it had no value in Florida because you had not used the mark in Florida.

Now it appears to have, in response to counsel, some value.

What is that "some value" that you attribute to the mark Unisource Discovery prior to the incorporation of Unisource Florida?

A.   What is the value of it?  Do you want me to tell you what the value of the company that exists?

Q.   Yes.

A.   It was that people all over the country would -- because insurance companies do things differently there.  They -- you know, they have branches and some of the branches, some of the people know each other in other branches.  Sometimes people who are in original offices go to other places and then their name gets around.

Q.   What caused you to change from no value to some value from yesterday to today?

A.   I guess I thought about it more.  I can't really explain that to you but --

Q.   Understood.

You were asked by your attorney what were the duties of

Mr. Mijares in Unisource Florida.  Correct?

A.  Yes.

Q.  I believe you responded general business matters?

A.  Yes.

Q.  Day-to-day operations type of thing.

I ask you as 50 percent owner of Unisource Florida at the time, what were your duties?  What did you do?

A.  My duties or his duties?

Q.  Yes.

A.  Just advise him, I guess, you know, places where we had relationships to try to expand those relationships from the west coast to here.  I don't think there is anything more specific than that.

Q.  Did you keep record correspondence, e-mails, telephone conversations back in 2006 when you formed Unisource Florida with Mr. Mijares?

A.  Yes.

Q.  He would send you information as to important things that he did or things that he deemed important.  Correct?

A.  Yes.

Q.  You would not be corresponding about every single detail of the company, were you?

A.  No.

Q.  And it could be that some of the things that Mr. Mijares sent you, you just probably didn't pay too much attention

because it was not that important to you at the time.  Correct?

A.  I don't know.  It would be hard to characterize it that way unless you tell me something specific.

Q.  Well, in particular, correspondence dealing with the registration application of the mark in question here, the brand in question here, it could have been that Mr. Mijares sent you an e-mail, you just forgot to read it.

It happens all the time.  Right?

A.  I think something of this, like this would rise to my attention, would be something we would discuss.

Q.  I see.  And that was, of course, before 2010 because by 2010 you already signed that agreement where you acknowledged in the agreement that the company owned the registered mark.

Correct?

A.  Yes.

Q.  You had this conversation with counsel in reference to who would benefit from the registration of the mark with the Patent and Trademark Office?

A.  Who did what?

Q.  Who was benefitting from the registration of the mark?

I believe that you made some representation that Mr. Mijares represented to you that it was for your protection also?

A.  I told you exactly what he said, which was that it was -- it would benefit us I said.

Q.    Benefit us?

A.    Yeah.

Q.    And you were 50 percent of Unisource Florida at that time?

A.    That's true.

Q.    So, it's true that it would benefit "us," both of you. Correct?

A.    Uh-huh.

MR. SANCHELIMA:  No further questions, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, because this is a civil trial, jurors have an opportunity to ask witnesses questions.  The procedure we use is similar to the procedure used with the attorneys.  If you have a question, you have to write it down.  I will review it with the lawyers and decide whether or not it is a proper question based on our civil rules and the rules of evidence.

If I believe it's a proper question, I will ask the witness the question and the lawyers will have an opportunity to ask follow-up questions, and then you will go through that procedure for each question.

I'm not suggesting that you necessarily have to ask questions because generally the attorneys will have asked all the questions they think are relevant, but you do have that opportunity.

So, before I have this witness take a seat, do any of you have any questions for him?

Okay.  If you will, write it down on a piece of paper and give it to the Court security officer, and then I will see the attorneys at sidebar once we have it.

All right.  If the attorneys will come sidebar, please.

(Sidebar conference.)

THE COURT:  Okay.  The question from the juror is, "Being a business owner, I don't understand why you don't know much about your company such as sales, report production, PPP. Are you involved in the day-to-day operations of the company?"

Is there any objection to me asking the question?

MR. VELARDE:  Well, certainly, anything before are you involved I think should not be asked, as far as his involvement in the day-to-day.

THE COURT:  So you just want me to ask the actual question?

MR. VELARDE:  The actual question.  I mean, I think that's fine.

MR. SANCHELIMA:  If the whole question is asked we have no objection, but not part of it.

THE COURT:  The first part of it is argumentative, so I will just ask the last part of the question.

"Are you involved in the day-to-day operations of the company?"  And then you will both be able to ask follow-up questions.

I think we have another question.

All right.  This question, "Did the advertised use of the logo and website allow Mr. Cerasale and Mr. Mijares to operate together outside of California and Florida after 2010?"

MR. VELARDE:  I am okay with that question.

MR. SANCHELIMA:  I am okay with that question too.

THE COURT:  All right.  Take your seat and after I ask the question, you can ask follow-up questions as well.

MR. SANCHELIMA:  Thank you.

MR. VELARDE:  Thank you.

(Sidebar conference concluded.)

(Juror Questions to Witness Steven Cerasale)

THE COURT:  Okay.  Mr. Cerasale, I am going to ask you a couple of questions from the jury.

The first one I am condensing to the actual question and it is as follows:

Are you involved in the day-to-day operations of your company?

THE WITNESS:  Yes.

THE COURT:  The next question:

Did the advertised use of the logo and website allow you and Mr. Mijares to operate together outside of California and Florida after 2010?

THE WITNESS:  No.  Separately, not together --

THE COURT:  I'm sorry, if you can, speak into the microphone so they can hear you.

THE WITNESS:  We haven't operated together for a long time, and certainly not since 2010.

THE COURT:  Okay.  Any follow-up questions to those questions on behalf of the plaintiff?

MR. SANCHELIMA:  No, Your Honor.

THE COURT:  All right.  On behalf of the defendant?

MR. VELARDE:  Just one clarifying question.

THE COURT:  Okay.

MR. VELARDE:  I just want to clarify, Mr. Cerasale, the last question you answered, when you said you haven't operated together, does that mean you don't serve the same customer together?

Is that what you meant or did you mean something else?

THE WITNESS:  No, that's part of it.  You know, we haven't operated -- we operated as completely separate businesses since then and even before then.

MR. VELARDE:  But in 2010 you were still using the same website.  Correct?

THE WITNESS:  Right.

MR. VELARDE:  You allowed Unisource Florida to use the same website that you owned since 2001.  Correct?

THE WITNESS:  Right.

MR. VELARDE:  That was true in 2010, and that was true all the way through 2019.  Correct?

THE WITNESS:  Yes.

MR. VELARDE: Okay. No further questions.

THE COURT: Ladies and gentlemen, were there any further questions for the witness?

All right. If you will write that down, please.

Yes, if you will come back up for the additional questions.

(Sidebar conference.)

THE COURT: Okay. The first one or the next one, "Why did the software owner get ten percent from Cerasale only and not five percent from each one of the other parties of Unisource? Means that only Mr. Cerasale can use the software?"

There is a question mark, so I don't know if that was the question.

MR. VELARDE: I think that reflects the --

MR. SANCHELIMA: This is right on point, Your Honor. We think that this question should be asked.

THE COURT: Hold on. For the last part, I don't know if this is a question, "Can Mr. Cerasale only use the software?"

MR. VELARDE: I think that is, "Does that mean only Mr. Cerasale can use the software?"

THE COURT: The first part, the obvious question, is there any objection from the plaintiff for that?

MR. SANCHELIMA: No.

THE COURT: From the defense?

MR. VELARDE:  I do.

THE COURT:  What is your objection?

MR. VELARDE:  That that's precisely why we had a motion in limine.  It seems like the jury is confused as to the significance of the software, so it -- I think the fact that the door was open is unfortunate, and I would ask for a jury instruction on that.  The software issue in 2010 is not an issue in this case.

THE COURT:  Well, I am going to ask the question, and again, the focus of the motion in limine was the dispute, not the actual agreement, so I will ask the question.

Then the modified second part of this adding, "Does that mean that only Mr. Cerasale can use the software," is there any objection from the plaintiff to me asking that question, that modified question?

MR. SANCHELIMA:  No.

THE COURT:  All right.  Any objection to that?

MR. VELARDE:  No, Your Honor.

THE COURT:  Okay.

MR. SANCHELIMA:  This shows that the jury is attentive.

MR. VELARDE:  Yeah.

THE COURT:  All right.  The next question, "Do you have any cognitive problems or Parkinson's disease that will impair your memory to answer the questions?  The answers are vague."

Any objection to that question?

MR. SANCHELIMA:  I think that goes to credibility rather than his -- I mean, that's probably the juror with the psychiatric background.

THE COURT:  That is her.

MR. SANCHELIMA:  I don't have a problem if he is not under any medication that would impair his testimony.  That goes along those lines -- I guess it would be something that you would ask in a deposition or if there is something that impairs him from answering the questions today.  If I have a choice, I would not ask that question.

I think it's loaded with possible potential issues or mistrial or this or that and I don't know.

THE COURT:  So you do not want me to ask the question?

MR. SANCHELIMA:  No.

THE COURT:  What's your position?

MR. VELARDE:  I agree with that.

THE COURT:  All right.  So I won't ask the question.

MR. VELARDE:  All right.

MR. SANCHELIMA:  Thank you.

THE COURT:  Okay.

(Sidebar conference concluded.)

THE COURT:  Okay.  I have some additional questions to ask you.

The first one is:

Why did the software owner get ten percent from you

only and not five percent from each of the other parties of Unisource?

Make sure to speak into the microphone, sir.

THE WITNESS:  Because the agreement we made, I was just being generous.

THE COURT:  The next part of that, which I have modified just a bit:  Does that mean that only you can use the software?

THE WITNESS:  No.

THE COURT:  All right.  And the second question I cannot ask pursuant to our rules.

I understand it, but I can't ask the question.

Were there any other questions from the jury for this witness?

All right.  You may step down, sir.

Why don't we just take five minutes?

We will give you a short break and you get some coffee and we will have the next witness ready.

COURT SECURITY OFFICER:  All rise.

(The jury exited the courtroom at 11:01 a.m.)

THE COURT:  You may step down, sir.

All right.  We will take five minutes.

Who is going to be your next witness?

MR. SANCHELIMA:  Your Honor, plaintiff plans to call Mr. Mijares.  We have another witness.  I don't know if she is

outside.  We will have to check, but if -- she is an elderly person, I believe, and when she shows I will ask the Court to allow us to bring her in and stop Mr. Mijares' testimony and finish with her, which would be fast, and then continue with Mr. Mijares, if that's possible.

THE COURT:  All right.  Any issue with taking her out of turn if she is available?

MR. VELARDE:  Who is the witness?

MR. SANCHELIMA:  Jill Nolden.

MR. VELARDE:  To interrupt Mr. Mijares, no objection, Your Honor.

THE COURT:  All right.  We will take her out of turn when she is available, so you will let me know.

All right.  Let's take a short recess.

Oh, before we break, regarding the issue regarding a summary, pursuant to Rule 1006, the rules of evidence, there must be a proper foundation for the summary and including showing the admissibility of the underlying materials and the accuracy of the summary.

So, if the summary is based on actual business records, then that meets that threshold, but the other issue is establishing the accuracy or authenticity of the summary.  And I am referring to the Federal Evidence Handbook, and I can have my clerk research the issue, but it does note that it's very difficult to authenticate a summary or to establish its

accuracy without calling as a witness the person who is responsible for its preparation.

Typically, in a trial, the person that prepared the chart is the one that is in court testifying or at least someone that has reviewed it and can verify the accuracy.

Mr. Cerasale can't do that, so the problem isn't -- well, therein is the problem, having someone that can authenticate the chart itself.  So, unless you have someone to do that, we still have the same problem.

Now, if this were a situation the parties, if they exchanged the summaries and the other side said there was no objection to it, that's a different matter.

MR. VELARDE:  That is what happened, Your Honor.

We exchanged summaries.  It wasn't my idea.  It was Mr. Sanchelima's idea to exchange summaries.  He provided me with a summary, and I provided him with a summary as rebuttal, and that was done more than a month ago.

I provided him with the raw data directly from my client's system with all the metadata to Mr. Sanchelima so that he can verify the accuracy of my discovery.  In response, Mr. Sanchelima sent me a few PDFs, but not once did I hear anything about authentication issues or accuracy issues.  In fact, he identified three exhibits, Plaintiffs' Exhibits 31, 32 and 33 that are all summaries of plaintiffs' exact same documents.

So, I think it's unfair at this point at the last minute, again, for Mr. -- for the plaintiff to take the position that this summary is objectionable when we have already exchanged that and he has had more than enough time with raw data to verify the accuracy.

THE COURT:  When did you receive this summary?

MR. SANCHELIMA:  We have been exchanging charts and documents, and they objected to some of the ones that we had submitted and so forth, but there was no stipulation as to the admissibility of any of that documents.

That's why we are going through this exercise of identifying the exhibits and either agreeing to them or authenticated them and so forth.  At no point in time I stipulated to the entry of all of these documents into evidence.

THE COURT:  Why do you think they gave it to you?

MR. SANCHELIMA:  Because they were going to be on the exhibit list and I was expecting to ask questions as to, like Your Honor says, the foundation of the document, who created this, under what was the criteria, the filter in your business records for selecting these numbers in this chart.  And the rules of evidence provide for the use of charts and summaries, no doubt, but as an exception to hearsay rule but there is a threshold that needs to be met in terms of its accuracy and reliability.  I was expecting to come to court and before

admitting the exhibit in the record to ask some questions about it because it was after discovery cutoff that I received those documents.

I have no -- I did not have the ability to take the deposition of any of the purported customers in that raw data that counsel is mentioning.

This was something that we were negotiating back and forth.  We discussed the possibility that even before this one month, because like counsel said, it was my idea to possibly reach some sort of stipulation as to the markets, as to the use but that never materialized.  So, what was expecting was to ask questions about these documents.

THE COURT:  Let me ask you, in both of your exhibit lists there are objections noted and in the defense witness list there are objections for different exhibits.

You did make objections after seeing the exhibit list?

MR. VELARDE:  Yes.

THE COURT:  I'm asking Mr. Sanchelima.

MR. SANCHELIMA:  Yes, sir.

THE COURT:  But you didn't for the chart?

MR. SANCHELIMA:  No, the chart was recent, was something that was created recent.

THE COURT:  I am looking at exhibit list dated December 2nd, which was before trial.

MR. SANCHELIMA:  I am looking at the exhibit list.

There are no annotations there as to any objections.

Your Honor, we went through a lengthy, a long time stipulating a number of facts that we submitted that we filed but we never -- and that was months ago and, you know, this was a last -- Your Honor orders to submit this list the last, I believe last Friday, by last Friday but the point is that I expected to be able to ask questions.  I didn't say, okay, we are going to stipulate to the admissibility of any of the documents.  That's why we are going through this exercise observing the rules of evidence.

MR. VELARDE:  I can provide a little more.

THE COURT:  And as far as not just the witness list but the actual chart, though, you got the chart a month ago.

Is that correct?

MR. SANCHELIMA:  I got one chart on November 1st, according to counsel's notation, which I have no doubt that it's accurate.  November 1st, and we discussed this in June, back in June what we were going to be to doing.

THE COURT:  When you say, you discussed what you were going to be doing, meaning an exchange of summary charts?

MR. SANCHELIMA:  I had to be able to have the raw data to verify, but at that point in time it was impossible to start -- well, depositions were out of the question because we were outside of the discovery period but some other means of verifying.  We discussed some sort of a statistical probability

of picking five out of a hundred or something just to verify the reliability of the data or that kind of thing, but it didn't materialize so I was expecting to get somebody, the author of the charts or at least somebody that was in charge of providing instructions to somebody and we provide -- well, I asked that to go into this database in our records and come up with a chart based on this query or this idea. That's what I would expect.

THE COURT: Did you specifically ask for that?

MR. SANCHELIMA: Well, Your Honor, it's in the rules. I mean, that's the kind of question you would ask to admit -- we did not stipulate to the outright admission of the charts or any of the exhibits.

THE COURT: And for your charts that are listed in your exhibit list, you didn't get an affirmative agreement to admit those either?

MR. SANCHELIMA: For none of the charts.

The charts were created by -- we planned, if we are going to use them and Mr. Mijares provided us those charts. He created those charts and he will testify who -- I represent to the Court it was created, and he would be able to ask questions as to the accuracy of the probation and so forth.

In fact, his client has substantially the same software now, now that we are talking about software, that our client has and pretty much not directly but gave the ideas as to how

we can sort the data and so forth for him, but I have the person, the author of that chart, and if the jury doesn't believe as to the credibility of what he is saying or where the chart came from or what he did, let it be.  It will not be admitted.

THE COURT:  Did you receive the underlying data, the underlying information from the charts?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  It's customary stuff.

MR. SANCHELIMA:  Yes, Your Honor, and we made it available to counsel eight months ago, even before we wanted to have some time to go over that, but what we received a month ago, it was just impossible for us to do any kind of verification at that point.  But my expectation was that I would ask from the author of the chart.

The author is not here, and the witness doesn't even know who did the chart nor the instructions that were given to somebody that he doesn't know who did the charts.  For all we know, it could be just created by a third party.  I'm -- not an expert, just somebody.

MR. VELARDE:  Okay.  Can I add some context, Your Honor?

THE COURT:  Yes.

MR. VELARDE:  I want to clarify something, the statement that I did not get an agreement or that I did not

provide an agreement for their charts is false.

On December 1st, December 1st, not November 1st, Your Honor, a few days ago, I got an e-mail from Ms. Liany Estevez with these three charts from the plaintiff.  The three charts, which are Plaintiffs' Exhibit 31, 32 and 33, just four days ago the e-mail asked me, let me know if you agree because they were not going to submit their final exhibit list unless I can tell them that I don't object, because if I did object, they were going to put my objection in their exhibit list because we discussed it both with Mr. Sanchelima and Ms. Estevez.

I discussed the fact that I might have some objections to their charts.  We resolved those objections, no objection to the charts and that's why their exhibit list does not reflect any objections, and the same was true with my chart.  My summary, which is the same data, just from a different company, the same today that was provided to them not on December 1st but on November 1st, along with the raw data.  And I was not going to submit that exhibit list reflecting zero objections if Mr. Sanchelima indicated he objected, which he did not.

We have discussed this, Your Honor, and it was stipulated.

THE COURT:  All right.  So we are talking about Defense Exhibit 27.  Correct?

MR. VELARDE:  Yes.

MR. SANCHELIMA:  May I clarify something, Your Honor?

THE COURT:  Okay.

MR. SANCHELIMA:  Sorry.  I'm really sorry, but I feel compelled to -- yes, we had several conversations and counsel's objections dealt with the legend, the definition as to what a bill customer is and the honorary customer is.

We were trying to bend over backwards to change our legend so that it would satisfy them because counsel brought up something that was legitimate, we can't compare apples to oranges.  It has to be the same thing.

We relabeled the exhibits so it would not mislead anyone, but we were expecting to argue and to litigate just as part of what we were doing here to introduce the evidence.  We did not say, hey, we stipulate to the entry, to the admissibility of everything here.  We didn't do that.

THE COURT:  All right.

Okay.  So, with regard to the chart, which is basically about business done by Unisource California, which doesn't necessarily go to the heart of what the case is about anyway, I'm going to admit the chart.

It was provided to the plaintiff well in advance.  There was no -- it appears in the exhibit list.  There is no noted objection, although there are objections noted as to other exhibits.

We are talking about admissibility.

Now, that doesn't prohibit the plaintiff from pointing

out what you have already done when you voir dired the witness that he really wasn't involved in the participation regarding the documents.

So, as there was no objection, it was timely provided, and the underlying data was provided, I will find it's admissible but, again, you have had an opportunity to question Mr. Cerasale about his lack of specific awareness regarding that.

Let's take five minutes and then we'll come back with the next witness.

MR. SANCHELIMA: Thank you, Your Honor.

THE COURT: Just let them know that we just need a few more minutes.

COURT SECURITY OFFICER: Yes, sir.

(Brief recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: I just need defense counsel.

All right. Let's bring in the jury.

Please rise for the jury.

(The jury entered the courtroom at 11:29 a.m.)

THE COURT: All right. Please be seated everyone.

Welcome ladies and gentlemen.

The break was longer than I thought. Sometimes we have legal matters we have to take up outside of your presence so we took that time.

There was an exhibit that we discussed, Defense Exhibit 27.  I'm admitting that document which is the summary.

We are now ready to proceed with the next witness.

Would you like to call your next witness?

(Defense Exhibit 27 was admitted in evidence.)

MR. SANCHELIMA:  Yes, Your Honor.

The plaintiff calls Jill Nolden to the stand.

THE COURT:  Ms. Nolden, you are going to come up here to the witness stand to my right.

There is an incline there, so please watch your step as you go up.

THE WITNESS:  Thank you.

THE COURT:  Okay.  If you will please raise your right hand.

(The witness, Jill Nolden, was duly sworn.)

DIRECT EXAMINATION

BY MR. SANCHELIMA:

Q.  Good morning or good afternoon.  I don't know now anymore, but could you please tell the jury your name and your place of occupation?

A.  My name is Jill Nolden, N-O-L-D-E-N.  I'm a retired person.

Q.  What was your last job?

A.  I was a consultant for Northwestern Mutual in marketing and Hispanic Marketing Program.

Q.  When was that?  When did you retire?

A.   I retired in 2020, but I stopped working in 2018.

Q.   Prior to that employment -- I believe you were an employee of that company.  Correct?

A.   Pardon me?

Q.   Were you an employee for that company?

A.   No, I was a consultant.

Q.   Prior to your engagement as a consultant with that company, who did you work for?

A.   Prior to Northwestern Mutual?

Q.   What did you do there?

A.   I'm sorry, your question was prior to Northwestern Mutual?

Q.   Yes.

A.   I worked at Unisource Discovery.

Q.   Where is that company or was that company located?

A.   In Miami.

Q.   Okay.  What did you do there?

A.   I was the director of marketing and communications and kind of responsible for new business development.

Q.   I see.  Who was your boss there at Unisource Discovery?

By the way, we have been referring to Unisource Discovery as Unisource Florida from time to time, so I'm just alerting you that sometimes they say it like that for the benefit of the record, but who was your immediate supervisor?

A.   My direct report was to Noel Mijares.

Q.   Is he present here today?

A.   Yes, he is.

Q.   From what year to what year you worked for Unisource Florida?

A.   I started in 2008, and I left in 2013.

Q.   As part of your engagement, your employment, were you an employee of Unisource Florida?

A.   Yes, I was.

Q.   As part of your duties, did you deal with advertising media?

A.   Advertising buys?  I'm not sure --

Q.   Well, were you involved in the promotion or advertising of Unisource Florida?

A.   Yes, I was.

Q.   And could you describe what was, what were your -- what did you do?

A.   My principal responsibilities were for new business development to grow the brand and to protect the brand and ask to become somewhat of a household name to attorneys doing litigation.

Q.   What was the brand that you were trying to protect?

A.   Unisource Discovery.

Q.   Do you remember if the company used the brand Unisource Discovery Digital Document Retrieval also?

A.   That is a logo that's familiar to me.

Q.   Thank you.

Now, are you familiar with an entity called Council on Litigation Management?

A.   Yes, I am.

Q.   What was your relationship with that entity?

A.   That was an organization that we identified as a large Mississippi organization comprised of attorneys, claims adjusters, paralegals and other legal professionals, and it was strategic to develop that relationship so that we could continue new business development.  So we elected to embrace the organization and did several sponsorships with them.

Q.   And the brand was displayed, was used to identify the Unisource Florida?

A.   There were several, what I would call, marketing buys within the organization for the Council on Litigation Management.

Some of them were at their national meetings and others were workshops where people would gather, and we would go as a participant.  And as a participant it was kind of like a learning situation but there was also plenty of opportunities within the sponsorship for you to network and build relationships with the individuals attending.

Q.   Were there any meetings that you attended, annual meetings and the like?

A.   There were two annual meetings.  To the best of my recollection, one was in New Orleans, and it was our national

convention and probably comprised north of 2,000 people in attendance, and we were a premier sponsor at that meeting. And, again, in Ponte Vedra, Florida, that was a second annual meeting and we attended there as a sponsor once again.

Q.   Did you attend those meetings just once or periodically or every year or --

A.   The annual meeting usually lasted anywhere from three to four days, and I would say our presence was active and visible over those three to four days.

Q.   What was the importance of attending those meetings?

A.   It was to cultivate the relationships that we had begun and to see people at the meetings and reconnect with them, and also to feature our product and the services which would be helpful to the legal professionals that were in search of discovery assistance.

Q.   Could we defer to say that this could be potential business for Unisource Florida?

A.   I would refer to the Council on Litigation Management as being absolute strategic because in marketing you fish where the fish are, and the audience was directly a part of the consumer pool that we were looking for.

Q.   And representing Unisource Florida did you attend any workshops?

A.   I personally attended a workshop in Orlando.

Q.   Do you know a company by the name AIG?

A.   Yes, I do.

Q.   How did you come to know that company?

A.   That was a company that we were doing business with in Florida through a managing attorney by the name of James Gallagher, and we saw an opportunity to grow that business outside of Florida on a national platform.  And AIG is an insurance company that does insurance defense and we were strategically cultivating that relationship with AIG to try to further additional business development.

Q.   I see.

How about Liberty Mutual, did you do any work with Liberty Mutual?

A.   In the case of Liberty Mutual, we had an opportunity through the relationship with the Council on Litigation Management to do what is called an RFP, request for proposal, and that invitation was a result of that new business development initiative.

Q.   Do you know if -- and all of this, when you say "we," you meant Unisource Florida, correct, your employer?

A.   I refer to we as the collective Unisource Discovery Florida.

Q.   Did you participate in any direct mail, prospecting clients?

A.   Well, one of the benefits of being a sponsor with the Council on Litigation Management is that we received a list

afterwards of all the contacts within the industry that were in attendance at these meetings and we were permitted to do followup, cultivation and direct mail to them as prospects for new business development.

Q.   And with respect to an association called Association of Legal Administrators, are you acquainted with that entity?

A.   Yes, I am.

Q.   And can you describe to us if you did anything with this entity while you were employed by Unisource Florida?

A.   Yes, that is a national organization comprised of legal administrators throughout the country, and legal administrators are usually the authorizing party to decide on new business development and whether or not they are going to use a particular service or product.

And they also hosted a national magazine that went out to all their members and we were able to get them to publish two articles on how to use Unisource Discovery litigation services and discovery and we were able to get that article penned by Noel Mijares, the CEO of the company.

Q.   And do you remember if in those publications, the mark or what you referred to as the logo, which is the word marked plus that rectangle there, was that -- did you see that logo displayed in any of the publications of this organization?

A.   Yes, and it was my goal from the outset as an employee with Unisource Discovery to protect the brand in any which way

because without protection of the brand you are just another company, and I fought very hard to do that from the outset.

Q.   Were there any articles written where the company was featured?

A.   There were two articles.  One was a -- I believe it was three to four pages, and it was explaining the business and why it is very good for litigation attorneys and paralegals to utilize, and the other was kind of an article that kind of built upon the initial article.  There were two articles and Mr. Mijares penned both of those.

Q.   Was there any direct mail generated prospecting new business as a result of the participation with the Association of Legal Administrators?

A.   With respect to the association on legal administrators, I would say that the direct mail was not what you would call traditional direct mail but the opportunity to publish in their magazine is kind of direct because you are publishing an article that is appealing to their members directly.  So any business that you would generate there was a bounceback opportunity within the article for them to contact us, but we utilized that opportunity as a way to service that need for new business development.

Q.   So from what I understand from a marketing standpoint, would it be fair to say that this type of distribution of subscribers to the magazine would be more of a rifle approach

to potential customers maybe?

A.   In marketing terms, it's what we would refer to as a targeted approach.

Q.   How about the Florida Defense Lawyer's Association, was there any involvement that you know of between Unisource Florida and this entity?

A.   This particular organization is an organization of -- it's called a defense -- I'm sorry, the Defense Lawyers' Association of Florida.

They -- it's an invitation, so you have to be sponsored by an attorney that already is a member, a defense attorney.  And in this case that would be Mr. James Gallagher who offered to sponsor our membership who was a client and gave us that opportunity but a company cannot just come into that organization without having a sponsorship, I'm sorry, without having the endorsement of a current member.

Q.   Okay.  And how about the Cuban American Bar Association, is there any involvement with Unisource Florida with that organization?

A.   Yes, the Cuban American Bar Association is a collection of attorneys, both plaintiff -- I guess a variety of attorneys, plaintiff and defense, and it's a membership organization and, once again, that was -- we joined -- I'm sorry, didn't join the organization because you have to be an attorney but we did sponsor several activities, a golf tournament.  We attended

their gala and we were visible at those events and had branded items at those events that showcase Unisource Discovery.

Q.   I see.

Were there any other organizations or entities that Unisource Florida used to promote its name and its business?

A.   Well, I like to refer to it as three buckets, the first bucket being a good corporate citizen among all, and those would be charitable organizations.  And some of those were close to Mr. Mijares's heart, like Toys for Tots, Smile Train, which deals with children who have abnormal facial deformities, and then the second would be affinity relationships, things that are probably close to your target audience or consumer and in the case of discovery work, a large percentage of the people that do that are paralegals, and they are predominantly women.

So we had affinity relationship with Susan G. Komen Foundation, for which we made monetary donation and did branding on our website.  I am sure everybody is familiar with the pink campaign in October.  We turned our website pink, so that it would reflect our good corporate citizenship and our affinity for the causes they might be sensitive to.

Q.   Whose idea was it to turn that website pink?

A.   I introduced the idea as a follow-up to the donation to Mr. Mijares in the month of October that followed the donation.

Q.   Was that the procedure that was followed at the time, you would offer your recommendations to Mr. Mijares?

A.   I would say so because the website turned pink.

Q.   Do you know what, if anything, Mr. Mijares had to do to get the color pink in that website?

A.   I don't know the particulars, but I would say that he probably discussed it with his partner, Mr. Cerasale.

Q.   Mr. Cerasale is present in this courtroom today.  Correct?

A.   Yes, sir.

Q.   Are you a football fan?

A.   Yes, I am.

Q.   Was there any involvement of Unisource Florida with the NFL?

A.   Yes, there was.

Q.   Could you please describe what that involvement was?

A.   We were engaged in a sponsorship called the Taste of the NFL, which is an event that takes place each year in front of the Super Bowl, and it brings together all the restauranteurs within the community.  So in the case of Miami, the event was held at the Broward Convention Center, and it was a collection of restauranteurs and we were attached as part of our sponsorship to a restaurant called Allen's in North Miami Aventura area.

It's a tasting of all of the different restaurants that participate, and there's probably north of a hundred at this event.  And it also is attended by all the former -- not the current players because they are playing the game that are in

the Super Bowl but all players that are both current and retired players within the NFL attend the event.

Q.   Thank you.

Now, Ms. Nolden, I am going to show you what has been identified as Plaintiffs' Exhibit 7, which has not been entered in the record yet from what I remember but it had been previously identified as such, and it will be shown in your screen.

Even though it's going to be on the screens, since it has multiple pages, sometimes it's easier to go through the actual paper.

THE COURT:  Okay.  You are aware it's not showing yet.

MS. ESTEVEZ:  It's not reading the --

THE COURT:  Plaintiffs' Exhibit 7.

MR. SANCHELIMA:  It's not admitted.

THE COURT:  Plaintiffs' Exhibit 7 was admitted yesterday.

MR. SANCHELIMA:  Okay.  Good.

BY MR. SANCHELIMA:

Q.   I will give you some time maybe to go through this document because I will be asking you some questions about it and you can either use the screen or use the actual document, whatever is easier for you, but my assistant would have to scroll it. What do you prefer?

A.   I am familiar with the document.

Q.   Oh, that was fast.

Okay.  Let's start with page one.  Do you recognize that document?

Have you seen it before?

A.   Yes, this was the first article that was published in the Association of Legal Administrators' magazine.

Q.   Who was the author?

A.   Noel Mijares.

Q.   And you are looking at page P-000477, Bates stamp 477, 478, and 479.  Are you following me with the pages?

A.   Yes, sir.

Q.   And 479 has a picture there, an image.

Do you know who that image depicts?

A.   The picture is of Mr. Mijares.

Q.   The article, I believe, do you know the date it was published?

A.   March, April, 2010.

Q.   If we go to 480, Bates stamp 480, is that part of that article?

A.   Yes, it is.

Q.   It continues onto 481.  Correct?

A.   Correct.

Q.   Then on 482, could you describe what that is, if you recognize it?

A.   That is the second article that we published in the

magazine for the Association of Legal Administrators.

Q.   In the bottom I believe it says, Legal Management.

Correct?   That's the company or that's the publisher?

A.   No, Legal Management is the name of the magazine.

Q.   Oh, the name of the magazine.

Who was the author of this particular article?

A.   Mr. Mijares.

Q.   And, again, on P-485, Mr. Mijares's image is depicted there.   Correct?

A.   Yes, it is.

Q.   The bottom right discusses the author, Mr. Mijares, of being the president and chief executive officer of Unisource Discovery.   Correct?

A.   Correct.

Q.   Now, going to P-486, we can read better the top than the bottom.   Do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   These are the documents that were part of the advertising benefit and marketing benefit for the spend that we did with the Taste of the NFL.

Q.   You consider that to have been a successful program?

A.   Yes.

Q.   Then on 487, do you recognize that?

A.   Yes, I do.

Q.   That image?

That resembles the actual helmet that I have here today. Correct?

A.   Yes, it does.

Q.   Where did you see that helmet before?

A.   I am not -- prior to the event.

Q.   Before today, had you seen that helmet before?

A.   In the headquarters of Unisource Discovery Florida.

Q.   In whose office?

A.   It was in our lobby, at 5570, our corporate offices, and it was at Mr. Mijares's office from time to time.

Q.   So, basically, anyone that would visit the offices would see that helmet.  Correct?

A.   Yes.

Q.   Did Mr. Cerasale visit the offices of Unisource Florida while you were employed by this company?

A.   Yes, he did.

Q.   How many times did you see him at the offices of Unisource Florida?

A.   I cannot be specific as to the number of times, but I would state, from the best of my recollection, that the travel was frequent, maybe every two to three months.

Q.   Now, in this exhibit, in this picture the helmet, is the logo displayed?

A.   Yes, it is.

Q.   And I know it's a little difficult to see but I am going to bring the actual helmet close to you.

May I approach the witness, Your Honor?

THE COURT:  Yes, sir.

BY MR. SANCHELIMA:

Q.   Do you see the logo there?

A.   Yes, I do.

Q.   And do you see a symbol next to the word "discovery" in the logo?

A.   Yes, I do.

Q.   What does that signal?

A.   Registered.

Q.   Exactly.  It's an R in a circle.  Correct?

A.   Correct.

Q.   What does that symbol mean to you, other than register?  Register what?

A.    It means that the logo Unisource Discovery Digital Document Retrieval is a protected logo.

Q.   It's registered.  Correct?

A.   Yes, sir.

Q.   Now, would you please go to the next page, 488, and you see at the top logo, again, and there are two letters next to the word "discovery."  Do you see that?

A.   Yes, I do.

Q.   What does TM mean; do you know?

A.   Trademark.

Q.   Do you know why Unisource Florida's advertising included TM in its logo?

A.   Again, it goes to wanting to protect the logo.

Q.   So was this page, 488, featured in any publications?

A.   In the early part of my time at Unisource Discovery we did some branding, so this would have appeared in opportunities where we could have published an advertisement in a magazine for an event sponsorship.

Q.   Do you know what kind of distribution that magazine had?

A.   It varies.  It depends on the event itself.  A golf tournament might have 150 golfers, but then there are people who attend, wives, office staff, so it would be hard for me to say specifically how many people this particular ad reached.

Q.   Right.  I understand.

But the -- would you be able to see that it was restricted to Florida?

A.   I'm sorry, I didn't hear.

Q.   Would you say that the publication of the magazine was restricted to the State of Florida?

A.   Where this ad was utilized, is that your question?

Q.   Yes.

A.   It would be specific to that event and to that sponsorship relationship.

Q.   Without any territorial limitations.  Correct?

A.   I'm sorry?

Q.   Without any territorial limitations?

A.   If -- can I use an example?

Q.   Yes, sure.

A.   Okay.  So, in the case of the Cuban Bar Association, this would be an ad that would appear in Miami because that organization is in Miami and the events were in Miami.

Q.   Were there any other samples where that publication appeared that were outside the State of Florida?

A.   It might have appeared as an opportunity with the Council on Litigation Management if we were given a full-page ad, it might have appeared there, but this was an ad in our early stages of marketing.

Q.   How about P-00489, could you describe -- first, do you recognize that page?

A.   Yes, I do.

Q.   Can you tell us what it was for?

A.   This was an event that we did at the Get Smart Children's Academy, which is preschool for children that have learning disabilities, and it's the Toys for Tots program, which is done by the U.S., United States Marine Corp. each year leading up to Christmas, and Mr. Mijares is passionate about children and impoverished children so we did this event for the school.  And we brought Santa to the event and the Marine Corp. showed up to collect the toys.

Q.   So you know, in 490, it appears there is another event by the Cuban American Association.  Are you familiar with this particular image, this particular document?

A.   Yes, I am.

Q.   And do you know where that took place?

A.   This event took place in Miami.  It was the 9th annual golf classic at Doral golf course on the Blue Monster, which was a kind of desired course to play on for golfers and to the right of that -- the image on the left is the cover of the program. And the image on the right is an advertisement that was featured as a full-page ad within that program.

Q.   And I noticed that above the logo on the right image there are the words, "case closed."

Do you know why those two words were placed there?

A.   We endeavored to make the logo kind of speak to what attorneys attempt to do in discovery and in litigation management, which is to settle cases or close cases.

Q.   I see.

All right.  So, basically, this was for the 9th Annual Golf Classic, an event sponsored by the Cuban American.  Correct?

A.   Yes, sir.

Q.   The next page is 491.  It mentions there 8th Annual Golf Classic.

Do you recognize that document?

A.   Yes, I do.

Q. Would it be fair to say that there were more than one, maybe more than two of these events with the Cuban American Bar Association that Unisource Florida sponsored?

A. It was an annual event.

Q. Now, on 492, do you recognize that document?

A. Yes, I do.

Q. Could you tell us what was the relevancy of that document?

A. This was the editor-in-chief of a Legal Magazine offering a testimonial as -- I guess for lack of a better word you can call it an endorsement of Unisource Discovery, and the articles that were placed in the magazine entitled Legal Management.

Q. Is that magazine published exclusively within the State of Florida?

A. No, it's not. It's a national magazine.

Q. International you said?

A. National.

Q. Oh, national magazine. Thank you.

Well, we are on 493. Do you recognize that image?

A. Yes, I do.

Q. Is that the Susan G. Komen organization that you were testifying about before?

A. This is a plaque for the Association of Legal Administrators, South Florida Chapter.

Q. Why was this plaque given to Unisource Discovery?

A. It was given in recognition for the donation made to the

Susan G. Komen for the Cure.

Q. For the cure of cancer?

A. Breast cancer.

Q. And 494, do you recognize this document?

A. Yes, I do.

Q. Then I see that case closed, those two words appear even bigger than Unisource Discovery.  Can you explain?

Do you know why it was enlarged in this particular issue?

A. In comparison to the other logos on the page, is that what you are asking me?

Q. In comparison with Unisource Discovery?

A. I am not sure I understand the question fully.

Q. All right.  Well, I will withdraw the question.  It's not that important.

All right.  495, could you describe briefly whether you recognize that document and what it is?

A. Yes, I do.

Q. What is it?

A. It's a letter of thanks from the Women in Distress organization, which is a not-for-profit, and they are acknowledging our donation of Samsung cellular phones to the organization.

Q. Okay.  Basically, if you could quickly go through the rest of the documents, I don't want to spend any more time than I have to.  This document would be available for the jury to

review and to go over, but can you tell us if the rest of the documents are also either advertisements or endorsements of Unisource Florida?

A.   496 is a letter acknowledging the thousand-dollar donation made to the Susan G. Komen for the Cure.

Q.   Okay.   497?

A.   The next document is a poster that was utilized at various events to describe our business.  So at a booth that we might be given as part of our sponsorship, this poster would appear next to our booth where we would be manning.

Q.   And the same can be said about 498, maybe?

A.   Correct.

Q.   Then 499, could you tell me if you recognize that document?

A.   We endeavored to bring some levity to the discovery process, so this is a joke that was purchased through the, through one of the people that we retained for advertising with permission, and this was an ad that appeared.

Q.   The same thing could be said about 500, 501.  Correct?

A.   Correct.

Q.   Now, in 502, do you recognize that document?

A.   Yes, I do.

Q.   What is it?

A.   It's a golfer, and this was in response -- this was an advertisement that appeared at an event sponsorship that we did for golf, but it's directed -- it's golf -- it's an

advertisement with a golfer photograph in it, but it's playing to the strength of the company.

Q.   And the website unisourcediscovery.com appears on the bottom.  Correct?

A.   Correct.

Q.   And 503 is the same as the previous one, 501 and the rest.  Correct?

A.   Yes, sir.

Q.   And the same can be said about 505.  Correct?

A.   505, correct.

Q.   So, in sum, you were actively pursuing different media, different marketing ideas while you were employed at Unisource Florida.  Could we say that?

A.   Yes, sometimes when you endeavor to do marketing, you do it for strategic reasons and you also do it for goodwill amongst the consumers that you are appealing to to try to earn new business, so you put a lot of irons in the fire.

Q.   And you already mentioned that you were instrumental in changing the color of the website for Unisource Florida, correct, to pink?

A.   Correct.

Q.   Was there a specific month here that this was done?

A.   October.

Q.   Was that done year over year?

A.   It was done in conjunction with breast cancer awareness

month which was the month of October.

Q.   Every year?

A.   For the time that I was there, but when we had the new website, the colors of the website were black and gray, and that didn't necessarily allow for it to turn pink.  So there was a pink ribbon put on the home page of the website.

Q.   Other than your contribution of the color pink to the website, were you involved with the design of the graphics and the Unisource Discovery website?

A.   Yes, I was.

Q.   And the address was unisourcediscovery.com.  Correct?

A.   Yes, it was.

Q.   What kind of involvement did you have with the design of the website?

A.    I did the work collaboratively with Mr. Mijares and another colleague in the office on the web mapping and the direction that we wanted to go, and that was -- upon Mr. Mijares's approval, it was advanced to Mr. Cerasale and other individuals that were retained to design the website.

Q.   And for us who have limited Internet understanding, exactly what was -- well, not exactly, but briefly, what does mapping mean?

A.   It's when you click on certain things within the website like who we are, where we are, those are clicks that help your search engine optimization for the brand.

It's also like a navigator within the website.

Q.   I show you what has been identified as Plaintiffs' Exhibit 23, and I will give a paper copy but you should see it on the screen now.  I ask you if you recognize this document.

(Plaintiffs' Exhibit 23 was marked for identification.)

A.   Yes, I do.

BY MR. SANCHELIMA:

Q.   Could you tell us why it is that you recognize this document?

A.   It's progressive communication on the progress of the website, unisourcediscovery.com.

Q.   Why were you -- I withdraw that.

Do you know who Phyllis Persechini is or was?

A.   She was the web designer.

Q.   In other words, the person that did the program?

A.   She was retained to do the website, to embed the images and to take the content that we prepared and make it look pretty on the website.

Q.   So who were the persons responsible for mapping the website during the time that you worked there?

A.   I was principally responsible.

MR. SANCHELIMA:  Your Honor, I move to introduce Plaintiffs' Exhibit 23 in the record.

THE COURT:  Is there any objection?

MR. VELARDE:  No objection.

THE COURT:  All right.  Without objection Plaintiffs' Exhibit 23 will be admitted.

(Plaintiffs' Exhibit 23 was admitted in evidence.)

Do you want to publish?

MR. SANCHELIMA:  Yes, Your Honor, may I?  -- I have to move to publish or is that automatic?

THE COURT:  No, you should ask.

MR. SANCHELIMA:  I should ask.  Okay.

THE COURT:  Yes.

MR. SANCHELIMA:  Understood.

BY MR. SANCHELIMA:

Q.   We are going to discuss now Plaintiffs' Exhibit 25.

Just 30 seconds, Your Honor.

THE COURT:  Okay.

MR. SANCHELIMA:  I'm sorry, Your Honor, it's 28, Defense (sic) Exhibit 28 the one that I would like to discuss.

THE COURT:  Defense?

MR. SANCHELIMA:  Plaintiff, Plaintiffs' Exhibit 28.

(Plaintiffs' Exhibit 28 was marked for identification.)

BY MR. SANCHELIMA:

Q.   Ms. Nolden, we are displaying Plaintiffs' Exhibit 28, and we ask you if you recognize that document?

A.   Yes, I do.

Q.   Could you tell us what is that document?

A.   It's an e-mail from Nikki O'Connor to Phyllis Persechini,

and it's carbon copied to Noel Mijares and Jill Nolden.

Q.   Who is Nikki O'Connor?

A.   I believe Nikki O'Connor to be a colleague that works with Phyllis Persechini.

Q.   Do you know if Ms. Phyllis Persechini had any relationship with anyone in the Unisource Discovery group?

A.   I have never met her, but I believe that she was the former spouse of Steven Cerasale, yes.

Q.   What was Nikki O'Connor engaged to do for Unisource Florida, if anything?

A.   Nikki O'Connor was an employee of Persechini & Company, and she was one of the persons responsible for uploading the content and marrying the content with the visual images that had been chosen for the website.

Q.   It would be fair to say that she had to consult with you primarily whether or not there was any changes?

A.   I think that was above my pay grade.  That would be, I think, changes that would have to be agreed upon by the business owners.

Q.   Who were those?

A.   Mr. Mijares and Mr. Cerasale.

Q.   And they both had to join in the approval.  Correct?

A.   I think so.

Q.   Your understanding the time that you were working for Unisource Florida?

A.   Yes, it wasn't something that I could approve.

MR. SANCHELIMA:  Your Honor, I have no further questions.

MS. ESTEVEZ:  Your Honor, we would seek to admit and publish Exhibit 28, please.

THE COURT:  Is there an objection?

MR. VELARDE:  No objection.

MR. SANCHELIMA:  Thank you.

THE COURT:  All right.  Plaintiffs' Exhibit 28 will be admitted and it is being published to the jury.

(Plaintiffs' Exhibit 28 was marked for identification.)

THE COURT:  Do you expect your cross to take more than six minutes?

A JUROR:  Are we allowed to ask questions?

THE COURT:  After the attorneys have asked their questions.  We still have cross-examination and redirect.

We will recess now for lunch.  Why don't we come back at 1:30.

Please don't discuss anything about the case.  I just want to remind you in case you run into one of the attorneys or attorneys and the witnesses, if they don't speak to you, they are following my instructions and we will see you back here at 1:30.

COURT SECURITY OFFICER:  All rise for the jury.

MR. ZORRILLA:  With respect to your ruling on

Exhibit 27, admitting that exhibit, remember the chart, that's defense exhibit.

THE COURT:  Why don't we take that up after the jury leaves?

MR. ZORRILLA:  Okay.

(The jury exited the courtroom at 12:25 p.m.)

THE COURT:  You may step down.

Ma'am, during the lunch break, please don't discuss your testimony with anyone.

THE WITNESS:  Thank you.

THE COURT:  Counsel, what was the issue you wanted to take up?

MR. ZORRILLA:  Yes, since it was admitted after further consideration, at that time we didn't know it was going to be admitted, so we didn't move to have it published to the jury. So we would like it to be published to the jury.

THE COURT:  Well, I am assuming you are going to put on a case, are you not?

MR. ZORRILLA:  Yes, we are.

THE COURT:  You can do it then or you can use it through another witness, if it's relevant with that witness, or you can just publish it in your case, but it's been admitted and I told the jury it's been admitted.

MR. ZORRILLA:  Understood.  I just wanted the jury to see it.

THE COURT:  Well, I don't know if they have to see if right now.

MR. ZORRILLA:  No, not right now necessarily.

THE COURT:  They can see it whenever.

MR. ZORRILLA:  Okay.  Thank you.

THE COURT:  We will be in recess until 1:30.

(Lunch recess.)

COURTROOM DEPUTY:  All rise.  Court is back in session.

THE COURT:  All right.  Let's bring back the jury.

Ma'am, you can make your way back up.

(The jury entered the courtroom at 1:32 p.m.)

THE COURT:  All right.  Please be seated.

Welcome back.

CROSS-EXAMINATION

BY MR. VELARDE:

Q.  Good afternoon, Ms. Nolden.

A.  Good afternoon.

Q.  I just wanted to ask you a few questions, just to confirm.

You were employed by Unisource Florida from 2008 to 2013.  Correct?

A.  Correct.

Q.  During that time period, your duties and functions remained the same?

A.  Pretty much.

Q.  That was generally a marketing and advertising for

Unisource Florida.  Correct?

A.   Also, I was familiar with the business, so if there was help needed in making calls and dealing with some of the more difficult cases, I assisted in that way.

Q.   Got you.

Are you aware also -- well, you mentioned that you know Mr. Steven Cerasale?

A.   I don't know what you mean by know.  I know who he is, but to know him as a friend or, no, I don't know him that way.

Q.   I didn't mean that you knew who he was.  He's not a stranger to you?

A.   I can identify him as Mr. Cerasale.

Q.   Were you aware that Mr. Cerasale had a company in California called Unisource Discovery, LLC?

A.   I was aware that there were two companies and two places for business, one in Florida, one in California.

Q.   Were you aware in Unisource Discovery California that they also did their own advertising in California?

A.   I don't know what they did, but I was aware that they had a company in California.

Q.   And you reported directly to Mr. Noel Mijares?

A.   Correct.

Q.   I believe your testimony was that you would report to Mr. Mijares and Mr. Mijares would discuss with Mr. Steven Cerasale?

A.   I did not discuss business with Mr. Cerasale, if that was your question.

Q.   No, the question was, that you reported to Mr. Noel Mijares, and from your understanding, Mr. Noel Mijares would then discuss with Mr. Steven Cerasale?

A.   I would assume if there was something for them to discuss, they were business owners, yes.

Q.   That's when these issues were made.

In other words, I believe your testimony was that it's above your pay grade to make the ultimate decision regarding the advertising and management?

A.   I was in a management position.  I would make recommendations but the owner of the company would ultimately decide whether or not to find a particular recommendation.

Q.   From your understanding, that would be Mr. Steven Cerasale and Mr. Mijares?

A.   In my situation, no, it would be Mr. Mijares.

Q.   Well, when you said equal owners of the company, I was clarifying that part.  When you said it was the ultimate decision to be owners of the company, that would be Mr. Mijares and Mr. Cerasale.  Correct?

A.   I'm confused by your question.

Q.   Let me rephrase it.

So you reported to Mr. Mijares and then Mr. Mijares spoke to Mr. Steven Cerasale.  Correct?

A.   I reported to Mr. Mijares in my position, but I cannot testify as to whether or not he spoke to Mr. Cerasale after he spoke with me on a particular matter.

Q.   Understood.  That's what I remembered your testimony being. I just wanted to clarify.  So, you don't know if Mr. Mijares -- I guess your testimony is you don't know if Mr. Mijares spoke to Mr. Cerasale before the decision was made?

A.   Counsel, the question asked of me previously was related to the website and the direction of the website, and since Mr. Cerasale was copied on the e-mails, I was of the assumption that he was aware and that the decisions to go forward with the website, the web mapping, and the visuals, would be made by the owners of the company.  I was not an owner.

Q.   Understood.

Again, I don't want to belabor the point, just so that I understand, when you say the owners of the company, you are referring to Mr. Noel Mijares and Mr. Cerasale.  Correct?

A.   It's my understanding that Mr. Cerasale was part owner of the company in Florida, as well.

Q.   How long have you known Mr. Mijares?

A.   How long have I known Mr. Mijares?

Q.   Yes.

A.   An educated guess would be probably three or four years prior to me starting working there in 2008.

Q.   Were you involved in any way in the negotiations between

Mr. Mijares and Mr. Cerasale in 2006?

A.   No, I was not.

Q.   Do you know what they had agreed in 2006 as to the logo, ownership, and use?

A.   No, I do not.

Q.   Do you know what they had agreed as to which company would serve which customers?

A.   I am not sure I understand your question.

Q.   So when I say company, I am referring to Unisource Florida and Unisource California.

So my question is, do you know what agreement existed between Mr. Mijares and Mr. Cerasale as to which of those two companies would serve which customers?

A.   I am going to try and answer your question.  There were two places of business, two separate corporations, one in California, and one in Florida, one name, Unisource Discovery.

MR. VELARDE:  Two seconds, Your Honor.

THE COURT:  Sure.

BY MR. VELARDE:

Q.   Just one more question.

A.   Yes, sir.

Q.   So those two companies, Unisource Florida and Unisource California, they serve different customers.  Right?

A.   Pardon me?  Serve different customers geographically?

Q.   Just different customers, different people, different

businesses?

A.   Different businesses?  Could you ask your question again, please?

Q.   Sure.  I can ask in a little bit more narrow scope.

A.   That would be helpful.

Q.   So, let's say the company, Unisource California and Unisource Florida, they did not serve, for example, the same law firm customer?

A.   Correct.

Q.   They did not serve the same insurance customer?

A.   Let me try and be clear from my standpoint, and then you may have a follow-up question from me.

Let's use the example of Geico.  Geico is a national brand. We had customers in Florida that were Geico customers, and I am sure Mr. Cerasale's company in California had Geico customers.

Q.   Right.  And the California would serve the California customers and Florida would serve the Florida customers?

A.   Well, occasionally you might have in your discovery in Miami a record that's requested in California, which would not make it proprietary to California because it's part of the discovery in the case in Miami or another place in Florida or another place in the country, but the actual location from which we are going to retrieve the records might be in San Francisco, might be in LA, and that would not be proprietary to California.  That would still be a customer of Florida.

Q.   Understood.  That was your understanding as to what the -- I guess how the two businesses worked with each other?

A.   I guess so.  I mean -- I don't know what you're trying to get at.  I guess maybe you could help me answer your question better if I could --

Q.   I am not trying -- I am just very clearly saying, that was how you understood the two businesses were operating?

A.   California had its customers.  Florida had its customers, and we worked the orders that were brought in by the Florida customers.  That's where I was involved.

MR. VELARDE:  Right.  Right.

That's perfectly -- that answered my question.

Okay.  Thank you very much.

No further questions.

THE COURT:  All right.  Any redirect?

REDIRECT EXAMINATION

BY MR. SANCHELIMA:

Q.   Thank you, Your Honor.  Three simple narrow questions.

Did Defendant Cerasale ever ask you for any information?

A.   Related to marketing or anything at all?

Q.   Related to marketing?

A.   I don't recall in the time that I worked there that I ever had a conversation with Mr. Cerasale about business.

Q.   Did you work with Defendant Cerasale on any project, directly or indirectly?

A.   No, I did not.

Q.   Did Defendant Cerasale show you any interest on what you were doing as the marketing director of Unisource Discovery?

A.   Showed any interest?  Like by asking me questions about what I was doing?

Q.   Yes.

A.   No.

THE COURT:  Ladies and gentlemen, do any of you have any questions for this witness?

All right.  If you will just write them down.

MR. SANCHELIMA:  Your Honor, may I request that my partner sit inside the bar?

THE COURT:  Sure.

All right.  If you will approach, please.

(Sidebar conference.)

THE COURT:  All right.  There are a lot of questions from this juror.  The first question is, "Why was a new website created in 2012?"

Is there an objection from the plaintiff?

MR. SANCHELIMA:  No.

THE COURT:  From the defense?

MR. VELARDE:  No objection.

THE COURT:  The second question is, "How could a new website be created using an existing domain name?"

Is there an objection from the plaintiff?

MR. SANCHELIMA:  No.

THE COURT:  From the defense?

MR. VELARDE:  No.

THE COURT:  The next question is, "It was previously stated that e-mails for Unisource California ended in .com, for Unisource Florida ended in .net.  Why did all the Florida advertisement shown have an e-mail at unisourcediscovery.com?

Any objection?

MR. SANCHELIMA:  No objection.  Those are good questions.

MR. VELARDE:  No objection.

THE COURT:  They are paying attention.

All right.  A lot of questions from this juror as well.

The first one is, "Jill has mentioned that her duties were to protect the brand.  May she explain what she means by that, protect it from what, who?"

Is there an objection from the plaintiff?

MR. SANCHELIMA:  No.

THE COURT:  Defense?

MR. VELARDE:  No objection.

THE COURT:  Okay.  The next question is, was she ever -- I am assuming this witness -- "Was she ever told that she had to protect Unisource Florida from Unisource California?"

MR. SANCHELIMA:  No objection.

THE COURT:  Is there an objection?

MR. SANCHELIMA:  No objection.

MR. VELARDE:  No objection.

THE COURT:  All right.  The next question is, "If her duty was to protect the brand, why wasn't Unisource California using the brand logo a threat?  What did she do about it?"

MR. SANCHELIMA:  I don't understand the question.

THE COURT:  If her duty was to protect the brand, why wasn't Unisource California -- I guess she meant why was Unisource California using the brand logo -- oh, "Why wasn't Unisource California using the brand a threat?  What did she do about it?"

MR. SANCHELIMA:  Sorry, I still don't understand it. May I?

THE COURT:  Sure.

MR. SANCHELIMA:  "If her duty was to protect the brand, why wasn't Unisource California using the brand logo a threat?"

Yeah, I have no objection to that the way I understand it.

THE COURT:  Okay.  Do you have an objection?

MR. VELARDE:  No objection.

THE COURT:  All right.  The next one is, "Because she began working with Unisource Discovery in 2008, and her duty was to protect the brand, and Mr. Cerasale was told it was to protect them, did she help assist or was present when the

application was being created?"

MR. SANCHELIMA:  I don't have a problem.

MR. VELARDE:  No objection.

THE COURT:  Okay.  And the last one from this juror, "Why wasn't Steven included in any of the e-mails that were shown in the exhibits shown if he was part owner?"

I am assuming they mean the e-mails that were admitted?

MR. SANCHELIMA:  I thought that he was, but I have to look to see if he was.

THE COURT:  Any objection to the question?

MR. SANCHELIMA:  No.

THE COURT:  Any objection?

MR. VELARDE:  No objection.

MR. SANCHELIMA:  But it's subject to verifying if that's --

THE COURT:  You get to ask follow-up questions, so if you look at the e-mails and you see that he was included, you can point that out.

MR. SANCHELIMA:  Can I, at this point, introduce another exhibit where he was copied or would that be improper?

THE COURT:  Well, let's deal with the question first and then we will take up that issue.

The next question is, were you informed of any intellectual property rights of Unisource -- wait a minute. Maybe you can help me.  I can't make out what this word is,

were you informed of any intellectual property rights of the Unisource Discovery something.

MR. SANCHELIMA:  Name.

THE COURT:  Prior to becoming marketing director.

MR. SANCHELIMA:  Mark.

THE COURT:  Oh, okay.  All right.  Is there an objection from the plaintiff?

MR. SANCHELIMA:  No.

THE COURT:  From the defendant?

MR. VELARDE:  No objection.

We didn't ask enough questions.

THE COURT:  "Are the phone numbers like 1-866-580-0022 and the websites www.unisourcediscovery.com, www.unisourcediscovery.net separate for California and Florida or are they shared when customers reach out?"

MR. SANCHELIMA:  No objection.  The problem is she quit or she left in 2013, and this occurred afterwards.

THE COURT:  Okay.  So I guess maybe a preliminary question.  This number, was this a shared number?  I don't recall.

MR. SANCHELIMA:  No, this one, I believe -- I think it's our clients.  They had both, one for the east coast, one for the west coast, until they had a problem and then they separated.

THE COURT:  Is there an objection of me just asking

her?

MR. SANCHELIMA: She will probably explain that she only worked there until 2013, and she doesn't know anything of what happened after that, but the time she was working there it was only one website.

THE COURT: Because the caveat should be when she worked there.

MR. SANCHELIMA: 2013, up until 2013.

THE COURT: You see, I don't want to in any way suggest that this was the case.

MR. SANCHELIMA: That's one of the phone numbers.

My understanding is that they had disclosed two phone numbers.

THE COURT: Well, I will ask the questions. You can ask follow-up questions depending on her answer.

MR. SANCHELIMA: Yes.

THE COURT: The next question is, "Were you aware of the Unisource digital logo not being officially registered? Was this known by Mr. Mijares?" Two questions at the bottom.

MR. SANCHELIMA: Oh, I see what she said.

Apparently, this person lost a little bit because TM is when you claim common law rights, and when the R in the circle is when you claim a registered mark. So the fact that he put that there, he wants to know at what point in time it became from TM to R. That's what we are trying to do because he is

using that common law copyright notice.

THE COURT:  Okay.  Any objection to these questions?

MR. SANCHELIMA:  No.

MR. VELARDE:  No objection.

THE COURT:  All right.

MR. SANCHELIMA:  Thank you.

MR. VELARDE:  Thank you.

(Sidebar conference concluded.)

(Juror Questions of Jill Nolden.)

THE COURT:  All right.  I have some questions from the jury that I am going to read to you.

For the jury's benefit, I am not reading them in any particular order.

The first question, and of course, this is in the context of when you worked for the company.

"Are the phone numbers like 1-866-580-0022 and the websites www.unisourcediscovery.com and www.unisourcediscovery.net separate for California and Florida or are they shared when customers reach out?"

THE WITNESS:  Can I pull that question apart?

THE COURT:  Sure.

THE WITNESS:  The phone numbers for California and the 800 numbers are, one is proprietary to California and the other is proprietary to Florida.  There are -- there was one website that had the ordering system that was shared by both and

clients would click on either Florida or California to direct the system to either Florida or California.

Does that answer the question?

THE COURT: Well, that will be up to the jury.

The next question is:

Were you aware of the Unisource Discovery logo not being officially registered?

THE WITNESS: Yes, I was.

THE COURT: Was this known to Mr. Mijares?

THE WITNESS: It was an observation that I -- well, known to Mr. Mijares -- it was known to me. I would assume it was known to him.

THE COURT: Okay. Did you ever discuss that with him?

THE WITNESS: I discussed that we should register the logo because you have to protect your brand. It's an identifier for the company.

THE COURT: All right. The next question is:

You mentioned that your duties were to protect the brand. Can you explain what you mean by that, protect it from what or whom?

THE WITNESS: If you -- kind of an oversimplification would be, the company name is Unisource, the prefix is Uni, which means one. So the translation would be that you are one source for discovery, and, yet, you are a document retrieval company. So if you are the source, you want to protect that so

nobody else becomes the source.

THE COURT: The next question, and I am slightly paraphrasing:

Were you ever told that you had to protect Unisource Florida from Unisource California?

THE WITNESS: Never.

THE COURT: The next question is:

If your duty was to protect the brand, why wasn't Unisource California using the brand and logo a threat?

THE WITNESS: Well, my experience with the -- I was working for Unisource Florida. It was a separate corporation, so I was protecting the brand, our brand, which was Unisource Discovery Florida and -- I'm sorry, the second part of your question, sir?

THE COURT: Well, the question was:

Why didn't you consider Unisource California's use a threat?

THE WITNESS: Okay. I think that's pretty clear in the website in that the website was a universal website used by both Florida and California. It's an ordering system in every case. Before we re-did it in the web mapping and after, the website was a website that was shared by both.

THE COURT: The next question is:

You began working with Unisource in 2008, and your job was to protect the brand, and Mr. Cerasale was told it was to

protect them.  Did you help assist or were you present when the application was being created?

THE WITNESS:  I'm not sure that was part of my testimony so I was -- when you say "protect the brand?"

THE COURT:  Well, let's focus again on the last, the actual question there.

Did you help assist or were you present when the application was being created?

THE WITNESS:  No, I was not.  I was there to celebrate when the trademark was given by the federal government.

THE COURT:  I am going to modify the next question.

Are you aware of whether Mr. Cerasale was included in the e-mails that were shown to you today and that were admitted?

THE WITNESS:  From the paper that I received, there was a CC, so I am assuming that he was aware.  It was visually apparent that he was copied on the e-mail.

THE COURT:  The next question:

Were you informed of any intellectual property rights of the Unisource Discovery mark prior to becoming marketing director?

THE WITNESS:  To my knowledge, there was no mark before becoming marketing director.  It didn't have a mark.  There was no registered trademark.

THE COURT:  The next question is:

Why was a new website created in 2012?

THE WITNESS: It was created because the product was very sophisticated and the original website was a little elementary, if you will, or a little bit simplistic, and if you are going to provide a sophisticated product, you need to reflect -- in marketing, we call it a mirror. It's a mirror image of what you are trying to promote.

THE COURT: The next question is:

How could a new website be created using an existing domain name?

THE WITNESS: What was new about the website was the web mapping and the visuals. The ordering system stayed the same.

THE COURT: Let me modify the next question a bit.

Are you a -- do you have any knowledge about whether Unisource California's e-mails ended differently from Unisource Florida's e-mails; for example, .com versus .net?

THE WITNESS: Off the top of my head, I don't really have any recollection as to the signature on the e-mail.

THE COURT: Okay.

THE WITNESS: I can look back at these e-mails and probably help the jury if you want me to.

THE COURT: And you are referring to what?

THE WITNESS: These documents that were given to me that were e-mails.

THE COURT: Okay.

After looking at it, does it refresh your memory about how they ended?

THE WITNESS: This doesn't help me because the descriptor of the e-mails is by name only, not by e-mail address.

THE COURT: Okay. I will let the parties follow up on any other related issues.

On behalf of the plaintiff, any questions?

MR. SANCHELIMA: Thirty seconds, Your Honor, so I can look at this.

THE COURT: Okay.

MR. SANCHELIMA: Just to clarify -- and I think you clarified because at the end when you were --

THE COURT: Counsel, make sure you turn on the microphone.

MR. SANCHELIMA: Thank you, Your Honor.

Did you hear what I said?

THE WITNESS: Can you repeat it, please?

MR. SANCHELIMA: Okay. I'll repeat it.

When you were -- one of the questions was whether when you were hired in 2008, whether a mark existed, and you kind of clarified, but I want to make sure because at the end you said registered mark.

Isn't it true that when you were hired the mark was not

registered?

THE WITNESS: Correct.

MR. SANCHELIMA: But the mark was being used in advertising and in the web page and so forth, correct, the logo?

THE WITNESS: Not the mark but the logo.

MR. SANCHELIMA: Well, I represent to you that the mark and the logo is the same thing. The word mark being Unisource Discovery Digital Document Retrieval, and the logo or the mark with the logo is the graphics of the rectangle that you see in the registration.

THE WITNESS: That particular logo -- if you want to bring it closer, but I don't see any registered trademark there. I just see the logo.

MR. SANCHELIMA: Correct. This is the logo that was in existence when you were first hired in 2008. Correct?

THE WITNESS: That was the logo we were working with.

MR. SANCHELIMA: Correct.

And later on in 2009 the mark with the logo was registered and that's when you celebrated. Correct?

THE WITNESS: Yes.

MR. SANCHELIMA: Now, with respect to the e-mails involving you and Defendant Cerasale, was Defendant Cerasale excluded in those e-mails?

THE WITNESS: When you say e-mails between me and

Mr. Cerasale, I never had a direct e-mail from Mr. Cerasale or wrote to Mr. Cerasale.

Those e-mails were authored by Nikki and by Phyllis Persechini, and Mr. Cerasale was copied.

MR. SANCHELIMA:  Okay.  I am going to show you what we have identified as Exhibit 25 and ask you whether this is one of those e-mails that you just described.

(Plaintiffs' Exhibit 25 was marked for identification.)

THE COURT:  I am not showing that Plaintiffs' Exhibit 25 is in evidence.

MR. SANCHELIMA:  It has not been admitted.  That's the one I hesitated and decided to move on to the next one.

THE COURT:  I am just asking.

MR. SANCHELIMA:  It cannot be published.

THE COURT:  Okay.  If you are just showing it to her, that's fine.

MR. SANCHELIMA:  Does this e-mail fit the category that you just described or where Mr. Cerasale was copied?

THE WITNESS:  This e-mail is to Tony Pisani, and it's cc'd to Steve Cerasale, Noel Mijares and Phyllis Persechini.  I am not identified here in this e-mail.

I am mentioned by name in the body of the text, but I am not copied.

MR. SANCHELIMA:  You are not copied but you are mentioned in the body of the e-mail.  Correct?

THE WITNESS:  Correct.

MR. SANCHELIMA:  So you were involved -- it would be reasonable to say you were involved in connection with this matter?

THE WITNESS:  You want me to read the content again?

Yes, that would be the final follow-up of the website.

MR. SANCHELIMA:  Your Honor, plaintiff moves to admit this Exhibit 25 into evidence.

THE COURT:  Is there any objection?

MR. VELARDE:  No objection, Your Honor.

THE COURT:  All right.  Without objection, Plaintiffs' Exhibit 25 will be admitted.

(Plaintiffs' Exhibit 25 was admitted in evidence.)

MR. SANCHELIMA:  Could it be published, Your Honor?

THE COURT:  All right.  Does that conclude your questions?

MR. SANCHELIMA:  I am done.

THE COURT:  All right.  Any questions from the defense?

MR. VELARDE:  Just a follow-up.

Can you leave it up, Counsel?

MR. VELARDE:  I just wanted to follow up, Ms. Nolden, on this e-mail.

This e-mail was dated March 29, 2012, and it refers in the subject line to the new website.

Is this e-mail about the new website that you mentioned

was made using the same domain name in 2012?

THE WITNESS:  I'm sorry, one more time?

MR. VELARDE:  Does this e-mail refer to that project of creating a new website in 2012?

THE WITNESS:  This is related to the new website mapping content, so on and so forth.

MR. VELARDE:  So that new website project was around the time frame of February, March 2012.

THE WITNESS:  I can't be specific, but it probably is accurate to say.

MR. VELARDE:  No further questions, thank you.

THE COURT:  All right.  Ladies and gentlemen, were there any follow-up questions to the questions that were asked?

All right.  You may step down.

THE WITNESS:  Thank you very much.

THE COURT:  Please call your next witness.

MR. SANCHELIMA:  The plaintiff calls Noel Mijares to the stand, Your Honor.

You may approach.

THE COURT:  All right.  Sir, before you have a seat, the court reporter will administer the oath to you.

(The witness, Noel Mijares, was duly sworn.)

THE COURT:  Please be seated.  Make sure you pull the microphone close to you.

                    DIRECT EXAMINATION

BY MR. SANCHELIMA:

Q.   Good afternoon, Mr. Mijares.  Could you please introduce yourself to the members of the jury?

A.   Yes, good afternoon.  My name is Noel Mijares.

Q.   And what is your current position?

A.   President of Unisource Discovery, Inc.

Q.   And you have been sitting in plaintiffs' table throughout this trial since yesterday.  So you have heard testimony of Defendant Cerasale and Ms. Nolden.

I'd like you to start by describing to the jury briefly your educational background.

A.   Graduated, went to Miami-Dade Community College but did not finish.  At the time I had opportunities to start my own business, so at a young age I started a company by the name of Global Traders, which we did procurement with Central American and Caribbean companies.  When they needed to acquire heavy duty equipment or tires, they would come here and put out bids for that.

Shortly after that, I expanded to an enterprise called Safe Wrap of America, which is a bag wrap at the airport where, you know, you shrink the baggage with plastic wrap to protect it.

I did that, we did that for many years until 2001.

After 9/11 then I met my wife in 2002 and then I opened The Subpoena Company in 2002.  Following that, in 2005 I was introduced to Mr. Cerasale, and we began Unisource Discovery,

Inc., and here we are.

Q.   Well, you answered the next question that I had.  That's very important history.

I'd like to show you what has been marked as, or we will mark as Exhibit 1.  Plaintiffs' Exhibit 1.  I'd like it to be displayed.

And the same way we have been doing, hand over a hard copy.

It's easier for you to follow up.

(Plaintiffs' Exhibit 1 was marked for identification.)

A.   Thank you.

BY MR. SANCHELIMA:

Q.   I ask you if you recognize that document?

A.   Yes.

Q.   Could you describe who authored that document?

A.   I did.

Q.   Why did you prepare that document?

A.   This was a comprehensive overview of what we were currently doing at the time, and I wanted to provide Mr. Cerasale with a clear understanding that we had built a small business here in Florida that had really matured.  And I was letting him know of the opportunities and the background of the company, The Subpoena Company, and the opportunities that we had and in sharing with him pretty much a lot of information of what we had accomplished at the time.

Q.   You heard when I asked Mr. Cerasale how he met you, I

described how was it he met you.  I believe that your wife, Lisa Cote, used to work for a company where Defendant Cerasale used to work.  Is that correct?

A.   That is correct.

Q.   Please tell us the name of that company.

A.   American DataMed.

Q.   Did you meet Defendant Cerasale at that time?

A.   No, I did not.  With regards to when he worked at American DataMed?

Q.   Yes.

A.   No, I did not know him at the time.

Q.   Tell us how it is that you ended up meeting Defendant Cerasale.

A.   With The Subpoena Company, we basically only were handling what's called the service of process.  So, you have insurance companies and law firms that issue subpoenas for records so they want to obtain records and we would do the process and we expanded throughout the whole State of Florida.  We had five offices throughout the state, so we had grown exponentially and we wanted to expand our offerings because we wanted to also include what is called records retrieval of the process of when you serve the subpoena and get records for the attorney.

We did not have the software to do this.  We had already some companies we were working with that wanted us to handle that part of it, so for us it was a move forward, a business

decision.

My wife at the time told me, look, the best company that was doing that was a company I worked for called American DataMed, and I know one of the founders.  Maybe we can speak to him.  It might work.  It might make sense for us and that's how I was introduced to Mr. Cerasale.

Q.   I see.

Counsel, do you have any objections to Exhibit 1?

MR. VELARDE:  No objections to Exhibit 1.

THE COURT:  All right.  Without objection it will be admitted.

(Plaintiffs' Exhibit 1 was admitted in evidence.)

MR. SANCHELIMA:  Could you publish, Your Honor?

THE COURT:  Yes.

BY MR. SANCHELIMA:

Q.   If you look at the first sentence in Plaintiffs' Exhibit 1, it says, "In keeping with our goal to strengthen our foundations in the service of process and records retrieval business," is that what you just mentioned now, that's the business you wanted to expand on?

A.   Correct, yes.

Q.   What were those goals that you referred to in this paper?

A.   Become a national presence in the industry, and the reason for that was because of my previous position with Safe Wrap, I was able to achieve up to eight countries offering the service,

and I wanted to do something similar with the industry here and expand it on a national footprint.

Q.   And your business as it's described here in this letter which appears to be reporting the history of your company pretty much.  Correct?

A.   Pretty much at the time, yes.

Q.   Would it be fair to say that this is -- you were exploring the possibility of joining forces with Defendant Cerasale and a new venture?

A.   That was the intent.

Q.   In other words, creating a synergism of one plus one equals three maybe?

A.   Correct.

Q.   And you could do with him something more than each one of you could do separately?

A.   Correct.

Q.   When did you have your first conversation with Defendant Cerasale?

A.   I would say shortly after this -- I don't know if before or after this e-mail that I sent to him, but it was right around this time period that he visited my home.

Q.   Did you meet him in person?

A.   I did.

Q.   Where?

A.   We met at -- we met at his hotel in Miami Beach where he

was staying at, and then we went out to dinner.

Q.   What was discussed at that dinner?

A.   We discussed the possibilities of being able to build something larger than what we both had at the time, and we discussed how that would work, how that would work in a real life setting.  Obviously, it was a lot of commitments that had to be made, and we discussed those details.

Q.   Do you know where that place was, the restaurant where you met with him?

A.   The first time when he came down, the first time I met with him?

Q.   Yes.

A.   I don't recall exactly the restaurant that I met with him at that time, but it was -- I apologize, it was across the street.  It was nearby his hotel where he was staying.

Q.   I am sure -- I don't remember where I had dinner last night either, but sometimes when events are important you kind of try to have some kind of a reference.

We can say that it was in 2005.  Correct?

A.   Yes.

Q.   All right.  And what, if anything, attracted you towards joining forces with Defendant Cerasale?

A.   He had already a background in the records retrieval business, and he had a software that we needed.  That was the piece we were missing.

Q.   To your understanding, what do you think that you could contribute to Defendant Cerasale in this new venture?

A.   Bring a complete new expansion of the services.  At the time, Florida was ripe.  This is early 2005, 2006, so the services in Florida were not known that well, so we were calling it kind of like the spear, doing a lot of service of process for a lot of the law firms in Florida, from Tallahassee, Orlando, Tampa, West Palm, Miami, Broward.  So we knew what the needs were and we felt this was a good opportunity to be able to launch and become a national footprint.

Q.   And did there ever come a time when you discussed the possibility of entering into an agreement?

A.   Yes, we were looking at that.  That was the purpose of this July 29th letter.

Q.   Did you eventually enter an agreement with Defendant Cerasale?

A.   Yes, we did.

Q.   Who prepared that agreement?

A.   Cerasale's attorney.

Q.   I show you what has been admitted in evidence as Plaintiffs' Exhibit 3.

May I ask you to review this document and tell us if you recognize it?

A.   I do.  Yes, I recognize this document.

Q.   What does the first sentence say?

A.   "We have reviewed the operating agreement for the creation of the limited liability company, which was prepared by your attorney."

Q.   And this particular letter is addressed to who?

A.   To Steven Cerasale.

Q.   And this is June 14th of 2006.  Correct?

A.   Correct.

Q.   So, from 2005 to 2006, you had several consultations with Defendant Cerasale and also with your attorney.  In the second paragraph, it mentions something like an accountant or attorney.  Did you consult with an attorney?

A.   You are asking if I consulted?

Q.   Yes.

A.   No, not at this time.

Q.   So why did you write in this letter -- do you see paragraph two?

It says that you had several consultations with our counsel and accountant.  Whose attorney was that?

A.   Oh, I'm sorry.  We did review everything.

The reason for this letter was because Mr. Cerasale was trying to set us up here with an LLC, so I had that reviewed on our end and you could not have the same LLC registered with the same name in two different states for IRS purposes and also because we did not want to fall under that type of a business

structure, the LLC business structure.

Q.   So, did you consult with an accountant or counsel here means attorney?

A.   Correct.  We consulted with our CPA at the time and also with counsel.

Q.   Fine.  And there is an attachment here that is page Bates stamp P-000325, entitled Operating Agreement for Unisource Discovery.

Do you see that?

A.   I do.

Q.   And this agreement attachment is unsigned.

Do you see that space for your signature on P-334?

A.   I do, yes, sir.

Q.   Then was there a time when this agreement was signed?

A.   Immediately after this interaction with Steven he conceded that, yes, the Florida corporation should be incorporated instead of the LLC.  He dropped the whole LLC push.

Q.   All right.  So, basically, you settled in naming the corporation Unisource Discovery, Inc.?

A.   Correct.

Q.   And was it important to you at that time what the name of the corporation was going to be?

A.   No.

Q.   Did Unisource Discovery, Inc., have any value at that time in 2006?

A.   Not to my understanding.  There was nothing of it here in the state.

Q.   So the client -- I withdraw that.

Prior to 2006, I believe you were working in a company that was serving subpoenas.

What was the name of that company or what is the name of that company?

A.   The Subpoena Summons and Affidavit Company.

Q.   And at that time in 2006 when this corporation was formed, the client service by your Subpoena Company, to shorten the name, would not recognize Unisource Discovery as a competitor of your company?

A.   No, they would not have recognized the name.

Q.   Because they had no advertisement, no use of the mark here, no use of the name, the mark in the State of Florida.  Correct?

A.   None.

Q.   All right.  I'd like to publish Exhibit 5, which has been admitted in the record and provide the witness with a copy.

I ask you to review this document and go directly to the page where the signatures are and tell us if you recognize your signature.

A.   Yes, I do.

Q.   And there are two other signatures there.  Are you familiar with those two other signatures?

A.   Very much so, yes.

Q.   Which ones?

A.   Steven Cerasale above me, mine and Lisa Cote.

Q.   Who is Lisa Cote?

A.   My wife.

Q.   All right.  Going to the first page of this agreement, it's clear from the document that the parties, this agreement were those named as directors.  Correct?

A.   Correct.

Q.   And they constituted the first board of directors?

A.   Correct.

Q.   And these directors stayed in their positions until when?

A.   Well, these three directors stayed in this position until June 28th, 2010, when we did a new Closed Corporation Shareholder Agreement.

Q.   Okay.  And did the directors change in 2010?

A.   They did.

Q.   Who were the directors in 2010?

A.   Steven Cerasale, Noel Mijares, Lisa Cote and Alfred Lutter.

Q.   Was Alfred Lutter a director?

A.   I believe he is, yes.  I believe he was in 2010.

Q.   But not before 2010?

A.   Not before, no.

Q.   So from 2008 to when this 2010 agreement was signed, the initial directors were the three that appeared in this document?

A.   Well, let me clarify that because there is a difference between directors and shareholders.

Q.   I am not talking about shareholders.  Exclusively, let's focus on directors.  No other directors.  Correct?

A.   Can you repeat the question?

Q.   From 2008 -- sorry, from 2006 to 2010, there were only three directors?

A.   Correct.

Q.   The three that signed this document?

A.   That's correct.

Q.   And if we go to the second page, we look at the purpose of the corporation, the purpose of the company, and it says, "The company shall be formed for providing records retrieval and related services."

That purpose includes when you were negotiating with Defendant Cerasale.  Correct?

A.   That's correct.

Q.   Then we go to the third page where the board of directors is defined to include those three names.

Correct?

A.   Correct.

Q.   Now, 3.2 is a provision that provides for the event that a director resigns.  Correct?

A.   Correct.

Q.   Did any of the directors resign from 2006 to 2010?

A.   No.

Q.   No resignations?

A.   None.

Q.   Well, in 3.1 there is a list of the shareholders of the corporation.  Correct?

A.   Correct.

Q.   And who were the shareholders of the corporation when it was formed?

A.   Steven Cerasale with 50 percent, Noel Mijares with 25 percent, and Lisa Cote with 25 percent.

Q.   So the would-be incorporators of this business association subscribed themselves for the issuance of shares in these proportions.  Correct?

A.   Correct.

Q.   And basically, no one has, neither Defendant Cerasale's side or your side, along with your wife, neither one of you have had majority power in the corporation?

A.   That's correct.

Q.   It's been 50/50?

A.   Yes.

Q.   So the way that the corporation has been managed is through blocking power, primarily?

A.   Yes.

Q.   There has to be an agreement by both sides before anything passes there, and nobody gave up its directorship?

A.    Correct.

Q.    Because it requires a majority, a majority that doesn't exist so it's a blocking power.  Unless at least two of you agree to pass a resolution for the board of directors, it's not going to pass?

A.    That's correct.

Q.    And your wife would probably side with you?

A.    Not necessarily, but, yeah, you know.

Q.    I understand.  You don't have to explain.

Now, let's discuss this business of management and powers, paragraph 4.1.

Now, I read you what it says here to direct your attention to the questions I want to ask.  "Management and Powers:  By entering into this agreement, the intent of each director is actively to engage in the management of the company?"

Is your understanding that Defendant Cerasale actively engaged in the management of the company?

A.    To a certain degree.

Q.    "Accordingly, unless otherwise limited by the articles of this agreement, each director shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property, and affairs of the company."

What do you understand that to be?

A.    This provided the board with the power to run the day-to-day business of the company.

Q. And who from the three directors was mostly engaged in the day-to-day business of the operation?

A. Myself primarily.

Q. Because you are the president of the Unisource Discovery?

A. That's correct.

Q. And you are also the CEO, chief executive officer?

A. Correct.

Q. And it has been like that from day one to this date?

A. Correct.

Q. If you had to enter into a lease agreement, you would consult with the other directors, I imagine?

A. Yes.

Q. And since you had full power of the company, it was within your power to transfer assets, acquire assets. Correct?

A. That's correct.

Q. You would buy the corporation with this clause here?

A. I could.

Q. And the other directors could do the same thing.

A. Correct.

Q. It's just that it would fall on you to do most of the day-to-day business of the corporation?

A. True.

Q. Then it says, "To make all those decisions regarding that matter and then to perform all other acts or activities customary or incident to the management of the company's

business, property and affairs, as assigned under the board of directors."

So, in addition to the full power you had, you could be told by the board of directors to do something else.

Correct?

A.   Correct.

Q.   So when you filed this trademark application in 2008, two years after this agreement, did you have an honest belief that the company had the right to protect its business property?

A.   Yes, absolutely.

Q.   Was there any reason for you to doubt that your company should not be protected, should not protect its assets?

A.   Rephrase that.

I didn't understand it.

Q.   Would you have any reason to believe that you did not have a duty as director to protect the assets of the corporation?

A.   No, I had a responsibility, a fiduciary responsibility to protect the assets of the company.  Those are my primary job.

Q.   So you heard the previous witness saying that I think she suggested that the brand should be protected, Ms. Nolden?

A.   Correct.

Q.   And you thought it was a good idea?

A.   I did.

Q.   The same way that you thought it was a good idea to paint

the website pink?

A.   It was, it is.

Q.   So Ms. Nolden had good ideas and you listened to your associates, your friends, your employees.  When they have good ideas, you move forward.

     It makes sense to protect the brand.  Right?

A.   Yes, I did.

     MR. VELARDE:  Your Honor, I didn't want to object to every question, but this is the fifth or sixth question in a row that's been leading.

     THE COURT:  All right.  Sustained.

     Please ask direct questions of your witness.

BY MR. SANCHELIMA:

Q.   It made sense to you at the time to protect the brand. Correct?

     THE COURT:  Counsel, that's a leading question.

     Please ask direct questions.

BY MR. SANCHELIMA:

Q.   What did you do, if anything, to protect the brand?

A.   We moved to file the registration to secure the brand with protections under the United States Patent Trademark Office.

Q.   How did you do that?

A.   We conducted a full review -- we, basically, first we hired LegalZoom to do what is called a comprehensive review in the market to see if there is any conflicts because if there is a

conflict then you can't proceed with it.  So, the first step was we hired LegalZoom to do a national comprehensive review of the trademark, and they also did for us a state-by-state review of the trademark, and when that came back negative, then we proceeded with having the filing.

Q.   Maybe not everybody knows who LegalZoom is.

Could you describe to the jury who LegalZoom is?

A.   Yes, it's a company that was formed to help people that might need something filed legally without having to -- you know, if you don't have access to a law firm or something like that, they will help with filing certain things, and we chose to use them to do the comprehensive trademark, at the time, review.

Q.   When you hired them, how did you pay them?

A.   With -- what do you mean exactly?

Q.   What did you use to pay them?

A.   Company, company credit card.

Q.   Who had access to that company credit card?

A.   Steven Cerasale, Lisa Cote and myself.

Q.   So all three of them could have seen on the statement that LegalZoom was paid?

A.   Absolutely, yes.

Q.   What happened after you received the results from LegalZoom?

A.   We received the results, and then we moved to start the

application process.

Q.   And could you describe how that happened?

A.   Yeah, we had to answer many questions and provide them with proof of the mark in use, so we pooled that information together.

Q.   What proof did you provide to LegalZoom?

A.   Copies of the website, of our website.

Q.   Unisourcediscovery.com, snapshots of the website?

A.   That is correct.

Q.   What kind of information LegalZoom asked?

A.   They asked from the standard information of, you know, address, filer information.  They asked information as to when was the first time the mark was used in commerce, among other things.

Q.   What did you respond as to what was the first time the mark was used in commerce?

A.   March of 2001.

Q.   Where did you get that information from?

A.   Steven Cerasale.

Q.   Could you describe to the jury how is it that you obtained that information?

A.   Yes.  When LegalZoom came back with their comprehensive report and we started the process, some of the questions I did not have answers to.  I didn't know.

So, in October of 2008, in one of his visits, I

specifically remember Steven and I were at a restaurant that we used to go to called Sardinia in Miami Beach.

We were sitting, standing at the counter, and he was on my right-hand side leaning in on me.  And we used to do this just to catch up, get away from the office, talk about things that are happening, decisions that have to be made, and one of the things I specifically remember was letting him know that I needed to finish this application and I did not have a date.  I did not know what date he first used the mark, the name and logo, and I asked him.  And he told me March, use March of 2001, and that's the reason why we used March of 2001.

Q.   And that information that you obtained was sent where?

A.   That was sent to LegalZoom so they could finish the application and then they submitted it.

Q.   Did you file this application in your own name?

A.   I did not.

Q.   Whose name -- who was the applicant?

A.   The applicant, the owner of the mark is Unisource Discovery, Inc.

Q.   And we already know who owns what there at that time.

What happened after that?

A.   Nothing, we waited.  Nothing at that time.

Q.   So, did you receive any other papers or acknowledgment or anything happened after the application was filed by LegalZoom?

A.   We received a confirmation from United States Patent

Trademark Office to our office.  Then after that we received another confirmation because they have to publish it, make it public for everyone to be able to see that this is the application that's going to be up for registration.

Then after that we received the actual certificate of registration.

Q.   Did anyone oppose the registration?

A.   No.

Q.   Was this kept a secret, away from Defendant Cerasale?

A.   No, not at all.

Q.   What happened when you received the certificate in the mail from LegalZoom, I guess, or the Patent & Trademark Office directly?

A.   It was from the patent trademark office.  It was a pretty exciting moment for the company, for us.

Q.   You heard Ms. Nolden testify that there was a celebration, I believe?

A.   There was.

Q.   Can you describe that celebration?

A.   Yeah, it was important for us because we actually were able to get something done as a whole, and when I shared it with everyone, to my recollection, Steven Cerasale was like, I believe, my third phone call, second or third phone call to let him know that we had gotten it.  And the reason for that is because we were now able to update our logo, name and logo,

with the registered mark and do more aggressive branding of it, which is what the intent was.

Q.   I see.

So, it would be fair to say -- would it be fair to say that the business marriage, if we can characterize it is that, from 2006 to about 2008 was a good one?

A.   Very good.

Q.   Business wise, what was happening?

A.   A lot.  A lot of things were happening.  We opened operations in 2006.  By 2007, we had more than doubled our business by end of -- by 2008, we almost tripled it, so it was an exciting time.

Q.   I believe that like any corporation or maybe some type of corporation, I am not a tax lawyer, but there is a K-1 form that is distributed, I believe?

A.   Correct.

Q.   Were those distributed?

A.   Yes.

Q.   Did the company pay dividends?

A.   Yes.

Q.   And the directors had benefits.  Correct?

A.   Yes.

Q.   Like maybe use of credit cards?

A.   Yes.

Q.   So that takes us to 2009.  Was everything fine in 2009

according to your estimation?

A.   Yeah.

Q.   Still making money.  Everybody was happy?

A.   Very much.  My daughter was born in 2008.

Q.   Great.

What happened after that, 2010, anything happened?

A.   In 2010, we had a lot going on in 2010.  We had the Taste of the NFL, which was a major position for us.  That was a big, big step for the company.  We learned that other events transpired in 2010, which was -- we learned that the software that Steven had brought to the table wasn't his to bring to the table, and that caused some friction.

Q.   I will show you what has been identified as Exhibit 8 and it has been admitted into evidence, which is entitled Stock Purchase and License Agreement, and I ask you if you have seen this document before?

A.   Yes.

Q.   Did you sign that document?

A.   I did.

Q.   Why did you sign that document?

A.   Multiple reasons.

Reason one, because I did not want the company engaged in litigation; and reason two, to resolve a dispute; and reason three, to acquire perpetual rights to the software for the company.

Q.   Did this stock purchase and license agreement accomplish those objectives?

A.   It did.

Q.   What was the cost to enter into this stock purchase and license agreement?

A.   Steven Cerasale had to sell back ten percent of his shares to the company and then the company sold those shares to Alfred Lutter to stop the furtherance of any activity that might have occurred.

Q.   Okay.  I call your attention to page one of the agreement, paragraph one, entitled Software License to Company.  Was that the license that was purchased?

A.   Yes.

Q.   You mentioned in perpetuity.  Why is that?

A.   Because the company had to give consideration, and Alfred Lutter accepted that consideration for a perpetual license to the company.

Q.   Were there any other agreements signed in 2010?

A.   Yes.

Q.   What agreements were signed?  How many agreements were signed?

A.   There was a total of two agreements that were executed in 2010, one being this one, the stock purchase and license agreement, and then there was a company, what we call a sister agreement, which is the Closed Shareholder Operation Agreement,

also the same date of June 28th, 2010.

MR. SANCHELIMA:  That's the one entitled Closed Corporation Shareholder Agreement.

Can I ask the Court to publish Exhibit 9, please?

THE COURT:  That's fine.

BY MR. SANCHELIMA:

Q.   I will hand you what has been admitted into evidence as Plaintiffs' Exhibit 9.  I ask you to review the agreement and tell us if that is the agreement that you are referring to.

A.   It is.

Q.   And it's dated?

A.   June 28th, 2010.

Q.   Is that the same date as the other agreement?

A.   It is.

Q.   So they were both simultaneously executed.  Correct?

A.   Yes.

Q.   And who were the parties to this agreement?

A.   Steven Cerasale, Alfred Lutter, Lisa Cote and myself, Noel Mijares.

Q.   Were you all present in one place when this was signed, when this agreement was signed?

A.   Yes.

Q.   Where?

A.   In our office.  I believe that it occurred in our office here in Miami.

Q.   By the way, how many times did Defendant Cerasale visit the office from 2006 to 2010 when this agreement was signed?

A.   Steven would visit Florida between, you know, five, six, seven times a year, minimum, no less than five times a year, sometimes seven times a year.

Q.   Did you make any special preparations at the office when he came?

A.   Not necessarily, no.  He was -- he had his own office if he wanted it.  He always stayed in my office.  So he would come in and he preferred to be with me in my office than to be in his own office, you know, some other place that was assigned to him.

Q.   Did you make efforts to hide any documents or keep anything away from him when he visited the office?

A.   No, he had access to anything he wanted.

Q.   So if he wanted to use your computer, he could use it?

A.   He did.

Q.   Or anybody else's computer.  Right?

A.   Yeah, or any computer you in the building.

        THE COURT:  All right.  Counsel, it's 3 o'clock.  It's a good time for a break.

        MR. SANCHELIMA:  Yes, sir.

        THE COURT:  All right.  We will take our afternoon break now.  We will normally take 15 minutes.  We will take just a few minutes more.

Today is Ms. Diaz's birthday. We have a cake for her in the back, so we want to make sure she gets a chance to eat some of it. We will take about 20 minutes.

You don't have to stay in the jury room. You can move about as you wish. We will see you back in 20 minutes.

(The jury exited the courtroom at 3:01 p.m.)

THE COURT: You may step down, sir.

THE WITNESS: Thank you.

THE COURT: If you don't mind taking the helmet back to the table.

MR. SANCHELIMA: I will.

THE COURT: All right. We will be in recess for 20 minutes.

(Brief recess.)

(The jury entered the courtroom at 3:27 p.m.)

THE COURT: All right. Please be seated.

Welcome back.

All right. If you come back up to the witness stand.

MR. SANCHELIMA: Would it be possible for madam court reporter to read back the last question that I had so I can get back to my train of thought.

(The question referred to was read back as above recorded.)

BY MR. SANCHELIMA:

Q. Would it be fair to say that -- well, withdraw that.

Did you receive any communications from Defendant Cerasale

up to 2010 protesting the registration of the mark?

A.   No.

Q.   After 2010, did you ever receive any complaints from Defendant Cerasale for the registration of the mark?

A.   No, not until now.

Q.   Now meaning when the counterclaim to cancel the registration was filed.  Correct?

A.   Correct.

Q.   Do you know what year was that?

A.   2021, if I am not mistaken.

Q.   You are correct.  So that was over a decade after the mark was registered.

     Correct?

A.   Yes, correct.

Q.   All right.  So this business charge went along in pretty good terms until I think you said 2010, and then we have this agreement, Closed Corporation Shareholder Agreement, that was executed.  And I call your attention to paragraph 1.3, which I asked Defendant Cerasale yesterday about.

     I ask you to read that paragraph and tell us why that paragraph was included in this agreement, if you know the answer.

A.   Yes.  "1.3 Trademark:  Unisource Discovery Digital Document Retrieval is a registered U.S. trademark of the company."

Q.   Who is the company?  What company are they referring to?

A.   Unisource Discovery, Inc.   This is part of the agreement.

Q.   So, on page one, the recitals or the first paragraph it says, Unisource Discovery Florida Corporation, and in parenthesis, the company.   Is that correct?

A.   That's correct.

Q.   So, then there is a second sentence here that I will ask you what you understand this second sentence to mean.

It says, "Without limiting the foregoing, the parties agree that the company shall be entitled to use the trademark, Unisource Discovery, as part of its corporate name, Unisource Discovery, Inc., or as a fictitious business name, or otherwise."

What did you understand that sentence to mean in this particular agreement?

A.   Well, I know exactly what it means because we are the ones -- we meaning Steven, Alfred, myself, and our attorneys are the ones that put all of this together.   That means that the company owns the rights to the trademark, the name, the logo, the registration, and the company has the ability to use it any way it wants.   That's all that means.

It can do anything it wants with it and there are no restrictions or limitations to its use or how it's used.

Q.   And when this agreement was signed, nobody objected to that.   Correct?

A.   They approved that.   Everyone approved that.

Q.   So what happened in 2010 with the 2006 agreement?

A.   The 2010 agreement overrides the 2006 agreement.  It made it null and void.

Q.   Could you tell me what does paragraph 1.1 mean?

A.   Under 1.1, "Operating Agreement:  The operating agreement is terminated effective as of the closing of and shall be of no further force and effect following the closing."

The provisions of the operating agreement are superseded by the provisions of this agreement.

Q.   Okay.  And what does that mean to you, that the 2006 agreement died on that day?

A.   Yeah, the operating agreement references the June 15, 2006, agreement, and that agreement ceased to exist the day that we signed this new agreement.

Q.   Okay.  How did Unisource -- you mentioned that -- I think we discussed 2001, the date of first use, on the forms you received from LegalZoom.  How did Unisource Discovery Florida obtain the rights to the mark?

A.   In 2006, when Steven and I did the deal, when we got together to do that deal, it was very clear, I was not going to enter into business with him unless we had full rights of ownership of that name and logo.  Otherwise, we are building something that we are not going to be able to grow value to. Somebody else could come and say, I own that, and we are the ones putting a lot of the investment into growing it into a

national platform.

So that was crucial in 2006, and I think, if I am not mistaken, it states that in that agreement.

Q.   All right.  Let's go back to that 2006 agreement, that the 2010 agreement terminates.

You mentioned before that you had meetings with Steven, I mean, with Defendant Cerasale on several occasions over those three, four years up to 2010.  Correct?

A.   Correct.

Q.   What was discussed in those meetings?

A.   Many of the inner workings on how we were going to set up Florida to become the national company, the lead horse is what we called it.

Q.   And did the -- who controlled the specifications and services that were being rendered through the website?

A.   Who controlled the specifications being rendered through the website?  Can you explain exactly your question?

Q.   Yes.  You were offering services, possibly for a certain fee, for customers like lawyers and insurance companies and the like.

Who set those fees?  Who decided what would be included in a particular service of information retrieval?

How did that work?  Did you discuss those matters with Mr. Cerasale?

A.   We did, but the pricing -- you know, we had separate type of pricing in Florida because what attorneys would pay here is not necessarily what they are going to pay in Georgia or Tennessee or New York, for instance.

So, we worked the pricing of Florida's client base directly here.

Q.   And you consulted and discussed different features that you would add or how -- who described services that would be rendered?

A.   Well, we discussed that.  We meaning Cerasale, myself, Cote, we discussed that because services that were being offered in California are not necessarily being offered here, vice versa, or in Texas or in other states.

So we would do what's called a premier package and we created a premier package that would fit the needs of the marketplace here specifically.

Q.   And all three of you had to approve that particular package.  Correct?

A.   Correct, yeah.

Q.   You mentioned it was through the 2006 agreement that Unisource Florida acquired the rights to the mark?

A.   What we called back then the name and logo, correct, yeah, the precedence or rights.

Q.   All right.  Let's go to paragraph 4.10, entitled, License and Name, and see if we can unpack that paragraph, what you

understood that paragraph to mean.

A.   Yes.

Q.   Can you take a minute and read it?

A.   You want me to read it out loud?

Q.   No, just to yourself, and then I will ask you the questions.

What did you understand, let's say, let's start with the first sentence, the second sentence, so forth, but take some time to read it, please.

Ready?

A.   Yeah.

Q.   Overall -- you probably have read this paragraph before many times?

A.   Many times, yes.

Q.   Overall, what was the intent of this paragraph?

A.   The intent was to clearly identify license and name use and then what we did was we wrote it in a simple English format for us at the time.  That was the intent, which was, "It is understood by the board of directors that the name Unisource Discovery, Inc., is a Florida registered corporation, clear and clean of any titles, and it's not subject to nor under any form of a licensing agreement to transact in business."

What that means is, the intent of Cerasale, myself, Cote, there was no claims of ownership over the name and logo.  It was free and clear.  So, when we acquired that right of the

name and logo, no one can come back and say, excuse me, I own it a year later, two years later, because it was acquired free and clear.

And the reason why we also made sure to put it is not subject to nor under any form of a licensing agreement, that was just to make sure that everybody understood there is no attachments to the name and the logo, the service mark.

California cannot come back and say I gave you a license. There is no license. They can't even -- they can't say, I gave you an implied license. There is no license. We had it free and clear, clean title, and that's why we wrote that that way. That's the intent.

Q. Thank you.

And then the second sentence, and I -- you were here, and I asked the same questions of Defendant Cerasale because this is important. This is a pivotal issue in terms of what happened in 2006.

The second sentence says, "It is understood by the board of directors that the use of name was chosen as a means to move forward but in no way a constitution to that particular use of name since the board of directors, since the board of directors agreed that certain directors have other entities that utilize similar names deriving from the words such as Unisource and Discovery, and this agreement shall govern and restrict any unlawful misuse of any part of the company name."

That long second sentence, what did you understand at the time to mean when you signed this agreement?

A.   That we will protect.  We will protect what we just acquired, the name, the name and the logo.  Meaning, we will not allow anybody to use it unlawfully.  So, in essence, it was -- we just acquired this.  We are now going to build this into a national brand, and this is something we are going to protect.  We are not going to allow anyone to -- we are not going to allow anyone in New York to come up and say, oh, I have Unisource Discovery in New York or in Illinois.

So, that's why that was written that way.

Q.   Okay.  But maybe because it's a long sentence, let's see if we can break it down a little bit.

Let me ask you the question, please.  "It is understood by the board of directors that the use of name was chosen as a means to move forward."

What do you understand that to mean?

A.   I will explain.  Because we were not stuck on any particular name, we could have used any name, but Steven, you know, wanted us to use this name.  He offered it.  It was part of what he was contributing, and that's why we adopted it.

Now, when we adopted it, we wanted to make sure it didn't come with any strings attached because why are we going to build something that later someone can claim it's not yours and all the investment that we have done in growing the brand means

nothing.  So that was the purpose of saying we are going to move forward with this.

The second part of that was because we acknowledged there was another company, his company over there in California, that used the same Unisource Discovery, and when we did that transfer of goodwill, we wanted to commit ourselves that we were going to protect that, even at this early stage.

Because, remember, at this time there was no registration. It was just a name and logo, and that's what the terminology intent of those sentences are.

Q.   So at that time it was acknowledged by the board of directors that there was at least one entity -- it uses plural here -- but that utilized the word Unisource and Discovery?

A.   It was plural because we had become Unisource Discovery Florida.

Q.   And was there any license or permission for Unisource California to use the mark?

A.   At that time, no.  There was no registration.

Q.   Well, besides the registration, leave aside the fact that it was not licensed?

A.   No, there was no license.  No, there was no license of any type.  That's why it states there, it is not subject to, nor under any form of a licensing agreement to transact in business.

Q.   So what was the arrangement that allowed Unisource

California to continue using the mark that included Unisource and Discovery once the plaintiff Unisource Florida acquired the bundle of rights for the mark?

A.   Implied at that time, an implied license at that time.

Q.   An implied license?

A.   To California.

Q.   To California?

A.   Yeah.

Q.   Then there is another sentence here that says, "The board of directors further agrees that in the case that Steven Cerasale is no longer a director, officer, or agent of the company, at that time the board of directors shall modify the current name of the company, Unisource Discovery, to be different in name only."  What did that mean to you?

A.   Well, what that meant to us all, us three, because, remember, it's not me who did this.  Cerasale did this agreement with myself, so it's -- I did not -- and his attorneys are the ones who prepared it.

Now, this specific portion, he requested for us to accommodate him with a carveout.  We didn't know how we were going to get along, if we would get along.  We didn't know how -- he didn't know me that well.  I did not know him that well, so we did not know how we were going to mesh in business.  So he wanted a way that, let's say three months pass, six months, eight months, we don't work out, I want to be able to

walk away.

I felt that was fair, and that's why we gave him what's called a carveout.  So we said, okay, if it doesn't work out, then we will change name only.  That's it, the name only.  So, not the mark, just the name, Unisource Discovery.  We kept everything else but that was a way that we gave him that little carveout.

Q.   Now, I direct your attention to paragraph 4.9, entitled, "First Right of Refusal."

Do you see that?

A.   I do.

Q.   And basically it lists three states, Arizona, Texas and Illinois.

Could you please tell us what you understood this paragraph to be intended to do?

A.   The intent of this specific paragraph in the agreement was to make sure that no one steps on anyone's toes, pretty much.  And it made sure that if we wanted to expand, because I was already looking, at the time, to expand to these states with the company.  So I wanted to make sure, look, this is our intent, this is what we have, this is what we are planning on doing.  So, if you're doing anything there, let us know and he was not doing anything in any of these states.

That's why these states are listed here, and we immediately filed, I believe in 2007, to start doing business in the state

of Arizona.  And I believe that was followed a couple of years later for Texas and also Illinois.

But we did all the filings directly the way that the contract required us to do, which was first right of refusal, and that's how we opened those states.

Q.  So, in those states, if I understand you correctly, these filings that you mentioned were -- included all three directors.

Is that correct?

A.  Absolutely.

Q.  And what happened after 2010 moving forward?

In 2011, was the business good then?

A.  It was good, yes.

Q.  Continued to grow?

A.  Continued to grow, expand.

Q.  In 2012?

A.  Good.

Q.  You had Ms. Nolden working for you at that time?

A.  I did.

Q.  And you were doing all these promotional materials?

A.  A lot of marketing, yeah.  We did a lot of shows.

Steven was -- Mr. Cerasale was with us in many of those shows.  He traveled with us to those shows.

Q.  Can you describe those shows, what they were?

A.  They were industry litigation events.  We would throw

events with national associations of litigation associates.  We would throw big, you know, golf tournaments, and the good thing about that, from my perspective, it was fun.  It was fun for all of us because here we are in an event where you have 500 participants, 600 participants and every single golf hole has our flag with our logo on it.  Very proud, it was very proud to be part of that, very humbling experience.

Q.   Whose idea was that?

A.   Jill Nolden's.

Q.   And how about this NFL promotional effort here?

A.   That's a very special helmet because it was signed by over 20 Hall of Famers from the NFL, retired guys, Don Shula, for instance, he signed it.

So it was a very important moment for the company.  Mr. Cerasale was with me in that event, and it was a fun time.

Q.   And where do you keep this helmet?

A.   At the office.

Q.   Where?

A.   In the -- there is a hallway that we have a lot of our achievements, and we are proud to display them.  And we have them out in the hall and that goes on one of the cubbies.

Q.   And you obtained this in 2010?

A.   We did.

Q.   And from 2010 through 2015, Defendant Cerasale visited the office as he was visiting before?

A.   Yes.

Q.   Were there any changes?

A.   None, no.  He stayed in my house.

Q.   So would it be fair to say that he saw this helmet?

A.   Absolutely, yeah, many times.

Q.   Now, these events that you attended, were they all in Florida?

A.   No, we did events in Louisiana.  We did events in Tennessee, in Georgia, in Texas, in Chicago.

Q.   And in these events, the mark, and what's been referred to as the logo, were they displayed in these events?

A.   Yes.

Q.   Could you describe how it is that they were displayed?

A.   In different types of settings, depending on the type of event.  We had different settings, so if we had a table, then we had a whole table setup and then we had big, you know, those big overlapping screens behind you that you can pass by and read what it's about.

     We did a big event in Louisiana where we had a gigantic bowl full of little crabs because of the Louisiana crabs, and if attorneys could guess how many crabs were in the bowl, they would win certain things.  But, no, we had different types of marketing tools for different types of events.

Q.   So now that places us around maybe 2015.

     Anything happened in 2015?

A.   2015 was the last time that I saw Mr. Cerasale until yesterday -- let me rephrase that.

I saw him in person in 2015 the last time until I saw him yesterday.

Q.   Why is that?

A.   I really don't know.  He stopped going to Florida.

Q.   Were there any problems, business issues that were unresolved?

A.   Not that I'm aware of.  He told Lisa Cote that he did not like my management style.  That's all I know about this issue.

Q.   Were there any issues with respect to expenditures?

A.   There were some issues in previous years with company expenses.  There were some communications that I had done directly to Mr. Cerasale about that that we needed to reign in some expenses.

Q.   And then let's move to 2019.  Did anything happen from 2015 to 2019 with the way the business was being conducted?

A.   Yes.  In 2016 I learned that Mr. Cerasale had opened a competing business in California.

MR. VELARDE:  Objection.  That's also part of the order in limine.

THE COURT:  Sustained.

BY MR. SANCHELIMA:

Q.   What else happened in 2019, if anything?

A.   In 2019 Mr. Cerasale and Alfred Lutter filed a complaint

against the company and myself.

Q.   And what web page were you using in 2019?

A.   We were using the same one that we had been using since 2006, the www.unisourcediscovery.com.

Q.   And does the company use any other website address today?

A.   Yes, it does.

Q.   When did it start using that other address?

A.   We went -- we started using the other address when Mr. Cerasale removed all of our information from our co-owned co-shared website of .com.

Q.   And when was that?

A.   In 2019.

Q.   Was that a big event that happened in 2019?

A.   A big event, yeah.

Q.   What happened when your Unisource Florida was disconnected from unisourcediscovery.com?

A.   The .com.  Yeah, that was a big event because it left us completely out of the public view.

I asked -- also we had an e-mail that I had personally setup that only Mr. Cerasale and myself had access to, which is the e-mail that was posted on the website, which is advantage@unisourcediscovery.com, and we, if anyone were to e-mail that account, it would come to both of us at the same time, and I noticed that I had been removed from that.

Then I noticed that our website, all mention of our side of

the business had been removed, wiped out.

Q.   Did Unisource Discovery suffer any damages result of that action?

A.   Yes.

Q.   Would you describe what those damages were?

MR. VELARDE:  Objection, Your Honor.  Irrelevance because he is asking about damages.

THE COURT:  Why don't you approach sidebar, please?

(Sidebar conference.)

THE COURT:  What is the objection?

MR. VELARDE:  He was asking about damages that happened in 2019.  That's also the subject of the state court claim that was dismissed via final judgment that I was not allowed to bring in.  This is the stipulation -- the pretrial stipulation in this case clearly says the plaintiff is not entitled to any damages before February 2020.

THE COURT:  Hold on.  Hold on.  Can you show me where in the stipulation.

MR. VELARDE:  All the plaintiffs claims --

THE COURT REPORTER:  I'm sorry, a little slower, please.

MR. VELARDE:  -- on the number 26 on the pretrial stipulation, all of plaintiffs claims arise from and relate only to actions or omissions that took place after February 21, 2020.  Asking about damages to the actions that caused damages

in 2019 is outside of the scope and is actually extremely prejudicial because those claims, again, were fully litigated in state court, subject to a final judgment and actually that was dismissed. It's been fully litigated and potentially subject to collateral estoppel because it is the exact properties. Bringing that up now is prejudicial and also violates the pretrial stipulation.

THE COURT: All right.

MR. SANCHELIMA: Your Honor, it is background information as to what happened in 2019.

It's background information only to build to the 2021 which is the relevant period for damages, and the verdict form is not going to ask for any damages during that period before this day anyway. We can tailor it to that if we have to, but the important thing is how did it arise, what happened. And it was not like immediate on this day February 21, 2020, that's when the damages start.

No, it started in 2019 as a background, but in the verdict form they are not going to be prejudiced because there is no room there for any damages prior to the this date, so I don't see what the problem is.

But if we can show where it suffered damage because of the disconnect of the website, I don't see what's wrong with that.

THE COURT: Well, I will let you establish that he

believes he was harmed by those actions and explain how but any -- no monetary value will be affixed to that as it's not a claim.

MR. SANCHELIMA:  No, it's not in --

THE COURT:  There is no need to mention amounts.

MR. SANCHELIMA:  No.

THE COURT:  Okay.

MR. VELARDE:  I will ask for instructions to make sure it's clear to the jury that events before February 2020 are not related to the claims of the plaintiff.  That's word for word what that stipulation says, Your Honor.

MR. SANCHELIMA:  In due time they will get instructions from Your Honor.

THE COURT:  Let me hear the testimony.  If I need to provide instruction in the final instruction regarding a time frame, then I will consider that.

MR. VELARDE:  Thank you, Your Honor.

MR. SANCHELIMA:  Thank you.

(Sidebar conference concluded.)

BY MR. SANCHELIMA:

Q.  Was Unisource Florida affected when Defendant Cerasale disconnected the website?

A.  Yes.

Q.  And was Unisource Florida -- hold on.

Did there ever come a time where Unisource Florida served,

sent a letter to Unisource California terminating the license to use the mark?

A.   Yes.

Q.   Do you remember when that was?

A.   In 2020.

Q.   In 2020.  So, did Unisource Florida suffer any injuries after that letter was sent terminating the connection to -- I mean, terminating the license for the mark as a result of having been disconnected from the website?

A.   Yes.

Q.   For how long was Unisource Florida injured by the website being disconnected?

A.   To a certain extent until today, until now.

Q.   What did you do, if anything, to mitigate that injury?

A.   We acted very quickly.  Back in 2010, 2011, what I did was in keeping with protecting the brand, I acquired for the company, obviously, the URLs for like .co, .net, .biz, .us, .digital, all the .nets that were associated with Unisource Discovery so that way nothing was out there that someone can come out, buy, acquire and then if we ever wanted to use that, we have to now buy it back from them, which is a tactic that is used frequently.

So, since then we acquired -- we just kind of put them on a shelf.  We wanted to make sure there is nothing out there that somebody else can use, and if we need to one day use it, we

have it.  So we just shelved it, and every year we just renewed them and kept them on the shelf.

And low and behold, unbeknownst to me, in 2019 Mr. Cerasale makes this unilateral decision to completely remove us from the website.  Not only that, he deleted all our company e-mails.  All our company e-mails with .com were deleted, all of them.  We lost all access company wide, over a hundred and something e-mails, gone.

So, we were left in a very, very scary position.  So what I first did was I pulled down which one, which one of the acquired URLs would be best, and we decided -- we meaning my team -- decided the .net would be best and I immediately went and had a new website built with the .net.  And I then went and started using all the .net e-mails at a larger capacity we have never done before because we had to now replace all the .com e-mails he deleted.

Q.   To today's date, have you been able to recover those e-mails?

A.   No, we have not.

Q.   And was the injury fixed a hundred percent with those actions?

A.   No, it has not.

Q.   How about your customers, has there been any confusion in the marketplace?

A.   A lot.

Q.   Would you describe what that confusion is?

A.   Customers that would think that they sent us requests for orders or, you know, information and some going to California and we don't get any notification whatsoever; locations, facilities, hospitals, medical doctors sending records that don't belong to us thinking they do belong to us, that sort of thing.

Q.   I am going to show you what has been identified as Plaintiffs' Exhibit 30, which I'd like you to review and tell us if you recognize this document.

(Plaintiffs' Exhibit 30 was marked for identification.)

A.   I do.

MR. SANCHELIMA:  Counsel, do you have any problems with this exhibit?

MR. VELARDE:  No objection.

THE COURT:  All right.  Without objection, Plaintiffs' Exhibit -- I'm sorry, it was 30?

MR. SANCHELIMA:  Yes, 30, Your Honor.

THE COURT:  It will be admitted.

MR. SANCHELIMA:  Will it be published also, Your Honor?

THE COURT:  Yes, sir.

(Plaintiffs' Exhibit 30 was admitted in evidence.)

BY MR. SANCHELIMA:

Q.   You reviewed the document?

A.   I am very familiar with the document.

Q.   Why are you very familiar with the document?

A.   Because I had to handle the fallout from this document.

Q.   Can you describe what that fallout is?

A.   This is one of our clients in Sunrise, Florida, Law Offices of Robinson, Pecaro, and they apparently sent information over to us but it didn't come to us.  It was diverted over to Unisource California through their Texas office, and the Texas office did not know, obviously, the procedures in Florida.

There was a back and forth and our client had to get involved.  And any time clients get involved, it's never good because you don't want the clients getting involved.  You just want to do what they need you to do and move on.  The client had to get involved and I had to explain to the client that there was a mix-up and we will fix it.

Q.   Was the problem fixed?

A.   This problem this time, yes.

Q.   Is this something -- is this an isolated case?

A.   No.

Q.   How often do you get this type of e-mails?

A.   Regularly.

Q.   Can you estimate --

A.   Multiple times a month.

Q.   Can you estimate what multiple is?

A.   Every other week.

Q.   And, of course, the reverse, did you ever or has Unisource

Florida received any e-mails misdirected to Florida when, in fact, they were intended for California?

A.   Yes, we have.

Q.   What is the procedure in Unisource Florida to handle those misdirected, which communications?

A.   We forward them to Brian Meyers in California.

Q.   And how often does that happen?

A.   This year I would say maybe a couple of times this year or more.

Q.   These instances of actual confusion, misdirected correspondence and the like, do they affect the goodwill of the company?

A.   It does.

Q.   How so?

A.   I can speak of one of these occurrences where the attorney out of Orlando thought that he was, had sent us his request. It turns out the request -- we never received it.  We didn't even know it existed until an objection that was filed, meaning that during that request there was an objection filed so you could not serve any subpoenas, and California, who had received that request, did not stop.  It kept on.

The attorney called us, called me very upset because --

MR. VELARDE:  Objection.  Hearsay.

THE COURT:  Sustained.

MR. SANCHELIMA:  Your Honor, the attorney called him.

THE COURT:  We will talk at sidebar.  I don't want any speaking responses.  Come forward.

(Sidebar conference.)

THE COURT:  Why is this out-of-court statement not hearsay?

MR. SANCHELIMA:  Because he is testifying that the attorney made a call --

THE COURT:  Okay.

MR. SANCHELIMA:  It's some action.  He hasn't said what the attorney said.

THE COURT:  It was clearly coming.

MR. VELARDE:  Everything that was said came from the phone call, so everything that was said was all hearsay and he prefaced what he was about to say with, "the attorney called and told me."

THE COURT:  So, if you can get around these questions without eliciting the statement from the attorney, that's fine, but it was clear to me that he was about to state what the attorney told him.

MR. SANCHELIMA:  All right.

(Sidebar conference concluded.)

THE COURT:  All right.  We will wait for the next question.

BY MR. SANCHELIMA:

Q.  Okay.  You mentioned something, a call from an attorney.

Without telling us what this attorney purportedly said to you, could you tell us if you know why you received this call?

MR. VELARDE:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

BY MR. SANCHELIMA:

Q.  Do you know when you received that call?

A.  2020, I want to say July 2020.

Q.  I am going to ask you questions about -- I am going to show you Exhibits 19 and 20.

Do you have any objections over those exhibits?

(Plaintiffs' Exhibits 19 and 20 were marked for identification.)

MR. VELARDE:  I do have objections.  The last page of 19 or the last two pages do because they do not appear to be part of the statement documents as pages 1 through 6 or 1 through 5.  And those last few pages, are the same pages as Exhibit 20.

MR. SANCHELIMA:  Which one are you looking at, 19?

MR. VELARDE:  Yes.

Your Honor, for Plaintiffs' 19, we stipulated to remove page 6 and 7 of Exhibit 19, and we agree, no objection.

For Plaintiffs' 20, we stipulated to remove pages 4 and 5, and with those removals, no objection as to page 1 through 3 of Exhibit 20.

THE COURT:  And you're fine with the stipulations?

MR. SANCHELIMA: Yes, Your Honor.

THE COURT: All right. With those stipulations, Plaintiffs' Exhibits 19 and 20 will be admitted.

(Plaintiffs' Exhibits 19 and 20 were admitted in evidence.)

MR. SANCHELIMA: Yes, Your Honor.

BY MR. SANCHELIMA:

Q. I want to go back to this attorney call for a second before we move those exhibits.

Without telling us what the attorneys say in that call, would you please tell us what you did, if anything, as a result of that call?

A. I immediately reached out to Steven Cerasale and informed him that I had received that call and informed him the reasons why I received that call and informed him that he needed to cease and desist from further acts like that.

Q. Okay. Going to Exhibit 19 now --

A. Okay.

Q. -- do you recognize that document?

A. Is that 349?

Q. Do you recognize this document?

A. I do.

Q. And document refers to a trademark search and that's the same trademark search you were mentioning before. Correct?

A. Correct.

Q. With respect to 20, do you recognize that document?

A.  I do.

Q.  And what is that -- why was that document sent to you?

A.  This is a confirmation from LegalZoom that they had prepared the federal trademark application and filed it.

Q.  Thank you.

Counsel, did you clean up that exhibit that you wanted to use?

MR. VELARDE:  Which one are you referring to?

MR. SANCHELIMA:  Was it admitted, that application that you wanted to use?

BY MR. SANCHELIMA:

Q.  I hand you what has been previously identified as Defense Exhibit 8, and I ask you to review this document and tell us whether you are familiar with it.

A.  Yes, I am.

Q.  What is that document?

A.  This is a confirmation directly from the trademark TEAS Plus application from the United States Patent Trademark Office.

Q.  And who is the owner of the mark according to this application, this documents?

A.  Unisource Discovery, Inc.

Q.  And the literal element of this mark, what does it read?

A.  I apologize, are you asking me regarding the description of the mark?

Q.   I am looking at the fourth line from the top.

A.   Oh, I apologize, Unisource Discovery Digital Document Retrieval.

Q.   That's the literal element of the mark that you filed the registration application for?

A.   That is correct.

Q.   The actual specimen that you submitted included -- did it include a logo?

A.   It did.

Q.   Now, there is -- on the second page there is a phone number there 866-580-0002.   Do you know whose telephone number that is?

A.   That's our home office.

Q.   It's not your personal number?

A.   No, it's our office main line.

Q.   And there is an e-mail there, nmijares@unisourcediscovery.com.   Correct?

A.   Correct.

Q.   And that's the website that Defendant Cerasale had control over.   Correct?

A.   Correct.

Q.   Now, do you know who has access to that particular account?

A.   To my understanding, only Steven Cerasale, that I am aware of.

Q.   Now, on this page two in the fourth line, it mentions the

date of first use anywhere and it says at least as early as 3/1/2001.

A.   That's correct.

Q.   I think you testified about the date of first use of the mark.

A.   I did.

Q.   And did you have any information as of this date other than what Defendant Cerasale told you?

A.   No, I relied on him giving that information because he is the one that originally used it, so when we acquired the name, I just needed to know what was the first use so I can put an adequate correct date.

Q.   And on the third page that says signature, it has your name, correct, Noel Mijares?

A.   Yes.

Q.   And next to it says, "president"?

A.   Correct.

Q.   You were acting as president for the applicant, Unisource?

A.   That was my capacity, and if I may add, the specimens that were used, I used a copy of our co-shared, co-owned website at the time, which is page seven.

Q.   Now, at the time that you filed this application, did you -- withdraw that.

I call your attention to page four, the bottom part of that page.

A.   Yes, sir.

Q.   You see, it says, "The undersigned, being hereby warranted willful false statements and the like, so made, are punishable by fine or imprisonment or both under Title 18, United States Code, Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration."

A.   Correct.

Q.   You were aware of this paragraph.  Correct?

A.   Absolutely.

Q.   When you signed this application?

A.   Yes, sir.

Q.   And then it goes on and says, declares, in this case you, as president of Unisource Florida, that he/she is properly authorized to execute this application on behalf of the applicant.

Did you have an honest belief that you were authorized to file this application on behalf of the company of which you were president?

A.   Absolutely, yes.  I did.

Q.   "He/she believes the applicant to be the owner of the trademark/service mark sought to be registered."  You believe that?

A.   Absolutely.

Q.   You had an honest belief that the company, of which you

were president, had the right to make this declaration. Correct?

A. One hundred percent, yes.

Q. Or if the application is being filed under Title 15 of the United States Code, Section 1051(b), which doesn't apply here, I represent to you that doesn't apply in this case because that's based on intent to use, but we will skip over that.

Then the next one is, he or she believes applicant to be entitled to use such mark in commerce.

Did you have an honest belief that the applicant corporation, of which you were president, was entitled to the use such mark in commerce?

A. One hundred percent, yes.

Q. Do you know what commerce means?

A. Yes, I do.

Q. Federal government?

A. Transact in commerce means doing business across state lines.

Q. Okay. Correct, interstate commerce?

A. Correct.

Q. Like the website?

A. Correct.

Q. "Either in the identical form thereof or in such near resemblance thereto as to be likely, when used or in connection with the goods or services of such other person, to cause

confusion, or to cause mistake, or to deceive; and that all the statements made of his/her own knowledge are true."

Do you have knowledge believe, expressed of Unisource Florida that these statements were true?

A.   Yes, and I will sign that again right now today if I had to.

Q.   All these statements made on information and belief are believed to be true?

A.   Yes.

Q.   Was that your honest belief at the time that you signed this application?

A.   One hundred percent true.

Q.   Before I go to the next exhibit, I want to clarify that the honest belief of the statements that you made included the belief at that time that March 1 of 2001 was the true date of first use of the mark?

A.   Yes, correct.  That's the date that Mr. Cerasale provided me.  I did not have a date.  I had to ask him for it, and that's why March 1 was the date that was used.

Q.   As a predecessor interest of?

A.   That is correct, yes --

Q.   Your company?

A.   -- of the company, Unisource Discovery, Inc.

MR. SANCHELIMA:  Do you have any problems with Exhibit 21?

THE COURT:  All right.  We will take a short restroom break.

COURT SECURITY OFFICER:  All rise for the jury.

(The jury exited the courtroom at 4:35 p.m.)

THE COURT:  Please be seated.

One of the jurors had to go to the restroom.  We will take a short break.

We will stop at 5:00, and just for planning purposes, we will resume at 9:30 tomorrow morning.

I have a couple of hearings that I cannot move, which will start I think at 10:45 and 11:00, so I will probably take a half hour break at about 10:45 but, otherwise, we will work a full day tomorrow.

MR. SANCHELIMA:  So 9:30 here tomorrow.

THE COURT:  9:30 tomorrow morning.

Let's take five.

(Brief recess.)

THE COURT:  All right.  We can bring them in.

Thank you.

(The jury entered the courtroom at 4:45 p.m.)

THE COURT:  All right.  Please be seated.

Whenever you are ready.

MR. SANCHELIMA:  Thank you, Your Honor.

(Plaintiffs' Exhibit 21 was marked for identification.)

BY MR. SANCHELIMA:

Q.   Mr. Mijares, I hand you what has been identified as Plaintiffs' Exhibit 21.  May I ask if you recognize this document?

     Do you recognize that document, sir?

A.   I do.

Q.   And do you see the date is May 30, 2010?

A.   Correct.

Q.   That was like four weeks before June 26, 2010, when the 2010 agreement was executed.  Correct?

A.   Correct.

Q.   I call your attention to the second page where below the sentence says, "under the closed corporation shareholder agreement," the second paragraph under that says, "Section 1.3."

     Do you see that?

A.   I do.

Q.   What was the purpose of including that particular section there?

A.   A pretty important section to identify the asset of the company, of the trademark, and to put it into historical, you know, into a historical document of the agreement.

Q.   So then, subsequently, this clause was incorporated in the June 26th, 2010, agreement?

A.   It is.

Q.   Now, I call your attention to the last portion of the

second page.

Do you see where your name is, Noel Mijares?

A.   Yes.

Q.   Underneath it says Unisource Discovery?

THE COURT:   I'm sorry, Counsel, what exhibit is this?

MR. SANCHELIMA:   Exhibit 21, Your Honor.

THE COURT:   You can't read from it unless it's in evidence.

MR. SANCHELIMA:   Oh, Counsel, do you have any objection to this particular exhibit?

MR. VELARDE:   I do depending on the purpose.   If it's -- I imagine it will be parole evidence if it relates to the 2010 shareholder agreement which Otazo-Reyes already found to be --

THE COURT:   Counsel.

MR. VELARDE:   That would be my objection, parole evidence.

THE COURT:   All right.   As long as you establish a foundation, it will be admitted.

BY MR. SANCHELIMA:

Q.   Who authored this document?

A.   I did.

Q.   For what purpose?

A.   For the purpose of making sure that before we proceeded to signing the 2010 closed corporation shareholder agreement at

the stock purchase shareholder agreement, everything had been properly identified and everything was included that needed to be included in those agreements.

MR. SANCHELIMA:  I move to admit the document in evidence, Your Honor.

THE COURT:  The legal objection is what, relevance?

MR. VELARDE:  Parole evidence, Your Honor.

THE COURT:  All right.  Give me just a moment.

I am going to have you both approach briefly.

(Sidebar conference.)

THE COURT:  Is this the document?

MR. SANCHELIMA:  Yes.  The two --

THE COURT:  Hold on.  Hold on.

I am not understanding the objection.  This is -- I am looking at her order.  Is this covered by her order?

MR. VELARDE:  Not in the order in limine.  This was a report and recommendation that was subsequently affirmed.  It's 250, the Docket Entry.

THE COURT:  Regarding this document --

MR. VELARDE:  Regarding the 2010 shareholder agreement.

THE COURT:  Hold on.

MR. SANCHELIMA:  Is that it?

MR. VELARDE:  Yeah.

THE COURT:  That issue is dealing with the preliminary injunction.

Obviously, we are not going to finish his testimony today.  Why don't you move into something else and I will get into this tomorrow morning after I had a chance --

MR. SANCHELIMA:  This is what the parties were bargaining for, both of these agreements, and I am not referring to the agreement at all.  What I am referring to is this is a clause where it was originally and then it was introduced here.

THE COURT:  You need to speak louder.

MR. SANCHELIMA:  Another reason why I want to introduce it is because it's using the notation, the R circle, which is the registration of the mark, and Defendant Cerasale was aware that this claim was being made with the Florida corporation.  So two reasons why I want to introduce it, that the actual mark was bargained for and this attorney was bargained for in the agreement and this notice was affixed to this communication.

THE COURT:  So this is --

MR. SANCHELIMA:  Our client, Mr. Mijares, the witness.

THE COURT:  But this isn't the actual agreement?

MR. SANCHELIMA:  No, this is towards the agreement.  That's how they were negotiating.

THE COURT:  This is his e-mail to -- oh, it includes Mr. Cerasale.

MR. SANCHELIMA:  Yeah.

THE COURT:  Okay.  When you say parole evidence, it's

as opposed to what?

MR. VELARDE:  Well, because it's drafts of the terms that were ultimately agreed to in a document that's already been -- that is unambiguous, so to the extent this is used in order to inform what those terms are or what the parties meant, it's inadmissible under the parole evidence rule.

I would also say that the issue about the registration is undisputed.  We stipulated that Mr. Cerasale -- that plaintiff owns the registration.

MR. SANCHELIMA:  You didn't know this?  He knew at all times that this was being bargained for and that it was owned by Florida, and he, Mr. Mijares, used this notation on all his correspondence with him.  He was on actual notice.

THE COURT:  But this -- but, for example, the actual stock purchase agreement doesn't have this notation on it is what you are saying?

MR. SANCHELIMA:  No, the agreement has this clause, Section 12.3.

THE COURT:  You have to speak in here.

MR. SANCHELIMA:  It has Section 1.3 that says that it's registered by Unisource Discovery, Inc., and this is one point to show that this agreement was consciously bargained for. It's not going to change any of the terms.

I am just saying that it was discussed, bargained for, and ended up in the June 26th agreement four weeks later.

In the meantime, throughout all the communications, this is the federal statute notice requirement to put someone in constructive notice that somebody is claiming a right to the mark, in this case this company, so that if he says, well, I didn't know that he had registered the mark and so forth, there has been a constant reminder.

THE COURT: But this isn't the agreement? This isn't what he agreed to?

MR. SANCHELIMA: No, of course not.

THE COURT: Okay. I am going to sustain the objection.

(Sidebar conference concluded.)

MR. SANCHELIMA: Plaintiffs' Exhibit 22. Do you have an objection to Plaintiffs' Exhibit 22, Counsel?

MR. VELARDE: No objection to Exhibit 22.

THE COURT: All right. Without objection, Plaintiffs' Exhibit 22 will be admitted.

(Plaintiffs' Exhibit 22 was admitted in evidence.)

MR. SANCHELIMA: Can it be published, Your Honor?

THE COURT: Yes.

BY MR. SANCHELIMA:

Q. Mr. Mijares, I have handed you what has been identified and admitted on the record as Exhibit 22, Plaintiffs' Exhibit 22. Do you recognize that document?

A. I do.

Q. And who was the author of that document?

A.    I was.

Q.    Who did you send it to?

A.    Steven Cerasale.

Q.    Why did you send this document to Steven Cerasale on May 26th, 2015?

A.    Because I had been informed that he had cancelled all our American Express cards, corporate cards for the company.

Q.    Why did you understand that the American Express credit card was cancelled?

A.    I don't know.  That's why I wrote him the e-mail.

Q.    I'm showing you on the second page, at the top, where it says "Digital Document Retrieval" below Unisource Discovery, do you see that?

A.    Yes.

Q.    Next to it has a parenthesis, capital R, and parenthesis. What does that mean to you?

A.    Registered trademark.

Q.    Did you include that in all your correspondence?

A.    All of them since 2009, company wide.

Q.    Okay.  What is the purpose of that R between the two parenthesis?

A.    To let the public know that it's a registered trademark, that it's protected.

Q.    Including the addressee in this e-mail.  Correct?

A.    Correct.

MR. SANCHELIMA:  Plaintiffs' Exhibit 26 --

THE COURT:  Counsel, it sounds like you are going onto a new point.

MR. SANCHELIMA:  This is going to be very quick because I think it was admitted already.  Let me just verify if it was admitted, 26.

THE COURT:  Okay.

Was it admitted?

MR. SANCHELIMA:  This will take me 45 seconds.

THE COURT:  Okay.

MR. SANCHELIMA:  If there is no objection --

MR. VELARDE:  I don't have it as admitted.

MR. SANCHELIMA:  It was not admitted.  I am asking you if you have an objection.

MR. VELARDE:  Yes, objection, the order in limine.

THE COURT:  All right.  We will take it up later.

All right.  We will recess for the evening now.  It's 5 o'clock.  We are going to resume tomorrow morning at 9:30. Again, please don't discuss anything about the case and we will see you tomorrow morning at 9:30.

COURT SECURITY OFFICER:  All rise for the jury.

(The jury exited the courtroom at 5:01 p.m.)

THE COURT:  All right.  You may step down.

THE WITNESS:  May I leave this here for tomorrow?

THE COURT:  You can leave that.  You are the only

witness testifying in the morning.

All right.  So what is the objection?

MR. VELARDE:  It goes to the order.

THE COURT:  Can you pull the microphone close to you, please?

MR. VELARDE:  The order in limine, Your Honor, that we discussed earlier today, from my understanding as far as the introduction of the underlying dispute, that was the letter, that was the subject of the letter of Alfred Lutter in 2010.  This e-mail is directly discussing that dispute.

THE COURT:  All right.  Can you put it on the screen so I can see it?

MR. SANCHELIMA:  Is that 25?

MS. ESTEVEZ:  It's 26.

THE COURT:  I thought you were offering 26.

MR. SANCHELIMA:  Oh, sorry.  I thought it was 25.

THE COURT:  25 is in.  It's not 26.

MR. SANCHELIMA:  My mistake, Your Honor, it's getting late.

THE COURT:  So you are not offering 26?

MR. SANCHELIMA:  No, because we already had that issue.  It was my mistake.

THE COURT:  All right.  So, presumably we will continue with Mr. Mijares in the morning.  After him you have one additional witness?

MR. SANCHELIMA:  We wanted to -- yes, Alfred Lutter through deposition because from what I hear he is around, but I don't know if he is going to show up tomorrow or not, but at least his deposition -- we discussed this before, I want to make a proffer for the benefit of the record as to the three pages of his deposition that I'd like to incorporate on the record as -- and then I know that there is a problem with that, but it's an opportunity to preserve the record, Your Honor.

THE COURT:  I am not going to prohibit you from preserving your objection, but I think instead of you reading a three-page letter, make it an exhibit and it will be made a part of the record and you don't need to read it.  We can all read it.

MR. SANCHELIMA:  It's not a letter, Your Honor, it's a deposition transcript.

THE COURT:  I'm sorry, the deposition transcript.  The pages that you want to introduce, make it an exhibit and I will read it, but I don't need you to read it.  It will be part of the record and it will get an exhibit number.

MR. VELARDE:  We were discussing that earlier today as well.  I wasn't given an opportunity to provide counter designations.  I wasn't previously provided designations.

THE COURT:  Speak into the microphone.

MR. VELARDE:  I was provided today at the start of the trial the three pages that is being proffered but those three

pages will require counter designations where Mr. Alfred Lutter explained his testimony.

I don't have it with me, but I would object to it being part of the record without giving me the opportunity to at least have those counter designations.  I mean, now it's a bit prejudicial to do it this late.

THE COURT:  Well, you can offer that tomorrow.  But, again, it's not going to the jury.  I am making it part of the record.

MR. VELARDE:  If it's not being admitted, Your Honor, I misunderstood.

THE COURT:  No, it is not being admitted.  That's why he wants to proffer it.

MR. VELARDE:  I misunderstood.

THE COURT:  Just timing wise, how much more time do you think you have on direct?

MR. SANCHELIMA:  It looks like we only have three more exhibits or so to discuss.  I would say an hour or so at the most.

So these three pages that I want to introduce, I will -- it will be, we will introduce it tomorrow as an exhibit.  Then Your Honor will not accept them, and then it goes in the record or how does that work?

THE COURT:  No, there is no point in offering it because I'm not going to admit it for the reasons we have

already discussed.  Just at some point before we conclude the trial you can just attach it.  We will give it an exhibit number and it will be filed and made a part of the record.  So it will appear on the docket.

I'm assuming the cross will go into the afternoon.

How much of a case do you expect?

I'm just trying to figure out time wise when we should start planning to do a charge conference, etcetera.

(Discussion held off the record.)

MR. VELARDE:  We anticipate at this moment just two witnesses, Your Honor, and it's relatively short testimony for both.

THE COURT:  Mr. Lutter and who?

MR. VELARDE:  Mr. Steven Cerasale.

THE COURT:  All right.  Then that may fill up the day tomorrow, so that's fine.

Keep in mind, if we come back on Thursday, which I told them it's a possibility, we may lose one of the jurors, so just keep it in mind.

All right.  We will be in recess until tomorrow at 9:30.

(Proceedings were adjourned at 5:15 p.m., to be continued in Volume 3.)

C E R T I F I C A T E


        I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.




June 27, 2023            /s/Patricia Diaz_____
DATE                     PATRICIA DIAZ, FCRR, RPR, FPR
                         Official Court Reporter
                         United States District Court
                         400 North Miami Avenue, 11th Floor
                         Miami, Florida 33128
                         (305) 523-5178

## /

**/s/Patricia** [1] - 188:9

## 1

**1** [14] - 1:6, 2:15, 116:5, 116:9, 118:8, 118:9, 118:12, 118:16, 167:15, 167:23, 174:15, 174:19
**1-866-580-0022** [2] - 103:12, 105:16
**1.1** [2] - 144:4, 144:5
**1.3** [5] - 35:21, 142:18, 142:23, 176:14, 180:20
**1001** [1] - 172:5
**1006** [1] - 53:16
**105** [1] - 2:11
**1051(b** [1] - 173:5
**10:00** [1] - 15:1
**10:45** [2] - 175:11, 175:12
**11** [4] - 7:8, 7:18, 7:19, 8:5
**112** [1] - 2:15
**113** [1] - 2:15
**115** [1] - 2:8
**116** [1] - 2:15
**118** [1] - 2:15
**11:00** [1] - 175:11
**11:01** [1] - 52:20
**11:29** [1] - 62:20
**11th** [2] - 1:24, 188:11
**12** [1] - 37:23
**12.3** [1] - 180:18
**12:25** [1] - 91:6
**13** [5] - 7:8, 7:18, 8:6, 26:14, 27:5
**1395** [1] - 1:19
**14th** [1] - 122:7
**15** [6] - 2:5, 2:22, 4:6, 140:24, 144:12, 173:4
**150** [1] - 79:12
**15th** [2] - 5:5, 25:18
**16** [2] - 7:13, 7:14
**163** [2] - 2:16
**167** [1] - 2:16
**168** [1] - 2:16
**16th** [1] - 31:1
**17** [1] - 2:22
**175** [1] - 2:17
**18** [1] - 172:4
**181** [1] - 2:17
**184** [2] - 3:22, 4:3
**19** [11] - 2:16, 7:19, 167:9, 167:11, 167:14, 167:18, 167:20, 167:21, 168:3, 168:4, 168:16
**1986** [1] - 5:8
**1:30** [3] - 90:18, 90:23, 92:6
**1:32** [1] - 92:11
**1st** [13] - 30:16, 30:19, 30:21, 30:23, 30:25, 31:4, 57:15, 57:17, 60:2, 60:16, 60:17

## 2

**2** [8] - 1:8, 2:22, 15:16, 15:18, 15:19, 16:1, 33:22, 34:5
**2,000** [1] - 67:1
**20** [13] - 2:16, 141:3, 141:5, 141:13, 154:12, 167:9, 167:11, 167:17, 167:22, 167:24, 168:3, 168:4, 168:25
**20,000** [1] - 20:7
**20-CV-23276** [1] - 3:7
**20-CV-23276-DPG** [1] - 1:2
**2001** [24] - 16:10, 16:11, 16:13, 16:20, 17:23, 22:16, 22:19, 22:21, 22:24, 23:14, 30:16, 30:19, 30:21, 30:23, 30:25, 31:4, 48:21, 115:22, 133:17, 134:11, 144:16, 174:15
**2002** [2] - 115:23, 115:24
**2005** [4] - 115:24, 120:19, 121:4, 122:9
**2006** [42] - 4:13, 9:9, 9:10, 10:12, 10:13, 10:15, 10:18, 22:16, 22:19, 22:21, 22:24, 23:14, 25:14, 25:18, 25:20, 34:8, 34:16, 35:18, 43:15, 96:1, 96:3, 121:4, 122:7, 122:9, 123:25, 124:4, 124:9, 126:6, 126:25, 136:6, 136:10, 140:2, 144:1, 144:2, 144:10, 144:12, 144:19, 145:2, 145:5, 146:20, 148:17, 157:4
**2007** [3] - 25:20, 136:10, 152:25
**2008** [15] - 25:22, 65:4, 92:19, 95:24, 101:23, 107:24, 110:22, 111:16, 125:23, 126:6, 130:7, 133:25, 136:6, 136:11, 137:4
**2009** [5] - 25:24, 111:19, 136:25, 182:19
**2010** [53] - 4:6, 5:5, 8:8, 8:13, 10:10, 10:11, 10:15, 35:16, 44:11, 44:12, 47:3, 47:22, 48:2, 48:17, 48:23, 50:7, 75:17, 125:13, 125:15, 125:17, 125:20, 125:21, 125:23, 126:6, 126:25, 137:6, 137:7, 137:10, 138:18, 138:23, 139:1, 139:12, 140:2, 142:1, 142:3, 142:16, 144:1, 144:2, 145:6, 145:9, 153:11, 154:22, 154:24, 161:15, 176:6, 176:8, 176:9, 176:23, 177:13, 177:25, 178:20, 184:9
**2011** [3] - 16:5, 153:12, 161:15
**2012** [8] - 17:24, 99:18, 109:1, 113:23, 114:1, 114:4, 114:8, 153:16
**2013** [6] - 65:4, 92:19, 103:17, 104:3, 104:8
**2015** [7] - 154:24, 155:24, 155:25, 156:1, 156:3, 156:16, 182:5
**2016** [1] - 156:18
**2018** [1] - 64:1
**2019** [13] - 48:24, 156:16, 156:17, 156:24, 156:25, 157:2, 157:12, 157:13, 158:12, 159:1, 159:10, 159:18, 162:3
**2020** [10] - 38:2, 64:1, 158:16, 158:25, 159:16, 160:9, 161:5, 161:6, 167:7
**2021** [2] - 142:10, 159:11
**2022** [3] - 1:5, 5:4, 31:12
**2023** [1] - 188:9
**21** [7] - 2:17, 158:24, 159:16, 174:25, 175:24, 176:2, 177:6
**21st** [1] - 31:12
**22** [8] - 2:17, 181:12, 181:13, 181:14, 181:16, 181:17, 181:22
**23** [6] - 2:14, 87:3, 87:5, 87:23, 88:2, 88:3
**235** [1] - 1:15
**24** [1] - 5:4
**25** [13] - 2:15, 88:12, 112:6, 112:8, 112:10, 113:8, 113:12, 113:13, 127:10, 184:13, 184:16, 184:17
**250** [1] - 178:18
**26** [9] - 38:1, 158:22, 176:8, 183:1, 183:6, 184:14, 184:15, 184:17, 184:20
**266** [3] - 3:23, 5:3, 5:4
**26th** [3] - 176:23, 180:25, 182:5
**27** [8] - 2:22, 17:10, 17:11, 60:23, 63:2, 63:5, 91:1, 188:9
**28** [9] - 2:14, 88:15, 88:16, 88:18, 88:19, 88:21, 90:5, 90:9, 90:11
**28th** [3] - 125:13, 139:1, 139:12
**29** [2] - 2:23, 113:23
**29th** [1] - 121:15
**2nd** [3] - 34:8, 34:16, 56:24

## 3

**3** [4] - 121:22, 140:20, 167:23, 187:23
**3.1** [1] - 127:4
**3.2** [1] - 126:22
**3/1/2001** [1] - 171:2
**30** [9] - 2:16, 41:24, 88:13, 163:9, 163:11, 163:17, 163:18, 163:22, 176:6
**300** [1] - 5:19
**305** [2] - 1:25, 188:12
**31** [2] - 54:23, 60:5
**32** [2] - 54:23, 60:5
**33** [2] - 54:24, 60:5
**33128** [2] - 1:24, 188:11
**33131** [1] - 1:19
**33134** [1] - 1:16
**333** [1] - 7:14
**349** [1] - 168:19
**3:01** [1] - 141:6
**3:27** [1] - 141:15

## 4

**4** [1] - 167:22
**4.1** [1] - 128:11
**4.10** [2] - 24:19, 146:24
**4.9** [1] - 152:8
**400** [2] - 1:23, 188:11
**41** [1] - 2:4
**45** [2] - 3:19, 183:9
**47** [1] - 2:10
**477** [1] - 75:9
**478** [1] - 75:9
**479** [2] - 75:10, 75:12
**480** [2] - 75:18
**481** [1] - 75:21
**482** [1] - 75:23
**487** [1] - 76:24
**488** [2] - 78:21, 79:5
**490** [1] - 81:1
**491** [1] - 81:22
**492** [1] - 82:5
**493** [1] - 82:18
**494** [1] - 83:4
**495** [1] - 83:15
**496** [1] - 84:4
**497** [1] - 84:6
**498** [1] - 84:11
**499** [1] - 84:13
**4:35** [1] - 175:4
**4:45** [1] - 175:20

## 5

**5** [5] - 24:3, 124:17, 167:16, 167:23, 183:18
**50** [3] - 43:6, 45:3, 127:9
**50/50** [1] - 127:19
**500** [2] - 84:18, 154:4
**501** [2] - 84:18, 85:6
**502** [1] - 84:20
**503** [1] - 85:6
**505** [2] - 85:9, 85:10
**523-5178** [2] - 1:25, 188:12
**5570** [1] - 77:10
**5:00** [2] - 1:7, 175:8

**5:01** [1] - 183:22
**5:15** [1] - 187:22

**6**

**6** [3] - 1:5, 167:15, 167:21
**600** [1] - 154:5
**63** [2] - 2:6, 2:22

**7**

**7** [4] - 74:5, 74:14, 74:16, 167:21

**8**

**8** [7] - 2:23, 29:3, 29:8, 29:19, 30:11, 137:13, 169:13
**800** [1] - 105:23
**866-580-0002** [1] - 170:11
**87** [1] - 2:14
**88** [2] - 2:14, 2:14
**8th** [1] - 81:22

**9**

**9** [4] - 35:3, 35:6, 139:4, 139:8
**9/11** [1] - 115:23
**90** [1] - 2:14
**92** [1] - 2:7
**98** [1] - 2:6
**9:30** [7] - 1:7, 175:9, 175:14, 175:15, 183:18, 183:20, 187:21
**9th** [2] - 81:6, 81:19

**A**

**a.m** [4] - 1:7, 15:1, 52:20, 62:20
**ability** [3] - 13:15, 56:4, 143:19
**able** [18] - 11:12, 12:5, 46:23, 57:7, 57:21, 58:21, 69:16, 69:18, 79:16, 118:25, 120:3, 121:10, 135:3, 135:20, 135:25, 144:23, 151:25, 162:17
**abnormal** [1] - 72:10
**above-entitled** [1] - 188:5
**absolute** [1] - 67:19
**absolutely** [9] -

10:17, 28:16, 130:11, 132:22, 153:10, 155:5, 172:10, 172:20, 172:24
**Academy** [1] - 80:19
**accept** [1] - 186:22
**accepted** [1] - 138:16
**access** [6] - 132:10, 132:18, 140:15, 157:20, 162:7, 170:22
**accommodate** [1] - 151:20
**accomplish** [1] - 138:1
**accomplished** [1] - 116:24
**accordance** [1] - 26:21
**according** [3] - 57:16, 137:1, 169:20
**accordingly** [1] - 128:19
**account** [2] - 157:23, 170:22
**accountant** [3] - 122:11, 122:19, 123:2
**accuracy** [13] - 17:14, 20:21, 20:24, 21:25, 53:19, 53:22, 54:1, 54:5, 54:20, 54:22, 55:5, 55:24, 58:22
**accurate** [4] - 20:17, 57:17, 114:10, 188:4
**accusation** [6] - 38:13, 40:20, 40:21, 40:22, 40:23, 41:3
**accusations** [1] - 38:23
**accusing** [2] - 38:5, 38:10
**achieve** [1] - 118:25
**achievements** [1] - 154:20
**acknowledged** [3] - 44:12, 150:3, 150:11
**acknowledging** [2] - 83:21, 84:4
**acknowledgment** [1] - 134:23
**acquainted** [1] - 69:6
**acquire** [4] - 115:16, 129:14, 137:24, 161:20
**acquired** [10] - 146:21, 147:25, 148:2, 149:4, 149:6, 151:2, 161:16, 161:23, 162:11,

171:10
**acquiring** [2] - 28:13, 28:14
**acted** [1] - 161:15
**acting** [1] - 171:18
**action** [5] - 38:16, 38:17, 41:2, 158:3, 166:9
**actions** [4] - 158:24, 158:25, 160:1, 162:21
**active** [1] - 67:8
**actively** [3] - 85:11, 128:15, 128:16
**activities** [2] - 71:25, 129:24
**activity** [1] - 138:8
**acts** [2] - 129:24, 168:15
**actual** [19] - 46:14, 46:16, 47:14, 50:11, 53:20, 57:13, 74:10, 74:22, 77:2, 78:2, 97:22, 108:6, 135:5, 165:10, 170:7, 179:14, 179:19, 180:13, 180:14
**ad** [7] - 79:14, 79:21, 80:6, 80:11, 80:12, 81:11, 84:17
**add** [3] - 59:21, 146:8, 171:19
**adding** [1] - 50:12
**addition** [1] - 130:3
**additional** [5] - 8:16, 49:5, 51:22, 68:9, 184:25
**address** [9] - 9:17, 11:12, 22:10, 86:11, 110:6, 133:12, 157:5, 157:7, 157:8
**addressed** [3] - 10:24, 14:14, 122:5
**addressee** [1] - 182:24
**adequate** [1] - 171:12
**adjourned** [1] - 187:22
**adjusters** [1] - 66:7
**administer** [1] - 114:21
**Administrators** [4] - 69:6, 70:13, 76:1, 82:23
**administrators** [3] - 69:11, 70:14
**Administrators'** [1] - 75:6
**admissibility** [5] - 53:18, 55:10, 57:8,

61:14, 61:24
**admissible** [1] - 62:6
**admission** [1] - 58:12
**admit** [8] - 21:9, 58:11, 58:15, 61:19, 90:4, 113:7, 178:4, 186:25
**ADMITTED** [2] - 2:13, 2:21
**admitted** [46] - 13:20, 15:18, 15:19, 29:8, 29:18, 29:19, 35:4, 37:22, 59:5, 63:5, 74:15, 74:16, 88:2, 88:3, 90:10, 91:13, 91:15, 91:22, 91:23, 102:7, 108:14, 112:11, 113:12, 113:13, 118:11, 118:12, 121:21, 124:18, 137:14, 139:7, 163:19, 163:22, 168:3, 168:4, 169:9, 177:19, 181:16, 181:17, 181:22, 183:5, 183:6, 183:8, 183:12, 183:13, 186:10, 186:12
**admitting** [3] - 56:1, 63:2, 91:1
**adopted** [2] - 149:21, 149:22
**advance** [1] - 61:20
**advanced** [1] - 86:18
**advantage@ unisourcediscovery. com** [1] - 157:22
**advertise** [8] - 31:19, 33:3, 33:8, 33:14, 33:16, 33:18, 33:19, 33:20
**advertised** [4] - 31:16, 33:13, 47:1, 47:20
**advertisement** [6] - 79:8, 81:10, 84:24, 85:1, 100:7, 124:14
**advertisements** [1] - 84:2
**advertising** [13] - 28:11, 31:20, 32:3, 65:8, 65:10, 65:11, 76:19, 79:2, 84:16, 92:25, 93:18, 94:11, 111:4
**advise** [1] - 43:10
**affairs** [2] - 128:22, 130:1

**affect** [1] - 165:11
**affected** [1] - 160:21
**Affidavit** [1] - 124:8
**affinity** [3] - 72:11, 72:15, 72:20
**affirmed** [1] - 178:17
**affixed** [2] - 160:2, 179:16
**afternoon** [7] - 63:18, 92:16, 92:17, 115:2, 115:4, 140:23, 187:5
**afterwards** [2] - 69:1, 103:17
**age** [1] - 115:14
**agent** [2] - 24:25, 151:11
**agents** [1] - 26:19
**aggressive** [1] - 136:1
**ago** [8] - 20:5, 54:17, 57:4, 57:13, 59:11, 59:13, 60:3, 60:5
**agree** [9] - 11:1, 21:3, 34:24, 36:5, 51:16, 60:6, 128:4, 143:8, 167:21
**agreed** [7] - 20:13, 89:18, 96:3, 96:6, 148:22, 180:3, 181:8
**agreeing** [1] - 55:12
**Agreement** [8] - 35:15, 123:7, 125:14, 137:15, 138:25, 139:3, 142:17, 144:5
**agreement** [100] - 4:14, 5:8, 8:8, 9:9, 9:11, 9:12, 9:13, 10:15, 10:19, 13:4, 13:23, 24:7, 24:20, 25:14, 25:16, 25:20, 26:2, 26:5, 26:8, 26:11, 26:21, 35:18, 35:19, 44:12, 44:13, 50:11, 52:4, 58:15, 59:25, 60:1, 96:11, 121:13, 121:16, 121:19, 122:2, 123:11, 123:14, 125:5, 125:6, 125:23, 127:24, 128:14, 128:20, 129:10, 130:8, 138:1, 138:5, 138:10, 138:24, 138:25, 139:8, 139:9, 139:13, 139:17, 139:21, 140:2, 142:17, 142:21, 143:1, 143:14, 143:23, 144:1, 144:2,

144:5, 144:8, 144:9, 144:11, 144:12, 144:13, 144:14, 145:3, 145:5, 145:6, 146:20, 147:22, 148:5, 148:24, 149:2, 150:23, 151:17, 152:16, 176:9, 176:13, 176:21, 176:23, 177:13, 177:25, 178:1, 178:20, 179:6, 179:16, 179:19, 179:20, 180:15, 180:17, 180:22, 180:25, 181:7

**agreements** [6] - 138:18, 138:20, 138:22, 178:3, 179:5

**agrees** [2] - 24:23, 151:10

**AIG** [4] - 38:6, 67:25, 68:6, 68:8

**airport** [1] - 115:20

**al** [2] - 1:4, 1:7

**alerting** [1] - 64:21

**Alfred** [14] - 7:2, 10:9, 10:15, 11:16, 125:18, 125:19, 138:7, 138:15, 139:18, 143:16, 156:25, 184:9, 185:1, 186:1

**Allen's** [1] - 73:20

**allow** [11] - 10:4, 39:13, 41:13, 41:15, 47:2, 47:20, 53:3, 86:5, 149:5, 149:8, 149:9

**allowed** [4] - 48:20, 90:14, 150:25, 158:13

**allowing** [1] - 20:5

**almost** [2] - 5:19, 136:11

**America** [1] - 115:20

**American** [11] - 71:17, 71:20, 81:2, 81:20, 82:2, 115:15, 117:6, 117:8, 118:3, 182:7, 182:8

**amounts** [1] - 160:5

**annotations** [1] - 57:1

**annual** [6] - 66:22, 66:24, 67:3, 67:7, 81:6, 82:4

**Annual** [2] - 81:19, 81:22

**answer** [13] - 16:18, 31:2, 36:15, 36:16,

40:10, 42:4, 50:24, 96:14, 98:4, 104:15, 106:3, 133:3, 142:22

**answered** [4] - 8:1, 48:10, 98:12, 116:2

**answering** [1] - 51:9

**answers** [4] - 14:2, 30:9, 50:24, 133:24

**anticipate** [1] - 187:10

**anyway** [2] - 61:18, 159:14

**apart** [1] - 105:20

**apologies** [1] - 21:7

**apologize** [4] - 39:4, 120:14, 169:24, 170:2

**apparent** [1] - 108:17

**appealing** [2] - 70:18, 85:16

**appear** [5] - 80:6, 83:6, 84:9, 167:14, 187:4

**APPEARANCES** [1] - 1:12

**appearances** [1] - 3:8

**appeared** [7] - 79:7, 80:9, 80:10, 80:12, 84:17, 84:24, 125:24

**apples** [1] - 61:8

**applicant** [7] - 134:17, 134:18, 171:18, 172:16, 172:21, 173:8, 173:10

**application** [28] - 29:22, 29:23, 30:1, 30:4, 30:7, 44:5, 102:1, 108:2, 108:8, 130:7, 133:1, 134:8, 134:14, 134:15, 134:24, 135:4, 169:4, 169:9, 169:18, 169:21, 170:5, 171:22, 172:6, 172:11, 172:15, 172:18, 173:4, 174:11

**apply** [3] - 5:23, 173:5, 173:6

**approach** [7] - 70:25, 71:3, 78:3, 99:14, 114:19, 158:8, 178:9

**approval** [2] - 86:18, 89:22

**approve** [2] - 90:1, 146:17

**approved** [2] - 143:25

**April** [2] - 31:1, 75:17

**area** [1] - 73:21

**argue** [2] - 13:20,

61:11

**argument** [4] - 10:14, 13:12, 19:16, 19:21

**argumentative** [1] - 46:20

**arise** [2] - 158:23, 159:15

**Arizona** [2] - 152:12, 153:1

**arrangement** [1] - 150:25

**article** [10] - 69:18, 70:8, 70:9, 70:18, 70:20, 75:5, 75:15, 75:19, 75:25, 76:6

**articles** [6] - 69:17, 70:3, 70:5, 70:9, 82:10, 128:19

**aside** [1] - 150:19

**asset** [1] - 176:19

**assets** [7] - 9:7, 26:1, 129:14, 130:13, 130:17, 130:19

**assigned** [2] - 130:1, 140:11

**assist** [3] - 101:25, 108:1, 108:7

**assistance** [1] - 67:15

**assistant** [1] - 74:23

**assisted** [1] - 93:4

**associated** [1] - 161:18

**associates** [2] - 131:4, 154:1

**ASSOCIATES** [1] - 1:15

**association** [3] - 69:5, 70:14, 127:11

**Association** [12] - 69:5, 70:12, 71:4, 71:8, 71:17, 71:20, 75:6, 76:1, 80:5, 81:2, 82:3, 82:22

**associations** [1] - 154:1

**assume** [4] - 19:3, 39:9, 94:6, 106:11

**assumed** [1] - 37:5

**assuming** [5] - 91:17, 100:22, 102:7, 108:16, 187:5

**assumption** [1] - 95:10

**attach** [1] - 187:2

**attached** [2] - 73:19, 149:23

**attachment** [2] - 123:6, 123:11

**attachments** [1] - 148:7

**attempt** [2] - 14:1, 81:16

**attempted** [1] - 6:16

**attend** [4] - 67:5, 67:22, 74:2, 79:13

**attendance** [2] - 67:2, 69:2

**attended** [6] - 66:22, 67:4, 67:24, 71:25, 73:24, 155:6

**attending** [2] - 66:21, 67:10

**attention** [10] - 43:25, 44:10, 100:12, 128:12, 138:10, 142:18, 152:8, 171:24, 176:11, 176:25

**attentive** [1] - 50:20

**attorney** [27] - 4:6, 5:5, 42:25, 68:4, 71:11, 71:24, 117:22, 121:20, 122:4, 122:10, 122:12, 122:19, 123:3, 165:15, 165:22, 165:25, 166:7, 166:10, 166:14, 166:17, 166:19, 166:25, 167:1, 168:7, 179:15

**attorneys** [18] - 45:12, 45:21, 46:3, 46:4, 65:18, 66:6, 70:7, 71:21, 81:16, 90:15, 90:20, 90:21, 143:16, 146:2, 151:18, 155:21, 168:9

**attracted** [1] - 120:21

**attribute** [1] - 42:8

**audience** [2] - 67:20, 72:12

**authenticate** [2] - 53:25, 54:8

**authenticated** [1] - 55:13

**authentication** [1] - 54:22

**authenticity** [1] - 53:22

**author** [8] - 58:4, 59:2, 59:15, 59:16, 75:7, 76:6, 76:11, 181:25

**authored** [3] - 112:3, 116:14, 177:21

**authority** [1] - 128:21

**authorized** [2] - 172:15, 172:17

**authorizing** [1] - 69:12

**automatic** [1] - 88:6

**available** [4] - 53:7, 53:13, 59:11, 83:25

**Aventura** [1] - 73:21

**Avenue** [3] - 1:19, 1:23, 188:11

**aware** [15] - 74:12, 93:6, 93:13, 93:15, 93:17, 93:19, 95:11, 104:17, 106:6, 108:12, 108:16, 156:9, 170:23, 172:9, 179:12

**awareness** [2] - 62:7, 85:25

## B

**background** [7] - 51:3, 115:11, 116:21, 120:23, 159:9, 159:11, 159:18

**backwards** [1] - 61:6

**bag** [1] - 115:20

**baggage** [1] - 115:21

**bar** [1] - 99:12

**Bar** [4] - 71:17, 71:20, 80:5, 82:2

**bargained** [5] - 179:15, 180:11, 180:22, 180:24

**bargaining** [1] - 179:5

**base** [1] - 146:5

**based** [5] - 18:7, 45:14, 53:20, 58:7, 173:7

**Bates** [3] - 75:9, 75:18, 123:6

**Beach** [2] - 119:25, 134:2

**became** [1] - 104:24

**become** [6] - 13:11, 65:18, 118:23, 121:10, 145:13, 150:14

**becomes** [1] - 107:1

**becoming** [3] - 103:4, 108:20, 108:23

**BEFORE** [1] - 1:10

**began** [3] - 101:23, 107:24, 115:25

**begun** [1] - 67:11

**behalf** [5] - 48:4, 48:6, 110:9, 172:15, 172:18

**behind** [1] - 155:17
**behold** [1] - 162:3
**belabor** [1] - 95:15
**belief** [8] - 130:8, 172:17, 172:25, 173:10, 174:7, 174:10, 174:14, 174:15
**beliefs** [3] - 10:10, 10:11
**believes** [3] - 160:1, 172:21, 173:8
**belong** [2] - 163:6
**below** [2] - 176:11, 182:12
**bench** [1] - 14:21
**bend** [1] - 61:6
**benefit** [10] - 10:5, 44:17, 44:25, 45:1, 45:5, 64:22, 76:20, 105:12, 185:5
**benefits** [2] - 68:24, 136:21
**benefitting** [1] - 44:20
**best** [6] - 9:16, 66:24, 77:21, 118:2, 162:11, 162:12
**better** [3] - 76:15, 82:9, 98:5
**between** [10] - 38:25, 39:5, 39:8, 71:5, 95:25, 96:12, 111:25, 126:2, 140:3, 182:20
**beyond** [1] - 5:23
**bids** [1] - 115:17
**big** [11] - 5:18, 13:9, 137:8, 137:9, 154:2, 155:16, 155:17, 155:19, 157:13, 157:14, 157:17
**bigger** [1] - 83:7
**bill** [1] - 61:5
**billing** [2] - 22:3, 22:7
**birthday** [1] - 141:1
**bit** [7] - 52:7, 97:4, 104:21, 109:4, 109:14, 149:13, 186:5
**biz** [1] - 161:17
**black** [1] - 86:4
**blocking** [2] - 127:22, 128:3
**Blue** [1] - 81:7
**board** [16] - 24:23, 24:25, 125:9, 126:18, 128:4, 128:24, 130:1, 130:4, 147:19, 148:18, 148:21, 149:15, 150:11,

151:9, 151:12
**body** [2] - 112:22, 112:25
**booth** [2] - 84:8, 84:10
**born** [1] - 137:4
**boss** [1] - 64:19
**bottom** [7] - 34:11, 76:2, 76:11, 76:16, 85:4, 104:19, 171:24
**bounceback** [1] - 70:19
**bounds** [6] - 5:3, 6:7, 12:8, 12:12, 14:4, 14:10
**Bowl** [2] - 73:16, 74:1
**bowl** [2] - 155:20, 155:21
**branch** [1] - 9:21
**branches** [3] - 42:16, 42:17
**brand** [35] - 44:6, 65:17, 65:20, 65:22, 66:11, 69:25, 70:1, 86:25, 97:13, 100:15, 101:5, 101:6, 101:8, 101:10, 101:11, 101:16, 101:17, 101:24, 106:15, 106:19, 107:8, 107:9, 107:12, 107:25, 108:4, 130:21, 131:6, 131:14, 131:19, 131:20, 149:7, 149:25, 161:16
**branded** [1] - 72:1
**branding** [3] - 72:17, 79:7, 136:1
**break** [11] - 22:11, 52:17, 53:15, 62:23, 91:8, 140:21, 140:24, 149:13, 175:2, 175:7, 175:12
**breast** [2] - 83:3, 85:25
**Brian** [1] - 165:6
**Brickell** [1] - 1:19
**brief** [2] - 62:15, 141:14
**Brief** [1] - 175:17
**briefly** [4] - 83:15, 86:21, 115:10, 178:9
**bring** [12] - 12:6, 14:21, 53:3, 62:18, 78:2, 84:14, 92:9, 111:13, 121:3, 137:11, 158:14, 175:18
**bringing** [1] - 159:6

**brings** [1] - 73:16
**broad** [1] - 20:3
**brought** [7] - 9:25, 11:5, 24:1, 61:7, 80:24, 98:9, 137:11
**Broward** [2] - 73:18, 121:8
**bucket** [1] - 72:7
**buckets** [1] - 72:6
**build** [5] - 66:20, 120:3, 149:6, 149:24, 159:11
**building** [2] - 140:19, 144:22
**built** [3] - 70:9, 116:19, 162:13
**bundle** [1] - 151:3
**Burglass** [1] - 38:7
**BURNETT** [1] - 1:18
**business** [86] - 12:22, 13:3, 14:12, 16:12, 18:4, 18:7, 18:8, 18:12, 20:9, 21:1, 21:3, 21:8, 21:19, 22:17, 27:1, 27:23, 28:9, 28:13, 28:15, 31:19, 32:1, 34:22, 36:8, 40:25, 43:3, 46:7, 53:20, 55:20, 61:17, 64:18, 65:16, 66:9, 67:16, 68:3, 68:5, 68:9, 68:16, 69:4, 69:12, 70:6, 70:12, 70:19, 70:22, 72:5, 84:8, 85:17, 89:19, 93:2, 93:16, 94:1, 94:7, 96:15, 98:23, 115:14, 116:19, 117:25, 118:19, 118:20, 119:3, 120:24, 122:25, 123:1, 127:11, 128:10, 128:22, 128:25, 129:2, 129:21, 130:1, 130:9, 136:5, 136:8, 136:11, 142:15, 143:11, 144:21, 147:22, 150:24, 151:23, 152:25, 153:12, 156:7, 156:17, 156:19, 158:1, 173:17
**Business** [1] - 38:2
**businesses** [5] - 48:16, 97:1, 97:2, 98:2, 98:7
**buy** [3] - 129:16, 161:20, 161:21
**buying** [1] - 26:9

**buys** [2] - 65:10, 66:13
**BY** [51] - 1:21, 2:4, 2:5, 2:6, 2:7, 2:8, 15:23, 16:17, 17:19, 18:21, 22:15, 24:12, 28:6, 29:20, 31:25, 32:17, 33:12, 33:25, 35:7, 36:18, 37:21, 39:22, 40:12, 41:18, 42:2, 63:17, 74:19, 78:5, 87:7, 88:11, 88:20, 92:15, 96:19, 98:17, 115:1, 116:11, 118:15, 131:13, 131:18, 139:6, 141:23, 156:23, 160:20, 163:23, 166:24, 167:5, 168:6, 169:11, 175:25, 177:20, 181:20

---

## C

**cake** [1] - 141:1
**California** [69] - 9:21, 16:7, 17:23, 18:1, 18:4, 18:13, 22:19, 22:22, 23:9, 23:22, 23:24, 30:23, 30:25, 31:19, 32:1, 33:20, 34:13, 34:17, 34:21, 34:25, 47:3, 47:21, 61:17, 93:14, 93:16, 93:17, 93:18, 93:20, 96:10, 96:16, 96:23, 97:6, 97:15, 97:16, 97:19, 97:20, 97:25, 98:8, 100:5, 100:24, 101:5, 101:9, 101:10, 101:11, 101:17, 103:14, 105:18, 105:22, 105:23, 106:1, 106:2, 107:5, 107:9, 107:20, 146:12, 148:8, 150:4, 150:17, 151:1, 151:6, 151:7, 156:19, 161:1, 163:3, 164:7, 165:2, 165:6, 165:20
**California's** [2] - 107:16, 109:16
**campaign** [1] - 72:18
**cancel** [1] - 142:6
**cancelled** [2] - 182:6, 182:9
**cancer** [3] - 83:2, 83:3, 85:25
**cannot** [8] - 20:18, 52:11, 71:14, 77:20,

95:1, 112:14, 148:8, 175:10
**capacity** [2] - 162:14, 171:19
**capital** [2] - 26:17, 182:15
**carbon** [1] - 89:1
**card** [3] - 132:17, 132:18, 182:9
**cards** [3] - 136:23, 182:7
**Caribbean** [1] - 115:16
**carries** [1] - 4:11
**carveout** [3] - 151:20, 152:3, 152:7
**CASE** [1] - 1:2
**case** [54] - 3:6, 3:25, 4:22, 5:7, 5:13, 5:22, 6:1, 8:9, 8:11, 8:18, 8:19, 8:21, 9:4, 9:6, 9:7, 9:11, 9:15, 10:3, 10:4, 11:2, 11:17, 12:9, 12:25, 13:9, 13:11, 24:24, 31:9, 32:5, 41:8, 50:8, 61:18, 68:13, 71:12, 72:13, 73:17, 80:5, 81:13, 83:6, 90:19, 90:20, 91:18, 91:22, 97:21, 104:10, 107:21, 151:10, 158:15, 164:17, 172:13, 173:6, 181:4, 183:19, 187:6
**cases** [3] - 81:17, 93:4
**catch** [1] - 134:5
**category** [1] - 112:17
**caused** [3] - 42:20, 137:12, 158:25
**causes** [1] - 72:20
**caveat** [1] - 104:6
**CC** [1] - 108:16
**cc'd** [1] - 112:20
**cease** [1] - 168:15
**ceased** [1] - 144:13
**celebrate** [1] - 108:9
**celebrated** [1] - 111:20
**celebration** [2] - 135:16, 135:19
**cellular** [1] - 83:21
**Center** [1] - 73:18
**Central** [1] - 115:15
**CEO** [2] - 69:19, 129:6
**Cerasale** [135] - 3:6, 4:23, 6:16, 8:1, 9:20, 10:1, 10:13, 11:13,

12:24, 13:15, 14:20, 15:4, 15:24, 17:16, 17:17, 18:22, 22:16, 24:24, 29:21, 31:12, 32:18, 34:1, 37:7, 37:10, 39:23, 41:19, 42:3, 47:2, 47:11, 47:12, 48:9, 49:9, 49:11, 49:18, 49:21, 50:13, 54:6, 62:7, 73:5, 73:6, 77:15, 86:18, 89:8, 89:21, 93:7, 93:12, 93:13, 93:25, 94:1, 94:5, 94:15, 94:21, 94:25, 95:2, 95:7, 95:10, 95:17, 95:18, 96:1, 96:12, 98:19, 98:23, 98:24, 99:2, 101:24, 107:25, 108:12, 111:23, 112:1, 112:2, 112:4, 112:18, 112:20, 115:9, 115:25, 116:18, 116:25, 117:2, 117:7, 117:13, 118:6, 119:8, 119:18, 120:22, 121:2, 121:17, 122:6, 122:10, 122:21, 125:2, 125:18, 126:16, 127:9, 128:16, 132:19, 133:19, 135:9, 135:22, 138:6, 139:18, 140:1, 141:25, 142:4, 142:19, 145:8, 145:25, 146:10, 147:23, 148:15, 151:11, 151:16, 153:22, 154:15, 154:24, 156:1, 156:14, 156:18, 156:25, 157:9, 157:20, 160:21, 162:3, 168:12, 170:19, 170:23, 171:8, 174:17, 179:12, 179:23, 180:8, 182:3, 182:4, 187:14

**CERASALE** [2] - 2:4, 2:10

**Cerasale's** [4] - 13:14, 97:15, 121:20, 127:15

**certain** [7] - 86:23, 128:18, 132:11, 145:19, 148:22, 155:22, 161:13

**certainly** [2] - 46:11, 48:2

**certificate** [2] - 135:5, 135:11

**certify** [1] - 188:3

**chance** [2] - 141:2, 179:3

**change** [6] - 25:6, 42:20, 61:6, 125:15, 152:4, 180:23

**changes** [3] - 89:16, 89:18, 155:2

**changing** [1] - 85:19

**Chapter** [1] - 82:23

**character** [1] - 13:14

**characterize** [2] - 44:2, 136:5

**charge** [3] - 58:4, 142:15, 187:8

**charitable** [1] - 72:8

**chart** [18] - 22:9, 54:4, 54:8, 55:21, 56:20, 56:21, 57:13, 57:15, 58:7, 59:2, 59:4, 59:15, 59:17, 60:14, 61:16, 61:19, 91:1

**charts** [17] - 55:7, 55:22, 57:20, 58:4, 58:12, 58:14, 58:17, 58:18, 58:19, 58:20, 59:7, 59:18, 60:1, 60:4, 60:12, 60:13

**check** [1] - 53:1

**Chicago** [1] - 155:9

**chief** [3] - 76:12, 82:8, 129:6

**children** [4] - 72:10, 80:19, 80:22, 80:23

**Children's** [1] - 80:18

**choice** [1] - 51:10

**chose** [1] - 132:11

**chosen** [3] - 89:14, 148:19, 149:15

**Christmas** [1] - 80:22

**circle** [3] - 78:13, 104:22, 179:11

**citizen** [1] - 72:7

**citizenship** [1] - 72:19

**civil** [2] - 45:10, 45:15

**claim** [9] - 38:21, 40:24, 41:4, 104:22, 104:23, 149:24, 158:12, 160:3, 179:13

**claiming** [1] - 181:3

**claims** [6] - 66:6, 147:24, 158:19,

158:23, 159:2, 160:10

**clarification** [2] - 11:16, 11:23

**clarified** [2] - 110:14, 110:23

**clarify** [8] - 17:25, 48:9, 59:24, 60:25, 95:5, 110:13, 126:1, 174:13

**clarifying** [2] - 48:7, 94:19

**classic** [1] - 81:7

**Classic** [2] - 81:20, 81:23

**clause** [4] - 129:16, 176:22, 179:7, 180:17

**clean** [5] - 29:4, 29:14, 147:21, 148:11, 169:6

**clear** [14] - 4:25, 12:16, 21:22, 97:11, 107:18, 116:19, 125:6, 144:20, 147:20, 147:25, 148:3, 148:11, 160:9, 166:18

**clearly** [5] - 17:20, 98:6, 147:16, 158:15, 166:11

**clerk** [1] - 53:24

**click** [2] - 86:23, 106:1

**clicks** [1] - 86:24

**client** [11] - 40:20, 58:23, 58:24, 71:13, 124:3, 124:10, 146:5, 164:9, 164:12, 164:13, 179:18

**client's** [3] - 20:2, 41:3, 54:19

**clients** [10] - 17:22, 20:4, 32:20, 32:22, 68:23, 103:22, 106:1, 164:4, 164:10, 164:11

**close** [8] - 15:7, 39:19, 72:9, 72:12, 78:2, 81:17, 114:24, 184:4

**Closed** [5] - 35:15, 125:13, 138:25, 139:2, 142:17

**closed** [4] - 81:13, 83:6, 176:12, 177:25

**closer** [1] - 111:13

**closing** [2] - 144:6, 144:7

**clue** [1] - 20:17

**co** [5] - 157:9, 157:10, 161:17, 171:20

**co-owned** [2] - 157:9, 171:20

**co-shared** [2] - 157:10, 171:20

**coast** [3] - 43:12, 103:22, 103:23

**Code** [2] - 172:5, 173:5

**coffee** [1] - 52:17

**cognitive** [1] - 50:23

**Cole** [1] - 38:8

**collaboratively** [1] - 86:15

**collateral** [1] - 159:5

**colleague** [2] - 86:16, 89:3

**collect** [1] - 80:25

**collection** [2] - 71:20, 73:18

**collective** [1] - 68:20

**College** [1] - 115:12

**color** [3] - 73:3, 85:19, 86:7

**colors** [2] - 29:13, 86:4

**com** [6] - 100:5, 109:17, 157:10, 157:17, 162:6, 162:15

**coming** [1] - 166:11

**commerce** [7] - 133:13, 133:16, 173:9, 173:12, 173:14, 173:17, 173:19

**commit** [1] - 150:6

**commitments** [1] - 120:6

**common** [2] - 104:22, 105:1

**communication** [2] - 87:10, 179:16

**communications** [5] - 64:17, 141:25, 156:13, 165:5, 181:1

**Community** [1] - 115:12

**community** [1] - 73:17

**companies** [8] - 42:15, 93:15, 96:13, 96:22, 115:16, 117:16, 117:24, 145:20

**Company** [8] - 26:18, 89:11, 115:24, 116:22, 117:14, 124:8, 124:10, 138:11

**company** [117] - 9:23, 24:25, 25:1, 25:7, 26:16, 26:20,

36:1, 36:5, 42:12, 43:22, 44:13, 46:8, 46:9, 46:23, 47:17, 60:15, 64:3, 64:5, 64:7, 64:14, 65:22, 67:25, 68:2, 68:3, 68:7, 69:19, 70:2, 70:3, 71:14, 76:3, 77:16, 85:2, 93:13, 93:20, 94:13, 94:18, 94:20, 95:13, 95:16, 95:19, 96:6, 96:9, 97:6, 97:15, 105:15, 106:16, 106:22, 106:25, 115:14, 116:21, 117:2, 117:5, 118:2, 118:3, 119:4, 122:3, 124:4, 124:6, 124:7, 124:12, 126:12, 126:13, 128:15, 128:17, 128:22, 128:25, 129:13, 130:9, 130:12, 130:19, 132:8, 132:17, 132:18, 135:15, 136:19, 137:9, 137:22, 137:25, 138:7, 138:15, 138:17, 138:24, 142:24, 142:25, 143:4, 143:9, 143:18, 143:19, 145:13, 148:25, 150:4, 151:12, 151:13, 152:20, 154:14, 156:12, 157:1, 157:5, 161:17, 162:5, 162:6, 162:7, 165:12, 172:18, 172:25, 174:22, 174:23, 176:20, 181:4, 182:7, 182:19

**company's** [1] - 129:25

**compare** [1] - 61:8

**comparison** [2] - 83:9, 83:11

**compelled** [1] - 61:3

**competing** [1] - 156:19

**competition** [2] - 41:8, 41:9

**competitor** [1] - 124:11

**complained** [1] - 9:22

**complaint** [1] - 156:25

**complaints** [1] -

142:3

**complete** [2] - 121:3, 128:20

**completely** [5] - 10:19, 26:21, 48:15, 157:18, 162:4

**comprehensive** [5] - 116:17, 131:24, 132:2, 132:12, 133:22

**comprised** [3] - 66:6, 67:1, 69:10

**computer** [4] - 9:6, 140:16, 140:18, 140:19

**conceded** [1] - 123:15

**concerned** [1] - 8:15

**conclude** [2] - 113:15, 187:1

**concluded** [8] - 22:14, 41:17, 47:10, 51:21, 105:8, 160:19, 166:21, 181:11

**condensing** [1] - 47:14

**conducted** [2] - 131:23, 156:17

**conference** [17] - 19:24, 22:14, 40:17, 41:17, 46:5, 47:10, 49:7, 51:21, 99:15, 105:8, 158:9, 160:19, 166:3, 166:21, 178:10, 181:11, 187:8

**confirm** [1] - 92:18

**confirmation** [4] - 134:25, 135:2, 169:3, 169:17

**conflict** [1] - 132:1

**conflicts** [1] - 131:25

**confuse** [2] - 8:15, 10:20

**confused** [2] - 50:4, 94:22

**confusion** [5] - 41:12, 162:23, 163:1, 165:10, 174:1

**conjunction** [1] - 85:25

**connection** [6] - 27:17, 30:4, 31:15, 113:3, 161:7, 173:24

**consciously** [1] - 180:22

**consider** [6] - 7:10, 7:17, 11:9, 76:22, 107:16, 160:16

**consideration** [9] - 4:13, 4:24, 5:8, 6:2, 9:3, 13:21, 91:14,

138:15, 138:16

**consistent** [1] - 8:2

**constant** [1] - 181:6

**constituted** [1] - 125:9

**constitution** [1] - 148:20

**constructive** [1] - 181:3

**consult** [4] - 89:15, 122:12, 123:2, 129:11

**consultant** [3] - 63:23, 64:6, 64:7

**consultations** [2] - 122:9, 122:18

**consulted** [3] - 122:13, 123:4, 146:7

**consumer** [2] - 67:21, 72:12

**consumers** [1] - 85:16

**contact** [1] - 70:20

**contacts** [1] - 69:1

**contained** [1] - 18:3

**contemporaneous** [1] - 14:9

**content** [5] - 87:17, 89:13, 113:5, 114:6

**context** [6] - 5:1, 8:18, 13:5, 14:6, 59:21, 105:15

**continue** [4] - 53:4, 66:9, 151:1, 184:23

**continued** [3] - 153:14, 153:15, 187:23

**continues** [1] - 75:21

**contract** [1] - 153:4

**contracts** [1] - 14:12

**contribute** [1] - 121:2

**contributed** [2] - 6:3, 9:7

**contributing** [1] - 149:21

**contribution** [4] - 4:23, 26:23, 27:2, 86:7

**contributions** [6] - 26:1, 26:11, 26:14, 27:5, 27:6

**control** [2] - 128:22, 170:19

**controlled** [2] - 145:15, 145:17

**convention** [1] - 67:1

**Convention** [1] - 73:18

**conversation** [4] - 37:4, 44:16, 98:23,

119:17

**conversations** [3] - 22:2, 43:15, 61:3

**copied** [8] - 89:1, 95:10, 102:20, 108:17, 112:4, 112:18, 112:23, 112:24

**copies** [1] - 133:7

**copy** [10] - 7:21, 21:22, 29:4, 29:14, 30:1, 37:25, 87:3, 116:7, 124:18, 171:20

**copyright** [2] - 9:5, 105:1

**Corp** [2] - 80:21, 80:24

**corporate** [7] - 16:25, 36:7, 72:7, 72:19, 77:10, 143:10, 182:7

**corporation** [21] - 34:12, 107:11, 123:16, 123:19, 123:22, 124:9, 126:12, 127:5, 127:7, 127:17, 127:21, 129:16, 129:21, 130:17, 136:13, 136:14, 147:20, 173:11, 176:12, 177:25, 179:13

**Corporation** [5] - 35:15, 125:13, 139:3, 142:17, 143:3

**corporations** [1] - 96:15

**correct** [165] - 18:2, 23:12, 23:18, 23:22, 24:8, 25:14, 26:2, 26:11, 27:7, 31:6, 32:20, 32:23, 33:1, 33:3, 33:6, 33:20, 34:9, 34:18, 35:16, 35:19, 35:22, 36:2, 36:20, 36:21, 36:23, 38:3, 38:8, 38:11, 38:13, 43:1, 43:19, 44:1, 44:14, 45:6, 48:18, 48:21, 48:24, 57:14, 60:23, 64:3, 68:19, 73:6, 75:21, 75:22, 76:3, 76:9, 76:13, 76:14, 77:3, 77:13, 78:13, 78:14, 78:19, 79:25, 81:20, 84:12, 84:18, 84:19, 85:4, 85:5, 85:7, 85:9, 85:10, 85:20, 85:21, 86:11, 89:22, 92:20,

92:21, 93:1, 93:22, 94:21, 94:25, 95:17, 97:9, 111:2, 111:4, 111:15, 111:16, 111:18, 111:20, 112:25, 113:1, 117:3, 117:4, 118:21, 119:5, 119:13, 119:16, 120:19, 122:7, 122:8, 123:4, 123:20, 124:15, 125:7, 125:8, 125:10, 126:4, 126:8, 126:10, 126:16, 126:17, 126:20, 126:21, 126:23, 126:24, 127:5, 127:6, 127:13, 127:14, 127:18, 128:1, 128:6, 129:5, 129:7, 129:9, 129:14, 129:15, 129:19, 130:5, 130:6, 130:22, 133:9, 136:16, 136:21, 139:15, 142:7, 142:8, 142:11, 142:13, 142:14, 143:4, 143:5, 143:24, 145:9, 145:10, 146:18, 146:19, 146:22, 153:9, 168:23, 168:24, 170:6, 170:17, 170:18, 170:20, 170:21, 171:3, 171:12, 171:14, 171:17, 172:8, 172:9, 173:2, 173:19, 173:20, 173:22, 174:17, 174:21, 176:7, 176:9, 176:10, 182:24, 182:25

**Correct** [1] - 131:15

**correctly** [2] - 34:14, 153:6

**correspondence** [5] - 43:14, 44:4, 165:11, 180:13, 182:18

**corresponding** [1] - 43:21

**cost** [1] - 138:4

**Cote** [12] - 26:15, 26:23, 117:2, 125:2, 125:3, 125:18, 127:10, 132:19, 139:18, 146:11, 147:23, 156:9

**Council** [6] - 66:1, 66:14, 67:18, 68:14, 68:25, 80:10

**counsel** [34] - 3:9,

4:25, 7:10, 7:23, 7:24, 11:3, 11:8, 12:2, 19:21, 20:1, 21:6, 22:5, 37:16, 37:18, 42:7, 44:16, 56:6, 56:9, 59:11, 61:7, 62:17, 91:11, 95:8, 110:15, 118:8, 122:18, 123:2, 123:5, 131:16, 140:20, 163:13, 169:6, 177:15, 183:2

**Counsel** [6] - 8:24, 41:6, 113:20, 177:5, 177:9, 181:13

**counsel's** [3] - 29:9, 57:16, 61:3

**count** [1] - 41:8

**counter** [4] - 134:3, 185:21, 186:1, 186:5

**counterclaim** [5] - 39:11, 40:2, 40:8, 40:13, 142:6

**countries** [1] - 118:25

**country** [3] - 42:14, 69:11, 97:22

**couple** [4] - 47:13, 153:1, 165:8, 175:10

**course** [10] - 11:22, 12:5, 18:8, 21:1, 44:11, 81:7, 81:8, 105:14, 164:25, 181:9

**Court** [17] - 1:22, 1:23, 3:1, 10:4, 10:25, 11:5, 11:8, 11:10, 12:9, 19:23, 46:2, 53:2, 58:21, 92:8, 139:4, 188:10, 188:10

**court** [17] - 7:2, 12:6, 31:8, 32:5, 38:21, 38:25, 39:5, 39:7, 40:2, 41:11, 54:4, 55:25, 114:21, 141:19, 158:12, 159:3, 166:4

**COURT** [302] - 1:1, 3:2, 3:4, 3:14, 4:25, 5:9, 6:11, 6:19, 6:22, 7:9, 7:16, 7:20, 7:23, 8:3, 8:20, 9:1, 9:12, 10:7, 10:21, 11:5, 11:18, 11:24, 12:2, 12:14, 14:5, 14:20, 14:24, 15:2, 15:5, 15:17, 15:20, 16:16, 18:16, 18:19, 19:16, 19:19, 19:21, 20:8, 20:22, 21:3, 21:6, 21:8, 21:18, 21:25,

22:10, 28:5, 29:1, 29:4, 29:8, 29:12, 29:14, 29:18, 31:21, 32:9, 32:14, 33:11, 33:24, 35:5, 36:15, 37:18, 39:17, 39:20, 40:10, 40:15, 40:18, 41:6, 41:13, 41:23, 41:25, 45:9, 46:6, 46:14, 46:20, 47:6, 47:12, 47:19, 47:24, 48:3, 48:6, 48:8, 49:2, 49:8, 49:17, 49:22, 49:25, 50:2, 50:9, 50:17, 50:19, 50:22, 51:4, 51:13, 51:15, 51:17, 51:20, 51:22, 52:6, 52:10, 52:19, 52:21, 53:6, 53:12, 55:6, 55:16, 56:13, 56:18, 56:20, 56:23, 57:12, 57:19, 58:9, 58:14, 59:6, 59:9, 59:23, 60:22, 61:1, 61:15, 62:12, 62:14, 62:16, 62:17, 62:21, 63:8, 63:13, 74:12, 74:14, 74:16, 78:4, 87:24, 88:1, 88:7, 88:9, 88:14, 88:17, 90:6, 90:9, 90:12, 90:15, 90:24, 91:3, 91:7, 91:11, 91:17, 91:20, 92:1, 92:4, 92:6, 92:9, 92:12, 96:18, 98:15, 99:8, 99:13, 99:16, 99:21, 99:23, 100:2, 100:4, 100:12, 100:19, 100:21, 101:1, 101:4, 101:8, 101:15, 101:20, 101:22, 102:4, 102:10, 102:12, 102:16, 102:21, 103:4, 103:6, 103:9, 103:12, 103:18, 103:25, 104:6, 104:9, 104:14, 104:17, 105:2, 105:5, 105:10, 105:21, 106:4, 106:9, 106:13, 106:17, 107:2, 107:7, 107:15, 107:23, 108:5, 108:11, 108:18, 108:25, 109:8, 109:14, 109:20, 109:23, 110:1, 110:7, 110:12, 110:15, 112:9, 112:13, 112:15, 113:9, 113:11,

113:15, 113:18, 114:12, 114:16, 114:20, 114:23, 118:10, 118:14, 131:11, 131:16, 139:5, 140:20, 140:23, 141:7, 141:9, 141:12, 141:16, 156:22, 158:8, 158:10, 158:17, 158:20, 159:8, 159:25, 160:5, 160:7, 160:14, 163:16, 163:19, 163:21, 165:24, 166:1, 166:4, 166:8, 166:11, 166:16, 166:22, 167:4, 167:25, 168:2, 175:1, 175:3, 175:5, 175:15, 175:18, 175:21, 177:5, 177:7, 177:15, 177:18, 178:6, 178:8, 178:11, 178:13, 178:19, 178:21, 178:24, 179:9, 179:17, 179:19, 179:22, 179:25, 180:14, 180:19, 181:7, 181:10, 181:15, 181:19, 183:2, 183:7, 183:10, 183:16, 183:21, 183:23, 183:25, 184:4, 184:11, 184:15, 184:17, 184:20, 184:23, 185:9, 185:16, 185:23, 186:7, 186:12, 186:15, 186:24, 187:13, 187:15
   **COURTROOM** [2] - 14:19, 92:8
   **courtroom** [11] - 15:1, 52:20, 62:20, 73:6, 91:6, 92:11, 141:6, 141:15, 175:4, 175:20, 183:22
   **cover** [1] - 81:9
   **coverage** [1] - 9:24
   **covered** [1] - 178:15
   **CPA** [1] - 123:4
   **crabs** [3] - 155:20, 155:21
   **create** [5] - 9:4, 18:25, 19:7, 19:9, 41:11
   **created** [23] - 18:3, 19:2, 19:5, 20:18, 20:25, 21:2, 23:18,

31:4, 55:19, 56:22, 58:18, 58:20, 58:21, 59:19, 99:18, 99:24, 102:1, 108:2, 108:8, 109:1, 109:2, 109:9, 146:15
   **creating** [4] - 8:12, 34:12, 114:4, 119:11
   **creation** [2] - 34:23, 122:2
   **credibility** [3] - 41:3, 51:1, 59:3
   **credit** [4] - 132:17, 132:18, 136:23, 182:8
   **criteria** [1] - 55:20
   **critical** [2] - 4:22, 13:24
   **cross** [5] - 11:9, 16:16, 90:12, 90:16, 187:5
   **CROSS** [3] - 2:3, 15:22, 92:14
   **cross-examination** [1] - 90:16
   **CROSS-EXAMINATION** [2] - 15:22, 92:14
   **crucial** [1] - 145:2
   **Cuban** [6] - 71:17, 71:20, 80:5, 81:2, 81:20, 82:2
   **cubbies** [1] - 154:21
   **cultivate** [1] - 67:11
   **cultivating** [1] - 68:8
   **cultivation** [1] - 69:3
   **Cure** [2] - 83:1, 84:5
   **cure** [1] - 83:2
   **current** [6] - 25:1, 71:16, 73:25, 74:1, 115:5, 151:13
   **customary** [2] - 59:9, 129:25
   **customer** [6] - 48:11, 61:5, 97:8, 97:10, 97:25
   **customers** [32] - 17:25, 22:3, 22:4, 22:5, 22:6, 22:7, 22:21, 22:24, 38:11, 40:21, 41:4, 41:19, 56:5, 71:1, 96:7, 96:13, 96:23, 96:24, 96:25, 97:14, 97:15, 97:17, 98:8, 98:10, 103:15, 105:19, 145:20, 162:23, 163:2
   **cutoff** [4] - 5:19, 21:14, 21:24, 56:2

## D

   **Dade** [1] - 115:12
   **damage** [1] - 159:22
   **damages** [11] - 158:2, 158:5, 158:7, 158:11, 158:16, 158:25, 159:12, 159:13, 159:17, 159:20
   **DARRIN** [1] - 1:10
   **data** [14] - 20:3, 21:11, 21:13, 54:18, 55:5, 56:5, 57:21, 58:2, 59:1, 59:6, 60:15, 60:17, 62:5
   **database** [1] - 58:6
   **DataMed** [3] - 117:6, 117:9, 118:4
   **date** [19] - 25:16, 75:15, 129:8, 134:8, 134:9, 139:1, 139:13, 144:16, 159:20, 162:17, 171:1, 171:4, 171:7, 171:12, 174:15, 174:17, 174:18, 174:19, 176:6
   **DATE** [1] - 188:9
   **dated** [5] - 5:5, 38:1, 56:23, 113:23, 139:11
   **dates** [1] - 18:13
   **daughter** [1] - 137:4
   **day-to-day** [8] - 43:5, 46:9, 46:13, 46:22, 47:16, 128:25, 129:2, 129:21
   **days** [4] - 60:3, 60:5, 67:8, 67:9
   **deal** [6] - 14:2, 37:18, 65:8, 102:21, 144:19, 144:20
   **dealing** [5] - 4:7, 8:8, 44:4, 93:3, 178:24
   **deals** [2] - 6:14, 72:10
   **dealt** [1] - 61:4
   **decade** [1] - 142:11
   **deceive** [1] - 174:1
   **December** [5] - 1:5, 56:24, 60:2, 60:16
   **decide** [4] - 9:18, 45:14, 69:12, 94:14
   **decided** [4] - 112:12, 145:22, 162:11, 162:12
   **decision** [5] - 94:10, 94:20, 95:7, 118:1, 162:4
   **decisions** [3] - 95:11, 129:23, 134:6

   **declaration** [1] - 173:1
   **declares** [1] - 172:13
   **deemed** [1] - 43:19
   **Defendant** [34] - 4:23, 6:16, 9:20, 10:1, 98:19, 98:24, 99:2, 111:23, 115:9, 117:2, 117:7, 117:12, 119:8, 119:17, 120:22, 121:2, 121:16, 122:10, 126:16, 127:15, 128:16, 135:9, 140:1, 141:25, 142:4, 142:19, 145:8, 148:15, 154:24, 160:21, 170:19, 171:8, 179:12
   **DEFENDANT** [1] - 1:17
   **defendant** [2] - 48:6, 103:9
   **defendants** [3] - 1:8, 3:13, 4:18
   **DEFENSE** [1] - 2:21
   **defense** [14] - 11:8, 49:25, 56:14, 62:17, 68:7, 71:8, 71:11, 71:22, 88:17, 91:2, 99:21, 100:2, 100:19, 113:18
   **Defense** [17] - 2:22, 2:22, 2:23, 15:17, 15:19, 16:1, 17:9, 17:11, 29:3, 29:19, 60:22, 63:1, 63:5, 71:4, 71:8, 88:16, 169:12
   **defer** [1] - 67:16
   **define** [1] - 5:2
   **defined** [1] - 126:19
   **definition** [1] - 61:4
   **deformities** [1] - 72:10
   **degree** [3] - 11:13, 33:21, 128:18
   **delay** [1] - 8:18
   **deleted** [3] - 162:5, 162:6, 162:16
   **delving** [1] - 8:7
   **demand** [4] - 12:18, 13:6, 13:8, 14:16
   **denied** [1] - 4:4
   **depicted** [1] - 76:8
   **depicts** [1] - 75:13
   **deposition** [24] - 4:16, 4:19, 6:19, 6:23, 7:1, 7:2, 7:4, 7:14, 8:3, 8:5, 10:6, 10:21, 11:20, 31:8, 31:12,

32:6, 32:18, 51:8, 56:5, 185:2, 185:4, 185:6, 185:15, 185:16

**depositions** [1] - 57:23

**DEPUTY** [2] - 14:19, 92:8

**deriving** [1] - 148:23

**describe** [17] - 65:14, 69:8, 73:13, 75:23, 80:14, 83:15, 84:8, 116:14, 132:7, 133:2, 133:20, 135:19, 153:24, 155:13, 158:5, 163:1, 164:3

**described** [5] - 112:7, 112:18, 117:1, 119:3, 146:8

**describes** [1] - 14:16

**describing** [1] - 115:10

**description** [1] - 169:24

**descriptor** [1] - 110:5

**design** [4] - 16:5, 86:8, 86:13, 86:19

**designation** [1] - 11:7

**designations** [6] - 6:25, 11:9, 185:22, 186:1, 186:5

**designer** [1] - 87:14

**desired** [1] - 81:8

**Desist** [1] - 38:3

**desist** [1] - 168:15

**detail** [1] - 43:21

**detailed** [1] - 14:10

**details** [1] - 120:7

**determine** [1] - 8:14

**detrimental** [1] - 6:1

**develop** [1] - 66:8

**developed** [1] - 22:9

**development** [8] - 64:18, 65:17, 66:9, 68:9, 68:17, 69:4, 69:13, 70:22

**Diaz** [1] - 188:9

**DIAZ** [2] - 1:22, 188:9

**Diaz's** [1] - 141:1

**died** [1] - 144:11

**DIEGO** [1] - 1:14

**difference** [1] - 126:1

**different** [24] - 9:23, 9:24, 22:3, 25:2, 29:13, 54:12, 56:15, 60:15, 73:22, 85:11, 85:12, 96:23, 96:24, 96:25, 97:2, 122:24,

146:7, 151:14, 155:14, 155:15, 155:22, 155:23

**differently** [2] - 42:15, 109:16

**difficult** [3] - 53:25, 78:1, 93:4

**difficulties** [1] - 4:9

**Digital** [7] - 35:25, 65:23, 78:17, 111:9, 142:23, 170:2, 182:12

**digital** [2] - 104:18, 161:18

**dinner** [3] - 120:1, 120:2, 120:16

**dire** [1] - 18:17

**DIRE** [1] - 18:21

**DIRECT** [3] - 2:3, 63:16, 114:25

**direct** [16] - 11:13, 33:10, 64:24, 68:22, 69:3, 70:11, 70:15, 70:16, 70:17, 106:1, 112:1, 128:12, 131:12, 131:17, 152:8, 186:16

**directed** [1] - 84:25

**direction** [2] - 86:16, 95:9

**directly** [15] - 14:2, 20:4, 54:18, 58:25, 67:20, 70:18, 93:21, 98:25, 124:19, 135:13, 146:5, 153:3, 156:14, 169:17, 184:10

**director** [12] - 24:24, 64:17, 99:3, 103:4, 108:21, 108:23, 125:19, 126:23, 128:14, 128:20, 130:17, 151:11

**directors** [33] - 24:23, 24:25, 27:7, 125:7, 125:9, 125:11, 125:12, 125:15, 125:17, 125:24, 126:2, 126:4, 126:7, 126:18, 126:25, 128:4, 129:1, 129:11, 129:18, 130:2, 130:4, 136:21, 147:19, 148:19, 148:21, 148:22, 149:15, 150:12, 151:10, 151:12, 153:8

**directorship** [1] - 127:25

**dired** [1] - 62:1

**disabilities** [1] -

80:20

**disclosed** [1] - 104:12

**disconnect** [1] - 159:23

**disconnected** [4] - 157:15, 160:22, 161:9, 161:12

**discovery** [16] - 5:19, 21:13, 21:23, 54:20, 56:2, 57:24, 67:14, 69:18, 72:13, 78:8, 78:23, 81:16, 84:14, 97:18, 97:21, 106:24

**DISCOVERY** [2] - 1:4, 1:7

**Discovery** [80] - 3:5, 3:6, 16:6, 16:7, 17:23, 18:4, 24:7, 24:13, 24:16, 25:2, 26:6, 26:9, 27:10, 32:1, 34:12, 35:25, 36:6, 36:7, 42:4, 42:9, 64:13, 64:19, 64:20, 65:21, 65:23, 68:20, 69:17, 69:25, 72:2, 76:13, 77:8, 78:17, 79:6, 82:10, 82:24, 83:7, 83:11, 86:9, 89:6, 93:14, 93:17, 96:16, 99:3, 101:23, 103:2, 106:6, 107:13, 108:20, 111:9, 115:6, 115:25, 123:8, 123:19, 123:24, 124:11, 129:4, 134:19, 142:23, 143:1, 143:3, 143:10, 143:11, 144:17, 147:20, 148:24, 149:10, 150:5, 150:13, 150:14, 151:2, 151:13, 152:5, 158:2, 161:19, 169:22, 170:2, 174:23, 177:4, 180:21, 182:12

**discretion** [1] - 128:21

**discuss** [15] - 5:24, 44:10, 88:12, 88:16, 90:19, 91:8, 93:24, 94:1, 94:5, 94:6, 106:13, 128:10, 145:24, 183:19, 186:18

**discussed** [26] - 9:8, 42:3, 56:8, 57:17, 57:19, 57:25, 60:10, 60:11, 60:20, 63:1,

73:5, 106:14, 120:2, 120:3, 120:5, 120:7, 121:12, 144:16, 145:11, 146:7, 146:10, 146:11, 180:24, 184:7, 185:4, 187:1

**discusses** [1] - 76:11

**discussing** [2] - 184:10, 185:20

**discussion** [1] - 12:11

**Discussion** [1] - 187:9

**disease** [1] - 50:23

**dismissed** [2] - 158:13, 159:4

**display** [1] - 154:20

**displayed** [7] - 18:24, 66:11, 69:23, 77:24, 116:6, 155:11, 155:13

**displaying** [1] - 88:21

**dispute** [12] - 12:19, 12:25, 13:1, 13:6, 13:8, 13:11, 14:14, 21:25, 50:10, 137:23, 184:8, 184:10

**disputing** [1] - 20:22

**Distress** [1] - 83:19

**distribute** [1] - 30:3

**distributed** [2] - 136:15, 136:17

**distribution** [2] - 70:24, 79:10

**district** [2] - 4:17, 4:18

**DISTRICT** [3] - 1:1, 1:1, 1:11

**District** [2] - 1:23, 188:10

**diverted** [1] - 164:6

**dividends** [1] - 136:19

**DIVISION** [1] - 1:2

**docket** [2] - 5:19, 187:4

**Docket** [6] - 3:22, 3:23, 4:3, 5:3, 7:14, 178:18

**doctors** [1] - 163:5

**document** [90] - 16:2, 16:4, 17:17, 17:21, 18:14, 18:24, 18:25, 19:2, 19:5, 19:9, 19:15, 19:25, 20:7, 20:15, 20:16, 20:18, 20:25, 21:17,

22:1, 24:5, 31:11, 31:15, 35:8, 35:10, 35:13, 36:9, 36:13, 36:14, 37:24, 37:25, 39:23, 40:3, 55:19, 63:2, 74:20, 74:22, 74:25, 75:3, 76:16, 81:3, 81:24, 82:5, 82:7, 83:4, 83:16, 83:25, 84:7, 84:13, 84:20, 87:4, 87:9, 88:22, 88:24, 106:24, 116:12, 116:14, 116:16, 121:23, 121:25, 124:19, 125:6, 125:25, 126:9, 137:16, 137:18, 137:20, 163:10, 163:24, 163:25, 164:1, 164:2, 168:18, 168:20, 168:22, 168:25, 169:2, 169:13, 169:16, 176:3, 176:4, 176:21, 177:21, 178:4, 178:11, 178:19, 180:3, 181:23, 181:25, 182:4

**Document** [7] - 35:25, 65:23, 78:17, 111:9, 142:23, 170:2, 182:12

**documented** [1] - 5:14

**documents** [19] - 19:7, 20:16, 21:13, 21:15, 54:25, 55:8, 55:10, 55:14, 56:3, 56:12, 57:9, 62:3, 76:19, 83:24, 84:2, 109:24, 140:13, 167:15, 169:21

**dollar** [1] - 84:4

**domain** [3] - 99:24, 109:10, 114:1

**Don** [1] - 154:12

**donation** [6] - 72:16, 72:22, 72:23, 82:25, 83:21, 84:4

**done** [15] - 18:12, 28:12, 37:13, 54:17, 61:17, 62:1, 80:20, 85:22, 85:24, 85:25, 113:17, 135:21, 149:25, 156:13, 162:15

**door** [1] - 50:6

**Doral** [1] - 81:7

**doubled** [1] - 136:10

**doubt** [4] - 30:8,

55:23, 57:16, 130:12
**down** [13] - 45:13, 46:1, 49:4, 52:15, 52:21, 91:7, 99:10, 114:14, 120:10, 141:7, 149:13, 162:10, 183:23
**drafts** [1] - 180:2
**drawn** [1] - 13:5
**dropped** [1] - 123:17
**due** [1] - 160:12
**duly** [2] - 63:15, 114:22
**during** [8] - 34:2, 34:5, 35:8, 87:20, 91:8, 92:22, 159:13, 165:19
**duties** [9] - 28:8, 42:25, 43:7, 43:8, 65:8, 92:22, 100:14, 106:18
**duty** [7] - 101:5, 101:8, 101:16, 101:23, 107:8, 115:17, 130:17

## E

**e-mail** [29] - 38:1, 38:5, 38:13, 44:7, 60:3, 60:6, 88:25, 100:7, 108:17, 109:19, 110:5, 112:1, 112:17, 112:19, 112:21, 112:25, 113:22, 113:23, 113:25, 114:3, 119:20, 157:19, 157:21, 157:23, 170:16, 179:22, 182:10, 182:24, 184:10
**e-mails** [25] - 43:14, 95:10, 100:5, 102:5, 102:7, 102:17, 108:13, 109:16, 109:17, 109:21, 109:25, 110:5, 111:22, 111:24, 111:25, 112:3, 112:7, 162:5, 162:6, 162:8, 162:14, 162:16, 162:18, 164:19, 165:1
**early** [6] - 30:15, 79:6, 80:12, 121:4, 150:7, 171:1
**earn** [1] - 85:16
**easier** [3] - 74:10, 74:23, 116:8
**east** [1] - 103:22

**eat** [1] - 141:2
**editor** [1] - 82:8
**editor-in-chief** [1] - 82:8
**educated** [1] - 95:23
**educational** [1] - 115:11
**effect** [1] - 144:7
**effective** [2] - 25:20, 144:6
**effort** [1] - 154:10
**efforts** [1] - 140:13
**eight** [3] - 59:11, 118:25, 151:25
**either** [9] - 41:13, 55:12, 58:16, 74:22, 84:2, 106:1, 106:2, 120:17, 173:23
**elaborate** [1] - 25:5
**elderly** [1] - 53:1
**elected** [1] - 66:9
**element** [2] - 169:23, 170:4
**elementary** [1] - 109:4
**elicit** [2] - 6:9, 14:2
**eliciting** [1] - 166:17
**embed** [1] - 87:16
**embrace** [1] - 66:9
**employed** [4] - 69:9, 77:16, 85:12, 92:19
**employee** [5] - 64:2, 64:5, 65:6, 69:24, 89:11
**employees** [2] - 32:25, 131:4
**employer** [1] - 68:19
**employment** [2] - 64:2, 65:5
**encompass** [1] - 4:11
**end** [4] - 110:14, 110:23, 122:23, 136:11
**endeavor** [1] - 85:14
**endeavored** [2] - 81:15, 84:14
**ended** [6] - 100:5, 100:6, 109:16, 110:3, 117:12, 180:25
**endorsement** [2] - 71:16, 82:10
**endorsements** [1] - 84:2
**engage** [1] - 128:15
**engaged** [5] - 73:14, 89:9, 128:17, 129:1, 137:22
**engagement** [2] - 64:7, 65:5

**engine** [1] - 86:25
**English** [1] - 147:17
**enlarged** [1] - 83:8
**enter** [8] - 13:23, 34:13, 34:17, 34:25, 121:16, 129:10, 138:4, 144:21
**entered** [6] - 15:1, 62:20, 74:5, 92:11, 141:15, 175:20
**entering** [2] - 121:13, 128:14
**enterprise** [1] - 115:19
**entirety** [1] - 7:1
**entities** [2] - 72:4, 148:22
**entitled** [14] - 20:16, 36:5, 82:11, 123:7, 137:14, 138:11, 139:2, 143:9, 146:24, 152:8, 158:15, 173:9, 173:11, 188:5
**entity** [6] - 66:1, 66:4, 69:6, 69:9, 71:6, 150:12
**entries** [1] - 5:20
**Entry** [6] - 3:22, 3:23, 4:3, 5:4, 7:14, 178:18
**entry** [2] - 55:14, 61:13
**equal** [1] - 94:18
**equals** [1] - 119:11
**equipment** [2] - 27:22, 115:17
**equity** [1] - 26:25
**especially** [1] - 4:10
**ESQ** [5] - 1:13, 1:14, 1:14, 1:17, 1:18
**essence** [1] - 149:5
**establish** [4] - 41:2, 53:25, 159:25, 177:18
**establishing** [1] - 53:22
**ESTEVEZ** [3] - 74:13, 90:4, 184:14
**Estevez** [2] - 60:3, 60:10
**estimate** [2] - 164:21, 164:23
**estimation** [1] - 137:1
**estoppel** [1] - 159:5
**et** [2] - 1:4, 1:7
**etcetera** [1] - 187:8
**evening** [1] - 183:17
**event** [26] - 11:6, 11:11, 73:15, 73:17, 73:24, 74:2, 77:6, 79:9, 79:11, 79:23,

80:18, 80:23, 80:24, 81:1, 81:6, 81:20, 82:4, 84:24, 126:22, 154:4, 154:15, 155:15, 155:19, 157:13, 157:14, 157:17
**events** [17] - 4:21, 72:1, 72:2, 80:7, 82:2, 84:8, 120:17, 137:9, 153:25, 154:1, 155:6, 155:8, 155:10, 155:11, 155:23, 160:9
**eventually** [1] - 121:16
**Evidence** [1] - 53:23
**evidence** [38] - 8:17, 13:15, 15:19, 18:15, 24:4, 29:7, 29:19, 32:9, 32:10, 32:12, 33:23, 37:17, 37:23, 45:15, 53:16, 55:15, 55:22, 57:10, 61:12, 63:5, 88:3, 112:10, 113:8, 113:13, 118:12, 121:21, 137:14, 139:7, 163:22, 168:4, 177:8, 177:12, 177:17, 178:5, 178:7, 179:25, 180:6, 181:17
**evident** [1] - 25:6
**exact** [2] - 54:24, 159:5
**exactly** [10] - 3:23, 6:11, 44:24, 78:13, 86:20, 86:21, 120:13, 132:15, 143:15, 145:18
**examination** [3] - 11:13, 15:9, 90:16
**EXAMINATION** [6] - 15:22, 42:1, 63:16, 92:14, 98:16, 114:25
**example** [6] - 6:14, 80:3, 97:7, 97:13, 109:17, 180:14
**except** [1] - 28:24
**exception** [1] - 55:23
**exceptions** [1] - 5:14
**exchange** [2] - 54:15, 57:20
**exchanged** [4] - 20:15, 54:11, 54:14, 55:4
**exchanging** [1] - 55:7
**exciting** [2] - 135:15, 136:12
**exclude** [1] - 9:10

**excluded** [1] - 111:24
**excluding** [1] - 5:4
**exclusion** [1] - 4:11
**exclusive** [1] - 128:21
**exclusively** [4] - 4:5, 5:4, 82:12, 126:3
**excuse** [1] - 148:1
**execute** [1] - 172:15
**executed** [4] - 138:22, 139:15, 142:18, 176:9
**executive** [2] - 76:12, 129:6
**exercise** [2] - 55:11, 57:9
**exhibit** [34] - 5:22, 7:3, 15:12, 17:12, 29:2, 34:1, 35:5, 55:18, 56:1, 56:13, 56:16, 56:23, 56:25, 58:15, 60:7, 60:9, 60:13, 60:18, 61:21, 63:1, 77:23, 91:1, 91:2, 102:20, 163:14, 169:6, 174:13, 177:5, 177:10, 185:11, 185:17, 185:19, 186:22, 187:2
**Exhibit** [89] - 2:14, 2:14, 2:15, 2:15, 2:16, 2:16, 2:17, 2:17, 2:22, 2:22, 2:23, 7:13, 7:14, 15:16, 15:18, 15:19, 16:1, 17:10, 17:11, 24:3, 29:3, 29:8, 29:19, 30:11, 33:22, 34:5, 35:3, 35:6, 37:23, 60:5, 60:23, 63:2, 63:5, 74:5, 74:14, 74:16, 87:3, 87:5, 87:23, 88:2, 88:3, 88:12, 88:16, 88:18, 88:19, 88:21, 90:5, 90:9, 90:11, 91:1, 112:6, 112:8, 112:10, 113:8, 113:12, 113:13, 116:5, 116:9, 118:8, 118:9, 118:12, 118:16, 121:22, 124:17, 137:13, 139:4, 139:8, 163:9, 163:11, 163:17, 163:22, 167:17, 167:21, 167:24, 168:16, 169:13, 174:25, 175:24, 176:2, 177:6, 181:12,

181:13, 181:14, 181:16, 181:17, 181:22, 183:1
**EXHIBIT** [1] - 2:21
**exhibits** [10] - 54:23, 55:12, 56:15, 58:13, 61:10, 61:23, 102:6, 167:10, 168:8, 186:18
**EXHIBITS** [1] - 2:13
**Exhibits** [5] - 54:23, 167:9, 167:11, 168:3, 168:4
**exist** [6] - 30:21, 30:23, 30:25, 31:2, 128:3, 144:13
**existed** [3] - 96:11, 110:22, 165:18
**existence** [3] - 39:4, 39:7, 111:16
**existing** [2] - 99:24, 109:9
**exists** [1] - 42:12
**exited** [5] - 52:20, 91:6, 141:6, 175:4, 183:22
**expand** [7] - 43:11, 117:20, 118:20, 119:2, 152:18, 152:19, 153:15
**expanded** [2] - 115:19, 117:18
**expansion** [1] - 121:3
**expect** [3] - 58:8, 90:12, 187:6
**expectation** [1] - 59:14
**expected** [1] - 57:7
**expecting** [5] - 55:18, 55:25, 56:11, 58:3, 61:11
**expenditures** [1] - 156:11
**expenses** [2] - 156:13, 156:15
**experience** [2] - 107:10, 154:7
**expert** [1] - 59:20
**expertise** [1] - 27:23
**explain** [13] - 8:17, 20:8, 42:22, 83:7, 100:15, 104:2, 106:19, 128:9, 145:18, 149:18, 160:1, 164:13
**explained** [1] - 186:2
**explaining** [1] - 70:6
**exploring** [1] - 119:7
**exponentially** [1] - 117:19

**Express** [2] - 182:7, 182:8
**expressed** [1] - 174:3
**extent** [4] - 5:12, 13:2, 161:13, 180:4
**extremely** [1] - 159:1

### F

**facial** [1] - 72:10
**facilitate** [1] - 26:18
**facilities** [1] - 163:5
**facility** [1] - 26:19
**fact** [10] - 9:22, 20:11, 41:2, 50:5, 54:23, 58:23, 60:11, 104:23, 150:19, 165:2
**facts** [1] - 57:3
**failed** [1] - 4:18
**fair** [9] - 70:24, 82:1, 89:15, 119:7, 136:4, 141:24, 152:2, 155:4
**fall** [2] - 122:25, 129:20
**fallout** [2] - 164:2, 164:3
**false** [3] - 60:1, 172:3, 172:5
**Famers** [1] - 154:12
**familiar** [10] - 65:24, 66:1, 72:17, 74:25, 81:2, 93:2, 124:23, 163:25, 164:1, 169:14
**fan** [1] - 73:8
**far** [4] - 37:4, 46:12, 57:12, 184:7
**fast** [2] - 53:4, 75:1
**FCRR** [2] - 1:22, 188:9
**feature** [1] - 67:13
**featured** [3] - 70:4, 79:5, 81:11
**features** [1] - 146:7
**February** [5] - 114:8, 158:16, 158:24, 159:16, 160:9
**Federal** [1] - 53:23
**federal** [4] - 108:10, 169:4, 173:16, 181:2
**fee** [1] - 145:20
**fees** [1] - 145:22
**felt** [2] - 121:9, 152:2
**few** [8] - 3:14, 3:17, 54:21, 60:3, 62:12, 92:18, 140:25, 167:16
**fictitious** [2] - 36:7, 143:11
**fiduciary** [1] - 130:18
**field** [1] - 26:19

**fifth** [1] - 131:9
**figure** [1] - 187:7
**file** [4] - 38:21, 131:20, 134:15, 172:18
**filed** [19] - 4:15, 20:12, 39:11, 40:2, 40:8, 57:3, 130:7, 132:9, 134:24, 142:7, 152:25, 156:25, 165:18, 165:19, 169:4, 170:4, 171:22, 173:4, 187:3
**filer** [1] - 133:12
**filing** [2] - 132:5, 132:11
**filings** [2] - 153:3, 153:7
**fill** [1] - 187:15
**filling** [1] - 30:6
**filter** [1] - 55:20
**final** [5] - 60:7, 113:6, 158:13, 159:3, 160:15
**finally** [1] - 37:22
**findings** [1] - 41:14
**fine** [13] - 5:11, 12:23, 13:10, 32:16, 46:17, 112:16, 123:6, 136:25, 139:5, 166:17, 167:25, 172:4, 187:16
**finish** [6] - 11:3, 53:4, 115:13, 134:8, 134:13, 179:1
**fire** [1] - 85:17
**firm** [3] - 38:8, 97:8, 132:10
**firms** [3] - 38:7, 117:16, 121:7
**First** [1] - 152:9
**first** [43] - 3:8, 15:12, 25:15, 29:1, 30:12, 30:15, 30:18, 35:24, 46:20, 47:14, 49:8, 49:22, 51:24, 72:6, 75:5, 80:14, 99:17, 100:14, 102:21, 105:14, 111:16, 118:16, 119:17, 120:10, 122:1, 125:5, 125:9, 131:23, 132:1, 133:13, 133:15, 134:9, 143:2, 144:16, 147:8, 153:4, 162:10, 171:1, 171:4, 171:11, 174:16
**fish** [2] - 67:19, 67:20
**fit** [2] - 112:17,

146:15
**five** [12] - 23:22, 23:24, 49:10, 52:1, 52:16, 52:22, 58:1, 62:9, 117:18, 140:3, 140:4, 175:16
**fix** [1] - 164:14
**fixed** [2] - 162:20, 164:15
**flag** [1] - 154:6
**Floor** [2] - 1:24, 188:11
**FLORIDA** [1] - 1:1
**Florida** [149] - 1:4, 1:16, 1:19, 1:24, 9:21, 9:23, 17:23, 23:18, 24:1, 24:8, 24:14, 26:8, 26:18, 26:24, 27:6, 27:16, 27:17, 27:21, 28:8, 28:11, 28:13, 28:15, 28:18, 30:18, 32:3, 32:20, 32:23, 33:1, 33:6, 33:14, 33:16, 33:18, 33:19, 34:12, 34:13, 34:18, 34:25, 35:1, 36:1, 36:9, 36:11, 36:20, 39:8, 39:10, 41:20, 42:5, 42:6, 42:10, 43:1, 43:6, 43:15, 45:3, 47:3, 47:22, 48:20, 64:21, 65:3, 65:6, 65:12, 66:12, 67:3, 67:17, 67:22, 68:4, 68:6, 68:19, 68:21, 69:9, 71:4, 71:6, 71:9, 71:18, 72:5, 73:10, 77:8, 77:15, 77:19, 79:17, 79:20, 80:9, 82:3, 82:13, 82:23, 84:3, 85:13, 85:19, 89:10, 89:25, 92:19, 93:1, 93:16, 95:19, 96:9, 96:16, 96:22, 97:7, 97:14, 97:17, 97:21, 97:25, 98:8, 98:9, 100:6, 100:23, 103:14, 105:18, 105:24, 106:1, 106:2, 107:5, 107:11, 107:13, 107:20, 116:20, 117:18, 121:4, 121:5, 121:7, 123:16, 124:15, 140:3, 143:3, 144:17, 145:13, 146:2, 146:21, 147:20, 150:15, 151:2, 155:7, 156:6, 157:15,

160:21, 160:24, 160:25, 161:6, 161:11, 164:4, 164:8, 165:1, 165:4, 172:14, 174:4, 179:13, 180:12, 188:11
**Florida's** [3] - 79:2, 109:17, 146:5
**focus** [5] - 14:13, 14:16, 50:10, 108:5, 126:4
**follow** [14] - 45:18, 46:23, 47:7, 48:3, 72:22, 97:12, 102:16, 104:15, 110:7, 113:6, 113:19, 113:21, 114:13, 116:8
**follow-up** [11] - 45:18, 46:23, 47:7, 48:3, 72:22, 97:12, 102:16, 104:15, 113:6, 113:19, 114:13
**followed** [3] - 72:23, 72:24, 153:1
**following** [4] - 75:10, 90:22, 115:24, 144:7
**follows** [1] - 47:15
**followup** [1] - 69:3
**football** [1] - 73:8
**footprint** [2] - 119:2, 121:11
**FOR** [4] - 1:13, 1:17, 2:13, 2:21
**force** [1] - 144:7
**forces** [2] - 119:8, 120:22
**foregoing** [3] - 36:5, 143:8, 188:3
**forgot** [1] - 44:7
**form** [7] - 136:14, 147:21, 148:5, 150:23, 159:12, 159:19, 173:23
**format** [1] - 147:17
**formed** [5] - 43:15, 124:9, 126:13, 127:8, 132:8
**former** [2] - 73:24, 89:7
**forms** [1] - 144:16
**formulated** [1] - 9:12
**forth** [12] - 6:1, 41:11, 55:9, 55:13, 56:8, 58:22, 59:1, 111:4, 114:6, 147:8, 164:9, 181:5
**forward** [9] - 95:11, 117:25, 131:5, 148:20, 149:16, 150:2, 153:11, 165:6,

166:2
  **fought** [1] - 70:2
  **Foundation** [1] - 72:16
  **foundation** [5] - 17:13, 17:15, 53:17, 55:19, 177:19
  **foundations** [1] - 118:18
  **founders** [1] - 118:4
  **four** [9] - 60:5, 67:8, 67:9, 70:6, 95:23, 145:9, 171:24, 176:8, 180:25
  **fourth** [2] - 170:1, 170:25
  **FOWLER** [1] - 1:18
  **FPR** [2] - 1:22, 188:9
  **frame** [2] - 114:8, 160:16
  **Francisco** [1] - 97:24
  **free** [3] - 147:25, 148:2, 148:10
  **frequent** [1] - 77:22
  **frequently** [1] - 161:22
  **friction** [1] - 137:12
  **Friday** [2] - 57:6
  **friend** [1] - 93:9
  **friendly** [1] - 28:3
  **friends** [1] - 131:4
  **front** [1] - 73:15
  **full** [11] - 26:17, 40:23, 80:11, 81:11, 128:20, 129:13, 130:3, 131:23, 144:21, 155:20, 175:13
  **full-page** [2] - 80:11, 81:11
  **fully** [3] - 83:12, 159:2, 159:4
  **fun** [3] - 154:3, 154:15
  **functions** [1] - 92:22
  **furtherance** [1] - 138:8

**G**

  **gag** [2] - 5:6, 5:24
  **gala** [1] - 72:1
  **Gallagher** [2] - 68:5, 71:12
  **game** [1] - 73:25
  **gather** [1] - 66:17
  **Gayles** [1] - 3:7
  **GAYLES** [1] - 1:10
  **Geico** [4] - 97:13, 97:14, 97:15

  **general** [2] - 34:22, 43:3
  **generally** [6] - 12:21, 13:10, 14:5, 14:12, 45:21, 92:25
  **generate** [1] - 70:19
  **generated** [1] - 70:11
  **generous** [1] - 52:5
  **gentlemen** [6] - 15:11, 45:9, 49:2, 62:22, 99:8, 114:12
  **geographically** [1] - 96:24
  **Georgia** [2] - 146:3, 155:9
  **gigantic** [1] - 155:19
  **given** [11] - 14:11, 21:16, 22:8, 59:17, 80:11, 82:24, 82:25, 84:9, 108:10, 109:24, 185:21
  **glad** [1] - 7:15
  **Global** [1] - 115:15
  **goal** [2] - 69:24, 118:17
  **goals** [1] - 118:22
  **Golf** [2] - 81:19, 81:22
  **golf** [8] - 71:25, 79:11, 81:6, 81:7, 84:25, 154:2, 154:5
  **golfer** [2] - 84:23, 85:1
  **golfers** [2] - 79:12, 81:8
  **goods** [1] - 173:25
  **goodwill** [3] - 85:15, 150:6, 165:11
  **govern** [1] - 148:24
  **governance** [1] - 14:13
  **government** [2] - 108:10, 173:16
  **grade** [2] - 89:17, 94:10
  **graduated** [1] - 115:12
  **grant** [3] - 12:14, 12:15, 12:17
  **granted** [5] - 4:2, 4:3, 9:5, 12:13, 12:16
  **graphics** [2] - 86:8, 111:10
  **gray** [1] - 86:4
  **great** [1] - 137:5
  **group** [1] - 89:6
  **grow** [5] - 65:17, 68:5, 144:23, 153:14, 153:15
  **growing** [2] - 144:25,

149:25
  **grown** [1] - 117:19
  **guess** [15] - 26:25, 42:22, 43:10, 51:7, 71:21, 82:9, 95:6, 95:23, 98:2, 98:3, 98:4, 101:9, 103:18, 135:12, 155:21
  **guys** [2] - 38:17, 154:12

**H**

  **half** [1] - 175:12
  **Hall** [1] - 154:12
  **hall** [1] - 154:21
  **hallway** [1] - 154:19
  **hand** [6] - 63:14, 116:7, 134:4, 139:7, 169:12, 176:1
  **Handbook** [1] - 53:23
  **handed** [1] - 181:21
  **handle** [3] - 117:24, 164:2, 165:4
  **handling** [1] - 117:14
  **happy** [1] - 137:3
  **hard** [4] - 44:2, 70:2, 79:13, 116:7
  **harmed** [1] - 160:1
  **hate** [1] - 39:2
  **he/she** [2] - 172:14, 172:21
  **head** [1] - 109:18
  **headquarters** [1] - 77:8
  **hear** [9] - 14:6, 31:21, 34:4, 47:25, 54:21, 79:18, 110:18, 160:14, 185:2
  **heard** [4] - 115:8, 116:25, 130:20, 135:16
  **hearings** [1] - 175:10
  **hears** [1] - 9:18
  **hearsay** [5] - 55:23, 165:23, 166:5, 166:13, 167:3
  **heart** [2] - 61:18, 72:9
  **heavy** [1] - 115:16
  **held** [2] - 73:18, 187:9
  **helmet** [10] - 77:2, 77:5, 77:7, 77:13, 77:23, 78:2, 141:9, 154:11, 154:16, 155:4
  **help** [12] - 30:6, 86:24, 93:3, 98:4, 101:25, 102:25,

108:1, 108:7, 109:22, 110:4, 132:8, 132:11
  **helpful** [2] - 67:13, 97:5
  **hereby** [2] - 172:2, 188:3
  **hesitated** [1] - 112:12
  **hide** [1] - 140:13
  **highlighted** [1] - 29:16
  **highlighting** [2] - 29:11, 29:13
  **highly** [2] - 4:22, 10:3
  **hired** [6] - 110:22, 110:25, 111:16, 131:23, 132:2, 132:14
  **hiring** [1] - 38:16
  **his/her** [1] - 174:2
  **Hispanic** [1] - 63:24
  **historical** [2] - 176:20, 176:21
  **history** [2] - 116:3, 119:4
  **hold** [7] - 49:17, 158:17, 160:24, 178:13, 178:21
  **hole** [1] - 154:5
  **home** [3] - 86:6, 119:21, 170:13
  **honest** [6] - 130:8, 172:17, 172:25, 173:10, 174:10, 174:14
  **Honor** [106] - 3:3, 3:10, 3:12, 3:18, 3:19, 5:2, 5:11, 6:21, 7:5, 7:7, 7:18, 7:21, 9:2, 9:11, 9:16, 9:18, 10:8, 11:15, 12:3, 12:7, 13:25, 15:10, 15:15, 15:21, 16:15, 17:13, 18:14, 18:18, 19:15, 19:20, 20:21, 22:12, 22:13, 28:25, 29:11, 32:13, 33:9, 36:12, 37:16, 37:20, 39:14, 39:16, 41:16, 41:22, 41:24, 45:8, 48:5, 49:15, 50:18, 52:24, 53:11, 54:13, 55:19, 57:2, 57:5, 58:10, 59:8, 59:10, 59:22, 60:3, 60:20, 60:25, 62:11, 63:6, 78:3, 87:22, 88:5, 88:13, 88:15, 90:2, 90:4, 96:17, 98:18, 99:11, 110:10, 110:17,

113:7, 113:10, 113:14, 114:18, 118:13, 131:8, 158:6, 159:9, 160:11, 160:13, 160:17, 163:18, 163:20, 165:25, 167:20, 168:1, 168:5, 175:23, 177:6, 178:5, 178:7, 181:18, 184:6, 184:18, 185:8, 185:14, 186:10, 186:22, 187:11
  **Honor's** [1] - 12:10
  **HONORABLE** [1] - 1:10
  **honorary** [1] - 61:5
  **hopefully** [1] - 5:14
  **horse** [1] - 145:13
  **hospitals** [1] - 163:5
  **hosted** [1] - 69:15
  **hotel** [2] - 119:25, 120:15
  **hour** [2] - 175:12, 186:18
  **house** [1] - 155:3
  **household** [1] - 65:18
  **humbling** [1] - 154:7
  **hundred** [8] - 4:17, 58:1, 73:23, 162:7, 162:20, 173:3, 173:13, 174:12
  **hundreds** [1] - 21:13

**I**

  **ID** [2] - 2:13, 2:21
  **idea** [11] - 20:17, 21:16, 54:14, 54:15, 56:9, 58:7, 72:21, 72:22, 130:23, 130:25, 154:8
  **ideas** [4] - 58:25, 85:12, 131:3, 131:5
  **identical** [1] - 173:23
  **identification** [9] - 17:11, 87:5, 88:19, 90:11, 112:8, 116:9, 163:11, 167:12, 175:24
  **identified** [15] - 7:2, 11:16, 54:23, 66:5, 74:5, 74:7, 87:2, 112:6, 112:21, 137:13, 163:8, 169:12, 176:1, 178:2, 181:21
  **identifier** [1] - 106:16
  **identify** [6] - 7:17,

11:22, 66:11, 93:12, 147:16, 176:19

**identifying** [1] - 55:12

**idle** [1] - 40:22

**illegal** [1] - 10:1

**Illinois** [3] - 149:10, 152:13, 153:2

**image** [10] - 75:12, 75:13, 76:8, 77:1, 81:3, 81:9, 81:10, 81:12, 82:18, 109:7

**images** [2] - 87:16, 89:13

**imagine** [2] - 129:11, 177:12

**immediate** [2] - 64:23, 159:16

**immediately** [4] - 123:15, 152:24, 162:12, 168:12

**impair** [2] - 50:23, 51:6

**impairs** [1] - 51:9

**impeachment** [1] - 32:12

**impinge** [1] - 41:3

**implied** [4] - 148:10, 151:4, 151:5

**importance** [2] - 3:21, 67:10

**important** [13] - 5:7, 43:18, 43:19, 44:1, 83:14, 116:3, 120:17, 123:21, 135:20, 148:16, 154:14, 159:15, 176:19

**impossible** [2] - 57:22, 59:13

**impoverished** [1] - 80:23

**imprisonment** [1] - 172:4

**improper** [1] - 102:20

**inadmissible** [1] - 180:6

**INC** [1] - 1:4

**Inc** [13] - 3:5, 36:7, 115:6, 116:1, 123:19, 123:24, 134:19, 143:1, 143:11, 147:20, 169:22, 174:23, 180:21

**incident** [1] - 129:25

**incline** [1] - 63:10

**include** [7] - 5:21, 28:11, 28:13, 117:21, 126:19, 170:8, 182:18

**included** [12] - 79:2,

102:5, 102:17, 108:12, 142:21, 145:22, 151:1, 153:7, 170:7, 174:14, 178:2, 178:3

**includes** [3] - 41:8, 126:15, 179:22

**including** [3] - 53:17, 176:17, 182:24

**incorporate** [1] - 185:6

**incorporated** [2] - 123:16, 176:22

**incorporation** [1] - 42:9

**incorporators** [1] - 127:11

**indicated** [1] - 60:19

**indicator** [1] - 5:17

**indirectly** [1] - 98:25

**individuals** [2] - 66:21, 86:18

**industry** [4] - 69:1, 118:23, 119:1, 153:25

**influenced** [1] - 13:3

**inform** [2] - 10:14, 180:5

**information** [25] - 11:6, 18:3, 18:7, 20:23, 43:18, 59:7, 98:19, 116:23, 133:4, 133:10, 133:11, 133:12, 133:18, 133:21, 134:12, 145:23, 157:9, 159:10, 159:11, 163:3, 164:5, 171:7, 171:9, 174:7

**informed** [7] - 102:23, 103:1, 108:19, 168:12, 168:13, 168:14, 182:6

**infringement** [2] - 9:5

**initial** [3] - 26:16, 70:9, 125:24

**initiative** [1] - 68:17

**injunction** [1] - 178:25

**injured** [1] - 161:11

**injuries** [1] - 161:6

**injury** [2] - 161:14, 162:20

**inner** [1] - 145:12

**inside** [1] - 99:12

**instance** [2] - 146:4, 154:13

**instances** [1] - 165:10

**instead** [2] - 123:17,

185:10

**instruction** [3] - 50:7, 160:15

**instructions** [9] - 19:8, 19:12, 21:16, 22:8, 58:5, 59:17, 90:22, 160:8, 160:12

**instrumental** [1] - 85:18

**insurance** [6] - 42:15, 68:7, 97:10, 117:15, 145:20

**integral** [1] - 4:12

**intellectual** [3] - 102:24, 103:1, 108:19

**intend** [1] - 4:16

**intended** [3] - 7:4, 152:15, 165:2

**intent** [12] - 119:10, 128:14, 136:2, 147:15, 147:16, 147:18, 147:23, 148:12, 150:10, 152:16, 152:21, 173:7

**interaction** [1] - 123:15

**interest** [4] - 6:15, 99:2, 99:4, 174:20

**interfere** [1] - 41:19

**interference** [5] - 38:19, 38:22, 40:13, 40:25, 41:7

**Interference/Cease** [1] - 38:3

**interfering** [4] - 38:6, 38:10, 40:21, 41:10

**international** [1] - 82:15

**Internet** [1] - 86:20

**interpretation** [2] - 6:4, 12:10

**interpreted** [1] - 9:10

**interrupt** [1] - 53:10

**interrupted** [1] - 3:20

**interstate** [1] - 173:19

**introduce** [17] - 4:16, 5:9, 6:12, 15:12, 15:15, 20:6, 20:10, 29:6, 61:12, 87:22, 102:19, 115:2, 179:10, 179:14, 185:17, 186:20, 186:21

**introduced** [10] - 6:5, 7:4, 15:13, 20:18, 20:19, 24:4, 72:22, 115:25, 118:6, 179:8

**introducing** [2] - 5:12, 20:6

**introduction** [1] - 184:8

**investment** [3] - 26:17, 144:25, 149:25

**invitation** [2] - 68:16, 71:10

**involved** [15] - 46:9, 46:12, 46:22, 47:16, 62:2, 65:11, 86:8, 95:25, 98:10, 113:2, 113:3, 164:10, 164:11, 164:13

**involvement** [6] - 46:12, 71:5, 71:18, 73:10, 73:13, 86:13

**involving** [1] - 111:23

**irons** [1] - 85:17

**irrelevance** [1] - 158:6

**irrelevant** [2] - 8:10, 10:19

**IRS** [1] - 122:24

**isolated** [1] - 164:17

**issuance** [1] - 127:12

**issue** [32] - 6:14, 8:7, 8:12, 8:19, 8:21, 8:22, 9:14, 10:23, 11:12, 11:22, 12:14, 12:18, 13:7, 14:3, 14:14, 50:7, 50:8, 53:6, 53:15, 53:21, 53:24, 83:8, 91:11, 102:22, 117:16, 148:16, 156:10, 178:24, 180:7, 184:21

**issues** [15] - 5:16, 8:14, 8:15, 10:19, 22:3, 22:4, 41:10, 51:11, 54:22, 94:8, 110:8, 156:7, 156:11, 156:12

**item** [1] - 4:4

**items** [2] - 4:2, 72:2

**itself** [3] - 36:14, 54:8, 79:11

**J**

**James** [2] - 68:4, 71:12

**January** [2] - 5:4, 10:23

**jeopardize** [1] - 172:6

**Jesus** [1] - 3:10

**JESUS** [1] - 1:13

**JILL** [2] - 2:6, 2:11

**Jill** [8] - 53:9, 63:7,

63:15, 63:21, 89:1, 100:14, 105:9, 154:9

**job** [3] - 63:22, 107:24, 130:19

**join** [2] - 71:23, 89:22

**joined** [2] - 5:18, 71:23

**joining** [2] - 119:8, 120:22

**joint** [1] - 9:4

**joke** [1] - 84:15

**JUAN** [1] - 1:18

**Judge** [4] - 8:20, 10:22, 14:19, 20:14

**JUDGE** [1] - 1:11

**judge's** [1] - 14:15

**judgment** [2] - 158:13, 159:3

**July** [2] - 121:15, 167:7

**June** [18] - 4:6, 5:5, 25:14, 25:18, 31:12, 34:8, 34:16, 57:17, 57:18, 122:7, 125:13, 139:1, 139:12, 144:12, 176:8, 176:23, 180:25, 188:9

**juror** [5] - 46:6, 51:2, 99:17, 100:13, 102:4

**JUROR** [4] - 2:10, 2:11, 15:3, 90:14

**Juror** [2] - 47:11, 105:9

**jurors** [5] - 3:15, 14:18, 45:10, 175:6, 187:18

**jury** [52] - 8:14, 8:15, 10:20, 14:22, 14:24, 15:1, 15:11, 24:10, 32:8, 32:14, 33:23, 40:22, 41:12, 47:13, 50:4, 50:6, 50:20, 52:13, 52:20, 59:2, 62:18, 62:19, 62:20, 63:19, 83:25, 90:10, 90:24, 91:3, 91:6, 91:15, 91:16, 91:23, 91:24, 92:9, 92:11, 105:11, 106:4, 109:22, 115:3, 115:10, 132:7, 133:20, 141:4, 141:6, 141:15, 160:9, 175:3, 175:4, 175:20, 183:21, 183:22, 186:8

**JURY** [1] - 1:10

**jury's** [1] - 105:12

## K

**K-1** [1] - 136:14
**keep** [6] - 39:2, 43:14, 140:13, 154:16, 187:17, 187:19
**keeping** [2] - 118:17, 161:16
**Kentucky** [3] - 22:25, 23:2
**kept** [4] - 135:9, 152:5, 162:2, 165:21
**kind** [21] - 20:24, 30:9, 58:2, 58:11, 59:13, 64:17, 66:18, 70:8, 70:17, 79:10, 81:8, 81:15, 86:13, 106:21, 110:22, 120:17, 120:18, 121:6, 133:10, 161:23
**Kissane** [1] - 38:8
**knowledge** [5] - 27:22, 108:22, 109:15, 174:2, 174:3
**known** [9] - 30:9, 95:20, 95:21, 104:19, 106:9, 106:11, 106:12, 121:5
**knows** [1] - 132:6
**Komen** [4] - 72:15, 82:20, 83:1, 84:5

## L

**LA** [1] - 97:24
**lack** [2] - 62:7, 82:9
**ladies** [6] - 15:11, 45:9, 49:2, 62:22, 99:8, 114:12
**laid** [1] - 17:13
**language** [2] - 4:10, 36:13
**large** [2] - 66:5, 72:13
**larger** [2] - 120:4, 162:14
**last** [25] - 3:23, 21:24, 23:1, 24:21, 27:19, 46:21, 48:10, 49:17, 55:1, 57:5, 57:6, 63:22, 102:4, 108:5, 120:16, 141:20, 156:1, 156:3, 167:13, 167:14, 167:16, 176:25
**lasted** [1] - 67:7
**late** [2] - 184:19, 186:6
**launch** [1] - 121:10

**Law** [1] - 164:4
**law** [12] - 5:13, 5:22, 12:9, 21:20, 38:7, 97:8, 104:22, 105:1, 117:16, 121:7, 132:10
**lawsuit** [8] - 4:7, 29:22, 29:25, 36:19, 38:25, 39:4, 39:7, 39:11
**lawyer** [1] - 136:14
**Lawyer's** [1] - 71:4
**lawyers** [3] - 45:13, 45:17, 145:20
**Lawyers'** [1] - 71:8
**lay** [1] - 17:15
**lead** [1] - 145:13
**leading** [5] - 16:15, 28:3, 80:21, 131:10, 131:16
**leaning** [1] - 134:4
**learned** [3] - 137:9, 137:10, 156:18
**learning** [2] - 66:19, 80:19
**lease** [1] - 129:10
**least** [10] - 10:4, 21:15, 30:15, 54:4, 58:4, 128:3, 150:12, 171:1, 185:4, 186:5
**leave** [8] - 11:14, 25:6, 25:8, 25:11, 113:20, 150:19, 183:24, 183:25
**leaves** [1] - 91:4
**led** [1] - 13:23
**left** [5] - 65:4, 81:9, 103:17, 157:17, 162:9
**legal** [7] - 62:24, 66:7, 67:14, 69:10, 69:11, 70:14, 178:6
**Legal** [9] - 69:6, 70:13, 75:6, 76:1, 76:2, 76:4, 82:8, 82:11, 82:22
**legally** [1] - 132:9
**LegalZoom** [14] - 131:24, 132:2, 132:6, 132:7, 132:21, 132:24, 133:6, 133:10, 133:22, 134:13, 134:24, 135:12, 144:17, 169:3
**legend** [2] - 61:4, 61:7
**legitimate** [1] - 61:8
**LeJeune** [1] - 1:15
**lengthy** [1] - 57:2
**less** [1] - 140:4
**letter** [29] - 4:6, 5:5, 5:9, 5:12, 5:21, 6:5,

10:22, 12:18, 13:6, 13:8, 13:25, 14:15, 14:16, 38:15, 38:16, 38:24, 83:19, 84:4, 119:3, 121:15, 122:5, 122:16, 122:21, 161:1, 161:7, 184:8, 184:9, 185:11, 185:14
**letters** [1] - 78:22
**letting** [2] - 116:20, 134:7
**levity** [1] - 84:14
**liability** [1] - 122:3
**Liany** [1] - 60:3
**LIANY** [1] - 1:14
**Liberty** [3] - 68:11, 68:13
**License** [4] - 24:20, 137:15, 138:11, 146:24
**license** [22] - 8:8, 8:9, 8:13, 8:18, 28:17, 138:1, 138:5, 138:12, 138:16, 138:23, 147:16, 148:8, 148:9, 148:10, 150:16, 150:21, 151:4, 151:5, 161:1, 161:8
**licensed** [1] - 150:20
**licensing** [6] - 5:25, 8:12, 10:1, 147:22, 148:5, 150:23
**lie** [1] - 13:14
**life** [1] - 120:6
**likely** [1] - 173:24
**limine** [9] - 3:22, 12:12, 14:14, 50:4, 50:10, 156:21, 178:16, 183:15, 184:6
**limitations** [3] - 79:25, 80:2, 143:22
**limited** [9] - 7:8, 7:16, 11:1, 12:24, 13:5, 33:21, 86:20, 122:3, 128:19
**limiting** [2] - 36:4, 143:8
**line** [8] - 7:19, 25:15, 30:14, 32:7, 113:24, 170:1, 170:15, 170:25
**lines** [2] - 51:7, 173:18
**Lisa** [10] - 26:15, 26:23, 117:2, 125:2, 125:3, 125:18, 127:10, 132:19, 139:18, 156:9
**list** [29] - 5:22, 14:10, 17:22, 17:25, 19:10, 22:5, 23:7, 23:8,

26:11, 26:13, 27:5, 27:9, 27:12, 55:18, 56:15, 56:16, 56:23, 56:25, 57:5, 57:12, 58:15, 60:7, 60:9, 60:13, 60:18, 61:21, 68:25, 127:4
**listed** [2] - 58:14, 152:24
**listened** [1] - 131:3
**lists** [2] - 56:14, 152:12
**literal** [2] - 169:23, 170:4
**litigate** [1] - 61:11
**litigated** [4] - 4:13, 41:4, 159:2, 159:4
**Litigation** [6] - 66:2, 66:14, 67:18, 68:14, 68:25, 80:11
**litigation** [11] - 4:13, 5:19, 40:23, 40:24, 65:19, 69:17, 70:7, 81:16, 137:23, 153:25, 154:1
**live** [4] - 5:13, 6:6, 6:8, 11:25
**lives** [2] - 4:17, 12:6
**LLC** [8] - 1:7, 3:6, 93:14, 122:22, 122:23, 123:1, 123:17
**loaded** [1] - 51:11
**lobby** [1] - 77:10
**located** [1] - 64:14
**location** [1] - 97:22
**locations** [1] - 163:4
**logo** [67] - 16:5, 17:4, 17:6, 22:16, 23:12, 23:20, 23:22, 23:24, 24:1, 24:13, 24:16, 27:13, 27:15, 27:18, 28:1, 30:19, 30:21, 31:5, 36:10, 37:5, 47:2, 47:20, 65:24, 69:21, 69:22, 77:24, 78:6, 78:9, 78:17, 78:18, 78:22, 79:3, 79:4, 81:12, 81:15, 96:3, 101:6, 101:10, 101:17, 104:18, 106:6, 106:15, 107:9, 111:5, 111:6, 111:8, 111:9, 111:10, 111:12, 111:14, 111:15, 111:17, 111:19, 134:10, 135:25, 143:19, 144:22, 146:22, 147:24, 148:1, 148:7, 149:4, 150:9, 154:6,

155:11, 170:8
**logos** [1] - 83:9
**look** [14] - 6:3, 21:20, 26:13, 32:5, 34:11, 87:17, 102:9, 102:17, 109:21, 110:11, 118:2, 118:16, 126:11, 152:20
**looking** [12] - 4:21, 14:7, 56:23, 56:25, 67:21, 75:9, 110:2, 121:14, 152:19, 167:18, 170:1, 178:15
**looks** [2] - 25:13, 186:17
**lose** [1] - 187:18
**lost** [2] - 104:21, 162:7
**loud** [1] - 147:4
**louder** [1] - 179:9
**Louisiana** [3] - 155:8, 155:19, 155:20
**low** [1] - 162:3
**lunch** [3] - 90:17, 91:8, 92:7
**Lutter** [26] - 4:16, 4:17, 6:13, 7:2, 9:19, 9:22, 9:25, 10:6, 10:15, 11:6, 11:19, 11:25, 12:21, 14:8, 14:15, 125:18, 125:19, 138:8, 138:16, 139:18, 156:25, 184:9, 185:1, 186:1, 187:13
**Lutter's** [4] - 4:6, 5:5, 10:9, 10:11

## M

**ma'am** [2] - 91:8, 92:10
**madam** [1] - 141:19
**magazine** [14] - 69:15, 70:17, 70:25, 75:6, 76:1, 76:4, 76:5, 79:8, 79:10, 79:19, 82:11, 82:12, 82:14, 82:17
**Magazine** [1] - 82:8
**magazines** [1] - 31:23
**magistrate** [5] - 4:5, 4:10, 4:20, 8:10, 12:10
**magistrate's** [3] - 3:23, 4:1, 5:3
**mail** [35] - 38:1, 38:5, 38:13, 44:7, 60:3, 60:6, 68:22, 69:3,

70:11, 70:15, 70:16, 88:25, 100:7, 108:17, 109:19, 110:5, 112:1, 112:17, 112:19, 112:21, 112:25, 113:22, 113:23, 113:25, 114:3, 119:20, 135:11, 157:19, 157:21, 157:23, 170:16, 179:22, 182:10, 182:24, 184:10

**mails** [25] - 43:14, 95:10, 100:5, 102:5, 102:7, 102:17, 108:13, 109:16, 109:17, 109:21, 109:25, 110:5, 111:22, 111:24, 111:25, 112:3, 112:7, 162:5, 162:6, 162:8, 162:14, 162:16, 162:18, 164:19, 165:1

**main** [1] - 170:15

**major** [1] - 137:8

**majority** [3] - 127:17, 128:2

**manage** [1] - 128:21

**managed** [1] - 127:21

**Management** [9] - 66:2, 66:15, 67:18, 68:15, 68:25, 76:2, 76:4, 80:11, 82:11

**management** [9] - 81:17, 94:11, 94:12, 128:10, 128:13, 128:15, 128:17, 129:25, 156:10

**managing** [1] - 68:4

**manning** [1] - 84:10

**mapping** [7] - 86:16, 86:21, 87:19, 95:12, 107:21, 109:12, 114:6

**March** [15] - 30:16, 30:19, 30:21, 30:23, 30:25, 31:4, 75:17, 113:23, 114:8, 133:17, 134:10, 134:11, 174:15, 174:19

**marginal** [2] - 8:22, 13:2

**Marine** [2] - 80:21, 80:24

**mark** [58] - 16:12, 42:5, 42:8, 44:5, 44:13, 44:17, 44:20, 49:12, 69:20, 103:5, 104:23, 108:20,

108:22, 108:23, 110:22, 110:24, 110:25, 111:3, 111:6, 111:7, 111:8, 111:9, 111:19, 116:5, 124:14, 124:15, 133:4, 133:13, 133:15, 134:9, 134:18, 136:1, 142:1, 142:4, 142:11, 144:18, 146:21, 148:7, 150:17, 151:1, 151:3, 152:5, 155:10, 161:2, 161:8, 169:20, 169:23, 169:25, 170:4, 171:5, 172:22, 173:9, 173:12, 174:16, 179:12, 179:14, 181:4, 181:5

**marked** [13] - 16:1, 17:9, 17:11, 69:21, 87:5, 88:19, 90:11, 112:8, 116:4, 116:9, 163:11, 167:11, 175:24

**market** [4] - 34:13, 34:18, 35:1, 131:25

**marketing** [20] - 63:23, 64:17, 66:13, 67:19, 70:23, 71:2, 76:20, 80:13, 85:12, 85:14, 92:25, 98:20, 98:21, 99:3, 103:4, 108:20, 108:23, 109:6, 153:21, 155:23

**Marketing** [1] - 63:24

**marketplace** [2] - 146:16, 162:24

**markets** [1] - 56:10

**markings** [3] - 28:24, 29:5, 29:9

**marriage** [1] - 136:5

**marrying** [1] - 89:13

**materialize** [1] - 58:3

**materialized** [1] - 56:11

**materials** [2] - 53:18, 153:20

**matter** [7] - 3:21, 9:25, 54:12, 95:3, 113:4, 129:24, 188:5

**matters** [3] - 43:3, 62:24, 145:24

**matured** [1] - 116:20

**mean** [35] - 11:1, 14:5, 14:11, 25:4, 38:15, 46:16, 48:11, 48:13, 49:20, 50:13, 51:2, 52:7, 58:11, 78:15, 78:25, 86:22,

93:8, 93:10, 98:3, 102:7, 106:19, 132:15, 143:7, 143:13, 144:4, 144:10, 145:8, 147:1, 149:2, 149:17, 151:14, 161:8, 182:16, 186:5

**meaning** [7] - 57:20, 142:6, 143:16, 146:10, 149:4, 162:11, 165:18

**means** [15] - 49:11, 57:24, 78:17, 100:15, 106:23, 123:3, 143:15, 143:17, 143:20, 147:23, 148:19, 149:16, 149:25, 173:14, 173:17

**meant** [7] - 10:15, 16:10, 48:13, 68:19, 101:9, 151:15, 180:5

**meantime** [1] - 181:1

**media** [2] - 65:9, 85:11

**medical** [1] - 163:5

**medication** [1] - 51:6

**meet** [2] - 117:7, 119:22

**meeting** [4] - 67:2, 67:4, 67:7, 117:12

**meetings** [10] - 66:16, 66:22, 66:24, 67:5, 67:10, 67:12, 69:2, 145:7, 145:11

**meets** [1] - 53:21

**member** [2] - 71:11, 71:16

**members** [3] - 69:16, 70:18, 115:3

**membership** [2] - 71:13, 71:22

**memo** [1] - 34:8

**memory** [2] - 50:24, 110:2

**mention** [2] - 157:25, 160:5

**mentioned** [14] - 85:18, 93:6, 100:14, 106:18, 112:22, 112:25, 113:25, 118:19, 138:14, 144:15, 145:7, 146:20, 153:7, 166:25

**mentioning** [2] - 56:6, 168:23

**mentions** [3] - 81:22, 122:11, 170:25

**merely** [1] - 9:21

**mesh** [1] - 151:23

**met** [11] - 23:16, 55:24, 89:7, 115:23, 116:25, 117:1, 119:25, 120:9, 120:10, 120:13

**metadata** [1] - 54:19

**metes** [5] - 5:3, 6:7, 12:7, 12:12, 14:4

**Meyers** [1] - 165:6

**MIAMI** [1] - 1:2

**Miami** [21] - 1:4, 1:16, 1:19, 1:23, 1:24, 64:15, 73:17, 73:20, 80:6, 80:7, 81:6, 97:19, 97:21, 115:12, 119:25, 121:8, 134:2, 139:25, 188:11, 188:11

**Miami-Dade** [1] - 115:12

**microphone** [7] - 15:7, 47:25, 52:3, 110:16, 114:24, 184:4, 185:23

**middle** [2] - 7:12, 11:11

**might** [17] - 7:6, 9:11, 10:17, 13:4, 60:11, 72:20, 79:12, 80:10, 80:12, 84:8, 97:18, 97:23, 97:24, 118:5, 132:9, 138:8

**Mijares** [78] - 10:12, 13:23, 23:16, 24:17, 26:15, 26:22, 29:25, 30:3, 30:6, 34:8, 34:16, 36:22, 38:1, 38:5, 39:1, 39:5, 39:10, 43:1, 43:16, 43:24, 44:6, 44:22, 47:2, 47:21, 52:25, 53:5, 53:10, 58:19, 64:24, 69:19, 70:10, 72:23, 72:25, 73:2, 75:8, 75:14, 76:7, 76:11, 80:22, 86:15, 89:1, 89:21, 93:21, 93:24, 94:4, 94:16, 94:17, 94:20, 94:24, 95:1, 95:5, 95:6, 95:17, 95:20, 95:21, 96:1, 96:12, 104:19, 106:9, 106:11, 112:20, 114:17, 114:22, 115:2, 115:4, 125:18, 127:9, 139:19, 171:14, 176:1, 177:2, 179:18, 180:12, 181:21,

184:24

**MIJARES** [1] - 2:8

**Mijares'** [1] - 53:3

**Mijares's** [5] - 28:7, 72:9, 76:8, 77:11, 86:17

**miles** [1] - 4:18

**mind** [5] - 10:12, 10:13, 141:9, 187:17, 187:19

**mine** [1] - 125:2

**minimum** [1] - 140:4

**minute** [4] - 20:22, 55:2, 102:24, 147:3

**minutes** [10] - 52:16, 52:22, 62:9, 62:13, 90:13, 140:24, 140:25, 141:3, 141:5, 141:13

**mirror** [2] - 109:6

**mischaracterizatio n** [1] - 36:13

**mischaracterizing** [1] - 37:17

**misdirected** [3] - 165:1, 165:5, 165:10

**mislead** [1] - 61:10

**missing** [1] - 120:25

**Mississippi** [1] - 66:6

**mistake** [3] - 174:1, 184:18, 184:22

**mistaken** [2] - 142:10, 145:3

**mistrial** [1] - 51:12

**misunderstood** [2] - 186:11, 186:14

**misuse** [1] - 148:25

**mitigate** [1] - 161:14

**mix** [1] - 164:14

**mix-up** [1] - 164:14

**modified** [3] - 50:12, 50:15, 52:7

**modify** [4] - 25:1, 108:11, 109:14, 151:12

**moment** [7] - 7:20, 7:23, 40:16, 135:15, 154:14, 178:8, 187:10

**moments** [1] - 3:17

**monetary** [2] - 72:16, 160:2

**money** [1] - 137:3

**monitor** [1] - 39:20

**Monster** [1] - 81:7

**month** [11] - 20:4, 21:24, 54:17, 56:9, 57:13, 59:12, 72:23, 85:22, 86:1, 164:22

**months** [7] - 4:20,

57:4, 59:11, 77:22, 151:24, 151:25

**moreover** [1] - 4:15

**morning** [19] - 3:3, 3:4, 3:10, 3:12, 15:2, 15:3, 15:11, 15:24, 15:25, 18:22, 18:23, 63:18, 175:9, 175:15, 179:3, 183:18, 183:20, 184:1, 184:24

**most** [2] - 129:20, 186:19

**mostly** [2] - 31:24, 129:1

**motion** [9] - 3:22, 4:3, 4:15, 4:20, 12:12, 13:20, 14:14, 50:3, 50:10

**mouth** [2] - 31:24, 39:3

**move** [18] - 15:6, 18:14, 87:22, 88:6, 91:15, 112:12, 117:25, 131:5, 141:4, 148:19, 149:16, 150:2, 156:16, 164:12, 168:8, 175:10, 178:4, 179:2

**moved** [2] - 131:20, 132:25

**moves** [1] - 113:7

**moving** [1] - 153:11

**MR** [358] - 2:4, 2:5, 2:6, 2:7, 2:8, 3:3, 3:10, 3:12, 3:18, 5:2, 5:11, 6:13, 6:21, 6:25, 7:7, 7:13, 7:18, 7:21, 7:25, 8:5, 8:25, 9:2, 9:16, 10:8, 11:4, 11:15, 11:19, 12:1, 12:3, 13:19, 14:23, 15:10, 15:14, 15:15, 15:21, 15:23, 16:15, 16:17, 17:12, 17:15, 17:19, 18:14, 18:17, 18:20, 18:22, 18:24, 19:2, 19:4, 19:8, 19:12, 19:15, 19:18, 19:20, 19:22, 19:25, 20:11, 20:14, 20:21, 20:24, 21:5, 21:7, 21:12, 21:23, 22:2, 22:12, 22:13, 22:15, 24:10, 24:12, 28:3, 28:6, 28:24, 29:3, 29:6, 29:11, 29:13, 29:16, 29:20, 31:25, 32:10, 32:12, 32:15, 32:17, 33:9, 33:12, 33:25, 35:6, 35:7,

36:12, 36:18, 37:16, 37:20, 37:21, 39:13, 39:15, 39:18, 39:21, 39:22, 40:12, 40:20, 41:7, 41:16, 41:18, 41:22, 41:24, 42:2, 45:8, 46:11, 46:16, 46:18, 47:4, 47:5, 47:8, 47:9, 48:5, 48:7, 48:9, 48:17, 48:20, 48:23, 49:1, 49:14, 49:15, 49:20, 49:24, 50:1, 50:3, 50:16, 50:18, 50:20, 50:21, 51:1, 51:5, 51:14, 51:16, 51:18, 51:19, 52:24, 53:8, 53:9, 53:10, 54:13, 55:7, 55:17, 56:17, 56:19, 56:21, 56:25, 57:11, 57:15, 57:21, 58:10, 58:17, 59:8, 59:10, 59:21, 59:24, 60:24, 60:25, 61:2, 62:11, 63:6, 63:17, 74:15, 74:18, 74:19, 78:5, 87:7, 87:22, 87:25, 88:5, 88:8, 88:10, 88:11, 88:15, 88:18, 88:20, 90:2, 90:7, 90:8, 90:25, 91:5, 91:13, 91:19, 91:24, 92:3, 92:5, 92:15, 96:17, 96:19, 98:11, 98:17, 99:11, 99:20, 99:22, 100:1, 100:3, 100:9, 100:11, 100:18, 100:20, 100:25, 101:2, 101:3, 101:7, 101:13, 101:16, 101:21, 102:2, 102:3, 102:8, 102:11, 102:13, 102:14, 102:19, 103:3, 103:5, 103:8, 103:10, 103:16, 103:21, 104:2, 104:8, 104:11, 104:16, 104:20, 105:3, 105:4, 105:6, 105:7, 110:10, 110:13, 110:17, 110:20, 111:3, 111:7, 111:15, 111:18, 111:22, 112:5, 112:11, 112:14, 112:17, 112:24, 113:2, 113:7, 113:10, 113:14, 113:17, 113:19, 113:21, 114:3, 114:7, 114:11, 114:17, 115:1,

116:11, 118:9, 118:13, 118:15, 131:8, 131:13, 131:18, 139:2, 139:6, 140:22, 141:11, 141:19, 141:23, 156:20, 156:23, 158:6, 158:11, 158:19, 158:22, 159:9, 160:4, 160:6, 160:8, 160:12, 160:17, 160:18, 160:20, 163:13, 163:15, 163:18, 163:20, 163:23, 165:23, 165:25, 166:6, 166:9, 166:12, 166:20, 166:24, 167:3, 167:5, 167:13, 167:18, 167:19, 168:1, 168:5, 168:6, 169:8, 169:9, 169:11, 174:24, 175:14, 175:23, 175:25, 177:6, 177:9, 177:11, 177:16, 177:20, 178:4, 178:7, 178:12, 178:16, 178:20, 178:22, 178:23, 179:4, 179:10, 179:18, 179:20, 179:24, 180:2, 180:10, 180:17, 180:20, 181:9, 181:12, 181:14, 181:18, 181:20, 183:1, 183:4, 183:9, 183:11, 183:12, 183:13, 183:15, 184:3, 184:6, 184:13, 184:16, 184:18, 184:21, 185:1, 185:14, 185:20, 185:24, 186:10, 186:14, 186:17, 187:10, 187:14

**MS** [3] - 74:13, 90:4, 184:14

**multiple** [4] - 74:10, 137:21, 164:22, 164:23

**must** [1] - 53:17

**Mutual** [6] - 63:23, 64:9, 64:11, 68:11, 68:12, 68:13

## N

**N-O-L-D-E-N** [1] - 63:21

**Name** [2] - 24:20,

146:25

**name** [80] - 19:4, 24:13, 24:16, 25:1, 25:2, 25:6, 25:7, 25:8, 25:11, 26:6, 26:9, 27:10, 27:15, 27:17, 30:18, 30:21, 31:4, 36:7, 36:8, 36:10, 39:9, 42:18, 63:19, 63:21, 65:18, 67:25, 68:4, 72:5, 76:4, 76:5, 96:16, 99:24, 103:3, 106:22, 109:10, 110:5, 112:22, 114:1, 115:4, 115:14, 117:5, 122:24, 123:21, 124:6, 124:11, 124:13, 124:15, 134:9, 134:15, 134:17, 135:25, 143:10, 143:11, 143:18, 144:22, 146:22, 147:16, 147:19, 147:24, 148:1, 148:7, 148:19, 148:21, 148:25, 149:4, 149:15, 149:19, 149:20, 150:9, 151:13, 151:14, 152:4, 152:5, 171:10, 171:14, 177:2

**named** [1] - 125:7

**names** [2] - 126:19, 148:23

**naming** [1] - 123:18

**narrow** [2] - 97:4, 98:18

**National** [1] - 38:6

**national** [17] - 66:16, 66:25, 68:6, 69:10, 69:15, 82:14, 82:16, 82:17, 97:13, 118:23, 119:2, 121:10, 132:2, 145:1, 145:13, 149:7, 154:1

**nationwide** [1] - 9:24

**navigator** [1] - 87:1

**near** [1] - 173:23

**nearby** [1] - 120:15

**necessarily** [8] - 45:20, 61:18, 86:5, 92:3, 128:8, 140:8, 146:3, 146:12

**necessary** [1] - 26:20

**need** [26] - 5:15, 6:8, 6:10, 6:11, 6:24, 7:16, 7:23, 11:21, 12:1, 12:7, 20:24, 21:15, 21:18, 21:19, 62:12,

146:25

**needed** [10] - 3:16, 28:12, 93:3, 115:16, 120:24, 134:8, 156:14, 168:14, 171:11, 178:2

**needs** [3] - 55:24, 121:9, 146:15

**negative** [1] - 132:4

**negotiating** [3] - 56:7, 126:15, 179:21

**negotiations** [1] - 95:25

**net** [6] - 100:6, 109:17, 161:17, 162:12, 162:13, 162:14

**nets** [1] - 161:18

**network** [1] - 66:20

**never** [9] - 3:20, 56:11, 57:4, 89:7, 107:6, 112:1, 162:15, 164:10, 165:17

**New** [4] - 66:25, 146:4, 149:9, 149:10

**new** [30] - 6:16, 28:13, 28:15, 64:18, 65:16, 66:9, 68:16, 69:4, 69:12, 70:11, 70:21, 85:16, 86:3, 99:17, 99:23, 109:1, 109:9, 109:11, 113:24, 113:25, 114:4, 114:5, 114:7, 119:9, 121:2, 121:3, 125:13, 144:14, 162:13, 183:3

**next** [39] - 47:19, 49:8, 50:22, 52:6, 52:18, 52:23, 62:10, 63:3, 63:4, 78:8, 78:21, 78:22, 81:22, 84:7, 84:10, 100:4, 100:21, 101:4, 101:22, 102:23, 104:17, 106:5, 106:17, 107:2, 107:7, 107:23, 108:11, 108:18, 108:25, 109:8, 109:14, 112:12, 114:16, 116:2, 166:22, 171:16, 173:8, 174:13, 182:15

**NFL** [7] - 73:11, 73:15, 74:2, 76:21, 137:8, 154:10, 154:12

**night** [2] - 3:23, 120:16
**Nikki** [6] - 88:25, 89:2, 89:3, 89:9, 89:11, 112:3
**nmijares@ unisourcediscovery. com** [1] - 170:17
**NO** [1] - 1:2
**nobody** [3] - 107:1, 127:25, 143:23
**Noel** [30] - 10:12, 23:16, 24:17, 26:14, 26:22, 28:7, 29:25, 34:8, 34:16, 36:22, 38:1, 38:5, 39:5, 64:24, 69:19, 75:8, 89:1, 93:21, 94:3, 94:4, 95:17, 112:20, 114:17, 114:22, 115:4, 125:18, 127:9, 139:18, 171:14, 177:2
**NOEL** [1] - 2:8
**Nolden** [16] - 53:9, 63:7, 63:8, 63:15, 63:21, 74:4, 88:21, 89:1, 92:16, 105:9, 113:21, 115:9, 130:21, 131:3, 135:16, 153:18
**NOLDEN** [2] - 2:6, 2:11
**Nolden's** [1] - 154:9
**none** [4] - 58:17, 124:16, 127:3, 155:3
**nonviable** [2] - 40:24, 41:1
**normal** [1] - 21:1
**normally** [1] - 140:24
**north** [2] - 67:1, 73:23
**North** [3] - 1:23, 73:20, 188:11
**Northwestern** [3] - 63:23, 64:9, 64:11
**not-for-profit** [1] - 83:20
**notation** [4] - 57:16, 179:11, 180:12, 180:15
**note** [2] - 13:12, 53:24
**noted** [5] - 8:21, 13:12, 56:14, 61:22
**notes** [1] - 29:9
**nothing** [8] - 8:9, 10:17, 124:1, 134:22, 150:1, 161:19, 161:24
**notice** [5] - 105:1, 179:16, 180:13,

181:2, 181:3
**noticed** [3] - 81:12, 157:24, 157:25
**notification** [1] - 163:4
**November** [4] - 57:15, 57:17, 60:2, 60:17
**null** [1] - 144:3
**number** [14] - 3:6, 4:4, 22:4, 26:13, 57:3, 77:20, 103:19, 158:22, 170:10, 170:11, 170:14, 185:19, 187:3
**numbers** [7] - 55:21, 103:12, 104:11, 104:13, 105:16, 105:22, 105:23

## O

**o'clock** [2] - 140:20, 183:18
**O'Connor** [5] - 88:25, 89:2, 89:3, 89:9, 89:11
**oath** [1] - 114:21
**object** [6] - 4:18, 17:12, 60:8, 131:8, 186:3
**objected** [3] - 55:8, 60:19, 143:23
**objection** [85] - 14:9, 15:14, 15:17, 16:15, 18:16, 19:19, 20:12, 28:3, 28:24, 33:9, 35:4, 36:12, 37:23, 39:15, 46:10, 46:19, 49:23, 50:2, 50:14, 50:17, 50:25, 53:10, 54:12, 60:9, 60:12, 61:22, 62:4, 87:24, 87:25, 88:1, 90:6, 90:7, 99:19, 99:22, 99:25, 100:8, 100:9, 100:11, 100:17, 100:20, 100:25, 101:1, 101:2, 101:3, 101:18, 101:20, 101:21, 102:3, 102:10, 102:12, 102:13, 103:7, 103:10, 103:16, 103:25, 105:2, 105:4, 113:9, 113:10, 113:11, 118:10, 156:20, 158:6, 158:10, 163:15, 163:16, 165:18,

165:19, 165:23, 167:3, 167:21, 167:23, 177:9, 177:16, 178:6, 178:14, 181:10, 181:13, 181:14, 181:15, 183:11, 183:14, 183:15, 184:2, 185:10
**objectionable** [1] - 55:3
**objections** [21] - 5:14, 6:23, 7:3, 7:5, 7:11, 7:22, 11:10, 56:14, 56:15, 56:16, 57:1, 60:11, 60:12, 60:14, 60:18, 61:4, 61:22, 118:8, 118:9, 167:10, 167:13
**objectives** [1] - 138:2
**observation** [1] - 106:10
**observing** [1] - 57:10
**obtain** [2] - 117:17, 144:18
**obtained** [3] - 133:20, 134:12, 154:22
**obvious** [1] - 49:22
**obviously** [5] - 20:25, 120:6, 161:17, 164:8, 179:1
**occasionally** [1] - 97:18
**occasions** [1] - 145:8
**occupation** [1] - 63:20
**occurred** [3] - 103:17, 138:9, 139:24
**occurrences** [1] - 165:15
**October** [5] - 72:18, 72:23, 85:23, 86:1, 133:25
**OF** [3] - 1:1, 2:10, 2:11
**offer** [2] - 72:25, 186:7
**offered** [6] - 13:14, 13:17, 71:12, 146:12, 149:20
**offering** [6] - 82:8, 118:25, 145:19, 184:15, 184:20, 186:24
**offerings** [1] - 117:20
**Office** [5] - 44:18,

131:21, 135:1, 135:12, 169:19
**office** [23] - 27:1, 77:9, 77:11, 79:13, 86:16, 134:5, 135:1, 135:14, 139:24, 140:2, 140:6, 140:8, 140:9, 140:10, 140:11, 140:14, 154:17, 154:25, 164:7, 164:8, 170:13, 170:15
**OFFICER** [7] - 14:24, 52:19, 62:14, 62:16, 90:24, 175:3, 183:21
**officer** [5] - 24:24, 46:2, 76:12, 129:6, 151:11
**Offices** [1] - 164:4
**offices** [6] - 42:18, 77:10, 77:12, 77:15, 77:18, 117:19
**official** [1] - 1:22
**Official** [1] - 188:10
**officially** [2] - 104:18, 106:7
**often** [2] - 164:19, 165:7
**omissions** [1] - 158:24
**once** [6] - 46:3, 54:21, 67:4, 67:5, 71:23, 151:2
**one** [90] - 4:2, 6:22, 8:13, 11:15, 13:22, 17:1, 19:25, 33:5, 41:13, 47:14, 48:7, 49:8, 49:10, 51:24, 54:4, 56:8, 57:15, 66:25, 68:24, 70:5, 75:2, 82:1, 84:16, 85:6, 88:16, 89:12, 90:20, 93:16, 96:15, 96:16, 96:20, 100:14, 101:22, 102:4, 103:21, 103:22, 104:5, 104:11, 105:23, 105:24, 106:23, 110:21, 112:6, 112:12, 114:2, 118:4, 119:11, 119:14, 127:15, 127:16, 129:8, 133:25, 134:6, 136:6, 137:22, 138:10, 138:11, 138:23, 139:2, 139:20, 143:2, 148:1, 150:12, 152:17, 154:21, 157:3, 161:25,

162:10, 164:4, 165:15, 167:18, 169:8, 171:10, 173:3, 173:8, 173:13, 174:12, 175:6, 180:21, 184:24, 187:18
**ones** [6] - 55:8, 125:1, 143:16, 143:17, 144:25, 151:18
**open** [2] - 39:3, 50:6
**opened** [5] - 9:20, 115:23, 136:9, 153:5, 156:18
**opening** [2] - 3:20, 5:17
**operate** [5] - 22:21, 22:24, 26:20, 47:3, 47:21
**operated** [5] - 23:10, 48:1, 48:10, 48:15
**Operating** [2] - 123:7, 144:5
**operating** [13] - 4:14, 22:19, 24:7, 24:19, 25:14, 25:20, 26:21, 35:19, 98:7, 122:2, 144:5, 144:8, 144:12
**Operation** [1] - 138:25
**operation** [3] - 9:21, 9:23, 129:2
**operations** [6] - 26:19, 43:5, 46:9, 46:22, 47:16, 136:10
**opportunities** [5] - 66:19, 79:7, 115:13, 116:21, 116:22
**opportunity** [17] - 20:15, 21:14, 45:10, 45:17, 45:23, 62:6, 68:5, 68:13, 70:16, 70:20, 70:21, 71:14, 80:10, 121:10, 185:8, 185:21, 186:4
**oppose** [2] - 20:13, 135:7
**opposed** [1] - 180:1
**opposing** [1] - 7:10
**optimization** [1] - 86:25
**oranges** [1] - 61:9
**order** [25] - 3:23, 4:1, 4:5, 4:9, 5:3, 5:6, 5:12, 5:24, 6:5, 6:7, 8:21, 9:10, 12:9, 12:10, 14:6, 14:15, 105:13, 156:20, 178:15, 178:16,

180:5, 183:15, 184:3, 184:6
**Order** [1] - 3:1
**ordering** [5] - 22:3, 22:6, 105:25, 107:20, 109:12
**orders** [7] - 17:22, 18:1, 18:11, 19:10, 57:5, 98:9, 163:3
**ordinary** [1] - 21:1
**Oregon** [1] - 23:6
**organization** [16] - 66:5, 66:6, 66:10, 66:14, 69:10, 69:23, 71:7, 71:15, 71:19, 71:22, 71:24, 80:7, 82:20, 83:20, 83:22
**organizations** [2] - 72:4, 72:8
**original** [3] - 35:18, 42:18, 109:3
**originally** [2] - 171:10, 179:7
**Orlando** [3] - 67:24, 121:8, 165:16
**Orleans** [1] - 66:25
**Otazo** [3] - 8:20, 10:23, 177:13
**Otazo-Reyes** [2] - 10:23, 177:13
**Otazo-Reyes's** [1] - 8:20
**otherwise** [6] - 20:6, 36:8, 128:19, 143:12, 144:22, 175:12
**ourselves** [1] - 150:6
**out-of-court** [1] - 166:4
**outcome** [1] - 40:14
**outright** [1] - 58:12
**outset** [2] - 69:24, 70:2
**outside** [12] - 4:17, 22:22, 23:24, 33:9, 47:3, 47:21, 53:1, 57:24, 62:24, 68:6, 80:9, 159:1
**overall** [2] - 147:12, 147:15
**overlapping** [1] - 155:17
**overrides** [1] - 144:2
**overruled** [5] - 16:16, 28:5, 33:11, 36:15, 39:17
**oversimplification** [1] - 106:21
**overview** [1] - 116:17
**own** [9] - 10:1, 93:18, 115:13, 134:15,

140:8, 140:11, 144:24, 148:1, 174:2
**owned** [6] - 36:11, 44:13, 48:21, 157:9, 171:20, 180:11
**owner** [11] - 43:6, 46:7, 49:9, 51:25, 94:13, 95:13, 95:18, 102:6, 134:18, 169:20, 172:21
**owners** [6] - 89:19, 94:7, 94:18, 94:20, 95:13, 95:16
**ownership** [13] - 4:8, 4:12, 4:24, 5:16, 5:25, 12:11, 13:22, 14:2, 27:10, 27:13, 96:4, 144:22, 147:24
**owns** [3] - 134:20, 143:18, 180:9

### P

**P-000325** [1] - 123:7
**P-000477** [1] - 75:9
**P-00489** [1] - 80:14
**P-334** [1] - 123:12
**P-485** [1] - 76:8
**P-486** [1] - 76:15
**P.A** [1] - 1:18
**p.m** [9] - 1:7, 91:6, 92:11, 141:6, 141:15, 175:4, 175:20, 183:22, 187:22
**package** [3] - 146:14, 146:15, 146:18
**page** [36] - 7:19, 25:15, 27:5, 30:11, 75:2, 75:9, 78:21, 79:5, 80:11, 80:15, 81:11, 81:22, 83:9, 86:6, 111:4, 123:6, 124:20, 125:5, 126:11, 126:18, 138:10, 143:2, 157:2, 167:13, 167:21, 167:23, 170:10, 170:25, 171:13, 171:21, 171:24, 171:25, 176:11, 177:1, 182:11, 185:11
**PAGE** [2] - 2:10, 2:11
**Pages** [1] - 1:6
**pages** [19] - 7:7, 7:18, 7:19, 8:5, 10:6, 20:7, 70:6, 74:10, 75:10, 167:14, 167:15, 167:16, 167:22, 185:6,

185:17, 185:25, 186:1, 186:20
**paid** [1] - 132:21
**paint** [1] - 130:25
**Palm** [1] - 121:8
**paper** [5] - 46:1, 74:11, 87:3, 108:15, 118:22
**papers** [1] - 134:23
**paragraph** [22] - 26:13, 26:14, 35:21, 122:11, 122:16, 128:11, 138:11, 142:18, 142:20, 142:21, 143:2, 144:4, 146:24, 146:25, 147:1, 147:12, 147:15, 152:8, 152:14, 152:16, 172:9, 176:13
**paralegals** [3] - 66:7, 70:7, 72:14
**paraphrasing** [1] - 107:3
**pardon** [2] - 64:4, 96:24
**parenthesis** [4] - 143:4, 182:15, 182:21
**Parkinson's** [1] - 50:23
**parole** [5] - 177:12, 177:16, 178:7, 179:25, 180:6
**part** [50] - 4:2, 4:12, 8:17, 9:8, 12:13, 12:15, 12:17, 13:9, 13:21, 27:19, 31:9, 36:6, 46:19, 46:20, 46:21, 48:14, 49:17, 49:22, 50:12, 52:6, 61:12, 65:5, 65:8, 67:20, 73:19, 75:18, 76:19, 79:6, 84:9, 94:19, 95:18, 97:20, 102:6, 107:13, 108:3, 117:25, 143:1, 143:10, 148:25, 149:20, 150:3, 154:7, 156:20, 167:15, 171:24, 185:12, 185:18, 186:4, 186:8, 187:3
**participant** [2] - 66:18
**participants** [2] - 154:5
**participate** [2] - 68:22, 73:23
**participation** [2] - 62:2, 70:12

**particular** [22] - 14:15, 44:4, 69:14, 71:7, 76:6, 79:14, 81:3, 83:8, 94:14, 95:3, 105:13, 111:12, 122:5, 143:14, 145:23, 146:17, 148:20, 149:19, 170:22, 176:17, 177:10
**particulars** [1] - 73:4
**parties** [13] - 9:4, 12:23, 36:5, 40:15, 49:10, 52:1, 54:10, 110:7, 125:6, 139:17, 143:8, 179:4, 180:5
**partner** [2] - 73:5, 99:12
**party** [2] - 59:19, 69:12
**pass** [4] - 128:4, 128:5, 151:24, 155:17
**passes** [1] - 127:25
**passionate** [1] - 80:22
**patent** [1] - 135:14
**Patent** [5] - 44:17, 131:21, 134:25, 135:12, 169:18
**PATRICIA** [2] - 1:22, 188:9
**pay** [8] - 43:25, 89:17, 94:10, 132:14, 132:16, 136:19, 146:2, 146:3
**paying** [1] - 100:12
**PDFs** [1] - 54:21
**Pecaro** [1] - 164:5
**penned** [2] - 69:18, 70:10
**people** [14] - 19:7, 37:5, 42:14, 42:17, 66:17, 67:1, 67:12, 72:13, 79:12, 79:14, 84:16, 96:25, 132:8
**percent** [15] - 6:15, 43:6, 45:3, 49:9, 49:10, 51:25, 52:1, 127:9, 127:10, 138:6, 162:20, 173:3, 173:13, 174:12
**percentage** [1] - 72:13
**perfectly** [2] - 32:15, 98:12
**perform** [1] - 129:24
**period** [5] - 57:24, 92:22, 119:21, 159:12, 159:13
**periodically** [1] -

67:5
**permission** [5] - 27:25, 28:1, 36:9, 84:17, 150:16
**permit** [1] - 10:21
**permitted** [1] - 69:2
**perpetual** [2] - 137:24, 138:16
**perpetuity** [1] - 138:14
**Persechini** [7] - 87:13, 88:25, 89:4, 89:5, 89:11, 112:4, 112:20
**person** [17] - 10:18, 11:20, 19:4, 19:9, 19:13, 21:17, 22:8, 53:2, 54:1, 54:3, 59:2, 63:21, 87:15, 104:21, 119:22, 156:3, 173:25
**personal** [1] - 170:14
**personally** [3] - 32:25, 67:24, 157:19
**persons** [2] - 87:19, 89:12
**perspective** [1] - 154:3
**pertaining** [1] - 22:3
**phone** [9] - 103:12, 104:11, 104:12, 105:16, 105:22, 135:23, 166:13, 170:10
**phones** [1] - 83:21
**photograph** [1] - 85:1
**Phyllis** [6] - 87:13, 88:25, 89:4, 89:5, 112:3, 112:20
**picking** [1] - 58:1
**picture** [3] - 75:12, 75:14, 77:23
**piece** [2] - 46:1, 120:25
**pink** [10] - 72:18, 72:21, 73:1, 73:3, 85:20, 86:5, 86:6, 86:7, 131:1
**Pisani** [1] - 112:19
**pivotal** [1] - 148:16
**place** [10] - 63:19, 73:15, 81:5, 81:6, 97:21, 97:22, 120:8, 139:20, 140:11, 158:24
**placed** [4] - 17:22, 18:1, 81:14, 82:11
**places** [5] - 42:18, 43:10, 93:15, 96:15, 155:24

**PLAINTIFF** [2] - 1:13, 18:21

**plaintiff** [31] - 3:11, 3:25, 5:24, 6:2, 8:25, 10:5, 10:25, 13:16, 48:4, 49:23, 50:14, 52:24, 55:2, 60:4, 61:20, 61:25, 63:7, 71:21, 71:22, 88:18, 99:19, 99:25, 100:17, 103:7, 110:9, 113:7, 114:17, 151:2, 158:15, 160:10, 180:9

**plaintiffs** [2] - 158:19, 158:23

**Plaintiffs** [1] - 1:5

**plaintiffs'** [10] - 3:9, 6:3, 12:2, 13:12, 13:16, 17:12, 54:24, 115:7, 167:11, 168:4

**PLAINTIFFS'** [1] - 2:13

**Plaintiffs'** [55] - 2:14, 2:14, 2:15, 2:15, 2:16, 2:16, 2:17, 2:17, 24:3, 33:22, 34:5, 35:3, 35:6, 37:23, 54:23, 60:5, 74:5, 74:14, 74:16, 87:2, 87:5, 87:23, 88:1, 88:3, 88:12, 88:18, 88:19, 88:21, 90:9, 90:11, 112:8, 112:9, 113:11, 113:13, 116:5, 116:9, 118:12, 118:16, 121:22, 139:8, 163:9, 163:11, 163:16, 163:22, 167:20, 167:22, 168:3, 175:24, 176:2, 181:12, 181:13, 181:15, 181:17, 181:22, 183:1

**plan** [1] - 6:8

**planned** [1] - 58:18

**planning** [4] - 11:24, 152:21, 175:8, 187:8

**plans** [1] - 52:24

**plaque** [2] - 82:22, 82:24

**plastic** [1] - 115:21

**platform** [2] - 68:6, 145:1

**play** [1] - 81:8

**players** [3] - 73:25, 74:1, 74:2

**playing** [2] - 73:25, 85:1

**plenty** [1] - 66:19

**plural** [2] - 150:12,

150:14

**plus** [2] - 69:21, 119:11

**Plus** [1] - 169:18

**point** [21] - 11:15, 13:19, 24:19, 27:12, 36:19, 39:17, 41:12, 49:15, 55:1, 55:13, 57:6, 57:22, 59:14, 95:15, 102:18, 102:19, 104:24, 180:21, 183:3, 186:24, 187:1

**pointing** [1] - 61:25

**Ponte** [1] - 67:3

**pool** [1] - 67:21

**pooled** [1] - 133:4

**portion** [5] - 7:16, 10:5, 29:17, 151:19, 176:25

**position** [12] - 22:5, 22:7, 41:11, 51:15, 55:3, 94:12, 95:1, 115:5, 118:24, 125:12, 137:8, 162:9

**positions** [1] - 125:11

**possibilities** [1] - 120:3

**possibility** [4] - 56:8, 119:8, 121:13, 187:18

**possible** [5] - 15:7, 19:22, 51:11, 53:5, 141:19

**possibly** [2] - 56:9, 145:19

**posted** [1] - 157:21

**poster** [2] - 84:7, 84:9

**potential** [3] - 51:11, 67:16, 71:1

**potentially** [1] - 159:4

**power** [8] - 127:17, 127:22, 128:3, 128:21, 128:24, 129:13, 129:14, 130:3

**powers** [1] - 128:10

**Powers** [1] - 128:13

**PPP** [1] - 46:8

**practice** [1] - 3:19

**precedence** [1] - 146:23

**precisely** [1] - 50:3

**preclude** [1] - 12:11

**predecessor** [4] - 3:24, 3:25, 13:21, 174:20

**predicate** [1] - 21:21

**predominantly** [1] -

72:14

**prefaced** [1] - 166:14

**prefer** [1] - 74:24

**Preferred** [1] - 38:6

**preferred** [1] - 140:10

**prefix** [1] - 106:22

**prejudiced** [1] - 159:19

**prejudicial** [3] - 159:2, 159:6, 186:6

**preliminary** [2] - 103:18, 178:24

**premier** [3] - 67:2, 146:14, 146:15

**preparation** [1] - 54:2

**preparations** [1] - 140:6

**prepare** [1] - 116:16

**prepared** [9] - 19:25, 20:1, 20:5, 54:3, 87:17, 121:19, 122:3, 151:18, 169:4

**preschool** [1] - 80:19

**presence** [3] - 62:24, 67:8, 118:23

**present** [6] - 64:25, 73:6, 101:25, 108:1, 108:7, 139:20

**presented** [9] - 6:22, 24:3, 31:7, 31:8, 31:11, 32:6, 34:1, 34:5, 40:22

**preserve** [1] - 185:8

**preserving** [1] - 185:10

**president** [9] - 76:12, 115:6, 129:4, 171:16, 171:18, 172:14, 172:19, 173:1, 173:11

**presumably** [1] - 184:23

**pretrial** [3] - 158:14, 158:22, 159:7

**pretty** [12] - 25:5, 58:25, 87:17, 92:24, 107:18, 116:23, 119:5, 119:6, 135:14, 142:15, 152:17, 176:19

**previous** [4] - 85:6, 118:24, 130:20, 156:12

**previously** [5] - 74:7, 95:8, 100:4, 169:12, 185:22

**pricing** [3] - 146:1, 146:2, 146:5

**primarily** [3] - 89:16,

127:22, 129:3

**primary** [1] - 130:19

**principal** [2] - 6:3, 65:16

**principally** [1] - 87:21

**probability** [1] - 57:25

**probation** [1] - 58:22

**probative** [1] - 9:14

**problem** [12] - 32:15, 51:5, 54:6, 54:7, 54:9, 102:2, 103:16, 103:23, 159:21, 164:15, 164:16, 185:7

**problems** [4] - 50:23, 156:7, 163:13, 174:24

**procedure** [5] - 45:11, 45:12, 45:19, 72:24, 165:4

**procedures** [1] - 164:8

**proceed** [3] - 15:8, 63:3, 132:1

**proceeded** [2] - 132:5, 177:24

**proceeding** [2] - 40:19, 41:14

**Proceedings** [1] - 187:22

**proceedings** [2] - 39:16, 188:4

**process** [8] - 84:15, 117:15, 117:17, 117:21, 118:18, 121:7, 133:1, 133:23

**procurement** [1] - 115:15

**produce** [1] - 32:7

**product** [4] - 67:13, 69:14, 109:2, 109:5

**production** [1] - 46:8

**professionals** [2] - 66:7, 67:14

**proffer** [4] - 9:17, 10:5, 185:5, 186:13

**proffered** [1] - 185:25

**profit** [1] - 83:20

**program** [5] - 76:22, 80:20, 81:9, 81:11, 87:15

**Program** [1] - 63:24

**progress** [1] - 87:10

**progressive** [1] - 87:10

**prohibit** [2] - 61:25, 185:9

**prohibition** [1] - 5:24

**project** [3] - 98:24,

114:3, 114:7

**projection** [1] - 9:24

**promote** [2] - 72:5, 109:7

**promotion** [1] - 65:11

**promotional** [2] - 153:20, 154:10

**proof** [2] - 133:4, 133:6

**propensity** [1] - 13:14

**proper** [5] - 17:13, 21:21, 45:14, 45:16, 53:17

**properly** [2] - 172:14, 178:2

**properties** [1] - 159:6

**property** [6] - 102:24, 103:1, 108:19, 128:22, 130:1, 130:10

**proportions** [1] - 127:13

**proposal** [1] - 68:15

**proprietary** [4] - 97:20, 97:24, 105:23, 105:24

**prospecting** [2] - 68:22, 70:11

**PROSPECTIVE** [1] - 15:3

**prospects** [1] - 69:3

**protect** [36] - 37:2, 37:3, 37:8, 65:17, 65:20, 69:25, 79:4, 100:15, 100:16, 100:23, 101:5, 101:8, 101:16, 101:24, 101:25, 106:15, 106:18, 106:19, 106:25, 107:4, 107:8, 107:25, 108:1, 108:4, 115:21, 130:9, 130:13, 130:17, 130:19, 131:6, 131:14, 131:19, 149:3, 149:8, 150:7

**protected** [4] - 78:18, 130:13, 130:21, 182:23

**protecting** [2] - 107:12, 161:16

**protection** [2] - 44:22, 70:1

**protections** [1] - 131:21

**protesting** [1] - 142:1

**proud** [3] - 154:6, 154:20
**provide** [14] - 6:16, 26:16, 29:25, 55:22, 57:11, 58:5, 60:1, 109:5, 116:18, 124:18, 133:3, 133:6, 160:15, 185:21
**provided** [16] - 11:8, 20:3, 27:6, 28:18, 54:15, 54:16, 54:18, 58:19, 60:16, 61:20, 62:4, 62:5, 128:24, 174:17, 185:22, 185:24
**provides** [1] - 126:22
**providing** [7] - 26:23, 27:9, 27:12, 27:17, 27:20, 58:5, 126:13
**provision** [1] - 126:22
**provisions** [2] - 144:8, 144:9
**psychiatric** [1] - 51:3
**public** [3] - 135:3, 157:18, 182:22
**publication** [2] - 79:19, 80:8
**publications** [3] - 69:20, 69:23, 79:5
**publish** [13] - 15:20, 24:10, 33:23, 69:16, 70:16, 88:4, 88:6, 90:5, 91:22, 118:13, 124:17, 135:2, 139:4
**published** [12] - 75:5, 75:16, 75:25, 79:8, 82:12, 90:10, 91:15, 91:16, 112:14, 113:14, 163:20, 181:18
**publisher** [1] - 76:3
**publishing** [1] - 70:17
**pull** [3] - 105:20, 114:23, 184:4
**pulled** [1] - 162:10
**punishable** [1] - 172:3
**Purchase** [1] - 137:15
**purchase** [5] - 138:1, 138:4, 138:23, 178:1, 180:15
**purchased** [2] - 84:15, 138:12
**purchasing** [1] - 26:9
**purported** [1] - 56:5

**purportedly** [1] - 167:1
**purpose** [13] - 34:17, 34:20, 34:24, 121:14, 126:11, 126:12, 126:15, 150:1, 176:17, 177:11, 177:23, 177:24, 182:20
**purposes** [2] - 122:24, 175:8
**pursuant** [2] - 52:11, 53:16
**pursuing** [1] - 85:11
**push** [1] - 123:17
**put** [15] - 5:1, 18:7, 60:9, 85:17, 86:6, 91:17, 104:23, 115:17, 143:17, 148:4, 161:23, 171:11, 176:20, 181:2, 184:11
**putting** [2] - 24:4, 144:25

### Q

**qualifications** [1] - 4:4
**query** [1] - 58:7
**questioning** [1] - 20:14
**QUESTIONS** [2] - 2:10, 2:11
**Questions** [2] - 47:11, 105:9
**questions** [67] - 7:25, 8:2, 14:9, 17:16, 28:20, 32:16, 33:5, 41:22, 45:8, 45:11, 45:18, 45:21, 45:22, 45:25, 46:24, 47:7, 47:13, 48:3, 48:4, 49:1, 49:3, 49:6, 50:24, 51:9, 51:22, 52:13, 55:18, 56:1, 56:12, 57:7, 58:21, 74:21, 90:3, 90:14, 90:16, 92:18, 98:14, 98:18, 99:4, 99:9, 99:16, 100:10, 100:13, 102:16, 103:11, 104:14, 104:15, 104:19, 105:2, 105:10, 110:9, 110:21, 113:16, 113:18, 114:11, 114:13, 128:13, 131:12, 131:17, 133:3, 133:23, 147:6,

148:15, 166:16, 167:8
**quick** [1] - 183:4
**quickly** [3] - 10:8, 83:23, 161:15
**quit** [1] - 103:16
**quoted** [1] - 13:16

### R

**raise** [2] - 7:3, 63:13
**rather** [1] - 51:2
**raw** [5] - 54:18, 55:5, 56:5, 57:21, 60:17
**re** [1] - 107:21
**re-did** [1] - 107:21
**reach** [3] - 56:10, 103:15, 105:19
**reached** [2] - 79:14, 168:12
**read** [26] - 5:19, 7:23, 24:21, 26:15, 34:11, 34:13, 35:24, 44:7, 76:15, 105:11, 113:5, 128:12, 141:20, 141:22, 142:20, 147:3, 147:4, 147:9, 147:12, 155:18, 169:23, 177:7, 185:12, 185:13, 185:18
**reading** [4] - 7:12, 74:13, 105:12, 185:10
**ready** [5] - 7:24, 52:18, 63:3, 147:10, 175:22
**real** [1] - 120:5
**really** [7] - 38:15, 42:22, 61:2, 62:2, 109:18, 116:20, 156:6
**reason** [19] - 9:3, 9:19, 9:25, 13:8, 13:20, 21:25, 36:17, 36:25, 118:23, 122:21, 130:12, 130:16, 134:11, 135:24, 137:22, 137:23, 148:4, 179:10
**reasonable** [1] - 113:3
**reasons** [5] - 85:15, 137:21, 168:13, 179:14, 186:25
**rebuttal** [5] - 11:17, 11:19, 11:21, 32:11, 54:16
**receive** [5] - 55:6, 59:6, 134:23, 141:25, 142:3
**received** [24] - 6:14, 6:25, 19:9, 21:12,

21:22, 21:23, 56:2, 59:12, 68:25, 108:15, 132:23, 132:25, 134:25, 135:1, 135:5, 135:11, 144:17, 165:1, 165:17, 165:20, 167:2, 167:6, 168:13, 168:14
**recent** [2] - 56:21, 56:22
**recess** [10] - 53:14, 62:15, 90:17, 92:6, 92:7, 141:12, 141:14, 175:17, 183:17, 187:20
**recitals** [1] - 143:2
**recognition** [1] - 82:25
**recognize** [29] - 16:2, 35:13, 75:2, 75:24, 76:16, 76:24, 80:15, 81:24, 82:5, 82:18, 83:4, 83:16, 84:13, 84:20, 87:4, 87:8, 88:22, 116:12, 121:24, 121:25, 124:11, 124:20, 163:10, 168:18, 168:20, 168:25, 176:2, 176:4, 181:23
**recognized** [1] - 124:13
**recollection** [7] - 39:14, 40:1, 40:7, 66:25, 77:21, 109:19, 135:22
**recommendation** [2] - 94:14, 178:17
**recommendations** [2] - 72:25, 94:13
**reconnect** [1] - 67:12
**reconsideration** [1] - 10:24
**record** [25] - 5:15, 9:17, 10:5, 20:9, 21:4, 21:8, 21:19, 43:14, 56:1, 64:23, 74:6, 87:23, 97:19, 124:18, 181:22, 185:5, 185:7, 185:8, 185:12, 185:19, 186:4, 186:9, 186:23, 187:3, 187:9
**recorded** [1] - 141:22
**records** [15] - 18:5, 18:8, 20:2, 53:20, 55:21, 58:6, 97:23, 117:16, 117:17, 117:21, 117:22, 118:18, 120:23,

126:13, 163:5
**recover** [1] - 162:17
**rectangle** [2] - 69:22, 111:10
**redirect** [4] - 37:19, 41:23, 90:16, 98:15
**REDIRECT** [3] - 2:3, 42:1, 98:16
**refer** [6] - 5:23, 67:18, 68:20, 71:2, 72:6, 114:3
**reference** [6] - 4:5, 4:11, 5:16, 10:22, 44:16, 120:18
**referenced** [1] - 12:19
**references** [1] - 144:12
**referred** [4] - 69:21, 118:22, 141:22, 155:10
**referring** [10] - 53:23, 64:20, 95:17, 96:9, 109:23, 139:9, 142:25, 169:8, 179:6
**refers** [2] - 113:23, 168:22
**reflect** [3] - 60:13, 72:19, 109:6
**reflecting** [1] - 60:18
**reflects** [1] - 49:14
**refresh** [4] - 39:14, 40:1, 40:7, 110:2
**Refusal** [1] - 152:9
**refusal** [1] - 153:4
**regard** [1] - 61:16
**regarding** [17] - 4:7, 5:16, 6:24, 13:7, 21:11, 21:20, 40:13, 53:15, 62:2, 62:7, 94:10, 129:23, 160:15, 169:24, 178:19, 178:20
**regards** [1] - 117:8
**register** [3] - 78:15, 78:16, 106:14
**registered** [24] - 35:25, 36:20, 36:22, 44:13, 78:12, 78:19, 104:18, 104:23, 106:7, 108:24, 110:24, 111:1, 111:13, 111:20, 122:23, 136:1, 142:12, 142:24, 147:20, 172:22, 180:21, 181:5, 182:17, 182:22
**registering** [3] - 36:25, 37:7, 37:10

**registration** [22] - 28:21, 29:21, 44:5, 44:17, 44:20, 111:11, 131:20, 135:4, 135:6, 135:7, 142:1, 142:4, 142:7, 143:19, 150:8, 150:18, 150:19, 170:5, 172:7, 179:12, 180:7, 180:9
**regular** [1] - 18:8
**regularly** [1] - 164:20
**reign** [1] - 156:14
**relabeled** [1] - 61:10
**relate** [1] - 158:23
**related** [10] - 5:6, 22:4, 33:5, 95:8, 98:20, 98:21, 110:8, 114:5, 126:14, 160:10
**relates** [1] - 177:12
**relating** [1] - 26:2
**Relations/Tortious** [1] - 38:2
**relationship** [12] - 12:22, 13:3, 14:12, 41:1, 66:4, 66:8, 68:8, 68:14, 72:15, 79:24, 89:5
**relationships** [5] - 43:11, 66:21, 67:11, 72:11
**relatively** [1] - 187:11
**relevance** [8] - 8:22, 10:9, 11:2, 13:2, 13:5, 13:13, 39:15, 178:6
**relevancy** [1] - 82:7
**relevant** [11] - 8:23, 9:2, 9:8, 9:18, 10:3, 13:18, 22:5, 45:22, 91:21, 159:12
**reliability** [2] - 55:25, 58:2
**relied** [1] - 171:9
**remained** [1] - 92:22
**remember** [27] - 23:7, 26:2, 28:22, 28:23, 30:8, 31:7, 31:9, 31:13, 31:17, 34:3, 35:8, 37:24, 38:25, 39:4, 39:7, 39:10, 42:4, 65:22, 69:20, 74:6, 91:1, 120:16, 134:1, 134:7, 150:8, 151:16, 161:4
**remembered** [1] - 95:4
**remind** [1] - 90:20
**reminder** [1] - 181:6
**removals** [1] - 167:23

**remove** [3] - 162:4, 167:20, 167:22
**removed** [3] - 157:9, 157:24, 158:1
**rendered** [3] - 145:16, 145:17, 146:9
**renewed** [1] - 162:1
**repeat** [4] - 39:2, 110:19, 110:20, 126:5
**rephrase** [3] - 94:23, 130:14, 156:2
**replace** [1] - 162:15
**replaced** [1] - 35:18
**report** [5] - 46:8, 64:24, 93:23, 133:23, 178:17
**reported** [4] - 93:21, 94:3, 94:24, 95:1
**REPORTED** [1] - 1:21
**REPORTER** [1] - 158:20
**reporter** [2] - 114:21, 141:20
**Reporter** [2] - 1:22, 188:10
**reporting** [1] - 119:4
**represent** [3] - 58:20, 111:7, 173:6
**representation** [1] - 44:21
**represented** [1] - 44:22
**representing** [2] - 3:25, 67:22
**request** [6] - 68:15, 99:11, 165:16, 165:17, 165:19, 165:21
**requested** [2] - 97:19, 151:19
**requests** [1] - 163:2
**require** [2] - 8:16, 186:1
**required** [1] - 153:4
**requirement** [1] - 181:2
**requirements** [1] - 26:20
**requires** [1] - 128:2
**research** [1] - 53:24
**resemblance** [1] - 173:24
**resembles** [1] - 77:2
**resign** [1] - 126:25
**resignations** [1] - 127:2
**resigns** [1] - 126:23
**resolution** [1] - 128:4

**resolve** [1] - 137:23
**resolved** [1] - 60:12
**resources** [1] - 26:17
**respect** [6] - 69:5, 70:14, 90:25, 111:22, 156:11, 168:25
**respond** [2] - 10:8, 133:15
**responded** [1] - 43:3
**response** [5] - 13:16, 20:1, 42:7, 54:20, 84:23
**responses** [1] - 166:2
**responsibilities** [1] - 65:16
**responsibility** [2] - 130:18
**responsible** [5] - 54:2, 64:18, 87:19, 87:21, 89:12
**rest** [3] - 83:23, 84:1, 85:6
**restaurant** [4] - 73:20, 120:8, 120:13, 134:1
**restauranteurs** [2] - 73:16, 73:19
**restaurants** [1] - 73:22
**restrict** [1] - 148:24
**restricted** [3] - 4:2, 79:16, 79:20
**restrictions** [1] - 143:22
**restroom** [2] - 175:1, 175:6
**result** [5] - 68:16, 70:12, 158:2, 161:8, 168:10
**resulting** [1] - 172:7
**results** [3] - 40:18, 132:23, 132:25
**resume** [2] - 175:9, 183:18
**retained** [3] - 84:16, 86:19, 87:16
**retire** [1] - 63:25
**retired** [4] - 63:21, 64:1, 74:2, 154:12
**retook** [1] - 15:4
**Retrieval** [7] - 35:25, 65:23, 78:18, 111:9, 142:24, 170:3, 182:12
**retrieval** [6] - 106:24, 117:21, 118:18, 120:23, 126:13, 145:23
**retrieve** [1] - 97:23
**reverse** [1] - 164:25

**review** [15] - 6:23, 20:15, 45:13, 84:1, 121:23, 122:20, 124:19, 131:23, 131:24, 132:2, 132:3, 132:13, 139:8, 163:9, 169:13
**reviewed** [4] - 54:5, 122:2, 122:22, 163:24
**Reyes** [2] - 10:23, 177:13
**Reyes's** [1] - 8:20
**RFP** [1] - 68:15
**ribbon** [1] - 86:6
**rifle** [1] - 70:25
**right-hand** [1] - 134:4
**rights** [16] - 4:12, 4:24, 6:15, 13:22, 102:24, 103:1, 104:22, 108:19, 137:24, 143:18, 144:18, 144:21, 146:21, 146:23, 151:3
**ripe** [1] - 121:4
**rise** [9] - 14:24, 44:9, 52:19, 62:16, 62:19, 90:24, 92:8, 175:3, 183:21
**Road** [1] - 1:15
**Robinson** [1] - 164:5
**room** [2] - 141:4, 159:20
**row** [1] - 131:10
**RPR** [2] - 1:22, 188:9
**rule** [5] - 7:11, 11:10, 14:9, 55:23, 180:6
**Rule** [1] - 53:16
**ruled** [3] - 6:24, 10:23, 13:7
**rules** [9] - 4:20, 20:5, 45:15, 52:11, 53:16, 55:22, 57:10, 58:10
**ruling** [1] - 90:25
**run** [4] - 27:23, 28:9, 90:20, 128:24

---

## S

**Safe** [2] - 115:19, 118:24
**sales** [2] - 26:19, 46:8
**samples** [1] - 80:8
**Samsung** [1] - 83:21
**San** [1] - 97:23
**Sanchelima** [8] - 3:11, 20:4, 32:11, 54:19, 54:21, 56:18, 60:10, 60:19

**SANCHELIMA** [219] - 1:13, 1:15, 2:4, 2:6, 2:8, 3:3, 3:10, 3:18, 5:2, 5:11, 6:13, 6:21, 7:7, 7:13, 7:18, 7:21, 8:25, 9:2, 9:16, 11:4, 12:3, 13:19, 14:23, 15:14, 16:15, 17:12, 18:17, 18:20, 18:22, 18:24, 19:2, 19:4, 19:8, 19:12, 19:15, 19:18, 20:14, 20:24, 21:12, 21:23, 22:2, 22:13, 22:15, 28:3, 28:24, 29:11, 29:13, 32:12, 33:9, 36:12, 37:16, 37:20, 39:15, 41:7, 41:16, 41:24, 42:2, 45:8, 46:18, 47:5, 47:8, 48:5, 49:15, 49:24, 50:16, 50:20, 51:1, 51:5, 51:14, 51:19, 52:24, 53:9, 55:7, 55:17, 56:19, 56:21, 56:25, 57:15, 57:21, 58:10, 58:17, 59:8, 59:10, 60:25, 61:2, 62:11, 63:6, 63:17, 74:15, 74:18, 74:19, 78:5, 87:7, 87:22, 88:5, 88:8, 88:10, 88:11, 88:15, 88:18, 88:20, 90:2, 90:8, 98:17, 99:11, 99:20, 100:1, 100:9, 100:18, 100:25, 101:2, 101:7, 101:13, 101:16, 102:2, 102:8, 102:11, 102:14, 102:19, 103:3, 103:5, 103:8, 103:16, 103:21, 104:2, 104:8, 104:11, 104:16, 104:20, 105:3, 105:6, 110:10, 110:13, 110:17, 110:20, 111:3, 111:7, 111:15, 111:18, 111:22, 112:5, 112:11, 112:14, 112:17, 112:24, 113:2, 113:7, 113:14, 113:17, 114:17, 115:1, 116:11, 118:13, 118:15, 131:13, 131:18, 139:2, 139:6, 140:22, 141:11, 141:19, 141:23, 156:23, 159:9, 160:4, 160:6, 160:12, 160:18,

160:20, 163:13, 163:18, 163:20, 163:23, 165:25, 166:6, 166:9, 166:20, 166:24, 167:5, 167:18, 168:1, 168:5, 168:6, 169:9, 169:11, 174:24, 175:14, 175:23, 175:25, 177:6, 177:9, 177:20, 178:4, 178:12, 178:22, 179:4, 179:10, 179:18, 179:20, 179:24, 180:10, 180:17, 180:20, 181:9, 181:12, 181:18, 181:20, 183:1, 183:4, 183:9, 183:11, 183:13, 184:13, 184:16, 184:18, 184:21, 185:1, 185:14, 186:17

**Sanchelima's** [1] - 54:15

**Santa** [1] - 80:24

**Sardinia** [1] - 134:2

**satisfy** [1] - 61:7

**saw** [6] - 38:24, 68:5, 155:4, 156:1, 156:3

**scary** [1] - 162:9

**school** [1] - 80:23

**scope** [3] - 28:17, 97:4, 159:1

**Scott** [1] - 38:8

**screen** [4] - 74:8, 74:22, 87:4, 184:11

**screens** [2] - 74:9, 155:17

**scroll** [1] - 74:23

**search** [4] - 67:14, 86:25, 168:22, 168:23

**seat** [3] - 45:24, 47:6, 114:20

**seated** [8] - 3:2, 15:5, 62:21, 92:12, 114:23, 141:16, 175:5, 175:21

**second** [24] - 36:4, 50:12, 52:10, 67:3, 72:11, 75:25, 99:23, 107:13, 122:10, 126:11, 135:23, 143:6, 143:7, 147:8, 148:14, 148:18, 149:1, 150:3, 168:7, 170:10, 176:11, 176:13, 177:1, 182:11

**seconds** [5] - 41:24, 88:13, 96:17, 110:10,

183:9

**secret** [1] - 135:9

**section** [3] - 7:4, 176:17, 176:19

**Section** [6] - 24:19, 172:5, 173:5, 176:14, 180:18, 180:20

**secure** [1] - 131:20

**SECURITY** [7] - 14:24, 52:19, 62:14, 62:16, 90:24, 175:3, 183:21

**security** [1] - 46:2

**see** [68] - 3:16, 3:23, 13:8, 17:20, 24:5, 26:14, 29:22, 30:13, 30:14, 30:16, 32:19, 33:24, 39:20, 39:23, 40:5, 40:11, 40:15, 41:12, 44:11, 46:2, 64:19, 67:12, 68:10, 69:22, 72:3, 77:5, 77:13, 77:18, 78:1, 78:6, 78:8, 78:21, 78:23, 79:16, 81:18, 83:6, 87:3, 90:22, 91:25, 92:1, 92:4, 102:9, 102:17, 104:9, 104:20, 111:10, 111:13, 111:14, 118:7, 122:16, 123:9, 123:12, 131:25, 135:3, 136:3, 141:5, 146:25, 149:12, 152:10, 159:21, 159:23, 172:2, 176:6, 176:15, 177:2, 182:13, 183:20, 184:12

**seeing** [2] - 40:3, 56:16

**seek** [1] - 90:4

**selecting** [1] - 55:21

**self** [1] - 25:6

**self-evident** [1] - 25:6

**sell** [4] - 24:13, 24:16, 27:3, 138:6

**selling** [2] - 26:5, 27:15

**send** [3] - 43:18, 182:2, 182:4

**sending** [1] - 163:5

**sense** [3] - 118:5, 131:6, 131:14

**sensitive** [1] - 72:20

**sent** [12] - 43:25, 44:7, 54:21, 119:20, 134:12, 134:13, 161:1, 161:7, 163:2,

164:5, 165:16, 169:2

**sentence** [16] - 24:21, 35:24, 36:4, 118:16, 122:1, 143:6, 143:7, 143:13, 147:8, 148:14, 148:18, 149:1, 149:12, 151:9, 176:12

**sentences** [1] - 150:10

**separate** [6] - 48:15, 96:15, 103:14, 105:18, 107:11, 146:1

**separated** [1] - 103:24

**separately** [2] - 47:23, 119:15

**sequence** [1] - 4:21

**serve** [13] - 22:21, 22:24, 48:11, 96:7, 96:13, 96:23, 96:24, 97:7, 97:10, 97:16, 97:17, 117:22, 165:20

**served** [1] - 160:25

**service** [9] - 69:14, 70:21, 117:15, 118:18, 118:25, 121:6, 124:10, 145:23, 148:7

**services** [10] - 67:13, 69:17, 121:3, 121:5, 126:14, 145:16, 145:19, 146:8, 146:11, 173:25

**serving** [1] - 124:5

**session** [1] - 92:8

**set** [3] - 122:22, 145:12, 145:22

**setting** [1] - 120:6

**settings** [2] - 155:14, 155:15

**settle** [1] - 81:17

**settled** [1] - 123:18

**setup** [2] - 155:16, 157:20

**seven** [3] - 140:4, 140:5, 171:21

**several** [8] - 22:2, 61:3, 66:10, 66:13, 71:25, 122:9, 122:18, 145:8

**Shall** [1] - 26:16

**shall** [8] - 25:1, 36:5, 126:13, 128:20, 143:9, 144:6, 148:24, 151:12

**shared** [8] - 103:15, 103:19, 105:19, 105:25, 107:22, 135:21, 157:10,

171:20

**shareholder** [5] - 176:12, 177:13, 177:25, 178:1, 178:20

**Shareholder** [5] - 35:15, 125:14, 138:25, 139:3, 142:17

**shareholders** [4] - 126:2, 126:3, 127:4, 127:7

**shares** [3] - 127:12, 138:6, 138:7

**sharing** [1] - 116:23

**shelf** [2] - 161:24, 162:2

**shelved** [1] - 162:1

**short** [5] - 52:17, 53:14, 175:1, 175:7, 187:11

**shorten** [1] - 124:10

**shortly** [2] - 115:19, 119:19

**show** [22] - 7:9, 13:14, 17:9, 17:15, 17:21, 25:15, 30:11, 33:22, 35:4, 74:4, 87:2, 99:2, 112:5, 116:4, 121:21, 137:13, 158:17, 159:22, 163:8, 167:8, 180:22, 185:3

**showcase** [1] - 72:2

**showed** [4] - 22:17, 27:13, 80:24, 99:4

**showing** [11] - 16:1, 29:15, 29:21, 31:11, 39:21, 39:23, 53:18, 74:12, 112:9, 112:15, 182:11

**shown** [11] - 32:14, 35:3, 35:8, 35:21, 37:22, 37:24, 74:7, 100:7, 102:6, 108:13

**shows** [7] - 9:22, 50:20, 53:2, 153:21, 153:23, 153:24

**shrink** [1] - 115:21

**Shula** [1] - 154:12

**sic** [1] - 88:16

**side** [7] - 8:12, 54:11, 127:16, 128:7, 134:4, 157:25

**sidebar** [18] - 19:22, 21:10, 22:14, 40:15, 41:17, 46:3, 46:4, 46:5, 49:7, 51:21, 99:15, 105:8, 158:8, 158:9, 166:1, 166:21, 178:10, 181:11

**Sidebar** [5] - 19:24,

40:17, 47:10, 160:19, 166:3

**sides** [1] - 127:24

**sign** [3] - 137:18, 137:20, 174:5

**signal** [1] - 78:11

**signature** [4] - 109:19, 123:12, 124:21, 171:13

**signatures** [3] - 124:20, 124:23, 124:24

**signed** [18] - 25:14, 44:12, 123:14, 125:23, 126:9, 138:18, 138:20, 138:21, 139:20, 139:21, 140:2, 143:23, 144:14, 149:2, 154:11, 154:13, 172:11, 174:10

**significance** [1] - 50:5

**signing** [1] - 177:25

**similar** [3] - 45:11, 119:1, 148:23

**simple** [2] - 98:18, 147:17

**simplistic** [1] - 109:4

**simply** [1] - 38:23

**simultaneously** [1] - 139:15

**single** [3] - 8:13, 43:21, 154:5

**sister** [1] - 138:24

**sit** [1] - 99:12

**sitting** [3] - 37:15, 115:7, 134:3

**situation** [3] - 54:10, 66:19, 94:17

**six** [4] - 4:19, 90:13, 140:3, 151:24

**sixth** [1] - 131:9

**skip** [1] - 173:7

**slightly** [1] - 107:2

**slower** [1] - 158:20

**small** [1] - 116:19

**Smart** [1] - 80:18

**Smile** [1] - 72:9

**snapshots** [1] - 133:8

**Software** [1] - 138:11

**software** [40] - 4:12, 5:7, 5:16, 5:25, 6:1, 6:15, 8:7, 8:8, 8:11, 8:12, 8:13, 8:18, 8:21, 9:5, 9:14, 10:2, 12:11, 12:25, 13:1, 13:11, 13:22, 13:23, 27:24,

27:25, 49:9, 49:11, 49:19, 49:21, 50:5, 50:7, 50:13, 51:25, 52:8, 58:23, 58:24, 117:23, 120:24, 137:10, 137:24

**sold** [1] - 138:7

**someone** [9] - 16:5, 16:9, 19:3, 54:5, 54:7, 54:8, 149:24, 161:19, 181:2

**sometimes** [7] - 42:17, 62:23, 64:22, 74:10, 85:14, 120:17, 140:5

**somewhat** [1] - 65:18

**sophisticated** [2] - 109:3, 109:5

**sorry** [35] - 4:3, 11:4, 16:10, 16:18, 18:9, 21:7, 23:1, 27:19, 31:21, 31:22, 34:4, 37:16, 38:20, 40:11, 41:7, 47:24, 61:2, 64:11, 71:8, 71:15, 71:23, 79:18, 80:1, 88:15, 101:13, 107:13, 114:2, 122:20, 126:6, 158:20, 163:17, 177:5, 184:16, 185:16

**sort** [5] - 21:16, 56:10, 57:25, 59:1, 163:6

**sought** [1] - 172:22

**sounds** [1] - 183:2

**source** [3] - 106:24, 106:25, 107:1

**South** [1] - 82:23

**SOUTHERN** [1] - 1:1

**space** [2] - 27:1, 123:12

**speaking** [1] - 166:2

**speaks** [1] - 36:14

**spear** [1] - 121:6

**special** [2] - 140:6, 154:11

**specific** [11] - 7:11, 12:18, 43:13, 44:3, 62:7, 77:20, 79:23, 85:22, 114:9, 151:19, 152:16

**specifically** [8] - 23:7, 30:11, 40:25, 58:9, 79:14, 134:1, 134:7, 146:16

**specifications** [2] - 145:15, 145:17

**specimen** [1] - 170:7

**specimens** [1] - 171:19

**spend** [2] - 76:20, 83:24

**sponsor** [5] - 67:2, 67:4, 68:24, 71:13, 71:25

**sponsored** [3] - 71:10, 81:20, 82:3

**sponsorship** [8] - 66:20, 71:15, 73:14, 73:20, 79:9, 79:23, 84:9, 84:24

**sponsorships** [1] - 66:10

**spouse** [1] - 89:8

**staff** [1] - 79:13

**stage** [1] - 150:7

**stages** [1] - 80:13

**stamp** [3] - 75:9, 75:18, 123:7

**stand** [5] - 15:4, 63:7, 63:9, 114:18, 141:18

**standard** [1] - 133:11

**standing** [1] - 134:3

**standpoint** [2] - 70:23, 97:11

**start** [13] - 14:20, 57:23, 75:2, 115:10, 115:13, 132:25, 147:7, 152:25, 157:7, 159:17, 175:11, 185:24, 187:8

**started** [8] - 38:16, 38:17, 65:4, 115:14, 133:23, 157:8, 159:18, 162:14

**starting** [2] - 3:9, 95:24

**State** [6] - 32:23, 79:20, 80:9, 82:12, 117:18, 124:15

**state** [22] - 7:1, 23:2, 26:18, 31:8, 32:5, 38:25, 39:5, 39:7, 39:16, 40:2, 41:1, 41:10, 77:21, 117:19, 124:2, 132:3, 152:25, 158:12, 159:3, 166:18, 173:17

**state-by-state** [1] - 132:3

**statement** [9] - 3:20, 5:17, 9:17, 34:24, 59:25, 132:20, 166:4, 166:17, 167:15

**statements** [6] - 172:3, 172:5, 174:2, 174:4, 174:7, 174:14

**states** [12] - 19:11, 23:9, 122:24, 145:3, 146:13, 150:22, 152:12, 152:19, 152:23, 152:24, 153:5, 153:6

**States** [8] - 1:23, 80:21, 131:21, 134:25, 169:18, 172:4, 173:5, 188:10

**STATES** [2] - 1:1, 1:11

**statistical** [1] - 57:25

**status** [1] - 38:7

**statute** [1] - 181:2

**stay** [1] - 141:4

**stayed** [5] - 109:12, 125:11, 125:12, 140:9, 155:3

**staying** [2] - 120:1, 120:15

**stealing** [1] - 41:4

**STENOGRAPHICA LLY** [1] - 1:21

**step** [9] - 52:15, 52:21, 63:10, 91:7, 114:14, 132:1, 137:9, 141:7, 183:23

**steps** [1] - 152:17

**Steve** [1] - 112:20

**STEVEN** [2] - 2:4, 2:10

**Steven** [37] - 3:6, 8:1, 15:4, 24:24, 31:12, 47:11, 89:8, 93:7, 93:24, 94:5, 94:15, 94:25, 102:5, 122:6, 123:15, 125:2, 125:18, 127:9, 132:19, 133:19, 134:1, 135:22, 137:11, 138:6, 139:18, 140:3, 143:16, 144:19, 145:7, 149:19, 151:10, 153:22, 168:12, 170:23, 182:3, 182:4, 187:14

**still** [12] - 3:14, 12:7, 17:4, 17:6, 17:8, 33:15, 48:17, 54:9, 90:16, 97:25, 101:13, 137:3

**stipulate** [3] - 57:8, 58:12, 61:13

**stipulated** [5] - 55:14, 60:21, 167:20, 167:22, 180:8

**stipulating** [1] - 57:3

**stipulation** [8] - 55:9,

56:10, 158:14, 158:18, 158:23, 159:7, 160:11

**stipulations** [2] - 167:25, 168:2

**Stock** [1] - 137:14

**stock** [5] - 138:1, 138:4, 138:23, 178:1, 180:15

**stole** [1] - 9:6

**stop** [4] - 53:3, 138:8, 165:21, 175:8

**stopped** [2] - 64:1, 156:6

**stranger** [2] - 10:18, 93:11

**strategic** [3] - 66:8, 67:19, 85:15

**strategically** [1] - 68:8

**street** [2] - 10:18, 120:15

**strength** [1] - 85:2

**strengthen** [1] - 118:17

**strings** [1] - 149:23

**structure** [2] - 123:1

**stuck** [1] - 149:18

**stuff** [2] - 27:3, 59:9

**style** [1] - 156:10

**subject** [10] - 40:23, 102:14, 113:24, 147:21, 148:5, 150:22, 158:12, 159:3, 159:5, 184:9

**submit** [3] - 57:5, 60:7, 60:18

**submitted** [4] - 55:9, 57:3, 134:14, 170:7

**Subpoena** [6] - 26:18, 115:24, 116:22, 117:14, 124:8, 124:10

**subpoena** [1] - 117:22

**subpoenas** [3] - 117:16, 124:5, 165:20

**subscribed** [1] - 127:12

**subscribers** [1] - 70:25

**subsequent** [1] - 13:4

**subsequently** [2] - 176:22, 178:17

**substantially** [1] - 58:23

**successful** [1] - 76:22

**successfully** [1] -

26:20

**sue** [1] - 38:19

**suffer** [2] - 158:2, 161:6

**suffered** [1] - 159:22

**suggest** [1] - 104:9

**suggested** [1] - 130:21

**suggesting** [2] - 11:7, 45:20

**sum** [1] - 85:11

**summaries** [7] - 20:6, 21:21, 54:11, 54:14, 54:15, 54:24, 55:22

**summary** [28] - 18:3, 18:7, 18:11, 18:12, 20:1, 20:5, 20:8, 20:10, 20:13, 20:23, 21:5, 21:10, 21:11, 21:18, 53:16, 53:17, 53:19, 53:20, 53:22, 53:25, 54:16, 55:3, 55:6, 57:20, 60:15, 63:2

**Summons** [1] - 124:8

**Sunrise** [1] - 164:4

**Super** [2] - 73:16, 74:1

**superseded** [1] - 144:8

**supervisor** [1] - 64:23

**support** [1] - 26:19

**suppose** [1] - 27:1

**supposed** [2] - 28:9

**Susan** [4] - 72:15, 82:20, 83:1, 84:5

**sustain** [2] - 19:19, 181:10

**sustained** [4] - 131:11, 156:22, 165:24, 167:4

**SW** [1] - 1:15

**sweat** [1] - 26:25

**sworn** [2] - 63:15, 114:22

**symbol** [2] - 78:8, 78:15

**synergism** [1] - 119:11

**system** [7] - 18:4, 19:7, 54:19, 105:25, 106:2, 107:20, 109:12

**T**

**table** [6] - 115:7, 137:11, 137:12,

141:10, 155:15, 155:16

**tactic** [1] - 161:21
**tailor** [1] - 159:14
**Tallahassee** [1] - 121:8
**Tampa** [1] - 121:8
**Tankersley** [1] - 38:7
**target** [1] - 72:12
**targeted** [1] - 71:3
**Taste** [3] - 73:14, 76:21, 137:7
**tasting** [1] - 73:22
**tax** [1] - 136:14
**team** [1] - 162:12
**TEAS** [1] - 169:17
**telephone** [2] - 43:14, 170:11
**ten** [4] - 6:15, 49:9, 51:25, 138:6
**Tennessee** [2] - 146:4, 155:9
**terminated** [1] - 144:6
**terminates** [1] - 145:6
**terminating** [3] - 161:1, 161:7, 161:8
**terminology** [1] - 150:9
**terms** [7] - 55:24, 71:2, 142:16, 148:16, 180:2, 180:5, 180:23
**territorial** [2] - 79:25, 80:2
**testified** [3] - 17:1, 25:12, 171:4
**testify** [4] - 11:7, 58:20, 95:2, 135:16
**testifying** [4] - 54:4, 82:21, 166:6, 184:1
**testimonial** [1] - 82:9
**testimony** [31] - 4:19, 6:9, 6:13, 6:20, 6:23, 8:4, 8:5, 10:22, 12:24, 13:5, 14:17, 26:3, 31:8, 31:9, 33:10, 34:2, 34:6, 35:9, 51:6, 53:3, 91:9, 93:23, 94:9, 95:4, 95:6, 108:4, 115:8, 160:14, 179:1, 186:2, 187:11
**Texas** [6] - 146:13, 152:12, 153:2, 155:9, 164:7
**text** [1] - 112:22
**THE** [355] - 1:10, 1:13, 1:17, 3:2, 3:4, 3:14, 4:25, 5:9, 6:11,

6:19, 6:22, 7:9, 7:16, 7:20, 7:23, 8:3, 8:20, 9:1, 9:12, 10:7, 10:21, 11:5, 11:18, 11:24, 12:2, 12:14, 14:5, 14:20, 14:24, 15:2, 15:5, 15:17, 15:20, 16:16, 17:18, 18:16, 18:19, 18:21, 18:23, 19:1, 19:3, 19:6, 19:10, 19:14, 19:16, 19:19, 19:21, 20:8, 20:22, 21:3, 21:6, 21:8, 21:18, 21:25, 22:10, 28:5, 29:1, 29:4, 29:8, 29:12, 29:14, 29:18, 31:21, 31:22, 32:9, 32:14, 33:11, 33:24, 35:5, 36:15, 36:17, 37:18, 39:17, 39:20, 40:10, 40:11, 40:15, 40:18, 41:6, 41:13, 41:23, 41:25, 45:9, 46:6, 46:14, 46:20, 47:6, 47:12, 47:18, 47:19, 47:23, 47:24, 48:1, 48:3, 48:6, 48:8, 48:14, 48:19, 48:22, 48:25, 49:2, 49:8, 49:17, 49:22, 49:25, 50:2, 50:9, 50:17, 50:19, 50:22, 51:4, 51:13, 51:15, 51:17, 51:20, 51:22, 52:4, 52:6, 52:9, 52:10, 52:21, 53:6, 53:12, 55:6, 55:16, 56:13, 56:18, 56:20, 56:23, 57:12, 57:19, 58:9, 58:14, 59:6, 59:9, 59:23, 60:22, 61:1, 61:15, 62:12, 62:17, 62:21, 63:8, 63:12, 63:13, 74:12, 74:14, 74:16, 78:4, 87:24, 88:1, 88:7, 88:9, 88:14, 88:17, 90:6, 90:9, 90:12, 90:15, 91:3, 91:7, 91:10, 91:11, 91:17, 91:20, 92:1, 92:4, 92:6, 92:9, 92:12, 96:18, 98:15, 99:8, 99:13, 99:16, 99:21, 99:23, 100:2, 100:4, 100:12, 100:19, 100:21, 101:1, 101:4, 101:8, 101:15, 101:20, 101:22, 102:4, 102:10, 102:12,

102:16, 102:21, 103:4, 103:6, 103:9, 103:12, 103:18, 103:25, 104:6, 104:9, 104:14, 104:17, 105:2, 105:5, 105:10, 105:20, 105:21, 105:22, 106:4, 106:8, 106:9, 106:10, 106:13, 106:14, 106:17, 106:21, 107:2, 107:6, 107:7, 107:10, 107:15, 107:18, 107:23, 108:3, 108:5, 108:9, 108:11, 108:15, 108:18, 108:22, 108:25, 109:2, 109:8, 109:11, 109:14, 109:18, 109:20, 109:21, 109:23, 109:24, 110:1, 110:4, 110:7, 110:12, 110:15, 110:19, 111:2, 111:6, 111:12, 111:17, 111:21, 111:25, 112:9, 112:13, 112:15, 112:19, 113:1, 113:5, 113:9, 113:11, 113:15, 113:18, 114:2, 114:5, 114:9, 114:12, 114:15, 114:16, 114:20, 114:23, 118:10, 118:14, 131:11, 131:16, 139:5, 140:20, 140:23, 141:7, 141:8, 141:9, 141:12, 141:16, 156:22, 158:8, 158:10, 158:17, 158:20, 159:8, 159:25, 160:5, 160:7, 160:14, 163:16, 163:19, 163:21, 165:24, 166:1, 166:4, 166:8, 166:11, 166:16, 166:22, 167:4, 167:25, 168:2, 175:1, 175:5, 175:15, 175:18, 175:21, 177:5, 177:7, 177:15, 177:18, 178:6, 178:8, 178:11, 178:13, 178:19, 178:21, 178:24, 179:9, 179:17, 179:19, 179:22, 179:25, 180:14, 180:19, 181:7, 181:10,

181:15, 181:19, 183:2, 183:7, 183:10, 183:16, 183:23, 183:24, 183:25, 184:4, 184:11, 184:15, 184:17, 184:20, 184:23, 185:9, 185:16, 185:23, 186:7, 186:12, 186:15, 186:24, 187:13, 187:15
**themselves** [1] - 127:12
**therein** [1] - 54:7
**thereof** [1] - 173:23
**thereto** [1] - 173:24
**thinking** [2] - 9:20, 163:6
**third** [5] - 59:19, 126:18, 135:23, 171:13
**thirty** [1] - 110:10
**thoughts** [3] - 10:10, 10:11
**thousand** [1] - 84:4
**thousand-dollar** [1] - 84:4
**thousands** [1] - 21:12
**threat** [5] - 101:6, 101:11, 101:17, 107:9, 107:17
**threats** [1] - 4:7
**three** [38] - 4:4, 7:18, 10:6, 26:13, 32:7, 33:5, 54:23, 60:4, 67:7, 67:9, 70:6, 72:6, 77:22, 95:23, 98:18, 119:12, 125:12, 125:24, 126:7, 126:9, 126:19, 129:1, 132:20, 137:24, 145:9, 146:17, 151:15, 151:24, 152:12, 153:7, 185:5, 185:11, 185:25, 186:17, 186:20
**three-page** [1] - 185:11
**threshold** [2] - 53:21, 55:24
**throughout** [5] - 69:11, 115:7, 117:18, 117:19, 181:1
**throw** [2] - 153:25, 154:2
**thrown** [1] - 41:5
**Thursday** [1] - 187:17

**timely** [1] - 62:4
**timing** [1] - 186:15
**tires** [1] - 115:17
**Title** [2] - 172:4, 173:4
**title** [1] - 148:11
**titled** [3] - 24:20, 35:21, 38:2
**titles** [1] - 147:21
**TM** [4] - 78:25, 79:2, 104:21, 104:25
**today** [18] - 20:12, 37:15, 42:21, 51:9, 60:16, 64:25, 73:6, 77:2, 77:7, 108:13, 141:1, 157:5, 161:13, 174:5, 179:2, 184:7, 185:20, 185:24
**today's** [1] - 162:17
**toes** [1] - 152:17
**together** [10] - 47:3, 47:21, 47:23, 48:1, 48:11, 48:12, 73:16, 133:5, 143:17, 144:20
**tomorrow** [13] - 175:9, 175:13, 175:14, 175:15, 179:3, 183:18, 183:20, 183:24, 185:3, 186:7, 186:21, 187:16, 187:20
**Tony** [1] - 112:19
**took** [4] - 62:25, 81:5, 81:6, 158:24
**tools** [1] - 155:23
**top** [6] - 8:16, 76:15, 78:22, 109:18, 170:1, 182:11
**tortious** [5] - 38:19, 38:21, 40:13, 40:25, 41:7
**tortiously** [3] - 38:6, 38:10, 40:21
**total** [2] - 26:17, 138:22
**totally** [2] - 9:23
**Tots** [2] - 72:9, 80:20
**tournament** [2] - 71:25, 79:12
**tournaments** [1] - 154:2
**towards** [2] - 120:21, 179:20
**Toys** [2] - 72:9, 80:20
**toys** [1] - 80:25
**trade** [1] - 31:23
**trademark** [31] - 8:12, 28:20, 29:22, 36:1, 36:6, 36:10, 36:20, 36:23, 37:1,

37:6, 37:8, 37:11, 79:1, 108:10, 108:24, 111:13, 130:7, 132:3, 132:4, 132:12, 135:14, 142:24, 143:9, 143:18, 168:22, 168:23, 169:4, 169:17, 176:20, 182:17, 182:22

**Trademark** [7] - 35:21, 44:18, 131:21, 135:1, 135:12, 142:23, 169:18

**trademark/service** [1] - 172:22

**Traders** [1] - 115:15

**traditional** [1] - 70:16

**traffic** [1] - 3:15

**train** [1] - 141:21

**Train** [1] - 72:9

**transact** [3] - 147:22, 150:23, 173:17

**transcript** [6] - 7:1, 7:14, 10:6, 32:18, 185:15, 185:16

**transcription** [1] - 188:4

**transfer** [2] - 129:14, 150:6

**transfers** [1] - 26:2

**translation** [1] - 106:23

**transpired** [1] - 137:10

**travel** [1] - 77:21

**traveled** [1] - 153:23

**trial** [10] - 10:25, 11:8, 11:11, 21:22, 45:10, 54:3, 56:24, 115:8, 185:25, 187:2

**TRIAL** [1] - 1:10

**tripled** [1] - 136:11

**true** [16] - 21:11, 30:18, 33:19, 36:3, 45:4, 45:5, 48:23, 60:14, 110:25, 129:22, 174:2, 174:4, 174:8, 174:12, 174:15

**truthful** [1] - 13:15

**try** [7] - 9:11, 43:11, 68:8, 85:16, 96:14, 97:11, 120:17

**trying** [9] - 20:9, 61:6, 65:20, 98:3, 98:6, 104:25, 109:7, 122:22, 187:7

**turn** [5] - 53:7, 53:12, 72:21, 86:5, 110:15

**turned** [2] - 72:18, 73:1

**turns** [1] - 165:17

**two** [39] - 4:3, 4:15, 30:11, 33:5, 66:24, 69:16, 70:5, 70:9, 77:22, 78:22, 81:14, 82:2, 83:6, 93:15, 96:12, 96:14, 96:15, 96:17, 96:22, 98:2, 98:7, 104:12, 104:19, 122:17, 122:24, 124:23, 124:24, 128:3, 130:8, 137:23, 138:22, 148:2, 167:14, 170:25, 178:12, 179:14, 182:20, 187:10

**type** [8] - 43:5, 70:24, 122:25, 136:13, 146:1, 150:22, 155:14, 164:19

**types** [3] - 155:14, 155:22, 155:23

**typically** [1] - 54:3

**U**

**U.S** [3] - 35:25, 80:21, 142:24

**ultimate** [3] - 40:14, 94:10, 94:19

**ultimately** [2] - 94:13, 180:3

**unambiguous** [1] - 180:4

**unbeknownst** [1] - 162:3

**under** [16] - 20:5, 26:16, 51:6, 55:20, 122:25, 130:1, 131:21, 144:5, 147:21, 148:5, 150:23, 172:4, 173:4, 176:12, 176:13, 180:6

**underlying** [10] - 12:19, 20:3, 20:23, 21:10, 21:13, 53:18, 59:6, 59:7, 62:5, 184:8

**underneath** [1] - 177:4

**undersigned** [1] - 172:2

**understood** [15] - 5:20, 25:8, 42:24, 88:10, 91:24, 95:4, 95:14, 98:1, 98:7, 147:1, 147:19, 148:6,

148:18, 149:14, 152:14

**undisputed** [1] - 180:8

**unfair** [4] - 4:22, 41:7, 41:8, 55:1

**unfortunate** [1] - 50:6

**Uni** [1] - 106:22

**unilateral** [1] - 162:4

**Unisource** [182] - 3:5, 3:6, 16:6, 16:7, 17:23, 18:1, 18:4, 23:18, 24:7, 24:13, 24:14, 24:16, 25:1, 26:6, 26:8, 26:9, 26:23, 27:6, 27:10, 27:15, 27:17, 27:21, 28:8, 28:18, 30:18, 30:23, 30:25, 32:1, 34:12, 34:17, 34:20, 34:25, 35:24, 36:1, 36:6, 36:7, 36:9, 36:11, 36:19, 39:8, 39:10, 41:20, 42:3, 42:9, 43:1, 43:6, 43:15, 45:3, 48:20, 49:11, 52:2, 61:17, 64:13, 64:19, 64:20, 64:21, 65:2, 65:6, 65:12, 65:21, 65:22, 66:12, 67:17, 67:22, 68:19, 68:20, 69:9, 69:17, 69:25, 71:5, 71:18, 72:2, 72:5, 73:10, 76:12, 77:8, 77:15, 77:18, 78:17, 79:2, 79:6, 82:3, 82:10, 82:24, 83:7, 83:11, 84:3, 85:12, 85:19, 86:9, 89:6, 89:9, 89:25, 92:19, 93:1, 93:14, 93:17, 96:9, 96:10, 96:16, 96:22, 97:6, 97:7, 99:3, 100:5, 100:6, 100:23, 101:5, 101:9, 101:10, 101:11, 101:17, 101:23, 102:24, 103:2, 104:18, 106:6, 106:22, 107:4, 107:5, 107:9, 107:11, 107:12, 107:16, 107:24, 108:20, 109:16, 111:8, 115:6, 115:25, 123:7, 123:19, 123:24, 124:11, 129:4, 134:18, 142:23,

143:1, 143:3, 143:10, 144:15, 144:17, 146:21, 147:19, 148:23, 149:10, 150:5, 150:13, 150:14, 150:16, 150:25, 151:1, 151:2, 151:13, 152:5, 157:15, 158:2, 160:21, 160:24, 160:25, 161:1, 161:6, 161:11, 161:18, 164:7, 164:25, 165:4, 169:22, 170:2, 171:18, 172:14, 174:3, 174:23, 177:4, 180:21, 182:12

**UNISOURCE** [2] - 1:4, 1:7

**unisourcediscovery.com** [8] - 17:2, 17:7, 85:3, 86:11, 87:11, 100:7, 133:8, 157:16

**United** [7] - 80:21, 131:21, 134:25, 169:18, 172:4, 173:5, 188:10

**UNITED** [2] - 1:1, 1:11

**united** [1] - 1:23

**universal** [1] - 107:19

**unknown** [1] - 21:16

**unlawful** [1] - 148:25

**unlawfully** [1] - 149:5

**unless** [9] - 7:5, 12:1, 44:3, 54:8, 60:7, 128:3, 128:19, 144:21, 177:7

**unopposed** [1] - 20:12

**unpack** [1] - 146:25

**unresolved** [1] - 156:8

**unsigned** [1] - 123:11

**up** [52] - 3:16, 9:25, 11:5, 39:18, 41:6, 45:18, 46:23, 47:7, 48:3, 49:5, 58:6, 61:7, 62:24, 63:8, 63:11, 72:22, 80:21, 80:24, 91:3, 91:12, 92:10, 97:12, 102:16, 102:22, 104:8, 104:15, 106:4, 110:7, 113:6, 113:19, 113:20, 113:21, 114:13, 116:8,

117:12, 118:25, 122:22, 127:25, 134:5, 135:4, 141:18, 142:1, 145:9, 145:12, 149:9, 159:6, 164:14, 169:6, 180:25, 183:16, 185:3, 187:15

**update** [1] - 135:25

**uploading** [1] - 89:12

**upset** [1] - 165:22

**URLs** [2] - 161:17, 162:11

**Use"** [1] - 24:20

**uses** [1] - 150:12

**Utah** [1] - 12:6

**utilize** [2] - 70:8, 148:22

**utilized** [4] - 70:21, 79:21, 84:7, 150:13

**V**

**vague** [1] - 50:24

**VALDES** [1] - 1:14

**validity** [1] - 172:6

**value** [13] - 23:20, 24:1, 42:3, 42:5, 42:7, 42:8, 42:11, 42:12, 42:20, 123:24, 144:23, 160:2

**varies** [1] - 79:11

**variety** [1] - 71:21

**various** [1] - 84:7

**Vedra** [1] - 67:3

**Velarde** [1] - 3:12

**VELARDE** [135] - 1:17, 2:5, 2:7, 3:12, 6:25, 7:25, 8:5, 10:8, 11:15, 11:19, 12:1, 15:10, 15:15, 15:21, 15:23, 16:17, 17:15, 17:19, 18:14, 19:20, 19:22, 19:25, 20:11, 20:21, 21:5, 21:7, 22:12, 24:10, 24:12, 28:6, 29:3, 29:6, 29:16, 29:20, 31:25, 32:10, 32:15, 32:17, 33:12, 33:25, 35:6, 35:7, 36:18, 37:21, 39:13, 39:18, 39:21, 39:22, 40:12, 40:20, 41:18, 41:22, 46:11, 46:16, 47:4, 47:9, 48:7, 48:9, 48:17, 48:20, 48:23, 49:1, 49:14, 49:20, 50:1, 50:3, 50:18, 50:21, 51:16, 51:18, 53:8, 53:10, 54:13, 56:17,

57:11, 59:21, 59:24, 60:24, 87:25, 90:7, 92:15, 96:17, 96:19, 98:11, 99:22, 100:3, 100:11, 100:20, 101:3, 101:21, 102:3, 102:13, 103:10, 105:4, 105:7, 113:10, 113:19, 113:21, 114:3, 114:7, 114:11, 118:9, 131:8, 156:20, 158:6, 158:11, 158:19, 158:22, 160:8, 160:17, 163:15, 165:23, 166:12, 167:3, 167:13, 167:19, 169:8, 177:11, 177:16, 178:7, 178:16, 178:20, 178:23, 180:2, 181:14, 183:12, 183:15, 184:3, 184:6, 185:20, 185:24, 186:10, 186:14, 187:10, 187:14

**VELAZQUEZ** [1] - 1:14

**Vendor** [1] - 38:6

**venture** [5] - 6:16, 9:4, 9:24, 119:9, 121:2

**verdict** [2] - 159:12, 159:19

**verification** [1] - 59:14

**verify** [7] - 21:14, 54:5, 54:20, 55:5, 57:22, 58:1, 183:5

**verifying** [2] - 57:25, 102:14

**versa** [1] - 146:13

**versus** [2] - 3:5, 109:17

**via** [1] - 158:13

**vice** [1] - 146:13

**Victor** [1] - 3:12

**VICTOR** [1] - 1:17

**view** [2] - 24:5, 157:18

**violate** [1] - 12:8

**violates** [1] - 159:7

**visible** [2] - 67:8, 72:1

**visit** [4] - 77:12, 77:15, 140:1, 140:3

**visited** [3] - 119:21, 140:14, 154:24

**visiting** [1] - 154:25

**visits** [1] - 133:25

**visual** [1] - 89:13

**visually** [1] - 108:16

**visuals** [2] - 95:12, 109:12

**void** [1] - 144:3

**voir** [2] - 18:17, 62:1

**VOIR** [1] - 18:21

**Volume** [2] - 1:8, 187:23

**vs** [1] - 1:6

## W

**wait** [3] - 20:22, 102:24, 166:22

**waited** [1] - 134:22

**waiting** [1] - 3:14

**walk** [1] - 152:1

**wants** [4] - 104:24, 143:20, 143:21, 186:13

**warranted** [1] - 172:2

**watch** [1] - 63:10

**web** [7] - 86:16, 87:14, 95:12, 107:21, 109:12, 111:4, 157:2

**website** [72] - 16:20, 16:22, 16:23, 16:24, 16:25, 17:6, 47:2, 47:20, 48:18, 48:21, 72:17, 72:18, 72:21, 73:1, 73:3, 85:3, 85:19, 86:4, 86:6, 86:8, 86:9, 86:14, 86:19, 86:23, 87:1, 87:11, 87:16, 87:18, 87:19, 89:14, 95:9, 95:12, 99:17, 99:24, 104:5, 105:24, 107:19, 107:22, 109:1, 109:3, 109:9, 109:11, 113:6, 113:24, 113:25, 114:4, 114:5, 114:7, 131:1, 133:7, 133:8, 145:16, 145:18, 157:5, 157:10, 157:21, 157:25, 159:23, 160:22, 161:9, 161:11, 162:5, 162:13, 170:19, 171:20, 173:21

**websites** [2] - 103:13, 105:17

**week** [1] - 164:24

**weeks** [3] - 4:15, 176:8, 180:25

**welcome** [3] - 62:22, 92:13, 141:17

**West** [1] - 121:8

**west** [2] - 43:12, 103:23

**whatsoever** [1] - 163:4

**WHITE** [1] - 1:18

**whole** [6] - 8:22, 46:18, 117:18, 123:17, 135:21, 155:16

**wide** [2] - 162:7, 182:19

**wife** [6] - 115:23, 117:1, 118:2, 125:4, 127:16, 128:7

**willful** [2] - 172:3, 172:5

**win** [1] - 155:22

**wiped** [1] - 158:1

**Wisconsin** [1] - 23:4

**wise** [3] - 136:8, 186:15, 187:7

**wish** [1] - 141:5

**withdraw** [5] - 83:13, 87:12, 124:3, 141:24, 171:23

**witness** [47] - 11:16, 11:17, 11:19, 11:21, 11:22, 11:25, 14:8, 18:17, 20:17, 20:19, 20:20, 28:4, 39:13, 39:20, 45:17, 45:24, 49:3, 52:14, 52:18, 52:23, 52:25, 53:8, 54:1, 56:14, 57:12, 59:16, 62:1, 62:10, 63:3, 63:4, 63:9, 63:15, 78:3, 91:21, 99:9, 100:22, 114:16, 114:22, 124:18, 130:20, 131:12, 141:18, 179:18, 184:1, 184:25

**Witness** [1] - 47:11

**WITNESS** [57] - 2:3, 17:18, 18:23, 19:1, 19:3, 19:6, 19:10, 19:14, 31:22, 36:17, 40:11, 47:18, 47:23, 48:1, 48:14, 48:19, 48:22, 48:25, 52:4, 52:9, 63:12, 91:10, 105:20, 105:22, 106:8, 106:10, 106:14, 106:21, 107:6, 107:10, 107:18, 108:3, 108:9, 108:15, 108:22, 109:2, 109:11, 109:18, 109:21, 109:24, 110:4, 110:19, 111:2, 111:6, 111:12, 111:17, 111:21, 111:25, 112:19, 113:1, 113:5, 114:2, 114:5, 114:9, 114:15, 141:8, 183:24

**witnesses** [4] - 6:9, 45:11, 90:21, 187:11

**wives** [1] - 79:13

**Women** [1] - 83:19

**women** [1] - 72:14

**word** [11] - 23:1, 31:24, 69:21, 78:8, 78:23, 82:9, 102:25, 111:8, 150:13, 160:10

**words** [7] - 81:13, 81:14, 83:6, 87:15, 94:9, 119:11, 148:23

**workings** [1] - 145:12

**works** [2] - 19:3, 89:3

**workshop** [1] - 67:24

**workshops** [2] - 66:17, 67:23

**would-be** [1] - 127:11

**Wrap** [2] - 115:20, 118:24

**wrap** [2] - 115:20, 115:21

**write** [5] - 45:13, 46:1, 49:4, 99:10, 122:16

**written** [2] - 70:3, 149:11

**wrote** [4] - 112:2, 147:17, 148:11, 182:10

**www. unisourcediscovery. com** [3] - 103:13, 105:17, 157:4

**www. unisourcediscovery. net** [2] - 103:14, 105:18

## Y

**year** [18] - 16:9, 25:25, 65:2, 67:6, 73:15, 80:21, 85:24, 86:2, 140:4, 140:5, 142:9, 148:2, 162:1, 165:8

**years** [10] - 3:19, 23:22, 23:24, 95:23, 115:22, 130:8, 145:9, 148:2, 153:1, 156:12

**yesterday** [18] - 8:1, 17:1, 24:3, 26:1, 28:20, 32:6, 32:11, 34:2, 34:6, 35:9, 37:22, 42:3, 42:21, 74:17, 115:8, 142:19, 156:2, 156:4

**York** [3] - 146:4, 149:9, 149:10

**young** [1] - 115:14

**yourself** [4] - 38:25, 39:2, 115:3, 147:5

## Z

**zero** [1] - 60:18

**ZORRILLA** [8] - 1:18, 90:25, 91:5, 91:13, 91:19, 91:24, 92:3, 92:5