UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 20-CV-23276-DPG

UNISOURCE DISCOVERY, INC., et al.,        Miami, Florida

    Plaintiffs,                               December 7, 2022

      vs.                                  Pages 1 to 235

UNISOURCE DISCOVERY, LLC, et al.,         9:30 a.m. to 5:45 p.m.

    Defendants.                               Volume 3
_____

JURY TRIAL
BEFORE THE HONORABLE DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:        JESUS SANCHELIMA, ESQ.
                          LIANY VELAZQUEZ, ESQ.
                          DIEGO VALDES, ESQ.
                          SANCHELIMA & ASSOCIATES
                          235 SW LeJeune Road
                          Miami, Florida 33134


FOR THE DEFENDANT:        VICTOR M. VELARDE, ESQ.
                          JUAN ZORRILLA, ESQ.
                          FOWLER WHITE BURNETT, P.A.
                          1395 Brickell Avenue
                          Miami, Florida 33131


STENOGRAPHICALLY REPORTED BY:

                          PATRICIA DIAZ, FCRR, RPR, FPR
                          Official Court Reporter
                          United States District Court
                          400 North Miami Avenue
                          11th Floor
                          Miami, Florida 33128
                          (305) 523-5178

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| NOEL MIJARES | | | |
| BY MR. SANCHELIMA | 5 | | 138 |
| BY MR. VELARDE | | 32 | |
| ALFRED LUTTER | | | |
| BY MR. VELARDE | 161 | | 195 |
| BY MR. SANCHELIMA | | 167 | |

| | |
|---|---|
| JUROR QUESTIONS TO MR. MIJARES | PAGE 151 |
| PLAINTIFFS' REST | PAGE 156 |
| DEFENSE MOTION FOR PARTIAL SUMMARY JUDGMENT | PAGE 157 |

| PLAINTIFFS' EXHIBITS | FOR ID | ADMITTED |
|---|---|---|
| Plaintiffs' Exhibit 17 | | 4 |
| Plaintiffs' Exhibit 15 | | 4 |
| Plaintiffs' Exhibit 18 | 14 | |
| Plaintiffs' Exhibit 31 | | 23 |
| Plaintiffs' Exhibit 32 | | 30 |

| DEFENSE EXHIBITS | FOR ID | ADMITTED |
|---|---|---|
| Defense Exhibit 30 | 51 | 52 |
| Defense Exhibit 31 | 57 | |
| Defense Exhibit 32 | 63 | 65 |
| Defense Exhibit 33 | | 96 |
| Defense Exhibit 34 | | 98 |
| Defense Exhibit 35 | | 99 |
| Defense Exhibit 36 | 114 | 114 |
| Defense Exhibit 37 | 111 | |
| Defense Exhibit 38 | 118 | 118 |

(Call to the Order of the Court.)

COURTROOM DEPUTY:  Calling case 20-CV-23276, Unisource Discovery, Inc. versus Unisource Discovery, LLC.

Counsel, please state your appearances, starting with the plaintiff.

MR. SANCHELIMA:  Good morning, Your Honor.  Jesus Sanchelima for the plaintiff.

MR. VELARDE:  Good morning, Your Honor, Victor Velarde and Juan Zorrilla for the defendants.

THE COURT:  Okay.  Are we ready to resume?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  All right.  I am going to bring in the jury.

Mr. Mijares, you can come back up.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  We are going to have to take a break for half an hour at 10:45.  I will tell the jury.  I have two hearings that I can't reschedule.

I will tell you in front of the jury when they come in.

COURT SECURITY OFFICER:  All rise for the jury, please.

THE COURT:  All right.

(The jury entered the courtroom at 9:35 a.m.)

THE COURT:  Please be seated everyone.

Good morning, ladies and gentlemen.  I was just telling the attorneys, so that we can have a full day, I had a lot of

other matters scheduled for today hoping that the trial would finish earlier.  We are still on schedule, but there are two matters that I can't reschedule.

They are longstanding, very important matters, so at 10:45 we will break for a half hour so I can take care of those other matters and then we will resume with trial.

All right.  Whenever you are ready.

MR. SANCHELIMA:  Thank you, Your Honor.

Just 30 seconds.

Your Honor, we are consulting as to whether or not there will be any objections to the exhibits we are planning to introduce, and counsel is going through them now.  Maybe that will expedite if we could enter the three at one time and that way we can expedite the proceedings a little bit.

Your Honor, it's been stipulated that 15 and 17 there are no objections from counsel.

THE COURT:  Exhibits 15 and 17?

MR. SANCHELIMA:  Correct.  Plaintiffs' Exhibits 15 and 17.

THE COURT:  Those exhibits will be admitted without objection.

(Plaintiffs' Exhibits 15 and 17 were admitted in evidence.)

MR. VELARDE:  Your Honor, if I may, I apologize, for 17 the stipulation was that there are certain highlights that block text of the exhibit, so the stipulation is that those

highlights will either be pushed back or removed so that the text can be shown.

THE COURT: Okay.

MR. VELARDE: With that stipulation, we have no objection to 17.

THE COURT: Okay. Which exhibit are you showing first?

MR. SANCHELIMA: Exhibit 15, Your Honor, please.

CONTINUED DIRECT EXAMINATION

BY MR. SANCHELIMA:

Q. Good morning, Mr. Mijares. This is Plaintiffs' Exhibit 15 that I am handing you.

Before we get into that, have you discussed your testimony so far with anyone?

A. No, I have not.

Q. Now, could you please review Plaintiffs' Exhibit 15 and tell us if you recognize that document?

A. I do.

Q. The document I handed you includes four pages. Correct?

A. Yes.

Q. All right. Page number one has an e-mail in the from field. Do you recognize that e-mail?

A. Yes.

Q. And I notice that it ends with .net.

Do you see that?

A. I do.

Q.   When did you start using that particular account?

A.   Probably around 2017, 2018.

Q.   Could you tell us why?

A.   Because at the time it was not being a hundred percent trustworthy of my .com account, my personal .com account.

Q.   You mean your e-mail .com account?

A.   I'm sorry, yes.

Q.   And you decided to set a different account from the one that you had been using until then?

A.   Correct.  I still had both e-mail accounts simultaneously.

Q.   And this was 2017.  Correct?

A.   Give or take, yeah.

Q.   At that time, were you -- what web page address were you using in 2017?

A.   The .com.

Q.   And until when did you use the .com website?

A.   2019.

Q.   And could you describe for the jury what happened when the account was, the .com website was disconnected?

A.   In 2019 is when they removed all our information from the co-owned, co-shared .com website.

Q.   Okay.  Could you describe better exactly what happened?

Did you -- was there like a grace period where you were given advance notice?

Could you please describe with detail what happened that

day with the office and there was no connection?

A.   Sure.

Well, there was no connection.  We just -- our information was wiped out.  So, I reached out to update the website. Again, it had been years since we had done the last upgrade to the website, going back to like 2012, I believe.  I wanted to freshen it up.  I wanted to add some things to it, so I reached out to the Persechini Company who handled that, and I was informed that Steven had already started doing a website update and that they could not include me into it.

At that time is when I learned, looking at the website, that they had removed all our information.  Everything that's related to Unisource Discovery, Inc. was wiped out.  That was very concerning because now our clients had no way of communicating with us via web.

For example, if somebody would reach out they wouldn't see anything.  They would be directed to California, not to us.

Q.   What advance notice, if any, did you receive?

A.   Zero, none.

Q.   So all of a sudden you came to your office and you couldn't work?

A.   Actually, this e-mail kind of tells the story.

Q.   On the second page, there is an e-mail in 2019, September of 2019.  Do you recognize that e-mail?

A.   I do.

Q.   And why did you write that e-mail?

A.   I wrote that e-mail because I needed for Steven to realize that he can't just do what he did, so I needed for him to work with us in providing Nikki with access to the website so at least we can take portions of what we own on the copyright of that website and build a new website.

That's why I wrote that, "Please provide Nikki with authorization to send copy of the website.  We would like for this process to be as amicable as possible, as the site holds copyright and trademark materials."

Q.   Can you tell us why the fifth -- I'm sorry, the fourth paragraph was inserted in there in that e-mail to Nikki?

Do you see that fourth paragraph?

A.   Are we talking about the September 13th e-mail?

Q.   Yes.

A.   That I just read out loud?

Q.   Yes, the fourth sentence after, Hi, Nikki; your message with hi Nikki.

A.   I am looking at the wrong one, hold on.

Q.   On the second page.  I'm sorry, the third page.

A.   You want me to look at the third.

Q.   The fourth -- the fourth sentence in that paragraph.

A.   Oh, sure.  Your question again was?

Q.   Why did you include -- first, read that fourth sentence.

A.   Please also understand that Unisource Discovery, Inc. is

the owner of the trademark and name.

Q.   Why did you write that?

A.   Because they had completely removed us from the .com website, but they were still using all our copyright and all our trademark material on the sites without our involvement at that time, so I wanted them to understand that let's work something out here because you guys -- what you are doing is not right, and that's why I wrote that notifying them that right now they are in breach.

Q.   So after you were disconnected, did the .com web page continue to use the mark and what we have been referred to as the logo and the website, .com?

A.   Yes.  Yeah, it did.

Q.   Did you protest that?

A.   I did.

Q.   And this e-mail is part of that, it's the initial protest. Correct?

A.   As a matter of fact, this is the initial, yeah, the initial time.  This was followed maybe by about three or four additional cease and desist letters.

Q.   What happened after you sent those additional cease and desist letters?

A.   Nothing.

Q.   So, to this date, the .com web page still uses the federally registered logo.  Correct?

MR. VELARDE:  Objection.  Leading.  Lack of foundation.

THE COURT:  Sustained.

BY MR. SANCHELIMA:

Q.  Okay.  Have you visited the .com web page recently?

A.  Yes.

Q.  And what do you see in that web page that you consider to be improper?

A.  Our registered trademark.

Q.  Is that one that we have discussed in this case?  I believe it's exhibit -- Plaintiffs' Exhibit 6.

Could you please display Plaintiffs' Exhibit 6?

I am showing you Plaintiffs' Exhibit 6.  Is that the mark and logo that is being used today as of your last visit to the .com web page?

A.  Yes.

Q.  I show you now what has been identified and admitted in the record as Plaintiffs' Exhibit 17 with some observations from counsel that we will disregard those entries with the, that have been blacked out because of the yellow highlighting, but other than that, do you recognize that document?

A.  I do.

Q.  Could you please describe to the jury and the Court what this document is?

A.  These are our Unisource Discovery orders that we received from clients, from law firms, insurance companies and claim

adjusters.

Q.   Are these all clients from exclusively the State of Florida?

A.   No.

Q.   What states are there, your recollection and by helping your recollection by looking at this exhibit, are those states?

A.   Georgia, Louisiana, Tennessee, New York, New Jersey, Ohio, Connecticut, Pennsylvania, Massachusetts.

Q.   Who created this document?

A.   Who generated the document?

Q.   Yes.

A.   I did.

Q.   What was the criteria that you used to generate this document?

A.   On our online system we have the ability to run -- since it's our system, we have the ability to run multiple types of reports, and this specific report shows us orders for a specific period of time, so I just went into that management report center, selected the orders by ordering and put a time frame in there and left it open so it can pull out all the data that the system generated.

Q.   What software does your system use?

A.   Proprietary.

Q.   Is that the same software you have been using over the years?

A.   Since day one, since 2006.

Q.   Do you know if that software -- do you know who created that software?

A.   I do.

Q.   Who?

A.   Alfred Lutter.

Q.   And is that the same software that Defendant Unisource California is using?

A.   It is.  To the best of my knowledge it is.

Q.   Well, that was the same software before you had problems -- withdraw that.

Was there a time where you were sure that that was the software the defendant Unisource California was using?

A.   Yes.

Q.   When were you sure of that?  What was the last year that you were sure of that?

A.   In 2021.

Q.   Today, do you know if the software that you are using is substantially identical to the one that Unisource California is using?

MR. VELARDE:  Objection.  Lack of foundation.

THE COURT:  Sustained.

BY MR. SANCHELIMA:

Q.   At the time that you had access to the software from Unisource California before the business relationship went

south, do you know if there were any differences between the two software, the one used by California and the one you were using?

A.   If it's from a time period from 2006 all the way to maybe 2016, maybe 2015.  It was identical software.

Q.   Is your software updated?

A.   No.

Q.   Could you describe why not?

A.   Whenever they would do updates to the software, for the most part, we would then experience errors on our end, and then we would have to report that.  And there was an update that was done on the California side but it was not transferred to us.  That's how we would know we have issues.

Q.   Who would you report those errors to?

A.   Alfred Lutter.

Q.   Have those errors been corrected?

A.   No.

Q.   Why not?

A.   You will have to ask Alfred Lutter.

Q.   Do you know if the state of your software today is affecting your ability to conduct business?

A.   Yes, it is.  I know that.

Q.   Affected adversity.  Correct?

A.   Very much so.  We cannot process volume subpoenas as we used to be able to.

MR. SANCHELIMA:  Your Honor, I am going to work with Exhibit 18.  I ask that the monitor be disconnected since counsel has voiced some objections to this document.

(Plaintiffs' Exhibit 18 was marked for identification.)

THE COURT:  Okay.

MR. SANCHELIMA:  Not this one, I'm sorry, unpublished.

THE COURT:  So that the jury can't see.

MR. SANCHELIMA:  Right, so that the jury cannot see it, right.

Counsel, would you like to voice your objections to this exhibit?

MR. VELARDE:  Yes, it's a 35-page document with --

THE COURT:  Well, for the jury, we only need to hear, and for my benefit, the legal objections.  If there is something you need to discuss, then we should do it at sidebar.

MR. VELARDE:  Yes, Your Honor.  Relevance and duplicative documents.

MR. SANCHELIMA:  I'm sorry, I can't hear you.

MR. VELARDE:  Duplicative, relevance, and it combines several e-mail chains into one PDF.  I would request a sidebar, Your Honor, so we can discuss other matters within this document.

THE COURT:  All right.  Approach.

(Sidebar conference.)

THE COURT:  First of all, what is this?

MR. SANCHELIMA:  These are a number of e-mails, Your Honor.  Defendant takes the position that there has been no control over the nature, over the quality and specifications of the web page, and the interaction of the businesses, and these set of e-mails show that there was an active role by Mr. Mijares trying to -- attempting to resolve problems dealing with the operation of the business.

If there is a specific e-mail that he believes is questionable, I will be glad to discuss it with him.

THE COURT:  These are e-mails between Mr. Lutter, Mr. Cerasale, Mr. Persechini.

MR. SANCHELIMA:  Definitely from Mr. Mijares.

THE COURT:  They are not all copied on all these e-mails.

MR. SANCHELIMA:  In the thread they should be somewhere.

THE COURT:  Well, for example, on this one -- on this first one Mr. Cerasale is copied.  It's sent to him but not on all of them.

MR. SANCHELIMA:  Well --

THE COURT:  Wait a minute, what is the objection?

MR. VELARDE:  Your Honor, there are several e-mail chains that seem to be irrelevant or not connected to each other.

Some of them have things that -- some of them are minor

things, but, for example, it has my firm's name on one of them, which I think would be potentially prejudicial and confusing.

MR. SANCHELIMA:  If it has your name --

THE COURT:  Sir, let me hear his objections.

MR. VELARDE:  I believe that maybe the best way to do this, Your Honor, is for each e-mail chain to be proffered and then we can have an objection to each one, but having -- these are several e-mail chains over a period of years with several different subject matters, not all of which -- arguably, none of which have to do with ownership or control but certain -- some of them have nothing to do with that but maybe it makes sense to do it e-mail chain by e-mail chain.

MR. SANCHELIMA:  I have a suggestion.  I don't want to cut the chain of testimony that I have so far.  So, why don't we, on the next break, counsel and I, sit down and go through each e-mail and see the ones that are troublesome.  And then I will decide whether or not I need them and then the ones that we really need to address we will come back to you and decide what to do with them.

THE COURT:  All right.  We will move on for now but I do have a question.

Was this whole chain of e-mails sent to Mr. Cerasale on July 8th of -- I mean, did he get all of these e-mails?

MR. SANCHELIMA:  Well, he is featured.  The way I filter them is by putting either his name or Mr. Mijares' name.

Mr. Mijares should be there or an employee of Mr. Mijares' company should be there or Mr. Lutter.

THE COURT:  So, these are compiled through a search -- it wasn't one chain of e-mails that was just printed?

MR. SANCHELIMA:  Well, each document --

THE COURT:  No, listen to what I am asking you.  We could send multiple e-mails involving different people and then someone could forward me that e-mail chain so then I have all the e-mails.

MR. SANCHELIMA:  Right, that's what this is.

THE COURT:  Okay.  As opposed to you doing a search for names and topics and this being --

MR. SANCHELIMA:  No, this is a topic, and the next subject comes.  It has a thread here and then another thread and so forth.

THE COURT:  We are going to have a half an hour break.

Why don't we wait until then and try to see if you can sort it out.

MR. SANCHELIMA:  Thank you, Your Honor.

THE COURT:  We will take up that issue later.

MR. SANCHELIMA:  Yes, we will discuss this later during the break.

(Sidebar conference concluded.)

MR. SANCHELIMA:  Let's do the numbers.  Otherwise, do you have an estimate of highest earnings year of Unisource

Florida?

THE WITNESS: It would be around the 2010 to 2012 period, 2013 period, around there.

BY MR. SANCHELIMA:

Q. During that time, the relationship, your relationship, how was your relationship with Defendant Cerasale at that time?

A. Very good, to my understanding.

Q. What was that figure? What were your earnings at that time?

A. Just approaching 6 million.

Q. Six million dollars?

A. Yeah.

Q. The year prior to the disconnect of the website .com, do you have an estimate as to what the earnings were for Unisource Florida?

A. A million.

Q. And then after the disconnect what were the earnings of Unisource Florida in 2020, for instance?

A. In the 500,000 territory.

Q. And in 2021?

A. The 300,000 territory.

Q. Do you have access to the records of Unisource Florida?

A. Which records?

Q. Corporate records?

A. Yes, I do.

Q.   Do they include the accounting records?

A.   Yes, they do.

Q.   Do you have access to the tax records of the corporation?

A.   I do.

Q.   And what kind of documents were sent to the shareholders from the corporation?  Were there any documents sent or not?

A.   Every year they would get a Schedule K with reports, and as far as last year is concerned, they got the full tax return.

Q.   I see.

     Can you estimate, from your access to the records, accounting records of Unisource Florida, an estimate as to what percentage of the sales are expenses?

A.   Roughly about 79 percent, 80 percent.

Q.   So, there is maybe -- I am not very good with accounting terms, but for the purposes of this discussion, we want to maybe agree that about 20 percent of the sales would be gross profits of the company?

A.   Give or take.

Q.   Was this, in your estimation, best estimate, was this the same percentage in 2012 as it was in 2019?

A.   No.

Q.   What was the percentage that you could estimate was in 2012?

A.   Probably double, 40 percent, 35 percent, around there.

Q.   And in 2019?

A.   Closer to the 20 percent.

Q.   And 2020?

A.   Less, a little less.

Q.   Less than what?

A.   Less than 20.

Q.   And in 2022?

A.   I don't know yet.

Q.   If you were to estimate for the 11 months -- how often -- sorry, I withdraw that.

How often do you check the records, the accounting records of Unisource Florida?

A.   Weekly.  Sometimes -- yeah, weekly at least, minimum.

Q.   And if you were to estimate the revenues for Unisource Florida today, what would be your best estimate?

A.   As of October, which was the last full closed month, we are a little bit over 315,000 for the year.

Q.   Would you say you are recuperating from your worst year?

MR. VELARDE:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. SANCHELIMA:

Q.   How does that compare with other years?

A.   It's improving.

Q.   In your opinion, what factors are affecting or determine the degree of improvement of your company, Unisource Florida, at this time?

A.   Affecting?

Q.   Yes.

A.   The degree of improvement, our inability to process volume, we lost that ability.  Sometime earlier on, 2017, I believe, 2018, there was a company that was added, but when that was added to the system, the company would -- you could see it in the -- I don't know if the jury can see that, but the company was added in the system, which is Equicopy, which has nothing to do with us --

        MR. VELARDE:  Objection.  Order in limine, Your Honor. This is the second time.

        THE COURT:  Sustained.

        THE WITNESS:  I could explain it differently.  That's the facts.

        THE COURT:  Sir, just wait for the next question, please.

BY MR. SANCHELIMA:

Q.   Could you please answer the same question without making reference to the company that you just mentioned?

A.   We used to have 35 different legal templates that we used to use to create subpoenas for all our clients in Florida, Texas, New York, Arizona, Connecticut, Illinois, etcetera, and all of those templates were deleted, removed without my consent, without ever being informed that that was going to take place.  So the entire company was left with only three

working templates, so I could only process Florida subpoena, a Florida depo subpoena, record subpoena and authorization.  That is it.

When that happened, we were no longer able to sustain the volume that we currently had.  It was impossible and even to this day it's impossible, so that's why we are where we are.

Q.  All right.  Leaving aside any monetary matters, what does Unisource Florida need to be made whole for the infringement and the counterfeiting of the federal registered mark, in your view?

A.  Let me see if I understand your question.  You are going to the revenue side?

Q.  No, let's leave out damages.  Let's leave out profits. Let's leave out everything.

At this point, what -- both companies are using the same name.  Correct?

A.  Correct.

Q.  What do you envision, what is your view as to what Unisource Florida needs so that it could go back to where it was working profitably?

MR. VELARDE:  Objection.  Relevance, and asking for an opinion of a layperson.

THE COURT:  Overruled.

THE WITNESS:  For the infringement to stop, which is causing confusion with clients, for continuous poaching of

clients of ours to stop, for us to have the ability again to have our templates that we used and we built throughout the years, which is the only way that my staff can process the volume that we need to process to get back to that level, those things are pivotal.

MR. SANCHELIMA:  Counsel, did we stipulate to Exhibit 31, Plaintiffs' Exhibit 31?

MR. VELARDE:  No objection, Your Honor.

THE COURT:  All right.  This is as to Exhibit 31?

MR. SANCHELIMA:  Yes, Your Honor.  May it be published?

THE COURT:  Yes.  Without objection, Plaintiffs' Exhibit 31 will be admitted.

(Plaintiffs' Exhibit 31 was admitted in evidence.)

MR. SANCHELIMA:  I am handling you what I have identified as Plaintiffs' Exhibit 31, Mr. Mijares, and I ask you if you recognize this document.

THE WITNESS:  I do.

BY MR. SANCHELIMA:

Q.   What is it?

A.   It's an Excel spreadsheet of all the orders per year and then broken down by state.

Q.   And who created this document?

A.   I did.

Q.   What did you use to create these documents?

A.   This was created from our own reports, the same report you

previously aired on the screen.  We took that report, we broke it down and then by Excel spreadsheet identified each state and then made a count of all the orders that came in by state for the year.

Q.   Okay.  I noticed that in 2006, the first row, that refers to what?

A.   Florida.

Q.   Florida.  What does that 289 number mean?

A.   Those are the first initial orders we took in when we officially started in June, July of 2006.

Q.   How about the other states from the second part of 2006, I guess.  What were your sales in the other states?

A.   Zero.

Q.   Now, in 2007, what happened in Florida?

A.   A lot of good stuff happened for the business in Florida in 2007.  We expanded and we were able to do something really special.

Q.   What do you consider to be something real special?

A.   We were able to grow significantly.  We were able to hire a lot of very talented people, and from that point on the company pretty much doubled in size.

Q.   Who hired the talented people?

A.   Mostly myself.

Q.   Anybody else?

A.   Sure, later on as I brought talented people, they hired

more talented people.

Q.   Did defendants -- I'm sorry, did I interrupt you?

A.   No.

Q.   Did Defendant Cerasale participate in the hiring of talented people?

A.   No, he did not.

Q.   So what happened in 2008?

I see a number there of 22,048 for Florida.

What does that mean?

A.   That's the number of orders we took in the state for 2008 for Florida alone.

Q.   It appears to be higher than 2007.  Correct?

A.   Double, yeah.

Q.   And in 2007 and 2008 the columns for the other states are not zero anymore.  Correct?

A.   Correct.

Q.   Do you have -- do you know why that was the case?

A.   We launched our national program.  Our footprint was starting to take root.  That was very important.  We expanded with our marketing, with our ads to reach out to new clients in different regions and that's why you see the numbers increasing across the country.

Q.   Okay.  And it looks like in 2007 Kentucky had 731 orders. Do you see that?

A.   I do.

Q.   What happened that time Unisource Florida was able to enjoy that increase from zero to 731?

A.   New clients.

Q.   The next the form says orders by billing customers.

Do you see that?

A.   I do.

Q.   When you created this report, could you explain what you understand to be billing customer?

A.   Any customer that orders from us.

Q.   So that would include any customers that pay Unisource Florida for services.  Correct?

A.   It does.

Q.   But do all customers pay for the services directly?

A.   No, not necessarily.  Some pay directly.  We take business from law firms, from insurance carriers, adjusters, from third-party administrators, which is private companies that handle insurance groups, from government entities, so they all pay somewhat differently depending on the arrangement.

Q.   So would there be an arrangement where maybe one of the customers would order a service and the bill is sent to another entity?

MR. VELARDE:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. SANCHELIMA:

Q.   Would you please explain the typical case of lawyers

ordering services from Unisource Florida?

A.   There is different types of law firms.  So you have what are called private law firms that are private attorneys and then have you what is called a staff counsel law firm, which works exclusively for an insurance company.  And then you have the third-party administrators, which are adjusters and then you have, within the levels of insurance carriers, adjusters for them that they also request orders.

So all those parties order differently.  Some want us to bill them directly back.  Others want us to bill the carrier directly, but at the end of the day, they all meet at the same spot because whoever pays for the service is the one who actually ordered it, needs it.  So it all culminates back.

It's like a wheel.  You get the order; you process the order; you bill the order.  That is the ultimate outcome of getting the records for the party that needs it.

Q.   Thank you.

That's what you meant by billing customers.  Correct?

A.   Yes, that's what it is.

Q.   So now we go to 2009, and for Florida was that a better year?

A.   Yeah, yes, it was a better year.

Q.   And the second one I believe if that's what, Iowa, IA?

The second column, I mean, the second row, is that IA?

A.   Correct.

Q.   What is that?  What state is that?

A.   I believe Iowa.

Q.   Excuse me, what state is that?

A.   I believe it's Iowa.

Q.   In 2009, if I read this correctly, there is 4,116 records. Is that -- does that correspond to orders?

A.   Yes.

Q.   After that, it appears that -- were there any improvements -- the question is, were there any improvements from 2008 to 2009?

A.   Improvements in our --

Q.   In sales?

A.   Absolutely, yeah.

We expanded our templates to include all these other states so we could take that business.  We made major improvements to the software.  We added a lot of new bells and whistles for clients that they wanted.

When we started with the software, it did not do all the things that it could do now in terms of providing the client a good experience.

Q.   I see.

And in 2011, I am looking at the first row, Florida, which is the one on the top, I see a drop.  Why was there a drop in 2011?

A.   Well, you know, there are ups and downs.  You have times

when you are able to successfully take in clients and sometimes some clients move on.

Q.   And how about 2012?

A.   Another drop.

Q.   It was another drop in Florida.  Correct?

A.   Correct.

Q.   And there was an increase in Iowa.  Correct?

A.   Correct.

Q.   What happened in Georgia?

A.   An increase, probably a new client was added there.

Q.   And Arizona?

A.   Also an increase.

Q.   Okay.  So up until 2012, do you consider that to be the normal operation of the business?

        MR. VELARDE:  Objection.  Leading.

        THE COURT:  Sustained.  If you will, rephrase it.

BY MR. SANCHELIMA:

Q.   How would you describe your business of Unisource Florida up until 2012?

A.   Healthy.

Q.   What happened after 2012 as far as orders are concerned?

A.   It maintained itself all the way until about 2016.

        MR. SANCHELIMA:  I'd like to identify Plaintiffs' Exhibit 32, Your Honor.  I don't believe that there is an objection to that exhibit, but I will ask counsel.

MR. VELARDE:  No objection.

THE COURT:  All right.  Without objection Plaintiffs' Exhibit 32 will be admitted.

(Plaintiffs' Exhibit 32 was admitted in evidence.)

MR. SANCHELIMA:  Would you please publish the exhibit?

THE COURT:  Yes, sir.

BY MR. SANCHELIMA:

Q.   Mr. Mijares, I hand you what has been identified as Plaintiffs' Exhibit 32.  Do you recognize this document?

A.   I do.

Q.   Who created this document?

A.   I did.

Q.   What criteria did you use to create this document?

A.   The same that I mentioned earlier from our management software program running the orders and part received from specific timeframes.

Q.   Is this -- what is the difference between this data and -- Plaintiffs' Exhibits 32 and Plaintiffs' Exhibits 31?

A.   This breaks it down by specific year, each report.  So you have a full report for the term of the years and then you have it broken down by each corresponding --

MR. SANCHELIMA:  Counsel, do you have an objection to Exhibit 33?

MR. VELARDE:  No, no objection.

I'm sorry, you said 33?

MR. SANCHELIMA:  Yes.

MR. VELARDE:  One second.

MR. SANCHELIMA:  Actually, don't bother, I am not going to use it.

Your Honor, may I have 30 seconds with my associate, please?

THE COURT:  Sure.

At any time during these breaks if you wanted to stand and stretch, feel free to do so.

MR. SANCHELIMA:  Your Honor, plaintiff has no further questions of this witness at this point.

THE COURT:  All right.  Cross.

CROSS-EXAMINATION

BY MR. VELARDE:

Q.  Good morning, Mr. Mijares.

Mr. Mijares, who owns the company, The Subpoena Company?

A.  Myself and Lisa Cote.

Q.  Who owns the name The Subpoena Company?

A.  The company does.

Q.  Has that always been the case?

A.  Yes.

Q.  Did you ever offer to sell the name The Subpoena Company to Mr. Steven Cerasale?

A.  I don't recall.

Q.  Did you ever offer to sell The Subpoena Company to the

Florida venture that you started with Mr. Cerasale?

A.   Maybe as an alternative name option, if that's what you are referring to.

Q.   To sell the name, the rights to the name?

A.   As an alternative for a name option, sure, that was the document I believe that you are referring to.

Q.   Let's discuss that document.

A.   Sure.

Q.   Your testimony -- just so that I am clear, your testimony is that you offered to sell the name The Subpoena Company to the Florida venture?  Was that the testimony?

A.   What testimony?

Q.   The one that you just gave?

A.   No, I was doing it on recollection.  That's why I said if you are mentioning an e-mail regarding when we were exploring possible names, I may have used The Subpoena Company as an option.

Q.   That wasn't my question.

My question was, did you offer to sell the name The Subpoena Company to the Florida company?

A.   Maybe.  It could have been an option at the time, yes.

Q.   I'm going to show you Plaintiffs' Exhibit 1.  It's already been admitted into evidence.

Can I publish it to the jury as well?

THE COURT:  Yes, sir.

BY MR. VELARDE:

Q.   This is the document you are referring to, correct, Mr. Mijares?

A.   I am, yes.

Q.   It's July 29, 2005.  Correct?

A.   Correct.

Q.   This is your e-mail to Mr. Steven Cerasale?

A.   Yes.

Q.   On page six, we have the operating name ideas.

Do you see that?

A.   I do.

Q.   If we look at number one, we see it says The Subpoena Company, a division of Unisource Discovery.  Correct?

A.   Correct.

Q.   So, from the very beginning this was agreed or at least intended by you and Mr. Cerasale, that the Florida venture would be a division of Unisource Discovery.  Correct?

A.   No, not necessarily.

Q.   So when it says "Division of Unisource Discovery," your testimony is you did not intend to be a Division of Unisource Discovery?

A.   No.  My testimony is that these were ideas at the time with some creative ways of making it, you know, look nice, and that's all it was, ideas.

Q.   So at the time, July 2005, was the idea -- was the idea

that the Florida company would be a Division of Unisource

Discovery?

A.   I think it says here "operating name ideas."

Now, I provided him with four options, but they are four

different options, and none of those options were selected at

the end.

Q.   Thank you.  That wasn't my question.

In 2005, July 2005, was the idea that you put forth -- this

is your e-mail.  Right?

A.   It is.

Q.   Was your idea that you put forth to Mr. Steven Cerasale in

July 2005 that the Florida venture would be a Division of

Unisource Discovery?

A.   I think you are misunderstanding what this is about.  At

this time in 2005 we were exploring what's called a joint

venture, which is very different from incorporation of a

company.  So, we were looking at a joint venture between The

Subpoena Company and Mr. Steven Cerasale's Unisource in

California.  That's why you have these options here.

Q.   Is that a no?

A.   That would be a no, yes, because these were based on a

joint venture between one company here in Florida and a company

in California.

Q.   So when you proffered or offered the idea of The Subpoena

Company, a Division of Unisource Discovery, your testimony is

you did not intend that company to be a Division of Unisource Discovery?

A.   No, it could have also been a Unisource Retrieval Company or Unisource Retrieval Partner or Group.  It was a joint venture name.

Q.   Understood.

So, let's talk about -- this wasn't the only e-mail that you sent to Mr. Steven Cerasale before you signed the operating agreement.  Right?

A.   No.

Q.   Let's look at the next one.

I am showing you what's been marked as Plaintiffs' Exhibit 2 admitted into evidence.

Do you see it on your screen?

Mr. Mijares, do you see that on your screen?

A.   I do.

Q.   This is the June 2nd, 2006, e-mail that you sent to Steven Cerasale.  Correct?

A.   Correct.

Q.   On line IA, we see that you wrote, "Name availability is open and approved for filing with the State of Florida." Correct?

A.   Correct.

Q.   You were referring to what name?

A.   Unisource Discovery Services.

Q.   And you were stating that it was open and approved for filing with the State of Florida.  That meant that it was available to put it with the Secretary of State.  Right?

     To register it with the Secretary of State; is that what that meant?

A.   Correct.

Q.   On line 3-2, we see that you wrote, "By creating a Florida corporation, Unisource Discovery Services California will enter the Florida market utilizing the established platform, sales force, field agents and support staff of The Subpoena Company throughout the state."

     In that paragraph, you were confirming that Unisource Discovery California would enter the Florida market as the purpose for the Florida venture.  Correct?

A.   No, I'm not.

Q.   So your testimony today is when you wrote, "by creating a Florida corporation, Unisource Discovery Services California will enter the Florida market," your testimony is that's not what you meant?

A.   No, that's not what that means.

     What that means, again, at that time we were discussing a joint venture, and what he was proposing, Steven Cerasale, was to do an extension of the LLC and that was something that we looked at back and forth.  And that was us trying to get to the point that we could create a corporation, a standalone

corporation, but we were still in the process of discussing how we can make that work because, remember, all this started as a joint venture opportunity.

A lot of this language is still based on that joint venture mentality.

Q.   So at this point you still hadn't reached the final agreement as to ownership of names and ownership of logos?

A.   What's the date of this letter?

Q.   June 2nd, 2006?

A.   No, we had not.

Q.   You hadn't yet reached an agreement with Mr. Cerasale that he was going to sell to you, according to your testimony, sell to you the name and logo.  Correct?

A.   Not yet.

Q.   Not yet?

A.   No.

Q.   But on June 2nd, 2006, you already agreed that Mr. Steven Cerasale was going to own 50 percent of the company.  Correct?

A.   It was a joint venture.  Either way it was going to be 50/50.

Q.   Either way, whether he sold his name or not?

A.   No, as a joint venture it was going to be 50/50, and if it was going to be a corporation, which it became a corporation, it was a 50/25/25.

Q.   At this date, you had already agreed, as you just stated,

that Mr. Steven Cerasale would own 50 percent of the Florida company. Correct?

A. That is correct.

Q. But at this time you still had not agreed that Mr. Cerasale would sell to you the name and logo. Correct?

A. No, at this time we still have not even agreed if it's going to be a corporation because he was still pushing the idea of a limited liability company.

Q. The answer is no. Correct?

A. The answer is no, at this time no.

Q. So you had already agreed Mr. Cerasale's ownership of Florida company without yet agreeing that he would sell to you the name and logo?

A. At this time we had come to a determination about certain things, and if you look at the letter that you are putting here, if you scroll down so I could read, a little higher up where it's number one, it's still talking about name availability. It's still talking about the type of corporation we are talking about, the type of business and the type of IRS tax.

Q. So, Mr. Cerasale's ownership of half of the company has nothing to do with the sale of the name and logo, does it?

A. It has everything to do with that. But you are mentioning an e-mail that is speaking about the initial way that we put the company together and that is not the final document. There

are more documents after that, as a matter of fact.

Q.  Let's discuss those documents.

A.  Sure.

THE COURT:  Counsel, I am going to have to break for the other hearing.

Is this a good time to break?

MR. VELARDE:  This is a good time.

THE COURT:  All right.  As I told you, ladies and gentlemen, for the hearings I have, we will break for 30 minutes.

Again, please don't discuss anything about the case.

You don't have to stay in the jury room.  You can move around but, again, if the attorneys and parties or witnesses don't say anything to you, they are following my instructions.

See you in 30 minutes.

(The jury exited the courtroom at 10:48 a.m.)

THE COURT:  For the attorneys here, the attorneys for the next couple of hearings will need the tables, so I am going to ask that you step into the gallery.

You can leave your things there but I wanted to clear that space.  Presumably during the break you will be talking about those issues that we talked about at sidebar, regarding the e-mails.

(Break for two other cases.)

COURT SECURITY OFFICER:  All rise.

THE COURT: Are we ready to resume?

MR. VELARDE: Yes.

COURT SECURITY OFFICER: Remain standing for the jurors.

(The jury entered the courtroom at 11:48 a.m.)

THE COURT: Please be seated. Welcome back, ladies and gentlemen. I apologize for the delay. That is attributed to me.

I had two cases that I had to take up which just ran a little longer.

We are ready to resume with the trial. We will go until 12:30 and then take a lunch break.

CONTINUED CROSS-EXAMINATION

BY MR. VELARDE:

Q. Mr. Mijares, welcome back.

When we left off, we were about to discuss the agreement that yourself and Mr. Cerasale reached in June 2006.

I will show you now that agreement. Mr. Mijares, I am showing you what's been admitted into evidence as Plaintiffs' Exhibit 5.

Do you see that in front of you?

A. I do.

Q. This is the operating agreement that you signed on June 15th, 2006, relating to Unisource Florida. Correct?

A. It is.

Q.   This agreement contains all of the contributions made by you to Unisource Florida.  Correct?

A.   The ones that were listed, yes.

Q.   Those are all the contributions that you made as of June 2006 to Unisource Florida?

A.   The ones that we listed, yes.  There was other contributions that we did not list here.

Q.   Other contributions off of June 2006 that are not listed on this agreement?

A.   Sure, minor contributions, little things that didn't make it to this agreement, yes, but as a whole, this is the contribution list.

Q.   This includes a list of important contributions?

A.   For what the agreement was, correct.

Q.   And this agreement includes a complete list of Mr. Steven Cerasale's contracts to Unisource Florida.  Correct?

A.   Correct.

Q.   I am going to show you page 13 of Plaintiffs' Exhibit 5.

     This is a list of the contributions that you made.  The list includes contributions that you made as well as the contributions that Mr. Steven Cerasale made to Unisource Florida.  Correct?

A.   Correct.

Q.   This list does not say that Steven Cerasale was selling or assigning the name Unisource Discovery.  Correct?

A.   It does not say that because that did not fall under this addendum.

Q.   And it didn't fall under any other section of this agreement.  Correct?

A.   No, it did.

Q.   I am showing you page five of the operating agreement, specifically Section 4.10, titled license and name use.

A.   Correct.

Q.   Is this the other section of the agreement that you were referring to that shows that Steven Cerasale sold to Unisource Florida the name and logo?

A.   It is.

Q.   This is the section in this agreement that states Steven Cerasale sold the name and logo to Unisource Florida?

A.   He did.

Q.   Can you please point out to the jury where it says he sold the name and logo?

A.   It is understood by the board of directors --

A JUROR:  It's not on.

THE COURT:  Oh, I'm sorry.

BY MR. VELARDE:

Q.   Go ahead, Mr. Mijares.

A.   "It is understood by the board of directors that the name Unisource Discovery, Inc. is a Florida registered corporation, clear and clean of any titles, and it is not subject to, nor

under any form of a licensing agreement to transact in business."

Q.   Where does it say that Mr. Cerasale sold the name and logo to Unisource Florida?

A.   He transferred -- the predecessor entity transferred all rights to the name to Unisource Discovery, Inc.

Q.   Thank you.

My question was where does it say that he transferred the name and logo?

A.   Where it says that the Florida corporation by the name of Unisource Discovery, Inc. is free and clear of any titles. There are no claims or titles of ownership.  It's free and clear when we obtained it in 2006 from Mr. Cerasale.  And it also includes that we are under no type, whatsoever, of a licensing agreement, implied or otherwise.

Q.   So this agreement doesn't give a license to Unisource California to use the logo?

A.   Actually, this agreement -- when we signed this agreement as a board of directors, it immediately provided Unisource California with an implied license.

Q.   Where does it say that on this agreement?

A.   It's an implied license.

Q.   Is Unisource California a party to this agreement?

A.   It is not.

Q.   This agreement doesn't mention Unisource California at all?

A.   It does not.

Q.   This agreement doesn't say that Unisource California is giving you ownership of anything?

A.   No, this agreement states that Cerasale and its predecessor assigned all rights of the name, Unisource Discovery, Inc., free and clear of any claims and title, and it also cites that it is not under any type or any form of licensing agreement.

Q.   Let's discuss that part.

A.   Sure.

Q.   Where it says there is no type of licensing agreement or under any -- let me use the wording, "Clean and clear of any titles and is not subject nor under any form of licensing agreement to transact in business."

I am going to show you what we have previously looked at, Plaintiffs' Exhibit 2 and also to the jury.

Just a few days before you signed it, June 2nd, 2006, you tell Mr. Cerasale that the name, Unisource Discovery Services Florida -- you say, "The name availability is opened and approved for filing with the State of Florida."  Correct?

A.   Correct, and in this document you are showing me now, that was a different name, and it's a Word product document.  There were negotiations.  We were doing negotiations at that time.

At the time of this document, there was no Unisource Discovery, Inc., and Mr. Cerasale nor myself had any percentages of ownership in that company.  It didn't exist.

Q.   And that -- what you are saying in this e-mail is that the name Unisource Discovery Services is clean and clear of any titles in Florida.  Correct?

A.   Well, that's what that says.

Q.   So if that's what you said in June 2006, June 5th, 2006, before, remember your testimony, before you agreed that the name and logo would transfer to Unisource Florida, when you signed the operating agreement stating that that same name is clean and clear of any titles, weren't you saying the same thing?

Weren't you saying that the name is clean and clear of titles in Florida?

A.   No, that's not what we are saying.  That's not what the agreement means either.

Q.   Now, let's look at the last sentence of this section, Section 4.10?

A.   Uh-huh.

Q.   The sentence says, "The board of directors further agrees --" who are the board of directors?

A.   Lisa Cote, Steven Cerasale and myself.

Q.   So you three board of directors agreed that in the case Steven Cerasale is no longer a director, officer, or agent of the company, at that time the board of directors shall modify the current name of the company, Unisource Discovery to be different in name only?

A.   Correct.

Q.   So you agreed, the board of directors, including yourself, agreed that if Steven Cerasale leaves Unisource Florida, the name goes with him?

A.   At the time we provided Steven Cerasale with what is called a carveout, and the reason is we did not know each other.  We were engaging in this new operation, and we didn't know if it was going to be a good one in six months, three months, a year.  We didn't know how that would end, so he asked and he was provided with a carveout that if things did not work out then he could take back the name.

     But, again, like it says on the agreement, in name only, not the service mark.  So that is very clear, and the reason it states it that way is because he is getting back something he gave when he transferred all rights of the name without any hindrance.

Q.   So the answer is, yes, if he leaves Unisource Florida, the name goes with him?

A.   The answer is yes at that time.  Correct?

Q.   At that time and all the way through 2010.  Correct?

A.   And all the way to 2010, correct.

Q.   Including the time in 2008 when the registration mark was filed?

A.   Yes, all the way to 2010.

Q.   And you said -- you mentioned that this last sentence was

put in there because you didn't know each other.  Correct?

A.  No, this last sentence was put on there at the request of Cerasale because he wanted to feel comfortable to see how the relationship worked.  I had no objection to that.

Q.  And you, yourself, mentioned now in testimony that you were being cautious.  Correct?

A.  I believe all of us were being cautious.

Q.  Because you don't know if this was going to be a successful business?

A.  That's an unknown on anything.

Q.  It was an unknown as to Unisource Florida in June 2006?

A.  That would be correct.

Q.  The business could go belly up in six months?

A.  Correct.

Q.  Would it be cautious -- would it be an act of caution to give up the name and logo?

A.  I don't understand your question.

Q.  I am asking for your opinion as a businessman.  Would it be cautious to give up your brand?

A.  It depends.  I don't understand your question exactly.

When you say that, you are making a hypothetical, so I don't know how to answer that.

Q.  The answer is you don't know.

Correct?

A.  Based on your hypothetical question, I don't know that.  I

don't know how to answer your question.  If you give me a more precise questions, I will gladly answer it.

Q.   I will try.  You understand the difference between a license to use a brand and ownership of the brand.  Correct?

A.   Yes.

Q.   You understood that difference in June 2006.  Correct?

A.   Yes.

Q.   And you understand that difference all the way through today?

A.   Correct.

Q.   And you testified yesterday that this agreement doesn't even give Florida an implied license.  Correct?

A.   Which agreement are you referring to?

Q.   The one we were just talking about.  The 2006 operating agreement does not give Florida an implied license.  That was your testimony.  Correct?

A.   That is correct.

Q.   With that knowledge of the difference between a license and ownership, you stated under oath that you only had an implied license in 2006 through 2010, did you not?

MR. SANCHELIMA:  Objection, Your Honor. Mischaracterizes --

THE COURT:  Overruled, but the witness can clarify his response or his previous answer.

THE WITNESS:  I don't recall.

BY MR. VELARDE:

Q. Would you have said that?

A. I'm sorry?

Q. Would you have testified that you only had an implied license from 2006 to 2010?

MR. SANCHELIMA: Objection, Your Honor.

THE COURT: Sustained to the form of the question.

BY MR. VELARDE:

Q. Have you ever testified or stated under oath that Unisource Florida only had an implied license from 2006 to 2010?

A. I may have testified under deposition some years back about that, and the only reason why I would have done that type of an answer is because I wasn't clear exactly what an implied license meant at the time.

Q. So, in 2006 you were very clear as to what an implied license was and then a couple of years back you were no longer clear and now you are clear.

Is that what your testimony is?

A. No, the reverse. The reverse is true.

Q. Please explain.

THE COURT: Hold on. Let him finish his answer, please.

THE WITNESS: The reverse is true. In 2006, all we knew was a name and a logo. I didn't know anything about trademarks, registrations, none of that. That was not even in

the radar.  It wasn't something that I was looking to even go after.  So, no, I did not know that at the time.

BY MR. VELARDE:

Q.  So your testimony now, contrary to what you mentioned five minutes ago, your testimony now is that in June 2006 you did not know the difference between an implied license and ownership of the logo?

A.  I did not know the difference of the meaning of implied license in 2006.  That's my testimony.

Q.  What about 2007, did you learn it then?

A.  No.

Q.  How about 2008?

A.  No.

Q.  2009?

A.  No.

Q.  What about when you filed this trademark litigation, did you know it then?

A.  I did in 2021, 2020.

Q.  So when you filed this litigation in 2020, you knew the difference between an implied license and ownership?

A.  I did.  I became more educated into the terminology of the trademark language.  I did not know it on the years you mentioned before.

Q.  So as of 2020, you were clear on that distinction?

A.  I learned.

MR. VELARDE:  Your Honor, I am going to show the witness a document that has not yet been introduced into evidence.  It should be Docket Entry 182, Your Honor.

BY MR. VELARDE:

Q.  Mr. Mijares, do you remember signing an affidavit in October 1st or rather, September 30th, 2021?

A.  I would need to look at the document.

Q.  Sure.

MR. VELARDE:  May I approach, Your Honor?

THE COURT:  Sure.

MR. VELARDE:  Thank you.

THE COURT:  Does this have an exhibit number?

MR. VELARDE:  No, Your Honor, it's a document for impeachment purposes, but I believe the last number we had was 26 for defendants.

THE COURT:  Let's mark this as number 30 for ID.

MR. VELARDE:  Thank you, Your Honor.

MR. SANCHELIMA:  Defense 30, Your Honor?

THE COURT:  Defense 30 for ID.

(Defense Exhibit 30 was marked for identification.)

BY MR. VELARDE:

Q.  Mr. Mijares, I handed you an affidavit that you signed on September 30th, 2021, and you filed in this case?

A.  Yes.

Q.  This is after you made very clear in your mind the

distinction between an implied license and ownership.  Correct?

A.   Yes.

Q.   Do you recognize that document?

A.   I do.

Q.   Did you sign that document?

A.   I did.

Q.   Did you sign that document swearing you were telling the truth?

A.   I did.

MR. VELARDE:  Your Honor, I move Exhibit 30 into evidence.

THE COURT:  Is there an objection?

MR. SANCHELIMA:  May I have 30 seconds, Your Honor?

THE COURT:  Sure.

MR. SANCHELIMA:  No objection, Your Honor.

THE COURT:  All right.  Without objection Defense Exhibit 30 will be admitted.

(Defense Exhibit 30 was admitted in evidence.)

MR. VELARDE:  I would like to publish it to the jury.

THE COURT:  All right.

BY MR. VELARDE:

Q.   Mr. Mijares, I would like to point you to paragraph ten of the affidavit that you signed under oath, and it says, "Unisource Florida had full rights under an implied license to use the name and logo until the year 2010, when we entered into

a mutually drafted 2010 close corporation shareholder agreement, that was prepared by all directors and shareholders, which included Steven Cerasale."  Did I read that correctly?

A.  You did.

Q.  You stated this under oath.  Correct?

A.  I did.

Q.  You were swearing you were telling the truth.  Correct?

A.  I did.

Q.  And you swore that Unisource Florida only had an implied license until 2010.  Correct?

A.  I did.

Q.  So, were you lying then or are you lying today?

A.  I am not lying then or today.  My writing here was of the right to use it, full right to use it.

Now, the definition of implied license and license, maybe I messed that up, which is what I admitted already.

Q.  You admitted that you messed it up several years ago.  You stated in your testimony by the time you filed this lawsuit in 2020, you had that distinction very clear.

Do you want to change your testimony again?

A.  I did not understand the definition back in the time and I might have done this writing where it should have probably just said full rights under the license that we obtained.

Q.  You might have done this writing because you were trying to avoid a summary judgment.  Correct?

A.   I don't believe that, no.

Q.   Let's look at paragraph 13.  I am going to read it.

     "However, Steven Cerasale, by his own actions and investment, provided Unisource Florida with a license to use the name and logo and, therefore, Unisource Florida had full rights and undisputed permission from 2006, the Florida corporate registration, until 2010, the closed corporation shareholder agreement."

     Did I read that correctly?

A.   You did.

Q.   That's your statement under oath?

A.   Correct.

Q.   You were swearing you were telling the truth?

A.   I am.

Q.   Okay.  That doesn't say implied license, does it?

     MR. SANCHELIMA:  Objection, Your Honor.  The full sentence -- only part of the sentence is being read to the witness.

     THE COURT:  All right.  Overruled.

     You can deal with that on redirect if you choose to do so.

     MR. SANCHELIMA:  Thank you, Your Honor.

BY MR. VELARDE:

Q.   It doesn't say implied license, does it?

A.   No, it says, "license."

Q.   License?

A.   It also says when Steven Cerasale acknowledged ownership of the trademark.

Q.   In 2010.  The trademark didn't exist in 2006, did it?

A.   No, it did not.  No.

Q.   So when you say when Steven Cerasale --

MR. SANCHELIMA:  Objection, Your Honor. Mischaracterization.  The trademark existed.  What did not exist was the registration.

THE COURT:  Overruled.  Again, that's an issue you can deal with on redirect.

BY MR. VELARDE:

Q.   So, if I understood your testimony, you mentioned that you stated under oath in paragraph ten that you only had an implied license because you didn't really understand at that point what an implied license was versus a normal license.  Correct?

A.   Correct.

Q.   And in this you don't say implied license.  Here you say just the word "license," and you say that you only had a license and you use the word permission to use the name and logo from 2006 to 2010.  Is that not what you stated under oath?

A.   What was stated here with the word "permission" was the fact that we had full rights to file the trademark in 2008.

Q.   Full rights because you had permission?

A.   We had full rights because we had acquired the name and the logo.

Q.   Under a license?

A.   Under the 2006 agreement, we had acquired the name and the logo without any restrictions, without any claim to title or claim to ownership by anyone else.

Q.   You had a license in 2006.  That's what you were stating under oath, you had a license in 2006 all the way to 2010.

That's what you stated under oath.  Correct?

A.   That's what the affidavit states.  Correct?

Q.   And you did this to avoid a summary judgment, did you not?

A.   I did not.

Q.   You changed your story because you got an unfavorable ruling.  Correct?

A.   I do not understand what unfavorable ruling you are mentioning.

Q.   Do you understand what unfavorable means?

A.   I don't understand what ruling you are mentioning.

Q.   I can show you the ruling.

MR. VELARDE:  May I approach, Your Honor?

THE COURT:  Yes.

MR. VELARDE:  I am going to show the witness a document that has not been marked.  It's for impeachment or rebuttal purposes.  I am going to designate it as Defense Exhibit 31.

(Defense Exhibit 31 was marked for identification.)

BY MR. VELARDE:

Q. Mr. Mijares, do you recognize this document?

A. I do.

Q. Is this the ruling that you received on January 10th, 2022. Correct?

MR. SANCHELIMA: Objection, Your Honor, as to the characterization of the document as a ruling. It is a report and recommendation.

THE WITNESS: That's correct.

THE COURT: Can you slide down so I can see exactly what the witness is seeing?

MR. VELARDE: Sure, Your Honor.

THE COURT: You'll clarify it but -- just use the title of the document.

MR. VELARDE: I will, Your Honor. I would also just mention this ruling was affirmed.

THE COURT: Counsel, that's not the issue. The issue is simply describe it for what it is.

MR. VELARDE: Okay, Your Honor.

BY MR. VELARDE:

Q. So to ask a more accurate question, Mr. Mijares, this is the report and recommendation that you received on January 10, 2022. Correct?

A. This is a report and recommendation, that's correct. This is not a ruling.

Q.   Very well.

A.   Okay.

MR. VELARDE:  Your Honor, I would like to move this into evidence or at least have the jury see it.

MR. SANCHELIMA:  Voir dire, Your Honor.  We object.

THE COURT:  All right.  Sustained.

MR. SANCHELIMA:  May I voir dire?

THE COURT:  I sustained the objection.  It won't be admitted.

MR. SANCHELIMA:  Understood, Your Honor.

MR. VELARDE:  Without admitting it into evidence, Your Honor, I would like to ask the witness a few questions about this report and recommendation.

THE COURT:  May I see the parties sidebar, please?

(Sidebar conference.)

THE COURT:  Under no circumstance are any of the Court's orders going to be presented to the jury.

Now, you've been able to establish he submitted an affidavit and the substance of it for purposes of litigation, but I am not going to let you get into any of this so let's move on.

MR. VELARDE:  Will do, Your Honor.

MR. SANCHELIMA:  Thank you.

(Sidebar concluded.)

BY MR. VELARDE:

Q.   Mr. Mijares, let's discuss the 2008 registration of the trademark.

MR. SANCHELIMA:   Mischaracterization, Your Honor. There was no registration in 2008.   It was not until 2009 that the mark was registered.

MR. VELARDE:   I misspoke.

You are correct, Mr. Sanchelima.   I meant the application.

BY MR. VELARDE:

Q.   Mr. Mijares, do you see in front of you the trademark registration application?

A.   I do not.

THE COURT:   What exhibit is this?

MR. VELARDE:   Defense Exhibit 8, Your Honor.   It's been admitted into evidence.

THE COURT:   Okay.   I still don't see anything.

MR. VELARDE:   Your Honor, if I may approach to provide the witness a copy.

THE COURT:   Yes, sir.

THE WITNESS:   Thank you.

BY MR. VELARDE:

Q.   On this exhibit, Mr. Mijares, I want to point you to page two under the section filing basis.

A.   Okay.

Q.   Where it says, "First use anywhere date:   At least as early

as March 1st, 2001," do you see that?

A.   I do.

Q.   Unisource Florida did not exist on March 1st, 2001.
Correct?

A.   Correct.

Q.   Unisource Florida did not use the mark until 2006.
Correct?

A.   Correct.

Q.   You mentioned yesterday in your testimony that you put this
date there because you got that information from Mr. Cerasale.
Correct?

A.   Correct.

Q.   And you went into detail about how you received that
information?

A.   I did.

Q.   And, specifically, you said you were at Sardinia?

A.   We were.

Q.   In an evening?

A.   I never said evening.  It was in Sardinia.  I believe it
was afternoon, early afternoon.

Q.   I apologize, Sardinia early afternoon?

A.   Yes, sir.

Q.   In October?

A.   Could have been September, early October.

Q.   September, early October?

A.   Yeah.

Q.   And Mr. Cerasale was sitting to your right you testified?

A.   He was standing.

Q.   He was standing to your right?

A.   Correct.

Q.   And he was standing to your right when he told you that he first used the name and logo on March 1st, 2001?

A.   He was standing to my right when we were having cheese and hams and things of that nature.

We were going through a conversation about things, and one of the things that I vividly remember is that I told him I needed to know what was the first time that he ever used this in the public domain, which is the question that was pending on the application.

I did not know the answer to that.

Q.   Understood.  I apologize for interrupting you.

A.   No, that's okay.

Q.   Do you have a very good memory just generally or is it because this is an important -- this was an important event?

MR. SANCHELIMA:  Objection, Your Honor.  Compound.

The question is compound using the word "or."

THE COURT:  Well, not in that instance.  Overruled. You can answer.

THE WITNESS:  For the most part, yes, I have a very good memory.

BY MR. VELARDE:

Q. Do you remember signing an affidavit dated September 13th, 2001, which you filed in this case?

A. Dated 2001?

Q. 2021, I apologize?

A. I signed many affidavits. You will have to show me the one you are referencing.

Q. I will show it to you.

Mr. Mijares, is your screen working?

A. Yes.

Q. I am going to show you a document that has not been identified.

Okay. Mr. Mijares, have you had a chance to review it?

A. I cannot see the document.

Q. Do you see the document that says affidavit of Noel Mijares?

A. Yes, only the top portion. I cannot see the rest of the document.

Q. I will scroll down. I am going to show you your signature.

Page three, that is your signature. Correct?

A. Yes.

Q. And you state that you are stating this under penalty of perjury. Correct?

A. Correct.

Q. You filed this affidavit under oath. Correct?

A.   It was filed under -- yeah, correct.

MR. VELARDE:  Your Honor, I would like to move into evidence this affidavit dated September 13th, 2021, and identify it as Defense Exhibit 32.

(Defense Exhibit 32 was marked for identification.)

THE COURT:  Is there an objection?

MR. SANCHELIMA:  Yes, Your Honor.

THE COURT:  What's the legal objection?

MR. SANCHELIMA:  This affidavit pertains to a --

THE COURT:  Just give me a legal objection.

MR. SANCHELIMA:  The witness is not versed.

THE COURT:  Counsel, I want a legal objection, one word to advance.

MR. SANCHELIMA:  No foundation, Your Honor.

MR. VELARDE:  It's his affidavit, Your Honor.

THE COURT:  Can you approach again, please?

(Sidebar conference.)

THE COURT:  May I see a copy of it?

MR. VELARDE:  Yes, I'm sorry.

THE COURT:  What is this?

MR. VELARDE:  It's an affidavit signed September 13th. I am introducing it for the purpose of stating that he doesn't have recollection, and he clearly said it now that he did remember vividly and it's the same issues.  It's impeachment.

THE COURT:  Well, normally impeachment documents aren't

admitted.  I admitted the last affidavit because there was no objection, but you objected because of foundation.

I didn't understand the objection.

MR. SANCHELIMA:  First, the affidavit dates back as to what his recollection was a year ago, two years ago.

Today, preparing for trial and with specialized counsel on trademark law, his understanding is completely different from what happened at that time.  I think that it's just going to confuse the jury if we start getting into all these terms as we did with the other affidavit, and all he is trying to do is to show that his recollection was better two years ago or a year ago than today.

MR. VELARDE:  Your Honor, recollection is not a specialized expert issue.  He just stated very clearly to the jury that he had a perfect memory on something where he previously stated under oath not to remember anything.

THE COURT:  Why isn't this a statement by a party opponent?

Why isn't it admissible for that reason?

MR. SANCHELIMA:  Well, one of the things is that there are terms there that are being used that have a legal significance, and it appears that in this affidavit they don't make the distinction as to what a registered mark is and what a mark is.

THE COURT:  Okay.  But that's -- I understand the point

you are making, but why wouldn't it be admissible, though, a statement by a party opponent?

MR. SANCHELIMA:  It's irrelevant what his recollection was two years ago or today.  He hasn't testified that he has continuously had the same recollection.

THE COURT:  All right.  Let me just read this.

All right.  I will admit the document as a statement by a party opponent.  It's directly related to this case.

MR. VELARDE:  Thank you, Your Honor.

MR. SANCHELIMA:  Thank you.

(Sidebar concluded.)

THE COURT:  All right.  Defense Exhibit 32 will be admitted.

(Defense Exhibit 32 was admitted in evidence.)

MR. VELARDE:  Your Honor, I would like to publish it to the jury.

THE COURT:  All right.  Mr. Mijares.

BY MR. VELARDE:

Q.  Mr. Mijares, I am showing you the affidavit that was signed under oath.

THE COURT:  It's his screen.

The rest of us are able to see it.

Do you have a hard copy that he can look at?

Thank you.

BY MR. VELARDE:

Q.   Mr. Mijares, I am showing you the affidavit that you signed under oath on September 13th, 2021.

Do you see that?

A.   I do.

Q.   I am going to show you paragraph four where it says, "I would like to begin by clarifying that because the Unisource Discovery logo application was filed with the USPTO in 2008 and received registration status as a trademark in 2009, my recollection of every detail and every step in the trademark application process is not as sharp as if it was yesterday, last month or in the last few years."

Did I state that correctly?

A.   You did.

Q.   You testified under oath that your recollection was not very good as to what happened in 2008 when you registered a trademark.  Correct?

A.   Are you saying testified under affidavit here?

Q.   Under affidavit?

A.   Yes.  That covers everything in the sense that a lot of things have happened from 2008 to now, but there are things that I am very sharp at in remembering.

Q.   You remember the details of how you got the information to fill in that registration in 2008.  Correct?

A.   I do.

Q.   Down to where Mr. Cerasale was standing.  Correct?

A.   Correct.

Q.   Down to whether he was standing or sitting?

A.   He was standing, leaning in, correct.

Q.   Down to whether it was evening or early afternoon?

A.   I think it was afternoon, early evening, 4:00 or 5 o'clock, something around that.  I remember we were waiting to meet people for dinner.  Mr. Cerasale spent a lot of his time in my home when he visited.

Q.   But in September of last year you didn't remember your recollection of every detail, those were your words, sir.

Your recollection of every detail was not good.

Correct?

A.   What I wrote here is a generalization.  What I remember in detail is what I testified to today, remembering Cerasale leaning in when I asked him about that particular question that was missing on the application.

Q.   You didn't state on this affidavit that Mr. Cerasale told you that he first used the name and logo in March 2001, do you?

A.   This affidavit doesn't mention 2001 anywhere.

Q.   The answer is no.  Correct?

A.   That's correct, it doesn't mention the March 2001 filing.

Q.   This affidavit.  I'm sorry, I apologize for interrupting --

This affidavit does not state that Mr. Cerasale and you were in Sardinia in October or September of 2001.  Correct?

A.   That's correct.

Q.   This affidavit doesn't say that Mr. Cerasale leaned into you when he was standing up when he was in Sardinia.  Correct?

A.   That is correct.

Q.   This affidavit doesn't say that Mr. Cerasale told you that he first used the mark and logo on March 1.  Correct?

A.   That's correct.

Q.   But what this states under oath is that you don't have recollection of the details.  Correct?

A.   What it states is my recollection of every detail and every step in the trademark application process is not as sharp as it was yesterday, last month or a few years back.  That's what it says.

Q.   So, yes, it states that you don't have recollection of every detail in the process of filling out that registration. Correct?

A.   I just read what it states and what I executed under the affidavit.  Would you like me to repeat it?

Q.   No, that's okay.  Thank you.

Yesterday -- well, let me strike that.  So you registered in 2008 and you received -- rather, you applied to register in 2008 and you received the registration from the federal government in 2009.  Correct?

A.   Correct.

Q.   And your testimony yesterday was that Mr. Steven Cerasale was informed right away when that registration was obtained.

Correct?

A.   Mr. Steven Cerasale knew before, during and after.

Q.   I believe your testimony was that he was probably the third call that you made?

A.   After we got the certificate, yes, I believe that was my testimony.

Q.   And you testified that you all celebrated when that certificate arrived?

A.   We did.

Q.   This trademark registration allows you to file this lawsuit today.  Correct?

A.   This trademark registration allows us as a company, Unisource Discovery, Inc., to protect the right of the trademark, correct.

Q.   Throughout the country.  Correct?

A.   Correct.

MR. SANCHELIMA:  Your Honor, this requires legal understanding, legal on the side of the witness.  There is no proper foundation.

THE COURT:  All right.  Sustained.

MR. VELARDE:  Your Honor, there was testimony yesterday about --

THE COURT:  Counsel, I understand.  Sustained.

BY MR. VELARDE:

Q.   Your understanding, Mr. Mijares, is that this trademark

registration allowed you to protect Unisource Florida even against Mr. Steven Cerasale.  Correct?

MR. SANCHELIMA:  Same objection, Your Honor.

THE COURT:  Sustained.

You can ask him what he believed but it's suggesting that.

MR. VELARDE:  I had asked him about -- I will ask another question I apologize.

BY MR. VELARDE:

Q.   Did you believe that the trademark registration allowed you to protect the registration even against Mr. Steven Cerasale?

A.   I believed that the registration can be protected against anyone that violates the trademark infringement.

Q.   Anyone that violates the trademark infringement?

A.   Any company that violates the trademark infringement, yes.

Q.   When did Mr. Cerasale violate the trademark infringement?

A.   Repeat your question.  I did not understand it.

Q.   At what point, did Mr. Steven Cerasale, in your opinion, violate the trademark registration?

A.   When he actively started using the trademark to come to Florida and pitch clients and cause confusion, and when he disconnected us from the website; primarily, when he disconnected us from the website.

Q.   When did that happen?

A.   In 2019.

Q.   You stipulated as part of this case that you are not entitled to any damages before 2019.  Correct?

Before 2020, rather; correct?

A.   I believe so, yes.

Q.   So we are not talking about what happened in 2019, in this case, are we?

A.   What happened in 2019 is what triggered the trademark infringement.

Q.   Didn't you send a letter in February 2020 to Mr. Steven Cerasale?  Do you remember that letter?

A.   We sent multiple letters to Mr. Cerasale during that time frame.

Q.   Do you remember a letter in February 2020 where you told Mr. Cerasale that he can no longer use the name and logo?

A.   That he can no longer have the -- yeah, the right of use, correct, yes.

Q.   So at that point is when he --

A.   That is correct.  And what triggered that letter of right of use was the actions from 2009.

Q.   I appreciate that.  Let me finish the question.

At that point in February 2020, after that point is when you understand the trademark violation began.  Correct?

A.   Correct.

THE COURT:  Is this a good time to break for lunch?

MR. VELARDE:  Your Honor, if I may ask maybe two more

questions.  It won't be more than five minutes.

THE COURT:  All right.

BY MR. VELARDE:

Q.  So your understanding, your belief that this trademark registration allows you to tell Mr. Steven Cerasale you can no longer use the name and logo.  Correct?

A.  This trademark registration allows us to send a right of use to Unisource Discovery, LLC, California, to stop using, correct.

Q.  Based on your discretion.  Correct?

A.  No, based on trademark infringement law.

Q.  Who decided to tell Mr. Cerasale to stop using the name and logo?

A.  When Mr. Cerasale started using the name and logo without permission.

Q.  Who decided that?

A.  The company did.

Q.  The company Unisource Florida?

A.  Correct.

Q.  Not Mr. Steven Cerasale?

A.  He was the infringing party.

Q.  Mr. Steven Cerasale -- just so I did understand your testimony, Mr. Steven Cerasale did not choose to prevent himself from using the name and logo, did he?

A.  No, Mr. Steven Cerasale was using his Unisource Discovery

California entity to infringe upon the trademark, knowing, knowing that it was registered to Florida and owned by Florida.

He had full knowledge of that.

Q.   Again, he started infringing after you sent a letter in February of 2020.  Correct?

A.   He started infringing when he removed us from the shared website and advertised that he still had trademark rights under Unisource California, which is a falsehood.

Q.   So this registration allows Unisource Florida to prohibit Mr. Cerasale from using the name and logo.  Correct?

A.   Correct, without a license.  Correct.

Q.   Why would Mr. Steven Cerasale celebrate that?

A.   Because in 2009 Mr. Cerasale was not infringing on the trademark, so he was part of the celebration.

Q.   Your position is that Mr. Steven Cerasale celebrated the fact that at any moment you can pull the plug.  Is that your testimony?

A.   I don't know.  I cannot testify for -- I cannot answer for what Steven Cerasale's process of mind is going to be.

Q.   Your testimony is that Mr. Steven Cerasale celebrated the fact that you at any moment can send him a letter telling him to stop using the name and logo?

A.   I think you are confused here, Counselor.

Unisource Discovery, Inc. is the owner of the trademark, not me, myself, Noel Mijares or any individual.

As a matter of fact, Steven Cerasale owns the trademark with me and the other shareholders of the company.

Q.  Isn't it the truth, Mr. Mijares, that Mr. Cerasale celebrated because you misinformed him about the registration?

A.  No.

Q.  Isn't it true that Mr. Cerasale celebrated because he thought you were protecting him?

A.  He was protected.  He still is protected through Unisource Discovery, Inc. Florida.

Q.  Protected?

A.  Yes, his asset here in Unisource Discovery Florida protects him.  The problem is, Cerasale chose to do trademark infringement using his company in California, knowing full well that he was in violation of the trademark.

Q.  After February of 2020.  Correct?

A.  Based on the right to use, correct.

MR. VELARDE:  All right.  Your Honor, we can break now.

THE COURT:  Ladies and gentlemen, we will break now for lunch.  We will return at 1:45.  Please don't discuss anything about the case.

COURT SECURITY OFFICER:  All rise, please.

(The jury exited the courtroom 12:44 p.m.)

THE COURT:  All right.  Anything we need to take up before we break for lunch from the plaintiff?

MR. SANCHELIMA:  No, Your Honor.

THE COURT:  From the defense?

MR. VELARDE:  No, Your Honor.

THE COURT:  All right.  We will see you back here at 1:45.

(Lunch recess.)

COURTROOM DEPUTY:  All rise.  Court is back in session.

THE COURT:  Please be seated.

We are still waiting for one of the jurors.

I just want to make you aware that two of the jurors, Ms. Jiha reminded my CRD that she works for herself and that returning tomorrow would be a hardship for her, and Dr. Rodriguez Suarez also reminded us that she told her coworkers she would be back at work tomorrow afternoon.  So I just want to remind everyone about that.

There was something else you wanted to bring up?

MR. SANCHELIMA:  Yes, Your Honor.

Plaintiff wants to move the Court ore tenus to strike the line of questioning involved in the 2001 date of first use and the reason for that, Your Honor, is that the law of the case is that any use of the mark prior to the filing date is irrelevant and immaterial, and I call your attention to the report and recommendation from the Magistrate Otazo-Reyes, Docket Entry 257, page nine, which is --

THE COURT:  Hold on.  Let me catch up.

All right.  Docket Entry 257.

MR. SANCHELIMA:  Yes, Your Honor.  I direct the Court's attention to page nine, and the paragraph right before the recommendation by the magistrate, which by the way was ratified, undisturbed in Docket Entry 299 by Your Honor, at the end of the sentence says, "Because plaintiff made valid use of the mark prior to the date it filed the registration application, the improper first use date contained in the application cannot be a basis for invalidating the registration," citing an Eleventh Circuit decision.

We submit, Your Honor, that even though I couldn't put my finger on this particular Docket Entry and in an abundance of caution I wanted to ratify my understanding I couldn't bring my objection at that time but we moved the entire line of questioning regarding the use in 2001, which would be only relevant to the counterclaim regarding the petition for cancellation of the registration, be stricken from the record.

THE COURT:  I'm sorry, specifically what you don't want the defense to talk about is what?

MR. SANCHELIMA:  The 2001 alleged first use, the alleged inaccuracy of that date in the application for registration.

In fact, plaintiff requests an instruction to the jury to disregard that entire line of questioning since it's not relevant for any of the causes of action except for the petition for cancellation and it's clear that it has no value.

THE COURT:  Okay.  Your response?

MR. VELARDE:  Two reasons why we oppose that, Your Honor.  First, this is information that came out during direct.

Mr. Sanchelima asked Mr. Mijares the specifics about how he knew that the first use was March 2001.  That was not my question, Your Honor.

That was a question from the plaintiff, plaintiffs' counsel eliciting that information from his client.

His client went into detail about that if that fact that Mr. Sanchelima claims is not relevant, and now that I brought in evidence to rebut all of that testimony, Mr. Sanchelima is moving to strike only my questions and not his.

So, Your Honor, the first reason is it's been -- the door has been opened by plaintiffs' presentation of the case.  It cannot now close it.

Second, Your Honor, this is -- the counterclaim is about fraud.  Fraud is subtle.  It's based upon all of the circumstances surrounding the fraud, and if you have three misstatements that were known to be misstatements, it's certainly more relevant or more likely that there was fraud compared to just having two.

THE COURT:  Can I ask you the simple question?

Are you planning on arguing or suggesting during your cross that plaintiff did not properly use the mark prior to the

date it filed its registration application?

MR. VELARDE:  No, Your Honor, that's not the basis of our defense.

THE COURT:  That's what this sentence deals with so the request is denied.

All right.  Let's bring them in.

MR. SANCHELIMA:  Thank you, Your Honor.

(The jury entered the courtroom at 1:55 p.m.)

THE COURT:  All right.  Please be seated.

Come back up to the stand, sir.  Whenever you are ready.

MR. VELARDE:  Thank you, good afternoon.

I would like to publish Defense Exhibit 8.

THE COURT:  Okay.  It's in.

BY MR. VELARDE:

Q.   Mr. Mijares, when we last left off with your testimony, we were discussing Mr. Cerasale's celebration of the registered trademark.  Do you remember?

A.   You mentioned Mr. Cerasale's celebration.  I was not the one discussing that.

Q.   That's fair.  But he did celebrate.  You remember that testimony.  Correct?

A.   I don't know if he celebrated.  He was not with me at that time.

Q.   Mr. Cerasale was not with you when you received the

registration of the trademark?

A.  No.

Q.  So you don't know whether he celebrated or not?

A.  I don't know.  No, I called him.  He was my third phone call to update him on that.  I never said he was with me in person.

Q.  So you don't know whether he celebrated?

A.  You will have to ask him that.

Q.  Let's look at Defense Exhibit 8, which is the registration application that you submitted.  Correct?

A.  Correct.

Q.  I am going to point your attention to page four under the title declaration.

Do you remember giving testimony about this declaration yesterday?

A.  I do.

Q.  Let me start with one of the sentences that you did not provide testimony for yesterday.

I am going to read it.  It's the one highlighted in yellow.

"The undersigned declares that to the best of his or her knowledge and belief, no other person, firm, corporation, or association, has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods, services of such other person, to cause confusion."

Did I read that correctly?

A.   Yes, you pieced in those sentences together.  Yes, you read that correctly.

Q.   At the time, October 2008, Mr. Steven Cerasale and Unisource California had the right to use the mark in commerce.  Correct?

A.   Correct.

Q.   And you knew at the time that Mr. Steven Cerasale and Unisource California had the right to use in commerce, correct, the right to use the logo in commerce.  Correct?

A.   Correct.

Q.   And despite knowing that, you certified under oath that no other person, firm, corporation, or association has the right to use the mark in commerce.

Correct?

A.   That is correct.

Q.   That's not true, is it?

A.   That is true.

Q.   Let's look at the part of the sentence that's highlighted in light blue, "The undersigned declares that he/she believes the applicant to be the owner of the trademark/service mark sought to be registered."

Who was the owner of the trademark/service mark?

A.   Unisource Discovery, Inc.

Q.   And you base that knowledge on the operating agreement of

2006.  Correct?

A.   That is correct.

Q.   The same operating agreement that you stated under oath on September, in September 2021 only gave you a license.  Correct?

A.   Which affidavit are we referring to so I could revise my -- so I can reread it again to make sure.

Q.   I can pull it up for you.

Do you have it there on the screen?  It was admitted into evidence as Defendants' Exhibit 30?

A.   Yes, that is correct.

Q.   Okay.  The answer was yes to the question?

A.   "Full rights undisputed permission from the 2006 Florida corporation."

Q.   Permission, not ownership?

A.   Well, ownership, based on the agreement.

Q.   That's not what that says, though, is it?

A.   Well, the agreement says exactly what it says.

Q.   Is permission and ownership the same thing?

A.   The agreement is ownership.

Q.   That wasn't my question.  Is permission and ownership the same thing?

A.   I would need to look at a Webster dictionary.

Q.   You don't know?

A.   I don't know the definition of what you are trying to use that right now.

Q.   Is ownership and license the same thing?

A.   No.

Q.   And here you said license.  Correct?

A.   I may have used license there, but on the operating agreement which gave us the ownership, provided us with undisputed rights without any claim or title to the name and the logo, the registered mark.

Q.   In this affidavit, you testified, you stated under oath the 2006 operating agreement gave you a license.  Correct?

A.   That's what it says.

Q.   That's what you said?

A.   Correct.

Q.   Under oath?  Under oath?

A.   It's an affidavit, yes.

Q.   You have never had any position in Unisource California.  Correct?

A.   Correct.

Q.   You don't have any ownership currently or ever in Unisource California.  Correct?

A.   Correct.

Q.   You were never an employee of Unisource California.  Correct?

A.   Correct.

Q.   So you don't know the day-to-day of Unisource California, do you?

A.   Not currently.

Q.   You didn't know in 2001?

A.   No.

Q.   2002?

A.   No.

Q.   2003?

A.   You can say I did not know from 2002 through 2006.

Q.   In 2006 you knew the day-to-day of Unisource California?

A.   A lot more, yes.  I knew some of it.

Q.   So you knew that Unisource California was operating in several states?

A.   California and Oregon.

Q.   You knew that they were operating in California and Oregon?

A.   Correct.

Q.   How about Kentucky?

A.   No.

Q.   How about Pennsylvania?

A.   No.

Q.   You never had any authority to dictate how Unisource California operated its business, did you?

A.   Only with regards to the co-owned, co-shared website.

Q.   You had authority to dictate how Unisource California used that website?

A.   I had authority to make changes as far as the actual website is concerned, yes, and it was approved by me and

Mr. Cerasale.

Q.   So it had to be approved by Cerasale?

A.   By both of us.

Q.   Is that a yes?

A.   That is a yes.

Q.   So you couldn't do it on your own?

A.   No.

Q.   But Mr. Cerasale could?

A.   No.

Q.   But he did?

A.   No, he did not.  He had to be approved by me and him.

Q.   Didn't you testify yesterday that you got thrown out of the website?

A.   I did.

Q.   Did you choose to do that?

A.   Of course not, no.

Q.   According to you, Mr. Cerasale did that?

A.   Yes.

Q.   Without your knowledge?

A.   He did, yeah, without my knowledge.

Q.   So Mr. Cerasale had control over the website, you did not?

A.   That is true.

Q.   And that's been true since 2001 to the present?

A.   That has been true, and not for lack of asking for access.
He refused to provide me with access.  From 2006 to even today

we co-own that website with him.  He just never provided me access to be able to publish anything I wanted.

Q.  You never had access to publish whatever you wanted on the website.  That's what you just testified?

A.  That is true.  When we received the registered trademark and we updated the website, Mr. Cerasale knew the trademark and he is the one that authorized the upload of the new website with the trademark on it.

Q.  He is the one who authorized it?

A.  He is the one -- yeah, he is the one that had the user ID and password for it.  He never provided me that even though he was asked to multiple times.

Q.  He was asked but you don't have an agreement in writing that you have the right to do that, right, that you have the right to change the website?

A.  No, there are e-mails to that effect.

Q.  My question was, do you have an agreement in writing that you have the right to change the website whenever you want to?

A.  It was an agreed understanding between both of us.

Q.  The answer is no.  Correct?

A.  The answer is yes.  It was an understanding, verbal agreement between both of us.  He did not want me, back in 2012, to break away and recreate our own website.  So, the understanding was, okay, we'd invest and we both owned this website.

Q.   So at first --

A.   So it was verbal.

Q.   Your testimony yesterday was that the operating agreement of 2006 gave you co-ownership of the website.

A few minutes ago your testimony was that e-mails gave you the right to the website, co-ownership.

Now your testimony is that you had a verbal agreement, not confirmed anywhere in writing, that you co-owned the website. Which one is it, Mr. Mijares?

A.   2006 gave us the full ownership.  What my testimony right now regarding the website is when we updated the website, and Mr. Cerasale is the one who uploaded it because I did not have user ID and password.  He never gave it to me.

From 2006 forward he has been asked maybe a thousand times for that information.  He never provided it.

Q.   So it's not a verbal agreement?

A.   I already testified it's a verbal agreement.

Q.   So it's not the 2006 written agreement?

A.   Are we talking about the 2006 written agreement or are we talking about a website, access to it?

Q.   We are talking about an agreement that you had the authority to change the website and co-owned the website. That's what we are talking about.

A.   Well, there are two separate things.  One is owning something and the other is having access to it.

In this scenario, we owned, co-owned it, we co-shared it, and we co-used it all the way up to 2019 when we were thrown out. And the other one is being provided with access to it. We were never provided that access.

Q. Okay. So the 2006 operating agreement gave you ownership to that website. Is that your testimony?

A. My testimony is the 2006 agreement, as it reads, give me one second -- as it reads under licenses and name use, it provided Unisource Discovery, Inc., a Florida corporation, clear and clean of any titles and is not subject to any order under any form of licensing agreement.

This 2006 agreement provided us, us meaning Unisource Discovery, Inc., with full rights and ownership of the name and logo. That was pivotal in doing this agreement in 2006.

Q. That operating agreement doesn't say provided, does it?

A. No, it provided us, meaning that's my testimony, and not only that, but this 2006 agreement became ratified in 2010 Closed Corporation Shareholder Agreement, which Mr. Cerasale was one of the authority along with myself and Lutter, which clearly states Section 1.3 trademarks that Unisource Discovery Digital Document Retrieval is a registered U.S. trademark of the company, and that was very clear to Mr. Cerasale starting in 2006 and reaffirming in 2010.

MR. VELARDE: Your Honor, I am going to move to strike everything after the word no as nonresponsive.

THE COURT:  The request is denied.

Please continue.

BY MR. VELARDE:

Q.  You testified earlier today and yesterday that Mr. Steven Cerasale was poaching your Florida customers.  Correct?

A.  Correct.

Q.  That's your testimony today that Mr. Steven Cerasale was poaching your Florida customers.  Correct?

A.  That is still correct.

Q.  And you knew about this in 2019.  Correct?

A.  Correct.

Q.  You knew about it in 2008.  Correct?

A.  Correct.

Q.  You knew about it in 2017.  Correct?

A.  I can't go that far back.

Q.  So we know for certain 2018 and 2019 he was poaching your customers?

A.  We have proof from our clients regarding the poaching.

MR. VELARDE:  I am going to show you what's been marked as Defense Exhibit 127.  That's Plaintiffs' Exhibit 11 as well. It's been admitted as Plaintiffs' Exhibit 11, so that's the one I'm going to use.

THE COURT:  Wait a minute, you are using Plaintiffs' Exhibit 11?

MR. VELARDE:  Yes.  And I'd like to publish it to the

jury as well.

THE COURT:  All right.  That's fine.

BY MR. VELARDE:

Q.  Mr. Mijares, I am showing you the February 21, 2020, letter that you sent to Mr. Steven Cerasale.  Do you recognize that letter?

A.  I do.

Q.  I would like to focus on the second paragraph.  In February 21, 2020, you stated -- you told Mr. Cerasale on the second paragraph, "To this end, we are offering Unisource Discovery, LLC, the option of a licensing agreement for the right to use and transact under the registered trademark." That was your words.  Correct?

A.  Correct.

Q.  Why would you give a license to someone who is poaching your clients for several years now?

A.  This letter is pertaining to trademark infringement and this is the first time that we -- after multiple cease and desist letters that were all ignored, we had no choice but to send the right of use revocation letter.

The attempts that we made were to get reconciliation with Mr. Cerasale so he could see that the actions he was taking against the company were not in good faith and they were hurting the company.  So when we were left with no other choice, we had to send him this right of use of trademark

revocation letter.

And even then, even then we gave him the option to enter into an agreement with us for the sole purpose of getting him back on his track and stop doing the things that he was doing that were greatly affecting us.

Q.   So your testimony is Mr. Cerasale for years was taking away your clients, and in February 2020 you said, hey, why don't we enter into a licensing agreement.  That's your testimony?

A.   My testimony is if you are asking about this specific letter or are you asking a hypothetical?

Q.   I can rephrase the question.

A.   Please do.

Q.   I am asking about your testimony, not about a letter, not about a hypothetical.  I am asking about your testimony.

Your testimony is that for years Mr. Steven Cerasale was stealing your customers and in 2020 you offered him a licensing agreement.

Is that your testimony?

A.   During that time period we were actively notifying Mr. Cerasale of his actions, and due to those actions there is ongoing litigation in state pertaining to that.

During that state complaint, there is pending litigation which includes fraud upon the Court by Mr. Cerasale regarding these matters.

Q.   Let me make sure I understand your answer.  Your answer is,

no, you did not offer Mr. Cerasale a licensing agreement?

A.   The letter speaks for itself.

Q.   So the answer is, yes, you did offer Mr. Cerasale a licensing agreement?

A.   We did.

Q.   You mentioned pending litigation in state court.
Correct?

A.   Correct.

Q.   That's a litigation where you sued Mr. Cerasale for tortiously interfering with your customers.
Correct?

A.   That is correct.

Q.   That litigation was thrown out of court.  Correct?

A.   No, that's not correct.

Q.   Is there not a final judgment finding that you did not state a cause of action for tortious interference?

A.   There is pending matters in front of that state court where Mr. Cerasale misled the Court in his deposition by stating that he was not doing business in the State of Florida for the last five years and now we have multiple law firms in the State of Florida in which Mr. Cerasale with Unisource Discovery, LLC, California had been actively engaged doing business in the State of Florida, including this very district on the Eleventh Judicial Circuit.

MR. VELARDE:  I am going to show the witness something

CASE 1:20-cv-23276-DPG  Document 392  Entered on FLSD Docket 06/30/2023  Page 92 of 235

that was not introduced into evidence.

THE COURT:  It's off.  I will tell both sides, before you put something on the screen, if it's already on, you need to let me know that in advance.

MR. VELARDE:  I will, Your Honor.  My apologies.  I'm sorry.

BY MR. VELARDE:

Q.  Mr. Mijares, I am showing you a final judgment as to Count 5 and 7 of your counterclaim dated July 5th, 2022.  Do you recognize this document?

A.  I do.

Q.  This final judgment is on your counterclaim for tortious interference.  Correct?

A.  This final judgment is based on our attempt to amend our complaint to bring in Unisource Discovery, LLC, which your legal team blocked us by stating to the Court that we had no jurisdiction over Unisource Discovery, LLC, in the State of Florida because Unisource Discovery, LLC, did not do business in the State of Florida.  Thus, the Court ruled with that document.

Next Tuesday, I believe next Wednesday we will be in circuit court having a hearing on our motion for fraud upon the Court, which will eventually change the outcome of this document based on our findings.

MR. SANCHELIMA:  Your Honor, I object to this line of

questioning.

THE COURT:  Sustained.

Please move on.

MR. VELARDE:  Your Honor, if I may approach.

THE COURT:  It's not necessary, but I will say, ladies and gentlemen, to the extent that there is any other litigation and somewhat related to these issues, that's not the issue before you.  Any other judge's rulings on anything else, again, not these issues but somewhat related, it's not related to this case except to the extent it might go to the parties' motives.  That's something for you to decide, but you won't be hearing about any specifics regarding the other cases or any rulings.

There is no way for me to digest that in a simple way for you.  So, that's not for your consideration.

Please continue.

MR. VELARDE:  Thank you, Your Honor.

BY MR. VELARDE:

Q.  You mentioned earlier today that your best year or your best years financially for Unisource Florida saw a revenue of about $2 million.  Correct?

A.  No, not correct.

Q.  What was your testimony as to your best year in revenues for Unisource Florida?

A.  I believe I said it was a little bit over 5 million.

Q.  It's over 5 million was your best year?

A.   I believe so, yes.

Q.   What year was that?

A.   I would have to check.  I don't know, maybe anywhere between 2009 and 2012.  I don't know.  I don't have financials in front of me in order to be able to answer that accurately.

Q.   Then after 2012 your revenues went down.  Correct?

A.   After 2012 probably for the next five years or so revenues were very steady.

Q.   And then in 2017 they went down?

A.   They started -- yeah, they started declining.

Q.   I want to be clear.

     In 2017 is when your revenue started declining?

A.   We probably had between 2012 and 2015 a change in revenue that would be maybe a two to three percent up or down which is very normal in our industry.  You know, you gain clients, you lose clients, you gain client.

     After 2017 is when we started having the issues because we did not have all our tools available.  Our Unisource printing program, which has the templates, we started losing that.  We did.  We lost it overnight.

     From there it started giving us hardship, which we could not maintain volume.  We still cannot until this day.

Q.   You lost it overnight in 2017?

A.   The Unisource templates, yes.

Q.   Isn't it true, Mr. Mijares, that you had -- let me strike

that.  I will start over.

Is Alfred Lutter -- I believe you testified Alfred Lutter is the individual who operates or manages the software that you use.  Correct?

A.  Correct.

Q.  Isn't it true, Mr. Mijares, that you have a long history of not paying Mr. Alfred Lutter for his services?

A.  No, that's not true.

MR. VELARDE:  Your Honor, I am going to put up a document that has not been introduced into evidence.

THE COURT:  All right.

BY MR. VELARDE:

Q.  Mr. Mijares, I am showing you an e-mail from Steven Cerasale to you, dated November 2nd, 2011.  The subject line is Lutter.  Do you see that e-mail?

A.  I do.

Q.  Do you recognize this e-mail?

A.  I do.

Q.  This was an e-mail sent to you from Steven Cerasale.  Is that correct?

A.  That's correct.

MR. VELARDE:  Your Honor, I would like to move this e-mail into evidence as Defense Exhibit 33.

THE COURT:  Is there an objection?

MR. SANCHELIMA:  Your Honor, it's the first time I see

this document.  I need 30 seconds to take a look at it.

No objection, Your Honor.

THE COURT:  All right.  Without objection Defense Exhibit 33 will be admitted.

(Defense Exhibit 33 was admitted in evidence.)

MR. VELARDE:  Thank you, Your Honor.  I would like to publish it to the jury.

THE COURT:  All right.

BY MR. VELARDE:

Q.  Mr. Mijares, in this e-mail Mr. Steven Cerasale states, "When I was there the first week of October, we agreed, and I told Alfred we would pay two invoices a week to get current with him.  Since then he received four checks rather than nine.  I don't think he is lying, or the other five are lost in the nail.  He has someone checking every day."

Mr. Cerasale -- at first, Mr. Cerasale is referring to a conference or a meeting he had with you the first week of October 2011.  Correct?

A.  Correct.

Q.  And he is stating that in that meeting you had agreed that you would pay two invoices a week to get current with Mr. Alfred Lutter.  Correct?

A.  It sounds that way, yes, correct.

Q.  And, again, Mr. Steven Cerasale says since then Mr. Alfred Lutter has not received the checks he should have received.

Correct?

A. Based on the e-mail I would have to, yeah, correct, based on the e-mail.

Q. The next paragraph states, "I am tired of talking to him and to you about this. We need to make it go away. If you can't or won't adhere to this schedule, please let me know, and I will try to figure something else out. I can set up an ACH or EFT and monitor it myself or I can pay him from California, charge Florida back for that portion and Florida can pay California back."

Did I read that correctly?

A. You read that correctly.

Q. First, Mr. Cerasale is saying he is tired of talking to you about payments to Mr. Lutter.

A. Well, that's what he said in the e-mail.

Q. And he is offering to pay for Florida and have Florida reimburse him. Correct?

A. Yeah, but I believe you need to know the rest of the story.

Q. We will talk about the rest of the story. I am going to put down that document on the screen, and I am going to open up another one.

Mr. Mijares, I am showing you an e-mail dated July 30th, 2014, from Mr. Steven Cerasale to you, and the subject line is, "IT Service Payments." Do you see that?

A. I do.

Q.   Do you recognize this e-mail?

A.   I do.

Q.   This a true copy of the e-mail you received from Mr. Cerasale on July 30th, 2014.  Correct?

A.   That is correct.

MR. VELARDE:  Your Honor, I would like to move this into evidence as Defense Exhibit 34.

MR. SANCHELIMA:  No objection, Your Honor.

THE COURT:  All right.  It will be admitted.

(Defense Exhibit 34 was admitted in evidence.)

MR. VELARDE:  I would like to publish it to the jury.

BY MR. VELARDE:

Q.   Mr. Mijares, in his e-mail Mr. Steven Cerasale is informing you that late last year you asked him to start billing you for the services and promised to pay them promptly.

"No payments were received in January, February, and March. When I was there in April, you gave me three checks and we were caught up.  Since then we have sent the bills monthly and once again they have been ignored."

Did I read that correctly?

A.   You did.

Q.   This is Mr. Steven Cerasale telling you on July 30th, 2014, that you are not paying your bills for the IT services. Correct?

A.   It appears to be that.  Correct.

Q.   I'm going to move on to another document.

Mr. Mijares, I am showing you an e-mail dated July 30th, 2014, from Mr. Steven Cerasale to you, and it's a continuation of the e-mails with the subject line, "IT Service Payments."

Do you see that?

A.   I do.

Q.   Is this a true copy of the e-mail you received from Mr. Cerasale on July 30th, 2014?

A.   I believe so.

MR. VELARDE:  Your Honor, I would like to move this into evidence as Defense Exhibit 35.

MR. SANCHELIMA:  Thirty seconds, Your Honor.

No objection, Your Honor.

THE COURT:  All right.  Without objection, Defense Exhibit 35 will be admitted.

(Defense Exhibit 35 was admitted in evidence.)

MR. VELARDE:  I would like to publish it as well.

BY MR. VELARDE:

Q.   Mr. Mijares, I am showing you at the bottom of Exhibit 35 the e-mail dated July 30th, 2014, from Steven Cerasale.  This is the e-mail that we were looking at previously as Defense Exhibit 34.  Correct?

A.   Yes.

Q.   And then you responded that same day, July 30th, 2014. Correct?

A.   Yes.

Q.   And you didn't say, what are you talking about, I am paying.  Correct?

A.   I'm sorry?

Q.   You didn't say, "I am paying"?

A.   I think maybe I can explain the rest of the story if you want me to, unless we can continue going and I can wait until the end.

Q.   Your counsel will have the opportunity to ask you questions and you can explain, but my question was, in your response you did not tell Mr. Steven Cerasale that he was wrong and that you are paying.  Correct?

A.   That is what it says, and he was still getting paid.

Q.   In fact, you stated in your e-mail that you are dealing with slow pay and it's directly affecting me personally and have not wanted to bother you at all.  Correct?

A.   Slow pay is the company was most likely at that time receiving slow pay from insurance companies which normally they pay slow and affecting me personally in my conversation to him was affecting me personally in the sense of being able to operate all the priorities of payments, payroll, rent, insurance, that sort of thing.

So that is the breakdown that I'm letting him know.  That's why I also said, "I'll push your bills through and maybe I'll send over the checks and you can deposit one every other week

or so until we are caught up again."

Q. So you were behind on payments?

A. When it comes to IT, software, Alfred, the bills for Alfred, all of that, we acquired the rights under the stock purchase and license agreement and we acquired perpetual rights to that license which includes that we do not need to pay Alfred for monthly services, unless we tell Alfred we would like for you to add something for us.

We don't have to pay him for it. We have perpetual rights to that software, and what was happening was we were getting billed by Alfred after we signed the stock purchase agreement in June 28th of 2010.

We kept getting billed by Alfred for $12,000, $15,000 a month, and it got to the point where I said this has to stop because under our agreement we don't have to pay Alfred monthly services.

Now, Steven does because California doesn't own the software. He is a licensee to Alfred, so he has to pay Alfred a monthly fee, but not Florida. Florida we own it and, thus, we don't have to pay Alfred.

Q. Unisource Florida owns the software?

A. We do. Yeah, we do, under the stock purchase and license agreement.

Q. The licensing agreement?

A. Yes, it's a perpetual license, and it also gives us source

code rights.

Q.   It's a software licensing agreement?

A.   With source code rights, yes.

Q.   Not ownership?

A.   No, it has ownership.

Q.   The software licensing agreement has ownership?

A.   Yes, it does.

Q.   Well, my question, Mr. Mijares, was that in 2014, July 30th, 2014, you did not tell Mr. Cerasale I don't owe him a cent.  Correct?

A.   Well, that would be a little abrupt.  I wouldn't say that. I would still meet my obligations and we did.

Q.   Your obligation, I'm sorry?

A.   Yes, our obligations.  That's why the e-mail says I will push your bills through and send you additional check.

Q.   Your obligation to pay Alfred Lutter?

A.   Whatever the balance was until we stopped paying him because we didn't need to, so we stopped that process.

Q.   You didn't need to pay him according to your testimony after 2010?

A.   No, not after we signed the stock purchase agreement, no. Unless we asked him to do something special.

     If I would tell Alfred I need you a whole new -- you know, I need you to create a new thing for us that is not already part of the source code then, yes, we would have to pay for

that.

Q.   Did you ask for that every other month?

A.   No, I did not.

Q.   Did you ask for it every two months?

A.   No, I did not.

Q.   How often did you ask it, once a year?

A.   Only when we needed to.

Q.   Twice a year?

A.   Maybe a little more than that.

Q.   Three times a year?

A.   Maybe a little more than that, but there was no monthly fee that we had to pay him for it.

Q.   Is it your testimony that in 2014 you had racked up bills from 2010 that you also didn't pay to Alfred Lutter?

A.   I don't know.

Q.   You don't know if that's your testimony?

A.   I don't know because I don't have my books in front of me from 2014 to be able to answer that question.

Q.   But it's possible?

A.   I don't know.

Q.   You don't know if it's possible?

A.   I don't think it's possible.  No, I don't know.  Unless I would be able to look at my accounting books.  I don't have them here.

          MR. VELARDE:  I am going to take this document down.

THE WITNESS: Your Honor, there is password information on this document that cannot be published.

THE COURT: Well, it's not being published to the jury.

The witness is saying that there is some information that shouldn't be public.

THE WITNESS: Password information.

MR. SANCHELIMA: I didn't hear that.

MR. VELARDE: Defense Exhibit 14, he says that this password should not be shown.

THE WITNESS: That's a sensitive password to Alfred Lutter. That's why it cannot be shown.

MR. SANCHELIMA: It's still active.

THE WITNESS: It is.

MR. VELARDE: I am not going to publish it.

BY MR. VELARDE:

Q. Mr. Mijares, I am just going to ask you questions about this document.

A. Okay.

Q. This is the September 16th, 2019, e-mail from you to Mr. Alfred Lutter. Correct?

A. Correct.

Q. And in this e-mail you state that you scheduled a wire payment for tomorrow for $2,500 against account. Correct?

A. Correct.

Q. Because in September 2019 you had an open account where you

owed funds to Mr. Alfred Lutter. Correct?

A. No. Against account means put it against Unisource Discovery Florida account. Whatever Alfred would do with that, that's up to Alfred. You would have to ask him that.

Q. So the $2,500 payment you are referencing against account was the entirety of what you owed to Mr. Alfred Lutter at that time?

A. No, actually, this e-mail is the payment that we had to make on an emergency basis to Alfred to set up our new e-mail -- I'm sorry, to set up a new website domain and to be able to transfer the back end where the clients log in so they can access the information. It goes through the front end of our website. I cannot do that. I don't have the ability to do that, so I had to pay Alfred.

After Mr. Cerasale knocked off our access, we then had to set up a new website, and that's the payment to get our new website working so our clients can log in and access their information.

Q. So as of September 16th, 2019, your testimony is as of that date you were thrown out of the website?

A. I don't know what came first, if it was the website or there was a -- we received an e-mail from Cerasale telling us that he was throwing out our servers, and that's what that was covering to make sure that our clients still had access, correct.

Q.   Correct, as of September 16th, 2019, you did not have access to the website?

A.   You're asking specifics.  Give me one second.

Q.   I'm asking about your testimony.  You said that you had to do it on an emergency basis.  You had to pay Alfred Lutter on an emergency basis to September 16, 2019.  Correct?  That was your testimony.

A.   That was my testimony, that's correct.

Q.   As of that date, then, you didn't have access to your website?

A.   Are you asking me about this specific e-mail?

Q.   I am asking you about your access to the website.

A.   This payment was for Alfred under an emergency to set up our access for clients to log onto our new website.

Q.   At this time point you were using the unisourcediscovery.net e-mail account.  Correct?

A.   Correct.

Q.   Is it your testimony that as you were using the .net e-mail account in September 2019, September 16, 2019 because you were also thrown out of your e-mail account?

A.   I started using that .net e-mail account simultaneously going back to probably 2017.  I believe I said that earlier in my testimony.

Q.   That wasn't my question.

A.   That's my answer.  I set up my e-mail in 2017 through .net.

I think it was for a handful of important e-mails because we were not trusting the .com e-mails at that time.

Q.   My question was, Mr. Cerasale -- Mr. Mijares, as of September 16, 2019, your testimony is you did not have access to your e-mails at the .com domain?

A.   The .com I believe that by that time it was gone.

Q.   It had been simultaneous, your deletion from the website and your e-mail being inaccessible?

A.   No, the website happened first; the e-mails happened later.

Q.   But by this time you did not have access to your e-mail by September 2019?

A.   I don't know if by this specific September 16th date he had already knocked off our e-mails or it happened a little later. I don't know that, but as of this date we already had to make preparations for the new website.  That's what that payment is for so Alfred could hook up the ability for our clients to log in and access their information.

Q.   Mr. Steven Cerasale, Unisource California, was paying or has paid for Unisource Florida the amounts owed to Alfred Lutter.  Correct?

A.   I don't know.

Q.   Mr. Cerasale, Unisource California, has paid Mr. Alfred Lutter for Unisource Florida's bills since 2011 through 2019. Correct?

A.   Incorrect.

Q.   Has Mr. Cerasale, Unisource California, not paid Unisource Florida's bills to Alfred Lutter in 2011?

A.   I don't know.  If Alfred Lutter had any open bills pending with the company, he could have sent that to us.

I don't believe I have that.

Q.   Is that true for 2012?

A.   I don't recall, but if Lutter under the process of being a vendor had open bills, he could have easily have sent them to me as early as 2013.  I don't have any pending bills with Alfred Lutter.  The company doesn't owe Alfred Lutter any money.

Q.   That's because he took away your right to have credit because you weren't paying him.  Correct?

A.   Because we didn't need to pay him under the stock purchase agreement.

Q.   You weren't paying him.  Correct?

A.   We don't need to pay him unless we ask him to do something, and in your previous e-mail you saw we paid him when we asked him to do something.

Q.   So that's correct, you were not paying him?

A.   Because under the stock purchase agreement we do not need to pay him for a monthly service.

Q.   Is that a yes?

A.   Under the stock purchase agreement we don't pay Alfred Lutter for monthly services.  We have perpetual rights, and we

own the source code.  It's been booked into our accounting books.  The source code, the accounting license of the software is booked into Unisource Discovery, Inc.'s, accounting as an asset.

Q.   So you were not paying him?

A.   We didn't need to.

MR. VELARDE:  I am going to show a document that has not been introduced into evidence to the witness.

Your Honor, if I may have a 30-second break.

THE COURT:  All right.

BY MR. VELARDE:

Q.   Mr. Mijares, you recognize this document.  Correct?

A.   I believe so.

Q.   This is the profit and loss statement of Unisource Discovery, Inc.?

A.   Okay.

Q.   For 2015.  Correct?

A.   That's what it says.

MR. SANCHELIMA:  Is that marked as an exhibit?

THE WITNESS:  Yes, I have never seen this exhibit, so I don't know where it came from.

THE COURT:  What exhibit number is this?

MR. VELARDE:  It hasn't been marked, Your Honor.  It's impeachment.  It would be 36, Defense Exhibit 36.

(Defense Exhibit 36 was marked for identification.)

BY MR. VELARDE:

Q.  You've never seen this document before?

A.  I cannot attest to the authenticity of the document.  I didn't produce it.  I don't know where you got this document from.

Q.  Who is Mr. David Phillips?

A.  That was an attorney of ours from the company.

Q.  He represented Unisource Florida?

A.  Years ago.

Q.  In 2019?

A.  Maybe, yes.

Q.  I am showing you an e-mail not introduced into evidence, Your Honor.

I am showing you an e-mail from Mr. David Phillips dated December 27th, 2018?  Do you see that e-mail?

A.  I do.

Q.  At that time was Mr. Phillips representing Unisource Florida?

A.  In 2018, yes.

Q.  Do you see where he says, "I re-uploaded onto your cloud"?

A.  Do you have a directory of what he uploaded to the cloud?

Q.  Of course.

MR. SANCHELIMA:  What is the exhibit number?

MR. VELARDE:  This is not going to be introduced into evidence.  It's for his recollection.

THE COURT: I will say, going forward, even if you are going to use something for any reason, it should have an exhibit number on it.

MR. VELARDE: Yes, Your Honor, so we will identify it as Exhibit 37, Defense Exhibit 37.

(Defense Exhibit 37 was marked for identification.)

THE COURT: Okay.

BY MR. VELARDE:

Q. Do you see this says, "Documents produced by Unisource and Noel Mijares"?

A. I do.

Q. Do you see where it says, "2015 profit and loss statement"?

A. Thank you.

Q. Going back to the 2015 profit and loss statement, is this a document that you produced?

A. Yes.

Q. This is a document that you prepared?

A. No.

Q. Who prepared this document?

A. Our accountant.

Q. On your behalf?

A. Yes, sir.

MR. VELARDE: Your Honor, I would like to move this into evidence, Defense Exhibit 36.

THE COURT: Is there an objection?

MR. SANCHELIMA:  Yes, Your Honor.  This is a state court proceeding, I believe.  It has nothing to do with this case.

MR. VELARDE:  Your Honor, it's a document that Mr. Mijares prepared.

THE COURT:  It doesn't matter.  Sustained as far as foundation or lack of foundation.

MR. VELARDE:  Your Honor, Mr. Mijares stated that --

THE COURT:  Counsel, don't argue with me.  I already ruled.

MR. VELARDE:  I apologize, Your Honor.

BY MR. VELARDE:

Q.   Is the information in your 2015's profit and loss statement accurate?

A.   I would need to review that.  I haven't seen that document in seven years, so I cannot tell you by looking at the screenshot you are giving me.  I would like to look at the whole document.

I don't know if there was any amendments made after the fact.  I don't know.  I would need to look at the document.

MR. VELARDE:  Your Honor, if I may approach to provide Mr. Mijares the document.

THE COURT:  Okay.

THE WITNESS:  It's a tax document.  It looks good.

BY MR. VELARDE:

Q.   It looks like it's accurate?

A.   I don't know if this was reconciled or not.  I don't know if this is a printout of the profit and loss before reconciliation and then filing or not.  That I cannot tell you.

Based on what I am looking at, it does not appear to be a final reconcile.

Q.   This is a document that you provided to your shareholders.  Correct?

A.   No, this is a document that the shareholders could obtain directly from the QuickBooks.  This is a QuickBooks printout, but I don't know.  If you are asking me to certify this right now, I cannot because I don't know if this was reconciled or not.  That's what I'm trying to say.

Q.   I didn't ask you if this was reconciled.  I am asking if this was a document that you provided through your attorney, David Phillips in 2018?

A.   It appears so, yes.

MR. VELARDE:  Your Honor, at this point I would like to move it into evidence, Defense Exhibit 35 -- 36.

THE COURT:  Is there an objection?

MR. SANCHELIMA:  No objection, Your Honor.

THE COURT:  All right.  Without objection it will be admitted.

(Defense 36 was admitted in evidence.)

MR. VELARDE:  I'd like to publish it to the jury.

THE COURT:  All right.

BY MR. VELARDE:

Q.   Mr. Mijares, you testified earlier that Steven Cerasale started poaching your clients, I believe you said 2018. Correct?

A.   That is still under ongoing discovery from the company.  We have identified up to 2017, I believe.

Q.   So it's now 2017 when it started?

A.   We don't know.  It's ongoing.

We have been learning new developments.  In the past six months we learned -- not even six months.  In the past three months, two months we learned that Mr. Cerasale has been doing business in Florida with at least five or four known law firms throughout the state in violation of the closed corporation shareholder agreement.

Q.   But it wasn't in 2015.  Correct?

A.   We haven't gone back that far.

That would probably be something that we would have to look at under discovery in that case.

Q.   You don't know if it was 2015?

A.   At this point in time, I don't know.

Q.   Was 2015 a good year?

A.   2015 was the year that Steven Cerasale stopped coming to Florida.  2016 is the year that he opened another company, and 2017 is the year that we lost all of our templates.

Q.   You testified earlier that 2017 is when your finances, your revenues started going down.  Correct?

A.   Aggressively, yes.

Q.   And you testified earlier that when the date, when you -- before that time you were averaging 20 percent profit?

A.   With regards to previous years, yes.

Q.   Previous to 2017?

A.   Correct, but, again, now you are going into the territory of whether or not this was reconciled with a final tax return.

Q.   Understood.

A.   Okay.  I just wanted to make that clear.

Q.   So in 2015 the document you provided profit and loss statement of Unisource Florida provides total income and gross profit about $2.4 million.

Correct?

A.   Correct.

Q.   That doesn't include your expenses.  Correct?

A.   Correct.

Q.   Your expenses are at the bottom, the last page of this document.  Correct?

A.   Correct.

Q.   And your expenses are $2,460,203 -- excuse me, let me do that over.

Your expenses were $2,460,203.91.  Correct?

A.   Based on the report here, yes.

Q.   Based on the report that you provided?

A.   Correct.

Q.   And your net income, the very bottom of the page for 2015, before things started going south --

A.   Uh-huh.

Q.   -- was negative $73,440.07.  Correct?

A.   Based on this document, and, again, I don't know if this was reconciled and filed with the final tax return.

Q.   Based on the document that you provided?

A.   Correct.

Q.   So 2015 was not a good year for Unisource Florida according to this document.  Correct?

A.   According to the document as it is, no.

Q.   It was a bad year for Unisource Florida?

A.   I will not be able to say whether it was a bad year because I don't have the final tax return for 2015.

Q.   According to the document, it was a bad year.  Correct?

A.   Again, I cannot attest whether this was a reconciled final document.  I don't know if this was a final document that was used for tax purposes.

Q.   You do know that this was a document that you provided?

A.   Yes, I have seen that.

Q.   And you do know that this document shows that 2015 was a bad year for Unisource Florida?

A.   It shows that.

Q.   And you do know that 2015 is two years before you claim that Steven Cerasale sabotaged your business.  Correct?

A.   Correct.

Q.   If Mr. Steven Cerasale was poaching your clients, if Mr. Cerasale prevented you from accessing your templates, if Mr. Cerasale attempted to sabotage your business, that would only affect your revenues, not your expenses.  Correct?

A.   That would affect everything.

Q.   Mr. Cerasale's secretly poaching your clients would affect your expenses.  Is that what your testimony is?

A.   It affects our revenue.  It affects our goodwill.  It affects our reputation.

Q.   That was not my question.

A.   That's my answer.

Q.   My question was, does it affect your expenses.  And the answer is, it does not affect your expense.  Correct?

A.   Are you answering it for me?

Q.   I'm asking if that's correct.

A.   It affects our revenues.  It affects our goodwill.  It affects our relationships.

Q.   So not your expenses.  Correct?

A.   Correct.

Q.   I am going to show another document that has not been introduced in evidence.

Mr. Mijares, I am showing you the 2016 profit and loss

statement of Unisource Discovery, Inc.  Do you recognize that document?

A.   Yes.

Q.   This was another document for the year 2016 that you provided.  Correct?

A.   I would imagine so, if it comes from the same batch.

MR. VELARDE:  Your Honor, if I may approach to provide a witness with a full copy.

THE COURT:  Okay.

MR. SANCHELIMA:  Full copy of what exhibit?

MR. VELARDE:  Defense Exhibit 38.

(Defense Exhibit 38 was marked for identification.)

THE WITNESS:  Thank you.

MR. VELARDE:  Your Honor, I would like to move this into evidence as Defense Exhibit 38.

THE COURT:  Is there an objection?

MR. SANCHELIMA:  No.  No objection, Your Honor.

THE COURT:  All right.  Without objection Defense Exhibit 38 will be admitted.

(Defense Exhibit 38 was admitted in evidence.)

MR. VELARDE:  I'd like to publish it as well to the jury.

THE COURT:  All right.

BY MR. VELARDE:

Q.   Mr. Mijares, this is the 2016 profit and loss statement

from Unisource Florida that you produced.  Correct?

A.   Correct.

Q.   And the total income gross profit shows $1,937,188.83.
Correct?

A.   Correct.

Q.   That figure does not include expenses.  Correct?

A.   Correct.

Q.   On page three of this exhibit you see the expenses as
$2,033,000 -- excuse me, $2,033,181.84.  Correct?

A.   Correct.

Q.   And it shows a net income of negative $99,097.01.  Correct?

A.   Correct.

Q.   This was a bad year for Unisource Florida.  Correct?

A.   I don't know if it was a bad year for Unisource Florida.
Again, I don't have the final tax return here.

Q.   According to the document that you provided, it's a bad
year for Unisource Florida.  Correct?

A.   Correct.

Q.   And this is a year before your testimony that Steven
Cerasale took away the templates and affected your revenues.
Correct?

A.   Correct.

Q.   And your expenses were at $2,033,181.84, which are not
affected by Mr. Steven Cerasale's supposed sabotaging of your
business.  Correct?

A.   Again, I don't know what the final tax return for this year was but, yes, based on this document, that's what it shows.

Q.   Based on the document that you provided?

A.   Based on the document that you were provided, that's what it shows.

Q.   By you, that was provided by you?

A.   By the company.

Q.   The company Unisource Florida?

A.   That's what the document says on the top, sir, yes.

THE COURT:  All right.  Before you do that, why don't we take the first break of the afternoon.

We will take 15 minutes.

Please don't discuss anything about the case.

COURT SECURITY OFFICER:  All rise.

(The jury exited the courtroom at 3:08 p.m.)

THE COURT:  You may step down.

How much more do you have of cross?

MR. VELARDE:  Your Honor, I am almost done with it, maybe 15, 20 minutes.  I don't think I will be longer than 20 minutes, Your Honor.

THE COURT:  All right.  So, it's already -- if we come back a little bit after 3:15 and we break around 5:00 that doesn't leave a lot of time.

We've got two jurors that are unavailable tomorrow and I've got a conflict in the morning, so we really only have a

half day tomorrow. So all of you should kind of keep the schedule in mind. I told them three days, but we might have to go into four. We are in the third day.

All right. Ten minutes.

COURT SECURITY OFFICER: All rise.

(Brief recess.)

COURT SECURITY OFFICER: All rise for the jurors, please.

(The jury entered the courtroom at 3:22 p.m.)

THE COURT: All right. Please be seated.

All right. Please continue.

BY MR. VELARDE:

Q. Mr. Mijares, your testimony earlier was that it was always the agreement or understanding between Unisource Florida and Unisource California that when one of you gets a customer belonging to the other, you let each other know.

Correct?

A. That was the original understanding that we operated by from the very beginning to at least 2015, 2016, around there.

Q. 2015, you stopped directing?

A. No, I apologize, not us. That was the understanding, and it worked, yeah.

Q. And it happened often that you would, for example, receive a call from a California customer. You would then redirect it to California. Correct?

A.   That would be the process.

Q.   Did it happen often when Unisource California received a Florida customer, they would redirect it to Unisource Florida. Correct?

A.   Correct.

Q.   I am going to show you Plaintiffs' Exhibit 17, which has been admitted into evidence.  I would like to publish it to the jury.

Mr. Mijares, this is the document that you testified you prepared.

Correct?

A.   Correct.

Q.   This document shows on the left column, ordering firm name, and on the right column, billing firm name.  Correct?

A.   Correct.

Q.   So that's what the company refers to as the ordering customer on the left and the billing customer on the right. Correct?

A.   Correct.

Q.   On the far right you have a column, orders received. Correct?

A.   Correct.

Q.   And on that line, you have seven, that means you received seven orders where the firm name is Abrahamson and Uiterwyk in Tampa.  Correct?

A.   That's correct.

Q.   And the billing customer was Abrahamson, the same firm in Tampa.  Correct?

A.   Correct.

Q.   So for every order you have an ordering customer and a billing customer.  Correct?

A.   Well, of course, correct.  It varies, some ordering customers have their own clients that order the order, so it would be a different billing customer but it's still a customer.

Q.   So for every order you have one ordering customer and one billing customer.  Correct?

A.   All you need to do is look at number two on the list, Adams, Adams & Baca, Miami, Travelers of Florida Personal Lines out of Buffalo.  That's the actual client who ordered through Adams & Adams in Miami for that request.

Q.   All right.  For that I am glad you pointed that out.

The second line has one order.  Is that correct?

A.   One order, correct.

Q.   And that one order has an ordering customer, Adams, Adams & Baca.  Correct?

A.   The customer would be Travelers of Florida.

Q.   I'm saying the ordering customer is Adams, Adams & Baca.  Correct?

A.   Adams, Adams & Baca was the law firm that handled the

litigation, but ordering is Travelers of Florida.  I'm sorry, Travelers of Florida Personal Lines out of Buffalo, New York. The client was Buffalo, New York.

Q.   My client wasn't who was the client.

My question was the ordering customer -- you testified that the left column is the ordering customers.  Correct?

A.   The ordering customer, Adams, Adams, but also Travelers of Florida is also a customer.

That's what I'm trying to say, just because it falls under one line or the other doesn't mean they are not a customer.

Q.   That wasn't my question.

A.   They are not --

THE COURT:  Hold on, one at a time.  Let him finish his question, then you can answer.

BY MR. VELARDE:

Q.   For every order, there is an ordering customer and a billing customer?

A.   Correct.

Q.   Sometimes they are the same, sometimes they are not?

A.   Correct.

Q.   And in this particular instance, the one you pointed out, the ordering customer was based in Miami.  Correct?

A.   The law firm, yes.  And like I'm trying to explain, in that case you also have Travelers of Florida, who is also an ordering customer out of Buffalo.

Q. Travelers of Florida under the billing customer column you are saying is also an ordering customer?

A. It is the ordering customer. They are the ones who requested the file to be handled.

Q. Is every name on under the billing customer column an ordering customer?

A. I believe so, yes.

Q. Is every name on the ordering column an ordering customer?

A. Yes.

Q. So for every order you have two different customers ordering?

A. Yes. You have two different customers. You have the customer who is requesting the claim file and paying for it, and then you have the customer who is going to represent them locally, wherever that may be in Florida, Georgia, Tennessee or Texas.

Q. And it's your position that both are your customers. Correct?

Unisource Florida has a relationship with both?

A. Correct.

Q. So those are Unisource Florida customers on both sides of the column?

A. They are.

Q. I am showing you page three, highlighted to make it easy.

Do you see the highlighted row that ends with the number

17?

A.   Yes.

Q.   On the left you have Law Offices of Jack D. Evans in Orlando, Florida.  Correct?

A.   Correct.

Q.   There are several in this column, orders from that law firm.  Correct?

A.   Correct.

Q.   And on the right, the billing customer, Travelers Diamond Bar.  Correct?

A.   Yes, we are a preferred vendor for Travelers.

Q.   Diamond Bar is in California, is it not?

A.   It may be.

Q.   Were you stealing customers from Mr. Cerasale?

A.   No.

Q.   But this you said is a customer of Unisource Florida. Correct?

A.   It is.

Q.   And this is a customer in California.  Correct?

A.   We have customers nationwide.  Travelers Insurance happens to be a nationwide company, and as a preferred vendor for Travelers Insurance they send us orders from all over the country.

Q.   That wasn't my question.

You have a customer in California for which you processed

17 orders. Correct?

A. I see what you're trying to do, Counselor. The Travelers customer is the national insurance carrier that we are a preferred vendor.

The law firm that is handling the file is out of Orlando.

Q. So you do not have a customer in California for which you processed 17 orders?

A. Apparently, that Travelers and Diamond Bar, that's where their adjuster is out of, and out of our national agreement to handle their business they send it to Orlando to get processed.

Q. That wasn't my question, Mr. Mijares. The question was, do you have a customer in California for which you ordered 17 -- for which you processed 17 orders?

A. It appears that Travelers sent us an order out of Diamond Bar for 17 orders to be processed in Orlando, Florida.

Q. Is that a yes?

A. I said it appears, yes.

Q. So you have customers in California for which you processed 17 orders?

A. The orders were processed in Orlando, Florida. The ordering insurance carrier for that 17 locations happens to be out of Diamond Bar.

Q. So this really is a Florida customer. Correct?

A. Which one, the Law Office of Jack D. Evans or Travelers.

Q. The highlighted row are 17 orders, in reality, from a

Florida customer, not from a California customer.  Right?

A.   I don't know.  It's a Travelers customer at the end.

Q.   So it is a California customer; that's your position?

A.   Travelers is -- we are the preferred vendor for Travelers.

Q.   You did not inform Mr. Cerasale that you have a California customer.  Correct?

A.   Mr. Cerasale would see the same reports.  He would know that.  He has access to all of these reports and paid close attention to them as I did.

Q.   You testified that you prepared this report in preparation for litigation.  Right?

A.   Well, we don't know what time frame those 17 orders came in.

I don't know if they came in 2006 or 2010 or 2012, I don't know.

Q.   The question is, did you prepare this report for this litigation?

A.   I did.

Q.   So you are telling me that Mr. Cerasale had access to this report years ago before it was prepared?

A.   No, Counselor.

What I am stating is that this report is for orders from January 1st of '06 to December 31st of 2012.  I don't know in the span of those six years when those orders came in.

Q.   I am showing you page nine of the same exhibit.

I highlighted it to make it easy to follow. It's the line that ends in number 29.

A. Yes.

Q. The ordering customer is Lane Reese Summers Ennis & Perdomo, P.A. in Coral Gables. Correct?

A. Correct.

Q. The billing customer is Safeco Los Angeles. Correct?

A. That's correct. That's what it says, correct.

Q. Los Angeles is in California?

A. It is.

Q. So Safeco is a California customer?

A. It is.

Q. So you processed 29 orders for a California customer. Correct?

A. Safeco is also a customer out of other states, but in this particular highlight, yes, Lane Reese out of Coral Gables has a customer by Safeco, which becomes our customer, and they sent 29 orders to be processed in Florida.

Q. Were you stealing customers from California from Mr. Cerasale?

A. No, we were not because these were not served in California.

You need to make a very clear distinction and you're not. You are almost playing games with that.

We did not go and serve subpoenas in Los Angeles.

We did not go and get a subpoena in Los Angeles or in Sacramento or San Diego or San Francisco and serve a subpoena there and generate revenue in California.  We've never done that.

Q.  So on the billing customer side, the right column, that does not tell you where you processed, what state you processed your order.  Is that your testimony?

A.  No, because there are clients on the billing side like Zurich right below, which we also have a national account that they have adjusters throughout the country that send us what is called authorization work.  An authorization is very different, but it's the same thing in the sense that we would then collect records for them.

Those authorizations would be sent to us from anybody in the country by any Zurich adjuster or by a Travelers adjuster.

Q.  Okay.  Let's focus then on the highlighted row.

Your testimony is, the highlighted row on the billing customer side says Los Angeles.

Your testimony is this is not an order out of California?

A.  We did not serve a subpoena in Los Angeles.

I think you are trying to muddy the water.  I will call it that.

We did not serve a subpoena in Los Angeles or any part of California.  The subpoenas were served in Florida, Miami, Dade County.

Q.   So you were not present in California for this order?

A.   No, Counselor.

Q.   No presence in California from Unisource Florida.

A.   No, zero footprint besides the fact that the billing -- the ordering entity by the name of Safeco that has an office in Los Angeles requested those orders to be processed through our client, Lane Reese, and that was processed in Florida.

Q.   That is true for all the billing customers?

A.   No, that's not true for all the billing customers.

Q.   Is it true for some billing customers other than Safeco?

A.   Some.

Q.   Do you know which?

A.   Not off the top of my head right now.  It's too many.

Q.   I am going to take this document down.

Mr. Mijares, I am showing you what has been marked and admitted into evidence as Plaintiffs' Exhibit 31, and I would like to publish it to the jury.

Mr. Mijares, this was previously presented to you during your testimony.  Correct?

A.   Correct.

Q.   This is a summary of all your billing customers, that is, the customers on the right column of that document we just looked at.  Correct?

A.   Correct.

Q.   And you testified that you don't know whether all of these

or some of these or most of these reflect states where you had a presence.  Correct?

A.   No, that's not correct.  I testified that on the previous report you had up on the screen I could not tell you off that report what was coming from what because it's a pretty long report.

Q.   Can you tell me off of this report?

A.   Sure.  What would you like to know?

Q.   Can you tell me which of these customers, which of these orders is an order where you, Unisource Florida, had a presence in the state?

A.   Well, from this report we processed from 2006 to 2012, 152,763 orders in Florida.

Q.   All of these are your customers where you had a presence in the state?

A.   I believe so.

Q.   Do you see where it says California in the bottom of this document?

A.   I do.

Q.   Do you see where it says, "California, 1 order in 2007"?

A.   I do.

Q.   Do you see where it says, "California, 17 orders in 2009"?

A.   I do.

Q.   Do you see where it says, "California, 28 orders in 2010"?

A.   I do.

Q.  Do you see where it says, "California, 2 orders in 2011"?

A.  I do.

Q.  Do you see where it says, "California, 12 orders in 2012"?

A.  I do.

Q.  These are the same orders that we just looked at in California in the other document, correct, under the billing customer column?

A.  Under the billing customer, okay, give me one second.

Q.  Are the numbers different?

A.  Give me a second.  What was the page on the other one that you had the highlight?

Q.  Page three and page nine.

A.  Page three and page nine.  Page -- this one says 29.

Q.  This one says 29 because it's a combination of 2006 through 2012.  Correct?

They are not spread out by year.

A.  Well, if that's the case, then the numbers don't jive.

Q.  Well, let's look at another document that you provided us, okay.  I am going to take this document down.

Mr. Mijares, I am showing you Plaintiffs' Exhibit 32, which has been admitted into evidence, and I would like to publish it to the jury.

Mr. Mijares, this is the document reflecting your billing customers from 2006 to 2012.  Correct?

A.  Correct.

Q.   We see on page ten of this document that in 2010 you had 16 orders from Diamond Bar California, and it looks like 12 and 28 orders from Los Angeles, California.  Correct?

A.   No, not correct.  That reflects the total, so it will be 16 plus 12 is 28.

Q.   Understood.

So, you had 28 orders that reflect California in 2010. Correct?

A.   That reflects the ordering party that made the payment for the request, correct.

Q.   And you testified that you had no presence in California when you processed these orders.

Correct?

A.   Because those orders were not served in California.

Q.   You had no presence in California when you processed these orders.  Correct?

A.   Counsel, because those orders, those subpoenas were not served in California.

Q.   Is that a yes?

A.   They were served in Florida.

Q.   Is that a yes?

A.   That is a no; they were served in Florida.

Q.   So you did have a presence in California when you processed these orders?

A.   Those orders, the client, Safeco and Travelers, initiated

the order there, but the subpoena was served in the State of Florida, not California, based on the report that you showed me previously that I showed you by Lane Reese out of Coral Gables.

Q.   Well, Mr. Mijares, when we discussed that other report, you testified you did not have any presence in California in connection with those orders.

Are you changing your testimony now?

A.   Mr. Velarde, I am trying to explain it the best I can for the jury to understand and the testimony to be very clear. Those orders are from our national Travelers account, Safeco account.  They order from all over, Travelers.  If you go down the list, you will see they order from a lot of states but those were not served in California.  They were served by Lane Reese in Florida.  So we serve those subpoenas in Coral Gables in the State of Florida Coral Gables Office.

Q.   Is that a yes?

A.   Repeat your question.

THE COURT:  Counsel, it seems like we are going in circles.

Can you be specific for the witness on what you mean by presence?

MR. VELARDE:  Your Honor, the witness.

THE COURT:  Just follow my direction.  Be more specific so that we can move on.

MR. VELARDE:  I will, Your Honor.

BY MR. VELARDE:

Q.   Mr. Cerasale, are these California customers?

A.   Are you asking him or me?

Q.   Excuse me, Mr. Mijares, I apologize, are these California customers?

A.   Yes and no.

Q.   They are California customers?

A.   No, because the subpoena was served in Florida by our client Lane Reese out of Coral Gables.  Yes, because the national insurance carrier that ordered it in this case happens to be Travelers office out of Diamond Bar, California, but the subpoena was not served in California.

Q.   And you know that from memory?

A.   I know that because it was Lane Reese out of Coral Gables.  So, they will not send it to Lane Reese in Coral Gables to have to then reroute it back to Diamond Bar for another law firm there to serve it.

Q.   So just because the billing customer reflects California doesn't mean -- excuse me?

A.   Yes.

Q.   Just because the billing customer reflects California doesn't mean that the subpoena was served in California.  Is that your testimony?

A.   That is correct.

         MR. SANCHELIMA:  Your Honor, may I say that we object

to this -- I mean, we have been patient in allowing --

THE COURT:  Counsel, I think we are moving on.  The question has been answered.

Let's move on, please.

MR. VELARDE:  Your Honor, I am going to take five seconds.

BY MR. VELARDE:

Q.  You didn't have any ordering customers in Arkansas ever.  Correct?

A.  We did in 2007.

Q.  Let me make sure I am clear on that question.

When I say "ordering customers," I am referring to the left column of the document which were labeled ordering customers?

A.  I guess we are going to start this process again, but based on my report, orders by state, which is Exhibit 31, if you go down in Arkansas, I believe Arkansas says we had 168 in 2007.

Q.  Those are the billing customers.  Correct?

A.  That was by Empire Fire and American Insurance Company, 168 orders received in 2007.  That's what I have in my report.

Q.  My question was, that was the billing customer.  Correct?

A.  Again, our clients are both the same in ordering and billing, and based on the relationship it could be a staff counsel.  It could be a regular law firm.  It could be a claim adjuster.  It could be a third-party administrator.

In this case, for answering the question, it appears that

168 orders came in from Arkansas in 2007 from Empire -- excuse me, I will read it aloud -- Empire Fire and Marine, which is also one of our clients.

MR. VELARDE:  No further questions, Your Honor.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. SANCHELIMA:

Q.  My mind is sharper in the more recent events than what was discussed earlier, so I will go backwards.

Since we are talking about this presence in the state, do you understand what that means?

A.  Yes, I do.

Q.  What do you understand it to mean when you were being asked questions by counsel?

A.  They were tricky questions, but I've tried to explain it in a very simple way.  We have different types of ordering clients, and they fall in different categories, and they submit orders to us in different ways.  And just because there might be a national insurance carrier that we have a contract with that might send something to a Florida law firm, they are still our client.

Just because they get billed doesn't mean they are not our client.  We treat them with the same level and they expect the same outcome from us.

So, it's just a play on words that they are trying to use

against me but, yeah, I believe I explained it correctly.

Hopefully I did.

Q.   What would be the relevance of this other than possibly an oral agreement that you had with Defendant Cerasale.  Is there any other importance?

MR. VELARDE:  Objection, Your Honor.

THE COURT:  What's the objection?

MR. VELARDE:  Asking about relevance to a witness.

THE COURT:  If you will rephrase your question, please.

BY MR. SANCHELIMA:

Q.   How would -- well, was there an oral agreement with Defendant Cerasale to divide the markets in the United States?

A.   No.

Q.   So either side could service customers anywhere in the United States.  Correct?

A.   No.  It was a written agreement, and I apologize, there is a written agreement from 2006, and then there is another agreement in 2010.  And the understanding between those agreements is clear.  Whenever we had any interaction, and we do -- we have had interaction from California law firms.  They call us confused.  They call us -- at least once a week we get a call asking us to place an order.  When we see where they are calling from, we don't take that client.

We don't make them a client.  We don't say, yes, let me help you, let me set you up with an account, a user ID.  We

say, no, you called the wrong location.  You need to contact this location and they call over there.

That's happened this year.  Surprisingly, this year it has happened more than any other year that I can recall.

We have had probably about at least seven, seven to nine of those calls from California law firms asking to set up accounts with us, and they were all rerouted.  We didn't take not one and we wouldn't.

Q.   Well, did you ever receive any complaints from Unisource California that Unisource Florida was poaching any clients?

A.   Never.  Never.

Q.   So this is the first time you are dealing with this question.  Correct?

A.   Yes.

Q.   There was a discussion as to whether your expenses would be affected by poaching.  Correct?

A.   Correct.

Q.   And I believe your answer was that they would not be affected.  Correct?

A.   My original answer was it would be affected.

Q.   How so?

A.   Because it affects everything.

Once your revenues drop, you are still operating at the same level that you were operating before, so your expenses get affected by that, and it takes a while to make those

adjustments.  And that includes having to make very difficult decisions which is to lay people off, if it comes to that, to -- you know, to make changes in the way you operate from going from an actual office maybe getting rid of that lease so you don't have that expense anymore, but it takes time.  It doesn't happen overnight, and I think that's the point I tried to explain earlier.

Q.  Now, there was some discussion as to some outstanding bills with the firm of Alfred Lutter.  Correct?

A.  Correct.

Q.  I am going to show you the contract that you referred to as the other story or the agreement, the stock purchase agreement, and ask you to look at one section there.

It's Plaintiffs' Exhibit 8.  I'd like to call your attention to --

A.  I have a copy.

Q.  I'd like to call your attention to page one, paragraph 1.1, "Software License to Company," and the company being -- do you know what company they are referring to?

A.  Unisource Discovery, Inc., Florida.

Q.  Then it says, "Effective as of the closing, Lutter, also sometimes referred to below as licensor, grants the company, also sometimes referred to within this Section 1 as the licensee, exclusive license and full rights, the company license, to use the software under terms and conditions, and

subject to the limitations set forth hereinbelow and, solely

for that purpose, to use any accompanying manuals,

descriptions, instructions, or other literature called the

documentation."

Correct?

A.    Correct.

Q.    Now, it also says, "provided by Lutter in connection with

the software."

What did you understand that to mean?

A.    That when we executed this stock purchase and licensing

agreement Alfred provide -- Alfred got 10 percent of the

company, and we acquired the license, the rights to the license

perpetually and more.  We also acquired the source code, which

is the ownership of the actual license material, the software.

Q.    Source code is what humans can read.  Correct?

A.    Correct, that's what programs are made of.

Q.    Now, the next sentence says, "Should licensor cease to

perform any necessary maintenance on any licensed product,

licensor will provide licensee with source code for licensee's

use only."

Is that the source code you are referring to?

A.    That's correct.

Q.    So, God forbid, but if Mr. Lutter were to pass away, the

company would receive the source code.  Correct?

A.    That is correct.

Q.   Was that a concern of yours at the time?

A.   Very much so.

Q.   Why?

A.   That's why it's even the only part in the stock purchase agreement that's underlined.  No other part is underlined, and that is -- it was a concern to us because of what had happened. We had experienced in 2006 Steven Cerasale's contribution of the source code -- I'm sorry, of the software, which is what we needed, and years later we are under threat because that did not turn out to be the way he said it was, and then this happened.

Q.   Now, the last sentence says, "It is agreed and understood that all new developments, additions and modifications to the software are made part of this software license to company agreement."

     What did that -- what did you understand that sentence to mean?

A.   What it says in plain English, anything that is added, modified, any additions to that software become part of what we already own in this license agreement and -- in other words, any modification has to be included for us, any application that's added to it has to be included for us.  That's what that means.

Q.   Did you understand that you had to pay Mr. Lutter any additional consideration other than the ten percent that he

acquired to keep maintenance of this software?

A.   No.

Q.   Maybe we should talk about the affidavits.  I believe you were read part of paragraph four of the first affidavit, I believe, or the second affidavit.  But I will rephrase it -- I will read it for you.

A.   Okay.

THE COURT:  I'm sorry, which exhibit is this?

MR. SANCHELIMA:  It's the second affidavit.

(Discussion off the record.)

BY MR. SANCHELIMA:

Q.   I just want to make sure I have the right number.

A.   I believe it's that one.

Q.   It's not marked?

A.   That's the only one that's highlighted.

THE COURT:  One affidavit was 30 and the other one was 32.

MR. SANCHELIMA:  It's 32, Your Honor.

THE COURT:  All right.

BY MR. SANCHELIMA:

Q.   That affidavit paragraph four says, "I would like to begin by clarifying because the Unisource Discovery logo application was filed with the United States Patent and Trademark Office in 2008 and received registered status as a trademark in 2009.  My recollection of every detail and every step in the trademark

application process is not as sharp as it was yesterday." Is that a true statement?

A. It is.

Q. Is it a true statement today that you cannot, that your mind is not as sharp on things that happened yesterday as things that happened 12 years ago?

A. That is true for me.

Q. So, the way this reads is a comparison on time periods. Correct?

A. That is the objective of that statement.

MR. VELARDE: I apologize, I can pull up the document if you want the jury to see it.

MR. SANCHELIMA: Yes. You want to publish it?

Could Your Honor publish Exhibit 32?

THE COURT: That decision is yours.

MR. SANCHELIMA: Yes.

Okay. That's paragraph four, and I just want to give a few seconds for the jury to read paragraph four, Your Honor.

I only have one more question to go.

BY MR. SANCHELIMA:

Q. You made several payments to Mr. Lutter for maintenance of the software?

A. I did.

Q. When did you realize that you didn't have a duty to pay any more payments?

A.   Unfortunately, some years later.

Q.   More or less when?

A.   2013, '14, around that frame.

Q.   2013?

A.   Yes, I apologize, 2013, 2014.

MR. SANCHELIMA:  Thank you, Your Honor.  No further questions.

THE COURT:  Does the jury have any questions for this witness?

All right.  If you will get the question, please.

Would the attorneys come forward, please?

(Sidebar conference.)

THE COURT:  All right.  There is a few questions.

You stated you use LegalZoom to file the -- what is this application, TEAS?

MR. SANCHELIMA:  Well, this person appears to have experience with TEAS, which is an automatic service provided for filing applications.

THE COURT:  Okay.  The question is, "You stated you used LegalZoom to file the TEAS applications, meaning they filed it for you.  Then why is your name on the application and not the LegalZoom attorney's information, and who filed it on your behalf?"

Is there an objection from the plaintiff?

MR. SANCHELIMA:  No, but it's going to complicate the

thing because LegalZoom is practicing law without a license.

It's one of those websites, but I don't have a problem.

THE COURT:  Any objection from the defense?

MR. VELARDE:  No.

THE COURT:  The other question is, "When you filed the TEAS application, did you tell or explain to Mr. Cerasale, e-mail, verbal, that you guys were to part ways, that Unisource California would not have legal rights to use the brand logo?"

Is there an objection to that question?

MR. SANCHELIMA:  Yes.

THE COURT:  What is the objection?

MR. SANCHELIMA:  That it assumes that the parties were -- no, I withdraw the objection.  We don't have an objection.

THE COURT:  Is there an objection?

MR. VELARDE:  No objection.

THE COURT:  The next question is, You said that you were not aware that Unisource Florida was -- I'm sorry, "You said that you were not aware that Unisource Florida, Florida's info was removed from the website and e-mail access was removed but you testified that you paid Lutter an emergency fee because Mr. Cerasale e-mailed you that he was removing access to the server.  What was it, were you or were you not informed?"

MR. SANCHELIMA:  We don't have a problem with that.

MR. VELARDE:  No objection.

THE COURT:  The last question is -- from this juror is, you said you lost the templates in 2017, how when you lost access in 2009 -- I don't understand that.  How when you lost access in 2019, if you owned the license for the program, why didn't you ask Lutter for access?

MR. SANCHELIMA:  He didn't have a right to the source.

THE COURT:  I guess the question is, when you lost access in 2019.

MR. SANCHELIMA:  He never had access.  Well, you can ask the question.  I don't have an objection.  He will clarify that.

MR. VELARDE:  No objection.

THE COURT:  All right.  I am assuming he will clarify.

Hold on.  We have more questions.

MR. SANCHELIMA:  Same person.

THE COURT:  Different, I think.  Yes.

"Can you purchase another software to replace the existing one?"

MR. SANCHELIMA:  No objection.

MR. VELARDE:  No objection.

THE COURT:  All right.  Hold on.  There is one more.

MR. SANCHELIMA:  I have never seen a jury that interested.

THE COURT:  "When you apply for the service mark register, does it allow for more than one person to be

identified as the owner?"

Is there an objection?

MR. SANCHELIMA:  No, no objection, Your Honor.

MR. VELARDE:  No objection.

THE COURT:  And then the final series, "Did you have knowledge of any potential software issues prior to 2010?"

Is there an objection?

MR. SANCHELIMA:  No.

THE COURT:  Is there an objection?

MR. VELARDE:  "Potential software issues prior to 2010," no objection because it is prior to 2010, which was the year of the order in limine dispute.  So if it's 2009 and before, no objection.

THE COURT:  The next question is, "Did you inform Mr. Cerasale that you purchased the other URLs in 2010?"

MR. SANCHELIMA:  He didn't purchase the URLs in 2010, I don't think.  I would say that the other URLs, and when did you purchase them, but I don't know that it was 2010 when he purchased them.  I thought it was later than that.

THE COURT:  Any objection?

MR. SANCHELIMA:  No, I think he will -- I think that the witness knows that it was not in 2010, and he will explain.

THE COURT:  Okay.  Any objection?

MR. SANCHELIMA:  No objection.

MR. VELARDE:  No objection.

THE COURT:  The next question is, did you have direct communication with Mr. Alfred Lutter?

MR. SANCHELIMA:  No objection, Your Honor.

MR. VELARDE:  No objection.

THE COURT:  The last question was, "Why was the phrase 'case closed' sometimes added to the top of the logo and not added other times?"

MR. SANCHELIMA:  I don't have a problem with that.  I raised it with them.  Maybe that's more confusing than anything else, but I did raise it.

MR. VELARDE:  It might be relevance.  Would you say that it's irrelevant?

THE COURT:  Just talk to me, please.

Do you have an objection to that question?

MR. SANCHELIMA:  I have no objection but I think it's going to be confusing because the mark case closed is not an issue here.  It was something that for background purposes I introduced, but I think it would be confusing at this stage.

I have no objection.  I am just making this recommendation.

THE COURT:  Do you have an objection?

MR. VELARDE:  I do.  I do agree it would be confusing at this point.

THE COURT:  I assume the objection for both is relevance.  The problem is, if the question isn't answered,

they are going to be thinking about that so I just want to ask the question.

MR. SANCHELIMA:  Oh, yeah.  Thank you, Your Honor.

MR. VELARDE:  Thank you.

(Sidebar concluded.)

(Juror Questions of Noel Mijares.)

THE COURT:  All right.  Sir, I have a few questions for you in no particular order.

When you applied for the service mark register, did it allow for more than one person to be identified as the owner?

THE WITNESS:  I don't believe so.  The owner was listed as Unisource Discovery, Inc.

THE COURT:  You stated you used LegalZoom to file the TEAS application, meaning they filed it for you.  Why is your name on the application and not the LegalZoom attorney's information who filed it on your behalf?

THE WITNESS:  Because LegalZoom is only the company that provides the application and we submit the information.  They are the ones that once it's done prepare it and submit it to the United States Patent Trademark Office.  But LegalZoom will not sign on behalf of Unisource Discovery, Inc.  The legal representative has to do that.

THE COURT:  When you filed the TEAS application, did you tell or explain to Mr. Cerasale, in any way, for example, by e-mail or verbal, that if you guys were to part ways that

Unisource California would not have legal rights to use the brand or logo?

THE WITNESS: No, that was not even a thought process.

Mr. Cerasale was involved from the very beginning. He was even copied on e-mails, e-mail exchanges with LegalZoom, that I provided. I don't know if that made it an admissible exhibit, but he was part of an e-mail.

When I uploaded to LegalZoom the logo, the trademark logo, he was cc'd with Lisa Cote, both of them, on that e-mail. So he knew the process from the very beginning, during, and after.

THE COURT: I will modify the next question a bit.

Were you aware that Unisource Florida's information was removed from the website and that the e-mail access was removed?

THE WITNESS: Yes, I became aware. My staff told me when they -- when you log in as an employee, you have to go to the website, so we are constantly seeing the website daily, multiple times a day. To access your user ID and password as an employee, we go in through the website.

So, they noticed when they saw that the website admin was all -- all the information in Florida was removed, and that's when I became alerted and I looked at it as well.

THE COURT: And the second part of these questions, which I will modify just a bit.

Did you testify earlier that you paid Mr. Lutter an emergency fee because Mr. Cerasale e-mailed you that he was removing access to the server?

THE WITNESS:  No, Mr. Cerasale never e-mailed me. Mr. Cerasale hasn't e-mailed me in years, to the best of my recollection right now.  I have not received an e-mail from him in probably close to seven years.

I have e-mailed him, but, no, he never notified us.

And when the e-mails were turned off, .com e-mails, when it was turned off, it was across the board everything, support, ordering, all the accounting, everything was gone, gone, so we had to start from scratch.

THE COURT:  All right.  I will modify just a bit the next question.

Did you say you lost the templates in 2017?

THE WITNESS:  Correct.

THE COURT:  When you lost access in 2019, if you owned the license to the program, why didn't you ask Mr. Lutter for access?

THE WITNESS:  We have asked Mr. Lutter probably for over ten years, maybe not that long, maybe like eight years for the source code so we could go ahead and take care of our issues.  That's never happened.

Sixty plus percent -- I want to say about 60 percent of our back end where we work, so when orders come in and clients

interact with us we work -- when we run reports, we get what's called Oracle errors.  So there is a lot of things that we cannot use.  They don't work anymore.

We have asked for that to be fixed numerous times, and when I say numerous, over a dozen times.  It has never been fixed.

We have requested the source code at a minimum of ten times, documented times, never been provided to us so we can go ahead and take care of our own problem and fix it.

Was there any other part to that question?

THE COURT:  No, I have a next question.

Can you purchase another software to replace the existing one?

THE WITNESS:  We can, at a great cost, but, yes, the answer is yes.  Yes, we can get a replacement software.

THE COURT:  Did you have any knowledge of any potential software issues prior to 2010?

THE WITNESS:  No.

THE COURT:  Did you inform Mr. Cerasale that you purchased the other URLs in 2010?

THE WITNESS:  Yes, he knew.  I believe the response was -- "that's silly," was his response to me about that, but for us it was about making sure that no one else anywhere in the country could go and register unisourcediscovery.biz, and now somebody else sits on it.  And then if we ever want that,

we have to buy it out from them, which is a practice that happens many times.

We have had these on the shelf, like I said, probably -- a long time, since 2011, 2012.

I started acquiring them as they came in.  Throughout the years new ones would come up and we would pick them up as well.

THE COURT:  Did you have any direct communication with Mr. Lutter?

THE WITNESS:  Yes.  Yeah.

THE COURT:  Can you just explain how?

THE WITNESS:  Mr. Lutter and myself, we have always had a very cordial relationship.  The last time I saw Mr. Lutter, apart from today, in person was on a trip, a business trip that we had in Dallas, Texas.  He was also in Dallas, Texas, and me and him met at the hotel.  That was the last time me and him personally had a face-to-face, but from that point on we communicate by text message, e-mail and phone calls.

We have had phone calls as well regarding matters, especially when the situation happened, and I needed his assistance to make the back end tie in with the new website.

THE COURT:  Why was the phrase "Case Closed" sometimes added to the top of the logo and not added at other times?

THE WITNESS:  That was a marketing tag on, tag line, so you don't -- you could use it as a tag, and we did some

research on how that would react with our clients, the paralegals and the lead attorneys, and they liked it.  So we used it on some marketing campaigns, but it's just a tag line.

THE COURT:  All right.  Any follow-up questions on behalf of the plaintiff?

MR. SANCHELIMA:  Thirty seconds, Your Honor.

No, Your Honor.

THE COURT:  Any follow-up questions on behalf of the defendants?

MR. VELARDE:  No, Your Honor.

THE COURT:  All right.  Any other questions for this witness from the jury?

All right.  You may step down.

Please call your next witness.

(Juror Questions of Noel Mijares concluded.)

MR. SANCHELIMA:  The plaintiffs rest, Your Honor.

THE COURT:  All right.  I need to talk to the parties about scheduling.

We are just going to take about five minutes.  I will call you back in.  I know a couple of you have scheduling issues, and we have already been talking about that, so we will address that before we leave today.

COURT SECURITY OFFICER:  All rise for the jurors.

(The jury exited the courtroom at 4:22 p.m.)

THE COURT:  All right.  Please be seated.

Any motions at this time?

THE COURT:  Any motions at this time?

MR. VELARDE:  Yes, Your Honor, we would like to move for partial judgment as a matter of law as to the issues of damages.

I believe the burden to establish damages based on revenues for profits of the defendants has not been established.  There has been no documentation presented and other than that PPP loan, which is not revenues and the only other potential testimony was Mr. Steven Cerasale not remembering whether he made any money -- or not remembering how much revenues he made or expenses in 2020, and saying in 2021 that maybe it was 10 million, maybe it was less than 5 million because the range is, essentially, Your Honor, astronomical between 5 million and 10 million.

The plaintiff has not established its burden as to the revenues or profits of defendants for the purposes of damages, so for that reason we move for judgment as a matter of law as to that specific issue of damages.

THE COURT:  All right.  Your response?

MR. SANCHELIMA:  There is definitely legally sufficient evidence, Your Honor, to defeat the motion.

First, I think counsel is confusing what the remedies that we are seeking.

The sales will deal with the disgorgement of profits

and the damages are what the plaintiff has suffered.  So a jury can use those figures to reasonably come up with an amount that will be adequate to satisfy the losses of the plaintiff, and Your Honor has -- in the event that it would be excessive, as counsel says -- the power to adjust that amount based on the equitable principles that are recognized by the Lanham Act.

I don't see how is it that this question, which is inherent within the province of the jury, the award of damages can be foreclosed for the plaintiff.

THE COURT:  What specific evidence is there of actual damages?

MR. SANCHELIMA:  What specific --

THE COURT:  Is there any evidence of actual damages here?

MR. SANCHELIMA:  Yes.  The testimony, Your Honor, from the witness, Mr. Mijares, for actual damage, the testimony from Mr. Mijares as to the decrease in the revenues that they realized.

THE COURT:  Okay.

MR. VELARDE:  Your Honor, there was no testimony as to decrease in revenues from my memory in 2021 and 2020.  There was a testimony of decrease in revenues in 2017, '18 and '19.

The damages here are, by stipulation, relevant only after February 21, 2020.  Additionally, Your Honor, as Mr. Sanchelima mentioned, disgorgement of profits is one of the

things that the plaintiff is seeking.  That was what was presented earlier, and there is no evidence from which the jury can come up with a number for profits.

THE COURT:  All right.  I don't recall the specific time frame.  I will reserve ruling on that issue.

MR. SANCHELIMA:  May I say something?

THE COURT:  Yes, sir.

MR. SANCHELIMA:  In addition to damages, and there was a comparison from before, 2020 and 2021, but in addition to that, there has been damage to the reputation and there is testimony to that effect and the goodwill of the brand.

Mr. Mijares testified to that.

THE COURT:  All right.  As I said, I will reserve ruling on that issue.

Is there going to be a defense case?

MR. ZORRILLA:  Thirty seconds, Your Honor.

THE COURT:  Okay.

MR. VELARDE:  Yes, Your Honor.  There will be -- we will present a case.

THE COURT:  All right.

MR. VELARDE:  We will call one, maybe two witnesses.

The first one will be Mr. Alfred Lutter.

I don't anticipate his testimony to last more than 30 minutes, at least on direct, so I do believe I will finish today with Mr. Alfred Lutter.

THE COURT:  Okay.  And your other witness will be Mr. Cerasale.

MR. VELARDE:  Mr. Cerasale.

THE COURT:  How long do you anticipate his additional testimony to take?

MR. VELARDE:  I apologize.  Mr. Cerasale is maybe at this point, and I don't think his testimony is going to take more than 20 minutes.

THE COURT:  Okay.  Why don't we get in as much testimony as we can?

Tomorrow, just so you know, I've got two commitments, one in the morning and one at noon, so we can -- I think we are going to lose two jurors tonight for tomorrow.

Then we can do the charge conference let's say at 11 o'clock tomorrow, finish the testimony at 1:00, and then charge them and have closing arguments and they can deliberate in the afternoon.

All right.  If you want to get Mr. Lutter and then we will bring in the jury.

Oh, regarding the two jurors, Ms. Jiha and Ms. Rodriguez, Ms. Rodriguez-Suarez, when we finish I can ask them if they can come back tomorrow afternoon, but they have already told us that they cannot.  If that is the case and what they tell us, is there any objection to excusing them?

That would leave us with seven jurors.

MR. SANCHELIMA:  Plaintiff has no objection, Your Honor.

MR. VELARDE:  No objection, Your Honor.

THE COURT:  Okay.  All right.

Is there anything else?

MR. SANCHELIMA:  No, Your Honor.

MR. VELARDE:  No, Your Honor.

COURT SECURITY OFFICER:  All rise for the jurors, please.

(The jury entered the courtroom at 4:29 p.m.)

THE COURT:  All right.  Please be seated.

All right.  Call your next witness.

MR. VELARDE:  The defense calls Alfred Lutter.

THE COURT:  Come forward, please.

Come up to the witness stand.  Just watch your step as you come up the incline.

Before you have a seat, I need you to raise your right hand, and the court reporter will administer the oath.

(The witness, Alfred Lutter, was duly sworn.)

DIRECT EXAMINATION

BY MR. VELARDE:

Q.  Good afternoon, Mr. Lutter.

A.  Good afternoon.

Q.  Could you please state your name for the record?

A.  Alfred William Lutter, III.

Q. Mr. Lutter, what do you do for a living?

A. I am a consultant.

Q. A consultant on what?

A. I write software for businesses, large and small.

Q. Do you know the defendants in this case, Mr. Steven Cerasale?

A. I do.

Q. How long have you known Mr. Cerasale?

A. Approximately 30 years.

Q. Do you have a business relationship with Mr. Cerasale?

A. I do.

Q. What is that relationship?

A. I have written software for his company, and I had written software for a previous company of his as well. And I also maintain that software on an ongoing basis.

Q. When you say his "current company," which company are you referring to?

A. Unisource Discovery.

Q. Is that in California or Florida?

A. California.

Q. Do you know Mr., the plaintiffs' representative, Mr. Noel Mijares?

A. I do.

Q. How long have you known Mr. Noel Mijares?

A. Twelve to 15 years.

Q.   Do you have a business relationship with Mr. Mijares?

A.   I do.

Q.   What is his relationship?

A.   I maintain a company as well for a company also called Unisource Discovery.

Q.   Is that Unisource Discovery Florida?

A.   Yes, it is.

Q.   Did you help Mr. Mijares in transferring his business from one website to another?

A.   I did.

Q.   When did you help them with that?

A.   Approximately, two to three years ago.

Q.   Approximately, September 2019?

A.   Yes.

Q.   There was testimony earlier today from Mr. Mijares that Mr. Steven Cerasale removed him from the website by surprise in 2019.  Is that testimony accurate?

A.   He gave him 60 days notice to that he was going to turn off the servers or turn off his service for Florida Unisource and Mr. Mijares gave --

        MR. SANCHELIMA:  Objection.  Hearsay, Your Honor.

        THE COURT:  Unless there is some foundation, sustained.

BY MR. VELARDE:

Q.   Were you involved in those communications?

A.   Mr. Mijares contacted me and said Steven is going to turn

me off.

MR. SANCHELIMA: Same objection.

THE COURT: Overruled.

THE WITNESS: Mr. Mijares contacted me by e-mail and said Steven was going to, said he had to get out of their data center and he had to find some other place for his website and the application that runs behind it.

BY MR. VELARDE:

Q. Approximately, how long did it take for you to transfer his business to a new website?

A. Thirty days. We made arrangements to get hosting forum on Microsoft Azure, set up his databases which require a license from Oracle, which I worked with Mr. Mijares to get that licensing for it.

At that time, we knew when they were going to turn him off so we allowed it to run on that, set up the new environment, tested it, and on the last day transferred all of the orders and records that were for Unisource Florida so that they would be accessed from that new website which was a -- has a different domain name, different last three letters in the domain name, but is the same as what he was running on before.

Q. So he was not removed -- if I understand your testimony, he was not removed from that website until you transferred it to the new domain?

A. That's correct.

Q.   Are you a current shareholder of Unisource Florida?

A.   I am.

Q.   How long have you been a shareholder of Unisource Florida?

A.   Early 2010.  I don't know the exact date offhand.

Q.   Have you ever received a dividend payment as a shareholder of Unisource Florida?

A.   No, I have not.

MR. VELARDE:  Five seconds, Your Honor.

BY MR. VELARDE:

Q.   You signed a stock purchase license agreement in 2010. Right?

A.   Yes.

Q.   What was your understanding as to your software in connection with that agreement?

A.   The software was licensed to Unisource Florida.  It had previously been licensed only to Unisource California, and now it was licensed to both companies.  They would have the right to use it in the course of their business.

Q.   Did you have an issue with Mr. Noel Mijares and Unisource Florida regarding payment?

A.   Both companies, and certainly before 2010, all payments came from Unisource California for maintenance and software upgrades, if they wanted to change something, put something new and then also just general maintenance for the site.

At the time we entered into that agreement, they had a

statement that they would split the bill, and I was paid half by Unisource Florida and half by Unisource California. That went on for some period of time, perhaps a year and Florida was not making its payments, did not make any payments at all.

I went back and said, I can't do business with you. We don't work for free. You have to pay your bill or we won't continue to do this.

Unisource California, Steven, agreed to pay both the Florida and the California bills, and then we continued. He brought their account up-to-date and we continued to work on both California and Florida sites. At that time they were the same site. They shared the same code set. They looked and felt exactly the same, except for if you logged in as a Florida client, you would go to the Florida orders. And if you logged in as a California client or business person, you would go to California.

Q. Did the payment issue regarding Unisource Florida have anything to do with you transferring Unisource Florida into a new website?

A. None whatsoever.

Q. Did Mr. Steven Cerasale ever mention to you anything regarding his payments to you on behalf of Unisource Florida?

A. He did make a statement to me that the reason that he was turning them off or saying they could no longer share the same facilities at the data center in California was because he

hadn't been paid by Mr. Mijares.

MR. VELARDE:  No further questions, Your Honor.

THE COURT:  All right.  Cross.

MR. SANCHELIMA:  May I have one minute to discuss something with my client, Your Honor?

THE COURT:  Sure.

CROSS-EXAMINATION

BY MR. SANCHELIMA:

Q.  Good afternoon, Mr. Lutter.  Thank you for coming all the way -- we thank you for coming all the way from California, I think, or where do you live?

A.  Park City, Utah.

Q.  Oh, Utah.  Okay.

Are you being paid to come here?

A.  No.

Q.  Not even transportation?

A.  Transportation and hotel, yes.

Q.  I believe you were a ten percent holder of Unisource Florida.

A.  That's correct.

Q.  Why did you receive ten percent of the shares of Unisource Florida?

A.  Because at the -- Steven had formed a new company with Noel for Florida to conduct business as Unisource Discovery, as a separate company, the Florida company.  His license from me was

for him to be able to expand in any other state using the course of his business if it was run as a single company.

It prevents him from reselling the software, using it anywhere else.  You know, he is not to go into business selling the software.  He is to use it in the course of his business.

I own the software.

Q.   Okay.  We will get to that very soon.  Let's see if we can establish the genesis, the creation of the software.

Are you a programer?

A.   I am.

Q.   In what language?

A.   In many languages.

Q.   Do you program in SQL?

A.   I do.

Q.   And all the program -- well, how many employees do you have that program in your company?

A.   Over time or currently?  Currently I have three.

Q.   Three, and do you have any employees overseas?

A.   I do.

Q.   And some of those employees oversees -- well, the employees overseas, are they all W-2 employees of your company?

A.   No, some of them are contractors, yes.

Q.   But they are not W-2 employees.  Correct?

A.   No.

Q.   And the copyright of the software, if it's not an employee

of your company belongs to the subcontractor. Correct?

A. I have agreements with all of those people that has worked for me for hire that it's my property.

Q. And you understand -- I believe there was some correspondence that I saw that software is not commissionable as copyrightable work. Correct?

A. I am not sure I understand the question.

Q. All right. I withdraw the question.

You have a website. Correct?

A. My own website for Lutter Consulting as a business, yes.

Q. And in that website you have a section called -- I believe you call it case studies?

A. Yes.

Q. And one of those case studies referred to Unisource Discovery. Correct?

A. Yes.

Q. Do you have a license from Unisource to use the term Unisource Discovery in your website?

A. I do not.

Q. Now, you mention in your website that what you refer to as Unisource Discovery case study was created when?

A. That site was created beginning in 2001.

Q. Well, it appears in reading it says, "period 1999 to present day." That's inaccurate?

A. It's quite some time ago. I don't know whether it was '99

or 2001.

Q.   I don't have a copy, unfortunately, of this paper.  I will let you see it.

Do you know a company by the name Datamed?

A.   American Datamed, yes.

Q.   American Datamed, thank you.

Did you develop software for American Datamed?

A.   I did.

Q.   At the time Defendant Cerasale, who you know, was working for that company.  Correct?

A.   Yes.

Q.   And that's where your idea for this type of software came from.  Correct?

A.   My idea for the software?

Q.   Yes.

A.   Yes, I was requested by them to design software for that business for legal photocopy, subpoena, and document retrieval starting in the '89, '90 period.

Q.   So the first algorithm that you had for these programs date back to that time before Unisource California was created.  Correct?

A.   Of course.

Q.   And while Defendant Cerasale was an employee of American Datamed.  Correct?

A.   Yes.

Q.   Did American Datamed own any rights over the software?

MR. VELARDE:  Your Honor, I object as to relevance.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  American -- that company was work made for hire.

BY MR. SANCHELIMA:

Q.   And it didn't have a contract for you to assign the copyrights to them.  Correct?  Is that your testimony?

A.   There was nothing to sign.  I am not sure I understand the question.  It was work made for hire.  I would never assign anything to them.

In our agreement for hire, it said you are doing this and it belongs to us.

Q.   So the software belonged to American Datamed.  Is that what you are saying?

A.   Yes, I am not sure I understand your point because it has nothing to do with the software that I have made for Unisource Discovery, which is a completely new thing.

Q.   Even though you reference in your website Unisource Discovery in a time period of 1999?

A.   Yes.  Is there a question?

Q.   If Unisource did not exist at that time, obviously, it was for American Datamed that you were creating that software, wasn't it?

A.   No, I had stopped working for American Datamed in '96,

perhaps.  It's quite some time ago.  I don't know the dates, but there is a significant multi-year period where I was working for neither company.

Q.  Okay.  But the Unisource software was created in 1999 according to your website?

A.  I didn't write that copy.  That was written by a marketing person that I had.  They say, well, when did you start?  I said early 2000.

It's not a legal document.  It's a brochure that says, you know, in 2000 I created this.

Q.  Okay.  You are also an actor.  Correct?

A.  I was, yes.

Q.  No longer an actor?

A.  One would say you are always an actor but, no, I have not acted professionally for many years.

Q.  You signed the stock purchase agreement, as counsel referred to.

Do you have a copy of that agreement for your records?

A.  I am sure I have a copy.  I don't have a copy with me, no.

Q.  I don't know if there is a copy here -- there are no papers here.

Do we have an extra copy for -- I am talking about Plaintiffs' Exhibit 8 that has been admitted in the record.  I can give you a copy of this.

A.  Thank you.

Q.   And I refer you to the page before last of that document.

A.   Page 11, yes.

Q.   Correct.

Do you recognize any of the signatures on that page?

A.   I recognize all of the signatures.

Q.   Including yours?

A.   Yes.

Q.   Now, what did you get when you signed this agreement?

A.   Ten percent of the company.

Q.   And what did you give to get the ten percent of the company?

A.   A license to use the software.

Q.   And if you look at page one, the bottom, Section 1, do you see that section there --

A.   Yes.

Q.   -- entitled, "Software License to Company"?

A.   Oh, this isn't page one.  Pardon me for just a second.

Q.   You don't have page one?

A.   Yes, I just wanted to find the spot.  I found it now.

Q.   Very good.

I direct your attention to paragraph one entitled, "Software License to Company."  Do you see that?

A.   I do.

Q.   Now, it says, "Effective as of the closing, Lutter --" that's you.  Correct?

A.   Yes.

Q.   Licensor, that means that you are going to give permission to do something.  Correct?

"Grants to company, also sometimes referred to within Section 1 as licensee," which is Unisource Florida.  Correct?

A.   Yes.

Q.   "Exclusive license and full rights, the company license," that's what the nature of the bundle of rights that you are giving at that time, "to use this offer under terms and conditions," and then we are going to leave that aside for just one second.

Now, what is your understanding of what you had bargained for at that time that you had to use the words "exclusive?"

Exclusive, what does that mean to you?

A.   Comprehensive.

Q.   It doesn't mean that it's exclusive to the company?

A.   No, it would mean that both Unisource California and Unisource Florida would be able to use that software.

Q.   All right.  Would you point to me in paragraph one where there is any reference to Unisource California?

A.   There is not.

Q.   Then exclusive, wouldn't that be an exclusive with respect to the entire world?

A.   That was not my understanding or intent.

Q.   Do you have anything to base yourself on any other

interpretation of the word exclusive?

A.   No.

Q.   All right.  Let's move on.  "To use the software on the terms and conditions, and subject to the limitations set forth hereinbelow and, solely for that purpose, to use any accompanying manuals, descriptions, instructions or other literature, namely the documentation provided by Lutter."

Did that occur?

A.   You are saying did Unisource Florida try and sell any of the things they are not supposed to do?  I'm not sure.

Q.   What I am saying is, what it says here, and subject to these limitations they were going to use --

A.   I'm sorry, I just want to catch up where you are reading from.

Q.   Okay.  The last line -- I started on the last line of the last paragraph on page one.

A.   Subject to the limitations -- okay.

Q.   So you did provide manuals.  Correct?

A.   There is manuals, descriptions, instructions or any other literature provided by me.

Q.   Okay.  Now, the next sentence says, "Should licensor cease to perform any necessary maintenance on any licensed products, licensor will provide licensee with source code for licensee's use only."

Have you provided the source code to Unisource Florida?

A.   No, I have not.

Q.   But if something were to happen to you, your successors would be advised to provide Unisource Florida with the source code?

A.   Yes.  The concern and what Mijares and I worked out at that time was, what if Alfred drops dead.  You have written all the software we are basing our business on.  I want to be able to say -- and he knows because it's a license.  He doesn't have a source code that if I went away, he would not be able to change it or modify it.

So this was to allay his concerns he wouldn't be able to continue his business using that software.

Q.   Could you tell the members of the jury why the source code is important?

A.   The source code is important because in the course of business in Florida, for instance, they might change the laws, you want to change how the work flow works, you might change the documents or the subpoenas or the other information that was contained in it, so you would want to update it, or if other businesses, they came up with new features, new things that they were doing in the legal business and you wanted to provide those, you would want them to add that to your existing system and we have done that.  Lutter has done that for the past 20 years for both of the Unisources and continues to do that for both Florida and California, update the software as

requested.

Q.   Even though Florida has exclusive right to the software?

A.   Florida has a license to use the software.  It doesn't prevent me from using it to sell to someone else or to have, for instance, California continue to use it.  That was the state of affairs for the last -- the period of time they were both in existence would be 15 years, perhaps.

Q.   So you give no weight to the word "exclusive" in this agreement; is that what you are saying?

A.   Not to me.  I don't feel that that was the intent of this document and the other statements of all of the -- where you are going in 1.2 that say all of the other things he is not allowed to do.

Q.   We haven't got there yet.

A.   Okay.  I look forward to it.

Q.   Just specifically with the word exclusive you give no weight to that particular -- that's -- you erase that word from the contract like it never existed, go away.

A.   Okay.  I understand.

          THE COURT:  Is that a question, Counsel?

          THE WITNESS:  I didn't want to be rude.  I didn't feel it was a question.

          MR. SANCHELIMA:  No, no, there is no question.

BY MR. SANCHELIMA:

Q.   So, basically, the source code -- to summarize what you

said, and you agree with me or not, you're the expert in the field, but the source code, really, gives you the ability to change the program.  Without the source code you cannot change the program.  Do you agree with me?

A.  I do.  I don't want to -- I don't want to disagree.  There is also a configuration.

There are options that you can change things that the application will do where you don't have to change the source code.  We call that configuration rather than change.

For instance, you would say, I will provide a table that says what color the screen is going to be.  You can then change the colors of those screens without having to change the source code, but you are correct that to make fundamental changes to the application, and there are certainly situations in which you would need the source code to be able to accomplish that.

Q.  Because without the source code humans, programers will not be able to change the program.  That's basically the purpose of it?

A.  It would be very complicated to do so, yes.

Q.  To reverse engineer?

A.  Correct.

Q.  To come up with another software would cost a lot of money to develop.  Whereas, if I had the source, it would just be a matter of copying.  Is that correct?

A.  Correct.

Q.   Then in programming languages you typically have two things, correct, the program itself and the data?

A.   Correct.

Q.   And where do the templates fall?

Is that data?

A.   The templates -- you're talking about the legal documents that are printed or generated by the application?

Q.   Yes.

A.   Yes.

Q.   That's that.

A.   Those are maintained in separate files.  That's more configuration rather than specific source code.

Q.   And do you claim that that's part of the source code?

A.   It's a technical distinction.  You wouldn't call it code because a document doesn't have any dynamic features to it.

Q.   Understood.  It's passive?

A.   Correct, it doesn't change.

Q.   When you compile the program, the source code, it stays the same?

A.   Uh-huh.

Q.   Have you given access to Unisource Florida to this part of the software that is not the source?

A.   No.

Q.   Why not?

A.   Well, the original version of the program in the early

2000s used a version of Word.  It was possible to change those documents outside of the application.

Microsoft stopped providing that version of Word and stopped supporting it.  It also was not efficient and reliable in its running.  Word often runs out of memory, as memory leaks would fail.

Sometime ten years ago we changed that to use something that is compiled into the application.  It uses something called an RDLC, which is written with a report writer.  It's not a source code, but it is written with a special tool that Microsoft provides that works well with the rest of the applications.

Q.  I appreciate the narrative, but the question is, have you provided Unisource Florida with the templates?

A.  No, I have not.

Q.  And has that been requested?

A.  It's not possible for them to be able to use it without being able to have the source code.  They wouldn't be able to create those new ones and have them function within the application without the source code because of the way it's fundamentally written.

It's not something I decided to do so that I can keep them from having it.  It is the way that Microsoft wants you to do it as a reliable way to generate those documents.  One of the reasons is because it's possible with those documents to cause

errors in the application that will cause it to crash.  If the application crashes -- say you had one particular document that would have a problem, okay, I'm going to do a Florida workers' comp.  If that failed, it would stop the other later documents from coming out as well, so it's possible to kind of throw a monkey wrench into the application.

In general, even with the Word documents, even when we used that model, we did not allow either Unisource California or Unisource Florida to modify those files directly, simply because they cause so many problems for themselves and for us to be able to say, I've modified the document, I've put them in and I don't know why the application doesn't run, so we would have to go in.

Q.   I appreciate the narrative again.

The question is, has it been requested from Unisource Florida for you to provide the templates?

A.   They usually provide me with the templates to begin with.  They will say we want to make a change to something or we have a new document we want to add, here it is, please include this in the application.  And we go ahead and do that.

It's exactly the same as we do for California.  They want to do something new, they provide us with a document.  We built it in the application form.

Q.   So, can I assume that then the answer is that they have not requested --

A.   Yes, they have requested those documents.

Q.   Thank you.

Now, let's move on to the next sentence.  It is agreed or understood that all the developers -- are you with me?

A.   I'm sorry, which paragraph?

Q.   The first paragraph?

A.   Yes.

Q.   The last sentence?

A.   Yes.

Q.   It is agreed and understood that all new developments, additions and modifications to the software are made part of this software license to company agreement.

What do you understand that sentence to mean?

A.   My understanding is that Noel has the right to use the software.  Unisource Florida can use it.  They have a license to run their business, create documents, whatever.

I couldn't -- if we added something new -- let's say we added five new documents, I wouldn't be able to say later, oh, they didn't fall under this umbrella of this agreement, like you need to pay me separately for that.  You need to say, if you want to have a license for that you got to do something else.

Q.   So if they are requesting an addition to the software, you expect payment for it?

A.   That is correct, the same as California.

Q.   Well, I am not talking about California now because --
well, I am just talking about Florida.

A.   Okay.

Q.   So this sentence here doesn't mean that for the ten percent
shares that you attained of this corporation, that you are
going to get additions to the software?

A.   And I wouldn't get more shares in the company because we
changed it or added or moved on.

Q.   So this sentence here, again, doesn't mean anything to you
because you are not going to provide any additions,
modifications or new developments to Florida.  Correct?

A.   Unless asked, no.  I don't change the software on my own.
I only change it as a result of them asking me.

Q.   But does it say here anywhere that you will get paid for
these developments, additions, modifications?

A.   It doesn't say I don't.

Q.   It doesn't say that you don't, but you did get something
when you signed this agreement?

A.   I did for the right to use the vast majority of preexisting
software that was there.

Q.   That becomes obsolete if you don't have the source code
because you cannot update it.  Correct?

A.   Obsolete is an opinion.  You could say I have a copy of
Word 2000 and it still does whatever Word 2000 does.  It
doesn't do what Word 2007 does or the next version.

Q.   Has Unisource Florida notified you of errors that they are getting in the operation of the software in the past three years?

A.   They notify me, yes, and we fix those issues.

Q.   Is it your testimony today that all errors have been fixed upon request?

A.   They have been fixed upon payment.

Unfortunately, because of Mr. Mijares's payment history in the past, he is cash in advance.  He gets the same rate as Unisource California, but he has to pay in advance because he has shown that he will not pay in arrears.

Q.   And did you discuss this provision in the stock shareholder's agreement with Mr. Mijares as to what he thinks he is entitled to obtain?

A.   We have a disagreement.

Q.   Would you say that you kept Unisource Florida hostage with the control of the source?

A.   No, I do not.  They have the same arrangement, long and profitable business arrangement that I have with Unisource California and with every other company I have done business with.  No business says give me a piece of software, license me a piece of software, however you want to describe it, and then continuously update it for me for free.

It's not possible.  It's not a viable business proposition, so whatever you would like to say about it, it never has been

the case.

Q.   Maybe it was a bad business decision you made in 2010 when you entered into that agreement?

A.   It's possible.

Q.   When you committed yourself --

A.   Do I commit myself to say that I regret the entire event, yes.  I wish that the parties involved were -- could come together, yes.

Q.   Well, we all do, but the bottom line is that we are here today and there were agreements that were breached or that were not honored and there are different interpretations, and yours is that you are not agreeing to do what you agreed to do in 2010?

A.   I'm sorry, you are a little harder to hear right there.  That I was not going to agree to do what I was going to do in 2010?

Q.   Yes.  Today the little reading that we just went through requires you to provide additions, modifications and new developments, but you are not willing to do that unless you get paid extra?

          MR. VELARDE:  Objection.  Mischaracterizes the testimony.

          THE COURT:  Overruled.  He can clarify.

BY MR. SANCHELIMA:

Q.   Did you understand the question?

A. Please repeat the question.

Q. Okay. In 2010, you enter into an agreement that would do three things, new developments, modifications and additions. That's what it says. Correct?

A. Let me elaborate.

Q. First answer the question. Is that what you promised to do back then?

A. That's your statement of what I promised to do.

Q. No, you want me to read the document again. I will read it again. That's what it says.

THE COURT: Hold on, one at a time. Finish the question then you can answer.

BY MR. SANCHELIMA:

Q. Does the agreement from 2010 provide for you or your company to provide new developments, additions and modifications to the source?

A. It requires me to either do that or provide Noel with the source code, under the assumption that they would be paid.

Q. So there is an assumption that is not written. Is that what you are saying?

A. It's a common business practice to have a license which states that this license for this software will cover this and all future additions to it. It does not say whether those additions will be done for free, and we have a long history of Mr. Mijares and Mr. Cerasale paying for those to be done.

There was no assumption ever that they would be for free.

Q.   Okay.  Let's talk about where this software resides.  Does it reside on a physical server, computer server?

A.   At some point, yes.  It's the Microsoft cloud, but in some points it is a physical machine.

Q.   But at one point in time -- well, by cloud you mean the same server except that it's somewhere in a remote area.

Is that what you are saying?

A.   Yes, in older days you would have the physical server yourself.  Now it's somebody else's.  You don't necessarily know where it is.

Q.   Now, let's go back to 2010.  Did the parties own the actual hardware, the actual server in a closet, maybe?

A.   Unisource California had a data center where they took space, paid for Internet service and put in servers that they had serviced.

Q.   Who paid for those services?

A.   California.

Q.   Unisource Florida never paid for the service?

A.   Not to my knowledge, just not to my knowledge.

Q.   So you don't know who paid for the service.  Is that your testimony today?

A.   My understanding from Steven is he had an agreement with Noel that they would split the cost of that data center.

As I stated earlier, they had a disagreement where he said

Noel is not paying, meaning he is not paying me his portion of that service.  Therefore, I would like him to get out.  I am going to give them notice that he needs to leave the data center.

Q.   I see.  So this data center, somewhere in California, I envision it's a place with different racks, and one of those servers belongs to either Unisource Florida or Unisource California.  Correct?

A.   A better way to phrase it is, it was used for California or Florida, yes.  They had a dedicated -- they shared a machine which did the application.  They had separate machines for their databases.

Q.   So there was one server for California and one server for Florida, is that what you are saying?

A.   Yes.

Q.   Physical units?

A.   Yes.

Q.   They were not being serviced out of the same server?

A.   The database was not served out of the same server.  The websites and the application were served from the same server because they shared the source code.  They used the same source code.

Q.   So the source code was in one server and the data was in a separate server?

A.   Yes.

Q.   That's the architectural configuration?

A.   Yes.

Q.   Okay.  Now, at one point users migrate to the cloud, correct, because it's a pain to update the actual physical servers.  Correct?

A.   There are reasons to go to the cloud, yes.

Q.   So today none of them have this arrangement?

A.   That's not the case.  California still maintains a data center.

Q.   So, they are still being -- they're still running their software from that data center, and I believe you said that Unisource Florida was given 60 days notice?

A.   Was given 60 days notice, yes.  Steven said I am going to turn you off in 60 days.

Q.   Okay.

A.   And allowed me access to be able to transfer that data to the new location, which was in the cloud.

Q.   So, the new location meaning the cloud.

Now, in those 60 days why didn't you take whatever it was in that server that serviced the data of Unisource Florida and transfer it to the cloud?  Why was that not done?

A.   I am not sure I follow.  That is what we did.

Q.   But not within the 60 days.  Correct?

A.   Yes.

Q.   Oh, you did?

A.   Otherwise, his site would have stopped running.

Q.   That's exactly what happened, didn't it?

A.   No, his site never stopped running.  He lost none of his data.  We transferred all of his data, all of his records to a new site.  The only difference is his site was www.unisourcediscovery.net instead of www.unisourcediscovery.com.

Q.   You never received any complaints from Unisource Florida stating, hey, we have a problem here; our site is not running; our program is not working; we try to sign in and we can't sign in?  You never received that notification from Unisource Florida?

A.   It's entirely possible that they had a notice from, you could have changed the password.  You could have had difficulty logging in.

Noel, I don't want to say it, but they don't have a lot of technical expertise on their end.  They could have easily forgotten something and not been able to log in it.

The site went over before it was turned off and they never had any outage.

Q.   What expertise do you need to enter a password and a user name?

A.   Sir, I don't know.  If you have a specific example, I'd like to know what it is.  To say that even California never has an issue where they have something that doesn't work and we

don't correct it is not true.  All sites, all things have problems.

Your phone doesn't work all the time, and that's from a far bigger and more valued company than mine.  So to say that there is never a problem, it's not true.  But to say that we ever did not immediately correct any of those issues or we did not transfer all of his data and the site as it stood -- he got all the features, everything that he had the day before Steven turned them on were available when he changed over.

Q.   So you would be -- as we stand here today, you would be surprised if Noel, Mr. Mijares would tell you that he has problems with his templates that he cannot operate himself?  That would be a shock to you?

A.   Mr. Mijares often says things.  He is a very passionate guy.  He doesn't have any issues that are greater than any that they have in any other business that I have worked with over the years.

Q.   And how about the website; did you participate with, in the website of the two companies?

A.   Participate in what ways?

Q.   Well, the design maybe?

A.   No, that was done by another firm that does graphic design.  Meaning if you are talking about -- I would characterize when we talk about websites, it's a very broad term.  It means a lot of things.

There is brochureware, which is what I would call a static site that if you are searching on the Internet for a new provider, you might go see, oh, look, here is the company who does it, as you say, here is the testimonial, here is information about something.  I am going to contact these guys that do business with them.

Next there would be the phase of the application that both companies use is delivered through the web, so it's a web-based product that you use.  You log in with an account.  You are able to see the orders.  You enter an order, it's for this kind of thing.  Here is who you're going to go subpoena.  These are the documents I want, generated works.  That all comes to the website.

That's private.  It's only for either clients of the company or employees of the company.  There is not as much look and feel or design there.  It stays relatively static because most companies don't want to pay for the redesign of the interior of their product.

On the other hand, the exterior, outward facing site is something that would go to graphic designer.

Again, there is not a lot of source code there.  It's relatively static.

Q.   Correct.  I believe in your industry they refer to it as GUI, G-U-I.  Correct?

A.   Uh-huh.

Q.   And that's the front end, user friendly that and you press buttons and so forth.

So you didn't get involved with that but if you wanted to go under the hood, that's where you come in.  Correct?

A.   Yes, I would be in charge of placing, not designing the site but having it work on a specific domain name and appear, the DNS, setting up the machines to actually run the web server that would deliver those pages, that would be me.

Q.   And you have to interface with the people that were working on the front end?

A.   Right, much like you might go to someone and say I want you to design a new brochure for me.  Now I am going to have it printed or I'm going to distribute it to my clients.

Q.   Did you receive any complaints from any of those designers as to maybe the source code, the software was not working properly?

A.   From the graphic designers?

Q.   Yes.

A.   Not to my knowledge.

Q.   So that was smooth as far as working with them?

A.   Yes.

Q.   And at some point it was divided, .com and .net.  Correct?

A.   Correct.

Q.   And you -- the software that you had for one of the companies, Unisource California has the same updates that

Unisource Florida has?

A.   So, up until the point where Steven said you must leave the data center, at that time I separated the -- I gave -- you're taking an exact copy, but now we've got two copies, and I maintained Florida's copy completely separately.  So if Noel pays me for something, Steven doesn't get the advantage of it. If Steven pays for something, Noel would not see it.

Q.   So would it be fair to say that the Unisource California software is more updated than the Unisource Florida?

A.   We respond exactly the same to both companies.  Steven puts more into his business than Noel does, yes.  He invests more in new changes.

Q.   Okay.  He pays you more.  Correct?

A.   Yes.

MR. SANCHELIMA:  Judge, may I have a few seconds to talk to my associate?

THE COURT:  Yes.

MR. SANCHELIMA:  No further questions, Your Honor.

THE COURT:  Any redirect?

MR. VELARDE:  A few questions, Your Honor.

REDIRECT EXAMINATION

BY MR. VELARDE:

Q.   Mr. Lutter, does this agreement, the Stock Purchase and License Agreement, does it require you to create new source codes?

A.   It doesn't require me to do that, no.

Q.   It just provides that you license the source code?

A.   Yes.

Q.   Does it require you to create modifications?

A.   No.

Q.   It just provides that you license the modifications when created?

A.   Yes, that's correct.

Q.   Does it require that you create additions?

A.   It does not require me to do so, no.

Q.   It just provides that you license those additions once they are created?

A.   Yes.

Q.   And there was a lot of questions asked about the word exclusive.  Do you remember that?

A.   Yes.

Q.   From 2010 to the present, has Mr. Mijares or Unisource Florida ever taken the position that they have the right to license that software exclusive of Unisource California?

A.   No, they have not.

Q.   So regardless of what this agreement says or may not say or what you believe it says or what they believe it says, for 12 years Mr. Mijares has never taken the position with you that he is the only one who can use that software?

A.   No.

MR. VELARDE:  No further questions, Your Honor.

THE COURT:  Ladies and gentlemen, do you have any questions for this witness?

All right, sir, you may step down.

All right.  Scheduling, I talked to the parties to find out where we are.

It's my understanding there is one witness left who would take about a half hour.

Tomorrow I have some other commitments so I am not available in the morning, and I also have to talk to the lawyers about the law.  So what I discussed with the lawyers was I will deal with my commitment early in the morning.  I will meet with them to go over the law for which I will instruct you, and then the jury would report back at 1 o'clock tomorrow, 1:15 tomorrow to finish the testimony and then receive the instructions on the law and the closing arguments. The jury would only work tomorrow afternoon.

Now, two of you I know have some scheduling issues and so I am going to ask you whether or not you are able to stay. I am not pressuring either one of you, but Dr. Rodriguez-Suarez, I know you told me in the beginning you were available in the morning but you told your colleagues you would be available tomorrow afternoon.

Are you able to come back tomorrow afternoon or is this the proverbial end of the road for you?

JUROR RODRIGUEZ-SUAREZ: I will be done tomorrow?

THE COURT: We will be done tomorrow.

JUROR RODRIGUEZ-SUAREZ: For sure?

THE COURT: For sure.

JUROR RODRIGUEZ-SUAREZ: Okay. I can stay.

THE COURT: Ms. Jiha, I will ask you the same questions. Again, I am not twisting your arm, and I understand you have work obligations. You work for yourself.

Can you return tomorrow afternoon or does today have to be the end of the road for you, so to speak?

JUROR JIHA: I will come back tomorrow afternoon to finish it off.

THE COURT: Well, I thank both of you. You will have your morning free tomorrow, and I will have you come back at 1:15. We will complete the trial tomorrow.

As I told you, it's just limited testimony. I will give you the instructions on the law. The lawyers will do the closing arguments, and thank you for staying a little longer. I needed to. It was an out-of-state witness, so I wanted to complete his testimony.

We are done for the day. I will see you at 1:15. Thank you.

COURT SECURITY OFFICER: All rise for the jury.

(The jury exited the courtroom at 5:30 p.m.)

THE COURT: All right. Please be seated.

For the kind of expedited process tomorrow, I have the joint proposed instructions, which is at Docket Entry 321.  If there are -- is there anything in particular I need to look at where there is some dispute between the parties?

MR. SANCHELIMA:  Yes, Your Honor.

I don't think that I am in a position now to discuss them in depth, but we had several conversations.  I remember I had another case last month, and I am still trying to rewind.  But there are issues of law that we need the Court to decide to be able to streamline the jury instructions.

One of the affirmative defenses has to do with naked license.

THE COURT:  Has to do with what?

MR. SANCHELIMA:  Naked license.

THE COURT:  Why don't you just have a seat.  Just pull the microphone close to you.

MR. SANCHELIMA:  I appreciate it.

One of the affirmative defenses has to do with naked licenses.  That's basically when a licensee challenges -- well, when a third party challenges a trademark because there has been no control over the nature quality of the services in this case.

Now, the law says, at least that's our position, that naked license does not apply when the defendant is the licensee.  That's called the Licensee Estoppel Doctrine, and we

need the Court to decide on that particular issue.  That's one of the things that I remember vividly where we differ in terms of what the law is.

Then there are a number of other instructions that are contingent upon a finding by the jury as to whether or not there was an assignment until 2006.  If there was no assignment, then we are going to be dealing with common law and who was the first, the entity who used first, in the different states, the 50 states, and there is priority as to in what state the mark was used first, especially if the cancellation goes forward and the federal registration does not survive.

That's the extreme case that would make this case more complicated.

The other book end is, there was an assignment.  There is a federal registration and the defendants are liable, basically.

In between, we have what we call the scenario two where there is no assignment in 2006, but there is a valid 2009 registration that preempts the whole United States except those states where there has been common law use prior to 2008, which is a constructive use that the Lanham Act provides.  At least that's the way we see it.

THE COURT:  All right.  So for purposes of the charge conference, you want me to make a ruling as a matter of law regarding this naked license issue, which is affirmative

defense what?

MR. VELARDE: I believe it's the first, but I am going to confirm that now. The first affirmative defense, Your Honor.

THE COURT: Okay.

And the second issue you made reference to?

MR. SANCHELIMA: Yes, Your Honor, this first affirmative defense only applies if there was the jury finding that there is an assignment.

May I stay seated?

THE COURT: You can stay seated.

MR. SANCHELIMA: If there is an assignment, defendants contend that we never control the nature and quality of the services; therefore, whatever rights we claim on the mark have been abandoned, but for that the jury has to find that there was an assignment or that from 2008 on the registration was valid.

If those two conditions are satisfied, then this first affirmative defense becomes relevant.

THE COURT: So why not have an interrogatory verdict form where they ask those preliminary questions?

MR. SANCHELIMA: Right.

We submitted four interrogatories and I invited counsel to submit some more. I believe that I was more concerned with the burden of proof in the four interrogatories that we

submitted but we can expand on that so that these contingencies will not come into play unless -- for the Court to decide afterwards how the findings were and apply it to the law.

That's basically the purpose of the interrogatories as I see them.  If they find there was no assignment, then one scenario would apply.

If they find there was an assignment, then another scenario would apply.

THE COURT:  Okay.

MR. VELARDE:  Your Honor, if I may.

THE COURT:  Yes, sir.

MR. VELARDE:  It's an affirmative defense.  It assumes the truth of the allegations.  That's already in the jury instructions.  That's exactly what it is.

The allegations are there was an assignment and the registration is valid.  That's when the naked license comes in. It's an affirmative defense.  So, I don't understand how that is necessarily confusing.

I believe the special, rather the jury instructions make very clear what an affirmative defense is, and I think it adequately explains the affirmative defense.

THE COURT:  But the point, I think, counsel is making is that the jury has to make that decision whether or not there was a valid assignment.

MR. VELARDE:  That's correct, Your Honor, and that's

why if there was not a valid assignment and the counterclaim is in my client's favor, I do want to point out something that I disagree with the plaintiffs' position about what scenarios are possible.

The theory, Your Honor, of the defense is that Mr. Cerasale -- it's very simple.  Mr. Cerasale owns the logo, has always owned the logo and provided the plaintiff with the license to use that logo and expand in Florida and outside the of Florida on the east coast.

So the scenario for defendants is everything that's done by the plaintiff was to the benefit of the defendants.  So there is no tallying up the states and determining geographic areas.  It's the defendant's own -- gave a license and Mr. Cerasale testified that everything that Mr. Mijares did in Florida and outside of Florida was within the license that Mr. Cerasale provided to Unisource Florida.

So it's that -- that scenario, Your Honor, was not mentioned by the plaintiff, and that's the one that's the defense's position.

MR. SANCHELIMA:  Your Honor, that's not within the pleadings in this case.  There are no claims for ownership of the mark that I can see.

The affirmative defense applies if the jury finds that there was an assignment in 2006.  That's the only way that that affirmative defense can apply, naked license.

If there was no assignment, the naked license cannot apply. So we need to determine first whether there was an assignment in 2006 for the affirmative defense of a naked license that we misused the mark did not apply because we abandoned it.

THE COURT: No, I understand the point that you are making and do you disagree?

It sounds like you agree that that is a finding that they have to make.

MR. VELARDE: Yes, Your Honor. I do agree, and if we are talking about one interrogatory about whether or not Mr. Cerasale sold or assigned that mark to Unisource Florida in 2006, if that's the interrogatory we are talking about, I agree that that is a finding that needs to be made.

THE COURT: And that would be a finding that they would make by a preponderance of the evidence. Correct?

MR. SANCHELIMA: Yes, sir.

THE COURT: So it would seem to me -- I don't see a verdict form. Have you guys submitted a proposed verdict form?

MR. VELARDE: Yes, Your Honor.

THE COURT: Okay. I don't have it.

MR. SANCHELIMA: Also, if we are going to make this clearer, we need to add an interrogatory as to the amount of sales and the amount of expenses so that it will hold -- you know, the verdict will be in line with the findings of fact.

The Lanham Act provides that the plaintiff has the duty to come forward and show sales and defendants have to show expenses.  We have no duty to show expenses at all.

THE COURT:  Okay.  So, you want an interrogatory finding regarding the amount of sales?

MR. SANCHELIMA:  The amount of sales by defendant for disgorgement, as per the Lanham Act, subject to equitable considerations of the Court.  I believe that's 15 U.S.C. 1117 or 14, sorry.

THE COURT:  Okay.  What's your position regarding that?

MR. VELARDE:  Well, Your Honor, first that was the basis of my motion for judgment of as a matter of law regarding the plaintiff not meeting their burden of proof to establish revenues, the sales.

So, Your Honor, that was the basis of my motion for judgment as a matter of law that the plaintiff has not established its burden, has not met its burden to establish revenues or sales.

THE COURT:  But, again, the question is now should that issue be an interrogatory and a verdict form?  Do you have an issue with that?

MR. VELARDE:  Just that it might confuse or prejudice the jury if they are being asked interrogatories that assume that the plaintiff has met his burden.

THE COURT:  Wouldn't the question be, do you find from

a preponderance of the evidence that, you know, that that has been established? I mean --

MR. VELARDE: Well, if the revenues have been established and my client proves his counterclaim and proves his affirmative defenses, then there is -- then that question would not be relevant. That's what I mean by if that's presented to the jury, the jury might get the wrong impression that the plaintiff has already met its burden.

MR. SANCHELIMA: The standard in trademark is to follow the Lanham Act, and it's just the amount of sales and they have the burden of showing expenses.

THE COURT: I don't see any problem with asking the questions regarding sales and expenses.

The jury can make that decision, that determination based on the evidence, and after he puts into the arguments and that would help kind of clear the air, so to speak, once we get the verdict, and if I have to make certain rulings based on the jury's factual findings, I'd be in a better position to do that. I wouldn't have to guess.

So I don't have a problem with the interrogatory, having those interrogatories in the verdict form.

I have to go. I am going to ask -- because you don't have to report until 11:00 tomorrow -- that the parties confer and you go over these instructions to streamline this hopefully for tomorrow, including a verdict form with any necessary

interrogatories, and that way we can perhaps keep the charge conference down to short as short a time as possible.

All right.  Otherwise, I will see you here at 11:00.

Anything else for the plaintiff for today?

MR. SANCHELIMA:  No, Your Honor.  As I understand it, then defendants will take the testimony of Defendant Cerasale tomorrow to close.

THE COURT:  Yes.

MR. SANCHELIMA:  And for the counterclaim will they start the cycle again or would that be it?

THE COURT:  Well, I am assuming all the evidence has come in?

MR. VELARDE:  Yes, Your Honor, we are not going to do it again.

THE COURT:  Okay.

MR. SANCHELIMA:  So when they rest, that's the end.

THE COURT:  That's it.

But I do want to emphasize, I expect that both sides will have conferred and gone over these instructions and the verdict form before we start at 11:00 tomorrow.

MR. SANCHELIMA:  Yes, Your Honor.

MR. VELARDE:  And the interrogatories as well, Your Honor.

THE COURT:  Right.  You figure out whatever time you want to meet tomorrow morning or talk tomorrow morning to take

care of that.

Anything else for the defense?

MR. VELARDE:  No, Your Honor.

THE COURT:  All right.  Then we will be in recess.
Thank you.

COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 5:45 p.m. to be continued in
Volume 4.)

C E R T I F I C A T E


          I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above-entitled matter.




June 30, 2023                    /s/Patricia Diaz
DATE                             PATRICIA DIAZ, FCRR, RPR, FPR
                                 Official Court Reporter
                                 United States District Court
                                 400 North Miami Avenue, 11th Floor
                                 Miami, Florida 33128
                                 (305) 523-5178

## $

**$1,937,188.83** [1] - 119:3
**$12,000** [1] - 101:13
**$15,000** [1] - 101:13
**$2,033,000** [1] - 119:9
**$2,033,181.84** [2] - 119:9, 119:23
**$2,460,203** [1] - 115:22
**$2,460,203.91** [1] - 115:24
**$2,500** [2] - 104:23, 105:5
**$73,440.07** [1] - 116:6
**$99,097.01** [1] - 119:11

## '

**'06** [1] - 128:23
**'14** [1] - 146:3
**'18** [1] - 158:22
**'19** [1] - 158:22
**'89** [1] - 170:18
**'90** [1] - 170:18
**'96** [1] - 171:25
**'99** [1] - 169:25
**'case** [1] - 150:6

## /

**/s/Patricia** [1] - 208:8

## 1

**1** [8] - 1:6, 32:22, 68:5, 132:20, 141:23, 173:13, 174:5, 196:14
**1.1** [1] - 141:17
**1.2** [1] - 177:12
**1.3** [1] - 87:20
**10** [4] - 57:22, 142:11, 157:13, 157:15
**10:45** [2] - 3:17, 4:5
**10:48** [1] - 39:16
**10th** [1] - 57:4
**11** [6] - 20:8, 88:20, 88:21, 88:24, 160:15, 173:2
**111** [1] - 2:22
**1117** [1] - 204:8
**114** [2] - 2:22
**118** [2] - 2:23
**11:00** [3] - 205:23, 206:3, 206:20

**11:48** [1] - 40:5
**11th** [2] - 1:24, 208:10
**12** [5] - 133:3, 134:2, 134:5, 145:6, 195:23
**127** [1] - 88:20
**12:30** [1] - 40:12
**12:44** [1] - 74:22
**13** [2] - 41:18, 54:2
**138** [1] - 2:5
**1395** [1] - 1:19
**13th** [5] - 8:14, 62:2, 63:3, 63:21, 66:2
**14** [3] - 2:15, 104:8, 204:9
**15** [13] - 2:14, 4:15, 4:17, 4:18, 4:22, 5:7, 5:10, 5:15, 120:12, 120:19, 162:25, 177:7, 204:8
**151** [1] - 2:9
**152,763** [1] - 132:13
**156** [1] - 2:10
**157** [1] - 2:10
**15th** [1] - 40:24
**16** [5] - 106:6, 106:19, 107:4, 134:1, 134:4
**161** [1] - 2:7
**167** [1] - 2:7
**168** [3] - 137:16, 137:18, 138:1
**16th** [4] - 104:19, 105:19, 106:1, 107:12
**17** [20] - 2:14, 4:15, 4:17, 4:19, 4:22, 4:23, 5:5, 10:17, 122:6, 126:1, 127:1, 127:7, 127:12, 127:13, 127:15, 127:19, 127:21, 127:25, 128:12, 132:22
**18** [3] - 2:15, 14:2, 14:4
**182** [1] - 51:3
**195** [1] - 2:7
**1999** [3] - 169:23, 171:20, 172:4
**1:00** [1] - 160:15
**1:15** [3] - 196:15, 197:15, 197:21
**1:45** [2] - 74:19, 75:4
**1:55** [1] - 78:8
**1st** [5] - 51:6, 60:1, 60:3, 61:7, 128:23

## 2

**2** [4] - 35:13, 44:15, 93:20, 133:1

**2.4** [1] - 115:14
**20** [8] - 19:16, 20:1, 20:5, 115:5, 120:19, 120:20, 160:8, 176:24
**20-CV-23276** [1] - 3:2
**20-CV-23276-DPG** [1] - 1:2
**2000** [4] - 172:8, 172:10, 183:24
**2000s** [1] - 180:1
**2001** [17] - 60:1, 60:3, 61:7, 62:3, 62:4, 67:18, 67:19, 67:21, 67:24, 75:18, 76:14, 76:19, 77:5, 83:2, 84:23, 169:22, 170:1
**2002** [2] - 83:4, 83:7
**2003** [1] - 83:6
**2005** [6] - 33:5, 33:25, 34:8, 34:12, 34:15
**2006** [61] - 12:1, 13:4, 24:5, 24:10, 24:11, 35:17, 37:9, 37:17, 40:17, 40:24, 41:5, 41:8, 43:13, 44:16, 45:5, 47:11, 48:6, 48:14, 48:20, 49:5, 49:10, 49:15, 49:23, 50:5, 50:9, 54:6, 55:4, 55:21, 56:4, 56:7, 56:8, 60:6, 81:1, 81:12, 82:9, 83:7, 83:8, 84:25, 86:4, 86:10, 86:14, 86:18, 86:19, 87:5, 87:7, 87:12, 87:14, 87:17, 87:23, 128:14, 132:12, 133:14, 133:24, 139:17, 143:7, 199:6, 199:18, 202:24, 203:3, 203:13
**2007** [12] - 24:14, 24:16, 25:12, 25:14, 25:23, 50:10, 132:20, 137:10, 137:16, 137:19, 138:1, 183:25
**2008** [20] - 25:7, 25:10, 25:14, 28:10, 46:22, 50:12, 55:24, 59:1, 59:4, 66:7, 66:15, 66:20, 66:23, 68:20, 68:21, 80:4, 88:12, 144:24, 199:20, 200:16
**2009** [15] - 27:20, 28:5, 28:10, 50:14, 59:4, 66:8, 68:22, 71:19, 73:13, 94:4,

132:22, 144:24, 148:3, 149:12, 199:18
**2010** [43] - 18:2, 46:20, 46:21, 46:24, 48:20, 49:5, 49:10, 52:25, 53:1, 53:10, 54:7, 55:4, 55:21, 56:8, 87:17, 87:23, 101:12, 102:20, 103:14, 128:14, 132:24, 134:1, 134:7, 139:18, 149:6, 149:11, 149:15, 149:16, 149:18, 149:22, 154:17, 154:20, 165:4, 165:10, 165:21, 185:2, 185:13, 185:16, 186:2, 186:14, 187:12, 195:17
**2011** [8] - 28:22, 28:24, 95:14, 96:18, 107:23, 108:2, 133:1, 155:4
**2012** [21] - 7:6, 18:2, 19:20, 19:23, 29:3, 29:13, 29:19, 29:21, 85:23, 94:4, 94:6, 94:7, 94:13, 108:6, 128:14, 128:23, 132:12, 133:3, 133:15, 133:24, 155:4
**2013** [5] - 18:3, 108:9, 146:3, 146:4, 146:5
**2014** [12] - 97:23, 98:4, 98:22, 99:3, 99:8, 99:20, 99:24, 102:8, 102:9, 103:13, 103:18, 146:5
**2015** [17] - 13:5, 94:13, 109:17, 111:12, 111:14, 114:16, 114:20, 114:22, 114:23, 115:12, 116:3, 116:11, 116:16, 116:23, 117:1, 121:19, 121:20
**2015's** [1] - 112:13
**2016** [7] - 13:5, 29:22, 114:24, 117:25, 118:4, 118:25, 121:19
**2017** [19] - 6:2, 6:11, 6:14, 21:4, 88:14, 94:9, 94:12, 94:17, 94:23, 106:22, 106:25, 114:7, 114:8,

114:25, 115:1, 115:7, 148:2, 153:15, 158:22
**2018** [7] - 6:2, 21:5, 88:16, 110:15, 110:19, 113:16, 114:4
**2019** [29] - 6:17, 6:20, 7:23, 7:24, 19:20, 19:25, 70:25, 71:2, 71:5, 71:7, 87:2, 88:10, 88:16, 104:19, 104:25, 105:19, 106:1, 106:6, 106:19, 107:4, 107:11, 107:23, 110:10, 148:4, 148:8, 153:17, 163:13, 163:17
**2020** [20] - 18:18, 20:2, 50:18, 50:19, 50:24, 53:19, 71:3, 71:9, 71:13, 71:21, 73:5, 74:15, 89:4, 89:9, 90:7, 90:16, 157:12, 158:21, 158:24, 159:9
**2021** [12] - 12:17, 18:20, 50:18, 51:6, 51:23, 62:5, 63:3, 66:2, 81:4, 157:12, 158:21, 159:9
**2022** [5] - 1:5, 20:6, 57:4, 57:23, 92:9
**2023** [1] - 208:8
**21** [3] - 89:4, 89:9, 158:24
**22,048** [1] - 25:8
**23** [1] - 2:15
**235** [1] - 1:15
**257** [2] - 75:23, 75:25
**26** [1] - 51:15
**27th** [1] - 110:15
**28** [4] - 132:24, 134:2, 134:5, 134:7
**289** [1] - 24:8
**28th** [1] - 101:12
**29** [6] - 33:5, 129:2, 129:13, 129:18, 133:13, 133:14
**299** [1] - 76:4
**2nd** [5] - 35:17, 37:9, 37:17, 44:16, 95:14

## 3

**3** [1] - 1:8
**3-2** [1] - 36:7
**30** [20] - 2:16, 2:19, 4:9, 31:5, 39:10, 39:15, 51:16, 51:18, 51:19, 51:20, 52:10, 52:13, 52:17, 52:18,

81:9, 96:1, 144:16, 159:23, 162:9, 208:8

**30-second** [1] - 109:9

**300,000** [1] - 18:21

**305** [2] - 1:25, 208:11

**30th** [10] - 51:6, 51:23, 97:22, 98:4, 98:22, 99:2, 99:8, 99:20, 99:24, 102:9

**31** [13] - 2:15, 2:19, 23:7, 23:9, 23:12, 23:13, 23:15, 30:18, 56:24, 56:25, 131:16, 137:15

**315,000** [1] - 20:16

**31st** [1] - 128:23

**32** [16] - 2:5, 2:16, 2:20, 29:24, 30:3, 30:4, 30:9, 30:18, 63:4, 63:5, 65:12, 65:14, 133:20, 144:17, 144:18, 145:14

**321** [1] - 198:2

**33** [6] - 2:20, 30:23, 30:25, 95:23, 96:4, 96:5

**33128** [2] - 1:24, 208:11

**33131** [1] - 1:19

**33134** [1] - 1:16

**34** [4] - 2:21, 98:7, 98:10, 99:22

**35** [8] - 2:21, 19:24, 21:20, 99:11, 99:15, 99:16, 99:19, 113:19

**35-page** [1] - 14:12

**36** [7] - 2:22, 109:24, 109:25, 111:24, 113:19, 113:24

**37** [4] - 2:22, 111:5, 111:6

**38** [6] - 2:23, 118:11, 118:12, 118:15, 118:19, 118:20

**3:08** [1] - 120:15

**3:15** [1] - 120:22

**3:22** [1] - 121:9

---

**4**

**4** [3] - 2:14, 2:14, 207:8

**4,116** [1] - 28:5

**4.10** [2] - 42:7, 45:16

**40** [1] - 19:24

**400** [2] - 1:23, 208:10

**4:00** [1] - 67:5

**4:22** [1] - 156:24

**4:29** [1] - 161:10

---

**5**

**5** [9] - 2:5, 40:20, 41:18, 67:5, 92:9, 93:24, 93:25, 157:13, 157:15

**50** [3] - 37:18, 38:1, 199:9

**50/25/25** [1] - 37:24

**50/50** [2] - 37:20, 37:22

**500,000** [1] - 18:19

**51** [1] - 2:19

**52** [1] - 2:19

**523-5178** [2] - 1:25, 208:11

**57** [1] - 2:19

**5:00** [1] - 120:22

**5:30** [1] - 197:24

**5:45** [2] - 1:7, 207:7

**5th** [2] - 45:5, 92:9

---

**6**

**6** [4] - 10:10, 10:11, 10:12, 18:10

**60** [7] - 153:24, 163:18, 189:12, 189:13, 189:14, 189:19, 189:23

**63** [1] - 2:20

**65** [1] - 2:20

---

**7**

**7** [2] - 1:5, 92:9

**731** [2] - 25:23, 26:2

**79** [1] - 19:13

---

**8**

**8** [5] - 59:14, 78:13, 79:9, 141:14, 172:23

**80** [1] - 19:13

**8th** [1] - 16:23

---

**9**

**96** [1] - 2:20

**98** [1] - 2:21

**99** [1] - 2:21

**9:30** [1] - 1:7

**9:35** [1] - 3:22

---

**A**

**a.m** [4] - 1:7, 3:22, 39:16, 40:5

**abandoned** [2] - 200:15, 203:5

**ability** [8] - 11:15, 11:16, 13:21, 21:4, 23:1, 105:13, 107:16, 178:2

**able** [34] - 13:25, 22:4, 24:16, 24:19, 26:1, 29:1, 58:18, 65:22, 85:2, 94:5, 100:20, 103:18, 103:23, 105:11, 116:15, 168:1, 174:18, 176:7, 176:9, 176:11, 178:15, 178:17, 180:17, 180:18, 181:11, 182:18, 189:16, 190:18, 192:10, 196:19, 196:24, 198:10

**above-entitled** [1] - 208:5

**Abrahamson** [2] - 122:24, 123:2

**abrupt** [1] - 102:11

**absolutely** [1] - 28:13

**abundance** [1] - 76:11

**access** [40] - 8:4, 12:24, 18:22, 19:3, 19:10, 84:24, 84:25, 85:2, 85:3, 86:20, 86:25, 87:3, 87:4, 105:12, 105:15, 105:17, 105:24, 106:2, 106:9, 106:12, 106:14, 107:4, 107:10, 107:17, 128:8, 128:19, 147:20, 147:22, 148:3, 148:4, 148:5, 148:8, 148:9, 152:14, 152:19, 153:3, 153:17, 153:19, 179:21, 189:16

**accessed** [1] - 164:19

**accessing** [1] - 117:5

**accompanying** [2] - 142:2, 175:6

**accomplish** [1] - 178:15

**according** [8] - 37:12, 84:17, 102:19, 116:11, 116:13, 116:17, 119:16, 172:5

**account** [21] - 6:1, 6:5, 6:6, 6:8, 6:19, 104:23, 104:25, 105:2, 105:3, 105:5, 106:16, 106:19, 106:20, 106:21, 130:9, 135:10, 135:11, 139:25, 166:10, 192:9

**accountant** [1] - 111:20

**accounting** [9] - 19:1, 19:11, 19:14, 20:10, 103:23, 109:1, 109:2, 109:3, 153:11

**accounts** [2] - 6:10, 140:6

**accurate** [5] - 57:21, 112:14, 113:1, 163:17, 208:4

**accurately** [1] - 94:5

**ACH** [1] - 97:7

**acknowledged** [1] - 55:2

**acquired** [7] - 56:1, 56:4, 101:4, 101:5, 142:12, 142:13, 144:1

**acquiring** [1] - 155:5

**Act** [5] - 158:6, 199:21, 204:1, 204:7, 205:10

**act** [1] - 47:15

**acted** [1] - 172:15

**action** [2] - 76:24, 91:16

**actions** [5] - 54:3, 71:19, 89:22, 90:20

**active** [2] - 15:5, 104:12

**actively** [3] - 70:20, 90:19, 91:22

**actor** [3] - 172:11, 172:13, 172:14

**actual** [10] - 83:24, 123:15, 141:4, 142:14, 158:10, 158:13, 158:16, 187:12, 187:13, 189:4

**Adams** [12] - 123:14, 123:16, 123:20, 123:23, 123:25, 124:7

**add** [5] - 7:7, 101:8, 176:22, 181:19, 203:23

**added** [14] - 21:5, 21:6, 21:8, 28:16, 29:10, 143:18, 143:22, 150:6, 150:7, 155:23, 182:17, 182:18, 183:8

**addendum** [1] - 42:2

**addition** [3] - 159:8, 159:9, 182:23

**additional** [5] - 9:20, 9:21, 102:15, 143:25, 160:4

**additionally** [1] - 158:24

**additions** [13] - 143:13, 143:19, 182:11, 183:6, 183:10, 183:15, 185:18, 186:3, 186:15, 186:23, 186:24, 195:9, 195:11

**address** [3] - 6:13, 16:18, 156:22

**adequate** [1] - 158:3

**adequately** [1] - 201:21

**adhere** [1] - 97:6

**adjust** [1] - 158:5

**adjuster** [4] - 127:9, 130:15, 137:24

**adjusters** [5] - 11:1, 26:15, 27:6, 27:7, 130:10

**adjustments** [1] - 141:1

**admin** [1] - 152:21

**administer** [1] - 161:18

**administrator** [1] - 137:24

**administrators** [2] - 26:16, 27:6

**admissible** [3] - 64:19, 65:1, 152:6

**admit** [1] - 65:7

**admitted** [36] - 4:20, 4:22, 10:16, 23:12, 23:13, 30:3, 30:4, 32:23, 35:13, 40:19, 52:17, 52:18, 53:16, 53:17, 58:9, 59:15, 64:1, 65:13, 65:14, 81:8, 88:21, 96:4, 96:5, 98:9, 98:10, 99:15, 99:16, 113:23, 113:24, 118:19, 118:20, 122:7, 131:16, 133:21, 172:23

**ADMITTED** [2] - 2:13, 2:18

**admitting** [1] - 58:11

**ads** [1] - 25:20

**advance** [6] - 6:24, 7:18, 63:13, 92:4, 184:9, 184:10

**advantage** [1] -

194:6

**adversity** [1] - 13:23
**advertised** [1] - 73:7
**advised** [1] - 176:3
**affairs** [1] - 177:6
**affect** [5] - 117:7, 117:8, 117:9, 117:15, 117:16
**affected** [7] - 13:23, 119:20, 119:24, 140:16, 140:19, 140:20, 140:25
**affecting** [7] - 13:21, 20:23, 21:1, 90:5, 100:15, 100:19, 100:20
**affects** [7] - 117:11, 117:12, 117:19, 117:20, 140:22
**affidavit** [35] - 51:5, 51:22, 52:23, 56:10, 58:19, 62:2, 62:15, 62:25, 63:3, 63:9, 63:15, 63:21, 64:1, 64:4, 64:10, 64:22, 65:19, 66:1, 66:17, 66:18, 67:17, 67:19, 67:22, 67:23, 68:1, 68:4, 68:17, 81:5, 82:8, 82:14, 144:4, 144:5, 144:9, 144:16, 144:21
**affidavits** [2] - 62:6, 144:3
**affirmed** [1] - 57:16
**afternoon** [18] - 60:20, 60:21, 67:4, 67:5, 75:13, 78:12, 120:11, 160:17, 160:22, 161:22, 161:23, 167:9, 196:17, 196:23, 196:24, 197:9, 197:11
**afterwards** [1] - 201:3
**agent** [1] - 45:22
**agents** [1] - 36:10
**aggressively** [1] - 115:3
**ago** [15] - 50:5, 53:17, 64:5, 64:11, 64:12, 65:4, 86:5, 110:9, 128:20, 145:6, 163:12, 169:25, 172:1, 180:7
**agree** [8] - 19:16, 150:22, 178:1, 178:4, 185:15, 203:8, 203:10, 203:13
**agreed** [18] - 33:15,

37:17, 37:25, 38:4, 38:6, 38:11, 45:6, 45:21, 46:2, 46:3, 85:19, 96:11, 96:20, 143:12, 166:8, 182:3, 182:10, 185:12
**agreeing** [2] - 38:12, 185:12
**Agreement** [2] - 87:18, 194:24
**agreement** [110] - 35:9, 37:7, 37:11, 40:16, 40:18, 40:23, 41:1, 41:9, 41:11, 41:14, 41:15, 42:4, 42:6, 42:9, 42:13, 43:1, 43:15, 43:16, 43:18, 43:21, 43:23, 43:25, 44:2, 44:4, 44:7, 44:10, 44:13, 45:8, 45:14, 46:12, 48:11, 48:13, 48:15, 53:2, 54:8, 56:4, 80:25, 81:3, 81:15, 81:17, 81:19, 82:5, 82:9, 85:13, 85:17, 85:22, 86:3, 86:7, 86:16, 86:17, 86:18, 86:19, 86:21, 87:5, 87:7, 87:11, 87:12, 87:14, 87:15, 87:17, 89:11, 90:3, 90:8, 90:17, 91:1, 91:4, 101:5, 101:11, 101:15, 101:23, 101:24, 102:2, 102:6, 102:21, 108:15, 108:21, 108:24, 114:15, 121:14, 127:9, 139:4, 139:11, 139:16, 139:17, 139:18, 141:12, 142:11, 143:5, 143:15, 143:20, 165:10, 165:14, 165:25, 171:12, 172:16, 172:18, 173:8, 177:9, 182:12, 182:19, 183:18, 184:13, 185:3, 186:2, 186:14, 187:23, 194:23, 195:21
**agreements** [3] - 139:19, 169:2, 185:10
**agrees** [1] - 45:19
**ahead** [4] - 42:22, 153:22, 154:9, 181:20
**air** [1] - 205:16
**aired** [1] - 24:1
**al** [2] - 1:4, 1:7

**alerted** [1] - 152:23
**Alfred** [50] - 12:6, 13:15, 13:19, 95:2, 95:7, 96:12, 96:22, 96:24, 101:3, 101:4, 101:7, 101:11, 101:13, 101:15, 101:18, 101:20, 102:16, 102:23, 103:14, 104:10, 104:20, 105:1, 105:3, 105:4, 105:6, 105:9, 105:14, 106:5, 106:13, 107:16, 107:19, 107:22, 108:2, 108:3, 108:10, 108:24, 141:9, 142:11, 150:2, 159:22, 159:25, 161:13, 161:19, 161:25, 176:6
**ALFRED** [1] - 2:6
**algorithm** [1] - 170:19
**allay** [1] - 176:11
**allegations** [2] - 201:13, 201:15
**alleged** [2] - 76:19, 76:20
**allow** [3] - 148:25, 151:10, 181:8
**allowed** [5] - 70:1, 70:10, 164:16, 177:13, 189:16
**allowing** [1] - 137:1
**allows** [5] - 69:10, 69:12, 72:5, 72:7, 73:9
**almost** [2] - 120:18, 129:24
**alone** [1] - 25:11
**aloud** [1] - 138:2
**alternative** [2] - 32:2, 32:5
**amend** [1] - 92:14
**amendments** [1] - 112:19
**American** [10] - 137:18, 170:5, 170:6, 170:7, 170:23, 171:1, 171:4, 171:14, 171:23, 171:25
**amicable** [1] - 8:9
**amount** [7] - 158:2, 158:5, 203:23, 203:24, 204:5, 204:6, 205:10
**amounts** [1] - 107:19
**Angeles** [9] - 129:7, 129:9, 129:25, 130:1,

130:18, 130:20, 130:23, 131:6, 134:3
**answer** [35] - 21:18, 38:9, 38:10, 46:17, 46:19, 47:22, 47:23, 48:1, 48:2, 48:24, 49:13, 49:21, 61:15, 61:23, 67:20, 73:18, 81:11, 85:20, 85:21, 90:25, 91:3, 94:5, 103:18, 106:25, 117:14, 117:16, 124:14, 140:18, 140:20, 154:15, 171:3, 181:24, 186:6, 186:12
**answered** [2] - 137:3, 150:25
**answering** [2] - 117:17, 137:25
**anticipate** [2] - 159:23, 160:4
**apart** [1] - 155:14
**apologies** [1] - 92:5
**apologize** [14] - 4:23, 40:7, 60:21, 61:16, 62:5, 67:22, 70:8, 112:11, 121:21, 136:4, 139:16, 145:11, 146:5, 160:6
**appear** [2] - 113:5, 193:6
**appearances** [1] - 3:4
**APPEARANCES** [1] - 1:12
**applicant** [1] - 80:21
**application** [38] - 59:8, 59:11, 61:14, 66:7, 66:10, 67:16, 68:10, 76:7, 76:8, 76:20, 78:1, 79:10, 143:21, 144:22, 145:1, 146:15, 146:21, 147:6, 151:14, 151:15, 151:18, 151:23, 164:7, 178:8, 178:14, 179:7, 180:2, 180:8, 180:20, 181:1, 181:2, 181:6, 181:12, 181:20, 181:23, 188:11, 188:20, 192:7
**applications** [3] - 146:18, 146:20, 180:12
**applied** [2] - 68:20, 151:9
**applies** [2] - 200:8, 202:23

**apply** [8] - 148:24, 198:24, 201:3, 201:6, 201:8, 202:25, 203:2, 203:4
**appreciate** [4] - 71:20, 180:13, 181:14, 198:17
**approach** [8] - 14:23, 51:9, 56:20, 59:17, 63:16, 93:4, 112:21, 118:7
**approaching** [1] - 18:10
**approved** [6] - 35:21, 36:1, 44:19, 83:25, 84:2, 84:11
**April** [1] - 98:17
**architectural** [1] - 189:1
**area** [1] - 187:7
**areas** [1] - 202:13
**arguably** [1] - 16:9
**argue** [1] - 112:9
**arguing** [1] - 77:24
**arguments** [4] - 160:16, 196:16, 197:18, 205:15
**Arizona** [2] - 21:22, 29:11
**Arkansas** [4] - 137:8, 137:16, 138:1
**arm** [1] - 197:7
**arrangement** [5] - 26:18, 26:19, 184:18, 184:19, 189:7
**arrangements** [1] - 164:11
**arrears** [1] - 184:11
**arrived** [1] - 69:8
**aside** [2] - 22:7, 174:10
**asset** [2] - 74:11, 109:4
**assign** [2] - 171:7, 171:10
**assigned** [2] - 44:5, 203:12
**assigning** [1] - 41:25
**assignment** [15] - 199:6, 199:7, 199:14, 199:18, 200:9, 200:12, 200:16, 201:5, 201:7, 201:15, 201:24, 202:1, 202:24, 203:1, 203:3
**assistance** [1] - 155:21
**associate** [2] - 31:5, 194:16
**ASSOCIATES** [1] -

1:15
  **association** [2] - 79:22, 80:13
  **assume** [3] - 150:24, 181:24, 204:23
  **assumes** [2] - 147:12, 201:12
  **assuming** [2] - 148:13, 206:11
  **assumption** [3] - 186:18, 186:19, 187:1
  **astronomical** [1] - 157:14
  **attained** [1] - 183:5
  **attempt** [1] - 92:14
  **attempted** [1] - 117:6
  **attempting** [1] - 15:6
  **attempts** [1] - 89:21
  **attention** [7] - 75:21, 76:2, 79:12, 128:9, 141:15, 141:17, 173:21
  **attest** [2] - 110:3, 116:18
  **attorney** [2] - 110:7, 113:15
  **attorney's** [2] - 146:22, 151:15
  **attorneys** [7] - 3:25, 27:3, 39:13, 39:17, 146:11, 156:2
  **attributed** [1] - 40:7
  **authenticity** [1] - 110:3
  **authority** [5] - 83:19, 83:22, 83:24, 86:22, 87:19
  **authorization** [4] - 8:8, 22:2, 130:11
  **authorizations** [1] - 130:14
  **authorized** [2] - 85:7, 85:9
  **automatic** [1] - 146:17
  **availability** [3] - 35:20, 38:18, 44:18
  **available** [6] - 36:3, 94:18, 191:9, 196:10, 196:22, 196:23
  **Avenue** [3] - 1:19, 1:23, 208:10
  **averaging** [1] - 115:5
  **avoid** [2] - 53:25, 56:11
  **award** [1] - 158:8
  **aware** [5] - 75:9, 147:18, 147:19, 152:13, 152:16
  **Azure** [1] - 164:12

## B

  **Baca** [4] - 123:14, 123:21, 123:23, 123:25
  **background** [1] - 150:17
  **backwards** [1] - 138:9
  **bad** [8] - 116:14, 116:15, 116:17, 116:24, 119:13, 119:14, 119:16, 185:2
  **balance** [1] - 102:17
  **Bar** [8] - 126:10, 126:12, 127:8, 127:15, 127:22, 134:2, 136:11, 136:16
  **bargained** [1] - 174:12
  **base** [2] - 80:25, 174:25
  **based** [29] - 34:21, 37:4, 47:25, 72:10, 72:11, 74:16, 77:18, 81:15, 92:14, 92:24, 97:2, 113:5, 115:25, 116:1, 116:7, 116:9, 120:2, 120:3, 120:4, 124:22, 135:2, 137:14, 137:22, 157:6, 158:5, 192:8, 205:15, 205:17
  **basing** [1] - 176:7
  **basis** [9] - 59:23, 76:8, 78:2, 105:9, 106:5, 106:6, 162:15, 204:12, 204:15
  **batch** [1] - 118:6
  **became** [5] - 37:23, 50:21, 87:17, 152:16, 152:23
  **become** [1] - 143:19
  **becomes** [3] - 129:17, 183:21, 200:19
  **BEFORE** [1] - 1:10
  **began** [1] - 71:22
  **begin** [3] - 66:6, 144:21, 181:17
  **beginning** [6] - 33:15, 121:19, 152:4, 152:10, 169:22, 196:21
  **behalf** [7] - 111:21, 146:23, 151:16, 151:21, 156:5, 156:8, 166:22
  **behind** [2] - 101:2, 164:7

  **belief** [2] - 72:4, 79:21
  **believes** [2] - 15:8, 80:20
  **bells** [1] - 28:16
  **belly** [1] - 47:13
  **belonged** [1] - 171:14
  **belonging** [1] - 121:16
  **belongs** [3] - 169:1, 171:13, 188:7
  **below** [2] - 130:9, 141:22
  **benefit** [2] - 14:14, 202:11
  **best** [11] - 12:9, 16:5, 19:19, 20:14, 79:20, 93:18, 93:19, 93:22, 93:25, 135:8, 153:5
  **better** [6] - 6:22, 27:20, 27:22, 64:11, 188:9, 205:18
  **between** [19] - 13:1, 15:10, 30:17, 34:17, 34:22, 48:3, 48:18, 50:6, 50:20, 52:1, 85:19, 85:22, 94:4, 94:13, 121:14, 139:18, 157:15, 198:4, 199:17
  **bigger** [1] - 191:4
  **bill** [6] - 26:20, 27:10, 27:15, 166:1, 166:6
  **billed** [3] - 101:11, 101:13, 138:22
  **billing** [31] - 26:4, 26:8, 27:18, 98:14, 122:14, 122:17, 123:2, 123:6, 123:9, 123:12, 124:17, 125:1, 125:5, 126:9, 129:7, 130:5, 130:8, 130:17, 131:4, 131:8, 131:9, 131:10, 131:21, 133:6, 133:8, 133:23, 136:18, 136:21, 137:17, 137:20, 137:22
  **bills** [13] - 98:18, 98:23, 100:24, 101:3, 102:15, 103:13, 107:23, 108:2, 108:3, 108:8, 108:9, 141:8, 166:9
  **bit** [7] - 4:14, 20:16, 93:24, 120:22, 152:12, 152:25, 153:13
  **blacked** [1] - 10:19

  **block** [1] - 4:25
  **blocked** [1] - 92:16
  **blue** [1] - 80:20
  **board** [9] - 42:18, 42:23, 43:19, 45:18, 45:19, 45:21, 45:23, 46:2, 153:10
  **book** [1] - 199:14
  **booked** [2] - 109:1, 109:3
  **books** [3] - 103:17, 103:23, 109:2
  **bother** [2] - 31:3, 100:16
  **bottom** [6] - 99:19, 115:19, 116:3, 132:17, 173:13, 185:9
  **brand** [6] - 47:19, 48:4, 147:8, 152:2, 159:11
  **breach** [1] - 9:9
  **breached** [1] - 185:10
  **Break** [1] - 39:24
  **break** [18] - 3:16, 4:5, 16:15, 17:16, 17:22, 39:4, 39:6, 39:9, 39:21, 40:12, 71:24, 74:17, 74:18, 74:24, 85:23, 109:9, 120:11, 120:22
  **breakdown** [1] - 100:23
  **breaks** [2] - 30:19, 31:8
  **Brickell** [1] - 1:19
  **Brief** [1] - 121:6
  **bring** [6] - 3:12, 75:15, 76:12, 78:6, 92:15, 160:19
  **broad** [1] - 191:24
  **brochure** [2] - 172:9, 193:12
  **brochureware** [1] - 192:1
  **broke** [1] - 24:1
  **broken** [2] - 23:21, 30:21
  **brought** [3] - 24:25, 77:11, 166:10
  **Buffalo** [4] - 123:15, 124:2, 124:3, 124:25
  **build** [1] - 8:6
  **built** [2] - 23:2, 181:22
  **bundle** [1] - 174:8
  **burden** [9] - 157:6, 157:16, 200:25, 204:13, 204:17, 204:24, 205:8, 205:11

  **BURNETT** [1] - 1:18
  **business** [50] - 12:25, 13:21, 15:7, 24:15, 26:14, 28:15, 29:14, 29:18, 38:19, 43:2, 44:13, 47:9, 47:13, 83:20, 91:19, 91:22, 92:18, 114:13, 117:2, 117:6, 119:25, 127:10, 155:14, 162:10, 163:1, 163:8, 164:10, 165:18, 166:5, 166:15, 167:24, 168:2, 168:4, 168:5, 169:10, 170:17, 176:7, 176:12, 176:16, 176:21, 182:16, 184:19, 184:20, 184:21, 184:24, 185:2, 186:21, 191:16, 192:6, 194:11
  **businesses** [3] - 15:4, 162:4, 176:20
  **businessman** [1] - 47:18
  **buttons** [1] - 193:2
  **buy** [1] - 155:1
  **BY** [74] - 1:21, 2:5, 2:5, 2:7, 2:7, 5:9, 10:3, 12:23, 18:4, 20:20, 21:17, 23:18, 26:24, 29:17, 30:7, 31:14, 33:1, 40:14, 42:21, 49:1, 49:8, 50:3, 51:4, 51:21, 52:21, 54:23, 55:12, 57:1, 57:20, 58:25, 59:9, 59:21, 62:1, 65:18, 65:25, 69:24, 70:9, 72:3, 78:15, 88:3, 89:3, 92:7, 93:17, 95:12, 96:9, 98:12, 99:18, 104:15, 109:11, 110:1, 111:8, 112:12, 112:25, 114:2, 118:24, 121:12, 124:15, 136:1, 137:7, 138:7, 139:10, 144:11, 144:20, 145:20, 161:21, 163:23, 164:8, 165:9, 167:8, 171:6, 177:24, 185:24, 186:13, 194:22

## C

  **California** [128] - 7:17, 12:8, 12:13,

12:19, 12:25, 13:2, 13:12, 34:19, 34:23, 36:8, 36:13, 36:17, 43:17, 43:20, 43:23, 43:25, 44:2, 72:8, 73:1, 73:8, 74:13, 80:5, 80:9, 82:15, 82:19, 82:21, 82:24, 83:8, 83:10, 83:12, 83:13, 83:20, 83:22, 91:22, 97:8, 97:10, 101:17, 107:18, 107:22, 108:1, 121:15, 121:24, 121:25, 122:2, 126:12, 126:19, 126:25, 127:6, 127:12, 127:18, 128:1, 128:3, 128:5, 129:9, 129:11, 129:13, 129:19, 129:22, 130:3, 130:19, 130:24, 131:1, 131:3, 132:17, 132:20, 132:22, 132:24, 133:1, 133:3, 133:6, 134:2, 134:3, 134:7, 134:11, 134:14, 134:15, 134:18, 134:23, 135:2, 135:5, 135:13, 136:2, 136:4, 136:7, 136:11, 136:12, 136:18, 136:21, 136:22, 139:20, 140:6, 140:10, 147:8, 152:1, 162:19, 162:20, 165:16, 165:22, 166:2, 166:8, 166:9, 166:11, 166:15, 166:16, 166:25, 167:10, 170:20, 174:17, 174:20, 176:25, 177:5, 181:8, 181:21, 182:25, 183:1, 184:10, 184:20, 187:14, 187:18, 188:5, 188:8, 188:9, 188:13, 189:8, 190:24, 193:25, 194:8, 195:19

**campaigns** [1] - 156:3

**cancellation** [3] - 76:16, 76:25, 199:10

**cannot** [24] - 13:24, 14:8, 62:14, 62:17, 73:18, 76:8, 77:16, 94:22, 104:2, 104:11, 105:13, 110:3,

112:16, 113:4, 113:12, 116:18, 145:4, 154:3, 160:23, 178:3, 183:22, 191:12, 203:1

**care** [4] - 4:5, 153:22, 154:9, 207:1

**carrier** [5] - 27:10, 127:3, 127:21, 136:10, 138:19

**carriers** [2] - 26:15, 27:7

**carveout** [2] - 46:6, 46:10

**case** [38] - 3:2, 10:9, 25:17, 26:25, 31:20, 39:11, 45:21, 51:23, 62:3, 65:8, 71:1, 71:6, 74:20, 75:20, 77:15, 93:10, 112:3, 114:19, 120:13, 124:24, 133:17, 136:10, 137:25, 150:16, 159:15, 159:19, 160:23, 162:5, 169:12, 169:14, 169:21, 185:1, 189:8, 198:8, 198:22, 199:12, 202:21

**CASE** [1] - 1:2

**Case** [1] - 155:22

**cases** [3] - 39:24, 40:9, 93:12

**cash** [1] - 184:9

**catch** [2] - 75:24, 175:13

**categories** [1] - 138:17

**caught** [2] - 98:18, 101:1

**causes** [1] - 76:24

**causing** [1] - 22:25

**caution** [2] - 47:15, 76:12

**cautious** [4] - 47:6, 47:7, 47:15, 47:19

**cc'd** [1] - 152:9

**cease** [5] - 9:20, 9:21, 89:18, 142:17, 175:21

**celebrate** [2] - 73:12, 78:21

**celebrated** [8] - 69:7, 73:15, 73:20, 74:4, 74:6, 78:23, 79:3, 79:7

**celebration** [3] - 73:14, 78:17, 78:19

**cent** [1] - 102:10

**center** [10] - 11:19,

164:6, 166:25, 187:14, 187:24, 188:4, 188:5, 189:9, 189:11, 194:3

**Cerasale** [161] - 15:11, 15:18, 16:22, 18:6, 25:4, 31:23, 32:1, 33:7, 33:16, 34:11, 35:8, 35:18, 36:22, 37:11, 37:18, 38:1, 38:4, 40:17, 41:21, 41:24, 42:10, 42:14, 43:3, 43:13, 44:4, 44:17, 44:24, 45:20, 45:22, 46:3, 46:5, 47:3, 53:3, 54:3, 55:2, 55:6, 60:10, 61:2, 66:25, 67:7, 67:14, 67:17, 67:23, 68:1, 68:4, 68:24, 69:2, 70:2, 70:11, 70:16, 70:18, 71:10, 71:11, 71:14, 72:5, 72:12, 72:14, 72:20, 72:22, 72:23, 72:25, 73:10, 73:12, 73:13, 73:15, 73:20, 74:1, 74:3, 74:6, 74:12, 78:25, 80:4, 80:8, 84:1, 84:2, 84:8, 84:17, 84:21, 85:6, 86:12, 87:18, 87:22, 88:5, 88:7, 89:5, 89:9, 89:22, 90:6, 90:15, 90:20, 90:23, 91:1, 91:3, 91:9, 91:18, 91:21, 95:14, 95:19, 96:10, 96:16, 96:24, 97:13, 97:23, 98:4, 98:13, 98:22, 99:3, 99:8, 99:20, 100:11, 102:9, 105:15, 105:22, 107:3, 107:18, 107:22, 108:1, 114:3, 114:12, 114:23, 117:2, 117:4, 117:5, 117:6, 119:20, 126:14, 128:5, 128:7, 128:19, 129:20, 136:2, 139:4, 139:12, 147:6, 147:22, 149:15, 151:24, 152:4, 153:2, 153:4, 153:5, 154:19, 157:10, 160:2, 160:3, 160:6, 162:6, 162:8, 162:10, 163:16, 166:21, 170:9, 170:23, 186:25, 202:6, 202:14, 202:16, 203:12, 206:6

**Cerasale's** [10] - 34:18, 38:11, 38:21, 41:16, 73:19, 78:17, 78:19, 117:9, 119:24, 143:7

**certain** [5] - 4:24, 16:10, 38:14, 88:16, 205:17

**certainly** [3] - 77:21, 165:21, 178:14

**certificate** [2] - 69:5, 69:8

**certified** [1] - 80:12

**certify** [2] - 113:11, 208:3

**chain** [7] - 16:6, 16:12, 16:14, 16:22, 17:4, 17:8

**chains** [3] - 14:20, 15:23, 16:8

**challenges** [2] - 198:19, 198:20

**chance** [1] - 62:13

**change** [24] - 53:20, 85:15, 85:18, 86:22, 92:23, 94:13, 165:23, 176:9, 176:16, 176:17, 178:3, 178:7, 178:8, 178:9, 178:11, 178:12, 178:17, 179:17, 180:1, 181:18, 183:12, 183:13

**changed** [5] - 56:13, 180:7, 183:8, 190:14, 191:9

**changes** [4] - 83:24, 141:3, 178:13, 194:12

**changing** [1] - 135:7

**characterization** [1] - 57:7

**characterize** [1] - 191:23

**charge** [6] - 97:9, 160:14, 160:16, 193:5, 199:23, 206:1

**check** [3] - 20:10, 94:3, 102:15

**checking** [1] - 96:15

**checks** [4] - 96:13, 96:25, 98:17, 100:25

**cheese** [1] - 61:8

**choice** [2] - 89:19, 89:25

**choose** [3] - 54:20, 72:23, 84:15

**chose** [1] - 74:12

**circles** [1] - 135:19

**Circuit** [2] - 76:9, 91:24

**circuit** [1] - 92:22

**circumstance** [1] - 58:16

**circumstances** [1] - 77:19

**cites** [1] - 44:6

**citing** [1] - 76:9

**City** [1] - 167:12

**claim** [9] - 10:25, 56:5, 56:6, 82:6, 117:1, 125:13, 137:23, 179:13, 200:14

**claims** [4] - 43:12, 44:6, 77:10, 202:21

**clarify** [5] - 48:23, 57:13, 148:10, 148:13, 185:23

**clarifying** [2] - 66:6, 144:22

**clean** [5] - 42:25, 45:2, 45:9, 45:11, 87:10

**Clean** [1] - 44:11

**clear** [29] - 32:9, 39:20, 42:25, 43:11, 43:13, 44:6, 44:11, 45:2, 45:9, 45:11, 46:13, 49:13, 49:15, 49:17, 50:24, 51:25, 53:19, 76:25, 87:10, 87:22, 94:11, 115:11, 129:23, 135:9, 137:11, 139:19, 201:20, 205:16

**clearer** [1] - 203:23

**clearly** [3] - 63:23, 64:14, 87:20

**client** [20] - 28:19, 29:10, 77:8, 77:9, 94:16, 123:15, 124:3, 124:4, 131:7, 134:25, 136:9, 138:21, 138:23, 139:23, 139:24, 166:14, 166:15, 167:5, 205:4

**client's** [1] - 202:2

**clients** [35] - 7:14, 10:25, 11:2, 21:21, 22:25, 23:1, 25:20, 26:3, 28:17, 29:1, 29:2, 70:21, 88:18, 89:16, 90:7, 94:15, 94:16, 105:11, 105:17, 105:24, 106:14, 107:16, 114:4, 117:4, 117:9, 123:8, 130:8, 137:21, 138:3, 138:17, 140:10, 153:25,

156:1, 192:14, 193:13

**close** [6] - 53:1, 77:16, 128:8, 153:7, 198:16, 206:7

**closed** [4] - 20:15, 54:7, 114:14, 150:16

**Closed** [2] - 87:18, 155:22

**closed'** [1] - 150:6

**closer** [1] - 20:1

**closet** [1] - 187:13

**closing** [5] - 141:21, 160:16, 173:24, 196:16, 197:18

**cloud** [9] - 110:20, 110:21, 187:4, 187:6, 189:3, 189:6, 189:17, 189:18, 189:21

**co** [12] - 6:21, 83:21, 85:1, 86:4, 86:6, 86:8, 86:22, 87:1, 87:2

**co-own** [1] - 85:1

**co-owned** [5] - 6:21, 83:21, 86:8, 86:22, 87:1

**co-ownership** [2] - 86:4, 86:6

**co-shared** [3] - 6:21, 83:21, 87:1

**co-used** [1] - 87:2

**coast** [1] - 202:9

**code** [42] - 102:1, 102:3, 102:25, 109:1, 109:2, 142:13, 142:15, 142:19, 142:21, 142:24, 143:8, 153:22, 154:7, 166:12, 175:23, 175:25, 176:4, 176:9, 176:13, 176:15, 177:25, 178:2, 178:3, 178:9, 178:13, 178:15, 178:16, 179:12, 179:13, 179:14, 179:18, 180:10, 180:18, 180:20, 183:21, 186:18, 188:21, 188:22, 188:23, 192:21, 193:15, 195:2

**codes** [1] - 194:25

**colleagues** [1] - 196:22

**collect** [1] - 130:12

**color** [1] - 178:11

**colors** [1] - 178:12

**column** [14] - 27:24, 122:13, 122:14, 122:20, 124:6, 125:1, 125:5, 125:8, 125:22,

126:6, 130:5, 131:22, 133:7, 137:13

**columns** [1] - 25:14

**com** [19] - 6:5, 6:6, 6:15, 6:16, 6:19, 6:21, 9:3, 9:10, 9:12, 9:24, 10:4, 10:14, 18:13, 107:2, 107:5, 107:6, 153:9, 193:22

**combination** [1] - 133:14

**combines** [1] - 14:19

**comfortable** [1] - 47:3

**coming** [5] - 114:23, 132:5, 167:9, 167:10, 181:5

**commerce** [5] - 79:22, 80:5, 80:9, 80:10, 80:14

**commissionable** [1] - 169:5

**commit** [1] - 185:6

**commitment** [1] - 196:12

**commitments** [2] - 160:11, 196:9

**committed** [1] - 185:5

**common** [3] - 186:21, 199:7, 199:20

**communicate** [1] - 155:18

**communicating** [1] - 7:15

**communication** [2] - 150:2, 155:8

**communications** [1] - 163:24

**comp** [1] - 181:4

**companies** [11] - 10:25, 22:15, 26:16, 100:18, 165:17, 165:21, 191:19, 192:8, 192:17, 193:25, 194:10

**Company** [17] - 7:8, 31:16, 31:18, 31:22, 31:25, 32:10, 32:16, 32:20, 33:13, 34:18, 34:25, 35:3, 36:10, 137:18, 141:18, 173:16, 173:22

**company** [84] - 17:2, 19:17, 20:24, 21:5, 21:6, 21:7, 21:19, 21:25, 24:20, 27:5, 31:16, 31:19, 32:20, 34:1, 34:17, 34:22, 35:1, 37:18, 38:2,

38:8, 38:12, 38:21, 38:25, 44:25, 45:23, 45:24, 69:12, 70:15, 72:17, 72:18, 74:2, 74:13, 87:22, 89:23, 89:24, 100:17, 108:4, 108:10, 110:7, 114:6, 114:24, 120:7, 120:8, 122:16, 126:21, 141:18, 141:19, 141:22, 141:24, 142:12, 142:24, 143:14, 151:17, 162:13, 162:14, 162:16, 163:4, 167:23, 167:25, 168:2, 168:16, 168:21, 169:1, 170:4, 170:10, 171:4, 172:3, 173:9, 173:11, 174:4, 174:7, 174:16, 182:12, 183:7, 184:20, 186:15, 191:4, 192:3, 192:15

**compare** [1] - 20:21

**compared** [1] - 77:22

**comparison** [2] - 145:8, 159:9

**compile** [1] - 179:18

**compiled** [2] - 17:3, 180:8

**complaint** [2] - 90:22, 92:15

**complaints** [3] - 140:9, 190:8, 193:14

**complete** [3] - 41:15, 197:15, 197:20

**completely** [4] - 9:3, 64:7, 171:18, 194:5

**complicate** [1] - 146:25

**complicated** [2] - 178:19, 199:13

**compound** [2] - 61:20, 61:21

**comprehensive** [1] - 174:15

**computer** [1] - 187:3

**concern** [3] - 143:1, 143:6, 176:5

**concerned** [4] - 19:8, 29:21, 83:25, 200:24

**concerning** [1] - 7:14

**concerns** [1] - 176:11

**concluded** [6] - 17:23, 58:24, 65:11, 151:5, 156:15, 207:7

**conditions** [4] -

141:25, 174:10, 175:4, 200:18

**conduct** [2] - 13:21, 167:24

**confer** [1] - 205:23

**conference** [9] - 14:24, 17:23, 58:15, 63:17, 96:17, 146:12, 160:14, 199:24, 206:2

**conferred** [1] - 206:19

**configuration** [4] - 178:6, 178:9, 179:12, 189:1

**confirm** [1] - 200:3

**confirmed** [1] - 86:8

**confirming** [1] - 36:12

**conflict** [1] - 120:25

**confuse** [2] - 64:9, 204:22

**confused** [2] - 73:23, 139:21

**confusing** [7] - 16:2, 150:9, 150:16, 150:18, 150:22, 157:23, 201:18

**confusion** [3] - 22:25, 70:21, 79:25

**connected** [1] - 15:23

**Connecticut** [2] - 11:8, 21:22

**connection** [6] - 7:1, 7:3, 79:24, 135:6, 142:7, 165:14

**consent** [1] - 21:24

**consider** [3] - 10:6, 24:18, 29:13

**consideration** [2] - 93:14, 143:25

**considerations** [1] - 204:8

**constantly** [1] - 152:18

**constructive** [1] - 199:21

**consultant** [2] - 162:2, 162:3

**consulting** [1] - 4:10

**Consulting** [1] - 169:10

**contact** [2] - 140:1, 192:5

**contacted** [2] - 163:25, 164:4

**contained** [2] - 76:7, 176:19

**contains** [1] - 41:1

**contend** [1] - 200:13

**contingencies** [1] - 201:1

**contingent** [1] - 199:5

**continuation** [1] - 99:3

**continue** [8] - 9:11, 88:2, 93:15, 100:7, 121:11, 166:7, 176:12, 177:5

**CONTINUED** [2] - 5:8, 40:13

**continued** [3] - 166:9, 166:10, 207:7

**continues** [1] - 176:24

**continuous** [1] - 22:25

**continuously** [2] - 65:5, 184:23

**contract** [4] - 138:19, 141:11, 171:7, 177:18

**contractors** [1] - 168:22

**contracts** [1] - 41:16

**contrary** [1] - 50:4

**contribution** [2] - 41:12, 143:7

**contributions** [9] - 41:1, 41:4, 41:7, 41:8, 41:10, 41:13, 41:19, 41:20, 41:21

**control** [6] - 15:3, 16:10, 84:21, 184:17, 198:21, 200:13

**conversation** [2] - 61:10, 100:19

**conversations** [1] - 198:7

**copied** [3] - 15:13, 15:18, 152:5

**copies** [1] - 194:4

**copy** [20] - 8:8, 59:18, 63:18, 65:23, 98:3, 99:7, 118:8, 118:10, 141:16, 170:2, 172:6, 172:18, 172:19, 172:20, 172:22, 172:24, 183:23, 194:4, 194:5

**copying** [1] - 178:24

**copyright** [4] - 8:5, 8:10, 9:4, 168:25

**copyrightable** [1] - 169:6

**copyrights** [1] - 171:8

**Coral** [8] - 129:5, 129:16, 135:3, 135:14, 135:15,

136:9, 136:14, 136:15

**cordial** [1] - 155:13

**corporate** [2] - 18:24, 54:7

**Corporation** [1] - 87:18

**corporation** [20] - 19:3, 19:6, 36:8, 36:17, 36:25, 37:1, 37:23, 38:7, 38:18, 42:24, 43:10, 53:1, 54:7, 79:21, 80:13, 81:13, 87:9, 114:14, 183:5

**correct** [380] - 4:18, 5:18, 6:10, 6:11, 9:17, 9:25, 13:23, 22:16, 22:17, 25:12, 25:15, 25:16, 26:11, 27:18, 27:25, 29:5, 29:6, 29:7, 29:8, 33:2, 33:5, 33:6, 33:13, 33:14, 33:17, 35:18, 35:19, 35:22, 35:23, 36:6, 36:14, 37:13, 37:18, 38:2, 38:3, 38:5, 38:9, 40:24, 41:2, 41:14, 41:16, 41:17, 41:22, 41:23, 41:25, 42:4, 42:8, 44:19, 44:20, 45:3, 46:1, 46:19, 46:20, 46:21, 47:1, 47:6, 47:12, 47:14, 47:24, 48:4, 48:6, 48:10, 48:12, 48:16, 48:17, 52:1, 53:5, 53:7, 53:10, 53:25, 54:12, 55:16, 55:17, 56:9, 56:10, 56:14, 57:5, 57:9, 57:23, 57:24, 59:7, 60:4, 60:5, 60:7, 60:8, 60:11, 60:12, 61:5, 62:20, 62:23, 62:24, 62:25, 63:1, 66:16, 66:23, 66:25, 67:1, 67:3, 67:12, 67:20, 67:21, 67:24, 67:25, 68:2, 68:3, 68:5, 68:6, 68:8, 68:15, 68:22, 68:23, 69:1, 69:11, 69:14, 69:15, 69:16, 70:2, 71:2, 71:3, 71:16, 71:18, 71:22, 71:23, 72:6, 72:9, 72:10, 72:19, 73:5, 73:10, 73:11, 74:15, 74:16, 78:22, 79:10, 79:11, 80:6, 80:7, 80:9, 80:10, 80:11, 80:15, 80:16, 81:1, 81:2, 81:4, 81:10, 82:3, 82:9, 82:12, 82:16, 82:17, 82:19, 82:20, 82:22, 82:23, 83:14, 85:20, 88:5, 88:6, 88:8, 88:9, 88:10, 88:11, 88:12, 88:13, 88:14, 89:13, 89:14, 91:7, 91:8, 91:11, 91:12, 91:13, 91:14, 92:13, 93:20, 93:21, 94:6, 95:4, 95:5, 95:20, 95:21, 96:18, 96:19, 96:22, 96:23, 97:1, 97:2, 97:17, 98:4, 98:5, 98:24, 98:25, 99:22, 99:25, 100:3, 100:12, 100:16, 102:10, 104:20, 104:21, 104:23, 104:24, 105:1, 105:25, 106:1, 106:8, 106:16, 106:17, 107:20, 107:24, 108:13, 108:16, 108:20, 109:12, 109:17, 113:8, 114:5, 114:16, 115:2, 115:8, 115:15, 115:16, 115:17, 115:18, 115:20, 115:21, 115:24, 116:2, 116:6, 116:10, 116:12, 116:17, 117:2, 117:3, 117:7, 117:16, 117:18, 117:21, 117:22, 118:5, 119:1, 119:2, 119:4, 119:5, 119:6, 119:7, 119:9, 119:10, 119:11, 119:12, 119:13, 119:17, 119:18, 119:21, 119:22, 119:25, 121:17, 121:25, 122:4, 122:5, 122:11, 122:12, 122:14, 122:15, 122:18, 122:19, 122:21, 122:22, 122:25, 123:1, 123:3, 123:4, 123:6, 123:7, 123:12, 123:18, 123:19, 124:6, 124:18, 124:20, 124:22, 125:18, 125:20, 126:4, 126:5, 126:7, 126:8, 126:10, 126:17, 126:19, 127:1, 127:23, 128:6, 129:5, 129:6, 129:7, 129:8, 129:14, 131:19, 131:20, 131:23, 131:24, 132:2, 132:3, 133:6, 133:15, 133:24, 133:25, 134:3, 134:4, 134:8, 134:10, 134:13, 134:16, 136:24, 137:9, 137:17, 137:20, 139:15, 140:13, 140:16, 140:17, 140:19, 141:9, 141:10, 142:5, 142:6, 142:15, 142:16, 142:22, 142:24, 142:25, 145:9, 153:16, 164:25, 167:20, 168:23, 169:1, 169:6, 169:9, 169:15, 170:10, 170:13, 170:21, 170:24, 171:8, 172:11, 173:3, 173:25, 174:3, 174:5, 175:18, 178:13, 178:21, 178:24, 178:25, 179:2, 179:3, 179:17, 182:25, 183:11, 186:4, 188:8, 189:4, 189:5, 189:23, 191:1, 191:6, 192:23, 192:24, 193:4, 193:22, 193:23, 194:13, 195:8, 201:25, 203:16

**Correct** [4] - 106:6, 123:21, 123:24, 183:22

**corrected** [1] - 13:16

**correctly** [10] - 28:5, 53:3, 54:9, 66:12, 80:1, 80:3, 97:11, 97:12, 98:20, 139:1

**correspond** [1] - 28:6

**correspondence** [1] - 169:5

**corresponding** [1] - 30:21

**cost** [3] - 154:14, 178:22, 187:24

**Cote** [3] - 31:17, 45:20, 152:9

**counsel** [29] - 3:4, 4:12, 4:16, 10:18, 14:3, 14:10, 16:15, 23:6, 27:4, 29:25, 30:22, 39:4, 57:17, 63:12, 64:6, 69:23, 77:8, 100:9, 112:9, 134:17, 135:18, 137:2, 137:23, 138:14, 157:23, 158:5, 172:16, 200:23, 201:22

**Counsel** [1] - 177:20

**Counselor** [4] - 73:23, 127:2, 128:21, 131:2

**Count** [1] - 92:9

**count** [1] - 24:3

**counterclaim** [7] - 76:15, 77:17, 92:9, 92:12, 202:1, 205:4, 206:9

**counterfeiting** [1] - 22:9

**country** [6] - 25:22, 69:15, 126:23, 130:10, 130:15, 154:24

**County** [1] - 130:25

**couple** [3] - 39:18, 49:16, 156:20

**course** [8] - 84:16, 110:22, 123:7, 165:18, 168:2, 168:5, 170:22, 176:15

**Court** [16] - 1:22, 1:23, 3:1, 10:22, 75:17, 90:23, 91:18, 92:16, 92:19, 92:23, 198:9, 199:1, 201:2, 204:8, 208:9, 208:10

**COURT** [255] - 1:1, 3:10, 3:12, 3:16, 3:20, 3:21, 3:23, 4:17, 4:20, 5:3, 5:6, 10:2, 12:22, 14:5, 14:7, 14:13, 14:23, 14:25, 15:10, 15:13, 15:17, 15:21, 16:4, 16:20, 17:3, 17:6, 17:11, 17:16, 17:20, 20:19, 21:12, 21:15, 22:23, 23:9, 23:11, 26:23, 29:16, 30:2, 30:6, 31:7, 31:12, 32:25, 39:4, 39:8, 39:17, 39:25, 40:1, 40:3, 40:6, 42:20, 48:23, 49:7, 49:21, 51:10, 51:12, 51:16, 51:19, 52:12, 52:14, 52:16, 52:20, 54:19, 55:10, 56:21, 57:10, 57:13, 57:17, 58:6, 58:8, 58:14, 58:16, 59:13, 59:16, 59:19, 61:22, 63:6, 63:8, 63:10, 63:12, 63:16, 63:18, 63:20, 63:25, 64:17, 64:25, 65:6, 65:12, 65:17, 65:21, 69:20, 69:23, 70:4, 71:24, 72:2, 74:18, 74:21, 74:23, 75:1, 75:3, 75:7, 75:24, 76:17, 77:1, 77:23, 78:4, 78:9, 78:14, 88:1, 88:23, 89:2, 92:2, 93:2, 93:5, 95:11, 95:24, 96:3, 96:8, 98:9, 99:14, 104:3, 109:10, 109:22, 111:1, 111:7, 111:25, 112:6, 112:9, 112:23, 113:20, 113:22, 114:1, 118:9, 118:16, 118:18, 118:23, 120:10, 120:14, 120:16, 120:21, 121:5, 121:7, 121:10, 124:13, 135:18, 135:23, 137:2, 138:5, 139:7, 139:9, 144:8, 144:16, 144:19, 145:15, 146:8, 146:13, 146:19, 147:3, 147:5, 147:11, 147:15, 147:17, 148:1, 148:7, 148:13, 148:16, 148:21, 148:24, 149:5, 149:9, 149:14, 149:20, 149:23, 150:1, 150:5, 150:13, 150:21, 150:24, 151:7, 151:13, 151:23, 152:12, 152:24, 153:13, 153:17, 154:11, 154:16, 154:19, 155:8, 155:11, 155:22, 156:4, 156:8, 156:11, 156:17, 156:23, 156:25, 157:2, 157:20, 158:10, 158:13, 158:19, 159:4, 159:7, 159:13, 159:17, 159:20, 160:1, 160:4, 160:9, 161:4, 161:8, 161:11, 161:14, 163:22, 164:3, 167:3, 167:6, 171:3, 177:20, 185:23, 186:11, 194:17, 194:19, 196:2, 197:2, 197:4, 197:6, 197:13,

197:23, 197:25, 198:13, 198:15, 199:23, 200:5, 200:11, 200:20, 201:9, 201:11, 201:22, 203:6, 203:15, 203:18, 203:21, 204:4, 204:10, 204:19, 204:25, 205:12, 206:8, 206:11, 206:15, 206:17, 206:24, 207:4, 207:6

**court** [7] - 75:6, 91:6, 91:13, 91:17, 92:22, 112:2, 161:18

**Court's** [2] - 58:17, 76:1

**COURTROOM** [2] - 3:2, 75:6

**courtroom** [10] - 3:22, 39:16, 40:5, 74:22, 78:8, 120:15, 121:9, 156:24, 161:10, 197:24

**cover** [1] - 186:22

**covering** [1] - 105:24

**covers** [1] - 66:19

**coworkers** [1] - 75:13

**crash** [1] - 181:1

**crashes** [1] - 181:2

**CRD** [1] - 75:10

**create** [10] - 21:21, 23:24, 30:13, 36:25, 102:24, 180:19, 182:16, 194:24, 195:4, 195:9

**created** [13] - 11:9, 12:2, 23:22, 23:25, 26:7, 30:11, 169:21, 169:22, 170:20, 172:4, 172:10, 195:7, 195:12

**creating** [3] - 36:7, 36:16, 171:23

**creation** [1] - 168:8

**creative** [1] - 33:23

**credit** [1] - 108:12

**criteria** [2] - 11:13, 30:13

**cross** [4] - 31:12, 77:25, 120:17, 167:3

**CROSS** [4] - 2:3, 31:13, 40:13, 167:7

**CROSS-EXAMINATION** [3] - 31:13, 40:13, 167:7

**culminates** [1] - 27:13

**current** [5] - 45:24, 96:12, 96:21, 162:16, 165:1

**customer** [60] - 26:8, 26:9, 121:15, 121:24, 122:3, 122:17, 123:2, 123:5, 123:6, 123:9, 123:10, 123:11, 123:12, 123:20, 123:22, 123:23, 124:5, 124:7, 124:8, 124:10, 124:16, 124:17, 124:22, 124:25, 125:1, 125:2, 125:3, 125:5, 125:6, 125:8, 125:13, 125:14, 126:9, 126:16, 126:19, 126:25, 127:3, 127:6, 127:12, 127:23, 128:1, 128:2, 128:3, 128:6, 129:4, 129:7, 129:11, 129:13, 129:15, 129:17, 130:5, 130:18, 133:7, 133:8, 136:18, 136:21, 137:20

**customers** [36] - 26:4, 26:10, 26:13, 26:20, 27:18, 88:5, 88:8, 88:17, 90:16, 91:10, 123:8, 124:6, 125:10, 125:12, 125:17, 125:21, 126:14, 126:20, 127:18, 129:19, 131:8, 131:9, 131:10, 131:21, 131:22, 132:9, 132:14, 133:24, 136:2, 136:5, 136:7, 137:8, 137:12, 137:13, 137:17, 139:14

**cut** [1] - 16:14

**cycle** [1] - 206:10

# D

**Dade** [1] - 130:24

**daily** [1] - 152:18

**Dallas** [2] - 155:15

**damage** [2] - 158:16, 159:10

**damages** [12] - 22:13, 71:2, 157:5, 157:6, 157:17, 157:19, 158:1, 158:8, 158:11, 158:13, 158:23, 159:8

**DARRIN** [1] - 1:10

**data** [19] - 11:20, 30:17, 164:5, 166:25, 179:2, 179:5, 187:14, 187:24, 188:3, 188:5, 188:23, 189:8, 189:11, 189:16, 189:20, 190:4, 191:7, 194:3

**database** [1] - 188:19

**databases** [2] - 164:12, 188:12

**Datamed** [9] - 170:4, 170:5, 170:6, 170:7, 170:24, 171:1, 171:14, 171:23, 171:25

**DATE** [1] - 208:9

**dated** [9] - 62:2, 62:4, 63:3, 92:9, 95:14, 97:22, 99:2, 99:20, 110:14

**dates** [2] - 64:4, 172:1

**David** [3] - 110:6, 110:14, 113:16

**day-to-day** [2] - 82:24, 83:8

**days** [10] - 44:16, 121:2, 163:18, 164:11, 187:9, 189:12, 189:13, 189:14, 189:19, 189:23

**dead** [1] - 176:6

**deal** [4] - 54:20, 55:11, 157:25, 196:12

**dealing** [4] - 15:6, 100:14, 140:12, 199:7

**deals** [1] - 78:4

**December** [3] - 1:5, 110:15, 128:23

**decide** [6] - 16:17, 16:18, 93:11, 198:9, 199:1, 201:2

**decided** [4] - 6:8, 72:12, 72:16, 180:22

**decision** [5] - 76:9, 145:15, 185:2, 201:23, 205:14

**decisions** [1] - 141:2

**declaration** [2] -

79:13, 79:14

**declares** [2] - 79:20, 80:20

**declining** [2] - 94:10, 94:12

**decrease** [3] - 158:17, 158:21, 158:22

**dedicated** [1] - 188:10

**defeat** [1] - 157:22

**Defendant** [8] - 12:7, 18:6, 25:4, 139:4, 139:12, 170:9, 170:23, 206:6

**DEFENDANT** [1] - 1:17

**defendant** [4] - 12:13, 15:2, 198:24, 204:6

**defendant's** [1] - 202:13

**defendants** [14] - 1:8, 3:9, 25:2, 51:15, 156:9, 157:7, 157:17, 162:5, 199:15, 200:12, 202:10, 202:11, 204:2, 206:6

**Defendants'** [1] - 81:9

**DEFENSE** [2] - 2:10, 2:18

**defense** [19] - 75:1, 76:18, 78:3, 147:3, 159:15, 161:13, 200:1, 200:3, 200:8, 200:19, 201:12, 201:17, 201:20, 201:21, 202:5, 202:23, 202:25, 203:3, 207:2

**Defense** [46] - 2:19, 2:19, 2:20, 2:20, 2:21, 2:21, 2:22, 2:22, 2:23, 51:18, 51:19, 51:20, 52:16, 52:18, 56:24, 56:25, 59:14, 63:4, 63:5, 65:12, 65:14, 78:13, 79:9, 88:20, 95:23, 96:3, 96:5, 98:7, 98:10, 99:11, 99:14, 99:16, 99:21, 104:8, 109:24, 109:25, 111:5, 111:6, 111:24, 113:19, 113:24, 118:11, 118:12, 118:15, 118:18, 118:20

**defense's** [1] - 202:19

**defenses** [3] - 198:11, 198:18, 205:5

**definitely** [2] - 15:12, 157:21

**definition** [3] - 53:15, 53:21, 81:24

**degree** [2] - 20:24, 21:3

**delay** [1] - 40:7

**deleted** [1] - 21:23

**deletion** [1] - 107:7

**deliberate** [1] - 160:16

**deliver** [1] - 193:8

**delivered** [1] - 192:8

**denied** [2] - 78:5, 88:1

**depo** [1] - 22:2

**deposit** [1] - 100:25

**deposition** [2] - 49:11, 91:18

**depth** [1] - 198:7

**DEPUTY** [2] - 3:2, 75:6

**describe** [8] - 6:18, 6:22, 6:25, 10:22, 13:8, 29:18, 57:18, 184:22

**descriptions** [3] - 142:3, 175:6, 175:19

**design** [5] - 170:16, 191:21, 191:22, 192:16, 193:12

**designate** [1] - 56:24

**designer** [1] - 192:20

**designers** [2] - 193:14, 193:17

**designing** [1] - 193:5

**desist** [3] - 9:20, 9:22, 89:19

**despite** [1] - 80:12

**detail** [10] - 6:25, 60:13, 66:9, 67:10, 67:11, 67:14, 68:9, 68:14, 77:9, 144:25

**details** [2] - 66:22, 68:8

**determination** [2] - 38:14, 205:14

**determine** [2] - 20:23, 203:2

**determining** [1] - 202:12

**develop** [2] - 170:7, 178:23

**developers** [1] - 182:4

**developments** [8] - 114:10, 143:13, 182:10, 183:11,

183:15, 185:19, 186:3, 186:15
**Diamond** [8] - 126:9, 126:12, 127:8, 127:14, 127:22, 134:2, 136:11, 136:16
**Diaz** [1] - 208:8
**DIAZ** [2] - 1:22, 208:9
**dictate** [2] - 83:19, 83:22
**dictionary** [1] - 81:22
**DIEGO** [1] - 1:14
**Diego** [1] - 130:2
**differ** [1] - 199:2
**difference** [9] - 30:17, 48:3, 48:6, 48:8, 48:18, 50:6, 50:8, 50:20, 190:5
**differences** [1] - 13:1
**different** [25] - 6:8, 16:9, 17:7, 21:20, 25:21, 27:2, 34:5, 34:16, 44:21, 45:25, 64:7, 123:9, 125:10, 125:12, 130:11, 133:9, 138:16, 138:17, 138:18, 148:16, 164:20, 185:11, 188:6, 199:8
**differently** [3] - 21:13, 26:18, 27:9
**difficult** [1] - 141:1
**difficulty** [1] - 190:14
**digest** [1] - 93:13
**Digital** [1] - 87:21
**dinner** [1] - 67:7
**dire** [2] - 58:5, 58:7
**DIRECT** [3] - 2:3, 5:8, 161:20
**direct** [6] - 76:1, 77:3, 150:1, 155:8, 159:24, 173:21
**directed** [1] - 7:17
**directing** [1] - 121:20
**direction** [1] - 135:23
**directly** [8] - 26:13, 26:14, 27:10, 27:11, 65:8, 100:15, 113:10, 181:9
**director** [1] - 45:22
**directors** [9] - 42:18, 42:23, 43:19, 45:18, 45:19, 45:21, 45:23, 46:2, 53:2
**directory** [1] - 110:21
**disagree** [3] - 178:5, 202:3, 203:7
**disagreement** [2] - 184:15, 187:25

**disconnect** [2] - 18:13, 18:17
**disconnected** [5] - 6:19, 9:10, 14:2, 70:22, 70:23
**discovery** [2] - 114:6, 114:19
**DISCOVERY** [2] - 1:4, 1:7
**Discovery** [59] - 3:3, 7:13, 8:25, 10:24, 33:13, 33:17, 33:19, 33:21, 34:2, 34:13, 34:25, 35:2, 35:25, 36:8, 36:13, 36:17, 41:25, 42:24, 43:6, 43:11, 44:5, 44:17, 44:24, 45:2, 45:24, 66:7, 69:13, 72:8, 72:25, 73:24, 74:9, 74:11, 80:24, 87:9, 87:13, 87:20, 89:11, 91:21, 92:15, 92:17, 92:18, 105:3, 109:3, 109:15, 118:1, 141:20, 144:22, 151:12, 151:21, 162:18, 163:5, 163:6, 167:24, 169:15, 169:18, 169:21, 171:18, 171:20
**discretion** [1] - 72:10
**discuss** [15] - 14:15, 14:21, 15:9, 17:21, 32:7, 39:2, 39:11, 40:16, 44:8, 59:1, 74:19, 120:13, 167:4, 184:12, 198:6
**discussed** [5] - 5:12, 10:9, 135:4, 138:9, 196:11
**discussing** [4] - 36:21, 37:1, 78:17, 78:20
**discussion** [4] - 19:15, 140:15, 141:8, 144:10
**disgorgement** [3] - 157:25, 158:25, 204:7
**display** [1] - 10:11
**dispute** [2] - 149:12, 198:4
**disregard** [2] - 10:18, 76:23
**distinction** [6] - 50:24, 52:1, 53:19, 64:23, 129:23, 179:14
**distribute** [1] - 193:13
**district** [1] - 91:23

**District** [2] - 1:23, 208:10
**DISTRICT** [3] - 1:1, 1:1, 1:11
**divide** [1] - 139:12
**divided** [1] - 193:22
**dividend** [1] - 165:5
**DIVISION** [1] - 1:2
**division** [2] - 33:13, 33:17
**Division** [6] - 33:19, 33:20, 34:1, 34:12, 34:25, 35:1
**DNS** [1] - 193:7
**Docket** [6] - 51:3, 75:23, 75:25, 76:4, 76:11, 198:2
**Doctrine** [1] - 198:25
**document** [106] - 5:16, 5:18, 10:20, 10:23, 11:9, 11:10, 11:14, 14:3, 14:12, 14:22, 17:5, 23:16, 23:22, 30:9, 30:11, 30:13, 32:6, 32:7, 33:2, 38:25, 44:20, 44:21, 44:23, 51:2, 51:7, 51:13, 52:3, 52:5, 52:7, 56:22, 57:2, 57:7, 57:14, 62:11, 62:14, 62:15, 62:18, 65:7, 92:10, 92:20, 92:24, 95:10, 96:1, 97:20, 99:1, 103:25, 104:2, 104:17, 109:7, 109:12, 110:2, 110:3, 110:4, 111:15, 111:17, 111:19, 112:4, 112:15, 112:18, 112:20, 112:22, 112:24, 113:7, 113:9, 113:15, 115:12, 115:20, 116:7, 116:9, 116:12, 116:13, 116:17, 116:19, 116:21, 116:23, 117:23, 118:2, 118:4, 119:16, 120:2, 120:3, 120:4, 120:9, 122:9, 122:13, 131:14, 131:22, 132:18, 133:6, 133:18, 133:19, 133:23, 134:1, 137:13, 145:11, 170:17, 172:9, 173:1, 177:11, 179:15, 181:2, 181:11, 181:19, 181:22, 186:9

**Document** [1] - 87:21
**documentation** [3] - 142:4, 157:8, 175:7
**documented** [1] - 154:8
**documents** [18] - 14:17, 19:5, 19:6, 23:24, 39:1, 39:2, 63:25, 176:18, 179:6, 180:2, 180:24, 180:25, 181:4, 181:7, 182:1, 182:16, 182:18, 192:12
**Documents** [1] - 111:9
**dollars** [1] - 18:11
**domain** [7] - 61:13, 105:10, 107:5, 164:20, 164:21, 164:24, 193:6
**done** [19] - 7:5, 13:12, 49:12, 53:22, 53:24, 120:18, 130:3, 151:19, 176:23, 184:20, 186:24, 186:25, 189:21, 191:22, 197:1, 197:2, 197:21, 202:11
**door** [1] - 77:15
**double** [2] - 19:24, 25:13
**doubled** [1] - 24:21
**down** [25] - 16:15, 23:21, 24:2, 30:19, 30:21, 38:16, 57:10, 62:19, 66:25, 67:2, 67:4, 94:6, 94:9, 94:14, 97:20, 103:25, 115:2, 120:16, 131:14, 133:19, 135:11, 137:16, 156:13, 196:4, 206:2
**downs** [1] - 28:25
**dozen** [1] - 154:5
**Dr** [2] - 75:12, 196:21
**drafted** [1] - 53:1
**drop** [5] - 28:23, 29:4, 29:5, 140:23
**drops** [1] - 176:6
**due** [1] - 90:20
**duly** [1] - 161:19
**duplicative** [2] - 14:17, 14:19
**during** [12] - 17:21, 18:5, 31:8, 39:21, 69:2, 71:11, 77:3, 77:24, 90:19, 90:22, 131:18, 152:10
**duty** [3] - 145:24,

204:1, 204:3
**dynamic** [1] - 179:15

**E**

**e-mail** [74] - 5:20, 5:21, 6:6, 6:10, 7:22, 7:23, 7:24, 8:1, 8:2, 8:12, 8:14, 9:16, 14:20, 15:8, 15:22, 16:6, 16:8, 16:12, 16:16, 17:8, 32:15, 33:7, 34:9, 35:7, 35:17, 38:24, 45:1, 95:13, 95:15, 95:17, 95:19, 95:23, 96:10, 97:2, 97:3, 97:15, 97:22, 98:1, 98:3, 98:13, 99:2, 99:7, 99:20, 99:21, 100:14, 102:14, 104:19, 104:22, 105:8, 105:10, 105:22, 106:11, 106:16, 106:18, 106:20, 106:21, 106:25, 107:8, 107:10, 108:18, 110:12, 110:14, 110:15, 147:7, 147:20, 151:25, 152:5, 152:7, 152:9, 152:14, 153:6, 155:18, 164:4
**e-mailed** [5] - 147:22, 153:2, 153:4, 153:5, 153:8
**e-mails** [21] - 15:1, 15:5, 15:10, 15:14, 16:22, 16:23, 17:4, 17:7, 17:9, 39:23, 85:16, 86:5, 99:4, 107:1, 107:2, 107:5, 107:9, 107:13, 152:5, 153:9
**early** [12] - 59:25, 60:20, 60:21, 60:24, 60:25, 67:4, 67:5, 108:9, 165:4, 172:8, 179:25, 196:12
**earnings** [4] - 17:25, 18:8, 18:14, 18:17
**easily** [2] - 108:8, 190:17
**east** [1] - 202:9
**easy** [2] - 125:24, 129:1
**educated** [1] - 50:21
**effect** [2] - 85:16, 159:11
**Effective** [2] -

141:21, 173:24
**efficient** [1] - 180:4
**EFT** [1] - 97:8
**eight** [1] - 153:21
**either** [12] - 5:1, 16:25, 37:19, 37:21, 45:14, 79:22, 139:14, 181:8, 186:17, 188:7, 192:14, 196:20
**elaborate** [1] - 186:5
**Eleventh** [2] - 76:9, 91:23
**eliciting** [1] - 77:8
**emergency** [6] - 105:9, 106:5, 106:6, 106:13, 147:21, 153:2
**emphasize** [1] - 206:18
**Empire** [3] - 137:18, 138:1, 138:2
**employee** [6] - 17:1, 82:21, 152:17, 152:20, 168:25, 170:23
**employees** [7] - 168:15, 168:18, 168:20, 168:21, 168:23, 192:15
**end** [19] - 13:10, 27:11, 34:6, 46:9, 76:5, 89:10, 100:8, 105:11, 105:12, 128:2, 153:25, 155:21, 190:17, 193:1, 193:10, 196:25, 197:10, 199:14, 206:16
**ends** [3] - 5:23, 125:25, 129:2
**engaged** [1] - 91:22
**engaging** [1] - 46:7
**engineer** [1] - 178:20
**English** [1] - 143:18
**enjoy** [1] - 26:1
**Ennis** [1] - 129:4
**enter** [9] - 4:13, 36:8, 36:13, 36:18, 90:2, 90:8, 186:2, 190:21, 192:10
**entered** [8] - 3:22, 40:5, 52:25, 78:8, 121:9, 161:10, 165:25, 185:3
**entire** [5] - 21:25, 76:13, 76:23, 174:23, 185:6
**entirely** [1] - 190:13
**entirety** [1] - 105:6
**entities** [1] - 26:17
**entitled** [5] - 71:2,

173:16, 173:21, 184:14, 208:5
**entity** [5] - 26:21, 43:5, 73:1, 131:5, 199:8
**entries** [1] - 10:18
**Entry** [6] - 51:3, 75:23, 75:25, 76:4, 76:11, 198:2
**environment** [1] - 164:16
**envision** [2] - 22:18, 188:6
**Equicopy** [1] - 21:8
**equitable** [2] - 158:6, 204:7
**erase** [1] - 177:17
**errors** [7] - 13:10, 13:14, 13:16, 154:2, 181:1, 184:1, 184:5
**especially** [2] - 155:20, 199:10
**ESQ** [5] - 1:13, 1:14, 1:14, 1:17, 1:18
**essentially** [1] - 157:14
**establish** [5] - 58:18, 157:6, 168:8, 204:13, 204:17
**established** [6] - 36:9, 157:8, 157:16, 204:17, 205:2, 205:4
**estimate** [9] - 17:25, 18:14, 19:10, 19:11, 19:19, 19:22, 20:8, 20:13, 20:14
**estimation** [1] - 19:19
**Estoppel** [1] - 198:25
**et** [2] - 1:4, 1:7
**etcetera** [1] - 21:22
**Evans** [2] - 126:3, 127:24
**evening** [4] - 60:18, 60:19, 67:4, 67:5
**event** [3] - 61:19, 158:4, 185:6
**events** [1] - 138:8
**eventually** [1] - 92:23
**evidence** [44] - 4:22, 23:13, 30:4, 32:23, 35:13, 40:19, 51:3, 52:11, 52:18, 58:4, 58:11, 59:15, 63:3, 65:14, 77:11, 81:9, 92:1, 95:10, 95:23, 96:5, 98:7, 98:10, 99:11, 99:16, 109:8, 110:12, 110:25,

111:24, 113:19, 113:24, 117:24, 118:15, 118:20, 122:7, 131:16, 133:21, 157:22, 158:10, 158:13, 159:2, 203:16, 205:1, 205:15, 206:11
**exact** [2] - 165:4, 194:4
**exactly** [10] - 6:22, 47:20, 49:13, 57:10, 81:17, 166:13, 181:21, 190:2, 194:10, 201:14
**EXAMINATION** [7] - 5:8, 31:13, 40:13, 138:6, 161:20, 167:7, 194:21
**example** [6] - 7:16, 15:17, 16:1, 121:23, 151:24, 190:23
**Excel** [2] - 23:20, 24:2
**except** [5] - 76:24, 93:10, 166:13, 187:7, 199:19
**excessive** [1] - 158:4
**exchanges** [1] - 152:5
**exclusive** [13] - 141:24, 174:7, 174:13, 174:14, 174:16, 174:22, 175:1, 177:2, 177:8, 177:16, 195:15, 195:19
**exclusively** [2] - 11:2, 27:5
**excuse** [6] - 28:3, 115:22, 119:9, 136:4, 136:19, 138:1
**excusing** [1] - 160:24
**executed** [2] - 68:16, 142:10
**Exhibit** [87] - 2:14, 2:14, 2:15, 2:15, 2:16, 2:19, 2:19, 2:20, 2:20, 2:21, 2:21, 2:22, 2:22, 2:23, 5:7, 5:10, 5:15, 10:10, 10:11, 10:12, 10:17, 14:2, 14:4, 23:7, 23:9, 23:12, 23:13, 23:15, 29:24, 30:3, 30:4, 30:9, 30:23, 32:22, 35:13, 40:20, 41:18, 44:15, 51:20, 52:10, 52:17, 52:18, 56:24, 56:25,

59:14, 63:4, 63:5, 65:12, 65:14, 78:13, 79:9, 81:9, 88:20, 88:21, 88:24, 95:23, 96:4, 96:5, 98:7, 98:10, 99:11, 99:15, 99:16, 99:19, 99:22, 104:8, 109:24, 109:25, 111:5, 111:6, 111:24, 113:19, 118:11, 118:12, 118:15, 118:19, 118:20, 122:6, 131:16, 133:20, 137:15, 141:14, 145:14, 172:23
**exhibit** [20] - 4:25, 5:6, 10:10, 11:6, 14:11, 29:25, 30:5, 51:12, 59:13, 59:22, 109:19, 109:20, 109:22, 110:23, 111:3, 118:10, 119:8, 128:25, 144:8, 152:7
**EXHIBITS** [2] - 2:13, 2:18
**exhibits** [2] - 4:11, 4:20
**Exhibits** [5] - 4:17, 4:18, 4:22, 30:18
**exist** [5] - 44:25, 55:4, 55:9, 60:3, 171:22
**existed** [2] - 55:8, 177:18
**existence** [1] - 177:7
**existing** [3] - 148:18, 154:13, 176:22
**exited** [5] - 39:16, 74:22, 120:15, 156:24, 197:24
**expand** [3] - 168:1, 201:1, 202:8
**expanded** [3] - 24:16, 25:19, 28:14
**expect** [3] - 138:23, 182:24, 206:18
**expedite** [2] - 4:13, 4:14
**expedited** [1] - 198:1
**expense** [2] - 117:16, 141:5
**expenses** [20] - 19:12, 115:17, 115:19, 115:22, 115:24, 117:7, 117:10, 117:15, 117:21, 119:6, 119:8, 119:23, 140:15, 140:24, 157:12,

203:24, 204:3, 205:11, 205:13
**experience** [3] - 13:10, 28:20, 146:17
**experienced** [1] - 143:7
**expert** [2] - 64:14, 178:1
**expertise** [2] - 190:17, 190:21
**explain** [14] - 21:13, 26:7, 26:25, 49:20, 100:6, 100:10, 124:23, 135:8, 138:15, 141:7, 147:6, 149:22, 151:24, 155:11
**explained** [1] - 139:1
**explains** [1] - 201:21
**exploring** [2] - 32:15, 34:15
**extension** [1] - 36:23
**extent** [2] - 93:6, 93:10
**exterior** [1] - 192:19
**extra** [2] - 172:22, 185:20
**extreme** [1] - 199:12

## F

**face** [2] - 155:17
**face-to-face** [1] - 155:17
**facilities** [1] - 166:25
**facing** [1] - 192:19
**fact** [12] - 9:18, 39:1, 55:24, 73:16, 73:21, 74:1, 76:22, 77:9, 100:14, 112:20, 131:4, 203:25
**factors** [1] - 20:23
**facts** [1] - 21:14
**factual** [1] - 205:18
**fail** [1] - 180:6
**failed** [1] - 181:4
**fair** [2] - 78:21, 194:8
**faith** [1] - 89:23
**fall** [5] - 42:1, 42:3, 138:17, 179:4, 182:19
**falls** [1] - 124:9
**falsehood** [1] - 73:8
**far** [11] - 5:13, 16:14, 19:8, 29:21, 83:24, 88:15, 112:6, 114:17, 122:20, 191:3, 193:20
**favor** [1] - 202:2
**FCRR** [2] - 1:22, 208:9
**featured** [1] - 16:24

features [3] - 176:20, 179:15, 191:8
February [10] - 71:9, 71:13, 71:21, 73:5, 74:15, 89:4, 89:9, 90:7, 98:16, 158:24
federal [4] - 22:9, 68:21, 199:11, 199:15
federally [1] - 9:25
fee [4] - 101:19, 103:11, 147:21, 153:2
felt [1] - 166:13
few [10] - 44:16, 58:12, 66:11, 68:11, 86:5, 145:18, 146:13, 151:7, 194:15, 194:20
field [3] - 5:21, 36:10, 178:2
fifth [1] - 8:11
figure [4] - 18:8, 97:7, 119:6, 206:24
figures [1] - 158:2
file [8] - 55:24, 69:10, 125:4, 125:13, 127:5, 146:14, 146:20, 151:13
filed [19] - 46:23, 50:16, 50:19, 51:23, 53:18, 62:3, 62:25, 63:1, 66:7, 76:6, 78:1, 116:8, 144:23, 146:21, 146:22, 147:5, 151:14, 151:16, 151:23
files [2] - 179:11, 181:9
filing [8] - 35:21, 36:2, 44:19, 59:23, 67:21, 75:20, 113:4, 146:18
fill [1] - 66:23
filling [1] - 68:14
filter [1] - 16:25
final [15] - 37:6, 38:25, 91:15, 92:8, 92:12, 92:14, 113:6, 115:9, 116:8, 116:16, 116:18, 116:19, 119:15, 120:1, 149:5
finances [1] - 115:1
financially [1] - 93:19
financials [1] - 94:4
findings [4] - 92:24, 201:3, 203:25, 205:18
fine [1] - 89:2
finger [1] - 76:11
finish [10] - 4:2, 49:21, 71:20, 124:13, 159:24, 160:15,

160:21, 186:11, 196:15, 197:12
Fire [2] - 137:18, 138:2
firm [16] - 27:4, 79:21, 80:13, 122:13, 122:14, 122:24, 123:2, 123:25, 124:23, 126:7, 127:5, 136:16, 137:23, 138:20, 141:9, 191:22
firm's [1] - 16:1
firms [8] - 10:25, 26:15, 27:2, 27:3, 91:20, 114:13, 139:20, 140:6
First [1] - 59:25
first [44] - 5:6, 8:24, 14:25, 15:18, 24:5, 24:9, 28:22, 61:7, 61:12, 64:4, 67:18, 68:5, 75:18, 76:7, 76:19, 77:3, 77:5, 77:14, 86:1, 89:18, 95:25, 96:11, 96:16, 96:17, 97:13, 105:21, 107:9, 120:11, 140:12, 144:4, 157:23, 159:22, 170:19, 182:6, 186:6, 199:8, 199:10, 200:2, 200:3, 200:7, 200:18, 203:2, 204:11
five [11] - 42:6, 50:4, 72:1, 91:20, 94:7, 96:14, 114:13, 137:5, 156:19, 165:8, 182:18
fix [2] - 154:9, 184:4
fixed [4] - 154:4, 154:6, 184:5, 184:7
Floor [2] - 1:24, 208:10
FLORIDA [1] - 1:1
Florida [213] - 1:4, 1:16, 1:19, 1:24, 11:3, 18:1, 18:15, 18:18, 18:22, 19:11, 20:11, 20:14, 20:24, 21:21, 22:1, 22:2, 22:8, 22:19, 24:7, 24:8, 24:14, 24:15, 25:8, 25:11, 26:1, 26:11, 27:1, 27:20, 28:22, 29:5, 29:18, 32:1, 32:11, 32:20, 33:16, 34:1, 34:12, 34:22, 35:21, 36:2, 36:7, 36:9, 36:13, 36:14, 36:17, 36:18, 38:1, 38:12, 40:24, 41:2,

41:5, 41:16, 41:22, 42:11, 42:14, 42:24, 43:4, 43:10, 44:18, 44:19, 45:3, 45:7, 45:12, 46:3, 46:17, 47:11, 48:12, 48:15, 49:10, 52:24, 53:9, 54:4, 54:5, 54:6, 60:3, 60:6, 70:1, 70:21, 72:18, 73:2, 73:9, 74:9, 74:11, 81:12, 87:9, 88:5, 88:8, 91:19, 91:21, 91:23, 92:18, 92:19, 93:19, 93:23, 97:9, 97:16, 101:19, 101:21, 105:3, 107:19, 110:8, 110:18, 114:13, 114:24, 115:13, 116:11, 116:14, 116:24, 119:1, 119:13, 119:14, 119:17, 120:8, 121:14, 122:3, 123:14, 123:22, 124:1, 124:2, 124:8, 124:24, 125:1, 125:15, 125:19, 125:21, 126:4, 126:16, 127:15, 127:20, 127:23, 128:1, 129:18, 130:24, 131:3, 131:7, 132:10, 132:13, 134:20, 134:22, 135:2, 135:14, 135:15, 136:8, 138:20, 140:10, 141:20, 147:18, 147:19, 152:22, 162:19, 163:6, 163:19, 164:18, 165:1, 165:3, 165:6, 165:15, 165:20, 166:2, 166:3, 166:9, 166:11, 166:13, 166:14, 166:17, 166:18, 166:22, 167:19, 167:22, 167:24, 167:25, 174:5, 174:18, 175:9, 175:25, 176:3, 176:16, 176:25, 177:2, 177:3, 179:21, 180:14, 181:3, 181:9, 181:16, 182:15, 183:2, 183:11, 184:1, 184:16, 187:19, 188:7, 188:10, 188:14, 189:12, 189:20, 190:8,

190:12, 194:1, 194:9, 195:18, 202:8, 202:9, 202:15, 202:16, 203:12, 208:11
Florida's [5] - 107:23, 108:2, 147:19, 152:13, 194:5
flow [1] - 176:17
focus [2] - 89:8, 130:16
follow [6] - 129:1, 135:23, 156:4, 156:8, 189:22, 205:9
follow-up [2] - 156:4, 156:8
followed [1] - 9:19
following [1] - 39:14
footprint [2] - 25:18, 131:4
FOR [5] - 1:13, 1:17, 2:10, 2:13, 2:18
forbid [1] - 142:23
force [1] - 36:10
foreclosed [1] - 158:9
foregoing [1] - 208:3
forgotten [1] - 190:18
form [15] - 26:4, 43:1, 44:7, 44:12, 49:7, 79:23, 87:11, 181:23, 200:21, 203:19, 204:20, 205:21, 205:25, 206:20
formed [1] - 167:23
forth [7] - 17:15, 34:8, 34:11, 36:24, 142:1, 175:4, 193:2
forum [1] - 164:11
forward [8] - 17:8, 86:14, 111:1, 146:11, 161:14, 177:15, 199:11, 204:2
foundation [8] - 10:1, 12:21, 63:14, 64:2, 69:19, 112:7, 163:22
four [15] - 5:18, 9:19, 34:4, 66:5, 79:12, 96:13, 114:13, 121:3, 144:4, 144:21, 145:17, 145:18, 200:23, 200:25
fourth [6] - 8:11, 8:13, 8:17, 8:22, 8:24
FOWLER [1] - 1:18
FPR [2] - 1:22, 208:9
frame [5] - 11:20, 71:12, 128:12, 146:3,

159:5
Francisco [1] - 130:2
fraud [6] - 77:18, 77:19, 77:21, 90:23, 92:22
free [9] - 31:9, 43:11, 43:12, 44:6, 166:6, 184:23, 186:24, 187:1, 197:14
freshen [1] - 7:7
friendly [1] - 193:1
front [9] - 3:19, 40:21, 59:10, 91:17, 94:5, 103:17, 105:12, 193:1, 193:10
full [21] - 3:25, 19:8, 20:15, 30:20, 52:24, 53:14, 53:23, 54:5, 54:16, 55:24, 55:25, 56:1, 73:3, 74:13, 81:12, 86:10, 87:13, 118:8, 118:10, 141:24, 174:7
function [1] - 180:19
fundamental [1] - 178:13
fundamentally [1] - 180:21
funds [1] - 105:1
future [1] - 186:23

## G

G-U-I [1] - 192:24
Gables [8] - 129:5, 129:16, 135:3, 135:14, 135:15, 136:9, 136:14, 136:15
gain [2] - 94:15, 94:16
gallery [1] - 39:19
games [1] - 129:24
GAYLES [1] - 1:10
general [2] - 165:24, 181:7
generalization [1] - 67:13
generally [1] - 61:18
generate [3] - 11:13, 130:3, 180:24
generated [4] - 11:10, 11:21, 179:7, 192:12
genesis [1] - 168:8
gentlemen [6] - 3:24, 39:9, 40:7, 74:18, 93:6, 196:2
geographic [1] - 202:12
Georgia [3] - 11:7,

29:9, 125:15

given [4] - 6:24, 179:21, 189:12, 189:13
glad [2] - 15:9, 123:17
gladly [1] - 48:2
God [1] - 142:23
goods [1] - 79:25
goodwill [3] - 117:11, 117:19, 159:11
government [2] - 26:17, 68:22
grace [1] - 6:23
grants [2] - 141:22, 174:4
graphic [3] - 191:22, 192:20, 193:17
great [1] - 154:14
greater [1] - 191:15
greatly [1] - 90:5
gross [3] - 19:16, 115:13, 119:3
Group [1] - 35:4
groups [1] - 26:17
grow [1] - 24:19
guess [4] - 24:12, 137:14, 148:7, 205:19
GUI [1] - 192:24
guy [1] - 191:15
guys [5] - 9:7, 147:7, 151:25, 192:5, 203:19

**H**

half [8] - 3:17, 4:5, 17:16, 38:21, 121:1, 166:1, 166:2, 196:8
hams [1] - 61:9
hand [3] - 30:8, 161:18, 192:19
handed [2] - 5:18, 51:22
handful [1] - 107:1
handing [1] - 5:11
handle [2] - 26:17, 127:10
handled [3] - 7:8, 123:25, 125:4
handling [2] - 23:14, 127:5
hard [1] - 65:23
harder [1] - 185:14
hardship [2] - 75:11, 94:21
hardware [1] - 187:13
he/she [1] - 80:20
head [1] - 131:13

healthy [1] - 29:20
hear [5] - 14:13, 14:18, 16:4, 104:7, 185:14
hearing [3] - 39:5, 92:22, 93:11
hearings [3] - 3:18, 39:9, 39:18
hearsay [1] - 163:21
help [4] - 139:25, 163:8, 163:11, 205:16
helping [1] - 11:5
hereby [1] - 208:3
hereinbelow [2] - 142:1, 175:5
herself [1] - 75:10
Hi [1] - 8:17
hi [1] - 8:18
higher [2] - 25:12, 38:16
highest [1] - 17:25
highlight [2] - 129:16, 133:11
highlighted [9] - 79:19, 80:19, 125:24, 125:25, 127:25, 129:1, 130:16, 130:17, 144:15
highlighting [1] - 10:19
highlights [2] - 4:24, 5:1
himself [2] - 72:24, 191:12
hindrance [1] - 46:16
hire [5] - 24:19, 169:3, 171:5, 171:10, 171:12
hired [2] - 24:22, 24:25
hiring [1] - 25:4
history [3] - 95:6, 184:8, 186:24
hold [8] - 8:19, 49:21, 75:24, 124:13, 148:14, 148:21, 186:11, 203:24
holder [1] - 167:18
holds [1] - 8:9
home [1] - 67:8
Honor [163] - 3:6, 3:8, 3:11, 3:15, 4:8, 4:10, 4:15, 4:23, 5:7, 14:1, 14:16, 14:21, 15:2, 15:22, 16:6, 17:19, 21:10, 23:8, 23:10, 29:24, 31:5, 31:10, 48:21, 49:6, 51:1, 51:3, 51:9, 51:13, 51:17, 51:18,

52:10, 52:13, 52:15, 54:16, 54:22, 55:7, 56:20, 57:6, 57:12, 57:15, 57:19, 58:3, 58:5, 58:10, 58:12, 58:22, 59:3, 59:14, 59:17, 61:20, 63:2, 63:7, 63:14, 63:15, 64:13, 65:9, 65:15, 69:17, 69:21, 70:3, 71:25, 74:17, 74:25, 75:2, 75:16, 75:19, 76:1, 76:4, 76:10, 77:3, 77:6, 77:14, 77:17, 78:2, 78:7, 87:24, 92:5, 92:25, 93:4, 93:16, 95:9, 95:22, 95:25, 96:2, 96:6, 98:6, 98:8, 99:10, 99:12, 99:13, 104:1, 109:9, 109:23, 110:13, 111:4, 111:23, 112:1, 112:4, 112:8, 112:11, 112:21, 113:18, 113:21, 118:7, 118:14, 118:17, 120:18, 120:20, 135:22, 135:25, 136:25, 137:5, 138:4, 139:6, 144:18, 145:14, 145:18, 146:6, 149:3, 150:3, 151:3, 156:6, 156:7, 156:10, 156:16, 157:3, 157:14, 157:22, 158:4, 158:15, 158:20, 158:24, 159:16, 159:18, 161:2, 161:3, 161:6, 161:7, 163:21, 165:8, 167:2, 167:5, 171:2, 194:18, 194:20, 196:1, 198:5, 200:4, 200:7, 201:10, 201:25, 202:5, 202:17, 202:20, 203:10, 203:20, 204:11, 204:15, 206:5, 206:13, 206:21, 206:23, 207:3
HONORABLE [1] - 1:10
honored [1] - 185:11
hood [1] - 193:4
hook [1] - 107:16
hopefully [2] - 139:2, 205:24
hoping [1] - 4:1
hostage [1] - 184:16

hosting [1] - 164:11
hotel [2] - 155:16, 167:17
hour [4] - 3:17, 4:5, 17:16, 196:8
humans [2] - 142:15, 178:16
hundred [1] - 6:4
hurting [1] - 89:24
hypothetical [4] - 47:21, 47:25, 90:10, 90:14

**I**

IA [3] - 27:23, 27:24, 35:20
ID [8] - 2:13, 2:18, 51:16, 51:19, 85:10, 86:13, 139:25, 152:19
idea [8] - 33:25, 34:8, 34:11, 34:24, 38:7, 170:12, 170:14
ideas [4] - 33:9, 33:22, 33:24, 34:3
identical [3] - 12:19, 13:5, 79:23
identification [7] - 14:4, 51:20, 56:25, 63:5, 109:25, 111:6, 118:12
identified [8] - 10:16, 23:15, 24:2, 30:8, 62:12, 114:7, 149:1, 151:10
identify [3] - 29:23, 63:4, 111:4
ignored [2] - 89:19, 98:19
III [1] - 161:25
Illinois [1] - 21:22
imagine [1] - 118:6
immaterial [1] - 75:21
immediately [2] - 43:19, 191:6
impeachment [5] - 51:14, 56:23, 63:24, 63:25, 109:24
implied [22] - 43:15, 43:20, 43:22, 48:12, 48:15, 48:19, 49:4, 49:10, 49:13, 49:15, 50:6, 50:8, 50:20, 52:1, 52:24, 53:9, 53:15, 54:15, 54:24, 55:14, 55:16, 55:18
importance [1] - 139:5
important [8] - 4:4,

25:19, 41:13, 61:19, 107:1, 176:14, 176:15
impossible [2] - 22:5, 22:6
impression [1] - 205:7
improper [2] - 10:7, 76:7
improvement [2] - 20:24, 21:3
improvements [4] - 28:9, 28:11, 28:15
improving [1] - 20:22
inability [1] - 21:3
inaccessible [1] - 107:8
inaccuracy [1] - 76:20
inaccurate [1] - 169:24
Inc [19] - 3:3, 7:13, 8:25, 42:24, 43:6, 43:11, 44:5, 44:24, 69:13, 73:24, 74:9, 80:24, 87:9, 87:13, 109:15, 118:1, 141:20, 151:12, 151:21
INC [1] - 1:4
Inc.'s [1] - 109:3
incline [1] - 161:16
include [8] - 7:10, 8:24, 19:1, 26:10, 28:14, 115:17, 119:6, 181:19
included [3] - 53:3, 143:21, 143:22
includes [8] - 5:18, 41:13, 41:15, 41:20, 43:14, 90:23, 101:6, 141:1
including [5] - 46:2, 46:22, 91:23, 173:6, 205:25
income [4] - 115:13, 116:3, 119:3, 119:11
incorporation [1] - 34:16
incorrect [1] - 107:25
increase [4] - 26:2, 29:7, 29:10, 29:12
increasing [1] - 25:21
individual [2] - 73:25, 95:3
industry [2] - 94:15, 192:23
info [1] - 147:20

**inform** [3] - 128:5, 149:14, 154:19

**information** [23] - 6:20, 7:3, 7:12, 60:10, 60:14, 66:22, 77:3, 77:8, 86:15, 104:1, 104:4, 104:6, 105:12, 105:18, 107:17, 112:13, 146:22, 151:16, 151:18, 152:13, 152:22, 176:18, 192:5

**informed** [4] - 7:9, 21:24, 68:25, 147:23

**informing** [1] - 98:13

**infringe** [1] - 73:1

**infringement** [10] - 22:8, 22:24, 70:13, 70:14, 70:15, 70:16, 71:8, 72:11, 74:13, 89:17

**infringing** [4] - 72:21, 73:4, 73:6, 73:13

**inherent** [1] - 158:8

**initial** [5] - 9:16, 9:18, 24:9, 38:24

**initiated** [1] - 134:25

**inserted** [1] - 8:12

**instance** [6] - 18:18, 61:22, 124:21, 176:16, 177:5, 178:10

**instead** [1] - 190:6

**instruct** [1] - 196:14

**instruction** [1] - 76:22

**instructions** [13] - 39:14, 142:3, 175:6, 175:19, 196:16, 197:17, 198:2, 198:10, 199:4, 201:14, 201:19, 205:24, 206:19

**insurance** [11] - 10:25, 26:15, 26:17, 27:5, 27:7, 100:18, 100:22, 127:3, 127:21, 136:10, 138:19

**Insurance** [3] - 126:20, 126:22, 137:18

**intend** [2] - 33:20, 35:1

**intended** [1] - 33:16

**intent** [2] - 174:24, 177:10

**interact** [1] - 154:1

**interaction** [3] - 15:4, 139:19, 139:20

**interested** [1] - 148:23

**interface** [1] - 193:9

**interference** [2] - 91:16, 92:13

**interfering** [1] - 91:10

**interior** [1] - 192:18

**Internet** [2] - 187:15, 192:2

**interpretation** [1] - 175:1

**interpretations** [1] - 185:11

**interrogatories** [7] - 200:23, 200:25, 201:4, 204:23, 205:21, 206:1, 206:22

**interrogatory** [7] - 200:20, 203:11, 203:13, 203:23, 204:4, 204:20, 205:20

**interrupt** [1] - 25:2

**interrupting** [2] - 61:16, 67:22

**introduce** [1] - 4:12

**introduced** [8] - 51:2, 92:1, 95:10, 109:8, 110:12, 110:24, 117:24, 150:18

**introducing** [1] - 63:22

**invalidating** [1] - 76:8

**invest** [1] - 85:24

**investment** [1] - 54:4

**invests** [1] - 194:11

**invited** [1] - 200:23

**invoices** [2] - 96:12, 96:21

**involved** [5] - 75:18, 152:4, 163:24, 185:7, 193:3

**involvement** [1] - 9:5

**involving** [1] - 17:7

**Iowa** [4] - 27:23, 28:2, 28:4, 29:7

**irrelevant** [4] - 15:23, 65:3, 75:21, 150:12

**IRS** [1] - 38:19

**issue** [18] - 17:20, 55:10, 57:17, 64:14, 93:7, 150:17, 157:19, 159:5, 159:14, 165:19, 166:17, 190:25, 199:1, 199:25, 200:6, 204:20, 204:21

**issues** [17] - 13:13, 39:22, 63:24, 93:7, 93:9, 94:17, 149:6, 149:10, 153:23, 154:17, 156:21, 157:4, 184:4, 191:6, 191:15, 196:18, 198:9

**IT** [4] - 97:24, 98:23, 99:4, 101:3

**itself** [3] - 29:22, 91:2, 179:2

---

**J**

**Jack** [2] - 126:3, 127:24

**January** [4] - 57:4, 57:22, 98:16, 128:23

**Jersey** [1] - 11:7

**JESUS** [1] - 1:13

**Jesus** [1] - 3:6

**JIHA** [1] - 197:11

**Jiha** [3] - 75:10, 160:20, 197:6

**jive** [1] - 133:17

**joint** [10] - 34:15, 34:17, 34:22, 35:4, 36:22, 37:3, 37:4, 37:19, 37:22, 198:2

**Juan** [1] - 3:9

**JUAN** [1] - 1:18

**Judge** [1] - 194:15

**JUDGE** [1] - 1:11

**judge's** [1] - 93:8

**JUDGMENT** [1] - 2:10

**judgment** [10] - 53:25, 56:11, 91:15, 92:8, 92:12, 92:14, 157:4, 157:18, 204:12, 204:16

**Judicial** [1] - 91:24

**July** [15] - 16:23, 24:10, 33:5, 33:25, 34:8, 34:12, 92:9, 97:22, 98:4, 98:22, 99:2, 99:8, 99:20, 99:24, 102:9

**June** [16] - 24:10, 35:17, 37:9, 37:17, 40:17, 40:24, 41:5, 41:8, 44:16, 45:5, 47:11, 48:6, 50:5, 101:12, 208:8

**jurisdiction** [1] - 92:17

**juror** [2] - 148:1, 151:6

**Juror** [1] - 156:15

**JUROR** [6] - 2:9, 42:19, 197:1, 197:3, 197:5, 197:11

**jurors** [10] - 40:4, 75:8, 75:9, 120:24, 121:7, 156:23, 160:13, 160:20, 160:25, 161:8

**jury** [66] - 3:13, 3:17, 3:19, 3:20, 3:22, 6:18, 10:22, 14:7, 14:8, 14:13, 21:7, 32:24, 39:12, 39:16, 40:5, 42:16, 44:15, 52:19, 58:4, 58:17, 64:9, 64:15, 65:16, 74:22, 76:22, 78:8, 89:1, 96:7, 98:11, 104:3, 113:25, 118:22, 120:15, 121:9, 122:8, 131:17, 133:22, 135:9, 145:12, 145:18, 146:8, 148:22, 156:12, 156:24, 158:1, 158:8, 159:2, 160:19, 161:10, 176:13, 196:14, 196:17, 197:23, 197:24, 198:10, 199:5, 200:8, 200:15, 201:13, 201:19, 201:23, 202:23, 204:23, 205:7, 205:14

**JURY** [1] - 1:10

**jury's** [1] - 205:18

---

**K**

**keep** [4] - 121:1, 144:1, 180:22, 206:1

**Kentucky** [2] - 25:23, 83:15

**kept** [2] - 101:13, 184:16

**kind** [7] - 7:22, 19:5, 121:1, 181:5, 192:10, 198:1, 205:16

**knocked** [2] - 105:15, 107:13

**knowing** [4] - 73:1, 73:2, 74:13, 80:12

**knowledge** [12] - 12:9, 48:18, 73:3, 79:21, 80:25, 84:19, 84:20, 149:6, 154:16, 187:20, 193:19

**known** [4] - 77:20, 114:13, 162:8, 162:24

**knows** [2] - 149:22, 176:8

---

**L**

**labeled** [1] - 137:13

**lack** [4] - 10:1, 12:21, 84:24, 112:7

**ladies** [6] - 3:24, 39:8, 40:6, 74:18, 93:5, 196:2

**Lane** [8] - 129:4, 129:16, 131:7, 135:3, 135:13, 136:9, 136:14, 136:15

**language** [3] - 37:4, 50:22, 168:11

**languages** [2] - 168:12, 179:1

**Lanham** [5] - 158:6, 199:21, 204:1, 204:7, 205:10

**large** [1] - 162:4

**last** [33] - 7:5, 10:13, 12:15, 19:8, 20:15, 45:15, 46:25, 47:2, 51:14, 64:1, 66:11, 67:9, 68:11, 78:16, 91:19, 98:14, 115:19, 143:12, 148:1, 150:5, 155:13, 155:16, 159:23, 164:17, 164:20, 173:1, 175:15, 175:16, 177:6, 182:8, 198:8

**late** [1] - 98:14

**launched** [1] - 25:18

**law** [35] - 10:25, 26:15, 27:2, 27:3, 27:4, 64:7, 72:11, 75:19, 91:20, 114:13, 123:25, 124:23, 126:6, 127:5, 136:16, 137:23, 138:20, 139:20, 140:6, 147:1, 157:4, 157:18, 196:11, 196:13, 196:16, 197:17, 198:9, 198:23, 199:3, 199:7, 199:20, 199:24, 201:3, 204:12, 204:16

**Law** [2] - 126:3, 127:24

**laws** [1] - 176:16

**lawsuit** [2] - 53:18, 69:10

**lawyers** [4] - 26:25, 196:11, 197:17

**lay** [1] - 141:2

**layperson** [1] - 22:22

**lead** [1] - 156:2

**leading** [4] - 10:1,

20:18, 26:22, 29:15
**leaks** [1] - 180:5
**leaned** [1] - 68:1
**leaning** [2] - 67:3, 67:15
**learn** [1] - 50:10
**learned** [4] - 7:11, 50:25, 114:11, 114:12
**learning** [1] - 114:10
**lease** [1] - 141:4
**least** [12] - 8:5, 20:12, 33:15, 58:4, 59:25, 114:13, 121:19, 139:21, 140:5, 159:24, 198:23, 199:21
**leave** [10] - 22:13, 22:14, 39:20, 120:23, 156:22, 160:25, 174:10, 188:3, 194:2
**leaves** [2] - 46:3, 46:17
**leaving** [1] - 22:7
**left** [11] - 11:20, 21:25, 40:16, 78:16, 89:24, 122:13, 122:17, 124:6, 126:3, 137:12, 196:7
**legal** [16] - 14:14, 21:20, 63:8, 63:10, 63:12, 64:21, 69:17, 69:18, 92:16, 147:8, 151:21, 152:1, 170:17, 172:9, 176:21, 179:6
**legally** [1] - 157:21
**LegalZoom** [10] - 146:14, 146:20, 146:22, 147:1, 151:13, 151:15, 151:17, 151:20, 152:5, 152:8
**LeJeune** [1] - 1:15
**less** [6] - 20:3, 20:4, 20:5, 146:2, 157:13
**letter** [16] - 37:8, 38:15, 71:9, 71:10, 71:13, 71:18, 73:4, 73:21, 89:4, 89:6, 89:17, 89:20, 90:1, 90:10, 90:13, 91:2
**letters** [5] - 9:20, 9:22, 71:11, 89:19, 164:20
**letting** [1] - 100:23
**level** [3] - 23:4, 138:23, 140:24
**levels** [1] - 27:7
**liability** [1] - 38:8
**liable** [1] - 199:15

**LIANY** [1] - 1:14
**license** [88] - 42:7, 43:16, 43:20, 43:22, 48:4, 48:12, 48:15, 48:18, 48:20, 49:5, 49:10, 49:14, 49:16, 50:6, 50:9, 50:20, 52:1, 52:24, 53:10, 53:15, 53:23, 54:4, 54:15, 54:24, 54:25, 55:1, 55:15, 55:16, 55:18, 55:19, 55:20, 56:3, 56:7, 56:8, 73:11, 81:4, 82:1, 82:3, 82:4, 82:9, 89:15, 101:5, 101:6, 101:22, 101:25, 109:2, 141:24, 141:25, 142:12, 142:14, 143:14, 143:20, 147:1, 148:4, 153:18, 164:12, 165:10, 167:25, 169:17, 173:12, 174:7, 176:8, 177:3, 182:12, 182:15, 182:21, 184:21, 186:21, 186:22, 195:2, 195:6, 195:11, 195:19, 198:12, 198:14, 198:24, 199:25, 201:16, 202:8, 202:13, 202:15, 202:25, 203:1, 203:4
**License** [4] - 141:18, 173:16, 173:22, 194:24
**licensed** [5] - 142:18, 165:15, 165:16, 165:17, 175:22
**Licensee** [1] - 198:25
**licensee** [7] - 101:18, 141:24, 142:19, 174:5, 175:23, 198:19, 198:25
**licensee's** [2] - 142:19, 175:23
**licenses** [2] - 87:8, 198:19
**licensing** [16] - 43:1, 43:15, 44:7, 44:10, 44:12, 87:11, 89:11, 90:8, 90:16, 91:1, 91:4, 101:24, 102:2, 102:6, 142:10, 164:14
**licensor** [6] - 141:22, 142:17, 142:19,

174:2, 175:21, 175:23
**light** [1] - 80:20
**likely** [3] - 77:21, 79:24, 100:17
**limine** [2] - 21:10, 149:12
**limitations** [4] - 142:1, 175:4, 175:12, 175:17
**limited** [2] - 38:8, 197:16
**line** [19] - 35:20, 36:7, 75:18, 76:13, 76:23, 92:25, 95:14, 97:23, 99:4, 122:23, 123:18, 124:10, 129:1, 155:24, 156:3, 175:15, 185:9, 203:25
**Lines** [2] - 123:14, 124:2
**Lisa** [3] - 31:17, 45:20, 152:9
**list** [9] - 41:7, 41:12, 41:13, 41:15, 41:19, 41:20, 41:24, 123:13, 135:12
**listed** [4] - 41:3, 41:6, 41:8, 151:11
**listen** [1] - 17:6
**literature** [3] - 142:3, 175:7, 175:20
**litigation** [12] - 50:16, 50:19, 58:19, 90:21, 90:22, 91:6, 91:9, 91:13, 93:6, 124:1, 128:11, 128:17
**live** [1] - 167:11
**living** [1] - 162:1
**LLC** [9] - 1:7, 3:3, 36:23, 72:8, 89:11, 91:21, 92:15, 92:17, 92:18
**loan** [1] - 157:9
**locally** [1] - 125:15
**location** [4] - 140:1, 140:2, 189:17, 189:18
**locations** [1] - 127:21
**log** [7] - 105:11, 105:17, 106:14, 107:16, 152:17, 190:18, 192:9
**logged** [2] - 166:13, 166:14
**logging** [1] - 190:15
**logo** [46] - 9:12, 9:25, 10:13, 37:13, 38:5, 38:13, 38:22, 42:11, 42:14, 42:17, 43:3, 43:9, 43:17, 45:7,

47:16, 49:24, 50:7, 52:25, 54:5, 55:21, 56:2, 56:5, 61:7, 66:7, 67:18, 68:5, 71:14, 72:6, 72:13, 72:14, 72:24, 73:10, 73:22, 80:10, 82:7, 87:14, 144:22, 147:8, 150:6, 152:2, 152:8, 152:9, 155:23, 202:6, 202:7, 202:8
**logos** [1] - 37:7
**longstanding** [1] - 4:4
**look** [25] - 8:21, 33:12, 33:23, 35:11, 38:15, 45:15, 51:7, 54:2, 65:23, 79:9, 80:19, 81:22, 96:1, 103:23, 112:17, 112:20, 114:18, 123:13, 133:18, 141:13, 173:13, 177:15, 192:3, 192:15, 198:3
**looked** [6] - 36:24, 44:14, 131:23, 133:5, 152:23, 166:12
**looking** [9] - 7:11, 8:19, 11:6, 28:22, 34:17, 50:1, 99:21, 112:16, 113:5
**looks** [4] - 25:23, 112:24, 113:1, 134:2
**Los** [9] - 129:7, 129:9, 129:25, 130:1, 130:18, 130:20, 130:23, 131:5, 134:3
**lose** [2] - 94:16, 160:13
**losing** [1] - 94:19
**loss** [8] - 109:14, 111:12, 111:14, 112:13, 113:3, 115:12, 117:25, 118:25
**losses** [1] - 158:3
**lost** [12] - 21:4, 94:20, 94:23, 96:14, 114:25, 148:2, 148:3, 148:7, 153:15, 153:17, 190:3
**loud** [1] - 8:16
**Louisiana** [1] - 11:7
**lunch** [5] - 40:12, 71:24, 74:19, 74:24, 75:5
**LUTTER** [1] - 2:6
**Lutter** [57] - 12:6, 13:15, 13:19, 15:10,

17:2, 87:19, 95:2, 95:7, 95:15, 96:22, 96:25, 97:14, 102:16, 103:14, 104:11, 104:20, 105:1, 105:6, 106:5, 107:20, 107:23, 108:2, 108:3, 108:7, 108:10, 108:25, 141:9, 141:21, 142:7, 142:23, 143:24, 145:21, 147:21, 148:5, 150:2, 153:1, 153:18, 153:20, 155:9, 155:12, 155:13, 159:22, 159:25, 160:18, 161:13, 161:19, 161:22, 161:25, 162:1, 167:9, 169:10, 173:24, 175:7, 176:23, 194:23
**lying** [4] - 53:12, 53:13, 96:14

## M

**machine** [2] - 187:5, 188:10
**machines** [2] - 188:11, 193:7
**Magistrate** [1] - 75:22
**magistrate** [1] - 76:3
**mail** [74] - 5:20, 5:21, 6:6, 6:10, 7:22, 7:23, 7:24, 8:1, 8:2, 8:12, 8:14, 9:16, 14:20, 15:8, 15:22, 16:6, 16:8, 16:12, 16:16, 17:8, 32:15, 33:7, 34:9, 35:7, 35:17, 38:24, 45:1, 95:13, 95:15, 95:17, 95:19, 95:23, 96:10, 97:2, 97:3, 97:15, 97:22, 98:1, 98:3, 98:13, 99:2, 99:7, 99:20, 99:21, 100:14, 102:14, 104:19, 104:22, 105:8, 105:10, 105:22, 106:11, 106:16, 106:18, 106:20, 106:21, 106:25, 107:8, 107:10, 108:18, 110:12, 110:14, 110:15, 147:7, 147:20, 151:25, 152:5, 152:7, 152:9, 152:14, 153:6,

155:18, 164:4
**mailed** [5] - 147:22, 153:2, 153:4, 153:5, 153:8
**mails** [21] - 15:1, 15:5, 15:10, 15:14, 16:22, 16:23, 17:4, 17:7, 17:9, 39:23, 85:16, 86:5, 99:4, 107:1, 107:2, 107:5, 107:9, 107:13, 152:5, 153:9
**maintain** [3] - 94:22, 162:15, 163:4
**maintained** [3] - 29:22, 179:11, 194:5
**maintains** [1] - 189:8
**maintenance** [6] - 142:18, 144:1, 145:21, 165:22, 165:24, 175:22
**major** [1] - 28:15
**majority** [1] - 183:19
**management** [2] - 11:18, 30:14
**manages** [1] - 95:3
**manuals** [4] - 142:2, 175:6, 175:18, 175:19
**March** [8] - 60:1, 60:3, 61:7, 67:18, 67:21, 68:5, 77:5, 98:16
**Marine** [1] - 138:2
**mark** [28] - 9:11, 10:12, 22:9, 46:13, 46:22, 51:16, 59:5, 60:6, 64:23, 64:24, 68:5, 75:20, 76:6, 77:25, 79:22, 80:5, 80:14, 80:21, 80:23, 82:7, 148:24, 150:16, 151:9, 199:10, 200:14, 202:22, 203:4, 203:12
**marked** [14] - 14:4, 35:12, 51:20, 56:23, 56:25, 63:5, 88:19, 109:19, 109:23, 109:25, 111:6, 118:12, 131:15, 144:14
**market** [3] - 36:9, 36:13, 36:18
**marketing** [4] - 25:20, 155:24, 156:3, 172:6
**markets** [1] - 139:12
**Massachusetts** [1] - 11:8
**material** [2] - 9:5,

142:14
**materials** [1] - 8:10
**matter** [11] - 9:18, 39:1, 74:1, 112:6, 157:4, 157:18, 178:24, 199:24, 204:12, 204:16, 208:5
**matters** [10] - 4:1, 4:3, 4:4, 4:6, 14:21, 16:9, 22:7, 90:24, 91:17, 155:19
**mean** [23] - 6:6, 16:23, 24:8, 25:9, 27:24, 124:10, 135:20, 136:19, 136:22, 137:1, 138:13, 138:22, 142:9, 143:17, 174:14, 174:16, 174:17, 182:13, 183:4, 183:9, 187:6, 205:2, 205:6
**meaning** [8] - 50:8, 87:12, 87:16, 146:20, 151:14, 188:1, 189:18, 191:23
**means** [10] - 36:20, 36:21, 45:14, 56:17, 105:2, 122:23, 138:11, 143:23, 174:2, 191:24
**meant** [6] - 27:18, 36:2, 36:5, 36:19, 49:14, 59:7
**meet** [5] - 27:11, 67:6, 102:12, 196:13, 206:25
**meeting** [3] - 96:17, 96:20, 204:13
**members** [1] - 176:13
**memory** [7] - 61:18, 61:25, 64:15, 136:13, 158:21, 180:5
**mentality** [1] - 37:5
**mention** [6] - 43:25, 57:16, 67:19, 67:21, 166:21, 169:20
**mentioned** [13] - 21:19, 30:14, 46:25, 47:5, 50:4, 50:23, 55:13, 60:9, 78:19, 91:6, 93:18, 158:25, 202:18
**mentioning** [4] - 32:15, 38:23, 56:16, 56:18
**message** [2] - 8:17, 155:18
**messed** [2] - 53:16,

53:17
**met** [4] - 155:16, 204:17, 204:24, 205:8
**MIAMI** [1] - 1:2
**Miami** [11] - 1:4, 1:16, 1:19, 1:23, 1:24, 123:14, 123:16, 124:22, 130:24, 208:10, 208:11
**microphone** [1] - 198:16
**Microsoft** [5] - 164:12, 180:3, 180:11, 180:23, 187:4
**might** [13] - 53:22, 53:24, 93:10, 121:2, 138:18, 138:20, 150:11, 176:16, 176:17, 192:3, 193:11, 204:22, 205:7
**migrate** [1] - 189:3
**MIJARES** [2] - 2:4, 2:9
**Mijares** [88] - 3:14, 5:10, 15:6, 15:12, 17:1, 23:15, 30:8, 31:15, 31:16, 33:3, 35:15, 40:15, 40:18, 42:22, 51:5, 51:22, 52:22, 57:2, 57:21, 59:1, 59:10, 59:22, 62:9, 62:13, 62:16, 65:17, 65:19, 66:1, 69:25, 73:25, 74:3, 77:4, 78:16, 86:9, 89:4, 92:8, 94:25, 95:6, 95:13, 96:10, 97:22, 98:13, 99:2, 99:19, 102:8, 104:16, 107:3, 109:12, 111:10, 112:5, 112:8, 112:22, 114:3, 117:25, 118:25, 121:13, 122:9, 127:11, 131:15, 131:18, 133:20, 133:23, 135:4, 136:4, 151:6, 156:15, 158:16, 158:17, 159:12, 162:22, 162:24, 163:1, 163:8, 163:15, 163:20, 163:25, 164:4, 164:13, 165:19, 167:1, 176:5, 184:13, 186:25, 191:11, 191:14, 195:17, 195:23, 202:14
**Mijares'** [2] - 16:25, 17:2

**Mijares's** [1] - 184:8
**million** [11] - 18:10, 18:11, 18:16, 93:20, 93:24, 93:25, 115:14, 157:13, 157:15
**mind** [5] - 51:25, 73:19, 121:2, 138:8, 145:5
**mine** [1] - 191:4
**minimum** [2] - 20:12, 154:7
**minor** [2] - 15:25, 41:10
**minute** [3] - 15:21, 88:23, 167:4
**minutes** [12] - 39:10, 39:15, 50:5, 72:1, 86:5, 120:12, 120:19, 120:20, 121:4, 156:19, 159:24, 160:8
**mischaracterizatio n** [2] - 55:8, 59:3
**mischaracterizes** [2] - 48:22, 185:21
**misinformed** [1] - 74:4
**misled** [1] - 91:18
**missing** [1] - 67:16
**misspoke** [1] - 59:6
**misstatements** [2] - 77:20
**misunderstanding** [1] - 34:14
**misused** [1] - 203:4
**model** [1] - 181:8
**modification** [1] - 143:21
**modifications** [9] - 143:13, 182:11, 183:11, 183:15, 185:18, 186:3, 186:16, 195:4, 195:6
**modified** [2] - 143:19, 181:11
**modify** [6] - 45:23, 152:12, 152:25, 153:13, 176:10, 181:9
**moment** [2] - 73:16, 73:21
**monetary** [1] - 22:7
**money** [3] - 108:11, 157:11, 178:22
**monitor** [2] - 14:2, 97:8
**monkey** [1] - 181:6
**month** [6] - 20:15, 66:11, 68:11, 101:14, 103:2, 198:8
**monthly** [7] - 98:18, 101:7, 101:15,

101:19, 103:11, 108:22, 108:25
**months** [9] - 20:8, 46:8, 47:13, 103:4, 114:11, 114:12
**morning** [13] - 3:6, 3:8, 3:24, 5:10, 31:15, 120:25, 160:12, 196:10, 196:12, 196:22, 197:14, 206:25
**most** [5] - 13:10, 61:24, 100:17, 132:1, 192:17
**mostly** [1] - 24:23
**motion** [4] - 92:22, 157:22, 204:12, 204:15
**MOTION** [1] - 2:10
**motions** [2] - 157:1, 157:2
**motives** [1] - 93:10
**move** [23] - 16:20, 29:2, 39:12, 52:10, 58:3, 58:21, 63:2, 75:17, 87:24, 93:3, 95:22, 98:6, 99:1, 99:10, 111:23, 113:19, 118:14, 135:24, 137:4, 157:3, 157:18, 175:3, 182:3
**moved** [2] - 76:13, 183:8
**moving** [2] - 77:12, 137:2
**MR** [337] - 2:5, 2:5, 2:7, 2:7, 2:9, 3:6, 3:8, 3:11, 4:8, 4:18, 4:23, 5:4, 5:7, 5:9, 10:1, 10:3, 12:21, 12:23, 14:1, 14:6, 14:8, 14:12, 14:16, 14:18, 14:19, 15:1, 15:12, 15:15, 15:20, 15:22, 16:3, 16:5, 16:13, 16:24, 17:5, 17:10, 17:13, 17:19, 17:21, 17:24, 18:4, 20:18, 20:20, 21:10, 21:17, 22:21, 23:6, 23:8, 23:10, 23:14, 23:18, 26:22, 26:24, 29:15, 29:17, 29:23, 30:1, 30:5, 30:7, 30:22, 30:24, 31:1, 31:2, 31:3, 31:10, 31:14, 33:1, 39:7, 40:2, 40:14, 42:21, 48:21, 49:1, 49:6, 49:8, 50:3, 51:1, 51:4, 51:9,

51:11, 51:13, 51:17, 51:18, 51:21, 52:10, 52:13, 52:15, 52:19, 52:21, 54:16, 54:22, 54:23, 55:7, 55:12, 56:20, 56:22, 57:1, 57:6, 57:12, 57:15, 57:19, 57:20, 58:3, 58:5, 58:7, 58:10, 58:11, 58:22, 58:23, 58:25, 59:3, 59:6, 59:9, 59:14, 59:17, 59:21, 61:20, 62:1, 63:2, 63:7, 63:9, 63:11, 63:14, 63:15, 63:19, 63:21, 64:4, 64:13, 64:20, 65:3, 65:9, 65:10, 65:15, 65:18, 65:25, 69:17, 69:21, 69:24, 70:3, 70:7, 70:9, 71:25, 72:3, 74:17, 74:25, 75:2, 75:16, 76:1, 76:19, 77:2, 78:2, 78:7, 78:12, 78:15, 87:24, 88:3, 88:19, 88:25, 89:3, 91:25, 92:5, 92:7, 92:25, 93:4, 93:16, 93:17, 95:9, 95:12, 95:22, 95:25, 96:6, 96:9, 98:6, 98:8, 98:11, 98:12, 99:10, 99:12, 99:17, 99:18, 103:25, 104:7, 104:8, 104:12, 104:14, 104:15, 109:7, 109:11, 109:19, 109:23, 110:1, 110:23, 110:24, 111:4, 111:8, 111:23, 112:1, 112:4, 112:8, 112:11, 112:12, 112:21, 112:25, 113:18, 113:21, 113:25, 114:2, 118:7, 118:10, 118:11, 118:14, 118:17, 118:21, 118:24, 120:18, 121:12, 124:15, 135:22, 135:25, 136:1, 136:25, 137:5, 137:7, 138:4, 138:7, 139:6, 139:8, 139:10, 144:9, 144:11, 144:18, 144:20, 145:11, 145:13, 145:16, 145:20, 146:6, 146:16, 146:25, 147:4, 147:10, 147:12,

147:16, 147:24, 147:25, 148:6, 148:9, 148:12, 148:15, 148:19, 148:20, 148:22, 149:3, 149:4, 149:8, 149:10, 149:16, 149:21, 149:24, 149:25, 150:3, 150:4, 150:8, 150:11, 150:15, 150:22, 151:3, 151:4, 156:6, 156:10, 156:16, 157:3, 157:21, 158:12, 158:15, 158:20, 159:6, 159:8, 159:16, 159:18, 159:21, 160:3, 160:6, 161:1, 161:3, 161:6, 161:7, 161:13, 161:21, 163:21, 163:23, 164:2, 164:8, 165:8, 165:9, 167:2, 167:4, 167:8, 171:2, 171:6, 177:23, 177:24, 185:21, 185:24, 186:13, 194:15, 194:18, 194:20, 194:22, 196:1, 198:5, 198:14, 198:17, 200:2, 200:7, 200:12, 200:22, 201:10, 201:12, 201:25, 202:20, 203:10, 203:17, 203:20, 203:22, 204:6, 204:11, 204:22, 205:3, 205:9, 206:5, 206:9, 206:13, 206:16, 206:21, 206:22, 207:3
   **muddy** [1] - 130:21
   **multi** [1] - 172:2
   **multi-year** [1] - 172:2
   **multiple** [7] - 11:16, 17:7, 71:11, 85:12, 89:18, 91:20, 152:19
   **must** [1] - 194:2
   **mutually** [1] - 53:1

### N

   **nail** [1] - 96:15
   **naked** [9] - 198:11, 198:14, 198:18, 198:24, 199:25, 201:16, 202:25, 203:1, 203:3
   **name** [82] - 9:1, 16:1, 16:3, 16:25, 22:16,

31:18, 31:22, 32:2, 32:4, 32:5, 32:10, 32:19, 33:9, 34:3, 35:5, 35:24, 37:13, 37:21, 38:5, 38:13, 38:17, 38:22, 41:25, 42:7, 42:11, 42:14, 42:17, 42:23, 43:3, 43:6, 43:9, 43:10, 44:5, 44:17, 44:18, 44:21, 45:2, 45:7, 45:8, 45:11, 45:24, 45:25, 46:4, 46:11, 46:12, 46:15, 46:18, 47:16, 49:24, 52:25, 54:5, 55:20, 56:1, 56:4, 61:7, 67:18, 71:14, 72:6, 72:12, 72:14, 72:24, 73:10, 73:22, 82:6, 87:8, 87:13, 122:13, 122:14, 122:24, 125:5, 125:8, 131:5, 146:21, 151:15, 161:24, 164:20, 164:21, 170:4, 190:22, 193:6
   **Name** [1] - 35:20
   **namely** [1] - 175:7
   **names** [3] - 17:12, 32:16, 37:7
   **narrative** [2] - 180:13, 181:14
   **national** [7] - 25:18, 127:3, 127:9, 130:9, 135:10, 136:10, 138:19
   **nationwide** [2] - 126:20, 126:21
   **nature** [5] - 15:3, 61:9, 174:8, 198:21, 200:13
   **near** [1] - 79:23
   **necessarily** [4] - 26:14, 33:18, 187:10, 201:18
   **necessary** [4] - 93:5, 142:18, 175:22, 205:25
   **need** [39] - 14:13, 14:15, 16:17, 16:18, 22:8, 23:4, 39:18, 51:7, 74:23, 81:22, 92:3, 96:1, 97:5, 97:18, 101:6, 102:18, 102:19, 102:23, 102:24, 108:14, 108:17, 108:21, 109:6, 112:15, 112:20, 123:13,

129:23, 140:1, 156:17, 161:17, 178:15, 182:20, 190:21, 198:3, 198:9, 199:1, 203:2, 203:23
   **needed** [7] - 8:2, 8:3, 61:12, 103:7, 143:9, 155:20, 197:19
   **needs** [5] - 22:19, 27:13, 27:16, 188:3, 203:14
   **negative** [2] - 116:6, 119:11
   **negotiations** [2] - 44:22
   **net** [7] - 5:23, 106:18, 106:21, 106:25, 116:3, 119:11, 193:22
   **never** [35] - 60:19, 79:5, 82:15, 82:21, 83:19, 85:1, 85:3, 85:11, 86:13, 86:15, 87:4, 109:20, 110:2, 130:3, 140:11, 148:9, 148:22, 153:4, 153:8, 153:23, 154:5, 154:8, 171:10, 177:18, 184:25, 187:19, 190:3, 190:8, 190:11, 190:19, 190:24, 191:5, 195:23, 200:13
   **new** [46] - 8:6, 25:20, 26:3, 28:16, 29:10, 46:7, 85:7, 102:23, 102:24, 105:9, 105:10, 105:16, 106:14, 107:15, 114:10, 143:13, 155:6, 155:21, 164:10, 164:16, 164:19, 164:24, 165:23, 166:19, 167:23, 171:18, 176:20, 180:19, 181:19, 181:22, 182:10, 182:17, 182:18, 183:11, 185:18, 186:3, 186:15, 189:17, 189:18, 190:5, 192:2, 193:12, 194:12, 194:24
   **New** [5] - 11:7, 21:22, 124:2, 124:3
   **next** [23] - 16:15, 17:13, 21:15, 26:4, 35:11, 39:18, 92:21, 94:7, 97:4, 142:17, 147:17, 149:14,

150:1, 152:12, 153:14, 154:11, 156:14, 161:12, 175:21, 182:3, 183:25, 192:7
   **nice** [1] - 33:23
   **Nikki** [5] - 8:4, 8:7, 8:12, 8:17, 8:18
   **nine** [7] - 75:23, 76:2, 96:13, 128:25, 133:12, 133:13, 140:5
   **NO** [1] - 1:2
   **NOEL** [1] - 2:4
   **Noel** [18] - 62:15, 73:25, 111:10, 151:6, 156:15, 162:21, 162:24, 165:19, 167:23, 182:14, 186:17, 187:24, 188:1, 190:16, 191:11, 194:5, 194:7, 194:11
   **none** [7] - 7:19, 16:9, 34:5, 49:25, 166:20, 189:7, 190:3
   **nonresponsive** [1] - 87:25
   **noon** [1] - 160:12
   **normal** [3] - 29:14, 55:16, 94:15
   **normally** [2] - 63:25, 100:18
   **North** [2] - 1:23, 208:10
   **nothing** [7] - 9:23, 16:11, 21:8, 38:22, 112:2, 171:9, 171:17
   **notice** [8] - 5:23, 6:24, 7:18, 163:18, 188:3, 189:12, 189:13, 190:13
   **noticed** [2] - 24:5, 152:21
   **notification** [1] - 190:11
   **notified** [2] - 153:8, 184:1
   **notify** [1] - 184:4
   **notifying** [2] - 9:8, 90:19
   **November** [1] - 95:14
   **number** [19] - 5:20, 15:1, 24:8, 25:8, 25:10, 33:12, 38:17, 51:12, 51:14, 51:16, 109:22, 110:23, 111:3, 123:13, 125:25, 129:2, 144:12, 159:3, 199:4

**numbers** [4] - 17:24, 25:21, 133:9, 133:17
**numerous** [2] - 154:4, 154:5

## O

**o'clock** [3] - 67:5, 160:15, 196:14
**oath** [21] - 48:19, 49:9, 52:23, 53:5, 54:11, 55:14, 55:22, 56:8, 56:9, 62:25, 64:16, 65:20, 66:2, 66:14, 68:7, 80:12, 81:3, 82:8, 82:13, 161:18
**object** [4] - 58:5, 92:25, 136:25, 171:2
**objected** [1] - 64:2
**Objection** [1] - 55:7
**objection** [88] - 4:21, 5:5, 10:1, 12:21, 15:21, 16:7, 20:18, 21:10, 22:21, 23:8, 23:11, 26:22, 29:15, 29:25, 30:1, 30:2, 30:22, 30:24, 47:4, 48:21, 49:6, 52:12, 52:15, 52:16, 54:16, 57:6, 58:8, 61:20, 63:6, 63:8, 63:10, 63:12, 64:2, 64:3, 70:3, 76:13, 95:24, 96:2, 96:3, 98:8, 99:13, 99:14, 111:25, 113:20, 113:21, 113:22, 118:16, 118:17, 118:18, 139:6, 139:7, 146:24, 147:3, 147:9, 147:11, 147:13, 147:14, 147:15, 147:16, 147:25, 148:10, 148:12, 148:19, 148:20, 149:2, 149:3, 149:4, 149:7, 149:9, 149:11, 149:13, 149:20, 149:23, 149:24, 149:25, 150:3, 150:4, 150:14, 150:15, 150:19, 150:21, 150:24, 160:24, 161:1, 161:3, 163:21, 164:2, 185:21
**objections** [6] - 4:11, 4:16, 14:3, 14:10, 14:14, 16:4
**objective** [1] - 145:10

**obligation** [2] - 102:13, 102:16
**obligations** [3] - 102:12, 102:14, 197:8
**observations** [1] - 10:17
**obsolete** [2] - 183:21, 183:23
**obtain** [2] - 113:9, 184:14
**obtained** [3] - 43:13, 53:23, 68:25
**obviously** [1] - 171:22
**occur** [1] - 175:8
**October** [9] - 20:15, 51:6, 60:23, 60:24, 60:25, 67:24, 80:4, 96:11, 96:18
**OF** [1] - 1:1
**offer** [6] - 31:22, 31:25, 32:19, 91:1, 91:3, 174:9
**offered** [3] - 32:10, 34:24, 90:16
**offering** [2] - 89:10, 97:16
**offhand** [1] - 165:4
**Office** [4] - 127:24, 135:15, 144:23, 151:20
**office** [5] - 7:1, 7:20, 131:5, 136:11, 141:4
**OFFICER** [11] - 3:20, 39:25, 40:3, 74:21, 120:14, 121:5, 121:7, 156:23, 161:8, 197:23, 207:6
**officer** [1] - 45:22
**Offices** [1] - 126:3
**Official** [1] - 208:9
**official** [1] - 1:22
**officially** [1] - 24:10
**often** [7] - 20:8, 20:10, 103:6, 121:23, 122:2, 180:5, 191:14
**Ohio** [1] - 11:7
**older** [1] - 187:9
**once** [7] - 98:18, 103:6, 139:21, 140:23, 151:19, 195:11, 205:16
**one** [115] - 4:13, 5:20, 6:8, 8:19, 10:9, 12:1, 12:19, 13:2, 14:6, 14:20, 15:17, 15:18, 16:1, 16:7, 17:4, 26:19, 27:12, 27:23, 28:23, 31:2, 32:13, 33:12, 34:22,

35:11, 38:17, 46:8, 48:14, 61:10, 62:6, 63:12, 64:20, 75:8, 78:20, 79:17, 79:19, 85:7, 85:9, 85:10, 86:9, 86:12, 86:24, 87:3, 87:8, 87:19, 88:21, 97:21, 100:25, 106:3, 121:15, 123:11, 123:18, 123:19, 123:20, 124:10, 124:13, 124:21, 127:24, 133:8, 133:10, 133:13, 133:14, 138:3, 140:7, 141:13, 141:17, 144:13, 144:15, 144:16, 145:19, 147:2, 148:18, 148:21, 148:25, 151:10, 154:13, 154:23, 158:25, 159:21, 159:22, 160:12, 163:9, 167:4, 169:14, 172:14, 173:13, 173:17, 173:18, 173:21, 174:11, 174:19, 175:16, 180:24, 181:2, 186:11, 187:6, 188:6, 188:13, 188:23, 189:3, 193:24, 195:24, 196:7, 196:20, 198:11, 198:18, 199:1, 201:5, 202:18, 203:11
**ones** [8] - 16:16, 16:17, 41:3, 41:6, 125:3, 151:19, 155:6, 180:19
**ongoing** [4] - 90:21, 114:6, 114:9, 162:15
**online** [1] - 11:15
**open** [7] - 11:20, 35:21, 36:1, 97:20, 104:25, 108:3, 108:8
**opened** [3] - 44:18, 77:15, 114:24
**operate** [3] - 100:21, 141:3, 191:12
**operated** [2] - 83:20, 121:18
**operates** [1] - 95:3
**operating** [18] - 33:9, 34:3, 35:8, 40:23, 42:6, 45:8, 48:14, 80:25, 81:3, 82:4, 82:9, 83:10, 83:13, 86:3, 87:5, 87:15,

140:23, 140:24
**operation** [4] - 15:7, 29:14, 46:7, 184:2
**opinion** [5] - 20:23, 22:22, 47:18, 70:18, 183:23
**opponent** [3] - 64:18, 65:2, 65:8
**opportunity** [2] - 37:3, 100:9
**oppose** [1] - 77:2
**opposed** [1] - 17:11
**option** [6] - 32:2, 32:5, 32:17, 32:21, 89:11, 90:2
**options** [5] - 34:4, 34:5, 34:19, 178:7
**Oracle** [2] - 154:2, 164:13
**oral** [2] - 139:4, 139:11
**order** [30] - 21:10, 26:20, 27:9, 27:14, 27:15, 87:10, 94:5, 123:5, 123:8, 123:11, 123:18, 123:19, 123:20, 124:16, 125:10, 127:14, 130:7, 130:19, 131:1, 132:10, 132:20, 135:1, 135:11, 135:12, 139:22, 149:12, 151:8, 192:10
**Order** [1] - 3:1
**ordered** [4] - 27:13, 123:15, 127:12, 136:10
**ordering** [32] - 11:19, 27:1, 122:13, 122:16, 123:5, 123:7, 123:11, 123:20, 123:23, 124:1, 124:5, 124:6, 124:7, 124:16, 124:22, 124:25, 125:2, 125:3, 125:6, 125:8, 125:11, 127:21, 129:4, 131:5, 134:9, 137:8, 137:12, 137:13, 137:21, 138:16, 153:11
**orders** [58] - 10:24, 11:17, 11:19, 23:20, 24:3, 24:9, 25:10, 25:23, 26:4, 26:9, 27:8, 28:6, 29:21, 30:15, 58:17, 122:20, 122:24, 126:6, 126:22, 127:1, 127:7, 127:13, 127:15, 127:19, 127:20,

127:25, 128:12, 128:22, 128:24, 129:13, 129:18, 131:6, 132:10, 132:13, 132:22, 132:24, 133:1, 133:3, 133:5, 134:2, 134:3, 134:7, 134:12, 134:14, 134:16, 134:17, 134:24, 134:25, 135:6, 135:10, 137:15, 137:19, 138:1, 138:18, 153:25, 164:17, 166:14, 192:10
**ore** [1] - 75:17
**Oregon** [2] - 83:12, 83:13
**original** [3] - 121:18, 140:20, 179:25
**Orlando** [5] - 126:4, 127:5, 127:10, 127:15, 127:20
**Otazo** [1] - 75:22
**Otazo-Reyes** [1] - 75:22
**otherwise** [4] - 17:24, 43:15, 190:1, 206:3
**out-of-state** [1] - 197:19
**outage** [1] - 190:20
**outcome** [3] - 27:15, 92:23, 138:24
**outside** [3] - 180:2, 202:8, 202:15
**outstanding** [1] - 141:8
**outward** [1] - 192:19
**overnight** [3] - 94:20, 94:23, 141:6
**overruled** [8] - 22:23, 48:23, 54:19, 55:10, 61:22, 164:3, 171:3, 185:23
**overseas** [2] - 168:18, 168:21
**oversees** [1] - 168:20
**owe** [2] - 102:9, 108:10
**owed** [3] - 105:1, 105:6, 107:19
**own** [20] - 8:5, 23:25, 37:18, 38:1, 54:3, 84:6, 85:1, 85:23, 101:17, 101:19, 109:1, 123:8, 143:20, 154:9, 168:6, 169:10,

171:1, 183:12,
187:12, 202:13
**owned** [11] - 6:21,
73:2, 83:21, 85:24,
86:8, 86:22, 87:1,
148:4, 153:17, 202:7
**owner** [7] - 9:1,
73:24, 80:21, 80:23,
149:1, 151:10, 151:11
**ownership** [33] -
16:10, 37:7, 38:11,
38:21, 43:12, 44:3,
44:25, 48:4, 48:19,
50:7, 50:20, 52:1,
55:2, 56:6, 81:14,
81:15, 81:18, 81:19,
81:20, 82:1, 82:5,
82:18, 86:4, 86:6,
86:10, 87:5, 87:13,
102:4, 102:5, 102:6,
142:14, 202:21
**owning** [1] - 86:24
**owns** [5] - 31:16,
31:18, 74:1, 101:21,
202:6

## P

**P.A** [2] - 1:18, 129:5
**p.m** [9] - 1:7, 74:22,
78:8, 120:15, 121:9,
156:24, 161:10,
197:24, 207:7
**page** [39] - 5:20,
6:13, 7:23, 8:20, 9:10,
9:24, 10:4, 10:6,
10:14, 15:4, 33:9,
41:18, 42:6, 59:22,
62:20, 75:23, 76:2,
79:12, 115:19, 116:3,
119:8, 125:24,
128:25, 133:10,
133:12, 133:13,
134:1, 141:17, 173:1,
173:2, 173:4, 173:13,
173:17, 173:18,
175:16
**PAGE** [3] - 2:9, 2:10,
2:10
**Pages** [1] - 1:6
**pages** [2] - 5:18,
193:8
**paid** [18] - 100:13,
107:19, 107:22,
108:1, 108:18, 128:8,
147:21, 153:1, 166:1,
167:1, 167:14,
183:14, 185:20,
186:18, 187:15,
187:17, 187:19,

187:21
**pain** [1] - 189:4
**paper** [1] - 170:2
**papers** [1] - 172:20
**paragraph** [22] -
8:12, 8:13, 8:22,
36:12, 52:22, 54:2,
55:14, 66:5, 76:2,
89:8, 89:10, 97:4,
141:17, 144:4,
144:21, 145:17,
145:18, 173:21,
174:19, 175:16,
182:5, 182:6
**paralegals** [1] -
156:2
**pardon** [1] - 173:17
**Park** [1] - 167:12
**part** [25] - 9:16,
13:10, 24:11, 30:15,
44:8, 54:17, 61:24,
71:1, 73:14, 80:19,
102:25, 130:23,
143:4, 143:5, 143:14,
143:19, 144:4, 147:7,
151:25, 152:7,
152:24, 154:10,
179:13, 179:21,
182:11
**PARTIAL** [1] - 2:10
**partial** [1] - 157:4
**participate** [3] - 25:4,
191:18, 191:20
**particular** [10] - 6:1,
67:15, 76:11, 124:21,
129:16, 151:8,
177:17, 181:2, 198:3,
199:1
**parties** [10] - 27:9,
39:13, 58:14, 147:12,
156:17, 185:7,
187:12, 196:5, 198:4,
205:23
**parties'** [1] - 93:10
**Partner** [1] - 35:4
**party** [11] - 26:16,
27:6, 27:16, 43:23,
64:17, 65:2, 65:8,
72:21, 134:9, 137:24,
198:20
**pass** [1] - 142:23
**passionate** [1] -
191:14
**passive** [1] - 179:16
**password** [9] -
85:11, 86:13, 104:1,
104:6, 104:9, 104:10,
152:19, 190:14,
190:21
**past** [5] - 114:10,

114:11, 176:24,
184:2, 184:9
**Patent** [2] - 144:23,
151:20
**patient** [1] - 137:1
**PATRICIA** [2] - 1:22,
208:9
**pay** [38] - 26:10,
26:13, 26:14, 26:18,
96:12, 96:21, 97:8,
97:9, 97:16, 98:15,
100:15, 100:17,
100:18, 100:19,
101:6, 101:9, 101:15,
101:18, 101:20,
102:16, 102:19,
102:25, 103:12,
103:14, 105:14,
106:5, 108:14,
108:17, 108:22,
108:24, 143:24,
145:24, 166:6, 166:8,
182:20, 184:10,
184:11, 192:17
**paying** [15] - 95:7,
98:23, 100:3, 100:5,
100:12, 102:17,
107:18, 108:13,
108:16, 108:20,
109:5, 125:13,
186:25, 188:1
**payment** [13] -
104:23, 105:5, 105:8,
105:16, 106:13,
107:15, 134:9, 165:5,
165:20, 166:17,
182:24, 184:7, 184:8
**payments** [10] -
97:14, 98:16, 100:21,
101:2, 145:21,
145:25, 165:21,
166:4, 166:22
**Payments** [2] -
97:24, 99:4
**payroll** [1] - 100:21
**pays** [4] - 27:12,
194:6, 194:7, 194:13
**PDF** [1] - 14:20
**penalty** [1] - 62:22
**pending** [6] - 61:13,
90:22, 91:6, 91:17,
108:3, 108:9
**Pennsylvania** [2] -
11:8, 83:17
**people** [10] - 17:7,
24:20, 24:22, 24:25,
25:1, 25:5, 67:7,
141:2, 169:2, 193:9
**per** [2] - 23:20, 204:7
**percent** [20] - 6:4,

19:13, 19:16, 19:24,
20:1, 37:18, 38:1,
94:14, 115:5, 142:11,
143:25, 153:24,
167:18, 167:21,
173:9, 173:10, 183:4
**percentage** [3] -
19:12, 19:20, 19:22
**percentages** [1] -
44:25
**Perdomo** [1] - 129:5
**perfect** [1] - 64:15
**perform** [2] - 142:18,
175:22
**perhaps** [4] - 166:3,
172:1, 177:7, 206:1
**period** [13] - 6:23,
11:18, 13:4, 16:8,
18:3, 90:19, 166:3,
169:23, 170:18,
171:20, 172:2, 177:6
**periods** [1] - 145:8
**perjury** [1] - 62:23
**permission** [10] -
54:6, 55:20, 55:23,
55:25, 72:15, 81:12,
81:14, 81:18, 81:20,
174:2
**perpetual** [4] - 101:5,
101:9, 101:25, 108:25
**perpetually** [1] -
142:13
**Persecchini** [2] - 7:8,
15:11
**person** [11] - 79:6,
79:21, 79:25, 80:13,
146:16, 148:15,
148:25, 151:10,
155:14, 166:15, 172:7
**personal** [1] - 6:5
**Personal** [2] -
123:14, 124:2
**personally** [4] -
100:15, 100:19,
100:20, 155:17
**pertaining** [2] -
89:17, 90:21
**pertains** [1] - 63:9
**petition** [2] - 76:15,
76:25
**phase** [1] - 192:7
**Phillips** [4] - 110:6,
110:14, 110:17,
113:16
**phone** [4] - 79:4,
155:18, 155:19, 191:3
**photocopy** [1] -
170:17
**phrase** [3] - 150:5,
155:22, 188:9

**physical** [5] - 187:3,
187:5, 187:9, 188:16,
189:4
**pick** [1] - 155:6
**piece** [2] - 184:21,
184:22
**pieced** [1] - 80:2
**pitch** [1] - 70:21
**pivotal** [2] - 23:5,
87:14
**place** [4] - 21:25,
139:22, 164:6, 188:6
**placing** [1] - 193:5
**plain** [1] - 143:18
**PLAINTIFF** [1] - 1:13
**plaintiff** [26] - 3:5,
3:7, 31:10, 74:24,
75:17, 76:5, 76:22,
77:7, 77:25, 146:24,
156:5, 157:16, 158:1,
158:3, 158:9, 159:1,
161:1, 202:7, 202:11,
202:18, 204:1,
204:13, 204:16,
204:24, 205:8, 206:4
**plaintiffs** [1] - 156:16
**Plaintiffs** [1] - 1:5
**PLAINTIFFS'** [2] -
2:10, 2:13
**Plaintiffs'** [36] - 2:14,
2:15, 2:15, 2:16, 4:18,
4:22, 5:10, 5:15,
10:10, 10:11, 10:12,
10:17, 14:4, 23:7,
23:11, 23:13, 23:15,
29:23, 30:2, 30:4,
30:9, 30:18, 32:22,
35:12, 40:19, 41:18,
44:15, 88:20, 88:21,
88:23, 122:6, 131:16,
133:20, 141:14,
172:23
**plaintiffs'** [5] - 2:14,
77:7, 77:15, 162:21,
202:3
**planning** [2] - 4:11,
77:24
**platform** [1] - 36:9
**play** [2] - 138:25,
201:2
**playing** [1] - 129:24
**pleadings** [1] -
202:21
**plug** [1] - 73:16
**plus** [2] - 134:5,
153:24
**poaching** [11] -
22:25, 88:5, 88:8,
88:16, 88:18, 89:15,
114:4, 117:4, 117:9,

140:10, 140:16

**point** [33] - 22:15, 24:20, 31:11, 36:25, 37:6, 42:16, 52:22, 55:15, 59:22, 64:25, 70:18, 71:17, 71:21, 79:12, 101:14, 106:15, 113:18, 114:21, 141:6, 150:23, 155:17, 160:7, 171:16, 174:19, 187:4, 187:6, 189:3, 193:22, 194:2, 201:22, 202:2, 203:6

**pointed** [2] - 123:17, 124:21

**points** [1] - 187:5

**portion** [3] - 62:17, 97:9, 188:1

**portions** [1] - 8:5

**position** [13] - 15:2, 73:15, 82:15, 125:17, 128:3, 195:18, 195:23, 198:6, 198:23, 202:3, 202:19, 204:10, 205:18

**possible** [14] - 8:9, 32:16, 103:19, 103:21, 103:22, 180:1, 180:17, 180:25, 181:5, 184:24, 185:4, 190:13, 202:4, 206:2

**possibly** [1] - 139:3

**potential** [4] - 149:6, 149:10, 154:16, 157:10

**potentially** [1] - 16:2

**power** [1] - 158:5

**PPP** [1] - 157:9

**practice** [2] - 155:1, 186:21

**practicing** [1] - 147:1

**precise** [1] - 48:2

**predecessor** [2] - 43:5, 44:4

**preempts** [1] - 199:19

**preexisting** [1] - 183:19

**preferred** [4] - 126:11, 126:21, 127:4, 128:4

**prejudice** [1] - 204:22

**prejudicial** [1] - 16:2

**preliminary** [1] - 200:21

**preparation** [1] -

128:10

**preparations** [1] - 107:15

**prepare** [2] - 128:16, 151:19

**prepared** [7] - 53:2, 111:17, 111:19, 112:5, 122:10, 128:10, 128:20

**preparing** [1] - 64:6

**preponderance** [2] - 203:16, 205:1

**presence** [10] - 131:3, 132:2, 132:10, 132:14, 134:11, 134:15, 134:23, 135:5, 135:21, 138:10

**present** [5] - 84:23, 131:1, 159:19, 169:24, 195:17

**presentation** [1] - 77:15

**presented** [5] - 58:17, 131:18, 157:8, 159:2, 205:7

**press** [1] - 193:1

**pressuring** [1] - 196:20

**presumably** [1] - 39:21

**pretty** [2] - 24:21, 132:5

**prevent** [2] - 72:23, 177:4

**prevented** [1] - 117:5

**prevents** [1] - 168:3

**previous** [6] - 48:24, 108:18, 115:6, 115:7, 132:3, 162:14

**previously** [7] - 24:1, 44:14, 64:16, 99:21, 131:18, 135:3, 165:16

**primarily** [1] - 70:22

**principles** [1] - 158:6

**printed** [3] - 17:4, 179:7, 193:13

**printing** [1] - 94:18

**printout** [2] - 113:3, 113:10

**priorities** [1] - 100:21

**priority** [1] - 199:9

**private** [4] - 26:16, 27:3, 192:14

**problem** [11] - 74:12, 147:2, 147:24, 150:8, 150:25, 154:9, 181:3, 190:9, 191:5, 205:12, 205:20

**problems** [5] - 12:10,

15:6, 181:10, 191:2, 191:12

**proceeding** [1] - 112:2

**proceedings** [2] - 4:14, 208:4

**Proceedings** [1] - 207:7

**process** [20] - 8:9, 13:24, 21:3, 22:1, 23:3, 23:4, 27:14, 37:1, 66:10, 68:10, 68:14, 73:19, 102:18, 108:7, 122:1, 137:14, 145:1, 152:3, 152:10, 198:1

**processed** [17] - 126:25, 127:7, 127:10, 127:13, 127:15, 127:18, 127:20, 129:13, 129:18, 130:6, 131:6, 131:7, 132:12, 134:12, 134:15, 134:23

**produce** [1] - 110:4

**produced** [3] - 111:9, 111:15, 119:1

**product** [4] - 44:21, 142:18, 192:9, 192:18

**products** [1] - 175:22

**professionally** [1] - 172:15

**proffered** [2] - 16:6, 34:24

**profit** [11] - 109:14, 111:12, 111:14, 112:13, 113:3, 115:5, 115:12, 115:14, 117:25, 118:25, 119:3

**profitable** [1] - 184:19

**profitably** [1] - 22:20

**profits** [7] - 19:17, 22:13, 157:7, 157:17, 157:25, 158:25, 159:3

**program** [15] - 25:18, 30:15, 94:19, 148:4, 153:18, 168:13, 168:15, 168:16, 178:3, 178:4, 178:17, 179:2, 179:18, 179:25, 190:10

**programer** [1] - 168:9

**programers** [1] - 178:16

**programming** [1] - 179:1

**programs** [2] - 142:16, 170:19

**prohibit** [1] - 73:9

**promised** [3] - 98:15, 186:6, 186:8

**promptly** [1] - 98:15

**proof** [3] - 88:18, 200:25, 204:13

**proper** [1] - 69:19

**properly** [2] - 77:25, 193:16

**property** [1] - 169:3

**proposed** [2] - 198:2, 203:19

**proposing** [1] - 36:22

**proposition** [1] - 184:24

**proprietary** [1] - 11:23

**protect** [3] - 69:13, 70:1, 70:11

**protected** [4] - 70:12, 74:8, 74:10

**protecting** [1] - 74:7

**protects** [1] - 74:11

**protest** [2] - 9:14, 9:16

**proverbial** [1] - 196:25

**proves** [2] - 205:4

**provide** [21] - 8:7, 59:17, 79:18, 84:25, 112:21, 118:7, 142:11, 142:19, 175:18, 175:23, 176:3, 176:22, 178:10, 181:16, 181:17, 181:22, 183:10, 185:18, 186:14, 186:15, 186:17

**provided** [37] - 34:4, 43:19, 46:5, 46:10, 54:4, 82:5, 85:1, 85:11, 86:15, 87:3, 87:4, 87:9, 87:12, 87:15, 87:16, 113:7, 113:15, 115:12, 116:1, 116:9, 116:21, 118:5, 119:16, 120:3, 120:4, 120:6, 133:18, 142:7, 146:17, 152:6, 154:8, 175:7, 175:20, 175:25, 180:14, 202:7, 202:16

**provider** [1] - 192:3

**provides** [8] - 115:13, 151:18, 180:11, 195:2, 195:6,

195:11, 199:21, 204:1

**providing** [3] - 8:4, 28:19, 180:3

**province** [1] - 158:8

**provision** [1] - 184:12

**public** [2] - 61:13, 104:5

**publish** [19] - 30:5, 32:24, 52:19, 65:15, 78:13, 85:2, 85:3, 88:25, 96:7, 98:11, 99:17, 104:14, 113:25, 118:21, 122:7, 131:17, 133:21, 145:13, 145:14

**published** [3] - 23:10, 104:2, 104:3

**pull** [5] - 11:20, 73:16, 81:7, 145:11, 198:15

**Purchase** [1] - 194:23

**purchase** [16] - 101:5, 101:11, 101:22, 102:21, 108:14, 108:21, 108:24, 141:12, 142:10, 143:4, 148:17, 149:16, 149:18, 154:12, 165:10, 172:16

**purchased** [3] - 149:15, 149:19, 154:20

**purpose** [7] - 36:14, 63:22, 90:3, 142:2, 175:5, 178:17, 201:4

**purposes** [8] - 19:15, 51:14, 56:24, 58:19, 116:20, 150:17, 157:17, 199:23

**push** [2] - 100:24, 102:15

**pushed** [1] - 5:1

**pushing** [1] - 38:7

**put** [16] - 11:19, 34:8, 34:11, 36:3, 38:24, 47:1, 47:2, 60:9, 76:10, 92:3, 95:9, 97:20, 105:2, 165:23, 181:11, 187:15

**puts** [2] - 194:10, 205:15

**putting** [2] - 16:25, 38:15

## Q

**quality** [3] - 15:3, 198:21, 200:13
**questionable** [1] - 15:9
**questioning** [4] - 75:18, 76:14, 76:23, 93:1
**Questions** [2] - 151:6, 156:15
**questions** [28] - 31:11, 48:2, 58:12, 72:1, 77:12, 100:9, 104:16, 138:4, 138:14, 138:15, 146:7, 146:8, 146:13, 148:14, 151:7, 152:24, 156:4, 156:8, 156:11, 167:2, 194:18, 194:20, 195:14, 196:1, 196:3, 197:7, 200:21, 205:13
**QUESTIONS** [1] - 2:9
**QuickBooks** [2] - 113:10
**quite** [2] - 169:25, 172:1

## R

**racked** [1] - 103:13
**racks** [1] - 188:6
**radar** [1] - 50:1
**raise** [2] - 150:10, 161:17
**raised** [1] - 150:9
**ran** [1] - 40:9
**range** [1] - 157:14
**rate** [1] - 184:9
**rather** [7] - 51:6, 68:20, 71:3, 96:13, 178:9, 179:12, 201:19
**ratified** [2] - 76:4, 87:17
**ratify** [1] - 76:12
**RDLC** [1] - 180:9
**re** [1] - 110:20
**re-uploaded** [1] - 110:20
**reach** [2] - 7:16, 25:20
**reached** [5] - 7:4, 7:7, 37:6, 37:11, 40:17
**react** [1] - 156:1
**read** [23] - 8:16, 8:24, 28:5, 38:16, 53:3, 54:2, 54:9, 54:17, 65:6, 68:16, 79:19,

80:1, 80:2, 97:11, 97:12, 98:20, 138:2, 142:15, 144:4, 144:6, 145:18, 186:9
**reading** [3] - 169:23, 175:13, 185:17
**reads** [3] - 87:7, 87:8, 145:8
**ready** [5] - 3:10, 4:7, 40:1, 40:11, 78:11
**reaffirming** [1] - 87:23
**real** [1] - 24:18
**reality** [1] - 127:25
**realize** [2] - 8:2, 145:24
**realized** [1] - 158:18
**really** [6] - 16:18, 24:16, 55:15, 120:25, 127:23, 178:2
**reason** [9] - 46:6, 46:13, 49:12, 64:19, 75:19, 77:14, 111:2, 157:18, 166:23
**reasonably** [1] - 158:2
**reasons** [3] - 77:2, 180:25, 189:6
**rebut** [1] - 77:11
**rebuttal** [1] - 56:23
**receive** [7] - 7:18, 121:23, 140:9, 142:24, 167:21, 193:14, 196:16
**received** [26] - 10:24, 30:15, 57:4, 57:22, 60:13, 66:8, 68:20, 68:21, 78:25, 85:5, 96:13, 96:25, 98:3, 98:16, 99:7, 105:22, 122:2, 122:20, 122:23, 137:19, 144:24, 153:6, 165:5, 190:8, 190:11
**receiving** [1] - 100:18
**recent** [1] - 138:8
**recently** [1] - 10:4
**recess** [3] - 75:5, 121:6, 207:4
**recognize** [16] - 5:16, 5:21, 7:24, 10:20, 23:16, 30:9, 52:3, 57:2, 89:5, 92:10, 95:17, 98:1, 109:12, 118:1, 173:4, 173:5
**recognized** [1] - 158:6
**recollection** [19] -

11:5, 11:6, 32:14, 63:23, 64:5, 64:11, 64:13, 65:3, 65:5, 66:9, 66:14, 67:10, 67:11, 68:8, 68:9, 68:13, 110:25, 144:25, 153:6
**recommendation** [7] - 57:8, 57:22, 57:24, 58:13, 75:22, 76:3, 150:20
**reconcile** [1] - 113:6
**reconciled** [6] - 113:2, 113:12, 113:14, 115:9, 116:8, 116:18
**reconciliation** [2] - 89:21, 113:4
**record** [6] - 10:17, 22:2, 76:16, 144:10, 161:24, 172:23
**records** [15] - 18:22, 18:23, 18:24, 19:1, 19:3, 19:10, 19:11, 20:10, 27:16, 28:5, 130:13, 164:18, 172:18, 190:4
**recreate** [1] - 85:23
**recuperating** [1] - 20:17
**redesign** [1] - 192:17
**redirect** [5] - 54:20, 55:11, 121:24, 122:3, 194:19
**REDIRECT** [3] - 2:3, 138:6, 194:21
**Reese** [8] - 129:4, 129:16, 131:7, 135:3, 135:14, 136:9, 136:14, 136:15
**refer** [3] - 169:20, 173:1, 192:23
**reference** [4] - 21:19, 171:19, 174:20, 200:6
**referencing** [2] - 62:7, 105:5
**referred** [7] - 9:11, 141:11, 141:22, 141:23, 169:14, 172:17, 174:4
**referring** [12] - 32:3, 32:6, 33:2, 35:24, 42:10, 48:13, 81:5, 96:16, 137:12, 141:19, 142:21, 162:17
**refers** [2] - 24:5, 122:16
**reflect** [2] - 132:1, 134:7

**reflecting** [1] - 133:23
**reflects** [4] - 134:4, 134:9, 136:18, 136:21
**refused** [1] - 84:25
**regarding** [18] - 32:15, 39:22, 76:14, 76:15, 86:11, 88:18, 90:23, 93:12, 155:19, 160:20, 165:20, 166:17, 166:22, 199:25, 204:5, 204:10, 204:12, 205:13
**regardless** [1] - 195:21
**regards** [2] - 83:21, 115:6
**regions** [1] - 25:21
**register** [5] - 36:4, 68:20, 148:25, 151:9, 154:24
**registered** [16] - 9:25, 10:8, 22:9, 42:24, 59:5, 64:23, 66:15, 68:19, 73:2, 78:17, 80:22, 82:7, 85:5, 87:21, 89:12, 144:24
**registration** [34] - 46:22, 54:7, 55:9, 59:1, 59:4, 59:11, 66:8, 66:23, 68:14, 68:21, 68:25, 69:10, 69:12, 70:1, 70:10, 70:11, 70:12, 70:19, 72:5, 72:7, 73:9, 74:4, 76:6, 76:9, 76:16, 76:21, 78:1, 79:1, 79:9, 199:11, 199:15, 199:19, 200:16, 201:16
**registrations** [1] - 49:25
**regret** [1] - 185:6
**regular** [1] - 137:23
**reimburse** [1] - 97:17
**related** [5] - 7:13, 65:8, 93:7, 93:9
**relating** [1] - 40:24
**relationship** [12] - 12:25, 18:5, 18:6, 47:4, 125:19, 137:22, 155:13, 162:10, 162:12, 163:1, 163:3
**relationships** [1] - 117:20
**relatively** [2] - 192:16, 192:22

**relevance** [8] - 14:16, 14:19, 22:21, 139:3, 139:8, 150:11, 150:25, 171:2
**relevant** [7] - 76:15, 76:24, 77:10, 77:21, 158:23, 200:19, 205:6
**reliable** [2] - 180:4, 180:24
**remain** [1] - 40:3
**remedies** [1] - 157:23
**remember** [19] - 37:2, 45:6, 51:5, 61:11, 62:2, 63:24, 64:16, 66:22, 67:6, 67:9, 67:13, 71:10, 71:13, 78:18, 78:21, 79:14, 195:15, 198:7, 199:2
**remembering** [4] - 66:21, 67:14, 157:11
**remind** [1] - 75:14
**reminded** [2] - 75:10, 75:12
**remote** [1] - 187:7
**removed** [14] - 5:1, 6:20, 7:12, 9:3, 21:23, 73:6, 147:20, 152:14, 152:15, 152:22, 163:16, 164:22, 164:23
**removing** [2] - 147:22, 153:3
**rent** [1] - 100:21
**repeat** [4] - 68:17, 70:17, 135:17, 186:1
**rephrase** [4] - 29:16, 90:11, 139:9, 144:5
**replace** [2] - 148:17, 154:12
**replacement** [1] - 154:15
**report** [32] - 11:17, 11:19, 13:11, 13:14, 23:25, 24:1, 26:7, 30:19, 30:20, 57:7, 57:22, 57:24, 58:13, 75:22, 115:25, 116:1, 128:10, 128:16, 128:20, 128:22, 132:4, 132:5, 132:6, 132:7, 132:12, 135:2, 135:4, 137:15, 137:19, 180:9, 196:14, 205:23
**REPORTED** [1] - 1:21
**reporter** [1] - 161:18
**Reporter** [2] - 1:22,

208:9

**reports** [6] - 11:17, 19:7, 23:25, 128:7, 128:8, 154:1

**represent** [1] - 125:14

**representative** [2] - 151:22, 162:21

**represented** [1] - 110:8

**representing** [1] - 110:17

**reputation** [2] - 117:12, 159:10

**request** [8] - 14:20, 27:8, 47:2, 78:5, 88:1, 123:16, 134:10, 184:6

**requested** [9] - 125:4, 131:6, 154:7, 170:16, 177:1, 180:16, 181:15, 181:25, 182:1

**requesting** [2] - 125:13, 182:23

**requests** [1] - 76:22

**require** [6] - 164:12, 194:24, 195:1, 195:4, 195:9, 195:10

**requires** [3] - 69:17, 185:18, 186:17

**reread** [1] - 81:6

**reroute** [1] - 136:16

**rerouted** [1] - 140:7

**reschedule** [2] - 3:18, 4:3

**research** [1] - 156:1

**reselling** [1] - 168:3

**resemblance** [1] - 79:23

**reserve** [2] - 159:5, 159:13

**reside** [1] - 187:3

**resides** [1] - 187:2

**resolve** [1] - 15:6

**respect** [1] - 174:22

**respond** [1] - 194:10

**responded** [1] - 99:24

**response** [6] - 48:24, 77:1, 100:10, 154:21, 154:22, 157:20

**REST** [1] - 2:10

**rest** [8] - 62:17, 65:22, 97:18, 97:19, 100:6, 156:16, 180:11, 206:16

**restrictions** [1] - 56:5

**result** [1] - 183:13

**resume** [4] - 3:10,

4:6, 40:1, 40:11

**retrieval** [1] - 170:17

**Retrieval** [3] - 35:3, 35:4, 87:21

**return** [8] - 19:8, 74:19, 115:9, 116:8, 116:16, 119:15, 120:1, 197:9

**returning** [1] - 75:11

**revenue** [6] - 22:12, 93:19, 94:12, 94:13, 117:11, 130:3

**revenues** [19] - 20:13, 93:22, 94:6, 94:7, 115:2, 117:7, 117:19, 119:20, 140:23, 157:7, 157:9, 157:12, 157:17, 158:17, 158:21, 158:22, 204:14, 204:18, 205:3

**reverse** [4] - 49:19, 49:23, 178:20

**review** [3] - 5:15, 62:13, 112:15

**revise** [1] - 81:5

**revocation** [2] - 89:20, 90:1

**rewind** [1] - 198:8

**Reyes** [1] - 75:22

**rid** [1] - 141:4

**rights** [28] - 32:4, 43:6, 44:5, 46:15, 52:24, 53:23, 54:6, 55:24, 55:25, 56:1, 73:7, 81:12, 82:6, 87:13, 101:4, 101:5, 101:9, 102:1, 102:3, 108:25, 141:24, 142:12, 147:8, 152:1, 171:1, 174:7, 174:8, 200:14

**rise** [11] - 3:20, 39:25, 74:21, 75:6, 120:14, 121:5, 121:7, 156:23, 161:8, 197:23, 207:6

**road** [2] - 196:25, 197:10

**Road** [1] - 1:15

**Rodriguez** [4] - 75:12, 160:21, 196:21

**RODRIGUEZ** [3] - 197:1, 197:3, 197:5

**Rodriguez-Suarez** [2] - 160:21, 196:21

**RODRIGUEZ-SUAREZ** [3] - 197:1, 197:3, 197:5

**role** [1] - 15:5

**room** [1] - 39:12

**root** [1] - 25:19

**roughly** [1] - 19:13

**row** [7] - 24:5, 27:24, 28:22, 125:25, 127:25, 130:16, 130:17

**RPR** [2] - 1:22, 208:9

**rude** [1] - 177:21

**ruled** [2] - 92:19, 112:10

**ruling** [11] - 56:14, 56:15, 56:18, 56:19, 57:4, 57:7, 57:16, 57:25, 159:5, 159:14, 199:24

**rulings** [3] - 93:8, 93:12, 205:17

**run** [8] - 11:15, 11:16, 154:1, 164:16, 168:2, 181:12, 182:16, 193:7

**running** [7] - 30:15, 164:21, 180:5, 189:10, 190:1, 190:3, 190:9

**runs** [2] - 164:7, 180:5

## S

**sabotage** [1] - 117:6

**sabotaged** [1] - 117:2

**sabotaging** [1] - 119:24

**Sacramento** [1] - 130:2

**Safeco** [8] - 129:7, 129:11, 129:15, 129:17, 131:5, 131:10, 134:25, 135:10

**sale** [1] - 38:22

**sales** [14] - 19:12, 19:16, 24:12, 28:12, 36:9, 157:25, 203:24, 204:2, 204:5, 204:6, 204:14, 204:18, 205:10, 205:13

**San** [2] - 130:2

**SANCHELIMA** [152] - 1:13, 1:15, 2:5, 2:7, 3:6, 3:11, 4:8, 4:18, 5:7, 5:9, 10:3, 12:23, 14:1, 14:6, 14:8, 14:18, 15:1, 15:12, 15:15, 15:20, 16:3, 16:13, 16:24, 17:5, 17:10, 17:13, 17:19,

17:21, 17:24, 18:4, 20:20, 21:17, 23:6, 23:10, 23:14, 23:18, 26:24, 29:17, 29:23, 30:5, 30:7, 30:22, 31:1, 31:3, 31:10, 48:21, 49:6, 51:18, 52:13, 52:15, 54:16, 54:22, 55:7, 57:6, 58:5, 58:7, 58:10, 58:23, 59:3, 61:20, 63:7, 63:9, 63:11, 63:14, 64:4, 64:20, 65:3, 65:10, 69:17, 70:3, 74:25, 75:16, 76:1, 76:19, 78:7, 92:25, 95:25, 98:8, 99:12, 104:7, 104:12, 109:19, 110:23, 112:1, 113:21, 118:10, 118:17, 136:25, 138:7, 139:10, 144:9, 144:11, 144:18, 144:20, 145:13, 145:16, 145:20, 146:6, 146:16, 146:25, 147:10, 147:12, 147:24, 148:6, 148:9, 148:15, 148:19, 148:22, 149:3, 149:8, 149:16, 149:21, 149:24, 150:3, 150:8, 150:15, 151:3, 156:6, 156:16, 157:21, 158:12, 158:15, 159:6, 159:8, 161:1, 161:6, 163:21, 164:2, 167:4, 167:8, 171:6, 177:23, 177:24, 185:24, 186:13, 194:15, 194:18, 198:5, 198:14, 198:17, 200:7, 200:12, 200:22, 202:20, 203:17, 203:22, 204:6, 205:9, 206:5, 206:9, 206:16, 206:21

**Sanchelima** [6] - 3:7, 59:7, 77:4, 77:10, 77:12, 158:25

**Sardinia** [5] - 60:16, 60:19, 60:21, 67:24, 68:2

**satisfied** [1] - 200:18

**satisfy** [1] - 158:3

**saw** [5] - 93:19, 108:18, 152:21, 155:13, 169:5

**scenario** [6] - 87:1, 199:17, 201:6, 201:8, 202:10, 202:17

**scenarios** [1] - 202:3

**Schedule** [1] - 19:7

**schedule** [3] - 4:2, 97:6, 121:2

**scheduled** [2] - 4:1, 104:22

**scheduling** [4] - 156:18, 156:20, 196:5, 196:18

**scratch** [1] - 153:12

**screen** [10] - 24:1, 35:14, 35:15, 62:9, 65:21, 81:8, 92:3, 97:20, 132:4, 178:11

**screens** [1] - 178:12

**screenshot** [1] - 112:17

**scroll** [2] - 38:16, 62:19

**search** [2] - 17:3, 17:11

**searching** [1] - 192:2

**seat** [2] - 161:17, 198:15

**seated** [10] - 3:23, 40:6, 75:7, 78:9, 121:10, 156:25, 161:11, 197:25, 200:10, 200:11

**second** [22] - 7:23, 8:20, 21:11, 24:11, 27:23, 27:24, 31:2, 77:17, 87:8, 89:8, 89:10, 106:3, 123:18, 133:8, 133:10, 144:5, 144:9, 152:24, 173:17, 174:11, 200:6

**seconds** [11] - 4:9, 31:5, 52:13, 96:1, 99:12, 137:6, 145:18, 156:6, 159:16, 165:8, 194:15

**Secretary** [2] - 36:3, 36:4

**secretly** [1] - 117:9

**section** [8] - 42:3, 42:9, 42:13, 45:15, 59:23, 141:13, 169:11, 173:14

**Section** [6] - 42:7, 45:16, 87:20, 141:23, 173:13, 174:5

**SECURITY** [11] - 3:20, 39:25, 40:3, 74:21, 120:14, 121:5, 121:7, 156:23, 161:8, 197:23, 207:6

**see** [79] - 5:24, 7:16, 8:13, 10:6, 14:7, 14:8, 16:16, 17:17, 19:9, 21:6, 21:7, 22:11, 25:8, 25:21, 25:24, 26:5, 28:21, 28:23, 33:10, 33:12, 35:14, 35:15, 35:20, 36:7, 39:15, 40:21, 47:3, 57:10, 58:4, 58:14, 59:10, 59:16, 60:1, 62:14, 62:15, 62:17, 63:18, 65:22, 66:3, 75:3, 89:22, 95:15, 95:25, 97:24, 99:5, 110:15, 110:20, 111:9, 111:12, 119:8, 125:25, 127:2, 128:7, 132:17, 132:20, 132:22, 132:24, 133:1, 133:3, 134:1, 135:12, 139:22, 145:12, 158:7, 168:7, 170:3, 173:14, 173:22, 188:5, 192:3, 192:10, 194:7, 197:21, 199:22, 201:5, 202:22, 203:18, 205:12, 206:3

**seeing** [2] - 57:11, 152:18

**seeking** [2] - 157:24, 159:1

**seem** [2] - 15:23, 203:18

**selected** [2] - 11:19, 34:5

**sell** [11] - 31:22, 31:25, 32:4, 32:10, 32:19, 37:12, 38:5, 38:12, 175:9, 177:4

**selling** [2] - 41:24, 168:4

**send** [14] - 8:8, 17:7, 71:9, 72:7, 73:21, 89:20, 89:25, 100:25, 102:15, 126:22, 127:10, 130:10, 136:15, 138:20

**sense** [4] - 16:12, 66:19, 100:20, 130:12

**sensitive** [1] - 104:10

**sent** [18] - 9:21, 15:18, 16:22, 19:5, 19:6, 26:20, 35:8, 35:17, 71:11, 73:4, 89:5, 95:19, 98:18, 108:4, 108:8, 127:14, 129:17, 130:14

**sentence** [21] - 8:17, 8:22, 8:24, 45:15, 45:18, 46:25, 47:2, 54:17, 76:5, 78:4, 80:19, 142:17, 143:12, 143:16, 175:21, 182:3, 182:8, 182:13, 183:4, 183:9

**sentences** [2] - 79:17, 80:2

**separate** [5] - 86:24, 167:25, 179:11, 188:11, 188:24

**separated** [1] - 194:3

**separately** [2] - 182:20, 194:5

**September** [25] - 7:23, 8:14, 51:6, 51:23, 60:24, 60:25, 62:2, 63:3, 63:21, 66:2, 67:9, 67:24, 81:4, 104:19, 104:25, 105:19, 106:1, 106:6, 106:19, 107:4, 107:11, 107:12, 163:13

**series** [1] - 149:5

**serve** [6] - 129:25, 130:2, 130:20, 130:23, 135:14, 136:17

**served** [14] - 129:21, 130:24, 134:14, 134:18, 134:20, 134:22, 135:1, 135:13, 136:8, 136:12, 136:22, 188:19, 188:20

**server** [16] - 147:23, 153:3, 187:3, 187:7, 187:9, 187:13, 188:13, 188:18, 188:19, 188:20, 188:23, 188:24, 189:20, 193:7

**servers** [5] - 105:23, 163:19, 187:15, 188:7, 189:5

**Service** [2] - 97:24, 99:4

**service** [13] - 26:20, 27:12, 46:13, 108:22, 139:14, 146:17, 148:24, 151:9, 163:19, 187:15, 187:19, 187:21, 188:2

**serviced** [3] - 187:16, 188:18, 189:20

**Services** [5] - 35:25,

36:8, 36:17, 44:17, 45:2

**services** [13] - 26:11, 26:13, 27:1, 79:25, 95:7, 98:15, 98:23, 101:7, 101:16, 108:25, 187:17, 198:21, 200:14

**session** [1] - 75:6

**set** [15] - 6:8, 15:5, 97:7, 105:9, 105:10, 105:16, 106:13, 106:25, 139:25, 140:6, 142:1, 164:12, 164:16, 166:12, 175:4

**setting** [1] - 193:7

**seven** [7] - 112:16, 122:23, 122:24, 140:5, 153:7, 160:25

**several** [10] - 14:20, 15:22, 16:8, 53:17, 83:11, 89:16, 126:6, 145:21, 198:7

**shall** [1] - 45:23

**share** [1] - 166:24

**shared** [7] - 6:21, 73:6, 83:21, 87:1, 166:12, 188:10, 188:21

**Shareholder** [1] - 87:18

**shareholder** [6] - 53:1, 54:8, 114:15, 165:1, 165:3, 165:5

**shareholder's** [1] - 184:13

**shareholders** [5] - 19:5, 53:2, 74:2, 113:7, 113:9

**shares** [3] - 167:21, 183:5, 183:7

**sharp** [5] - 66:10, 66:21, 68:10, 145:1, 145:5

**sharper** [1] - 138:8

**shelf** [1] - 155:3

**shock** [1] - 191:13

**short** [2] - 206:2

**show** [24] - 10:16, 15:5, 32:22, 40:18, 41:18, 44:14, 51:1, 56:19, 56:22, 62:6, 62:8, 62:11, 62:19, 64:11, 66:5, 88:19, 91:25, 109:7, 117:23, 122:6, 141:11, 204:2, 204:3

**showed** [2] - 135:2, 135:3

**showing** [22] - 5:6,

10:12, 35:12, 40:19, 42:6, 44:20, 65:19, 66:1, 89:4, 92:8, 95:13, 97:22, 99:2, 99:19, 110:12, 110:14, 117:25, 125:24, 128:25, 131:15, 133:20, 205:11

**shown** [4] - 5:2, 104:9, 104:11, 184:11

**shows** [9] - 11:17, 42:10, 116:23, 116:25, 119:3, 119:11, 120:2, 120:5, 122:13

**side** [7] - 13:12, 22:12, 69:18, 130:5, 130:8, 130:18, 139:14

**sidebar** [12] - 14:15, 14:20, 14:24, 17:23, 39:22, 58:14, 58:15, 58:24, 63:17, 65:11, 146:12, 151:5

**sides** [3] - 92:2, 125:21, 206:18

**sign** [6] - 52:5, 52:7, 151:21, 171:9, 190:10

**signature** [2] - 62:19, 62:20

**signatures** [2] - 173:4, 173:5

**signed** [17] - 35:8, 40:23, 43:18, 44:16, 45:8, 51:22, 52:23, 62:6, 63:21, 65:19, 66:1, 101:11, 102:21, 165:10, 172:16, 173:8, 183:18

**significance** [1] - 64:22

**significant** [1] - 172:2

**significantly** [1] - 24:19

**signing** [2] - 51:5, 62:2

**silly** [1] - 154:22

**simple** [4] - 77:23, 93:13, 138:16, 202:6

**simply** [2] - 57:18, 181:9

**simultaneous** [1] - 107:7

**simultaneously** [2] - 6:10, 106:21

**single** [1] - 168:2

**sit** [1] - 16:15

**site** [14] - 8:9, 165:24, 166:12,

169:22, 190:1, 190:3, 190:5, 190:9, 190:19, 191:7, 192:2, 192:19, 193:6

**sites** [3] - 9:5, 166:11, 191:1

**sits** [1] - 154:25

**sitting** [2] - 61:2, 67:2

**situation** [1] - 155:20

**situations** [1] - 178:14

**six** [7] - 18:11, 33:9, 46:8, 47:13, 114:10, 114:11, 128:24

**sixty** [1] - 153:24

**size** [1] - 24:21

**slide** [1] - 57:10

**slow** [4] - 100:15, 100:17, 100:18, 100:19

**small** [1] - 162:4

**smooth** [1] - 193:20

**software** [90] - 11:22, 11:24, 12:2, 12:3, 12:7, 12:10, 12:13, 12:18, 12:24, 13:2, 13:5, 13:6, 13:9, 13:20, 28:16, 28:18, 30:15, 95:3, 101:3, 101:10, 101:18, 101:21, 102:2, 102:6, 109:2, 141:25, 142:8, 142:14, 143:8, 143:14, 143:19, 144:1, 145:22, 148:17, 149:6, 149:10, 154:12, 154:15, 154:17, 162:4, 162:13, 162:14, 162:15, 165:13, 165:15, 165:22, 168:3, 168:5, 168:6, 168:8, 168:25, 169:5, 170:7, 170:12, 170:14, 170:16, 171:1, 171:14, 171:17, 171:23, 172:4, 173:12, 174:18, 175:3, 176:7, 176:12, 176:25, 177:2, 177:3, 178:22, 179:22, 182:11, 182:12, 182:15, 182:23, 183:6, 183:12, 183:20, 184:2, 184:21, 184:22, 186:22, 187:2, 189:11, 193:15, 193:24,

194:9, 195:19, 195:24

**Software** [3] - 141:18, 173:16, 173:22

**sold** [6] - 37:21, 42:10, 42:14, 42:16, 43:3, 203:12

**sole** [1] - 90:3

**solely** [2] - 142:1, 175:5

**someone** [5] - 17:8, 89:15, 96:15, 177:4, 193:11

**sometime** [2] - 21:4, 180:7

**sometimes** [9] - 20:12, 29:1, 124:19, 141:22, 141:23, 150:6, 155:22, 174:4

**somewhat** [3] - 26:18, 93:7, 93:9

**somewhere** [3] - 15:16, 187:7, 188:5

**soon** [1] - 168:7

**sorry** [25] - 6:7, 8:11, 8:20, 14:6, 14:18, 20:9, 25:2, 30:25, 42:20, 49:3, 63:19, 67:22, 76:17, 92:6, 100:4, 102:13, 105:10, 124:1, 143:8, 144:8, 147:18, 175:13, 182:5, 185:14, 204:9

**sort** [2] - 17:18, 100:22

**sought** [1] - 80:22

**sounds** [2] - 96:23, 203:8

**source** [46] - 101:25, 102:3, 102:25, 109:1, 109:2, 142:13, 142:15, 142:19, 142:21, 142:24, 143:8, 148:6, 153:22, 154:7, 175:23, 175:25, 176:3, 176:9, 176:13, 176:15, 177:25, 178:2, 178:3, 178:8, 178:12, 178:15, 178:16, 178:23, 179:12, 179:13, 179:18, 179:22, 180:10, 180:18, 180:20, 183:21, 184:17, 186:16, 186:18, 188:21, 188:23, 192:21, 193:15, 194:24, 195:2

**south** [2] - 13:1, 116:4

**SOUTHERN** [1] - 1:1

**space** [2] - 39:21, 187:15

**span** [1] - 128:24

**speaking** [1] - 38:24

**speaks** [1] - 91:2

**special** [5] - 24:17, 24:18, 102:22, 180:10, 201:19

**specialized** [2] - 64:6, 64:14

**specific** [17] - 11:17, 11:18, 15:8, 30:16, 30:19, 90:9, 106:11, 107:12, 135:20, 135:23, 157:19, 158:10, 158:12, 159:4, 179:12, 190:23, 193:6

**specifically** [4] - 42:7, 60:16, 76:17, 177:16

**specifications** [1] - 15:3

**specifics** [3] - 77:4, 93:12, 106:3

**spent** [1] - 67:7

**split** [2] - 166:1, 187:24

**spot** [2] - 27:12, 173:19

**spread** [1] - 133:16

**spreadsheet** [2] - 23:20, 24:2

**SQL** [1] - 168:13

**staff** [5] - 23:3, 27:4, 36:10, 137:22, 152:16

**stage** [1] - 150:18

**stand** [4] - 31:8, 78:10, 161:15, 191:10

**standalone** [1] - 36:25

**standard** [1] - 205:9

**standing** [9] - 40:3, 61:3, 61:4, 61:6, 61:8, 66:25, 67:2, 67:3, 68:2

**start** [10] - 6:1, 64:9, 79:17, 95:1, 98:14, 137:14, 153:12, 172:7, 206:10, 206:20

**started** [22] - 7:9, 24:10, 28:18, 32:1, 37:2, 70:20, 72:14, 73:4, 73:6, 94:10, 94:12, 94:17, 94:19, 94:21, 106:21, 114:4, 114:8, 115:2, 116:4,

155:5, 175:15

**starting** [4] - 3:4, 25:19, 87:22, 170:18

**State** [13] - 11:2, 35:21, 36:2, 36:3, 36:4, 44:19, 91:19, 91:20, 91:23, 92:17, 92:19, 135:1, 135:15

**state** [31] - 3:4, 13:20, 23:21, 24:2, 24:3, 25:10, 28:1, 28:3, 36:11, 62:22, 66:12, 67:17, 67:23, 90:21, 90:22, 91:6, 91:16, 91:17, 104:22, 112:1, 114:14, 130:6, 132:11, 132:15, 137:15, 138:10, 161:24, 168:1, 177:6, 197:19, 199:10

**statement** [17] - 54:11, 64:17, 65:2, 65:7, 109:14, 111:12, 111:14, 112:13, 115:13, 118:1, 118:25, 145:2, 145:4, 145:10, 166:1, 166:23, 186:8

**statements** [1] - 177:11

**states** [26] - 11:5, 11:6, 24:11, 24:12, 25:14, 28:14, 42:13, 44:4, 46:14, 56:10, 68:7, 68:9, 68:13, 68:16, 83:11, 87:20, 96:10, 97:4, 129:15, 132:1, 135:12, 186:22, 199:9, 199:20, 202:12

**States** [7] - 1:23, 139:12, 139:15, 144:23, 151:20, 199:19, 208:10

**STATES** [2] - 1:1, 1:11

**static** [3] - 192:1, 192:16, 192:22

**stating** [10] - 36:1, 45:8, 56:7, 62:22, 63:22, 91:18, 92:16, 96:20, 128:22, 190:9

**status** [2] - 66:8, 144:24

**stay** [5] - 39:12, 196:19, 197:5, 200:10, 200:11

**staying** [1] - 197:18

**stays** [2] - 179:18, 192:16

**steady** [1] - 94:8

**stealing** [3] - 90:16, 126:14, 129:19

**STENOGRAPHICA LLY** [1] - 1:21

**step** [8] - 39:19, 66:9, 68:10, 120:16, 144:25, 156:13, 161:15, 196:4

**Steven** [80] - 7:9, 8:2, 31:23, 33:7, 34:11, 34:18, 35:8, 35:17, 36:22, 37:17, 38:1, 41:15, 41:21, 41:24, 42:10, 42:13, 45:20, 45:22, 46:3, 46:5, 53:3, 54:3, 55:2, 55:6, 68:24, 69:2, 70:2, 70:11, 70:18, 71:9, 72:5, 72:20, 72:22, 72:23, 72:25, 73:12, 73:15, 73:19, 73:20, 74:1, 80:4, 80:8, 88:4, 88:7, 89:5, 90:15, 95:13, 95:19, 96:10, 96:24, 97:23, 98:13, 98:22, 99:3, 99:20, 100:11, 101:17, 107:18, 114:3, 114:23, 117:2, 117:4, 119:19, 119:24, 143:7, 157:10, 162:5, 163:16, 163:25, 164:5, 166:8, 166:21, 167:23, 187:23, 189:13, 191:8, 194:2, 194:6, 194:7, 194:10

**still** [31] - 4:2, 6:10, 9:4, 9:24, 37:1, 37:4, 37:6, 38:4, 38:6, 38:7, 38:17, 38:18, 59:16, 73:7, 74:8, 75:8, 88:9, 94:22, 100:13, 102:12, 104:12, 105:24, 114:6, 123:9, 138:20, 140:23, 183:24, 189:8, 189:10, 198:8

**stipulate** [1] - 23:6

**stipulated** [2] - 4:15, 71:1

**stipulation** [4] - 4:24, 4:25, 5:4, 158:23

**stock** [13] - 101:4, 101:11, 101:22, 102:21, 108:14, 108:21, 108:24, 141:12, 142:10, 143:4, 165:10, 172:16, 184:12

**Stock** [1] - 194:23

**stood** [1] - 191:7

**stop** [8] - 22:24, 23:1, 72:8, 72:12, 73:22, 90:4, 101:14, 181:4

**stopped** [9] - 102:17, 102:18, 114:23, 121:20, 171:25, 180:3, 180:4, 190:1, 190:3

**story** [6] - 7:22, 56:13, 97:18, 97:19, 100:6, 141:12

**streamline** [2] - 198:10, 205:24

**stretch** [1] - 31:9

**stricken** [1] - 76:16

**strike** [5] - 68:19, 75:17, 77:12, 87:24, 94:25

**studies** [2] - 169:12, 169:14

**study** [1] - 169:21

**stuff** [1] - 24:15

**SUAREZ** [3] - 197:1, 197:3, 197:5

**Suarez** [3] - 75:12, 160:21, 196:21

**subcontractor** [1] - 169:1

**subject** [13] - 16:9, 17:14, 42:25, 44:12, 87:10, 95:14, 97:23, 99:4, 142:1, 175:4, 175:11, 175:17, 204:7

**submit** [5] - 76:10, 138:17, 151:18, 151:19, 200:24

**submitted** [5] - 58:18, 79:10, 200:23, 201:1, 203:19

**subpoena** [13] - 22:1, 22:2, 130:1, 130:2, 130:20, 130:23, 135:1, 136:8, 136:12, 136:22, 170:17, 192:11

**Subpoena** [11] - 31:16, 31:18, 31:22, 31:25, 32:10, 32:16, 32:20, 33:12, 34:18, 34:24, 36:10

**subpoenas** [7] - 13:24, 21:21, 129:25, 130:24, 134:17, 135:14, 176:18

**substance** [1] - 58:19

**substantially** [1] -

12:19

**subtle** [1] - 77:18
**successful** [1] - 47:8
**successfully** [1] - 29:1
**successors** [1] - 176:2
**sudden** [1] - 7:20
**sued** [1] - 91:9
**suffered** [1] - 158:1
**sufficient** [1] - 157:21
**suggesting** [2] - 70:5, 77:24
**suggestion** [1] - 16:13
**summarize** [1] - 177:25
**summary** [3] - 53:25, 56:11, 131:21
**SUMMARY** [1] - 2:10
**Summers** [1] - 129:4
**support** [2] - 36:10, 153:11
**supporting** [1] - 180:4
**supposed** [2] - 119:24, 175:10
**surprise** [1] - 163:16
**surprised** [1] - 191:11
**surprisingly** [1] - 140:3
**surrounding** [1] - 77:19
**survive** [1] - 199:11
**sustain** [1] - 22:4
**sustained** [15] - 10:2, 12:22, 20:19, 21:12, 26:23, 29:16, 49:7, 58:6, 58:8, 69:20, 69:23, 70:4, 93:2, 112:6, 163:22
**SW** [1] - 1:15
**swearing** [3] - 52:7, 53:7, 54:13
**swore** [1] - 53:9
**sworn** [1] - 161:19
**system** [7] - 11:15, 11:16, 11:21, 11:22, 21:6, 21:8, 176:23

## T

**table** [1] - 178:10
**tables** [1] - 39:18
**tag** [4] - 155:24, 155:25, 156:3
**talented** [5] - 24:20, 24:22, 24:25, 25:1,

25:5
**tallying** [1] - 202:12
**Tampa** [2] - 122:25, 123:3
**tax** [10] - 19:3, 19:8, 38:20, 112:24, 115:9, 116:8, 116:16, 116:20, 119:15, 120:1
**team** [1] - 92:16
**TEAS** [6] - 146:15, 146:17, 146:20, 147:6, 151:14, 151:23
**technical** [2] - 179:14, 190:17
**templates** [18] - 21:20, 21:23, 22:1, 23:2, 28:14, 94:19, 94:24, 114:25, 117:5, 119:20, 148:2, 153:15, 179:4, 179:6, 180:14, 181:16, 181:17, 191:12
**ten** [13] - 52:22, 55:14, 121:4, 134:1, 143:25, 153:21, 154:7, 167:18, 167:21, 173:9, 173:10, 180:7, 183:4
**Tennessee** [2] - 11:7, 125:15
**tenus** [1] - 75:17
**term** [3] - 30:20, 169:17, 191:24
**terminology** [1] - 50:21
**terms** [8] - 19:15, 28:19, 64:9, 64:21, 141:25, 174:9, 175:4, 199:2
**territory** [3] - 18:19, 18:21, 115:8
**tested** [1] - 164:17
**testified** [28] - 48:11, 49:4, 49:9, 49:11, 61:2, 65:4, 66:14, 66:17, 67:14, 69:7, 82:8, 85:4, 86:17, 88:4, 95:2, 114:3, 115:1, 115:4, 122:9, 124:5, 128:10, 131:25, 132:3, 134:11, 135:5, 147:21, 159:12, 202:14
**testify** [3] - 73:18, 84:12, 153:1
**testimonial** [1] - 192:4
**testimony** [93] - 5:12, 16:14, 32:9,

32:11, 32:12, 33:20, 33:22, 34:25, 36:16, 36:18, 37:12, 45:6, 47:5, 48:16, 49:18, 50:4, 50:5, 50:9, 53:18, 53:20, 55:13, 60:9, 68:24, 69:3, 69:6, 69:21, 72:23, 73:17, 73:20, 77:11, 78:16, 78:22, 79:14, 79:18, 86:3, 86:5, 86:7, 86:10, 87:6, 87:7, 87:16, 88:7, 90:6, 90:8, 90:9, 90:13, 90:14, 90:15, 90:18, 93:22, 102:19, 103:13, 103:16, 105:19, 106:4, 106:7, 106:8, 106:18, 106:23, 107:4, 117:10, 119:19, 121:13, 130:7, 130:17, 130:19, 131:19, 135:7, 135:9, 136:23, 157:10, 158:15, 158:16, 158:20, 158:22, 159:11, 159:23, 160:5, 160:7, 160:10, 160:15, 163:15, 163:17, 164:22, 171:8, 184:5, 185:22, 187:22, 196:15, 197:16, 197:20, 206:6
**Texas** [4] - 21:22, 125:16, 155:15
**text** [3] - 4:25, 5:2, 155:18
**THE** [279] - 1:10, 1:13, 1:17, 3:10, 3:12, 3:15, 3:16, 3:21, 3:23, 4:17, 4:20, 5:3, 5:6, 10:2, 12:22, 14:5, 14:7, 14:13, 14:23, 14:25, 15:10, 15:13, 15:17, 15:21, 16:4, 16:20, 17:3, 17:6, 17:11, 17:16, 17:20, 18:2, 20:19, 21:12, 21:13, 21:15, 22:23, 22:24, 23:9, 23:11, 23:17, 26:23, 29:16, 30:2, 30:6, 31:7, 31:12, 32:25, 39:4, 39:8, 39:17, 40:1, 40:6, 42:20, 48:23, 48:25, 49:7, 49:21, 49:23, 51:10, 51:12, 51:16, 51:19, 52:12, 52:14, 52:16, 52:20, 54:19, 55:10, 56:21,

57:9, 57:10, 57:13, 57:17, 58:6, 58:8, 58:14, 58:16, 59:13, 59:16, 59:19, 59:20, 61:22, 61:24, 63:6, 63:8, 63:10, 63:12, 63:16, 63:18, 63:20, 63:25, 64:17, 64:25, 65:6, 65:12, 65:17, 65:21, 69:20, 69:23, 70:4, 71:24, 72:2, 74:18, 74:23, 75:1, 75:3, 75:7, 75:24, 76:17, 77:1, 77:23, 78:4, 78:9, 78:14, 88:1, 88:23, 89:2, 92:2, 93:2, 93:5, 95:11, 95:24, 96:3, 96:8, 98:9, 99:14, 104:1, 104:3, 104:6, 104:10, 104:13, 109:10, 109:20, 109:22, 111:1, 111:7, 111:25, 112:6, 112:9, 112:23, 112:24, 113:20, 113:22, 114:1, 118:9, 118:13, 118:16, 118:18, 118:23, 120:10, 120:16, 120:21, 121:10, 124:13, 135:18, 135:23, 137:2, 138:5, 139:7, 139:9, 144:8, 144:16, 144:19, 145:15, 146:8, 146:13, 146:19, 147:3, 147:5, 147:11, 147:15, 147:17, 148:1, 148:7, 148:13, 148:16, 148:21, 148:24, 149:5, 149:9, 149:14, 149:20, 149:23, 150:1, 150:5, 150:13, 150:21, 150:24, 151:7, 151:11, 151:13, 151:17, 151:23, 152:3, 152:12, 152:16, 152:24, 153:4, 153:13, 153:16, 153:17, 153:20, 154:11, 154:14, 154:16, 154:18, 154:19, 154:21, 155:8, 155:10, 155:11, 155:12, 155:22, 155:24, 156:4, 156:8, 156:11, 156:17, 156:25, 157:2, 157:20,

158:10, 158:13, 158:19, 159:4, 159:7, 159:13, 159:17, 159:20, 160:1, 160:4, 160:9, 161:4, 161:11, 161:14, 163:22, 164:3, 164:4, 167:3, 167:6, 171:3, 171:4, 177:20, 177:21, 185:23, 186:11, 194:17, 194:19, 196:2, 197:2, 197:4, 197:6, 197:13, 197:25, 198:13, 198:15, 199:23, 200:5, 200:11, 200:20, 201:9, 201:11, 201:22, 203:6, 203:15, 203:18, 203:21, 204:4, 204:10, 204:19, 204:25, 205:12, 206:8, 206:11, 206:15, 206:17, 206:24, 207:4
**themselves** [1] - 181:10
**theory** [1] - 202:5
**therefore** [3] - 54:5, 188:2, 200:14
**thereof** [1] - 79:23
**thereto** [1] - 79:24
**thinking** [1] - 151:1
**thinks** [1] - 184:13
**third** [9] - 8:20, 8:21, 26:16, 27:6, 69:3, 79:4, 121:3, 137:24, 198:20
**third-party** [3] - 26:16, 27:6, 137:24
**thirty** [4] - 99:12, 156:6, 159:16, 164:11
**thousand** [1] - 86:14
**thread** [3] - 15:15, 17:14
**threat** [1] - 143:9
**three** [22] - 4:13, 9:19, 21:25, 45:21, 46:8, 62:20, 77:19, 94:14, 98:17, 103:10, 114:11, 119:8, 121:2, 125:24, 133:12, 133:13, 163:12, 164:20, 168:17, 168:18, 184:2, 186:3
**throughout** [6] - 23:2, 36:11, 69:15, 114:14, 130:10, 155:5
**throw** [1] - 181:5
**throwing** [1] - 105:23

**thrown** [5] - 84:12, 87:2, 91:13, 105:20, 106:20

**tie** [1] - 155:21

**timeframes** [1] - 30:16

**tired** [2] - 97:4, 97:13

**title** [5] - 44:6, 56:5, 57:13, 79:13, 82:6

**titled** [1] - 42:7

**titles** [8] - 42:25, 43:11, 43:12, 44:12, 45:3, 45:9, 45:12, 87:10

**TO** [1] - 2:9

**today** [31] - 4:1, 10:13, 12:18, 13:20, 20:14, 36:16, 48:9, 53:12, 53:13, 64:6, 64:12, 65:4, 67:14, 69:11, 84:25, 88:4, 88:7, 93:18, 145:4, 155:14, 156:22, 159:25, 163:15, 184:5, 185:10, 185:17, 187:22, 189:7, 191:10, 197:9, 206:4

**together** [3] - 38:25, 80:2, 185:8

**tomorrow** [28] - 75:11, 75:13, 104:23, 120:24, 121:1, 160:11, 160:13, 160:15, 160:22, 196:9, 196:15, 196:17, 196:23, 196:24, 197:1, 197:2, 197:9, 197:11, 197:14, 197:15, 198:1, 205:23, 205:25, 206:7, 206:20, 206:25

**tonight** [1] - 160:13

**took** [6] - 24:1, 24:9, 25:10, 108:12, 119:20, 187:14

**tool** [1] - 180:10

**tools** [1] - 94:18

**top** [6] - 28:23, 62:17, 120:9, 131:13, 150:6, 155:23

**topic** [1] - 17:13

**topics** [1] - 17:12

**tortious** [2] - 91:16, 92:12

**tortiously** [1] - 91:10

**total** [3] - 115:13, 119:3, 134:4

**track** [1] - 90:4

**trademark** [54] - 8:10, 9:1, 9:5, 10:8, 50:16, 50:22, 55:3, 55:4, 55:8, 55:24, 59:2, 59:10, 64:7, 66:8, 66:9, 66:16, 68:10, 69:10, 69:12, 69:14, 69:25, 70:10, 70:13, 70:14, 70:15, 70:16, 70:19, 70:20, 71:7, 71:22, 72:4, 72:7, 72:11, 73:1, 73:7, 73:14, 73:24, 74:1, 74:12, 74:14, 78:18, 79:1, 85:5, 85:6, 85:8, 87:21, 89:12, 89:17, 89:25, 144:24, 144:25, 152:8, 198:20, 205:9

**Trademark** [2] - 144:23, 151:20

**trademark/service** [2] - 80:21, 80:23

**trademarks** [2] - 49:25, 87:20

**transact** [3] - 43:1, 44:13, 89:12

**transcription** [1] - 208:4

**transfer** [6] - 45:7, 105:11, 164:9, 189:16, 189:21, 191:7

**transferred** [8] - 13:12, 43:5, 43:8, 46:15, 164:17, 164:23, 190:4

**transferring** [2] - 163:8, 166:18

**transportation** [2] - 167:16, 167:17

**Travelers** [23] - 123:14, 123:22, 124:1, 124:2, 124:7, 124:24, 125:1, 126:9, 126:11, 126:20, 126:22, 127:2, 127:8, 127:14, 127:24, 128:2, 128:4, 130:15, 134:25, 135:10, 135:11, 136:11

**treat** [1] - 138:23

**trial** [5] - 4:1, 4:6, 40:11, 64:6, 197:15

**TRIAL** [1] - 1:10

**tricky** [1] - 138:15

**tried** [2] - 138:15, 141:6

**triggered** [2] - 71:7, 71:18

**trip** [2] - 155:14

**troublesome** [1] - 16:16

**true** [23] - 49:19, 49:23, 74:6, 80:17, 80:18, 84:22, 84:23, 84:24, 85:5, 94:25, 95:6, 95:8, 98:3, 99:7, 108:6, 131:8, 131:9, 131:10, 145:2, 145:4, 145:7, 191:1, 191:5

**trusting** [1] - 107:2

**trustworthy** [1] - 6:5

**truth** [5] - 52:8, 53:7, 54:13, 74:3, 201:13

**try** [5] - 17:17, 48:3, 97:7, 175:9, 190:10

**trying** [13] - 15:6, 36:24, 53:24, 64:10, 81:24, 113:13, 124:9, 124:23, 127:2, 130:21, 135:8, 138:25, 198:8

**Tuesday** [1] - 92:21

**turn** [6] - 143:10, 163:18, 163:19, 163:25, 164:15, 189:14

**turned** [4] - 153:9, 153:10, 190:19, 191:9

**turning** [1] - 166:24

**twelve** [1] - 162:25

**twice** [1] - 103:8

**twisting** [1] - 197:7

**two** [35] - 3:17, 4:2, 13:2, 39:24, 40:9, 59:23, 64:5, 64:11, 65:4, 71:25, 75:9, 77:2, 77:22, 86:24, 94:14, 96:12, 96:21, 103:4, 114:12, 117:1, 120:24, 123:13, 125:10, 125:12, 159:21, 160:11, 160:13, 160:20, 163:12, 179:1, 191:19, 194:4, 196:18, 199:17, 200:18

**type** [8] - 38:18, 38:19, 43:14, 44:7, 44:10, 49:12, 170:12

**types** [3] - 11:16, 27:2, 138:16

**typical** [1] - 26:25

**typically** [1] - 179:1

## U

**U.S** [1] - 87:21

**U.S.C** [1] - 204:8

**Uiterwyk** [1] - 122:24

**ultimate** [1] - 27:15

**umbrella** [1] - 182:19

**unavailable** [1] - 120:24

**under** [65] - 42:1, 42:3, 43:1, 43:14, 44:7, 44:11, 44:12, 48:19, 49:9, 49:11, 52:23, 52:24, 53:5, 53:23, 54:11, 55:14, 55:21, 56:3, 56:4, 56:8, 56:9, 58:16, 59:23, 62:22, 62:25, 63:1, 64:16, 65:20, 66:2, 66:14, 66:17, 66:18, 68:7, 68:16, 73:7, 79:12, 80:12, 81:3, 82:8, 82:13, 87:8, 87:11, 89:12, 101:4, 101:15, 101:22, 106:13, 108:7, 108:14, 108:21, 108:24, 114:6, 114:19, 124:9, 125:1, 125:5, 133:6, 133:8, 141:25, 143:9, 174:9, 182:19, 186:18, 193:4

**underlined** [2] - 143:5

**undersigned** [2] - 79:20, 80:20

**understood** [13] - 35:6, 42:18, 42:23, 48:6, 55:13, 58:10, 61:16, 115:10, 134:6, 143:12, 179:16, 182:4, 182:10

**undisputed** [3] - 54:6, 81:12, 82:6

**undisturbed** [1] - 76:4

**unfavorable** [3] - 56:13, 56:15, 56:17

**unfortunately** [3] - 146:1, 170:2, 184:8

**UNISOURCE** [2] - 1:4, 1:7

**Unisource** [211] - 3:2, 3:3, 7:13, 8:25, 10:24, 12:7, 12:13, 12:19, 12:25, 17:25, 18:14, 18:18, 18:22, 19:11, 20:11, 20:13, 20:24, 22:8, 22:19, 26:1, 26:10, 27:1, 29:18, 33:13, 33:17, 33:19, 33:20, 34:1, 34:13, 34:18, 34:25, 35:1, 35:3, 35:4, 35:25, 36:8, 36:12, 36:17, 40:24, 41:2, 41:5, 41:16, 41:21, 41:25, 42:10, 42:14, 42:24, 43:4, 43:6, 43:11, 43:16, 43:19, 43:23, 43:25, 44:2, 44:5, 44:17, 44:23, 45:2, 45:7, 45:24, 46:3, 46:17, 47:11, 49:9, 52:24, 53:9, 54:4, 54:5, 60:3, 60:6, 66:6, 69:13, 70:1, 72:8, 72:18, 72:25, 73:8, 73:9, 73:24, 74:8, 74:11, 80:5, 80:9, 80:24, 82:15, 82:18, 82:21, 82:24, 83:8, 83:10, 83:19, 83:22, 87:9, 87:12, 87:20, 89:10, 91:21, 92:15, 92:17, 92:18, 93:19, 93:23, 94:18, 94:24, 101:21, 105:2, 107:18, 107:19, 107:22, 107:23, 108:1, 109:3, 109:14, 110:8, 110:17, 111:9, 115:13, 116:11, 116:14, 116:24, 118:1, 119:1, 119:13, 119:14, 119:17, 120:8, 121:14, 121:15, 122:2, 122:3, 125:19, 125:21, 126:16, 131:3, 132:10, 140:9, 140:10, 141:20, 144:22, 147:7, 147:18, 147:19, 151:12, 151:21, 152:1, 152:13, 162:18, 163:5, 163:6, 163:19, 164:18, 165:1, 165:3, 165:6, 165:15, 165:16, 165:19, 165:22, 166:2, 166:8, 166:17, 166:18, 166:22, 167:18, 167:21, 167:24, 169:14, 169:17, 169:18, 169:21, 170:20, 171:17, 171:19, 171:22, 172:4, 174:5, 174:17, 174:18, 174:20, 175:9, 175:25, 176:3, 179:21, 180:14, 181:8, 181:9, 181:15,

182:15, 184:1, 184:10, 184:16, 184:19, 187:14, 187:19, 188:7, 189:12, 189:20, 190:8, 190:11, 193:25, 194:1, 194:8, 194:9, 195:17, 195:19, 202:16, 203:12

**unisourcediscovery.biz** [1] - 154:24

**unisourcediscovery.net** [1] - 106:16

**Unisources** [1] - 176:24

**united** [1] - 1:23

**United** [6] - 139:12, 139:15, 144:23, 151:20, 199:19, 208:10

**UNITED** [2] - 1:1, 1:11

**units** [1] - 188:16

**unknown** [2] - 47:10, 47:11

**unless** [9] - 100:7, 101:7, 102:22, 103:22, 108:17, 163:22, 183:12, 185:19, 201:2

**unpublished** [1] - 14:6

**up** [55] - 3:14, 7:7, 17:20, 29:13, 29:19, 38:16, 40:9, 47:13, 47:16, 47:19, 53:16, 53:17, 68:2, 74:23, 75:15, 75:24, 78:10, 81:7, 87:2, 94:14, 95:9, 97:7, 97:20, 98:18, 101:1, 103:13, 105:4, 105:9, 105:10, 105:16, 106:13, 106:25, 107:16, 114:7, 132:4, 139:25, 140:6, 145:11, 155:6, 156:4, 156:8, 158:2, 159:3, 161:15, 161:16, 164:12, 164:16, 166:10, 175:13, 176:20, 178:22, 193:7, 194:2, 202:12

**up-to-date** [1] - 166:10

**update** [9] - 7:4, 7:9, 13:11, 79:5, 176:19, 176:25, 183:22, 184:23, 189:4

**updated** [4] - 13:6, 85:6, 86:11, 194:9

**updates** [2] - 13:9, 193:25

**upgrade** [1] - 7:5

**upgrades** [1] - 165:23

**upload** [1] - 85:7

**uploaded** [4] - 86:12, 110:20, 110:21, 152:8

**ups** [1] - 28:25

**URLs** [4] - 149:15, 149:16, 149:17, 154:20

**user** [6] - 85:10, 86:13, 139:25, 152:19, 190:21, 193:1

**users** [1] - 189:3

**uses** [2] - 9:24, 180:8

**USPTO** [1] - 66:7

**Utah** [2] - 167:12, 167:13

**utilizing** [1] - 36:9

## V

**VALDES** [1] - 1:14

**valid** [6] - 76:5, 199:18, 200:17, 201:16, 201:24, 202:1

**value** [1] - 76:25

**valued** [1] - 191:4

**varies** [1] - 123:7

**vast** [1] - 183:19

**Velarde** [2] - 3:8, 135:8

**VELARDE** [186] - 1:17, 2:5, 2:7, 3:8, 4:23, 5:4, 10:1, 12:21, 14:12, 14:16, 14:19, 15:22, 16:5, 20:18, 21:10, 22:21, 23:8, 26:22, 29:15, 30:1, 30:24, 31:2, 31:14, 33:1, 39:7, 40:2, 40:14, 42:21, 49:1, 49:8, 50:3, 51:1, 51:4, 51:9, 51:11, 51:13, 51:17, 51:21, 52:10, 52:19, 52:21, 54:23, 55:12, 56:20, 56:22, 57:1, 57:12, 57:15, 57:19, 57:20, 58:3, 58:11, 58:22, 58:25, 59:6, 59:9, 59:14, 59:17, 59:21, 62:1, 63:2, 63:15, 63:19, 63:21, 64:13, 65:9, 65:15, 65:18, 65:25, 69:21, 69:24, 70:7,

70:9, 71:25, 72:3, 74:17, 75:2, 77:2, 78:2, 78:12, 78:15, 87:24, 88:3, 88:19, 88:25, 89:3, 91:25, 92:5, 92:7, 93:4, 93:16, 93:17, 95:9, 95:12, 95:22, 96:6, 96:9, 98:6, 98:11, 98:12, 99:10, 99:17, 99:18, 103:25, 104:8, 104:14, 104:15, 109:7, 109:11, 109:23, 110:1, 110:24, 111:4, 111:8, 111:23, 112:4, 112:8, 112:11, 112:12, 112:21, 112:25, 113:18, 113:25, 114:2, 118:7, 118:11, 118:14, 118:21, 118:24, 120:18, 121:12, 124:15, 135:22, 135:25, 136:1, 137:5, 137:7, 138:4, 139:6, 139:8, 145:11, 147:4, 147:16, 147:25, 148:12, 148:20, 149:4, 149:10, 149:25, 150:4, 150:11, 150:22, 151:4, 156:10, 157:3, 158:20, 159:18, 159:21, 160:3, 160:6, 161:3, 161:7, 161:13, 161:21, 163:23, 164:8, 165:8, 165:9, 167:2, 171:2, 185:21, 194:20, 194:22, 196:1, 200:2, 201:10, 201:12, 201:25, 203:10, 203:20, 204:11, 204:22, 205:3, 206:13, 206:22, 207:3

**VELAZQUEZ** [1] - 1:14

**vendor** [5] - 108:8, 126:11, 126:21, 127:4, 128:4

**venture** [14] - 32:1, 32:11, 33:16, 34:12, 34:16, 34:17, 34:22, 35:5, 36:14, 36:22, 37:3, 37:4, 37:19, 37:22

**verbal** [7] - 85:21, 86:2, 86:7, 86:16, 86:17, 147:7, 151:25

**verdict** [9] - 200:20, 203:19, 203:25, 204:20, 205:17, 205:21, 205:25, 206:20

**versed** [1] - 63:11

**version** [4] - 179:25, 180:1, 180:3, 183:25

**versus** [2] - 3:3, 55:16

**via** [1] - 7:15

**viable** [1] - 184:24

**VICTOR** [1] - 1:17

**Victor** [1] - 3:8

**view** [2] - 22:10, 22:18

**violate** [2] - 70:16, 70:19

**violates** [3] - 70:13, 70:14, 70:15

**violation** [3] - 71:22, 74:14, 114:14

**visit** [1] - 10:13

**visited** [2] - 10:4, 67:8

**vividly** [3] - 61:11, 63:24, 199:2

**voice** [1] - 14:10

**voiced** [1] - 14:3

**voir** [2] - 58:5, 58:7

**volume** [5] - 13:24, 21:3, 22:5, 23:4, 94:22

**Volume** [2] - 1:8, 207:8

**vs** [1] - 1:6

## W

**W-2** [2] - 168:21, 168:23

**wait** [5] - 15:21, 17:17, 21:15, 88:23, 100:7

**waiting** [2] - 67:6, 75:8

**wants** [2] - 75:17, 180:23

**watch** [1] - 161:15

**water** [1] - 130:21

**ways** [5] - 33:23, 138:18, 147:7, 151:25, 191:20

**web** [11] - 6:13, 7:15, 9:10, 9:24, 10:4, 10:6, 10:14, 15:4, 192:8, 193:7

**web-based** [1] - 192:8

**website** [76] - 6:16,

6:19, 6:21, 7:4, 7:6, 7:9, 7:11, 8:4, 8:6, 8:8, 9:4, 9:12, 18:13, 70:22, 70:23, 73:7, 83:21, 83:23, 83:25, 84:13, 84:21, 85:1, 85:4, 85:6, 85:7, 85:15, 85:18, 85:23, 85:25, 86:4, 86:6, 86:8, 86:11, 86:20, 86:22, 87:6, 105:10, 105:13, 105:16, 105:17, 105:20, 105:21, 106:2, 106:10, 106:12, 106:14, 107:7, 107:9, 107:15, 147:20, 152:14, 152:18, 152:20, 152:21, 155:21, 163:9, 163:16, 164:6, 164:10, 164:19, 164:23, 166:19, 169:9, 169:10, 169:11, 169:18, 169:20, 171:19, 172:5, 191:18, 191:19, 192:13

**websites** [3] - 147:2, 188:20, 191:24

**Webster** [1] - 81:22

**Wednesday** [1] - 92:21

**week** [6] - 96:11, 96:12, 96:17, 96:21, 100:25, 139:21

**weekly** [2] - 20:12

**weight** [2] - 177:8, 177:17

**welcome** [2] - 40:6, 40:15

**whatsoever** [2] - 43:14, 166:20

**wheel** [1] - 27:14

**whereas** [1] - 178:23

**whistles** [1] - 28:16

**WHITE** [1] - 1:18

**whole** [6] - 16:22, 22:8, 41:11, 102:23, 112:18, 199:19

**William** [1] - 161:25

**willing** [1] - 185:19

**wiped** [2] - 7:4, 7:13

**wire** [1] - 104:22

**wish** [1] - 185:7

**withdraw** [4] - 12:11, 20:9, 147:13, 169:8

**witness** [29] - 31:11, 48:23, 51:2, 54:18, 56:22, 57:11, 58:12,

59:18, 63:11, 69:18, 91:25, 104:4, 109:8, 118:8, 135:20, 135:22, 139:8, 146:9, 149:22, 156:12, 156:14, 158:16, 160:1, 161:12, 161:15, 161:19, 196:3, 196:7, 197:19

**WITNESS** [34] - 2:3, 3:15, 18:2, 21:13, 22:24, 23:17, 48:25, 49:23, 57:9, 59:20, 61:24, 104:1, 104:6, 104:10, 104:13, 109:20, 112:24, 118:13, 151:11, 151:17, 152:3, 152:16, 153:4, 153:16, 153:20, 154:14, 154:18, 154:21, 155:10, 155:12, 155:24, 164:4, 171:4, 177:21

**witnesses** [2] - 39:13, 159:21

**Word** [8] - 44:21, 180:1, 180:3, 180:5, 181:7, 183:24, 183:25

**word** [11] - 55:19, 55:20, 55:23, 61:21, 63:12, 87:25, 175:1, 177:8, 177:16, 177:17, 195:14

**wording** [1] - 44:11

**words** [5] - 67:10, 89:13, 138:25, 143:20, 174:13

**workers'** [1] - 181:3

**works** [5] - 27:5, 75:10, 176:17, 180:11, 192:12

**world** [1] - 174:23

**worst** [1] - 20:17

**wrench** [1] - 181:6

**write** [4] - 8:1, 9:2, 162:4, 172:6

**writer** [1] - 180:9

**writing** [6] - 53:13, 53:22, 53:24, 85:13, 85:17, 86:8

**written** [12] - 86:18, 86:19, 139:16, 139:17, 162:13, 172:6, 176:6, 180:9, 180:10, 180:21, 186:19

**wrote** [7] - 8:2, 8:7, 9:8, 35:20, 36:7, 36:16, 67:13

**www. unisourcediscovery. com** [1] - 190:7

**www. unisourcediscovery. net** [1] - 190:6

**Y**

**year** [47] - 12:15, 17:25, 18:13, 19:7, 19:8, 20:16, 20:17, 23:20, 24:4, 27:21, 27:22, 30:19, 46:8, 52:25, 64:5, 64:12, 67:9, 93:18, 93:22, 93:25, 94:2, 98:14, 103:6, 103:8, 103:10, 114:22, 114:23, 114:24, 114:25, 116:11, 116:14, 116:15, 116:17, 116:24, 118:4, 119:13, 119:14, 119:17, 119:19, 120:1, 133:16, 140:3, 140:4, 149:12, 166:3, 172:2

**years** [45] - 7:5, 11:25, 16:8, 20:21, 23:3, 30:20, 49:11, 49:16, 50:22, 53:17, 64:5, 64:11, 65:4, 66:11, 68:11, 89:16, 90:6, 90:15, 91:20, 93:19, 94:7, 110:9, 112:16, 115:6, 117:1, 128:20, 128:24, 143:9, 145:6, 146:1, 153:5, 153:7, 153:21, 155:6, 162:9, 162:25, 163:12, 172:15, 176:24, 177:7, 180:7, 184:3, 191:17, 195:23

**yellow** [2] - 10:19, 79:19

**yesterday** [14] - 48:11, 60:9, 66:10, 68:11, 68:19, 68:24, 69:21, 79:15, 79:18, 84:12, 86:3, 88:4, 145:1, 145:5

**York** [4] - 11:7, 21:22, 124:2, 124:3

**yourself** [7] - 40:17, 46:2, 47:5, 174:25, 185:5, 187:10, 197:8

**Z**

**zero** [5] - 7:19, 24:13, 25:15, 26:2, 131:4

**Zorrilla** [1] - 3:9

**ZORRILLA** [2] - 1:18, 159:16

**Zurich** [2] - 130:9, 130:15